# EXHIBIT 1

03/24/2004 WED 18:15 FAX 404 215 1455    USDC JUDGE WILLIS HUNT   →→→ NORTH    ☒002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 2 4 2004

LUTHER ~~~
BY: ~~~ ~~~ ~~~lerk
Deputy Clerk

|   |   |
|---|---|
| IN RE GEMSTAR DEVELOPMENT CORPORATION PATENT LITIGATION | MDL-1274-WBH

RELATED TO
CIVIL ACTION FILE

No. 1:98-CV-3477-WBH (MDL)
No. 1:99-CV-1242-WBH (MDL)
No. 1:01-CV-2426-WBH (MDL) |

## ORDER

Before the Court are Gemstar's[1] motions for partial summary judgment dismissing Plaintiffs'[2] advertising tying claims [608] and patent-product tying claims [607]. For the reasons set forth below, the motions are GRANTED.

## BACKGROUND[3]

Gemstar publically claims that its broad portfolio of IPG-related patents makes it impossible for any company to make, sell, or use a competitor's IPG without infringing Gemstar's patents. Gemstar representatives have made it clear that if multiple system

---

[1] "Gemstar" refers collectively to Defendants Gemstar-TV Guide International, Inc., Gemstar Development Corp., TV Guide, Inc., StarSight Telecast, Inc., and Index Systems, Inc.

[2] "Plaintiffs" refers collectively to EchoStar Communications Corp., EchoStar Satellite Corp., EchoStar Technologies Corp., and Scientific-Atlanta, Inc. These motions were also filed in case number 1 99-CV-1258 in which Pioneer Corp., Pioneer North America, Inc., and Pioneer New Media Technologies, Inc. were Plaintiffs, but that case settled on March 3, 2004.

[3] Because this case is before the Court on Gemstar's motion for summary judgment, the facts have been construed in the light most favorable to Plaintiffs, the non-movants. See Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918 (11th Cir. 1993).

AO 72A
(F rv.8/82)

operators ("MSOs") deploy a non-Gemstar IPG, they run the risk of being sued by Gemstar for patent infringement.[4] Faced with the prospect of being sued, numerous MSOs tried to obtain from Gemstar a "pure" patent license, i.e., a prospective, no-strings-attached license that would allow them to make, sell, and use an already existing non-Gemstar IPG or create their own IPG incorporating Gemstar's patented IPG technology. In some cases, Gemstar has flatly refused to grant a pure patent license, while in other cases, Gemstar has simply ignored requests for such a license. Since its merger with TV Guide in 2000, Gemstar has not executed a pure patent license with an MSO, taking the position that the only way for an MSO to avoid infringement liability is to accept Gemstar's IPG product.

When an MSO agrees to purchase the Gemstar IPG product, it enters into a detailed, written agreement with Gemstar (an "MSO agreement"). In general, these agreements grant the MSO the right to use the Gemstar IPG product, and they protect the MSO from claims of infringement for future use of the Gemstar IPG. When an MSO has previously used an IPG product, the MSO agreements also include provisions establishing payments to Gemstar for the MSO's past use of the IPG. In particular, the following three provisions are included in many MSO agreements and work together to resolve the claims of past infringement: the "legacy fee" provisions, the "covenant and release" provisions, and the "covenant to limit collections" provisions.

The following is an example of a typical legacy fee provision in a Gemstar MSO agreement:

---

[4] In their briefs, the parties use the term "MSO" loosely to refer to cable companies, satellite companies, consumer electronics manufacturers, and set-top box manufacturers. In this Order, the Court uses the term MSO in this manner as well.

> Legacy Fees: [Ashland Fiber Network] agrees to pay [Gemstar] a monthly fee for its use and distribution of IPGs, including the [Gemstar IPG product], for periods of time prior to the Effective Date of this Agreement. For IPGs other than [the Gemstar IPG] this monthly fee shall be calculated at the rates set forth in Exhibit D ("Legacy Fees") . . . Subject to payment of the Legacy Fees, use and distribution of such IPGs prior to the Effective Date of this Agreement shall hereby be ratified by the parties and, except as provided in this Section 15, no other amounts shall be payable in connection with such prior use. . . .

PSAF 24, Tab 28 at § 15. According to Gemstar executive Peter Boylan, the purpose of the legacy fee provision is to provide retroactive patent royalties to Gemstar for the prior use of an allegedly infringing device. Gemstar attorney Mark Allen explained that the legacy fee provision serves as a waiver of Gemstar's ability to sue an MSO for patent infringement. The following is a typical covenant and release provision:

> Covenant and Release. Subject to payment of the Legacy Fees, [Gemstar] will release and discharge [the MSO] from, and covenant not to sue for, any and all claims, actions, causes of action, suits, injuries, losses, damages, demands, or other liability or relief, of any nature whatsoever (including without limitation, patent infringement), arising out of, or in any way relating to, the purchase, license, use, promotion or sale of any IPG deployed prior to the Effective Date of this Agreement. . . .

Id. Tab 28 at § 18. A number of the MSO agreements contain a covenant to limit collections, such as that contained in Gemstar's agreement with InfoStructure, Inc.:

> (i) Covenant to Limit Collections. [Gemstar] agrees and covenants that [Gemstar] shall pursue recovery of any damages or license fees awarded in connection with any and all claims and causes of action for patent infringement based on the use and distribution by Affiliate in its systems of IPGs other than the Service developed or manufactured by third parties primarily from such third parties to the extent possible without compromising [Gemstar's] position in any material way, and [Gemstar] shall limit its collection from Affiliate of any damages or license fees awarded in connection with any such patent infringement claim or cause of action to the total amount recoverable by Affiliate pursuant to any indemnification agreements Affiliate may have with such third parties, if Affiliate, has taken, or has not omitted to take, any and all reasonable actions necessary to fully preserve its rights to indemnification from such third parties.

3

Id. Tab 39 at ¶ 15(b)(i).  Later in this section, the parties make it clear that this covenant is

not a license:

> (ii) Covenant to Limit Collections Not A License.  No license of any kind is granted nor deemed granted by estoppel, implication, exhaustion or other doctrine of law, equity or otherwise herein to Affiliate or any third party under any intellectual property rights owned or controlled by [Gemstar] or its affiliates with respect to IPGs other than the Service.

Id. at § 15(b)(i).

While Gemstar grants protection from infringement liability based on use and deployment of its IPG product, it reserves the right to sue the MSO for use of a non-Gemstar IPG.  For example, the agreement with Charter Communications provides: "[Gemstar] expressly reserves the right to . . obtain and enforce injunctive relief against [licensee] or any third party with respect to IPGs other than the Service." SUMF, Tab 1 at § 15(v)(ii).

In its MSO agreements, Gemstar requires its licensees to accept an advertising feature as part of the Gemstar IPG product.  All of Gemstar's recent license negotiations for its IPG product, including those with Plaintiffs, have involved the offer of the Gemstar IPG product with the advertising component. In providing the advertising, Gemstar serves as the exclusive seller or reseller of the IPG advertising space, thereby controlling the advertising content. Additionally, Gemstar keeps the lion's share of the advertising revenues.  Gemstar takes a sales commission of 15% off the gross revenues, then distributes up to 15% to the MSOs and keeps the remainder for itself.  Plaintiffs' experts describe Gemstar's portion of the IPG advertising revenue as a "commission" for selling the advertising, and claim that the "exceedingly high" percentage of those revenues payable to Gemstar is possible only by virtue of an illegal advertising tie.

Many MSOs have expressed their preference for an IPG without any advertising, protesting that advertising clutters the screen, reduces the amount of television programming information that can be displayed, and generally offends television viewers. Despite this request, Gemstar has refused to provide an advertising-free IPG product. Other MSOs do not generally object to advertising on the IPG, but want to control the advertising inventory and select their own advertising broker. The MSO agreements essentially prohibit MSOs from choosing their own advertisements and give Gemstar exclusively a brokerage commission.

IPG advertising is big business. Analysts estimate that revenues from selling advertising spots on IPGs could exceed $1.3 billion in five years. For the three quarters ending September 30, 2002, Gemstar reported revenues from IPG advertising of approximately $43 million. Expert economist Roger Noll is of the opinion that Gemstar is using its IPG patents to become the only seller of IPG advertising and that Gemstar's IPG patents enable it to degrade the ability of other sellers of IPG advertising who may have a pre-existing "resource advantage" over Gemstar:

> Recall that Gemstar asserts that its market power rests in patents for essential IPG features, and that it expects to use licensing of its IPGs to become the only provider of advertising and t-commerce. By bundling all patents in a blanket license Gemstar assures that if it blocks (or has substantial market power in) only one IPG feature, it can enhance its chance of controlling other features and products, notably advertising and t-commerce, against potential entrants that, in Gemstar's own assessment, have a resource advantage in exploiting these possibilities. In essence, Gemstar seeks to foreclose competition from formidable potential competitors in these ancillary uses of an IP[G] by tying its advertising and t-commerce business to its IPG, and tying its IPG to its IPG technology.

Doc. 634 Tab 1 at ¶ 81.

5

## ANALYSIS

### *Summary judgment standard*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-movant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Resolving all doubts in favor of the non-moving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id.

### *Section 1 of the Sherman Act*

A tying claim under Section 1 of the Sherman Act requires, among other things, that there be two separate products, a "tying" product and a "tied" product, and that those products are in fact "tied" together – that is, the buyer was forced to buy the tied product to get the tying product. See Tic-X-Press, Inc. v. Omni Promotions Co., 815 F.2d 1407, 1414 (11th Cir. 1987).

6

Plaintiffs contend that Gemstar has violated Section 1 of the Sherman Act by (1) conditioning a prospective pure patent license for Gemstar's IPG-related patents on the purchase of the Gemstar IPG product; and (2) conditioning the sale of Gemstar's IPG product on an agreement to carry the Gemstar-provided IPG advertising. In its motions for summary judgment, Gemstar argues that both tying claims must be dismissed because under either theory, there s no evidence that MSOs are forced to purchase two separate, tied products. The Court wi l address the tying claims separately.

### Patent-product tie claim

Plaintiffs claim that Gemstar forced MSOs to purchase and use Gemstar's IPG (the "tied product") as a condition for granting a license to Gemstar's IPG technology (the "tying product"). In its motion for summary judgment, Gemstar argues that there is no "tying product" because the agreements grant no license beyond the implied-by-law license that comes with the purchase of the IPG product.

As explained by the Federal Circuit in Hewlett-Packard Co. v. Repeat-O-Type Stencil Manufacturing Co.:

> Generally, when a seller sells a product without restriction, it in effect promises the purchaser that in exchange for the price paid, it will not interfere with the purchaser's full enjoyment of the product purchased. The buyer has an implied license under any patents of the seller that dominate the product or any uses of the product to which the parties might reasonably contemplate the product will be put.

123 F.3d 1445, 1451 (Fed. Cir. 1997). Such an implied-by-law "license" does not give the purchaser of the product a license to practice the patents at issue. Rather, the right is limited to use of the licensed product. See id. ("The authority to use and sell a purchased device, however, does not include the right to make a new device or to reconstruct one which has been spent.")

7

Gemstar argues that the undisputed evidence conclusively demonstrates that its MSO agreements do not provide a prospective license for Gemstar's patents; the agreements simply authorize the MSOs to use the Gemstar IPG without fear of being sued for such use. Stated another way, the agreements license only a single item: the IPG product itself, which comes with the appurtenant and inseparable right to use the product free from any risk of infringing the underlying intellectual property. Thus, Gemstar claims that in the absence of a separate conveyance of patent rights, there is no "tying product."

Plaintiffs concede that the MSO agreements settle claims for past infringement and also provide protection for past and future use of the Gemstar IPG. Plaintiffs argue that the MSO agreements go beyond the implied-by-law license and actually grant MSOs a prospective license to make, use, and deploy non-Gemstar IPGs. Plaintiffs argue that the three provisions in the MSO agreements which purport to settle past claims of infringement also provide a separate, prospective license to Gemstar's patent portfolio.

Plaintiffs argue that the legacy fee and the covenant and release provisions amount to a Gemstar promise not to sue the MSO for patent infringement on the basis of the MSOs' future use of a non-Gemstar IPG. This interpretation, however, is not supported by the clear language of the agreement. On their face, the legacy fee and the covenant and release provisions set up retroactive royalty payments for past use of IPGs and ratify such past use of an IPG. There is no expression of Gemstar's intent to waive its ability to sue for future use of non-Gemstar IPGs. In fact, Gemstar expressly retained the right to go to court for an injunction preventing such deployment. By settling responsibility for past infringement caused by the use and distribution of an IPG prior to the effective date of the agreement and

8

03/24/2004 WED 16:19 FAX 404 215 1455     USDC JUDGE WILLIS HUNT   →→→ NORTH          ☒010

by calculating a legacy fee payment, these provisions do not grant the MSOs a license to engage in future deployments of non-Gemstar IPGs.

Plaintiffs' argument that the covenant to limit collections provision amounts to a prospective license is similarly without support. The MSO agreements unambiguously provide that Gemstar's covenants to limit collections do not effect a grant of any license by estoppel, implication, or otherwise. In fact, the relevant sections in many MSO agreements are entitled, "Covenant to Limit Collections Not a License."

The Court finds, as a matter of law, that the language of the MSO agreements does not authorize MSOs to make, sell, or deploy on a going-forward basis non-Gemstar IPGs. These provisions deal exclusively with previously-deployed non-Gemstar IPGs, do not establish any royalty scheme for future non-Gemstar IPG deployments, and expressly reserve Gemstar's right to file suit to enjoin signatory MSOs from deploying infringing non-Gemstar IPGs in the future. Settlement for past infringement cannot be equated with a license for prospective use. See Ransburg Electro-Coating Corp. v. Spiller and Spiller, Inc., 489 F.2d 974, 977 (7th Cir. 1973) (concluding that a settlement agreement in which one party agrees to pay liquidated damages for past infringements in return for the dismissal of an infringement suit is not the equivalent of a license for prospective use).

Plaintiffs also argue that Gemstar has publically admitted that the MSO agreements provide protection from patents beyond those practiced by the Gemstar IPG. Plaintiffs point out that in its Amended Complaint filed with the ITC, Gemstar stated that it:

> [has] issued licenses to various MSOs and set-top box manufacturers authorizing the use of [Gemstar's] IPG technology. Although these agreements do not generally name the patents licensed therein, the IPG technology licensed under the agreements includes all of the patents in suit

9

PSAF, Tab 46 at ¶ 8.7. Mark Allen, who was responsible for negotiating Gemstar's MSO

agreements for the Gemstar IPG testified as follows:

> Q:    If I understood your direct testimony, most of your direct involvement in negotiations has been with the large MSOs?
>
> A:    That's correct.
>
> Q:    In those discussions, do you tell them, or words to the effect, that if they enter into a deal with TV Guide and take the TV Guide Interactive IPG, they would enjoy the full protection of Gemstar TV Guide patent portfolio, both currently issued patents and future patents?
>
> A:    Yes, or words to that effect.

PSAF, Tab 11. Additionally, Mr. Boylan testified as follows:

> Q:    When an operator licenses a TV Guide Interactive program, do they license the TV Guide patents with that as well?
>
> A:    They take a service that enjoys the benefits of all of the companies' patents in that related field of use, in this case an IPG.

Id. at Tab 17. Thus, Plaintiffs argue that by admitting that Gemstar provides protection from

Gemstar's entire patent portfolio – rather than from only those patents practiced by the IPG

product – Gemstar has admitted to granting a pure patent license.

Contrary to Plaintiffs' assertions, these admissions do not create a fact issue. By

telling its licensees that their use of Gemstar's IPG would have the full protection of

Gemstar's patent portfolio, Gemstar was not granting the MSOs a prospective patent license

to make, sell, or deploy non-Gemstar IPGs such as could constitute the sale of a tying product.

It is abundantly clear that Gemstar was simply assuring those licensees that they could not be

sued under any of Gemstar's IPG patents for using Gemstar's IPG product. The Court

concludes that Plaintiffs have failed to demonstrate a genuine issue of material fact to support

the proposition that Gemstar's MSO licensing agreements convey to MSOs a pure patent license that can be said to constitute a tying product. Absent a tying product, Plaintiffs' patent-product tying claims fail as a matter of law. See Borschow Hosp. & Med. Supplies v. Cesar Castllo Inc., 96 F.3d 10, 17 (1st Cir. 1996) (finding summary judgment appropriate on an antitrust tying claim where there was no evidence of an illegal tie).

*Advertising-tie claim*

In its motion for summary judgment on Plaintiffs' advertising-tie claim, Gemstar argues, among other things, that the advertising-tie claim is untenable because there is no forced purchase of advertising as a separate product. Gemstar maintains that when it sells its advertising, it does so on its own behalf, not as an agent for its customers, who have no rights to the underlying space on the Gemstar IPG where the advertisements are displayed. According to Gemstar, there is no second purchase because the MSOs are not purchasing anything, and the IPG advertising space does not belong to them. Comparing its IPG to a piece of real estate, Gemstar argues that it is entitled to make its own design decisions to control the look and feel of its IPG. Because MSOs do not buy the advertising, Gemstar argues, there is no "tied product."

In response, Plaintiffs admit that the MSOs do not purchase advertising, contending that the tied product is Gemstar's "brokered advertising content." Plaintiffs argue that Gemstar forces MSOs to carry the advertising content that Gemstar has sold to advertisers as a condition of licensing Gemstar's IPG product and technology. Absent Gemstar's tie, they argue, the MSOs might sell their own advertising on the IPG, or engage their own broker to sell the advertising at significantly less than the required payment to Gemstar of between 85 and 90 percent of advertising revenue as a brokerage fee. Plaintiffs maintain that they have

11

demonstrated a forced purchase of a separate, tied product by showing that MSOs are forced (1) to use Gemstar as the broker for their IPG advertisements, (2) to forego selling the advertising spots on the IPG themselves, and (3) to forego using the services of a less expensive advertising broker.

The Court agrees with Gemstar that Plaintiffs' position rests on the assumptions that the MSOs own the IPG product and that the MSOs are entitled to control the look and feel of the IPG product. The Court also agrees with Gemstar that Plaintiffs have failed to provide evidence to support these assumptions. Plaintiffs give no explanation why Gemstar is not legally entitled to make its own design decisions – including the decision to include or not include advertising on its IPG. It is clear that the MSOs have not been forced to purchase anything, and the Court cannot see how the MSOs have foregone any rights by accepting an IPG containing advertising.

Plaintiffs' complaint is not that they were forced to purchase a second, unwanted product, but rather that they were forced to accept the Gemstar IPG in the first place, or, at a minimum, were forced to accept a guide containing advertising. Thus, it appears that this claim is merely a subset of Plaintiffs' complaint that they have not been allowed to obtain a license in Gemstar's IPG technology to create their own IPGs; if Plaintiffs could create their own IPGs, presumably they could decide what advertising, if any, would be displayed on them. The Court can discern no unlawful antitrust tie between the advertising and the IPG, and conclude ; as a matter of law that Gemstar's requirement that its MSO licensees accept advertising along with its IPG product does not amount to a forced separate purchase of a tied product. Because this essential element of Plaintiffs' Sherman Act claim is absent, Gemstar's

12

A  72A
(F ev 8/82)

motion for summary judgment on this claim is GRANTED.  See Borschow Hosp. & Med.

Supplies, 96 F.3d at 17.

## CONCLUSION

For the reasons set forth above, Gemstar's motions for partial summary judgment

dismissing Plaintiffs' advertising tying claims [608] and patent-product tying claims [607] are

GRANTED.

It is so ORDERED this 24 day of March, 2004.

Willis B. Hunt, Jr.
Judge, United States District Court

13



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 115553 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
James GREIFF and T.I.C. Enterprises, Inc.,
Plaintiffs,
v.
T.I.C. ENTERPRISES, L.L.C., NUI Capital Corp.,
NUI Sales Management, Inc., and NUI Corporation,
Defendants.
**No. Civ. 03-882-SLR.**

Jan. 9, 2004.

Elizabeth M. McGeever, Prickett, Jones & Elliott, Wilmington, DE, for Plaintiffs.
Jack Charles Schecter, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Defendants.

MEMORANDUM ORDER

ROBINSON, J.
*1 At Wilmington, this 9th day of January, 2004, having reviewed defendants' motion to strike plaintiffs' affirmative defenses and the papers submitted by the parties in connection therewith;

IT IS ORDERED that defendants' motion to strike plaintiffs' sixteen affirmative defenses (D.I.69) is granted in part as to plaintiffs' seventh, eighth, ninth, tenth, twelfth, and sixteenth affirmative defenses and denied in part as to plaintiffs' first, second, third, fourth, fifth, sixth, eleventh, thirteenth, fourteenth, and fifteenth affirmative defenses.

1. On May 8, 2001, defendants agreed to purchase plaintiffs' fifty-one percent remaining interest [FN1] in T.I.C. Enterprises, LLC for a total sum of eight million dollars to be financed in two parts: (1) five million dollars to be paid in cash upon closing the sale transaction in May 2001; and (2) three million dollars in promissory notes to be paid on a maturity

date of January 2, 2001. (D.I. 6 at ¶ 7; *see id.*, exh. A) On April 4, 2002, plaintiffs filed suit against defendants in state court for failure to pay the promissory notes as required under the purchase agreement. (D.I. 36 at 2) Defendants removed the case to the United States District Court for the Northern District of Georgia on May 15, 2002. Plaintiffs filed their first amended complaint on June 17, 2002 alleging breach of contract, fraud, and tortious interference with contractual relations. (*See* D.I. 6) Defendants answered this first amended complaint on July 15, 2002 denying the allegations and contending that plaintiffs failed to state a claim upon which relief may be granted for select counts. (*See* D.I. 11) Defendants later amended their answer on November 14, 2002 to raise affirmative defenses. (*See* D.I. 26) On March 5, 2003, defendants also raised counterclaims against plaintiffs alleging breach of contract, unjust enrichment, and fraud. (*See* D.I. 59) Plaintiffs filed a second amended complaint on May 29, 2003 to refine their fraud claims against defendants to include a charge that defendants defrauded their creditors. (D.I. 60 at ¶ 34) Plaintiffs answered defendants' counterclaims on June 2, 2003 denying the allegations and, alternatively, pleading affirmative defenses. (*See* D.I. 63) Defendants moved to tranfer the case to the District of Delaware on July 2, 2003 (D.I. 66; 02-CV-1323), and the Northern District of Georgia granted this motion on September 10, 2003. (D.I.86)

> FN1. Plaintiffs previously sold their forty-nine percent interest in T.I.C. Enterprises, LLC to defendants.

2. Plaintiff James Greiff is a resident of the State of Georgia. (D.I. 6 at ¶ 1) Plaintiff T.I.C. Enterprises, Inc. is a Georgia corporation with its principal place of business in Georgia. (*Id.* at ¶ 2) Defendant T.I.C. Enterprises, L.L.C. is a limited liability company organized under the laws of the State of Delaware with its principal place of business in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 115553 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Georgia. (*Id.* at ¶ 3) Defendant NUI Capital Corporation is incorporated under the laws of the State of Florida with its principal place of business in Florida. (*Id.* at ¶ 4) Defendant NUI Sales Management is incorporated under the laws of the State of Delaware with its principal place of business in New Jersey. (*Id.* at ¶ 5) Defendant NUI Corporation is incorporated under the laws of the State of New Jersey with its principal place of business in New Jersey. (*Id.* at ¶ 6) The court has jurisdiction over the instant suit pursuant to 28 U.S.C. § 1332.

**\*2** 3. Federal Rule of Civil Procedure 8 requires a party to set forth affirmative defenses in a responsive pleading with a "short and plain statement." Fed.R.Civ.P. 8(a) (2003). Rule 8(c) specifically enumerates a non-exhaustive list of nineteen affirmative defenses. FN2 Federal Rule of Civil Procedure 12(f), in turn, states:

> FN2. The affirmative defenses recognized in the rule include: accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. *See* Fed.Civ.P. 9(c) (2003).

Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.
Fed.R.Civ.P. 12(f) (2003). Motions to strike affirmative defenses, however, are disfavored. *Proctor & Gamble Co. v. Nabisco Brands, Inc.,* 697 F.Supp. 1360, 1362 (D.Del.1988). When ruling on such a motion, "the court must construe all facts in favor of the nonmoving party ... and deny the

motion if the defense is sufficient under the law." *Id.* Furthermore, courts prefer not to grant a motion to strike "unless it appears to a certainty that ... [the movant] would succeed despite any state of the facts which could be proved in support of the defense." *Salcer v. Envicon Equities, Corp.,* 744 F.2d 935, 939 (2d Cir.1984).

4. Plaintiffs' first affirmative defense asserts that the defendants' complaint fails to state a claim upon which relief can be granted. The court notes that the Federal Rules of Civil Procedure specifically permit this averment to be raised as either an affirmative defense or in a motion to dismiss. Rule 12(b) states, in pertinent part, that: "A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under Rule 7(a)." Fed.R.Civ.P. 12(b) (2003). Rule 12(h) also states, in pertinent part, that: "Every defense, in law or fact, to a claim for relief in any pleading ... may at the option of the pleader be made by motion [including]: ... failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(h) (2003). Additionally, it is well settled that the concept of failure to state a claim may be included in an answer as an affirmative defense. *See S.E.C. v. Toomey,* 866 F.Supp. 719, 723 (S.D.N.Y.1992). Accordingly, the court denies defendants' motion to strike plaintiffs' first affirmative defense.

5. Plaintiffs' second through sixth affirmative defenses plead, respectively, an arbitration clause, estoppel, failure of consideration, release, and waiver. These averments are proper affirmative defenses under Rule 8(c) and likewise comply with the "short and plain statement" requirement of Rule 8(a). Additionally, the court finds that plaintiffs' pleadings adequately place defendants on sufficient notice of the nature of the defenses to be litigated against them. Defendants may ascertain the context of these averments through the discovery process, possibly via contention interrogatories. Furthermore, the court concludes that defendants will not be unnecessarily prejudiced if these affirmative defenses remain in the pleadings. The court, consequently, denies defendants' motion to strike the second through sixth affirmative defenses.

**\*3** 6. Plaintiffs' seventh affirmative defense alleges

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 115553 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

that any excessive punitive damages sought by defendants are barred by the Due Process Clause of the Fourteenth Amendment and the Due Process Clause of the Georgia Constitution. Plaintiffs' eighth and ninth affirmative defenses plead, respectively, that defendants' counterclaims must fail because defendants have not incurred any damages and that defendants' damages are contractually limited by the purchase agreement. The court finds that these averments do not constitute affirmative defenses because they will not defeat defendants' counterclaims if proven. In other words, these averments entirely overlook liability and focus solely on potential relief. In contrast, " [a]ffirmative defenses, if accepted by the court, will defeat an otherwise legitimate claim for relief." *FDIC v. Haines,* 3 F.Supp.2d 155, 166 (D.Conn.1997) (quoting 2 James Wm. Moore et al., Moore's Federal Practice § 8.07[1] (3d ed.1997)). Moreover, it is clear that the concept of damages serves a purpose far different from an affirmative defense-damages are intended to redress injuries incurred by a plaintiff after liability has been established, not as a means to shield liability in the first instance. The court, therefore, grants defendants' motion to strike plaintiffs' seventh, eighth, and ninth affirmative defenses.

7. Plaintiffs' tenth affirmative defense asserts that any damages incurred by defendants are due to their own actions. The court construes this averment as an attempt to plead contributory negligence. Defendants, however, do not plead negligence as one of their counterclaims. The court, consequently, grants defendants' motion to strike this defense.

8. Plaintiffs' eleventh affirmative defense pleads that defendants' breach of the purchase agreement and unjust enrichment counterclaims must fail because defendants breached the contract at issue. [FN3] The court construes this averment to argue that plaintiffs could not have breached the purchase agreement because defendants breached it first, thereby rendering the purchase agreement invalid. In other words, plaintiffs appear to argue that they could not have breached the purchase agreement because it was invalid. Plaintiffs' thirteenth, fourteenth, and fifteenth affirmative defenses plead, respectively, that defendants' fraud in the

inducement counterclaim [FN4] must fail because (1) plaintiffs did not knowingly make any false representations or material ommissions; (2) plaintiffs did not knowingly make any false representations or material ommissions with intent to induce defendants to act or to refrain from acting; and (3) defendants did not justifiably rely on any alleged misrepresentation or material omission made by plaintiffs. The court interprets these averments as denying particular elements of defendants' breach of contract and fraud in the inducement counterclaims. The court finds that these specific denials give defendants notice of the particular issues to be litigated, despite plaintiffs' choice of nomenclature. Such is one of the main purposes for the affirmative pleadings requirement of Rule 8. Additionally, "as long as the pleading clearly indicates the allegations in the complaint that are intended to be placed in issue, the improper designation should not prejudice the pleader." 5 Wright & Miller, Federal Practice and Procedure: Civil 2d § 1269 (1990). Accordingly, the court denies defendants' motion to strike plaintiffs' eleventh, thirteenth, fourteenth, and fifteenth affirmative defenses.

FN3. An action for breach of contract requires proof of: (1) a valid contract; (2) breach of a duty imposed by the contract; and (3) damages resulting from the breach.

FN4. An action for a fraud in the inducement under Delaware law, requires proof of: (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction [was] taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. *See Lord v. Souder,* 748 A.2d 393, 402 (Del.2000).

*4 9. Plaintiffs' twelfth affirmative defense alleges that defendants' fraud in the inducement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 115553 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

counterclaim must fail because defendants breached
the contract at issue. Plaintiffs have agreed to
withdraw this affirmative defense. (*See* D.I. 73 at
15) "[I]f a defense has been withdrawn, a motion to
strike it from the pleadings is proper." 5A Wright &
Miller, Federal Practice and Procedure: Civil 2d
1381 (1990). Therefore, the court grants defendants'
motion to strike plaintiffs' twelfth affirmative
defense.

10. Plaintiffs' sixteenth affirmative defense alleges
that      "plaintiffs      respond      to      the
individually-numbered paragraphs in defendants'
counterclaim as follows." (D.I. 63 at 4) The court
construes this averment as attempt to offer plaintiffs'
entire answer as an affirmative defense. The court
finds this attempt illogical and grants defendants'
motion to strike plaintiffs' sixteenth affirmative
defense.

D.Del.,2004.
Greiff v. T.I.C. Enterprises, L.L.C.
Not Reported in F.Supp.2d, 2004 WL 115553
(D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00882 (Docket) (Sep. 16, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2005 WL 418023 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
John HAMILTON, et al., Plaintiffs,
v.
CIVIGENICS, et al., Defendants.
No. Civ.A. 03-826 GMS.

Feb. 22, 2005.

John H. Hamilton, Georgetown, DE, Pro se.
Joseph S. Wigate, Georgetown, DE, Pro se.
Andre L. Parker, Georgetown, DE, Pro se.
Juan Martinez, Jr., Georgetown, DE, Pro se.
Lee Ross, Georgetown, DE, Pro se.
Thomas Norwood, Georgetown, DE, Pro se.
James Colemen, Georgetown, DE, Pro se.
Christopher Gibbs, Georgetown, DE, Pro se.
Enrico D. Bates, Georgetown, DE, Pro se.
Trevor Moncrief, Georgetown, DE, Pro se.
Michael Lewis, Georgetown, DE, Pro se.
Danny Lee Parker, Georgetown, DE, Pro se.
Larry Reich, Georgetown, DE, Pro se.
Stefan Brittingham, Georgetown, DE, Pro se.
Alex Justice, Laurel, DE, Pro se.
Benjamin McKenzie, Georgetown, DE, Pro se.
Andre Hackett, Georgetown, DE, Pro se.
John D. Rickards, Georgetown, DE, Pro se.
Richard Jones, Georgetown, DE, Pro se.
Jacquie Reynolds, Georgetown, DE, Pro se.
Kevin Williams, Georgetown, DE, Pro se.
Lennie F. Childress, Georgetown, DE, Pro se.
Billy A. Winn, New Castle, DE, Pro se.
Timothy C. Duval, Sr., Georgetown, DE, Pro se.
Mitchell Hubis, Georgetown, DE, Pro se.
Darrel D. Stanley, Georgetown, DE, Pro se.
David Fowler, Georgetown, DE, Pro se.
Curtis G. Elliott, Georgetown, DE, Pro se.
Collidge Frazier, Georgetown, DE, Pro se.
Calvin L. Allen, Georgetown, DE, Pro se.
Jeremy Geiger, Georgetown, DE, Pro se.
Shawn Hopkins, Georgetown, DE, Pro se.

Edward A. Clark, Georgetown, DE, Pro se.
Daniel M. Prouse, Georgetown, DE, Pro se.
George R. Anthony, Jr., Georgetown, DE, Pro se.
Ronald Benton, Georgetown, DE, Pro se.
Eric S. Huffstutler, Georgetown, DE, Pro se.
Dedrick Chase, Georgetown, DE, Pro se.
Virgil Sudler, Georgetown, DE, Pro se.
Eric Tilghman, Georgetown, DE, Pro se.
Clifford T. Donnes, II, Georgetown, DE, Pro se.
Francis Worrell, Georgetown, DE, Pro se.
Alvin Wilson, Georgetown, DE, Pro se.
Barry L. Griffith, Georgetown, DE, Pro se.
Linwood Eley, Georgetown, DE, Pro se.
Vence D. Byrd, Georgetown, DE, Pro se.
Ronald Lofland, Georgetown, DE, Pro se.
Mark A. Mulrooney, Georgetown, DE, Pro se.
Jamaal Layne, Georgetown, DE, Pro se.
Deshawn Butter, Georgetown, DE, Pro se.
Michael P. Brown, Georgetown, DE, Pro se.
Louis J. Rizzo, Jr., Reger & Rizzo, LLP, and Aaron
R. Goldstein, Wilmington, DE, for Defendants.

*MEMORANDUM*

SLEET, J.

I. INTRODUCTION

*1 On August 21, 2003, John Hamilton ("Hamilton"
) filed this *pro se* civil rights action pursuant to 42
U.S.C. § 1983, on behalf of himself and
ninety-eight inmates (collectively, the "plaintiffs")
incarcerated in the Sussex Correctional Institution ("
SCI"), located in Georgetown, Delaware. [FN1] The
complaint alleges that the State of Delaware
Department of Corrections (the "DOC"), Rick
Kearney ("Kearney"), in his capacity as warden,
Civigenics ("Civigenics"), Allen Nesbit ("Nesbit"),
a Civigenics employee, in his capacity as program
coordinator of the KEY Program, and Civigenics
employees Russell Buskirk ("Buskirk"), Dawn
Burton ("Burton"), Theresa Evans Carter ("Carter"
), and Michelle Reeves ("Reeves") violated the
plaintiffs' First, Eighth, and Fourteenth Amendment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 418023 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

rights. FN2

> FN1. Hamilton was incarcerated at the time he initiated this lawsuit. On or about October 14, 2004, Hamilton was released from incarceration.

> FN2. The KEY Program is part of the KEY Therapeutic Community, a drug rehabilitation program for incarcerated addicts that is administered by Civigenics, under contract with the State of Delaware.

Presently before the court are several motions: (1) Hamilton's motions to amend; FN3 (2) the DOC's motion to dismiss; (3) Kearney's motion to dismiss; and (4) the Civigenics defendants' motion to dismiss. For the following reasons, the court will deny the motions to amend and grant the motions to dismiss.

> FN3. At present, fifty-three plaintiffs are still involved in the litigation. Hamilton is the only plaintiff that has responded to the defendants' motions to dismiss. However, Hamilton asserts that he is "the spokesperson for all the plaintiffs," and that "[h]is motion[s] not only serve[ ] him, but all the plaintiffs." (D.I. 77 ¶ 1.) Neither the defendants nor the remaining plaintiffs oppose Hamilton's assertions. The court, therefore, will treat Hamilton as the spokesperson for all of the plaintiffs.

## II. BACKGROUND

The plaintiffs allege that Kearney, Nesbit, and Civigenics violated their First, Eighth, and Fourteenth Amendment rights by "allowing inmates to have authority over them in violation of federal court mandates." The complaint alleges that since entering the KEY Program, on July 10, 2003, the plaintiffs have been given directives to keep their mouths shut. According to the plaintiffs, the directives violate their freedom of speech rights under the First Amendment.

The plaintiffs also allege violations of their Eighth Amendment rights. Specifically, the complaint alleges that the plaintiffs have been deprived of sleep since their first night in the KEY Program because of "listen ups" that are called during the night. The complaint further alleges that the plaintiffs must lift "substantially heavy" locker boxes of other inmates during their daily cleaning requirements, and that they are required to "stand or sit tight" throughout the day. These requirements cause the plaintiffs great pain and anguish to their bodies. In addition, the complaint alleges that the plaintiffs are constantly screamed at and ridiculed by other inmates who serve as their supervisors. The plaintiffs contend that these acts constitute cruel and unusual punishment.

Lastly, the plaintiffs allege that their sentencing to the KEY Program violates their Fourteenth Amendment right to due process. The complaint alleges that if the plaintiffs choose not to participate in the KEY Program they are sent to the "hole," given a "write up" that adds points to their classification record, and lose all privileges for ninety days. The plaintiffs also allege that allowing inmates to supervise them violates their due process rights.

## III. STANDARD OF REVIEW

### A. Motion to Amend

Rule 15 of the Federal Rules of Civil Procedure permits a party to amend the complaint by leave of court or by written consent of the adverse party. Leave to amend a complaint should be "freely given when justice so requires." Fed. R. Civ. P. 15(a). The court has discretion to deny leave to amend when there exists undue delay, bad faith, dilatory motive or undue prejudice to the opposing party, or when the amendment would be futile. *See Foman v Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). Specifically, an amendment would be futile for purposes of Rule 15(a) if, accepting all the well pleaded facts as true, the amended complaint fails to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 418023 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

state a claim upon which relief may be granted. *See Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington,* 646 F.Supp. 118, 120 (D.Del.1986). In other words, "the court should apply the same standards as are applied to Rule 12(b)(6) motions to dismiss." *Id.*

## B. Motion to Dismiss

### 1. Rule 12(b)(1)

**\*2** A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) may present either a facial or factual challenge to subject matter jurisdiction. *Mortensen v. First Fed. Savings and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977). The present motion makes a facial challenge to the complaint because the defendants' arguments are based solely upon the application of legal principles to the facts as alleged in the complaint. Such a motion requires the court to consider the allegations of the complaint as true and to make all reasonable inferences in the plaintiffs' favor. *See id.*

### 2. Rule 12(b)(6)

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz,* 1 F.3d 183 (3d Cir.1993). Thus, as in the case of a Rule 12(b)(1) motion, the court must accept the factual allegations of the complaint as true. *See Graves v. Lowery,* 117 F.3d 723, 726 (3d Cir.1997); *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996). In particular, the court looks to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." *Colburn v. Upper Darby Tp.,* 838 F.2d 663, 666 (3d Cir.1988). However, the court need not "credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3rd Cir.1997). A court should dismiss a complaint "only if it is clear that no relief could be granted under

any set of facts that could be proved consistent with the allegations." *See Graves,* 117 F.3d at 726; *Nami,* 82 F.3d at 65 (both citing *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). However, *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.' " *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

## IV. DISCUSSION

### A. Motion to Amend

Hamilton has filed two motions to amend (D.I.47, 72). The first amended complaint asserts a claim for retaliation. Hamilton alleges that he was unjustly removed from the Civigenics KEY Program in retaliation for filing this lawsuit. [FN4] Hamilton further alleges that, before he was dismissed from the KEY Program, Carter yelled and screamed at him calling him the "ringleader of the lawsuit," and asked what steps he had taken in terms of the state prisoner grievance procedure. He also alleges that SCI retaliated against him by placing his home phone number on its "visitors sheet," which was then circulated to all of the prisoners.

> FN4. The court notes that Hamilton now complains that he was removed from the KEY Program. However, in his original complaint, Hamilton alleges that being sentenced to the KEY program violates his right to due process.

In *Rauser v. Horn,* the Third Circuit defined the elements of a prisoner's cause of action for retaliation and the burden he must carry to succeed in that claim. *See Rauser v. Horn,* 241 F.3d 330 (3d Cir.2001). The court established a three prong test for determining whether retaliation has occurred. First, the prisoner must prove that the conduct

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 418023 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

which led to the alleged retaliation was constitutionally protected. *See id.* at 333 (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 389 (6th Cir.1999)); *see also Drexel v. Vaughn,* Civ.A.No. 96-3918, 1998 WL 15178, at * 7 (E.D.Pa. Apr. 2, 1998) (determining that prisoner had engaged in constitutionally protected conduct before proceeding with retaliation inquiry). Next, the prisoner-plaintiff must show that he has suffered some adverse action at the hands of prison officials. *See Rauser,* 241 F.3d at 333 (citing *Allah v Sieverling,* 229 F.3d 220, 225 (3d Cir.2000)). A prisoner-plaintiff can satisfy this prong by demonstrating that the action was sufficient to deter a person of ordinary firmness from exercising his constitutional rights. *See id.* The last *Rauser* prong requires a prisoner-plaintiff to establish a causal link between the exercise of his constitutional rights and the adverse action taken against him. The court employs a burden-shifting regime to determine whether a causal link exists. The prisoner-plaintiff bears the initial burden of proving that his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him or retaliate against him. *See id* (citing *Mount Healthy Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). The burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same disciplinary action even in the absence of the protected activity. *See id* If the defendants prove that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest, they will prevail in the retaliation action. *See id.* at 334.

*3 In the present case, Hamilton has a constitutional right to pursue civil redress in federal court under § 1983. Therefore, Hamilton meets the first prong of the *Rauser* test. Hamilton, however, does not satisfy the second prong of *Rauser.* As previously stated, in the first sought after amendment, Hamilton has alleged that he was removed from the KEY Program, yelled at by Carter, and that his home phone number was circulated throughout the prison building. The court finds that these events would not negatively sway a reasonable prisoner from pursuing redress in the court. As a result, the court finds that these allegations are insufficient to

survive a motion to dismiss, thus rendering the amendment futile. Accordingly, the court will deny Hamilton's motion to amend. [FN5]

> FN5. The court does not reach the third prong of the *Rauser* test because Hamilton has not satisfied the second prong.

The second amended complaint alleges a Double Jeopardy claim. Hamilton alleges that forcing inmates to participate in the KEY Program and giving them institutional "write ups" and sanctions, in addition to program sanctions, violates the plaintiffs' Fifth Amendment rights. The Double Jeopardy Clause of the Fifth Amendment provides that no person shall be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Double Jeopardy Clause affords three protections to the criminal defendant. The first two protect against a second prosecution for the same offense after acquittal, and against a second prosecution for the same offense after conviction. *Jones v. Thomas,* 491 U.S. 376, 381, 109 S.Ct. 2522, 105 L.Ed.2d 322 (1989). The third protection is against " 'multiple punishments for the same offense' imposed in a single proceeding." *Id* (citing *North Carolina v. Pearce,* 395 U.S. 711, 717 (1969)). It ensures that the sentencing court does not exceed the total punishment authorized by the legislature. *See Ohio v. Johnson,* 467 U.S. 493, 499, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984).

With these protections in mind, the court turns to Hamilton's Double Jeopardy claim. The court concludes that the DOC's disciplinary guidelines do not raise a due process issue because the DOC is neither a prosecutor nor a sentencing court. Furthermore, Hamilton's complaints are not related to any judicial proceeding. Thus, Double Jeopardy does not prevent the DOC from imposing treatment program sanctions, as well as institutional sanctions or disciplinary action for the same misconduct. Hamilton's amended complaint, therefore, would not withstand a 12(b)(6) motion to dismiss and would, again, be futile. Given the foregoing, the court will deny this motion to amend.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 418023 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

### B. Motion to Dismiss

### 1. Sovereign Immunity

### a. The DOC and Warden Kearney

The plaintiffs' complaint seeks to hold the DOC and Kearney liable in their official capacities. The plaintiffs assert that the DOC is a municipality or local government entity and not the State of Delaware. According to Hamilton, the DOC operates much like the Mayor of a town in that it has the authority to regulate and set standards for the penal institutions as well as the probation and parole authorities within the State of Delaware. Thus, the DOC is a "person" under § 1983. Hamilton also asserts that Kearney is a "person" under § 1983 because the warden is "responsible once a person is entrusted to that institution [SCI]." (D.I. 73, at 2.) The court disagrees and concludes that the doctrine of sovereign immunity bars any claims against the DOC and Kearney.

*4 The DOC is a state agency that exists pursuant to the laws of Delaware. *See* Del.Code Ann. tit. 11 §§ 6501, 6520. Kearney, as warden of the Sussex Correctional Institute, is a state official acting under color of state law. *See Cespedes v. Coughlin,* 956 F.Supp. 454, 465 (S.D.N.Y.1997). A suit against a state agency or state official in his or her official capacity is treated as a suit against the state. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). This is so because neither a state nor its officials acting in their official capacities are "persons" under § 1983. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). While a state is normally entitled to sovereign immunity, Congress may have abrogated the state's immunity through a valid exercise of its power, or the state itself may have waived its immunity. *See Lavia v. Commonwealth of Pennsylvania,* 224 F.3d 190, 195 (3d Cir.2000).

Neither of the two above-mentioned sovereign immunity exceptions are relevant here. First, the state has not waived its Eleventh Amendment immunity. A waiver will be found only where it has been stated "by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Space Age Products, Inc. v. Gilliam,* 488 F.Supp. 775, 780 (D.Del.1980) (citing *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). Such an express waiver may be made through clear constitutional or statutory language. *See Lavia,* 224 F.3d at 195. Neither the constitution nor any Delaware statute expressly waives Delaware's Eleventh Amendment sovereign immunity. *See Ospina v. Dept. of Corr.,* 749 F.Supp. 572, 579 (D.Del.1990). Therefore, Delaware has not clearly waived its immunity.

Finally, Congress has not abrogated the states' immunity for claims under Section 1983. *See Quern v. Jordan,* 440 U.S. 332, 345, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). Since Delaware's immunity has not been waived or abrogated, the court will dismiss the plaintiffs' claims against the DOC and Kearney in their official capacities.

### b. Civigenics and Its Employees

The plaintiffs assert that Civigenics and its employees are not state actors. The plaintiffs further assert if the court finds that Civigenics and its employees were acting "under color of law," then they have waived sovereign immunity under Del.Code Ann. tit. 10 § 4012(2) and/or Del.Code Ann. tit. 18 § 6511. The court is not persuaded by either of the plaintiffs' assertions. First, Civigenics and its employees are state actors because they are employed by the State of Delaware to provide treatment to inmates and, therefore, acted under color of law for purposes of § 1983 when undertaking their duties in treating the plaintiffs' addictions. *See West v. Atkins,* 487 U.S. 42, 48-54, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (holding that a physician who is under contract with the State to provide medical services to inmates at a state-prison hospital on a part-time basis acts " under color of state law" within the meaning of § 1983).

*5 Moreover, Civigenics and its employees have

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 418023 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

not waived sovereign immunity because Del.Code Ann. tit. 10 § 4012(2) and Del.Code Ann. tit. 18 § 6511 are inapplicable to these defendants. Section 4012(2) states that a governmental entity will be liable for negligent acts or omissions causing property damage, bodily injury, or death "[i]n the construction, operation or maintenance of any public building or the appurtenances thereto ..." Because Civigenics and its employees are not involved in the construction, operation, or maintenance of SCI, this provision does not apply to them. Similarly, section 6511 has no relevance to this litigation. While section 6511 expressly consents to suits against the State in state court, the Delaware courts have held that section 6511 does not waive sovereign immunity to suits in federal court. *See Ospina,* 749 F.Supp. 572; *Kardon v. Hall,* 406 F.Supp. 4 (D.Del.1975). As such, Civigenics and its employees are state actors and have not waived sovereign immunity. Accordingly, the court will dismiss the plaintiffs' claims against these defendants in their official capacities.

### 2. Individual Liability under 42 U.S.C. § 1983

It is not clear from Hamilton's complaint whether he seeks to hold the defendants liable in their individual capacities. However, because Hamilton is a *pro se* plaintiff and because he has stated in response to the defendants' motions to dismiss that he is suing the defendants in both their official and individual capacities, the court will address Hamilton's claims against the defendants individually. *See Manchester v. Rzewnicki,* 777 F.Supp. 319, 324 (D.Del.1991) (noting how *"pro se* complaints are read with less stringent scrutiny than formal [one]s drafted by lawyers"). In order to recover against the defendants individually, the plaintiffs must show that they were deprived of a constitutional right by a person acting under the color of state law. *See* 42 U.S.C. § 1983. As previously discussed, the defendants were acting under color of state law. Thus, the only question raised by the motions to dismiss is whether the defendants' actions violated any of the plaintiffs' rights.

The plaintiffs allege that the defendants have

violated their First, Eighth, and Fourteenth Amendment rights. The complaint, however, fails to indicate any personal involvement by any of the defendants. [FN6] At most, the complaint alleges that Kearney and Nesbit violated the plaintiffs' rights in their supervisory roles. [FN7] Thus, Hamilton's claims against the defendants are premised on the doctrine of *respondeat superior.* It is well established, however, that absent some sort of personal involvement in the allegedly unconstitutional conduct, a § 1983 defendant cannot be held liable under a *respondeat superior* theory. *See Fagan v. City of Vineland,* 22 F.3d 1283, 1291 (3d Cir.1994); *Gay v. Petsock,* 917 F.2d 768 (3d Cir.1990). Because the plaintiffs have failed to allege any act or omission by the defendants that violated their constitutional rights, they cannot hold the defendants liable individually. Accordingly, the court will dismiss the plaintiffs' claims against the defendants in their individual capacities.

FN6. For example, the plaintiffs allege that their First Amendment freedom of speech rights were violated when they were told to keep their mouths shut, but do not allege which, if any, of the defendants told them to keep their mouths shut.

FN7. Buskirk, Burton, Carter, and Reeves are not listed as defendants in the complaint's caption. Nor do any of the plaintiffs' claims allege any personal involvement by these defendants.

## V. CONCLUSION

*6    After reviewing Hamilton's proposed amendments, the record, and the relevant case law, the court concludes that the amendments are futile because they would not survive a motion to dismiss. Therefore, the court will deny Hamilton's motions to amend. The court further concludes that the plaintiffs cannot prove any set of facts in support of their claims that would entitle them to relief. Thus, the court will grant the defendants' motions and dismiss the present case in its entirety.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 418023 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

*ORDER*

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
1. The plaintiffs' Motions to Amend (D.I.47, 72) are DENIED.
2. The defendants' Motions to Dismiss (D.I.50, 67, 78) are GRANTED.
3. All claims in the plaintiffs' complaint (D.I.5) are DISMISSED with prejudice.
4. The plaintiffs' ten outstanding motions (D.I 27, 29, 31, 38, 40, 42, 88, 103, 104) are DENIED as moot.
5. The State defendants' Motion to Stay Discovery (D.I.107) is DENIED as moot.


D.Del.,2005.
Hamilton v. Civigenics
Not Reported in F.Supp.2d, 2005 WL 418023 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03cv00826 (Docket) (Aug. 21, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy

Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: Slip Copy)

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
SEA STAR LINE, LLC, a limited liability
company, Plaintiff,
v.
EMERALD EQUIPMENT LEASING, INC., a
corporation, Defendant.
No. Civ.A.05-245-JJF.

Jan. 26, 2006

Kathleen M. Miller, of Smith, Katzenstein &
Furlow, LLP, Wilmington, Delaware, Charles C.
Robinson, of Garvey Schubert Barer, Seattle,
Washington, Timothy J. Armstrong, of Armstrong
& Mejer, P.A., Coral Gables, Florida, for Plaintiff,
of counsel.
Bradford J. Sandler, and Jonathan M. Stemerman,
of Adelman Lavine Gold and Levin, A Professional
Corporation, Wilmington, Delaware, Gary M.
Schildhorn, and Alan I. Moldoff, of Adelman
Lavine Gold and Levin, A Professional
Corporation, Philadelphia, Pennsylvania, for
Defendant, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.
*1 Pending before the Court is a Motion To
Dismiss Emerald Equipment Leasing, Inc.'s
Counterclaim (D.I.56) filed by Plaintiff, Sea Star
Line, LLC ("Sea Star"). For the reasons discussed,
Sea Star's Motion To Dismiss will be granted with
respect to Count I of the Counterclaim to the extent
it alleges a breach of the E-Mail Agreement, Count
II pertaining to quantum meruit, Count III alleging
turnover to the extent that rent is sought, and Counts
V through VIII alleging tort claims for failure to
plead in accordance with the requirements of
Federal Rule of Civil Procedure 9(b). The Motion
To Dismiss will be denied in all other respects.

Emerald Equipment Leasing, Inc. will be granted
leave to file an Amended Counterclaim.

BACKGROUND

On March 1, 2004, Sea Star filed a Complaint
against Defendant, Emerald Equipment Leasing,
Inc. ("Emerald"), in the United States District Court
for the Middle District of Florida seeking
declaratory judgment as to the parties' rights and
liabilities under an Equipment Rental Agreement
dated September 28, 2002 (the "Equipment Rental
Agreement"). Sea Star also asserted claims for
breach of other maritime contracts and for money
owed as a result of goods delivered and services
provided to Emerald.

Emerald is a debtor-in-possession in a pending
Chapter 11 case in the United States Bankruptcy
Court for the District of Delaware. Unaware of the
action Sea Star filed in the Middle District of
Florida, Emerald filed an adversary proceeding
against Sea Star in the United States Bankruptcy
Court for the District of Delaware on March 17,
2004. In the adversary proceeding, Emerald
asserted claims against Sea Star based on the
Equipment Rental Agreement for (1) post-petition
account receivable/breach of lease, (2) post-petition
quantum meruit, (3) turnover/conversion, and (4)
accounting. Sea Star moved to dismiss, stay or
abate the adversary proceeding.

The Bankruptcy Court held a hearing on May 27,
2004, and concluded that Emerald's adversary
proceeding was a non-core proceeding and that the
Bankruptcy Court had "related to" jurisdiction over
the action. D.I. 59 at All. However, the Bankruptcy
Court acknowledged that under 28 U.S.C. § 959,
concomitant jurisdiction existed with the federal
district court, because a party doing business with a
debtor-in-possession has the right to file suit
regarding that dispute in any jurisdiction *Id.* For
purposes of its decision, the Bankruptcy Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: Slip Copy)

assumed that the Florida District Court had jurisdiction, and the Bankruptcy Court applied the " first filed rule" to conclude that the adversary proceeding should be dismissed. *Id* at A12 However, the Bankruptcy Court's dismissal was without prejudice so that "if the Florida Court determines that it doesn't have jurisdiction or its action should be dismissed, the debtor is free to file here." *Id* at A13.

In the meantime, in the Florida action, Emerald had moved to dismiss the Complaint, to transfer venue or to abstain. Emerald disputed the Florida District Court's jurisdiction on the grounds that a declaratory judgment was inappropriately sought by Sea Star because the Equipment Rental Agreement had been terminated. The Florida District Court concluded that this case should be transferred to Delaware, primarily because Sea Star's Complaint references proceedings that took place in the Delaware Bankruptcy Court, the Delaware Bankruptcy Court was familiar with the parties, and Emerald is a debtor undergoing reorganization in the Delaware Bankruptcy Court. D.I. 59 at A18-19.

\*2 On April 25, 2005, Emerald filed an Answer, Affirmative Defenses and Counterclaim in this action. D.I. 53. Emerald admits jurisdiction under 28 U.S.C. § 1333 (admiralty jurisdiction), but denies federal jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulations) and 1367 (supplemental jurisdiction). Emerald asserts a Counterclaim against Sea Star alleging eight causes of action: (1) post-petition account receivable/breach of lease, (2) post-petition quantum meruit, (3) turnover, (4) accounting, (5) fraud, (6) constructive fraud, (7) fraudulent concealment, and (8) negligent misrepresentation/breach of fiduciary duty. Emerald contends that the Court has jurisdiction over its counterclaims pursuant to 28 U.S.C. §§ 1334 (original jurisdiction of bankruptcy cases in the district court) and 157 (referral to bankruptcy court of cases arising under or related to a case under Title 11) and 11 U.S.C. § 542 (turnover of property to the estate). Emerald also contends that this action is a "core" proceeding that should be heard and determined by the Bankruptcy Court under 28 U.S.C. § 157(b)(2)(A),(C),(E) and (O). [FN1] D.I.

53, Counterclaim at ¶ 1.

> FN1. Core proceedings include, but are not limited to:
> (A) matters concerning the administration of the estate;
> (C) counterclaims by the estate against persons filing claims against the estate;
> (E) orders to turn over property of the estate;
> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims....
> 28 U.S.C. § 157(b)(2)(A), (C), (E) and (O).

STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) governs Sea Star's Motion To Dismiss Emerald's Counterclaim. The purpose of a motion to dismiss is to test the sufficiency of a complaint, or in this case, a counterclaim, and not to resolve disputed facts or decide the merits of the case. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). When considering a motion to dismiss, a court must accept as true all allegations in the counterclaim and must draw all reasonable factual inferences in the light most favorable to the non-moving party. *Neitzke v. Williams,* 490 U.S. 319, 326 (1989); *Piecknick v. Pennsylvania,* 36 F.3d 1250, 1255 (3d Cir.1994). The Court is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost,* 1 F.3d at 183. Dismissal is only appropriate when it appears beyond doubt that the movant can prove no set of facts in support of its claims entitling it to relief. *Conley v. Gibson,* 355 U.S. 41, 45 (1957). The burden of demonstrating that the counterclaim fails to state a claim upon which relief may be granted rests on the movant. *Young v. West Coast Industrial Relations Assoc., Inc.,* 763 F.Supp. 64, 67 (D.Del.1991) (citations omitted).

As a general matter, a court may not consider matters outside the pleadings when adjudicating a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: Slip Copy)

motion to dismiss. However, a court may consider " document [s] integral to or explicitly relied upon" in the pleadings without converting a motion to dismiss to a motion for summary judgment. *In re Rockefeller Center Properties, Inc Securities Litigation*, 184 F.3d 280, 287 (3d Cir.1999).

## DISCUSSION

As a threshold matter, Emerald appears to raise a jurisdictional issue. Specifically, Emerald contends that this case implicates the "core" jurisdiction of the Bankruptcy Court and that this case should be referred to the Bankruptcy Court under the Bankruptcy Court's "related to" jurisdiction under 28 U.S.C. § 1334. D.I. 66 at X (discussing core jurisdiction) & n. 6 (requesting referral to the Bankruptcy Court). Emerald contends that its counterclaim is a "core" matter, because it is a " counterclaim by the estate against persons filing claims against the estate" under 28 U.S.C. § 157(b)(2)(C).

*\*3* In response, Sea Star contends that the Court should not refer this case to the Bankruptcy Court under its "related to" jurisdiction because Sea Star did not consent to that jurisdiction. In addition, Sea Star contends that the Bankruptcy Court already concluded that this matter was "non-core" when it dismissed Emerald's adversary proceeding, and in any event, Sea Star has not filed a proof of claim against Emerald, and therefore, core jurisdiction under 28 U.S.C. § 157(b)(2)(C) is not implicated.

A proceeding is a core proceeding, if it invokes a substantive right provided by Title 11 or is a proceeding, which by its nature, could only arise in the context of a bankruptcy case. *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir.1999). The Bankruptcy Court has already concluded that similar claims alleged by Emerald in the context of its adversary proceeding were "non-core." However, Emerald contends that the Bankruptcy Court's decision should not be considered the law of the case, because that decision was made in a different procedural context. Specifically, Emerald contends that the Bankruptcy Court was only dealing with claims made by Emerald against Sea Star based on

post-petition activities when it addressed Emerald's adversary proceeding. In contrast, Emerald contends that this case now involves claims asserted by Sea Star against the Emerald estate, and therefore, the proceeding is core under Section 157(b)(2)(C). However, Emerald has not advanced any case law supporting its assertion that its Counterclaim is core.

In considering the question of core jurisdiction under Section 157(b)(2)(C), it appears to the Court that the case law involves situations in which the debtor has filed a counterclaim in response to a proof of claim filed by a creditor. Sea Star has not filed a proof of claim against Emerald in the Bankruptcy Court, and therefore, the Court is not persuaded that Section 157(b)(2)(C) is applicable here. In addition, the Court notes that the exercise of "related to" jurisdiction is not mandated in this case, particularly where, as here, Sea Star has not consented to such jurisdiction. 28 U.S.C. § 157(c)(2), (d). [FN2] However, the Court does have subject matter jurisdiction over this action, because it arises in connection with a maritime contract over which this Court has admiralty jurisdiction. Indeed, the parties agree that the exercise of the Court's jurisdiction is appropriate under 28 U.S.C. § 1333. D.I. 53, Counterclaim at ¶ 1; D.I. 57 at 1, 6. Accordingly, the Court declines to refer this case to the Bankruptcy Court as requested by Emerald in Footnote 6 of its Answering Brief.

> FN2. In pertinent part, 28 U.S.C. § 157(c)(2) and (d) provides:
>
> (c)(1) A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.
> (2) Notwithstanding the provisions of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: Slip Copy)

paragraph (1) of this subsection, the district court, with the consent of all the parties to the proceeding, may refer a proceeding related to a case under title 11 to a bankruptcy judge to hear and determine and to enter appropriate orders and judgments, subject to review under section 158 of this title.

(d) The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

### I. Whether Emerald's Counterclaims Based On Contract Law State A Claim Upon Which Relief May Be Granted

#### A. Emerald's Counterclaim for Breach of Contract

In Count I of its Counterclaim, Emerald alleges that Sea Star breached its obligations under two agreements: (1) the E-Mail Agreement, and (2) the Equipment Rental Agreement. Emerald contends that Sea Start failed to pay Emerald rent due for the use of the equipment and for the loss incurred as a result of damage, theft, destruction or other loss of the equipment. Emerald contends that its Counterclaim appropriately refers to breach of the E-Mail Agreement, because the parties operated under the E-Mail Agreement for more than five months while the formal Equipment Rental Agreement was being finalized. To the extent Sea Star seeks dismissal of its Counterclaim based on the E-Mail Agreement, Emerald contends that such a claim is premature, because there has been no factual development regarding whether the parties intended the Equipment Rental Agreement to supersede and cancel the E-Mail Agreement.

*4 Sea Star contends that dismissal of Emerald's

Counterclaim as it applies to the E-Mail Agreement is appropriate in light of the Integration Clause contained in the Equipment Rental Agreement. Although executed on July 31, 2002, the Equipment Rental Agreement indicates that it "cover[s] equipment in use at various times commencing April 29, 2002." A40. The E-Mail Agreement did not commence until May 2, 2002, and thus, Sea Star contends that the Equipment Rental Agreement supersedes the E-Mail Agreement. Sea Star also contends that extrinsic evidence is not required to determine the parties' intent, because the Equipment Rental Agreement is clear, and therefore, parol evidence is inadmissible.

The parties appear to agree that Maryland law governs the contracts at issue. D.I. 57 at 8; D.I. 66 at n. 7. In determining whether a contract is ambiguous, Maryland law uses an "objective interpretation of contracts." *Calomiris v. Woods*, 727 A.2d 358, 363 (Md.1999). Under this view, a written contract is ambiguous if it is susceptible to more than one meaning when it is read by a reasonably prudent person. *Id.* The determination of whether language is susceptible to more than one meaning includes a consideration of " 'the character of the contract, its purpose and the fact and circumstances of the parties at the time of execution.' " *Id.* (citations omitted). The test for whether the contract is plain and unambiguous is " not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Id.* (citations omitted). Prior evidence of the parties' intentions and negotiations is not admissible; however, the court may consider the context of the transaction or the custom of the trade in determining whether an ambiguity exists. *Id.*

In its Counterclaim, Emerald makes the following allegations regarding the E-Mail Agreement:
9.... [O]n or about May 1, 2002, Sea Star and Emerald entered into an agreement (the "E-Mail Agreement" attached hereto as Exhibit "A"), whereby Sea Star agreed to lease Emerald equipment previously leased by Emerald to NPR.
10. The E-Mail Agreement was effective as of May 1, 2002 and was applicable to any cargo worthy Emerald equipment, which Sea Star dispatched out

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 214206 (D Del )
(Cite as: Slip Copy)

of any port terminal or inland depot for customer use at agreed upon per diems (the "Emerald Equipment").

11. Sea Star used the Emerald Equipment pursuant to the E-Mail Agreement for a number of months, *before the leasing arrangement was more formally documented in a written agreement executed by Sea Star and Emerald in the later part of September, 2002* (the "Equipment Rental Agreement" attached hereto as Exhibit "B").

D.I. 53, Counterclaim at ¶ 9-11 (emphasis added).

Reviewing Emerald's allegations in light of the terms of the Equipment Rental Agreement which is attached to the pleadings, the Court concludes that Emerald has failed to state a claim for breach of the E-Mail Agreement. The Equipment Rental Agreement "cover[s] equipment in use at various times commencing April 29, 2002." D.I. 53, Exh. B at introductory paragraph. It also contains an Integration Clause which states that "[t]his Agreement contains the entire agreement between the parties and subject to the provisions of section 1, may not be amended, altered, or modified, except by a writing signed by the party to be bound." *Id*, Exh. B at ¶ 15(a). Based on this language, the Court concludes that a reasonable person reading the Equipment Rental Agreement would not find any ambiguity in its terms. The Equipment Rental Agreement covers the period for which the E-Mail Agreement had applied, and as Emerald acknowledges, the Equipment Rental Agreement constituted the parties more formal documentation of the earlier E-Mail Agreement. *Id* at ¶ 11.

*5 Emerald contends that extrinsic evidence is required to determine the parties' intent as to whether the Equipment Rental Agreement was meant to supersede the E-Mail Agreement, because the Equipment Rental Agreement does not expressly reference the E-Mail Agreement. Relying on *Bradney v Sakelson*, 473 A.2d 189, 199 (Pa.Super.1984) and *Franz Tractor Co v J.I. Case Co*, 566 So.2d 524 (Fla.App. 2 Dist.1990), Emerald contends that factual discovery is needed because the doctrine of integration turns on the parties' intentions. In the Court's view, however, both *Bradney* and *Franz* are distinguishable from

the circumstances in this case. As the court in *Bradney* noted, the termination agreement at issue did not contain an integration clause, did not encompass the same obligations and did not involve the same parties that were bound by the oral agreement. 473 A.2d at 192. In light of these circumstances, the *Bradney* court concluded that they could not discern any intention by the parties that the oral contract be merged into the termination agreement. *Id*.

Similarly, in *Franz Tractor Co*, the court concluded that a modification contract was not merged into the dealer contract, because references in the modification to the dealer contract demonstrated that the parties intended the two agreements to remain separate. In addition, the modification expressly provided that it was to " supplement" the dealer contract. 566 So.2d at 526.

In this case, the Court concludes that extrinsic evidence is not required to illuminate the meaning of the Equipment Rental Agreement because it is not ambiguous when viewed from the standpoint of a reasonable person. Unlike the circumstances in *Bradney* and *Franz*, the Equipment Rental Agreement here covers the same subject matter as the E-Mail Agreement for the same time period that the E-Mail Agreement had been in effect. As Emerald acknowledges in its Counterclaim, the Equipment Rental Agreement was the parties' formal documentation of the leasing arrangement that had existed previously under the E-Mail Agreement. Further, the Equipment Rental Agreement has an Integration Clause expressing the parties' intent that the Equipment Rental Agreement be "the entire agreement between the parties." *See e.g., ARB (American Research Bureau), Inc. v. E-Systems, Inc.,* 663 F.2d 189 (D.C.Cir.1980) (applying Maryland law and concluding that written contract was intended to be exclusive statement of the parties' agreement based primarily on presence of an integration clause). In these circumstances, the Court concludes that extrinsic evidence is not required to determine the meaning of the Equipment Rental Agreement, and Emerald cannot maintain its Counterclaim to the extent that it alleges a breach of the E-Mail Agreement because the E-Mail Agreement was subsumed by the Equipment Rental

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: Slip Copy)

Agreement entered into by the parties. *Calomiris, 727 A.2d at 361-362* (recognizing that "[u]nder the parol evidence rule, a written agreement ' discharges prior agreements' thereby rendering legally inoperative communications and negotiations leading up to the written contract.'") (quoting *Restatement (Second) of Contracts* § 213 (1979)). Accordingly, the Court will grant Sea Star's motion to the extent that it seeks dismissal of Emerald's claim alleging breach of the E-Mail Agreement. FN3

> FN3. Emerald also directs the Court to two Delaware cases for the proposition that "a new contract relating to the subject matter of a former agreement does not destroy the obligations of the former agreement, except as it is inconsistent therewith, unless it is shown that the parties intend that the new contract supersede the old contract entirely." D.I. 66 at 2 (citing *Lee Builders, Inc. v. Wells,* 92 A.2d 710, 715 (Del. Ch.1952); *Jefferson Island Salt Min Co v. Empire Box Corp.,* 23 A.2d 106 (Del.Super.1941)). However, Delaware law does not govern the contract at issue here.

B. *Emerald's Counterclaim For Quantum Meruit*

*6 In Count II of its Counterclaim, Emerald alleges a claim for post-petition quantum meruit. Emerald alleges that Sea Star has used Emerald's property and has failed to compensate Emerald for that use resulting in harm to Emerald and actual material gain to the benefit of Sea Star. Emerald seeks damages under the theory of quantum meruit, to the extent that Sea Star's use of Emerald's equipment occurred during any period not covered by the written lease agreement. Thus, Emerald contends that its quantum meruit claim is properly pled in the alternative to its contract claim.

Sea Star contends that dismissal of Emerald's quantum meruit claim is warranted. Sea Star contends that Count II is not properly pled in the alternative to Count I, because it expressly " incorporates" the paragraphs of Count I, "as fully as

if set forth herein in their entirety." D.I. 53, Counterclaim at ¶ 22. Sea Star further contends that quantum meruit does not apply for matters covered by a written contract, and Emerald has failed to allege any time period for which the Equipment Rental Agreement would not have applied.

Under Maryland law, quantum meruit is not available "when there is an express contract dealing specifically with the services rendered." *See e.g., First Nat'l Bank v. Burton, Parsons & Co.,* 470 A.2d 822, 829 (Md.Ct.Spec.App.1984). Emerald contends that an action for quantum meruit may appropriately lie if Sea Star contends that it is not liable to Emerald for compensation under the written agreement. However, Maryland courts have rejected the use of quantum meruit in such circumstances. As the Court in *Mass Transit Admin. v. Granite Constr. Co.,* 471 A.2d 1121, 1126 (Md.Ct.Spec.App.1984) stated:
The general rule is that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests. The reason for this rule is not difficult to discern. When parties enter into a contract they assume certain risks with an expectation of a return. *Sometimes, their expectations are not realized, but they discover that under the contract they have assumed the risk of having those expectations defeated. As a result, they have no remedy under the contract for restoring their expectations. In desperation, they turn to quasi-contract for recovery. This the law will not allow.*

(emphasis added).

In this case, Emerald has pled the existence of a written contract governing its claims, and the contract contains an integration clause. *County Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.,* 747 A.2d 600, 607-608 (Md.2000); *see also Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 872 A.2d 611, 620 (Del. Ch.2005) (recognizing that dismissal of quantum meruit claim is appropriate where it is clear from face of complaint that written contract exists and controls). Accordingly, the Court will dismiss Count II of the Complaint

Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: Slip Copy)

alleging recovery under the theory of quantum
meruit.

### C. Emerald's Counterclaim For Turnover

*7 In Count III of its Counterclaim, Emerald alleges
a claim for turnover pursuant to 11 U.S.C. § 342. In
its briefing, Emerald alleges that its reference to
Section 342 is a typographical error, and that the
appropriate reference should be to 11 U.S.C. § 542.
Emerald contends that Section 542 permits it to
seek the return of the equipment or the value of the
equipment, and therefore, it has appropriately
alleged a claim for turnover.

Sea Star contends that dismissal of Count III is
warranted, because Count III alleging turnover is
essentially a rephrasing of Count I's breach of
contract allegations. Specifically, Sea Star contends
that Emerald does not demand turnover of the
equipment, but only "damages equaling unpaid rent,
and the value of the equipment together with
interest and costs of suit."

In its Counterclaim, Emerald does not specify under
which paragraph of Section 542 it is seeking relief.
However, in its briefing it asserts Section 542(a). It
appears to the Court, that two paragraphs of Section
542 may be applicable, paragraph (a) and paragraph
(b). In full, 11 U.S.C. § 542(a) and (b) provides:
(a) Except as provided in subsection (c) or (d) of
this section, an entity, other than a custodian, in
possession, custody, or control, during the case, of
property that the trustee may use, sell, or lease
under section 363 of this title, or that the debtor
may exempt under section 522 of this title, shall
deliver to the trustee, and account for, such property
*or the value of such property,* unless such property
is of inconsequential value or benefit to the estate.
(b) Except as provided in subsection (c) or (d) of
this section, an entity that owes a debt that is
property of the estate and that is matured, payable
on demand, or payable on order, shall pay such
debts to, or on the order of the trustee, except to the
extent that such debt may be offset under section
553 of this title against a claim against the debtor.

(emphasis added)

To the extent Emerald seeks rent in its claim for
turnover, the Court concludes that Emerald fails to
state a claim for turnover. Under Section 542(b),
turnover is required for amounts that are "matured,
payable on demand, or payable on order." Active
disputes over the amount owed take an action
outside the realm of a turnover action. *See J.T.
Moran Fin. Corp. v. American Consol. Fin. Corp.,*
124 B.R. 931, 938 (S.D.N.Y.1991) ("Where as
here, the court must resolve whether or not the debt
claimed is due, the action to collect the disputed
funds cannot be regarded as a turnover proceeding
under the core jurisdiction of the bankruptcy court."
); *In re Teligent, Inc.,* 325 B.R. 134, 137-138
(Bankr.S.D.N.Y.2005) (recognizing that turnover
provisions cannot be used to liquidate contract
disputes or demand assets whose title is in dispute
and collecting cases). Rather, the action is simply a
claim for breach of contract. *In re National Audit
Defense Network,* 332 B.R. 896
(Bankr.D.Nev.2005) ("Settled and controlling law
holds that the presence of an active dispute over the
amount owed takes the action out of the turnover
area; one cannot shortcut a breach of contract action
with a turnover demand."). In this case, it appears to
the Court that the rental amount is in dispute, and
therefore, the Court concludes that a turnover action
is not properly sustained as to the rental amounts.

*8 However, Emerald also alleges that Sea Star has
failed to return numerous chassis, gen sets and
containers under the Equipment Rental Agreement.
The Equipment Rental Agreement does not give
Sea Star any title, ownership or property rights in
this equipment, and pursuant to paragraph 10 of the
Equipment Rental Agreement, Sea Star is required
to redeliver the equipment to certain locations
identified in the contract or agreed to by the parties.
The Court understands Sea Star to base its motion
to dismiss this claim on the sole fact that Emerald
seeks the value of the Equipment rather than the
return of the Equipment itself. However, the
Equipment Rental Agreement provides that if the
equipment is not returned within 60 days, Emerald
may elect to treat the Equipment at a loss and seek
the value of the equipment, together with all
accrued rental charges. Further, it appears that
Section 542(a) permits Sea Star to seek the value of
the equipment, and not just the return of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: Slip Copy)

equipment, in a turnover action. In light of the express language of both the applicable contract and Section 542(a), Sea Star has not explained why dismissal of this Count is warranted. Accordingly, the Court concludes at this juncture, that Emerald has pled a claim for turnover to the extent that it seeks the value of certain property belonging to Emerald which Sea Star is alleged to have failed to return.

### D. *Emerald's Counterclaim For An Accounting*

In Count IV of its Counterclaim, Emerald seeks an accounting of all Sea Star's usage of Emerald's equipment. Emerald contends that an accounting is a proper remedy regardless of whether this action is an action at law or equity, because the accounts are complex and Sea Star had a fiduciary relationship with Emerald as a result of Sea Star's obligation to produce self-billing reports.

Sea Star seeks dismissal of this claim contending that the equitable relief of an accounting is not appropriate because there is an adequate remedy at law for Emerald, namely the recovery of money damages. Because Emerald's counterclaim seeks damages for breach of contract, and such damages are an adequate remedy at law, Sea Star contends that the Court lacks equity jurisdiction to award an accounting.

"The necessary prerequisite to the right to maintain a suit for an equitable accounting, like all other equitable remedies, is ... the absence of an adequate remedy at law." *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962). Whether equitable jurisdiction should be exercised is a decision committed to the sound discretion of the Court. 1 Am.Jur.2d, Accounts and Accounting § 54 (1994 & Supp.2002).

Actions for an accounting are not available when the amount in question is readily ascertainable; however, such an action may be maintained when the facts create a reasonable doubt as to whether an adequate remedy at law may be obtained. *Id.* Equitable jurisdiction for an accounting is typically invoked in three circumstances: "(1) there is a

fiduciary relationship between the parties, accompanied by a duty on the part of the defendant to render an account; (2) there are mutual accounts, or, if the account is all on one side, the account is complicated; and (3) there is a need for discovery." *Id.* An action for an accounting may also be appropriate when there are allegations of fraud. *Id.*

\*9 At this juncture, Emerald has alleged that Sea Star had an obligation to produce self-billing reports which created an independent fiduciary relationship. Emerald has also alleged that Sea Star has used over 5,000 pieces of Emerald equipment and that the information regarding Sea Star's use of this equipment is only within the knowledge of Sea Star. Given the complexities alleged by Emerald as a result of Sea Star's self-billing, the apparent need for discovery, and the allegations of fraud and a fiduciary relationship, all of which must be taken as true at this juncture, the Court declines to dismiss Emerald's claim for an accounting.

### II. Whether Emerald's Counterclaims Based On Tort Law State A Claim Upon Which Relief May Be Granted

In Counts V through VIII of its Counterclaim, Emerald alleges fraud (Count V), [FN4] constructive fraud (Count VI), fraudulent concealment (Count VII), and negligent misrepresentation/breach of fiduciary duty (Count VIII). Sea Star contends that these claims should be dismissed, because Emerald's tort claims do not exist independently, but instead are woven into the contract. Sea Star contends that the economic loss doctrine prohibits Emerald from recovering in tort, because its economic losses flow only from Sea Star's alleged breaches of a contract. Sea Star also contends that, even if Emerald's tort claims withstand dismissal under the economic loss doctrine, the allegations of fraud are not pled with particularity as required by Federal Rule of Civil Procedure 9(b), and therefore, dismissal of Emerald's tort claims is warranted.

> FN4. The Counterclaim refers to the fraud count as Count IV, but this appears to be an error. Given the sequence of the other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 214206 (D.Del.)
(Cite as: Slip Copy)

counts asserted, the fraud count should be labeled Count V.

In response, Emerald contends that the Equipment Rental Agreement is silent as to Sea Star's obligations to create self-billing reports. Emerald further contends that it was not notified when Sea Star began using a piece of Emerald Equipment and no receipt or document was required to be executed in order for Sea Star to begin using that equipment. Because Emerald was relying on Sea Star's honesty to report its usage of equipment, Emerald contends that the circumstances were rife with the opportunity for fraud. Emerald contends that Sea Star took advantage of this self-billing to under-report its usage of Emerald's equipment. Emerald also contends that this self-billing arrangement resulted in a fiduciary relationship between the parties created based on the " relationship of inequality" between the parties. Specifically, Emerald contends that it placed particular reliance and confidence in Sea Star to report its usage accurately.

As for Sea Star's arguments under Rule 9(b), Emerald contends that its counterclaim is properly pled. However, Emerald contends that, to the extent the Court concludes that further particularity is required, Emerald should have the opportunity to amend its Counterclaim [FN5]

> FN5. As a threshold matter, the parties have not specifically alleged which state's substantive law applies to Emerald's tort claims. Sea Star alleges that the claims are non-maritime, and therefore, Delaware's conflict of law rules apply to determine which state's substantive law applies. Although Sea Star identifies the "most significant relationship test" as the appropriate test, it is unclear which state Sea Star alleges has the most significant relationship to the occurrences and the parties. In a footnote, Emerald alleges that federal common law should apply, because courts sitting in admiralty strive for uniformity. In the alternative, Emerald identifies Delaware choice of law rules and

contends that the law of the place of injury would apply, because this is a diversity action. However, it is also unclear which state Emerald alleges as the specific place of injury.

In the Court's view, the choice of law issue is not sufficiently briefed for the Court to make a final decision as to which law applies to the tort claims in this case. The parties cite case law from Florida, Virginia, Iowa, Georgia, Delaware and New Jersey. Accordingly, at this juncture, the Court will work within the confines of the law that has been presented in the briefing to make a determination as to whether Emerald's claims can withstand a motion to dismiss.

### A. Whether Emerald Has Pled Torts Existing Independently From The Contract

Stated generally, the economic loss doctrine prohibits a party from recovering in tort economic losses, the entitlement of which, flows only from a contract. *Werwinski v. Ford Motor Company*, 286 F.3d 661, 671 (3d Cir.2002) (predicting how the Pennsylvania Supreme Court would rule on the viability of the economic loss doctrine). It appears to the Court that the formulation of the economic loss doctrine varies depending on which state law applies. For example, under Delaware law, the economic loss doctrine " 'prohibits recovery in tort where a product has damaged only itself (i.e., has not caused personal injury or damage to other property) and, the only losses suffered are economic in nature." ' *Pinkert v. Olivieri*, 2001 WL 641737, *5 n. 6 (D.Del. May 24, 2001) (quoting *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194, 1195 (Del.1992)). However, Delaware courts have also recognized that "where an action is based entirely on a breach of the terms of a contract between the parties and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort." *Id.* at *5 (dismissing fraud claims where plaintiff alleged that defendants knowingly misrepresented the nature of their work each time they submitted an application and certification for payment where duty to submit these periodic payment applications existed solely by reason of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

construction contract and defendant had not violated any common law duty independent of the construction contract).

**\*10** Exceptions to the economic loss doctrine have also been recognized where the claim arises independently from the contract *See e.g., HTP, Ltd. v. Lineas Aereas Constarricenses, S.A.,* 685 So.2d 1238, 1239 (Fla.1996). Further, in the case of allegations of fraud resulting from circumstances involving self-billing type reports, courts in other jurisdictions have permitted such claims to proceed in tort. *See e.g., Insteel Indus., Inc v. Costanza Contracting Co., Inc.,* 276 F.Supp.2d 479, 484-486 (E.D.Va.2003) (allowing claim based on false invoices to proceed in tort as a fraud claim where duty to submit invoice stemmed from contract, but contract did not require sworn and truthful statements in the invoices); *F/V Robins Nest, Inc v. Atlantic Marine Diesel, Inc.,* 1994 WL 594592, \*10 (D.N.J. Oct. 24, 1994) (allowing fraud claim to proceed where vessel owner had to rely on integrity of shipyard to honestly report parts and labor used and work actually performed, contract had no specific price term, and shipyard had wide latitude in carrying out repairs).

Reviewing the circumstances alleged in this case in light of the case law cited by the parties, the Court concludes that dismissal of Emerald's fraud claims is not appropriate at this juncture. As Emerald points out, the Equipment Rental Agreement makes no provisions for self-billing. Rather, under the Equipment Rental Agreement, the lease term begins on the date when the equipment is delivered to the Lessee and ends when the equipment is returned pursuant to section 10. Emerald has alleged, however, that the equipment was already in place at the time Sea Star purchased the assets of NPR, Inc. Emerald has further alleged that Sea Star's usage was determined by self-billing and that Emerald relied on Sea Star to accurately report its usage. Emerald has also alleged that Sea Star intentionally under-reported its usage of Emerald's equipment. At this juncture, the Court concludes that Emerald has pled sufficient facts to establish distinct torts arising independently of the contractual obligations such that the claims are not definitively barred by the economic loss doctrine. Accordingly, the Court will

deny Sea Star's Motion To Dismiss Emerald's tort claims on this ground.

### B. *Whether Emerald Has Satisfied The Pleading Requirements Under Rule 9(b)*

Sea Star contends that Emerald has failed to plead its fraud charges with particularity as required by Rule 9(b). With respect to the self-billing allegations which form the basis of its fraud claim, Emerald has pled that (1) in order to ascertain rental payments due for equipment, Sea Star provided Emerald with monthly self-billing reports; and (2) " upon later investigation, Emerald discovered that the 'self-billing reports' prepared by Sea Star were grossly understated, failing, *inter alia,* to account for numerous pieces of Emerald Equipment which Sea Star has been using without paying rental charges to Emerald and failing to pay the appropriate amounts for usage of equipment contained in the 'self-billing reports.' " D.I. 53, Counterclaim at ¶ 14, 15. Emerald has not pled any specific dates of the alleged fraud and to the extent Emerald is aware from the further investigation it alleges it conducted in its Counterclaim, Emerald has not disclosed which invoices were defective or which pieces of equipment were implicated. In these circumstances, the Court concludes that additional facts are required to establish the pleading requirements of Rule 9(b), if those facts are within Emerald's knowledge. To the extent that some or all of this information is within Sea Star's exclusive control, Emerald should reflect that allegation in any amended pleadings it submits. Accordingly, the Court will dismiss Emerald's fraud claims, Counts V through VIII, with leave to amend to more particularly state the allegations relevant to Emerald's fraud claims.

### CONCLUSION

**\*11** For the reasons discussed, Emerald's Motion To Dismiss will be granted as it pertains to (1) Count I, to the extent Count I alleges a breach of the E-Mail Agreement, (2) Count II alleging quantum meruit, (3) Count III alleging turnover to the extent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 214206 (D.Del.)
**(Cite as: Slip Copy)**

that rent is sought, and (4) Counts V through VIII alleging tort claims for failure to satisfy the pleading requirements under Rule 9(b). In all other respects, the Motion To Dismiss will be denied. Emerald will be granted leave to file an Amended Counterclaim.

An appropriate Order will be entered.

D.Del.,2006.
Sea Star Line, LLC v. Emerald Equipment Leasing, Inc.
Slip Copy, 2006 WL 214206 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:05cv00245 (Docket) (Apr. 27, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.