# TAB   1

Westlaw.

2002 WL 31556392                                                    Page 1
 USITC Inv. No. 337-TA-454

United States International Trade Commission (U.S.I.T.C.)

Commission Determination

IN THE MATTER OF CERTAIN SET-TOP BOXES AND COMPONENTS THEREOF

FINAL INITIAL DETERMINATION

USITC Inv. No. 337-TA-454
June 21, 2002

APPEARANCES

FOR COMPLAINANTS GEMSTAR-TV GUIDE INTERNATIONAL, INC. AND STARSIGHT TELECAST, INC.

Lewis E. Leibowitz, Esq.

Steven P. Hollman, Esq.

Raymond Kurz, Esq.

Celine Crowson, Esq.

Stephen F. Propst, Esq.

HOGAN AND HARTSON LLP

Columbia Square

555 13th Street, NW

Washington, DC 20004-1109

Morris Waisbrot, Esq.

William F. Haigney, Esq.

James C. Hansen, Esq.

HOGAN AND HARTSON LLP

100 Park Avenue

New York, NY 10017

William H. Wright, Esq.

HOGAN AND HARTSON LLP

500 South Grand Avenue, Suite 1900

Los Angeles, CA 90071

FOR COMPLAINANTS GEMSTAR-TV GUIDE INTERNATIONAL, INC. AND STARSIGHT TELECAST, INC.:

George M. Schwab, Esq.

Duane H. Mathiowetz, Esq.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 2
 USITC Inv. No. 337-TA-454

K.T. Cherian, Esq.

Byron W. Cooper, Esq.

TOWNSEND AND TOWNSEND AND CREW LLP

Two Embarcadero Center, 8th Floor

San Francisco, CA 94111-3834

FOR COMPLAINANTS GEMSTAR-TV GUIDE INTERNATIONAL, INC. AND STARSIGHT TELECAST, INC.:

James E. Doroshow

David A. Dillard

Wesley W. Monroe

CHRISTIE, PARKER & HALE, LLP

350 W. Colorado Boulevard, Suite 500

Pasadena, California 91109-7068

Ian Simmons

O'MELVENY & MEYERS, LLP

555 13th Street, N.W.

Washington, DC 20004-1109

Mark A. Samuels, Esq.

O'MELVENY & MEYERS, LLP

400 South Hope Street, 15th Floor

Los Angeles, CA 90071-2899

John L. North

SUTHERLAND, ASBILL & BRENNAN

1275 Pennsylvania Avenue, N.W.

Washington, DC 20004-2415

Alexander J. Hadjis, Esq.

Brian R. Nester, Esq.

FISH & RICHARDSON P.C.

601 Thirteenth Street, N.W.

Washington, DC 20005

Frank E. Scherkenbach, Esq.

FISH & RICHARDSON P.C.

2200 Sand Hill Road

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Suite 100

Menlo Park, California 94025

FOR RESPONDENT SCIENTIFIC-ATLANTA, INC.:

V. James Adduci, II, Esq.

Barbara A. Murphy, Esq.

ADDUCI, MASTRIANI & SCHAUMBERG, LLP

1200 Seventeenth Street, NW

Fifth Floor

Washington, DC 20036

Joseph Potenza, Esq.

Frederic M. Meeker, Esq.

BANNER & WITCOFF, LTD.

1001 G Street, NW

Washington, DC 20001

Joseph R. Bankoff, Esq.

KING & SPALDING

191 Peachtree Street, NE

Suite 4900

Atlanta, GA 30303-1763

Kevin R. Sullivan, Esq.

Joseph W. Dorn, Esq.

KING & SPALDING

1730 Pennsylvania Avenue, NW

Washington, DC 20006-4706

FOR RESPONDENTS PIONEER CORPORATION, PIONEER DIGITAL TECHNOLOGIES, INC., PIONEER
NORTH AMERICA, INC. AND PIONEER NEW MEDIA TECHNOLOGIES, INC.:

Robert G. Krupka, Esq.

Alexander F. MacKinnon, Esq.

Christopher J. Heck, Esq.

Eric R. Lamison, Esq.

Lillian L. Lai, Esq.

KIRKLAND & ELLIS

777 South Figueroa St.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Los Angeles, CA 90017

FOR RESPONDENTS PIONEER CORPORATION, PIONEER DIGITAL TECHNOLOGIES, INC., PIONEER
NORTH AMERICA, INC. AND PIONEER NEW MEDIA TECHNOLOGIES, INC.:

Linda S. Resh, Esq.

Alexandra N. DeNeve, Esq.

C. Graham Gerst, Esq.

Laura A. TenBroeck, Esq.

KIRKLAND & ELLIS

200 East Randolph Drive

Chicago, IL 60601

Eugene F. Chay, Esq.

KIRKLAND & ELLIS

655 Fifteenth Street, NW

Washington, DC 20005

FOR RESPONDENTS ECHOSTAR COMMUNICATIONS CORPORATION AND SCI SYSTEMS, INC.:

F. David Foster, Esq.

Sturgis M. Sobin, Esq.

MILLER & CHEVALIER

655 Fifteenth Street, NW

Suite 900

Washington, DC 20005

Harold J. McElhinny, Esq.

Rachel Krevans, Esq.

MORRISON & FOERSTER LLP

425 Market Street

San Francisco, CA 94105

David C. Doyle, Esq.

Craig I. Celnicker, Esq.

MORRISON & FOERSTER LLP

3811 Valley Centre Drive

Suite 500

San Diego, CA 92130

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                          Page 5
 USITC Inv. No. 337-TA-454

FOR RESPONDENTS ECHOSTAR COMMUNICATIONS CORPORATION AND SCI SYSTEMS, INC.:

Stephen S. Durham, Esq.

MORRISON & FOERSTER LLP

5200 Republic Plaza

370 Seventeenth Street

Denver, CO 80202

Bryan A. Schwartz, Esq.

MORRISON & FOERSTER LLP

2000 Pennsylvania Ave., NW

Suite 5500

Washington, DC 20006-1812

FOR RESPONDENT ECHOSTAR COMMUNICATIONS CORPORATION:

T. Wade Welch, Esq.

T. WADE WELCH & ASSOCIATES

2401 Fountainview

Suite 215

Houston, TX 77057

FOR RESPONDENT SCI SYSTEMS, INC.:

J. R. Brooks, Esq.

Frank M. Caprio, Esq.

LANIER FORD SHAVER & PAYNE P.C.

200 West Side Square

Suite 5000

Huntsville, AL 35804

Jerry B. Blackstock, Esq.

Linda C. Odum, Esq.

POWELL, GOLDSTEIN, FRAZER & MURPHY LLP

191 Peachtree Street, NE

Atlanta, GA 30303

STAFF:

Thomas S. Fusco, Esq.

  This is the administrative law judge's final initial determination, under
Commission rule 210.42. The administrative law judge, after a review of the record

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 6
 USITC Inv. No. 337-TA-454

developed, finds no violation by any respondent of section 337 of the Tariff Act of
1930, as amended (19 U.S.C. § 1337). [FN1]

FN1. Should the Commission find a violation the administrative law judge is making
recommendations as to remedy and bonding in this final initial determination.

TABLE OF CONTENTS

  I. PROCEDURAL HISTORY

  II. PARTIES

  III. JURISDICTION

  IV. PATENTED SUBJECT MATTER IN ISSUE

  V. CLAIM CONSTRUCTION
    A. '121 Patent
    1. Independent Claim 18
    a. The language "comprises supplying program schedule information to"
    b. The language "storage means in a data processor"
    c. The language "supplying user program selection criteria to the data
processor, said user program selection criteria comprising a plurality of
independent user chosen program selection criteria and at least one program choice,
the data processor combining said user selection criteria, selecting those programs
meeting the combined user selection criteria for viewing from the program schedule
information in said storage means in the data processor"
    i. Whether a "program choice" is part of the "said user selection criteria"
combined by the data processor
    ii. Whether the "said user selection criteria" combined by the data processor
is limited to the criteria of theme, prime time and channels
    iii. Whether "combining", as used in claim 18, requires the use of logical
"AND" combining of the selection criteria or whether it can mean just the use of
logical "OR" combining
    iv. Whether the combining step could be performed through multiple sequential
searches or has to be performed prior to any search
    d. The language "storing information identifying the selected programs, said
stored information identifying broadcast schedule times, channels, and program
titles"
    e. The language "and using the stored information to tune the television
receiver to the selected programs"
    2. Other Claims In Issue
    a. Independent Claim 32
    i. The language "program schedule information"
    ii. The language "user program selection criteria"
    iii. The language "supplying program schedule information to the data
processor"
    iv. The language "during the process"
    b. Independent Claim 33
    i. The language "turning on"
    c. Independent Claim 36
    d. Independent Claim 42
    i. The language "a first input means for the schedule information connected to
said data processor"
    ii. The language "a second user selection input means connected to said data
processor"
    iii. The language "wherein said data processor is configured for a selectable
display mode, said data processor being configured to present an initial display of
said schedule information stored in said storage means upon selection of said
display mode, said initial display automatically comprising schedule information for
at least one of a current time period and a current channel of said programmable
tuner"
    e. Independent Claim 51
    f. Independent Claim 54

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

    i. The language "means connected between said programmable tuner and said data processor for separating the broadcast schedule information from the broadcast programs and supplying the broadcast schedule information to said data processor"
     g. Independent Claim 57
    B. '268/'204 Patents
     1. The language "visual identification" ('268/'204 Patents)
     2. The language "means ... for displaying" ('268/'204 Patents)
     3. The movement limitation ('268/'204 Patents)
     4. The program note limitation ('268/'204 Patents)
     5. The language "tuning a programmable tuner to a select channel based on position of said visual identification" ('204 patent)

  VI. INFRINGEMENT
   A. '121 Patent
    1. Pioneer
    a. Independent Claim 18 And Dependent Claims 19-24, 26-28 And 31
    b. Independent Claim 33
    c. Independent Claim 36
    d. Independent Claim 42 And Dependent Claims 43, 48, 49, And 50
    e. Independent Claim 54
    f. Independent Claim 57 And Dependent Claims 59, 60 And 61
    g. Independent Claim 66
    2. EchoStar
    a. Independent Claim 18 And Dependent Claims 19 -24, 26-28 And 31
    b. Independent Claim 32
    c. Independent Claim 36
    d. Independent Claim 54
    e. Independent Claim 57 And Dependent Claims 58, 59, 60 And 61
    f. Independent Claim 66
    3. S-A
    a. Independent Claim 18 And Dependent Claims 19-24, 26-28 And 31
    b. Independent Claim 33
    c. Independent Claim 36
    d. Independent Claim 42 And Dependent Claims 43, 48, 49 and 50
    e. Independent Claim 51
    f. Independent Claim 54
    g. Independent Claim 57 And Dependent Claims 59, 60 And 61
    h. Independent Claim 66
   B. '268/'204 Patents
    1. Pioneer
    a. Independent Claim 1 And Dependent Claim 3 Of The '268 Patent
    b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The ' 204 Patent
    c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The ' 204 Patent
    2. S-A
    a. Independent Claim 1 And Dependent Claim 3 Of The '268 Patent
    b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The ' 204 Patent
    c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The ' 204 Patent
    3. EchoStar
    a. Independent Claim 1 And Dependent Claim 3 Of The '268 Patent
    b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The ' 204 Patent
    c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The ' 204 Patent

  VII. PATENT MISUSE
   A. Market Power
    1. Relevant Market(s) For Establishing Market Power
    2. Complainants' Share Of The Relevant Market
    a. Gemstar's Market Share In The Relevant IPG Technology Market
    b. Gemstar's Market Share In The Relevant IPG Product Market
    c. Barriers To Entry
    d. Gemstar's Pricing
    e. Conclusion
   B. Tying
    1. Whether Gemstar Illegally Ties Its Licensing Of Its IPG Patents To The TV Guide Interactive IPG

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

        2. Whether Gemstar Illegally Ties Its IPG Technology/Products To Unpatented
And Separate Advertising
      C. Grantback Provisions Of Gemstar's Licenses
      D. Blocking Effect

  VIII. VALIDITY (Prior Art)
      A. The '121 Patent
      B. The '268/'204 Patent

   IX. VALIDITY (Alleged Impermissible Broadening - Claims 18-31, 33, 34, 36 and 38
of the '121 Patent)

   X. INVENTORSHIP ('121 Patent)

   XI. VALIDITY (Best Mode - '268/'204 Patents)

   XII. VALIDITY (Indefiniteness - '121 Patent)

   XIII. VALIDITY (Indefiniteness - '268/'204 Patents)

   XIV. VALIDITY (Enablement - '121 Patent)

   XV. INEQUITABLE CONDUCT

   XVI. DOMESTIC INDUSTRY ('121, '268 and '204 Patents)
      A. Economic Prong
      B. Technical Prong ('121 Patent)
      C. Technical Prong ('268 Patent)
      D. Technical Prong ('204 Patent)

   XVII. REMEDY

   XVIII. BOND

   XIX. ADDITIONAL FINDINGS
      A. Parties
      B. Patents At Issue
      C. Gemstar's Licenses
      D. Person Of Ordinary Skill In The Art
      E. Reexamination Of The '121 Patent
      F. Infringement
      G. Remedy

   XX. CONCLUSIONS OF LAW

   XXI. ORDER

                              ABBREVIATIONS
CFF        Complainants' Proposed Findings Of Fact

CORFF      Complainants' Objection To Respondents' Proposed Finding Of Fact

CPost      Complainants' Initial Posthearing Brief

CPre       Complainants' Prehearing Brief

CRBr       Complainants' Reply Brief

CRRFF      Complainants' Rebuttal To Respondents' Proposed Finding Of Fact

CX         Complainants' Exhibit

          ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                            Page 9
 USITC Inv. No. 337-TA-454

EPost       EchoStar's Initial Posthearing Brief

ERBr        EchoStar's Reply Brief

EPre        EchoStar's Prehearing Brief

FF          Findings Of Fact

JX          Joint Exhibit

PPost       Pioneer's Initial Posthearing Brief

PPre        Pioneer's Prehearing Brief

PRBr        Pioneer's Reply Brief

RFF         Respondents' Proposed Findings of Fact

ROCFF       Respondents' Objection To Complainants' Proposed Finding Of Fact

RRCFF       Respondents' Rebuttal To Complainants' Proposed Finding Of Fact

RX          Respondents' Exhibit

S-A Post    S-A's Initial Posthearing Brief

S-A Pre     S-A's Prehearing Brief

S-A RBr     S-A's Reply Brief

SFF         Staff's Proposed Finding Of Fact

SPost       Staff's Initial Posthearing Brief

SPre        Staff's Prehearing Brief

SRBr        Staff's Reply Brief

SX          Staff's Exhibit

Tr.         Hearing Transcript Of Record


I. PROCEDURAL HISTORY

   By notice, issued on March 14, 2001, the Commission instituted an investigation,
pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, to
determine whether there is a violation of subsection (a)(1)(B) of section 337 in the
importation into the United States, the sale for importation into the United States,
or the sale within the United States after importation of certain set-top boxes by
reason of infringement of claims 18-24, 26-28, 31, 32, 33, 36, 42, 43, 48-51, 54,
57-61 and 66 of United States Patent 4,706,121 (the '121 patent), claims 1-5 and 10-
14 of United States Patent 5,253,066 (the '066 patent), claims 1, 3, 8, and 10 of
United States Patent 5,479,268 (the '268 patent), and claims 14-17, 19, and 31-35 of
United States Patent 5,809,204 (the '204 patent) and whether there exists an
industry in the United States as required by subsection (a)(2) of section 337. The
notice of investigation was published in the Federal Register on March 21, 2001. (66
Fed. Reg. No. 55 at 15,887-89).

   Complainants identified in the Commission notice were Gemstar-TV Guide
International, Inc. (Gemstar) and StarSight Telecast, Inc. (StarSight). As

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

respondents, the following were named in the notice: Pioneer Corporation, Pioneer
North America, Inc., Pioneer Digital Technologies, Inc., Pioneer New Media
Technologies, Inc. [FN1] (collectively, Pioneer), Scientific-Atlanta, Inc., (S-A),
EchoStar Communications Corporation, and SCI Systems, Inc. (collectively, EchoStar).

On March 21, 2001, the presiding Administrative Law Judge Morriss issued a notice
in which she advised the parties that she owned one of the accused products (an
EchoStar 4900 set-top box) and that she had an ongoing service contract with DISH
Network, which she believed was related to EchoStar. Judge Morriss stated that, if
any party requested her disqualification as the presiding administrative law judge,
she would seek to recuse herself from the investigation and directed each party to
file a written submission to her attorney-advisor, by April 2, indicating whether
the party requested her disqualification or whether the party consented to her
continuing to preside over the investigation. Judge Morriss directed that said
submission should not be filed or served on the other parties.

By notice, issued on April 4, 2001, the Commission chairman directed that the
submissions ordered by Judge Morriss should be filed with the Commission by the
close of business on April 6. Respondent Pioneer subsequently filed a submission
with the Commission requesting disqualification of Judge Morriss. On April 10, the
Commission issued an order designating the undersigned as the presiding
administrative law judge in this investigation in place of Judge Morriss.

Order No. 1, which issued on April 12, 2001, set a target date for completion of
this investigation of June 21, 2002. Revised Order No. 55, which issued on March 19,
was an initial determination which extended the target date to October 21. On April
24, the Commission issued a notice stating that it would not review said initial
determination.

Order No. 2, which issued on April 2, 2001, was the protective order. Order No. 6,
which issued on May 17, denied complainants' Motion No. 454-10 regarding
modification of Order No. 2. Order No. 6 further imposed a limitation on patent
prosecution attorneys subscribing to the protective order. Order No. 9, which issued
on May 31, granted Pioneer's Motion No. 454-13 to amend their response to include
two additional factual allegations to the Ninth Affirmative Defense and to reference
supplemental exhibits submitted by complainants.

Order No. 17, which issued on July 9, 2001, granted EchoStar's Motion  Nos. 454-31
and 454-32 to modify the response to the complaint and the notice of investigation
by providing additional details regarding the products imported by or in behalf of
EchoStar. Order No. 18, which issued on July 12, denied EchoStar's Motion No. 454-15
for an order sanctioning complainants.

Order No. 24 was an initial determination, which issued on August 23, 2001, and
granted complainants' Motion No. 454-43 to attach copies of license agreements and a
list of licensees to the complaint, and to amend the complaint to reflect the
attachments. In a notice dated December 14, the Commission determined not to review
Order No. 24.

Order No. 25, which issued on August 28, 2001, denied complainants' Motion No.
454-45 to strike the First Affirmative Defense of Pioneer relating to patent misuse.
Order No. 29, which issued October 9, denied S-A's Motions Nos. 454-55 and - 56 to
take evidence relating to public interest and to certify to the Commission the
question of whether the administrative law judge can receive evidence relating to
public interest issues and to amend the notice of investigation to allow the
administrative law judge to take evidence relating to public interest issues. Order
No. 32, which issued on October 12, denied complainants' Motion No. 454-52 to
disqualify Miller & Chevalier from representing EchoStar in this investigation.
Order No. 46, which issued November 21, denied respondent Pioneer's motion to
disqualify Fish & Richardson from representing complainants in this investigation.

Order No. 36, which issued on November 2, 2001, denied Motion No. 454-82 of non-
party Peter Vogel, the named inventor on the '066 patent, to compel the return of
allegedly privileged documents, and granted Pioneer's Motion No. 454-81 for in

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

camera review of those documents to determine if the documents in issue were subject to any privilege. In the same order, complainants' Motion No. 454-80 to exclude the use of those same documents in issue was denied.

Order No. 37, which issued on November 6, 2001, granted respondents' joint Motion No. 454-78 to amend responses to the complaint and to assert an additional affirmative defense that the '066 patent is unenforceable because of inequitable conduct. Order No. 38, which issued on November 7, denied complainants' Motion No. 454-50 for summary determination requesting dismissal of certain affirmative defenses regarding patent misuse. Order No. 39, which issued on November 14, denied complainants' Motion No. 454-92 for summary determination regarding the economic prong of the domestic industry requirement. Order No. 41, which issued on November 15, granted S-A's Motion No. 454-89 to amend its response to the complaint and notice of investigation to assert additional affirmative defenses that the '121 patent is unenforceable due to inequitable conduct and that the '121 patent is invalid due to non-joinder of an actual inventor.

Complainants, in a letter to the administrative law judge dated November 15, 2001, gave notice of their intention to remove all of the asserted claims of the '066 patent, two claims of the '268 patent, and two claims of the '204 patent from this investigation. Order No. 44, which issued on November 20, was an initial determination granting complainants' Motion No. 454-103 to terminate the investigation with respect to the '066 patent, claims 8 and 10 of the '268 patent, and claims 19 and 35 of the '204 patent. On January 30, 2002 the Commission determined not to review the initial determination. Thus, the claims that remain at issue in this investigation are claims 18-24, 26-28, 31, 32, 33, 36, 42, 43, 48-51, 54, 57-61 and 66 of the '121 patent, claims 1 and 3 of the '268 patent, and claims 14-17, and 31-34 of the '204 patent.

On December 3, 2001, the hearing commenced and continued through December 19. During the hearing, the administrative law judge granted respondents' Motion No. 454-111 to preclude complainants from asserting infringement under the doctrine of equivalents. (Tr. at 92). Also during the hearing, the administrative law judge granted an unopposed motion by EchoStar to amend their answer to add defenses that the '121 patent is unenforceable due to inequitable conduct and that the '121 patent is invalid due to non-joinder of an inventor similar to the relief granted to S-A in Order No. 41. (Tr. at 5337-38).

On January 17, 2002, respondents jointly moved to strike the testimony of complainants' proffered expert witness, Dr. Philip Faillace, and related findings and exhibits on any topics relating to the IPG [FN2] source code for the accused products. (Motion Docket No. 454-143A). Order No. 62, which issued on June 21 granted in part said motion.

Post hearing submissions have been made. The matter is now ready for decision.

The final initial and recommended determinations are based on the record compiled at the hearing and the exhibits admitted into evidence. The administrative law judge has also taken into account his observation of the witnesses who appeared before him during the hearing. Proposed findings of fact submitted by the parties not herein adopted, in the form submitted or in substance, are rejected as either not supported by the evidence or as involving immaterial matters and/or as irrelevant. Certain findings of fact included herein have references to supporting evidence in the record. Such references are intended to serve as guides to the testimony and exhibits supporting the findings of fact. They do not necessarily represent complete summaries of the evidence supporting said findings.

II. PARTIES

    See FF 1-22.

III. JURISDICTION

    The complaint and notice of investigation state a cause of action under section

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

337 of the Tariff Act of 1930, as amended. Thus, the Commission has jurisdiction
over the subject matter of this investigation. See Amgen, Inc. v. U.S. International
Trade Commission, 902 F. 2d 1531, 1536 (Fed. Cir. 1990). Each of the named
respondents responded to the complaint and notice of investigation and participated
in the hearing. Thus, the Commission has personal jurisdiction over each of the
respondents.

   While EchoStar appeared at the hearing, it argued that named respondent EchoStar
Communications Corporation (ECC) is not a proper respondent under section 337
because ECC is a holding company; that ECC does not import the accused devices; that
ECC does not sell the accused devices for importation; and that because there is no
evidence that ECC has committed the acts alleged by complainants to invoke the
Commission's jurisdiction under section 337, complainants have not met their
statutory burden under section 337. (EPost at 279-284). Charles Ergen, who testified
at the hearing, is the Chairman and Chief Executive Officer of ECC{* * *}in that ETC
is a wholly owned subsidiary of EchoStar DBS Corporation which is a wholly owned
subsidiary of EchoStar Broadband Corporation, a wholly owned subsidiary of ECC.
(Ergen, Tr. at 2985- 87, 3029, RX-1943, RX-7448). Ergen is an officer of ETC. (Tr.
at 3043). ETC has participated in the design of accused set-top boxes. (Ergen, Tr.
at 3046-47, CX-3773, No. 1). In addition, ETC participates in the importing,
purchasing and licensing of EchoStar set-top boxes. (Ergen Tr. at 3032-33). In view
of Ergen's testimony and the referenced evidence, the administrative law judge
rejects EchoStar's argument that ECC is not a properly named respondent.

   Respondents argued that they cannot be found to have violated section 337 because
they do not import an alleged infringing article. (See, e.g., S-A Post at 294).
Complainants argued that respondents admitted that they imported the accused set-top
boxes and/or components thereof into the United States, or that such articles were
imported on their behalf; that the evidence established that all of the accused set-
top boxes and/or components thereof were imported with hardware and/or software that
enable the later downloading of infringing IPG software or resident software
applications(s) that contain an infringing IPG. The staff argued that there is
subject mater jurisdiction because the evidence of record established that set-top
boxes alleged to be part of an infringing system or process have been manufactured
abroad, imported into the United States, and sold within the United States after
importation. (SPost at 95).

   Subject matter jurisdiction in section 337 investigations is established by the
filing of a complaint alleging "unfair acts in the importation of articles ... into
the United States, or in the sale of such articles by the owner, importer, or
consignee." 19 U.S.C. § 1337(a)(1)(A). The term "unfair acts" has been construed
broadly to include infringement of patents, and the alleged unfair acts occurring
incident to importation of the articles or products involved or affected. See
Novelty Glasses, ITC Inv. No. 337-TA-55, USITC Pub. No. 991 (1979); Welded Stainless
Steel Pipe and Tube, Inv. No. 337- TA-29, USITC Pub. Np. 863 (1978); In re von
Clemm, 229 F. 2d 441 (C.C.P.A. 1955). In Hardware Logic Emulation Systems, Inv. No.
337-TA-383, Final Initial Determination at 159 (July 31, 1997), this administrative
law judge rejected respondents' arguments that they must directly infringe the
patents-in-issue in order to violate section 337, stating that "[t]here is nothing
in the plain language of section 337(a)(1)(B), or the legislative history that would
limit articles that 'infringe a ... patent to only those articles that directly
infringe, and would exclude those articles that contributorily infringe." See also
Certain Flash Memory Circuits and Products Containing Same, Inv. No. 337- TA-382,
Comm'n Op. at 15-16 (June 9, 1997), Certain Curable Fluoroelastomer Compositions and
Precursors Thereof, Inv. No. 337-TA-364, Unreviewed Initial Determination at 66
(December 15, 1994).

   The record does establish that set-top boxes alleged to be part of an infringing
system or process have been manufactured abroad imported into the United States, and
sold within the United States after importation by the named respondents. See, e.g.
SX-3 (EchoStar) at 18-23, SX-4 (SCI) at 14-15, SX-5 (Pioneer) at 12-13 and SX-3 (S-
A) at 11-17. {* * *}

   {* * *}In addition, while S-A relied on Greg Durden's testimony to support the

argument that an Explorer set-top box can be used without IPG software, Durden, who
has worked for S-A for around 21 years (Tr. at 2713), was unable to identify any end
user who has actually employed an Explorer set-top box with SARA software but
without SARA IPG software (Tr. at 2810):

    Q Is it correct that Scientific-Atlanta cannot identify any end user who has
actually employed an Explorer set-top box with SARA software but without SARA IPG
software (Tr. at 2810).

    A I believe that's correct, yes.

    Q Is it also true that Scientific-Atlanta is unaware of any MSO that has
installed Explorer boxes with SARA software but without the SARA IPG software?

    A As far as I know, yes.

Accordingly the administrative law judge rejects respondents' contention that they
cannot be found to have violated section 337 because they do not import an alleged
infringing article.

IV. PATENTED SUBJECT MATTER IN ISSUE

    In issue are certain claims of the '121 patent, the '268 patent and the '204
patent. The '121 patent, entitled "TV Schedule System and Process," initially issued
to Patrick Young on November 10, 1987, based on Application Serial No. 860,077 filed
on May 6, 1986. Serial No. 860,077 was a continuation-in-part of abandoned
Application Serial No. 754, 630 filed July 12, 1985. On December 14, 1993,
Reexamination Certificate B1 4,706,121 issued to Patrick Young on the initial '121
patent. (FF 23-25, 31, 32). In issue are independent claim 18 (and, by dependency,
claims 19-24, 26-28, and 31), independent claims 32, 33, 36, 42 (and, by dependency,
claims 43, 48-50), independent claims 51, 54, 57 (and, by dependency, claims 58-61)
and independent claim 66. [FN3]

    The '268 patent, entitled "User Interface for Television Schedule System," issued
to Patrick Young, John H. Roop, Alan R. Ebright, Michael W. Faber and David Anderson
on December 26, 1995, based on Application Serial No. 198,538 filed on February 18,
1994. Serial No. 198,538 was a continuation of abandoned Application Serial No.
579,555 filed on September 10, 1990, which in turn was a continuation of abandoned
Application Serial No. 579,555 filed September 10, 1990, which in turn was a
continuation-in-part of Application Serial No. 219,971, filed July 15, 1998, which
issued as U.S. Patent No. 4,977,455. In issue are independent claim 1 and dependent
claim 3. (FF 26, 27).

    The '204 patent, entitled "User Interface for Television Schedule System," issued
to Patrick Young, John H. Roop, Alan R. Ebright, Michael W. Faber and David Anderson
on September 15, 1998 based on Application Serial No. 484,412. filed on June 7,
1995. [FN4] Serial No. 484,412 was a continuation of Application Serial No. 198,538,
filed February 18, 1994 (now the '268 patent). (FF 28-30). In issue are independent
claims 14 and 31, claims 15 through 17, which are dependent upon claim 14, and
claims 32 through 34, which are dependent upon claim 31.

V. CLAIM CONSTRUCTION

    Claim construction is a question of law to be decided by the administrative law
judge. Markman v. Westview Instruments, Inc., 52 F.3d 967, 978, 34 U.S.P.Q.2d 1321,
1328 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 376 (1996) (Markman). The construction
of the language of a claim should be made independently of what is being alleged to
infringe the claim. See Donald S. Chisum, Patents § 18.03.

    As for proper claim construction:

    It is well-settled that, in interpreting an asserted claim, the court should
look first to the intrinsic evidence of record i.e., the patent itself, including
the claims, the specification and, if in evidence, the prosecution history. Such
intrinsic evidence is the most significant source of the legally operative meaning
of disputed claim language.
Vitronics Corp. v. Conceptronic Inc., 90 F.3d 1576, 1582, 39 U.S.P.Q.2d 1573, 1576
(Fed. Cir. 1996) (citation omitted) (Emphasis added) (Vitronics). To construe the
claims of a patent "a court principally consults the evidence intrinsic to the
patent, including the claims, the written description, and the relevant prosecution

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 14
USITC Inv. No. 337-TA-454

history." Watts v. XL Sys. Inc., 232 F.3d 877, 882 (Fed. Cir. 2000).

     In considering claim language, the "ordinary and customary meaning of a disputed
claim term is presumed to be the correct one." K-2 Corp. v. Salomon, S. A., 191 F.3d
1356, 1363 (Fed. Cir. 1999). "[T]he focus is on the objective test of what one of
ordinary skill in the art at the time of the invention would have understood the
term to mean." Markman, 52 F.3d at 986. A claim term must be given the same
interpretation whenever it is employed in the claims, i.e., the meaning of a claim
term should not vary from claim element or from claim to claim. Southwall
Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1579 (Fed. Cir. 1995).

     The specification contains a written description of the invention that must enable
one of ordinary skill in the art to make and use the invention. For claim
construction purposes the written description may act as a dictionary, which
explains the invention and may define terms used in the claims. A patentee is free
to be his own lexicographer, although any special definition given to a word must be
clearly defined in the specification. Markman, 52 F.3d at 978, 979, 34 U.S.P.Q.2d at
1328, 1329; Vitronics, 90 F.3d at 1580.

     The prosecution history is of "critical significance in determining the meaning of
the claims" Vitronics, 90 F.3d at 1582 (Emphasis added). "The prosecution history
limits the interpretation of claim terms so as to exclude any interpretation that
was disclaimed during prosecution" Id. at 1583 (quoting Southwall Technologies, 54
F.3d 1570, 1576 (Fed. Cir. 1995) (Emphasis added)). Claims may not be construed one
way in order to obtain their allowance and in a different or inconsistent way
against accused infringers. Spectrum International, Inc. v. Sterlite Corp., 164 F.3d
1372, 1379 (Fed. Cir. 1998). The Federal Circuit has made it clear that the public
is entitled to rely on an applicant's representations. See Hockerson-Halberstadt,
Inc. v. Avia Group International, Inc. 222 F.3d 951, 957 (Fed. Cir. 2000).

     The administrative law judge may, in his discretion, receive extrinsic evidence to
aid him in coming to a correct conclusion as to the true meaning of language
employed in a patent. Markman, 52 F.3d at 981, 34 U.S.P.Q.2d at 1331. Extrinsic
evidence consists of all evidence external to the patent and prosecution history,
including expert and inventor testimony, dictionaries and learned treatises. The
evidence may be helpful to explain scientific principles and the meaning of
technical terms, and terms of art that appear in the patent and prosecution history.
It may also demonstrate the state of the prior art at the time of the invention.
Extrinsic evidence, however, is not to be used for the purpose of clarifying
ambiguities in claim terminology. Markman, 52 F.3d at 981, 34 U.S.P.Q.2d at 1331.
Moreover, neither the patentee nor the alleged infringer may alter the scope of the
claims. Thus,
     where the public record unambiguously describes the scope of the patented
invention, reliance on any extrinsic evidence is improper. The claims,
specification, and file history, rather than extrinsic evidence, constitute the
public record of the patentee's claim, a record on which the public is entitled to
rely.
Vitronics, 90 F.3d at 1538-39, 34 U.S.P.Q.2d at 1577. The testimony of an inventor
on the proper construction of claims, based on the text of the patent, is entitled
to no deference because it amounts to no more than legal opinion about the process
of construction that the administrative law judge must undertake. No inquiry as to
the subjective intent of the inventor or of the U.S. Patent and Trademark Office
(PTO) is appropriate or even possible in the context of a patent infringement
action. In fact, commonly the claims are drafted by the inventor's patent solicitor
and they may even be drafted by the patent examiner in an examiner's amendment
subject to the approval of the inventor's solicitor. Markman, 52 F.3d at 985, 34
U.S.P.Q.2d at 1334-35. The scope of a patent is defined by the claims, and not by
the description of the preferred embodiment in the specification. Gart v. Logitech,
Inc. 254 F.3d 1334, 59 U.S.P.Q.2d 1290 (Fed. Cir. 2001).
     35 U.S.C. § 112, ¶ 6 provides guidelines for interpreting means-plus-function
limitations.

     This section of the patent statute states:
     An element in a claim for a combination may be expressed as a means or step for

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

performing a specified function without the recital of structure, material, or acts
in support thereof, and such claim shall be construed to cover the corresponding
structure, material, or acts described in the specification and equivalents thereof.

   Only the disputed claim elements need be interpreted by the administrative law
judge. See In the Matter Certain Hardware Logic Emulation Systems and Components
Thereof, Inv. No. 337-TA-383, (July 31, 1997) (Hardware Logic); and In the Matter of
Certain Ion Trap Mass Spectrometers and Components Thereof, Inv. 337-TA-393 at p.
24-25 (February 25, 1998). [FN5]

A. '121 Patent

   In issue are claims 18-24, 26-28, 31-33, 36, 42, 43, 48-51, 54, 57-61 and 66.

1. Independent Claim 18.

   Independent process claim 18 (FF 33), the earliest numbered claim in issue of the
'121 patent, reads:
   18. A process for controlling the presentation of broadcast programs to a
television receiver, which comprises supplying program schedule information to
storage means in a data processor, supplying user program selection criteria to the
data processor, said user program selection criteria comprising a plurality of
independent user chosen program selection criteria and at least one program choice,
the data processor combining said user selection criteria, selecting those programs
meeting the combined user selection criteria for viewing from the program schedule
information in said storage means in the data processor, storing information
identifying the selected programs, said stored information identifying broadcast
schedule time, channels, and program titles, and using the stored information to
tune the television receiver to the selected programs.

   The administrative law judge finds that the language of the preamble, viz.,  "[a]
process for controlling the presentation of broadcast programs to a television
receiver," pursuant to the plain meaning of the language, refers to a process for
controlling the presentation of broadcast programs to a conventional TV set. Such
interpretation is consistent with EchoStar's proposed construction that "television
receiver" is a conventional TV set (respondents' jointly proposed claim
constructions submitted pursuant to the administrative law judge's November 27, 2001
telephonic hearing) and complainants' proposed construction that "the presentation
of broadcast programs to a television receiver" refers to providing television
programs to a television set. (RX-3311 at 4). He further finds that the language of
process claim 18 describes a process in which several discrete steps occur. First
claim 18 recites that the process "comprises supplying program schedule information
to storage means in a data processor, [and] supplying user program selection
criteria to the data processor." (Emphasis added) (FF 33). Therefore, claim 18
requires that during the process two things first occur: program schedule
information is supplied to the data processor's storage means and user program
selection criteria is supplied to the data processor. The claim language does not
expressly mandate that "program schedule information" and the "user program
selection criteria" be provided to the data processor in any given order in relation
to each other, i.e., the claim language does not state that the "program schedule
information" must be supplied before the "user program selection criteria" is
supplied, or vice versa, or whether both are to be supplied simultaneously. The
claim language however does expressly state that the "program schedule information"
is to be supplied to a particular location in the data processor (viz., the data
processor's storage means), whereas no particular part of the data processor is
specified with respect to the "user program selection criteria."

   The administrative law judge further finds that claim 18 goes on to describe the
"user program selection criteria" that is supplied to the data processor in the
preceding step as "comprising a plurality of independent chosen program selection
criteria and at least one program choice." (FF 33). Therefore, from this clause the
claim discloses that the data processor had been provided two or more "independent
chosen program selection criteria" and one or more program choices. This clause
clearly refers to more than one "independent chosen program selection criteria" as

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 16
USITC Inv. No. 337-TA-454

it refers to "a plurality of independent chosen program selection criteria," which
is in stark contrast to the second part of the clause which specifies that "at least
one program choice" is to be provided to the data processor, instead of a "plurality
of program choices." Id. There is no indication as to when the "plurality of
independent chosen program selection criteria" or the "program choice" must be
supplied in relation to each other, i.e., the claim language does not state that the
"program choice" is to be supplied after the "independent chosen program selection
criteria," or vice versa, or whether both are to be supplied simultaneously. Id.

    In the claim 18 process, the next step that is recited is that the data processor
"combin[es] said user selection criteria." (FF 33). The administrative law judge
finds from this language, that this step must occur after the data processor has
been supplied with "user selection data" as the data processor cannot combine the
"said user selection criteria" before it is supplied with the "user selection
criteria." However, the claim language does not specify whether the "said user
selection criteria" refers to the "user program selection criteria" or the
"independent user selection criteria." The next step in the process, pursuant to the
language of claim 18, is that the data processor selects the programs that meet the
"combined user selection criteria" from the "program schedule information" that is
stored in the data processor's storage means, which step must take place after the
data processor "combin[es] the user selection criteria," or else there would be no
"combined user selection criteria" and, since the data processor is selecting from
the "program schedule information in [its] storage means," the selection step must
also occur after the data processor's storage means has been supplied with "program
schedule information."

    The data processor then stores information identifying the programs that it had
just selected. The administrative law judge finds that this step must occur only
after the data processor has selected programs meeting the "combined user selection
criteria," or else there would no information identifying the selected programs to
store. The information identifying the programs is further described as identifying
the broadcast schedule times, channels, and the program titles. (CX-1, col. 5, lns.
26-27). The data processor then uses the "stored" information to tune the television
to the selected programs which is the last step in process claim 18. (Emphasis
added) (FF 33). As the plain language of this clause indicates, the information
identifying the selected programs must have been stored prior to the data processor
using it to tune the television receiver to the selected programs.

    The construction of claim 18, supra, as including a number of discrete steps is
consistent with the specification of the '121 patent, which states:
    The process of this invention includes the following steps. Program schedule
information is supplied to a data processor. User program selection criteria are
supplied to the data processor. The user selection criteria are used to select
programs for viewing from program schedule information in the data processor. The
stored information is used to tune the television receiver to the selected programs.
(col. 4, lns. 53-60). The only difference in this description of the '121 invention
and that which is described in claim 18, is the description of the process in the
specification specifies that program schedule information is supplied to the data
processor first, and then the user program selection criteria is supplied to the
data processor, whereas claim 18 does not explicitly require one to be supplied
before the other.

    The prosecution history of the '121 patent is also consistent with the
administrative law judge's interpretation of claim 18 as comprising a number of
discrete steps. In its November 23, 1992 amendment to the '121 patent, filed during
the re-examination, the applicant described original claim 18 accordingly, in an
attempt to distinguish it from certain prior art references:
    Process claim 18 contains similar limitations which distinguish over the prior
art. Regarding the claimed "combining of user selection criteria," the Examiner has
asserted that this reads on the plurality of data needed to identify a single
program to be recorded (channel, time, etc.). This trivializing simplification,
however, ignores the plain meaning and interpretation of the claims, which
interpretation is also supported by the specification. Of course, programming
information such as channel and time might be used as selection criteria, but, such

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

as is recited in claim 18, the selection criteria must then be combined, the
combined criteria must be used to select programs from the schedule information, and
then the schedule information for the selected programs is stored. These steps are
clearly not met by the simple input and storage of programming data for a single
program.
(Emphasis in original omitted) (FF 91).

   During reexamination the applicant in a February 26, 1993 supplemental amendment
further described the process disclosed in several of the claims of the '121 patent:
     Several of the present claims recite a process in which the user enters user
program selection criteria, and the user enters user program selection criteria, and
the data processor combines the program selection criteria, and the data processor
combines the program selection criteria, searches through the stored selection
criteria, searches through the stored schedule information, and creates and stores a
display list of program listings that meet the combined criteria. This is disclosed,
for example, at co. 17 lines 33 et seq. The user may then make program selection
choices (which the Examiner has characterized as further program selection criteria)
from this display. The data processor then stores information for these program
selections, including information identifying program titles, in a reminder calender
list.
(FF 150).

   There follows the interpretation of the clauses of claim 18 that are recited after
the preamble and in the order in which they are recited.

a. The language "comprises supplying program schedule information to"

   Claim 18 recites, after the preamble, the clause "comprises supplying program
schedule information to storage means in a data processor." (FF 33). In issue is the
meaning of "program schedule information."

   Complainants argued that "program schedule information" is merely information
concerning scheduled television programs. (CFF 282). Respondents argued that the
'121 reexamination prosecution history in the context of the asserted claims of the
'121 patent explicitly provides that "schedule information" refers to times, titles
and channels. (RFF 640). The staff argued that the proper construction of "program
schedule information" requires that the term include the titles of programs, as well
as the scheduled broadcast time and the channels on which the broadcast is to occur.
(SPost at 7).

   Original claim 18 of the '121 patent was amended in the examination prosecution to
read (FF 33, 165):
     A process for controlling the presentation of broadcast programs to a television
receiver, which comprises supplying program schedule information to storage means in
a data processor, supplying user program selection criteria to the data processor,
said user program selection criteria comprising a plurality of independent user
program selection criteria and at least one program choice, the data processor
combining said user selection criteria, selecting those programs meeting the
combined user selection criteria for viewing from the program schedule information
in said storage means in the data processor, storing information identifying the
selected programs, said stored information identifying broadcast schedule times,
channels and program titles, and using the stored information to tune the television
to the selected program. (CX-1, B '121 Patent at col. 5, lns. 14-29) (underlined
language was added in the reexamination proceeding)
Thus, the language of claim 18 in issue conclusively shows that in the reexamination
proceeding, applicant Patrick Young specifically amended claim 18 to identify the
information in the storage means as "broadcast schedule times, channels and program
titles." (Emphasis added).

   Original independent process claim 18, as issued on November 10, 1987, did not
refer to "program titles." (FF 91). Moreover, the phrase "program titles" was
included in claim 18 in response to rejections by the Examiner. In reference to the
reexamination proceedings, the Examiner in an Office Action of June 8, 1992 rejected
all of the claimed subject matter in light of certain prior art. (FF 94). In an

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 18
USITC Inv. No. 337-TA-454

amendment received by the Patent Office on August 13, 1992, while new independent
claim 57 directed to a "television schedule system" defined "broadcast schedule
information" as "comprising broadcast schedule times, titles and channels,"
independent process claim 18 was not amended to include program titles. (FF 96).

   Following a rejection on September 22, 1992 in which the claimed subject matter
was rejected prior art (FF 108-112), applicant, in a response filed on November 23,
1992, rewrote the claims. (FF 113). While revised independent claim 57 relating to a
"television schedule system" again defined "broadcast schedule information" as
comprising broadcast schedule times, titles and channels, rewritten independent
process claim 18 did not include the phrase "program titles." (FF 113). In a Final
Office Action of January 5, 1993, claim 18, which still did not include "program
titles," was rejected by the Examiner in light of prior art. (FF 121-128). A
proposed amendment attached to a Reexamination Interview Summary Form and relating
to a telephonic interview on January 6, 1993 did not include "program titles" in
claim 18. (FF 129). On January 21, 1993, applicant faxed to the Examiner a proposed
amendment. Proposed claim 18 in the amendment was again devoid of any reference to
"program titles." (FF 130). Likewise applicant in an amendment after final date-
stamped at the Patent Office on January 29, 1993 and in a proposed supplemental
amendment after final faxed to the Examiner in February 16, 1993, each in response
to the Patent Office action of January 5, 1993, did not amend claim 18 to include
"program titles." (FF 132).

   Applicant, ultimately, in a proposed Supplemental Amendment After Final, faxed to
the Examiner on February 23, 1993, proposed to amend claim 18 by adding the language
"said stored information identifying broadcast schedule times, channels, and program
titles." (FF 141). In the accompanying remarks, it was stated that independent claim
18, inter alia, had been amended "to further clarify that the schedule information
stored for the selected programs identifies not only program channels and times, but
also program titles." (FF 141). Likewise, in a February 26, 1993 Supplemental
Amendment After Final, applicant added to claim 18 the phrase "said stored
information identifying broadcast schedule times, channels, and program titles." (FF
146). In commenting on the amendment applicant specifically stated (FF 150):
   In response to earlier arguments that the claims require schedule information
including program title to be stored for selected programs, the Examiner only argued
that the term "schedule information" was not defined so as to require program title.
Several claims have been amended to specify the storage of program title for the
selected programs and are thus believed to be allowable. As previously noted, prior
art systems simply program the VCR with the channels and times for selected
programs; information identifying the title was not stored.
(Emphasis added). Thereafter, the Examiner, in each of a Notice Of Intent To Issue
Reexamination Certificate dated June 2, 1993 and a supplemental notice dated August
26, 1993, specifically stated that claim 18 avoided the art of record in at least
the art of record did not show or suggest a process for controlling the presentation
of broadcast programs to a television receiver which comprises, inter alia, "storing
information identifying the selected programs and identifying broadcast schedule
times, channels and titles." (FF 163-164).

   Complainants argued that "schedule information" is used in two contexts in claim
18, and only the second context, in which schedule information for the selected
programs is stored, requires the inclusion of time, title, and channel for the
selected programs. The administrative law judge rejects complainants' argument
because pursuant to the plain language of independent claim 18, programs are
selected from schedule information already in the storage means in the data
processor. Hence, if the schedule information from which the selected programs are
selected did not already include time, title, and channel, the process would not be
able to store information identifying time, title and channel for the selected
programs.

   Based on the instrinsic evidence, the administrative law judge finds that the
claimed phrase "program schedule information" in claim 18 requires that it includes
the titles of programs, the scheduled broadcast times and the channels on which the
programs are to be broadcast.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

b. The language "storage means in a data processor"

   Complainants argued that "storage means in a data processor" should be construed
as the "directly addressable" or "main memory" of a data processor's processing
unit. (CRRFF760). Complainants also argued that such memory, in addition to
constituting the storage means of claim 18, should also be considered to be part of,
and therefore within, a data processor. (CFF 305).

   Respondents argued that "storage means" should be construed as memory that
includes a program list buffer, screen buffer and a user pre-configured channel
buffer (containing a list of user-selected channels), user pre-configured theme
buffer (containing a list of user-selected themes), and user pre-configured prime
time buffer (containing a user selected time range). (PPost at 64, S-A Post at 61,
EPost at 58). Respondents also argued that "storage means in a data processor"
should be construed as meaning a "storage means in a central processing unit (CPU)"
(PPost at 72), i.e., a memory internal to the CPU (S-A at 87), such that the five
buffers constituting the storage means are within the CPU (EPost at 65). The staff
argued that evidence presented at the hearing established that the claim term "data
processor" refers to a CPU and that the meaning of the phrase "in a data processor"
means that the storage means must be within, and not merely connected to, the data
processor. (SPost at 13-17).

   The administrative law judge finds that the record establishes that the claimed
term "storage means" does not have a clear meaning to one of ordinary skill in the
art. However, he finds, based on the specification of the '121 patent and the re-
examination history, that "storage means" should be interpreted as including at
least five buffers that are disclosed in the ' 121 patent as constituting the
"storage means": viz., the "program list buffer," "theme buffer," "screen buffer,"
"channel buffer," and "prime time buffer."

   The specification defines the "storage means" as comprising the  "program list
buffer," "theme buffer," "screen buffer," "channel buffer," and "prime time buffer."
Thus it recites: "[p]rogram list buffer 303, screen buffer 353, and the other
buffers discussed above." (FF 168). This portion of the specification refers to FIG.
8, which is a flow chart of software used with the systems shown in FIGs. 3 and 4.
FIGs. 3 and 4 are block diagrams of receiver and television receiver control systems
that are to be used in conjunction with the systems to be used to broadcast program
schedule information depicted in FIGs. 1 and 2 and are the only systems implementing
the invention of the '121 patent disclosed in the '121 patent (col. 5, lns. 64-66,
col. 6, lns. 1-14). Moreover, the administrative law judge finds the binding nature
of this definition is reinforced by the '121 patent's reexamination proceeding which
demonstrates that the language added to the specification was necessary to obtain
the allowance of claim 18.

   In a Proposed Amendment attached to a January 6, 1993, Reexamination Interview
Summary Form, Young added the language "storage means comprising an electronic
memory" to system claims 1, 12, 14, 15, 39, 42, 51, 52 and 54, and the language
"electronic memory associated with a data processor" to process claims 18, 33, 34,
36, and 38 in an attempt to overcome the rejection. (FF 129). However, the phrase
"comprising an electronic memory" was subsequently omitted in the February 16, 1993
Proposed Supplemental Amendment After Final. (FF 134).

   In a Proposed Supplemental Amendment After Final, faxed on February 23, 1993,
Young attempted to find support in the specification that "electronic memory" could
comprise the claimed "storage means" (FF 142):
   A group of claims have been amended to clarify that the schedule information is
provided to a storage means (in some claims recited as an electronic memory in the
data processor), the data processor combines user selection criteria, and programs
meeting the combined criteria are then selected from the schedule information in the
storage means. Support of these limitations can be found in a number of locations in
the patent, including at column 8, lines 23 et. seq., and at column 17, lines 33 et
seq. It is believed inherent and implicit that the list operations described in
column 17 are performed on information in an electronic memory.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Examiner in a Reexamination Interview Summary Form, in reference to interviews that took place on February 19 and 24, 1993, "expressed concerns that the term 'electronic memory' and the recitations that the schedule data is stored and retrieved from such a memory did not appear to have clear support in the disclosure." (FF 143).

In a February 26, 1993 Supplemental Amendment After Final, Young attempted to overcome the Examiner's rejections with three amendments to the '121 patent's specification: (1) changing from "A memory" at column 7, line 47 to "An electronic memory" (2) amending column 17, line 38 to specify that the "program listing" is stored in "program list buffer 303;" and (3) amending column 17, line 49 to read, "Program list buffer 303, screen buffer 353, and the other buffers discussed above are located within an electronic memory coupled to the data processor, such as electronic memory 111." (FF 144). Young explained the reason for these proposed amendments to the specification as follows:
    As suggested by the Examiner, various minor amendments have been made to the specification to make explicit various aspects of the invention that were implicit but not totally explicit in the original specification. At column 7, language was added to make explicit the fact that the memory employed by the data processor is an electronic memory. This is believed not to be new matter because it is inherent and implicit in the original specification that in the disclosed embodiment the memory used by the data processor is electronic (as opposed to human, for example).

                              * * * *

    In column 17 language was added to make explicit the facts that program listing 325 is stored in program list buffer 303, and that the various buffers are within electronic memory coupled to the data processor. This is believed not to be new matter because at column 16, lines 45 et. seq., it is stated that the CPU stores the program data in program list buffer 303, and because it is inherent and implicit in the original specification that in the disclosed embodiment the various buffers manipulated by the data processor must be in the electronic memory, or the data processor could not do the recited functions.
(FF 144).

The Examiner in a Office Action dated March 26, 1993 rejected Young's attempt to amend the specification so as to disclose an "electronic memory," stating (FF 153):
    In Column 7, line 47, 'A memory' has been changed to - - an electronic memory - -. This amendment is considered to introduce new matter because: a) it is not clear from the disclosure as originally filed what kind of memories are included or excluded by the term "electronic memories" (i.e. RAM, disc, tape, storage tubes, etc...); and b) it appears to suggest that said memory is now intended to be limited only to memories of some certain type (i.e. electronic) while the disclosure as originally filed appears to have recited a generic memory (i.e. inclusive of all types).
Accordingly, the Examiner found that "[c]laims 1-12, 14, 15, 18-31, 33, 34, 36, 38, 54-56, and 64-67 recited that the schedule information is stored in an 'electronic memory'. Such recitations do not appear to be supported by the specification as originally filed" and thus he rejected those claims. However, the Examiner stated that if this deficiency in the claim language were remedied, the claims at issue would be patentable. (FF 154).

Young next attempted to overcome this rejection in an amendment dated April 6, 1993 by again amending the claims to delete "comprising an electronic memory" or "electronic memory," and adding the phrase "storage means." (FF 156). Furthermore, Young proposed amending the specification to recite "[p]rogram list buffer 303, screen buffer 353, and the other buffers discussed above are located within a data storage device coupled to the data processor." Id. Young explained this proposed amendment as follows:
    Applicant has amended the specification as requested by the Examiner, and has amended the claims to no longer refer to an electronic memory. It is respectfully submitted that the original specification fully supports the claims and that the objection to the specification and the § 112 rejection of claims is therefore overcome.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(FF 157). Applicant Young again, however, failed to describe the scope of the pertinent claim term "storage means."

In a Reexamination Interview Summary form regarding a telephonic interview held on April 19, 1993, the Examiner stated that "[a]pplicant agreed to change the last two lines in the sixth full paragraph of column 17 so as to avoid the issue of the new matter" [The last two lines was a reference to the following: "[p]rogram list buffer 303, screen buffer 353, and the other buffers discussed above are located within a data storage device coupled to the data processor."] (FF 158).

The next day, Young submitted a Supplemental Amendment dated April 20, 1993 that amended the specification to change "data storage device coupled to a data processor" to "data storage means" and to define explicitly that they comprise the five recited buffers. (FF 159, 160). Young's remarks explain his motivation for this supplemental amendment to the specification: "During the telephone conversation of April 19, 1993, Applicant ... agreed to change the amendment to column 17 of the specification to simply refer to a data storage means." (FF 160). Furthermore, the Examiner stated in the April 19, 1993 Reexamination Interview Summary Form that: "[a]pplicant agreed to change the last two lines in the sixth full paragraph of column 17 so as to avoid the issue of new matter." (FF 158). This amendment was accepted and appears in the Reexamination Certificate at column 2, lines 38-52. (FF 162). The Examiner then, on June 2, 1993, issued a Notice of Intent to Issue Reexamination Certificate. (FF 163).

Accordingly, in light of the specification and the prosecution history, the administrative law judge finds that the "storage means" of claim 18 is composed of at least the following buffers: the program list buffer, the screen buffer, the channel buffer, the theme buffer, and the prime time buffer.

The administrative law judge further finds based on the intrinsic evidence that the claimed phrase "storage means in a data processor" refers to a storage means within a CPU. Thus, the ordinary meaning of the term "in" when used to connote the location of an object "in" another object is "within." In In the Matter of Certain Digital Satellite Sys. (DSS) Receivers & Components Thereof, Inv. No. 337-TA-392, USITC Pub. 3418. Initial Determination, (Oct. 20, 1997), this administrative law judge construed the claim language "a predetermined signal in a television program transmission." Id. at 248. Based in part on dictionary definitions of the term "in," he concluded that the ordinary meaning of "'a predetermined signal in a television program transmission' requires a 'predetermined signal' that is located or positioned within an electronic transmission" Id. Likewise, it is found that the plain meaning of the phrase "storage means in a data processor" indicates that the "storage means" must be "within" the CPU.

In addition the administrative law judge finds the abstract of the '121 patent, which supplies relevant evidence for claim interpretation, [FN6] correlates the claim limitation "data processor" with "CPU 110" four times. Thus the front page of the patent has a diagram identifying the "CPU" as "110" (CX-1). The abstract then states:

     A data processor (110) is connected to receive the schedule information ... user remote control transmitter 116-remote receiver (118) combination supplies user selection inputs to the data processor (110). The data processor (110) selects programs from the schedule information based on the user inputs. The schedule information for the selected programs is stored in a memory (111), and is used by the data processor (110) to control a programmable TV tuner (132).

Id. The prosecution history of the '121 patent further supports the finding that the claimed storage means is within a CPU. When Young first attempted, in a proposed amendment attached to a Reexamination Interview Summary Form concerning a telephonic interview on January 6, 1993, to add language to the first occurrence of "a data processor" in claim 18, which language was the precursor of "storage means in," he did so by adding the language "electronic memory associated with a data processor." (FF 129). On the face of this proposed amendment to claim 18, hand-written brackets were placed around the words "associated with" and the word "in" was hand-written next to the end of that line of text. Id. This change was incorporated into Young's next Proposed Amendment faxed on January 21, 1993 which read "electronic memory in"

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 22
USITC Inv. No. 337-TA-454

a data processor. (FF 130). Thus, the Examiner did not allow Young to claim an electronic memory that was "associated with," but not "in," a data processor.

   Also on two separate occasions, the Examiner rejected Young's attempts to amend the specification to state that the buffers discussed at column 17, lines 38-49, are located within some form of storage device coupled to, rather than in, the data processor/CPU. First, in a February 26, 1993 supplemental amendment Young attempted to amend column 17, line 49 to read, "Program list buffer 303, screen buffer 353, and the other buffers discussed above are located within an electronic memory coupled to the data processor, such a electronic memory 111." (FF 144). Young argued that this amendment made explicit various aspects of the invention, and the changes to the specification were not "new matter because at column 16, lines 45 et seq., it is stated that the CPU stores the program data in program list buffer 303." (FF 144). The Examiner, in an Office Action dated March 26, 1993, disagreed and rejected this amendment as "new matter." (FF 152). The Examiner's explanation as to why he considered this new matter was cut-off in the document. (FF 153).

   A subsequent amendment dated April 6, 1993 stated, "Program list buffer 303, screen 353, and the other buffers discussed above are located within a data storage device coupled to the data processor." (FF 156, 157). The Examiner, however, in a Reexamination Interview Summary form regarding a telephonic interview held on April 19, 1993, rejected this amendment because he found that the language "are located within a data storage device coupled to the data processor" constituted new matter. (FF 158). In Young's next amendment to the specification, dated April 20, 1993, Young changed "data storage device coupled to a data processor" to "data storage means," as he had agreed he would in the April 19, 1993, "telephone conversation" with the Examiner. (FF 159, 160). This amendment was accepted, and the claims were allowed. (FF 160, 161). Hence, the administrative law judge finds that the Examiner refused to allow Young to amend the specification to place the buffers that comprise the storage means outside of the data processor/CPU.

   Complainants argued that if "data processor" is interpreted to mean a CPU without any associated memory, such an interpretation would render the '121 patent invalid for lack of an enabling disclosure and therefore such an interpretation should be avoided. The basis for complainants' argument that interpreting "data processor" as a CPU would invalidate the '121 patent is that the CPU disclosed as part of the preferred enablement of the '121 invention using a Little Board/186 Microcomputer does not have sufficient capacity in its internal memory to store the volume of data that would be required to be stored by the claims in issue. (See, e.g., CRPost at 62-65). Neither respondents nor the staff dispute that the Little Board/186 Microcomputer would be incapable of containing the data required to be held by the storage means in the claim 18 invention.

   The '121 patent states, "[t]he systems shown in FIGS. 1-4 are preferably implemented with the commercially available subsystems shown in the following table." (col. 21, lns. 21-22). Among the "commercially available subsystems" so identified is the "Little Board/186 Microcomputer," which is the subsystem identified as being the preferred method of implementing system control units 106 (of Fig. 3) and 180 (of Fig. 4) (col. 21, lns. 30-31). System control units 106 and 180 each are depicted in FIGs. 3 and 4, respectively, as a block containing, inter alia, another block representing a CPU. The Little Board/186 Microcomputer has an integrated 80186 CPU and has either 128K or 512K of RAM. (Tr. at 3740-41; CX-3452). Respondents' expert, Rhyne, agreed, with respect to the Little Board/186 Microcomputer and after examining the Little Board's specification sheet (CX 3542), that it would be impossible to store the data required to be held in the storage means available on the CPU. (Tr. at 3742). However, complainants made no allegation before the administrative law judge that the Examiner, either during the original prosecution or during the extensive reexamination proceedings (FF 92-168) was given access or made aware of the Little Board's specification sheet.

   Furthermore, although the specification of the '121 patent identifies the Little Board/186 Microcomputer as the preferred device to enable system control units 106 and 180, the specification does not state that the Little Board device is the only device capable of being used to implement the control system units. Complainants

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claimed that no CPU, as of 1985, was capable of storing the information on its
internal registers that claim 18 required to be stored on the storage means. [FN7]
In support of this argument, complainants relied upon the testimony of their expert,
Faillace, and that of respondents' experts, Grimes and Rhyne.

   Faillace testified that "[t]he most expensive microprocessor you could get in 1985
had in its internal registers that were available for storing things, about two
dozen bytes of storage," and that this would be inadequate to hold the information
required to be held in claim 18's storage means. (Tr. at 1208- 10; 5624-25).
Faillace also testified as microcomputers existed in 1985 they would be unable to
hold the information required to be held by claim 18's storage means (Tr. at 1219-
20) and that one in the ordinary skill of the art as of 1985 would not have
interpreted the '121 patent to be referring to the internal registers of a CPU
because such an interpretation would not have read on the preferred embodiment. (Tr.
at 1225). Rhyne testified that he was unaware of a CPU with sufficient memory within
itself to meet the storage requirements, but testified that if such a CPU existed it
would have read on claim 18. (Tr. at 3785). In fact, both of respondents' expert
witnesses, Grimes and Rhyne, were unable to identify any CPU that existed, as of
1985, that would have had sufficient memory internally to hold the data required to
be held by the storage means of the claims in question. (Tr. at 3784-85; 4343-49).

   Under Talbert Fuel Systems Patents Co. v. Unocal Corp., 275 F.3d 1371 (Fed. Cir.
2002), it is complainants' burden to show that a preferred construction would render
the patent invalid for lack of an enabling disclosure. In Talbert the federal
circuit affirmed a district court's construction of a patent claim relating to a
"gasoline having a boiling point range of 121-345° F" in which the lower court
interpreted the claim "as limited to gasolines having a final boiling point of 345°
F, and excluding gasolines having a higher final boiling point," despite the
plaintiff's claim that the lower court's construction was "incorrect because it was
inoperable." Id. at 1374-76. In rejecting the plaintiff's argument, the federal
circuit observed that, "while it agreed that a construction that renders the claimed
invention inoperable should be viewed with extreme skepticism," the plaintiff "did
not demonstrate inoperability or provide any basis for judicially interpreting the
claim to adjust the temperature range that [the plaintiff] stat[ed was] the
inoperable limitation." The administrative law judge finds that complainants have
not met their burden in establishing that the invention disclosed in claim 18 would
be inoperable if the data processor were interpreted to be a CPU.

   In Genentech, Inc. v. Novo Nordisk, 108 F.3d 1361 (Fed. Cir. 1997), the Federal
Circuit observed that "[t]o be enabling, the specification of a patent must teach
those skilled in the art how to make and use the full scope of the claimed invention
without 'undue experimentation.'" Id. at 1365. The court further noted that
"[p]atent protection is granted in return for an enabling disclosure of invention,
not for vague intimations of general ideas that may or may not be workable." Id. at
1366. [FN8]

   There is no question that the specification for the '121 patent is more than a
"vague intimation[] of general ideas that may or may not work." The only argument
that was raised concerning the enablement of the '121 patent was that there was no
CPU in 1985 that was capable of performing all the data storage functions of the
data processor of claim 18. While Rhyne and Grimes testified that they were unaware
of any microcomputer existing in 1985 that had sufficient internal memory to satisfy
the storage requirements of claim 18, there is no indication that either one made
any attempt to locate such a CPU. Such an omission is determinative, because both
Grimes and Rhyne were respondents' witnesses, and respondents were not challenging
the validity of their proposed construction. It was complainants' burden to
ascertain whether or not there were such CPUs available in 1985.

   Complainants' sole remaining evidence in support of their argument is the
testimony of Faillace, who made a conclusory statement that there were no such CPUs
available in 1985. Faillace did not detail how he had determined that no such CPU
had been available in 1985 nor did he identify what CPUs were available in 1985 and
that any specific microcomputer was inadequate. An expert's opinion on the ultimate
legal issue of enablement must be supported by something more than a conclusory

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statement. See In re Buchner, 929 F.2d 660, 661, 18 U.S.P.Q.2d 1331, 1332 (Fed. Cir. 1991). Thus the administrative law judge rejects complainants' argument that construing "data processor" to be "CPU" would render the '121 patent invalid on account of a lack of an enabling disclosure.

c. The language "supplying user program selection criteria to the data processor, said user program selection criteria comprising a plurality of independent user chosen program selection criteria and at least one program choice, the data processor combining said user selection criteria, selecting those programs meeting the combined user selection criteria for viewing from the program schedule information in said storage means in the data processor"

The parties disputed the proper interpretation of the terms "said selection criteria" and "combining" as used in the above portion of claim 18. Complainants argued that the "said user selection criteria" must include a "program choice" and are not limited to the criteria of theme, channels, and prime time. (CPost at 52). Respondents and the staff argued that "said user selection criteria" do not include a "program choice" and are limited to the criteria of theme, prime time and channels. (RFF 789, SPost at 11).

The parties also disputed whether the term "combining" as used in claim 18, requires the data processor to employ logical "AND" combining of the selection criteria, or whether the data processor can employ logical "OR" combining of the selection criteria instead of logical "AND" combining. Complainants argued that the data processor could employ just logical "OR" combining, such that the data processor would use the combined "user selection criteria" to select those programs that satisfied any of the user selection criteria. (CPost at 59-60). Respondents and the staff argued that the data processor must employ logical "AND" combining, such that the data processor, using the combined user selection criteria, would select only those programs that satisfied all of the combined selection criteria. (RFF 854; PPost at 82-83).

Finally, complainants argued that the combining step could be performed through multiple, sequential searches. (CRRFF 817.3). Respondents and the staff argued that the combining step had to be performed prior to any search by the data processor. (RFF 817).

Accordingly, there are four areas of dispute relating to the language: (1) whether a "program choice" is part of the "said user selection criteria" combined by the data processor, (2) whether the "said user selection criteria" combined by the data processor are limited to the criteria of theme, prime time, and channels, (3) whether "combining," as used in claim 18, requires the use of logical "AND" combining of the selection criteria or whether it can mean just the use of logical "OR" combining, and (4) whether the combining step could be performed through multiple sequential searches or has to be performed prior to any search. These four issues will be addressed ad seriatim.

i. Whether a "program choice" is part of the "said user selection criteria" combined by the data processor

The above portion of claim 18 mentions criteria in three contexts, viz., (1) "user program selection criteria," which is supplied to the data processor, (2) "independent user chosen program selection criteria," which, in part, composes the "user program selection criteria," and (3) "user selection criteria," which is "combined" by the data processor. In addition, the phrase "user selection criteria" is referred to as "said user selection criteria," but there is no preceding use of the term "user selection criteria." In fact, claim 18 only uses criteria in connection with two terms before reciting "said user selection criteria," viz., "user program selection criteria," and "independent user chosen program selection criteria." Therefore, the administrative law judge finds that the plain language of the claim indicates that "said user selection criteria" is referring to one of those two terms. Referring to the plain language of claim 18, if "said user selection criteria" were interpreted to refer to "user program selection criteria," "said user selection criteria" would include a "program choice," as well as "independent user

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

chosen program selection criteria." However, if "said user selection criteria" were
interpreted to refer only to "user chosen program selection criteria," then this
would exclude "program choice" from being a "said user selection criteria," since
"independent user chosen program selection criteria" and "program choice" are
separate and distinct components of "user program selection criteria." Thus, a
finding must be made as to whether "said user program selection criteria" refers to
"user program selection criteria" or "independent user chosen program selection
criteria."

   From the plain language of claim 18 and the specification, the administrative law
judge finds that "said user selection criteria" refers to "independent user chosen
program selection criteria," exclusive of the program choice. A "program choice" is
the user's choice of a single television program at a specific date and time, as the
term "choice" means "the voluntary and deliberate action of picking, singling out,
or selecting from two or more that which is favored or superior.' (RX-7407 at ES-
7033-000671). Thus, a "program choice" is the deliberate selection or singling out
of a specific program, on a specific channel, at a specific time. The '121 patent's
specification supports this construction. For example, the '121 patent's
specification (and its original claims) never use the term "program choice." Said
specification does, however, give examples of a user making a selection of a
particular program, provided on a particular channel, at a particular time and date.
(See, e.g., CX-1, at col. 16, lns. 18-23, col. 18, lns. 16-18). Hence the
administrative law judge finds that a "program choice" by the viewer, i.e., an
actual selection of a particular program to watch by the user, would render any
subsequent combining of "user selection criteria" so as to select those programs for
viewing from the stored program schedule information, needless. The user does
ultimately make a "program choice," but this is after the data processor has
combined the "user selection criteria" and has selected those programs satisfying
the combined criteria, so that the user makes his "program choice" from those
programs selected by the data processor.

   Furthermore, interpreting "said user selection criteria" to mean only
"independent user chosen selection criteria" is consistent with the earlier use of
the term "said user program selection criteria," in the claim, which refers to the
antecedent "user program selection criteria," as the term "independent user chosen
program selection criteria" has not yet occurred in the claim. Therefore, when the
inventor wanted to refer to "user program selection criteria" he referred to it as
"said user program selection criteria." Hence "said user selection criteria" must
mean something other than "user program selection criteria."

   The interpretation that "said user selection criteria" refers to "independent user
chosen selection criteria" is consistent with the language of the specification
which states:
   A search of the program listing 352 is made. The search is dependent on the
status of the channel buffer, the theme buffer, the prime time buffer, and the
direction of the search. If the page 356 is up, the search direction is forward
starting from the list pointer. When the search satisfies the above criteria, the
program listing is placed into the screen buffer 353. The search continues until the
screen buffer is full 354 in which case the search is terminated. The status lines
information is passed to the screen and displayed by the TV.

                                    * * *

   If an SEL key entry is detected at 370, the channel of the programmable tuner
132 or 164 will be set to the channel listed at 375 at the current cursor position
of the MG display.
(CX-1 at col. 17, ln. 38-col. 18., ln. 4). Therefore, as this excerpt from the
specification makes clear, the data processor's search of the program schedule
information does not take into account the viewer's selection of a particular
program to view, because such a selection occurs after the search.

   The interpretation of "said user selection criteria," as referring to
"independent user chosen program selection criteria," is supported by the
reexamination history, during which the applicant, in order to distinguish the use

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 26
 USITC Inv. No. 337-TA-454

of combined selection criteria by the invention disclosed in the '121 patent over
the selection of a single program, stated in the Amendment of November 23, 1992
that:

    Regarding the claimed 'combining of user selection criterion,' the Examiner
has asserted that this reads on the plurality of data needed to identify a single
program to be recorded (channel, time, etc.) This trivializing simplification,
however, ignores the plain meaning and interpretation of the claims, which
interpretation is also supported by the specification. Of course, programming
information such as channel and time might be used as selection criteria, but, such
as is recited in claim 18, the selection criteria must then be combined, the
combined criteria must be used to select programs from schedule information, and
then the schedule information for the selected programs is stored. These steps are
clearly not met by the simple input and storage of programming data for a single
program.
(FF 117) (Emphasis in original)

  Said interpretation is also consistent with the applicant's February 26, 1993
Supplemental Amendment After Final:

  Combining User Selection Criteria and Selecting Programs
    Several of the present claims recite a process in which the user enters user
program selection criteria, and the data processor combines the program selection
criteria, searches through the stored schedule information, and creates and stores a
display list of program listings that meet the combined criteria. This is disclosed,
for example, at col. 17 lines 33 et seq. The user may then make program selection
choices (which the Examiner has characterized as further program selection criteria)
from this display. The data processor then stores information for these program
selections, including information identifying program titles, in a reminder calendar
list.
    Several claims recite the data processor combining a plurality of user selection
criteria other than the program choices. This is different from the scenario that
the Examiner has proposed would be inherent in Levine and similar art, namely that
the user could enter a date as a first selection criteria, then be presented with a
page of program listings, and then enter a program choice as a second selection
criteria to be "combined" with the date selection criteria. As amended, several
claims (such as claim 1) require the [sic] data processor combine a plurality of
selection criteria in addition to the program choice. The Examiner's proposed date
entry does not meet the requirement of combined selection criteria even if entered
as a series of page commands. Each page command simply establishes a new requirement
that supersedes and replaces the previous requirement rather than being combined
with it.
(FF 150) (emphasis in original omitted and emphasis added).

  Based on the foregoing, as complainants' representations to the Examiner during
the '121 patent's reexamination bear out, the administrative law judge finds that
the "said user selection criteria" that is combined by the data processor does not
include the "program choice," but instead consists of the "independent user chosen
program selection criteria." Hence, a "program choice" is found not to be a "said
user selection criteria" that is combined by the data processor.


ii. Whether the "said user selection criteria" combined by the data processor is
limited to the criteria of theme, prime time and channels

  The claimed language in issue uses the word "criteria." Criteria is the plural of
criterion which is defined as "a standard on which a decision or judgement may be
based." (Webster's Third New Int'l Dictionary (1993)). Thus the administrative law
judge finds that "independent user chosen program selection criteria," which is
referred to by the "said program selection criteria," are two or more standards used
for the selection of programs by the data processor. Further he finds that the plain
language of "independent user chosen program selection criteria" indicates that it
is the user who determines which criteria are to be so used and sets those criteria.
As set forth in the specification:
    It is a further object of the invention to provide such a system in which the
user supplied selection criteria can be combined by the system to make program

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                            Page 27
USITC Inv. No. 337-TA-454

selection.
(CX-1, col. 3, lns. 14-20).
      Because the system will search through a volume of schedule information to
find programs meeting the viewer's selection criteria, the program selection is much
easier and more rapid with the system of this invention than with manual selection.
(CX-1, col. 5, lns. 19-36). However, the administrative law judge finds that the
intrinsic evidence, specifically, the specification and the re-examination
proceeding, makes it clear that the term "independent user chosen program selection
criteria" refers to the criteria of "theme" (i.e., selection of programs classified
in a particular theme, e.g., "news" or "drama"), "channel" (i.e., selection of
programs being broadcast on particular channels), and "prime time" (i.e., selection
of programs being scheduled for broadcast at a particular time slot), the parameters
of which can be pre-selected by the user. For example, the specification describes
what is shown on the screen when the claimed invention is working in the "Master
Guide (MG) mode:"
      At the bottom of the screen is a two line status display; showing the actual
time and date, and whether any of the search restrictions (prime, theme, and
channel) are activated.
(CX-1, col. 11, lns. 34-37 (emphasis added)).

   The specification later describes how the invention, when working in the  "Program
Guide (PG) mode," conducts searches of the program listings according to the theme,
prime time, and channel criteria as set by the user. (See CX-1, col. 12, ln. 12 -
col. 15, ln. 17; and, in particular, col. 12, ln. 45 - col. 13, ln. 58; col 13, ln.
60 - col. 14, ln. 34; and col. 14, ln. 36 - col. 15, ln. 17). Also, the
specification describes the invention as conducting searches only on the basis of
theme, channel, and prime time:
      For advanced users, the Program Master can be set up to list only the types of
programs (theme), only certain channels, and only programs within a certain time,
such as Prime Time.
(CX-1, col. 12, lns. 13-16). [FN9]

   Furthermore, during the re-examination of the '121 patent, the applicant
repeatedly indicated that "selection criteria" were prime time, theme, and channel.
For example, the applicant in his August 13, 1992 amendment distinguished his
invention over a prior art system of Kram by noting that the prior art "cannot
automatically combine two selection criteria such as 'weather' and 'channels 2, 5,
and 11."'). (FF 107). Thus, according to the applicant, the theme ("weather") and
the list of desired channels ("2, 5, and 11") are each a single criterion. Later in
the reexamination proceeding, the applicant reiterated that each of theme, channel,
and prime time is an individual selection criterion. For example, in the Amendment
of February 26, 1993, Young stated:
      The user selection criteria may be entered and activated independently under
different categories (theme, channel, prime time) and are maintained by the data
processor whether currently activated or not. This is disclosed, for example, from
column 12 line 12 to column 15 line 17 (wherein it is stated that buttons can be
pressed to independently activate the THEME, PRIME-TIME, and CHANNEL selection
criteria) and from Column 18 line 11 to column 20 line 38. Furthermore, the
selection criteria can be combined as alternatives (in a logical OR fashion), such
as a list of acceptable channels or a list of acceptable themes.
(FF 148) (emphasis added).

   Additionally, applicant Young in the August 10, 1992 Amendment, specifically
argued that his invention provided for prime time, channel and theme criteria that
could be independently activated and stored for use after being selected:
      Typical schedule selection criteria include accessible satellite symbols or
channel numbers, viewing times, or programs themes (news, sports, comedy, etc.) The
system stores the schedule selection criteria, and the various selection criteria
may then be enabled or disabled by the user as desired. When schedule information is
presented to the user, the data processor system automatically combines all the
currently enabled schedule selection criteria and presents to the user only schedule
information meeting the requirements of the combined criteria.
(FF 97). The applicant reaffirmed his position that his invention provided for prime
time, channel and theme criteria that could be independently activated and stored

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 28
USITC Inv. No. 337-TA-454

for use after being selected in his February 26, 1993 Supplemental Amendment After
Final:
    The user selection criteria may be entered and activated independently under
different categories (theme, channel, prime time) and are maintained by the data
processor whether currently activated or not.... Also the prior art does not allow
complex entries such as theme or channel lists to be deactivated yet stored in
memory.
(FF 150) (Emphasis in original).

    As found, supra, the '121 patent describes a channel list as one of the three user
selection criteria that can be stored in a buffer and independently activated. The
administrative law judge finds the '121 prosecution history shows that a list of
favorite channels is a single user selection criterion, even though more than one
channel is included in the list. In the Amendment of August 13, 1992, Young stated:
"The system of Kram cannot automatically combine two selection criteria such as
'weather' and 'channels 2, 5, and 11' to provide the user a custom assembled list of
programs meeting the combined criteria." (FF 107). By placing quotes around
"weather" and "channels 2, 5, and 11" Young identified the two referenced selection
criteria. If each channel were itself a selection criterion he would have referenced
four criteria (channels 2, 5 and 11 and weather) not two (weather and channels).

    Furthermore, as Young explicitly stated in the February 23, 1993 Proposed
Supplemental Amendment After Final:
    III. Clarifying Manner of Combining: Independent claims 65 and 68 now require
that at least some of the selection criteria are combined as alternatives. This is
supported, for example, at column 14, in the discussion of the Channel Restriction
selection criteria. Multiple channels may be specified, and the combined channel
criterion is satisfied whenever any one of the selected individual channel criteria
matches a listing.
(FF 141) (Emphasis added). Thus, as Young made explicit during the reexamination
proceeding, even though more than one channel may be specified so as to restrict the
data processor's search, the channels so specified constitute collectively only one
selection criterion.

    Based on the foregoing, in view of the plain language of claim 18, the
specification of the '121 patent and its prosecution history, the administrative law
judge finds that the "user program selection criteria" are the theme, channel and
prime time criteria.

iii. Whether "combining," as used in claim 18, requires the use of logical  "AND"
combining of the selection criteria or whether it can mean just the use of logical
"OR" combining

    Claim 18 requires "combining said user program selection criteria." The term
"combining," as used in claim 18, means the combining of "independent user chosen
program selection criteria" such that the programs selected in the subsequent search
satisfy all of the selection criteria. The administrative law judge finds that the
intrinsic evidence makes it clear that when combining the user selection criteria
(theme, prime time and channel) such combining is logical "AND" (the selected
programs must satisfy all of the combined criteria). However, the administrative law
judge further finds that the intrinsic evidence establishes that the channel and
theme selection criteria may be comprised of lists of multiple themes or channels,
wherein the channels or themes composing these lists are combined in a logical "OR"
manner, such that a selected programs must satisfy only one of the listed themes or
one of listed channels.

    Referring to the reexamination proceeding, the applicant, in his Amendment of
August 21, 1993, specifically stated:
    Furthermore, even if the system of Kram could be used as a television guide
controller for Kruger, the present system would not result. First, it is noted
systems such as Kram cannot custom assemble a new page of data combining a plurality
of listings earlier received. Systems such as Kram are only capable of associating
related but distinct pages of data which must be viewed one at a time. The Examiner
cited a "weather", then "city" operation in Kram. This type of operation is

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

explained in more detail from col. 24, line 52 to col. 26, line 41. If the user
selects a keyword topic "weather", the system constructs an index menu including
each page having the keyword "weather". Each such page will also have a particular
supplemental keyword which will be displayed on the index menu. The user then
chooses one of the index entries to retrieve either a single page or a series (one
at a time) of relational pages. The system of Kram cannot automatically combine two
selection criteria such as "weather" and "channels 2, 5, and 11" to provide the user
a custom assembled list of programs meeting the combined criteria. The system of
Kram could only provide a first index in response to "weather", from which the user
would have to select "channel 2" to receive that screen, and then select "channel 5"
to receive that screen, and then select "channel 11" to receive that screen.
Furthermore, as with Kato, Kram is very specific and does not remedy the general
deficiencies of Kruger.
(FF 107) (Emphasis added). From the wording of this statement the administrative law
judge finds that the applicant was distinguishing his invention from prior art,
since his invention could automatically create a list of programs that related to
"weather" and were to scheduled to be broadcast on channel "2" or channel "5" or
channel "11." Moreover, this statement demonstrates the logical "AND" combining
between selection criteria (i.e., themes (weather) and channels (2, 5, and 11)) and
the logical "OR" combining between the individual channels comprising the channels
selection criterion (i.e., "2, 5, and 11"), that the invention was designed to
accomplish. This is apparent by the steps a user of the Kram system of would need to
carry out in order to duplicate the results of the '121 invention. Thus, the user
would have to first select "weather," and then the user would have to select channel
2 to receive a listing of the programs relating to programs relating to weather on
channel 2 from the index provided to him by the Kram system. The user would then
need to select channel 5 to receive a listing of the programs relating to weather on
channel 5. Finally, the user would need to select channel 11 to receive a listing of
the programs relating to weather on channel 11. Upon completition of those steps,
the user of the Kram system would have received listings of all of the programs
relating to "weather" and occurring on channel 2 or channel 5 or channel 11. While
this result duplicates the '121 invention's logical "AND" combining of the theme and
channel selection criteria and its logical "OR" combining of the list of channels
comprising the channel selection criterion, the administrative law judge finds that
it does not duplicate the results of using only logical "OR" combining because the
user would not have received a list of all the programs relating to weather (only
those programs relating to weather and occurring on channels 2, 5, and 11) and would
not have received a listing of all the programs occurring on channels 2, 5, and 11
(only those programs relating to weather).

     The administrative law judge finds that the claim 18 invention's requirement of
logical "AND" combining is consistent with the teaching of the '121 patent itself.
Thus, the '121 patent teaches the use of independent user chosen program selection
criteria to reduce the number of scheduled programs to a subset which have certain
characteristics of particular interest to the viewer. For example, the '121 patent
teaches using "combined" criteria to select a particular subset of the available
programs. (See, e.g., at col. 1, lns. 14-17; col. 3, ln. 14-17; col. 3, ln. 19-24;
col. 5, ln. 19-27). To eliminate programs that the viewer is not interested in,
programs containing the characteristics of each of the combined criteria are
selected. As amended, the specification provides:
     A search of the program listing 352, stored in program list buffer 303, is
made. The search is dependent on the status of the channel buffer, the theme butter,
the prime time buffer, and the direction of search. If the page is down 357, the
search direction will be backward 358 from the current list pointer. When the search
satisfies the above criteria, the program listing from program list buffer 303 is
placed into the screen buffer 353.
('121 Reexam. Certificate col. 2, ln. 38-52 amending original '121 patent, col. 17,
lns. 38-49). As stated by complainants' expert, Faillace, the focus of the '121
patent was to help the average user use database techniques to take a vast sea of
program schedule information, cut it down to size, and enable that user to focus
just on those programs most likely to be of interest to him. (Failace, Tr. at 1150).

     Also Young, in a February 26, 1993 Amendment, stated:
          The user selection criteria may be entered and activated independently under

          ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

different categories (theme, channel, prime time) and are maintained by the data
processor whether currently activated or not. This is disclosed, for example, from
column 12 line 12 to column 15 line 17 (wherein it is stated that buttons can be
pressed to independently activate the THEME, PRIME-TIME, and CHANNEL selection
criteria) and from Column 18 line 11 to column 20 line 38. Furthermore, the
selection criteria can be combined as alternatives (in a logical OR fashion), such
as a list of acceptable channels or a list of acceptable themes.
(FF 150) (emphasis omitted from original and emphasis added). In this statement,
Young only mentions logical "OR" combining as occurring within individual selection
criterion (i.e., within the list of acceptable channels or the list of acceptable
themes) and not occurring between the selection criteria.

    Claim 67, which was added during the reexamination in an Amendment dated February
23, 1993, explicitly requires logical "OR" combining. However, Young used specific
language to so claim logical "OR" combining. Thus, while claim 67 requires
"supplying user program selection criteria to the data processor" (CX-1 at col. 12,
lns. 22-23), it does not further define the "user program selection criteria" to
include a plurality of "independent user chosen program selection criteria." Claim
67 later specifies, "wherein a group of said selection criteria are combined by the
date processor as logical alternatives so that the combination of said group of
selection criteria is satisfied whenever any one of said selection criteria of said
group is met." (Id. at col. 12, lns. 30-34). Hence, claim 67 describes the process
of setting up selection criteria, which are then combined as logical alternatives,
before being used to select programs meeting the combined criteria.

    This interpretation of claim 67 and its use of the language "logical alternatives"
is consistent with the reexamination proceedings, where Young explained in a
Proposed Supplemental Amendment After Final faxed on February 23, 1993:
    Independent claims 65 and 68 [which became claims 64 and 67] now require that at
least some of the selection criteria are combined as alternatives. This is
supported, for example, at column 14, in the discussion of the Channel Restriction
selection criteria. Multiple channels may be specified, and the combined of
selection criteria by the present invention versus the 'combining' of paging
commands or other selections by the cited prior art systems.
(FF 141). Therefore, as Young stated, multiple channels are combined as alternatives
(i.e., in a logical "OR" manner) to form the "channel criteria." However, Young gave
no indication that the "theme", "channel" and "prime time" criteria, each one
defined by a separate buffer, could be combined together in a logical "OR" fashion.

    Hence, in light of the plain language of the claim, the specification of the '121
patent, and complainants' own representations to the patent examiner during the '121
patent's reexamination proceedings, the "said user selection criteria" are to be
combined in a logical "AND" fashion, while lists of channels and themes comprising
the channel and theme criteria are to be combined in a logical "OR" manner.

iv. Whether the combining step could be performed through multiple sequential
searches or has to be performed prior to any search

    Complainants argued that the "combining" step can be performed through multiple
sequential and hierarchal searches, as long as these searches each use independent
criterion. Thus, it was argued that the limitation would be satisfied by a system
that allows a user to select a selection criterion, such as a particular title or
theme, causing the system to find the programs with the selected theme or title.
Complainants argued that the system then would display the programs satisfying the
first selection criterion, at which point the user could choose another selection
criterion, causing the system to display only those programs satisfying both the
first and second selection criterion. (CRRFF 817.3). Respondents and the staff
argued that for the "combining" step to be satisfied, the system had to combine the
selection criteria and then conduct a single search instead of multiple searches.
(RFF 817).

    The parties are in agreement that the applicant disclaimed "dependent, hierarchal"
entry of search data during the prosecution history. (CRRFF 817). Complainants
argued, however, that the applicant did not disclaim "combining user selection

criteria in a 'hierarchal' fashion when the user selection criteria are
'independent."' (CRRFF 805.14). Thus, complainants contended that a system that
allows a user to select one "independent" selection criterion and displays the
programs meeting that criterion, then allows the user to select another
"independent" selection criterion and then displays only those programs satisfying
the first selection criterion and the second selection criterion would satisfy the
"combining" limitation because it involves hierarchial entry of independent user
selection criteria. (See CRRFF 805 et seq.).

   The administrative law judge rejects complainants' argument. In support of their
argument, complainants relied upon the testimony of their expert witness, Faillace,
in an attempt to distinguish a "dependent hierarchial" search from a mere
"hierarchial" search. (CRRFF 805.13). Faillace testified as follows:
     In the context of the teletext art, this refers to the combination of criteria
for which the satisfaction of any one is entirely dependent on the satisfaction of
another, such as, for example, when soccer programs can only be requested if sports
programs have previously been requested.
(Faillace, Tr. at 5654). The administrative law judge finds that, Faillace's
testimony fails to make any distinguishment between mere "hierarchal" searches at
issue and "dependent, hierarchal" searches.

   According to complainants, the ability of some of the accused systems to allow a
user to select a criterion, conduct a search, display the search results and allow
the user to choose a second selection criterion, and then conduct a search for
programs meeting both selection criteria is somehow different than Faillace's sport
programs/soccer example. However, in both systems the second selection criterion is
"determined by and dependent upon the previous choice[]." For example, in Faillace's
example, sports programs is selected as the first selection criterion, and soccer is
selected as the second criterion, causing the system to select only those sports
programs relating to soccer. If movies were chosen as the first selection criterion,
and soccer were chosen as the second criterion, the system would find and display an
entirely different list of results, i.e., movies relating to soccer. Similarly, with
some of the accused devices, a user can, for example, select a particular theme,
view a list of programs with that theme, and then select a particular date, causing
the system to display programs of the selected theme scheduled to be broadcast on
the selected date. The second criterion is completely dependent upon the first
criterion, because if the user selects a different first selection criterion the
search results will differ even though the user chose the same second selection
criterion.

   In a February 26, 1993 Amendment, Young clearly disclaimed hierarchal entry of
data to distinguish his invention from prior art teletext devices:
     The user selection criteria may be entered and activated independently under
different categories (theme, channel, prime time) and are maintained by the data
processor whether currently activated or not. This is disclosed, for example, from
column 12 line 12 to column 15 line 17 (wherein it is stated that buttons can be
pressed independently activate the THEME, PRIME-TIME, and CHANNEL selection
criteria) and from column 18 line 11 to column 20 line 38.... This is far different
from even the cited teletext art, where search criteria are entered and combined in
a dependent, hierarchical fashion. At each stage in the cited teletext art, the
available search choices are determined by and dependent upon the previous choices
made....
(FF 150) (Emphasis in original).

   Thus, the administrative law judge finds that the selection criteria must be
combined prior to any search.

d. The language "storing information identifying the selected programs, said stored
information identifying broadcast schedule times, channels, and program titles"

   Complainants argued that "storing" means to place in an apparatus in which
information can be retained; that "information identifying" means data sufficient
"to serve as a means of identification for;" and that "the selected programs" refers
to the programs that were chosen by the data processor using the combined user

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

program selection criteria. (CFF 503). It was argued that the language in issue
requires information to be stored (i.e., placed or retained) in the system's memory,
and that such information be sufficient to allow the system to distinguish the
selected programs from the remaining programs so that the selected programs can be
tuned in. Complainants further argued that such information can include, for
example, an address or a pointer or a link to an address in memory for the specified
data or some other type of information, such as program times and channels. (CPost
at 69). Respondents argued that the language "storing information identifying the
selected programs" refers to "storing times, titles, and channels for the programs
that the user has selected. (RFF 875, 876).

   The plain language of the claim clearly indicates that "information identifying
the selected programs" consists of the broadcast schedule times, channels, and
program titles of the selected programs, and that this information is stored after
the data processor selects the programs on the basis of combined user selection
criteria. The prosecution history is consistent with this interpretation.

   In the June 8, 1992 Office Action, the Examiner found that original claim 18,
inter alia, of the '121 patent was subject to reexamination and rejected original
claim 18 as being anticipated or rendered obvious in light of several pieces of
prior art, including Yarbrough et al., U.S. Letters Patent 4, 305,101 (Yarbrough).
(FF 94). In the August 10, 1992 Amendment, responsive to this Office Action,
applicant Young, in an attempt to distinguish claim 18 from Yarbrough, made the
following argument:
   Independent process claims 18 and 32-38 all recite the process steps of
providing schedule information to a data processor, selecting programs from the
schedule information based on user inputs, storing schedule information for the
selected programs, and using the stored schedule information to tune a television to
receive the selected programs.
   It should be noted that the term "schedule information", both as used in the
present patent and as commonly understood, refers to a television schedule, i.e., a
list of programs to be shown over a range of times, with at least program titles,
program times, and, if for a plurality of channels, program channels. This usage is
consistent with the dictionary meaning, wherein a schedule is defined as "a list of
times of recurring events...; a timetable".
(FF 102).

   Original claim 18 did not recite the "storing [of] schedule information for the
selected programs," only the "storing [of] information identifying the selected
programs." Therefore the applicant was clearly equating "information identifying the
selected programs" with "schedule information," which is properly construed so as to
include title. See supra. The applicant also makes clear that the "schedule
information" of the selected programs is to be stored after the data processor has
selected the programs, not before. Thus the Examiner, in the September 22, 1992
Office Action, again rejected the original claim 18, but this time as being
anticipated by or obvious in light of Levine, U.S. Letters Patent, 4,963,994
(Levine) either alone or in view of Monteath et al., U.S. Letters Patent 4, 329, 684
and Wright, U.K. published application 2,034, 995. (FF 109, 112). The Examiner made
no mention of Yarbrough.

   In a November 23, 1992 Amendment responsive to the Office Action of September 22,
1992, the applicant stated that
   These rejections are based on a failure to recognize the fundamental distinction
between "schedule information" as used in, e.g., Claim 1 or "information identifying
the selected programs" as used in, e.g. Claim 18, and the program data used in the
prior art, i.e., sufficient data such as time, day and channel to program a VCR or
television set.

                                    * * * *

   Additionally, Applicant notes that Levine stores only conventional programming
data, not schedule information as presently claimed. As discussed in the previous
Amendment, the storage of schedule information as opposed to mere programming data
significantly enhances the user's ability to verify and later identify the selected

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

programs, and also enables the data processor to perform additional functions, such
as linking and tracking programs, i.e., allowing the user to review a list of
programs selected for future viewing or taping by presenting a calendar as
disclosed, rather than simple programming data for controlling a video recorder.
Some of the Examiner's current remarks appear to recognize the distinction between
these two types of information, but the relevance of this distinction to the
analysis of the claim language was not explicitly discussed. Applicant respectfully
submits that this distinction is an important one separating the claimed invention
from the prior art, and is sufficient to distinguish the claimed invention from the
prior art.
(FF 116) (Emphasis in original).

    Young also represented that:
    Claim 18 further requires "storing information identifying the selected
programs." It is respectfully submitted that data, channel and time data do not
sufficiently identify the selected programs. Date, channel and time data identify
time slots and channels without any identification of programs broadcast in the time
slots on the channels. Again, the distinction between identifying selected programs
and identifying only time slots and channels is critical for achieving many
benefits" tracking programs that have been selected with the system, i.e., allowing
the user to review a list of programs selected for future viewing or taping by
presenting identifying information on the program, rather than just an indication of
when recordings will be made; linking related programs with the schedule
information; and, automatically updating the stored schedule information for the
selected program when the schedule time for a previously selected program is
changed, as described in the '121 patent. Because the prior art does not combine
user selection criteria, use such combined user selection criteria to select
programs meeting the combined user selection criteria in the data processor, or
store information identifying the selected programs, the Levine, Wright and Monteath
prior art fails to teach or suggest the subject matter of Claim 18 or its dependent
claims 19-31.
(FF 118) (Emphasis in original). Therefore, again Young distinguished the prior art
from claim 18 on the basis that "information identifying the selected programs"
included the programs title.

    In the January 5, 1993 Office Action the Examiner maintained his rejection of
claim 18 stating, inter alia:
    1) The examiner notes that applicant does not appear to dispute the receipt and
display of "schedule information" in Levine [see lines 1-4 in the last paragraph on
page 8 of the arguments filed 11/23/92]. Nor does applicant appear to dispute that a
user may enter codes into the system of Levine, wherein said codes are obtained from
the displayed "schedule information", such that the entered information directs the
processor to control a video recorder to receive and record the selected programs
[see the paragraph which starts on page 8 and extends to page 9 in the arguments
filed 11/23/92].
    As disclosed, applicant's claimed invention also displays schedule information
from which a user also selects the desired program to be recorded. The user then
also enters data into the system which directs the processor to control a video
recorder to receive and record the selected programs. Applicant's disclosed system
differs from Levine in that the user inputs of applicant are used by the processor
to actually access the stored information while the user inputs in Levine actually
represent the stored information. The examiner maintains that the recitation that
the processor is "configured to select programs from the schedule information based
on user inputs" does not distinguish two systems. Specifically, the processors of
both systems are directed to record selected programs based on user inputs [see
applicant's arguments on page 9 and the first 7 lines of page 10].
    2) In the first full paragraph on page 10 of the argument's [sic], applicant
argues that Levine stores only "conventional programming data" and not "schedule
information" as claimed. This argument seems only to be directed to terminology
(i.e. labels) and appears to be inconsistent with applicant's discussion in the last
paragraph on page 8 in which applicant has acknowledged thestored [sic] data to be
schedule information [see lines 52-59 in column 2 of Levine].
(FF 123). Lines 1-4 of last paragraph on page 8 of the argument filed on November
23, 1992 read:

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 34
USITC Inv. No. 337-TA-454

    Levine discloses a system which can prompt the user through the steps of
programming the VCR and which in some embodiments can display schedule information
on the television screen.
(FF 115) (Emphasis added).

    Therefore the Examiner rejected applicant's attempt to distinguish Levine from
claim 18, because by the applicant's own admission Levine could utilize schedule
information, rendering the distinction between schedule information and programming
data made with respect to Yarbrough irrelevant.

    Applicant Young, next, in interviews with the Examiner and in submissions of
proposed amendments for the Examiner's evaluation, attempted to distinguish claim 18
from the prior art by specifying an "electronic memory" for the storage means. See,
supra. This attempt to define the "storage means" as an "electronic memory"
ultimately failed. See, supra. While attempting to so define "storage means,"
applicant Young also, in the February 23, 1993 Proposed Supplemental Amendment,
added the phrase "said stored information identifying broadcast schedule times,
channels, and program titles" and explained that amendment accordingly:
    I. Clarifying Schedule Information: Independent claims 1, 12, 14-15, 18, 33-34,
36-38, and 54 have been amended, in addition to the earlier clarifications agreed
upon by the Examiner, to further clarify that the schedule information stored for
the selected programs identifies not only program channels and times, but also
program titles. New claim 57 also contains this recitation. As previously noted,
prior art systems simply program the VCR with the channels and times for selected
programs; information identifying the title was not stored.
(FF 141).

    The phrase "said stored information identifying broadcast schedule times,
channels, and program titles" was retained in a February 26, 1993 Supplemental
Amendment After Final, as was the attempt to define storage means as an electronic
memory. (FF 144 to 151). In a March 26, 1993 Office Action, the Examiner rejected
claim 18 as modified, because of the attempt to define storage means as an
"electronic memory." (FF 152 to 155). The Examiner did not object to the addition of
the phrase "said stored information identifying broadcast schedule times, channels,
and program titles." Id. In the April 6, 1993 Amendment, Young submitted claim 18
with language referring to an electronic memory removed, but still with the phrase
"said stored information identifying broadcast schedule times, channels, and program
titles." (FF 156, 157). Claim 18 as modified was ultimately approved for inclusion
in the issuance of the reexamination certificate. (FF 158, 161, 162, 163, 164).

    Therefore, the prosecution history and the plain language of the claim, clearly
support the administrative law judge's interpretation of this language as meaning
that the "information identifying the selected programs" consists of the broadcast
schedule times, channels, and program titles of the selected programs, and that this
information is stored after the data processor selects the programs on the basis of
combined user selection criteria.

e. The language "and using the stored information to tune the television receiver to
the selected programs"

    Complainants argued that the language means the data processor must use some of
the stored information about the selected programs to cause a programmable tuner for
the television receiver to tune in the selected programs. It was further argued that
"tun[ing] the television receiver" means isolating a desired signal for a selected
program from among a group of signals being received. (CPost at 74, 75).

    Respondents argued that "tun[ing] the television receiver" requires "conventional
tuning, i.e., the tuning to analog channels that was done by the analog television
in 1985 and 1990." (RFF 958). It was also argued that "tuning the television
receiver" excludes tuning a tuner that is external to the television set. (RFF 981).

    There is nothing in the claim language, patent specification, or file history, to
limit the "programmable tuner" to an analog or digital tuner or evinces any need or
intent to limit the invention to analog tuning. There is no language in the claim

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that limits "tuning" to analog tuning or which excludes digital tuning. On the
contrary, the only kind of tuning that the claims require is tuning to selected
programs. The administrative law judge finds no language in the claims which defines
or limits tuning to the selection of a frequency. Indeed, the express language of
claim 18 states that tuning means "tun[ing] the television receiver to the selected
programs."

   The administrative law judge also finds no statement in the specification that
tuning means selecting frequencies. Indeed, there is no reference at all in the
patent specification to selecting a frequency or frequencies or to tuning to a
frequency or frequencies and the '121 patent's specification does not expressly or
implicitly require analog broadcasts or an analog tuning process. Respondents have
failed to cite a single part of the specification that discusses tuning to a
frequency or equates tuning with selecting a frequency. [FN10] The administrative
law judge finds that the only requirement ascribed by the specification to the
invention's tuner is that it be "programmable." (CX-1, col. 4, lns. 46-48; col. 7,
lns. 60-61; col. 8, lns. 48- 56). A "programmable tuner" is a tuner "that is capable
of programmatic control, as control via control signals, as opposed to control
signals." (RFF 986). The specification clearly shows that the control signals
controlling the programmable tuner are generated by the data processor. ('121
patent, col. 7, lns. 60-61; col. 8, lns. 35-40). Likewise the administrative law
judge finds that the two places that specifically discuss tuning, state that the
television receiver must be "tuned" to selected programs or "channels for selected
programs," ('121 patent, col. 4, lns. 53-60; col. 11, lns. 60-65) without any
indication of how the tuning is to be achieved. He also finds that the term
"channel" has not been used in the specification of file history to refer to a band
of frequencies. Rather, the '121 patent's specification repeatedly uses the term
"channel" to mean "service provider." Equating "channels" with service providers is
consistent with digital tuning because the tuner would be used to find a particular
provider not necessarily a particular frequency. The administrative law judge notes
that the patent specification uses the word "channel" synonymously with service
provider no fewer than 10 times, each underscored below:
   "In most metropolitan areas, a large variety of cable programming is available.
Since a cable channel will provide its signal on different numbered channels in
different areas, depending on which channels are otherwise unused, programming for
the cable channels is disseminated on a national or regional basis by the name of
the channel, rather than the particular channel number on which the signal is
supplied, while the television set must be tuned by the channel number. In the San
Francisco metropolitan area, for example, there are presently 15 different cable
channels that are listed by name, not channel number. A viewer will often not
remember the channel number on which a given cable service is furnished, especially
if that service is only watched occasionally. U.S. Pat. No. 4,405,946, issued Sept.
20, 1983 to Knight, discloses a system for providing an on-screen display of channel
numbers or an indication that a signal is coming from a recording device, but with
no teaching or suggestion of displaying a cable channel by name rather than number."
(CX-1, col. 2, lns. 36-55).

   The administrative law judge finds, consistent with the way "channel" is used
throughout the specification ('121 patent, col. 2, lns. 36-35, col. 5, lns. 21-24,
col. 4., lns. 13-18, col. 10, lns. 24-37), channel refers to a programming source
typically identified by a number or a service name, such as Channel 2 or Channel 5
or HBO. Indeed, the '121 patent's specification, in the Summary of the Invention
section equates channel selection with program selection ('121 patent, col. 3, lns.
21-24). In fact, the specification expressly disclaims that it is providing any
novel teachings in the area of broadcast systems or processes. ('121 patent, col. 6,
lns. 55-59, col. 7, lns. 24-30). Furthermore, the patent itself contemplated that
program schedule information could be supplied to the system of the invention in
digital form over the internet, from internet service providers such as Compuserve
('121 patent, col. 21, ln. 65-col. 22, ln. 9). Such information could not have been
used by the patented system unless the techniques for isolating the desired digital
data was known in the art.

   Similarly, the administrative law judge rejects respondents' arguments that the
tuner being tuned to the selected channel must be within the television receiver.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 36
USITC Inv. No. 337-TA-454

Figures 3, 4a and 4b, the only depictions of embodiments of the '121 invention, clearly depict the programmable tuner as being separate (i.e., outside) of the television receiver.

2. Other Claims In Issue

   Remaining claims 19-24, 26-28, 31-33, 36, 42, 43, 48-51, 54, 57-61 and 66 in issue are set forth in the section titled "ADDITIONAL FINDINGS." See FF 34 to 58. There follows interpretation of disputed language of those claims.

a. Independent Claim 32

   Independent claim 32 reads:
   A process for controlling the presentation of broadcast programs to a television receiver, which comprises supplying program schedule information to a data processor, supplying user program selection criteria to the data processor, using the user selection criteria to select programs for viewing from the program schedule information in the data processor, storing information identifying the selected programs, using the stored information to tune the television receiver to the selected programs, using the television receiver as a display by the data processor for presenting messages to the user during the process, including time remaining for a program being broadcast.
(FF 44). Much of the language in claim 32 is found in claim 18; and hence the interpretation of that language controls the interpretation of the same language in claim 32. However, based on the plain language of claim 32, the specification of the '121 patent and the reexamination proceedings, and the arguments of the parties, the following claimed language is in issue for interpretation: "program schedule information," "user program selection criteria," "supplying program schedule information to a data processor," and "during the process."

i. The language "program schedule information"

   Claim 32 recites, after the preamble, "comprises supplying program schedule information to the data processor." In issue is the meaning of "program schedule information." Complainants argued that "program schedule information" or "schedule information" should be given its ordinary meaning. i.e., "information concerning scheduled television programs." (CFF 282). In support of their argument complainants asserted that the specification does not, explicitly or implicitly, require that "schedule information" or "program schedule information" include the time, channel or title of a program (CFF 287(a)) and that the specification's use of the terms is consistent with the meaning urged by complainants. (CFF 287(b)). Each of respondents and the staff argued that the phrase should be interpreted in the same way as the identical phrase was interpreted in claim 18 and therefore that the term includes the titles of programs, as well as the scheduled broadcast time, and the channels.

   The language of claim 32, with respect to the term "program schedule information," differs significantly from the language of claim 18. Thus, while claim 18 contains the phrase "said stored information identifying broadcast schedule times, channels and program titles," which the administrative law judge found applicant specifically included in claim 18 due to rejections of claim 18 by the Examiner, claim 32 does not have said phrase. See supra. Moreover, the Examiner in finding that claim 32 avoided the art of record did not rely on the fact that the art of record does not show or suggest a process for controlling the presentation of broadcast programs to a television receiver which comprises storing information identifying the selected programs and identifying broadcast schedule times, channels and titles as he did for claim 18. As was found, supra, it was not until February 26, 1993 that applicant amended claim 18 during reexamination to include "titles" and represented that "[s]everal claims have been amended to specify the storage of program title for the selected programs and are thus believed to be allowable." (FF 150). However claim 32 in issue was never amended in the reexamination proceeding.

   In the reexamination proceedings original claim 32 was rejected over certain prior art in the Office Action of June 8, 1992. (FF 94). However in the next Office Action of September 22, 1992, the Examiner specifically found that claim 32, which does not

recite "titles," avoided the art of record in that it at least recites displaying
data indicating the time remaining in a broadcast signal and that such a display is
not taught or suggested by the art of record. (FF 112). Moreover in the next Office
Action of January 5, 1993, the Examiner again stated that claim 32 avoids the art of
record "as was set forth in paragraph 9 of paper #12 [viz., the Office Action of
September 22, 1992] (FF 128). Also in the supplemental notice of intent to issue the
reexamination certificate, mailed August 26, 1993, titles were absent from the
specific reasons the Examiner found claim 32 avoided the art of record. See FF 164.
The Examiner never required that claim 32 include titles to avoid the art of record.
While respondents relied on arguments of applicant made in a November 23, 1992
amendment, the Examiner in his Office Action of September 22, 1992 had already
determined that claim 32 avoided the art of record. Hence the administrative law
judge rejects the argument of respondents and the staff that "program schedule
information" of claim 32 must include broadcast schedule times, channels and program
titles.

   As to how "program schedule information" in claim 32 should be interpreted, the
specification states:
      This invention relates to an electronic system and a process which allows the
user to make broadcast selection using selection criteria that can be combined in
different ways. Most especially, the invention relates to such an electronic system
and process which receives the schedule information in broadcast form and then
processes the schedule information to make the selections.
(col. 1, lns. 11-21) (Emphasis added). Therefore, "schedule information," pursuant
to the specification, is the information that is used by the system or process to
select programs satisfying the selection criteria chosen by the user. As already
found, see supra, the selection criteria are prime time, channels, and theme. Hence
the "program information" must at least include: information concerning a program's
time of scheduled broadcast to satisfy the prime time criterion, the channel on
which it is to be broadcast to satisfy the channels criterion, and the theme of the
program to satisfy the theme criterion. This is the only information which is
required for the system or process to be able to conduct a search based on the
selection criteria.

   This finding is consistent with the following portion of the specification:
      The process of this invention includes the following steps. Program schedule
information is supplied to a data processor. User program selection criteria are
supplied to the data processor. The user selection criteria are used to select
programs for viewing from program schedule information in the data processor. The
stored information is used to tune the television receiver to the selected programs.
(col. 4, lns. 53-60). Thus, in this section of the specification,  "program schedule
information" must be sufficient so as to allow the system or process to search the
"program schedule information" and select those programs satisfying the "user
selection criteria." Therefore according to said section, the "program schedule
information" must consist of information about a program's broadcast time, the
channel on which it is to be broadcast, and its theme.

   Furthermore, in a subsequent portion of the specification, said portion under
"Broadcast Format," specifies that "[e]ach program listing is framed with the
following information[:]" "[s]tart time," "[d]uration of program," "[c]hannel
number," "[t]heme classification number," "[t]heme subclassification number,"
"[l]inking number (only for serial shows)," "[o]ptional expanded listing," "[e]nd of
program," "[s]atellite symbol," "[s]atellite name," and "[e]ncrypted and any special
broadcast indicators." (col. 20, ln. 65 - col. 21, ln. 15). Therefore, of the
information that is to frame the program listing, most of it is related to either
the program's time of broadcast ("[s]tart time," "[d]uration of program," and "[e]nd
of program"), the program's theme ("[t]heme classification number" and "[t]heme
subclassification number"), or the channel on which it is to be broadcast
("[c]hannel number," "[s]atellite symbol," and "[s]atellite name"). The remaining
information which does not fall under any of three selection criteria is not
transmitted for every program, but rather for only certain programs. The "[l]inking
number' is "only for serial shows," while the "expanded listing" is "[o]ptional,"
and the "[e]ncrypted and any special broadcast indicators" are for those shows that
are broadcast encrypted or deserving of a "special broadcast indicator[]."

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                                Page 38
USITC Inv. No. 337-TA-454

Therefore, all program listings are to be broadcast with information relating to the program's theme, time of broadcast, and the channel on which it is to be broadcast, while certain programs may contain additional information.

Based on the foregoing, the administrative law judge finds that "program schedule information", as used in claim 32, includes a program's theme information, the channel on which it is scheduled to be broadcast, the time when it is to be broadcast, and may, but does not have to, include other information relating to a program, such as the program's title.

ii. The language "user program selection criteria"

According to the plain language of claim 32, which differs from the language of claim 18, in that claim 32 does not recite "independent user chosen program selection criteria" or "program choice," "user selection criteria" refers to "user program selection criteria." [FN11] Insofar as claim 32 calls for the "user selection criteria to select programs for viewing from the program schedule information in the data processor," where the only method disclosed in the specification for using "user selection criteria" to select programs is to combine theme, channel and prime time selection criteria, and search for programs that satisfy all of the combined criteria in a user program selection criteria see supra, "user program selection criteria" as used in claim 32 is found to be the "theme," "channel" and "prime time" selection criteria.

iii. The language "supplying program schedule information to the data processor"

The administrative law judge interprets "data processor" the same way he interpreted it in claim 18, viz., a CPU. See supra. The administrative law judge finds that the "program schedule information" must, as with the claim 18 invention, be stored inside the data schedule processor. Unlike claim 18 there is no explicit disclosure of a storage means in the data processor in claim 32. However claim 32 does recite that the "program schedule information" is "supplied to" the data processor, such that the "program schedule information" is "in the data processor." (col. 27, ln. 2). Therefore, the administrative law judge finds that claim 32 requires the "program schedule information" be supplied to and stored in the CPU.

iv. The language "during the process"

Claim 32 requires the television receiver be used "as a display by the data processor for presenting messages to the user during the process, including time remaining for a program being broadcast." Respondents argued that such messages had to be displayed "before the television set is tuned to a program that the CPU selected." (EPost at 114). This argument is based on the contention that the process in claim 32 ends when the television set is tuned to the program. However, the process in claim 32 includes "supplying program schedule information to a data processor." The claim does not indicate when this "supplying" begins or ends. Moreover, as the specification states, the program schedule information is repeatedly broadcast:

The microcomputer 22 of FIGS. 1 and 2 is programmed to repeat transmissions of the program list for a number of times to allow for correction of uncorrectable errors at the receiver 90 or 160 (FIGS. 3 and 4).
(col. 17, lns. 5-9). Also, the data processor is sent new program schedule information to update the existing program schedule information:

As each block of data is received, the data integrity is verified by error checking logic at 302. If no error exists, the received data is stored in the program list buffer 303, replacing the previous program list data.
(col. 16., lns. 60-63).

Therefore, based on the '121 patent's specification, the process in claim 32 does not have an "end," but rather it is always continuing. The administrative law judge finds that claim 32 does not require that the television receiver be used as a display before the selected program is tuned to.

b. Independent Claim 33

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Independent claim 33 reads:
   A process for controlling the presentation of broadcast programs to a television
receiver, which comprises supplying program schedule information to storage means in
a data processor, supplying user program selection criteria to the data processor,
the data processor combining said user program selection criteria with automatic
criteria according to at least one of a current time and a current channel, using
the combination of user program selection criteria and automatic criteria to select
programs for viewing from the program schedule information in said storage means in
the data processor, storing information identifying the selected programs, using the
stored information to tune the television receiver to the selected programs, turning
on a broadcast program recording device for a selected broadcast program, recording
the selected broadcast program, and supplying a different program broadcast signal
to the television receiver than the broadcast signal for the selected program
supplied to the program recording device.
(FF 45). Much of the language in claim 33 is found in claim 18 and hence, the
interpretation of that language controls the interpretation of the same language in
claim 33. Moreover, the parties are in agreement that the plain meaning of the
phrase "supplying a different program broadcast signal to the television receiver
than the broadcast signal data processor" is that while one signal for a selected
program is being supplied to a recording device, such as a VCR, the data processor
causes a different signal to be supplied to the television set. (Faillace, Tr. at
1499-00). This feature is referred to in the industry as the "watch one/record
another" capability. (Faillace, Tr. at 1500). The parties are also in agreement that
the '121 specification does not define said phrase in a manner that is
unconventional or inconsistent with the ordinary meaning of these terms. (CFF 741).

   The parties further do not dispute that "automatic criteria" are criteria provided
by the system and not the user. (CFF 700). Furthermore, as indicated by the plain
claim language "the data processor combining said user selection criteria with
automatic criteria according to at least one of a current time period and a current
channel," the parties are in agreement that the system must supply certain program
information for a given time interval. This program information must include at
least the current time or the program information for a set of channels, which
includes the currently tuned channel. (CFF 702). However, the phrase "turning on" is
in dispute.

i. The language "turning on"

   Complainants contend that this limitation means that the system causes a  "program
recording device" to begin recording and to in fact record the selected program, but
does not mean that the system has to cause the provision of electricity to the
"recording device." (CPost at 109). Respondents and the staff argued that the
limitation requires the system to turn on the recording device's power, so that it
will be able to record the selected program. (SPost at 22).

   The administrative law judge finds that the ordinary meaning of "turn on" requires
that the system disclosed in claim 33 turn on the recording device's power so that
it will be able to record the selected program. "Turn on" means "to activate or
cause to flow, operate, or function by or as if by turning a control <turn the water
on full> <turn on the power>." (Mirriam-Webster's Collegiate Dictionary Online
available at http://www.m-w.com/) (Emphasis in original). Furthermore, one of the
express objects of the '121 patent's invention was "to provide such a system and
process in which the user is not required to leave the VCR powered on for unattended
recording." (col. 3, lns. 66-68). Similarly,
   [i]n one form of this invention, the system is connected to the remote control
facilities of a VCR to turn on its power, start the recording, and stop recording of
programs on the VCR. The user therefore not required to leave the VCR powered on for
unattended recording.
(col. 5, lns. 48-53). Pursuant to this objective, the preferred embodiment of the
'121 patent's invention turns on the power to a connected VCR:
   Figure 4b is a block diagram of a modified form of the receiver 160, which may
also be used with the transmitter system 50 shown in Figure 2. In the Figure 4b
receiver 160, a remote VCR 216 and its wireless remote controller 1010, so that the

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

remote VCR 216 need not be powered up in advance of unattended recording. The remote
controller 1010 is connected by lines 1000 and 1002 to CPU 178. In response to the
CPU 178, the remote controller 1010 transmits control signals to the remote VCR 216
in a conventional manner, as indicated at 1004. The remote controller 1010 can
either be a unit designed for the VCR, but modified to be electrically operated from
the TV scheduler, or it can be an equivalent design of the remote controller with
direct connections to the CPU 178. Instead of enabling the VCR from pause line 214,
when the CPU 178 determines that a program is to be recorded (see, e.g., block 501
of FIG. 13) according to the selected programs, it issues a control signal to power
up the VCR on control line 1000. This control signal generates a contact closure
across the switch matrix of the remote controller 1010 power-on key. The contact
closure may be obtained with a relay or an PET transistor switch. The control signal
on line 1000 also generates a contact closure across the play key and the record key
of the of the controller 1010 to initiate recording of the program. When the program
ends, CPU 178 will issue a control signal on line 1002. Line 1002 generates a
contact closure across the remote controller power-off key. When the CPU 178
determines another program is to be recorded, the above process is repeated.
(col. 9, lns. 5-35) (Emphasis added). Therefore, as the above language of the
specification of the '121 patent describes the operation of the '121 patent's
invention's unattended recording feature, the administrative law judge finds that
the VCR is powered on by the invention through a signal causing a closure in the
VCR's remote control's power on switch, which signal activates the remote control's
"play" and "record" buttons causing the powered on VCR to record the scheduled
program; and that when the scheduled program is over, the VCR's power is turned off
by a signal to the VCR's remote control's "power off" switch. The administrative law
judge finds nothing in the '121 patent that suggests that the invention of the '121
patent can cause a VCR to record a selected program, without the VCR first being
powered on by the invention.

     Moreover, the administrative law judge finds that the specification disclosed that
the "turn-on"command to a VCR is different than the "record" command. In Fig. 13,
box 506 is labeled "Turn On VCR & Record." (Emphasis added). The finding that the
"turn-on"command to a VCR is different than the "record" command is further
reinforced by the following section of the specification, which lists "turn-on" and
"record" as different operations:
     For unattended recording with the TV scheduler 160 of FIG. 4B, turn on of the
remote VCR 216 is accomplished by means of the remote controller 1010 connected to
the TV scheduler 160. Turn-on, record and turn-off are all actuated remotely as
described above in connection with FIG. 4B.
(col. 20, lns. 59-64) (Emphasis added). Also, this difference between the "turn on"
and "record" functions is reflected in the plain language of the claim itself, as
the system must be capable of both "turning on a broadcast program recording device
and recording the selected broadcast program" (col. 6, lns. 39-31) (Emphasis added).

     The reexamination proceedings also support the finding that "turning on" a VCR is
to cause electricity to go to the VCR, and not merely causing the VCR to record a
program. After the Examiner, in the June 8, 1992 Office Action, rejected claim 32-36
as being "unpatentable as anticipated under 35 USC §  102 over Muguet, 4, 787, 063,"
because Muguet disclosed, inter alia, the "turning on and off the VCR at start and
en [sic] of the program or both." (FF 94). In the August 13, 1992, amendment, Young
distinguished Muguet from the rejected claims on the following basis:
     Claims 33-35 include in their recitations the step of turning on a program
recorder for a selected program, whereas in Muguet the specialized VCR must remain
on continually, not just for the selected program.
(FF 106).

     Based on the plain language of the claim, the specification and the prosecution
history, the administrative law judge finds that "turning on" requires that the
system disclosed in claim 33 to turn on the recording device's power so that it is
able to record the selected program.

c. Independent Claim 36

     Independent claim 36 reads:

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A process for controlling the presentation of broadcast programs to a television
receiver, which comprises supplying program schedule information to storage means in
a data processor, supplying user program selection criteria to the data processor,
said user program selection criteria comprising a plurality of independent user
chosen selection criteria and at least one portion [sic] choice, the data processor
combining said user program selection criteria, using the combined user program
selection criteria to select programs for viewing from the program schedule
information in said storage means in the data processor, storing information
identifying the selected programs including broadcast schedule times, channels and
program titles, using the stored information to tune the television receiver to the
selected programs, turning on a program recording device and recording the selected
broadcast program by supplying control signals to a remote controller for the
program recording device.

(FF 46). All of the language in claim 36 is found in claim 18 or in claim 33. Hence,
the interpretation of that language in claim 18 or in claim 33 controls the
interpretation of the same language in claim 36.

d. Independent Claim 42

   Independent claim 42 reads:
   A system for controlling a recording device to allow user selection of broadcast
programs from schedule information, which comprises a data processor, a first input
means for the schedule information connected to said data processor, a second user
selection input means connected to said data processor, said data processor being
configured to select programs from the schedule information based on user inputs,
storage means connected to receive the schedule information for programs selected by
said data processor, a programmable tuner for connection to the recording device,
said programmable tuner being connected to receive control signals from said data
processor at a time of a selected broadcast for causing said programmable tuner to
supply broadcast signals for the selected programs to the recording device, and a
television receiver, said system being configured to allow said television receiver
to receive a different program than the broadcast signal for the selected program
supplied to said recording device, wherein said data processor is configured for a
selectable display mode, said data processor being configured to present an initial
display of said schedule information stored in said storage means upon selection of
said display mode, said initial display automatically comprising schedule
information for at least one of a current time period and a current channel of said
programmable tuner.

(FF 47). Much of the language in claim 42 is found in claim 18 and hence, the
interpretation of that language in claim 18 controls the interpretation of the same
language in claim 42. The parties have disputed: "a first input means for the
schedule information connected to said data processor," "a second user selection
input means connected to said data processor," and
   wherein said data processor is configured for a selectable display mode, said
data processor being configured to present an initial display of said schedule
information stored in said storage means upon selection of said display mode, said
initial display automatically comprising schedule information for at least one of a
current time period and a current channel of said programmable tuner.

i. The language "a first input means for the schedule information connected to said
data processor"

   Complainants argued that this claim limitation is not a means plus function
element, because it "does not recite a function; it only recites a structure well
known in the computer field;" that an "input means" which is, according to
complainants, simply a mechanism for supplying a data to the data processor, e.g.,
is an input port and wire; and that a person of ordinary skill in the art would know
that the input port of a computer is its input means. (CPost at 115). Complainants
also argued that if this limitation was construed to be a means plus function
element, the structures corresponding to the input means are the lines running from
the data demodulator in FIGs. 3 and 4 to the CPU (lines 108 and 182, respectively)
and the input ports to which they are connected. (CPost at 116).

   Respondents argued that this limitation is a means plus function limitation, the

claimed function being the receipt and supply of schedule information to the data
processor. (RFF 1114). Respondents also argued that two corresponding sets of
structures are disclosed in this specification: (1) in the Fig. 3 embodiment, the
corresponding structure is the FM antenna 92, the FM receiver 94, the SCA subcarrier
decoder 98, and the data demodulator 102, and (2) in the Fig. 4 embodiment, the
corresponding structure is the antenna 162, programmable TV tuner 164, program data
timing controller 168, and data demodulator 169. (RFF 112).

    The staff did not take a position regarding this limitation in its initial post
hearing brief.

    The use of term "means" creates a presumption of the applicability of 35 U.S.C. §
112, ¶ 6. See Sage Products, Inc. v. Devon Industries, Inc., 126 F. 3d 1420, 1427
(Fed. Cir. 1997); Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1584 (Fed.
Cir. 1996); Certain Flooring Products, Inv. No. 337-TA-443, Final Initial
Determination at 11-20 (Nov. 2, 2001), Comm'n Notice Finding No Violation (March 22,
2002). The administrative law judge rejects complainants' argument that this
limitation is not subject to 35 U.S.C. § 112, ¶ 6, because there is no function
recited. The limitation in question, "a first input means for the schedule
information connected to said data processor," recites a "means," which is connected
to the "data processor," for the "input" of "schedule information." Therefore, the
administrative law judge finds that this limitation should be interpreted pursuant
to 35 U.S.C. § 112, ¶ 6.

    The administrative law judge also rejects complainants' argument that if
interpreted under 35 U.S.C. § 112, ¶ 6, this limitation should be construed to
mean only the lines running from the data demodulator in FIGs. 3 and 4 and the input
ports to which they are connected (lines 108 and 182, respectively). To the
contrary, the only instance the term "port" is used in the '121 specification of the
'121 patent is in connection with "conventional" transmitter systems which are
described as being without "novelty." Thus the specification does not disclose any
input ports being connected to the data processors depicted in FIGs. 3 and 4. The
only mention of a "port" at all in the specification is the "serial input/output
(I/O) port" 24 which, in conjunction with line 28, connects the microcomputer 22 to
the data modulator 26 in the transmitter depicted in FIG. 1. (col. 6, lns. 28-31).
In the transmitter depicted in FIG. 2, the microcomputer's 22 I/O port 24 is
connected to a buffer. (col. 6, lns. 64-67). The transmitter system 20 depicted in
FIG. 1 is described accordingly:
    Since the design and implementation of the system 20 is [sic] itself [sic]
conventional, and the novelty resides in the particular data processing signals
broadcast with the system 20, the design and operation of the system 20 will not be
described in further detail.
(col. 6, lns. 55-59) (Emphasis added). The transmitter system 50 depicted in Fig. 2
is described in similar terms. (See col. 7, lns. 26-30).

    While the only instance the term "port" is used in the specification of the '121
patent is in connection with "conventional" transmitter systems which are without
"novelty," the specification makes the following description of the structures
involved in allowing the data processor in the first embodiment to receive the
information broadcast by the "conventional" transmitter systems:
    FIG. 3 is a block diagram of a receiver and television receiver control system
90 which is used in combination with the FM transmitter system 20 of FIG. 1. An FM
antenna 92 receives the broadcast signals from the system 20, which are supplied to
FM receiver 94 on line 96. FM receiver 94 supplies the FM broadcast signals to an
SCA subcarrier decoder 98 on line 100. The decoder 98 strips the schedule
information signals from the FM broadcast signals and supplies the schedule
information signals to a data demodulator 102 on line 104. The data demodulator 102
converts the schedule information signals to digital format and supplies the digital
schedule information signals to system control unit 106 on line 108, more
particularly, to CPU 110 of the system control unit 106.
(col. 7, lns. 33-46). Therefore, in accordance with the first embodiment the
following structures are needed in order to supply to the CPU the program schedule
information: an FM antenna (to receive the broadcast signals), an FM receiver (to
supply the broadcast signals to the SCA subcarrier decoder), a SCA subcarrier

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

decoder (to separate the program schedule information from the rest of the broadcast
signal), and a data demodulator (to convert the program schedule information into
digital format).

   In connection with the second embodiment, the specification of the '121  patent
(CX-1) describes the following structures and operations:
      FIG. 4 is a block diagram of another receiver system 160, which may be used with
the transmitter system 50 shown in FIG. 2. Antenna 162 receives the TV broadcast
signal from the transmitter system 50 and supplies it to a programmable TV tuner 164
on line 166. The tuner 164 supplies the broadcast signal to a program data timing
controller 168 on line 170, to data demodulator 169 on line 171 and to a video
switcher 172 on line 174. The output of controller 168 is supplied to the
demodulator 169 on line 176. The demodulator 169 supplies the program schedule
information signals, which have been stripped from the TV broadcast signals and
digitized, to CPU 178 of system control unit 180 on line 182.
(col. 8, lns. 23-35). Therefore, supplying the CPU of the second embodiment with
program schedule information involves the following structure: an antenna (to
receive the broadcast signal), a programmable tuner (to route the broadcast signal
to a data demodulator) and a program data timing controller, and a data demodulator
(to digitize the schedule information).

   The administrative law judge finds that in neither the first or second embodiments
the term "port" is used, either in connection with supplying the CPU with schedule
information or otherwise. Additionally, with respect to the other structures relied
upon by complainants in their proposed constructions, viz., lines 108 and 182, the
administrative law judge finds no description of those "structures." Rather the
specification merely states that the digitized schedule information is supplied to
the CPUs by the data demodulators along lines 108 and 182. The administrative law
judge finds no indication that lines 108 and 182 are capable of supplying schedule
information to the CPUs without the structures described above. [FN12]

   Based on the foregoing, the administrative law judge finds the first input means
of claim 42 comprises either (1) an FM antenna, an FM receiver, a SCA subcarrier
decoder, and data demodulator; or (2) an antenna, a programmable tuner, a program
data timing controller and a data demodulator; or (3) their 35 U.S.C. § 112, ¶ 6
equivalents.

ii. The language "a second user selection input means connected to said data
processor"

   Complainants argued that this limitation is not a means plus function element
because it does not recite a function, and, if it were construed as a means plus
function element, the corresponding structures are a remote controller and a remote
receiver, as well as line 120/192. (CPost at 117). Respondents argued that this
limitation was a means plus function element and that the corresponding structures
are a remote controller and a remote receiver, lines 120 and 192, and the keypad and
keys depicted in Fig. 5. (RRCFF 851). The staff took no position regarding the
construction of this element.

   The administrative law judge rejects complainants' argument that the limitation in
issue is not governed by 35 U.S.C. § 112, ¶ 6, because he finds that the
limitation does recite a function, viz., a "means" for the "input" of "user
selection[s]." Therefore, he finds that it should be construed under 35 U.S.C. §
112, ¶ 6, for the same reasons that that "first input means" of claim 42 was so
construed. See supra.

   The administrative law judge further finds that the structure corresponding to the
limitation in issue is a remote controller, with a keypad, and a remote receiver or
its 35 U.S.C. § 112, ¶ 6 equivalents. In support and with reference to the first
embodiment, the specification states that "[o]ther inputs are supplied to the CPU
110 are supplied by a remote transmitter controller 116-remote receiver 118
combination on line 120." (col. 7, lns. 51- 53). With respect to the second
embodiment, "[u]ser program selections and other user inputs are provided by a
remote control transmitter 188-remote receiver 190 combination on line 192," (col.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 44
USITC Inv. No. 337-TA-454

8, lns. 42-44), the remote controller 116/188 is also clearly depicted in Fig. 5 as
having a keypad.

iii. The language "wherein said data processor is configured for a selectable
display mode, said data processor being configured to present an initial display of
said schedule information stored in said storage means upon selection of said
display mode, said initial display automatically comprising schedule information for
at least one of a current time period and a current channel of said programmable
tuner"

   Complainants argued that this limitation should be construed as requiring that the
data processor be capable of invoking a particular mode of displaying schedule
information in response to user inputs, that the "initial display of said schedule
information" refers to the first display of television schedule information that
appears when the user selects a particular "selectable display mode," and that this
initial display will include at least information about one program that is either
being currently broadcast, or is scheduled to be broadcast, on the channel to which
the system is already tuned. (CPost at 125).

   Respondents and the staff argued that limitation requires an initial display mode
that the user can select from multiple options for the display of schedule
information when the display is first invoked and that this information should
include information for programs selected for recording, and therefore, the initial
display should provide current programming information and programming information
for recording. (PPost at 114-15; SPost at 17).

   The limitation at issue was added to claim 42 during reexamination proceedings in
the applicant's February 26, 1993 Supplemental After Final amendment in response to
the Examiner's rejection of the claim in his January 5, 1993 Office Action. (FF 121
to 128). Young stated in the accompanying remarks:

   Automatically Focusing the Display
     Also discussed were clarifications of the preselection of schedule information
for display, directed to automatically focusing a display of schedule information
according to a current time or a current channel. The Examiner has confirmed that
the claims reciting this selective display are believed to be allowable. Support for
this selective display can found [sic], for example, at column 10, lines 12-65.
Lines 50-59 are an example display for preferred embodiment. Lines 45-46 explain
that the listing starts at the nearest previous half-hour. Lines 46-47 explain that
a pointer (not shown in the example screen) will be positioned at the last selection
made (and thus indicate the current channel). Lines 60 to 62 explain that the screen
also includes 3 lines of status information, which at lines 56-59 is shown to
include for the currently selected channel the remaining time and program title
schedule information. Similar disclosure also appears at column 1, lines 33-37.
(FF 149). In a March 26, 1993 Office Action, the Examiner found that claim 42, "as
amended, avoid[s] the art of record and [is] patentable." (FF 155).

   Said remarks in the February 26 1993 Supplemental After Final refer to sections of
the specification, which disclose a "selectable display," such that an user can
change the display by changing the prime time, channel or theme criteria or the time
in which the display begins and in which the initial display comprises information
selected by the data processor in response to the user inputs, as well as either the
current channel that the television is tuned to or the current time. Thus the
"example display" referred to by Young discloses a list of six programs, the start
times of which run from 9:00 pm to 9:30 pm, and three additional lines of
information immediately below the last program listed. (col. 10, lns. 50-59). The
current time and date is contained in the three lines below the program listing. Id.
The current time is reported to be 9:23 pm, and because the "[l]isting always starts
at the previous half hour," the first time slot display is at "9:00." (col. 10. lns.
45-46). The listing is also restricted in accordance to the settings of the prime
time, channel and theme criteria. (col. 10, ln. 65 - col. 11, ln. 5). The text
discloses "that the pointer always is positioned at the last selection made,"
although no "pointer" is depicted in the sample display. (col. 10, lns. 46-47). The
display can be changed by changing the prime time, channel and theme criteria. (col.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 45
USITC Inv. No. 337-TA-454

13, lns. 32-44; col. 14, lns. 16-28; and col. 14, ln. 55 - col. 15, ln. 16). The
user can also change the time that the display will start at. (col. 11, lns. 29-36).

   Based on the foregoing, the administrative law judge finds, consistent with the
portions of the '121 patent's specification cited by Young in his February 26, 1993
Supplemental After Final, that the limitation in issue requires a "selectable
display," such that an user can change the display by changing the prime time,
channel and theme criteria and in which the initial display comprises information
selected by the data processor in response to the user inputs, as well as either the
current channel that the television is tuned to or the current time.

e. Independent Claim 51

   Independent claim 51 reads:
   A system for controlling a recording device to allow user selection of broadcast
programs from schedule information, which comprises a data processor, a first input
means for the schedule information connected to said data processor, a second user
selection input means connected to said data processor, said data processor being
configured to select programs from the schedule information based on user inputs,
storage means connected to receive the schedule information for programs selected by
said data processor, a programmable tuner for connection to the recording device,
said programmable tuner being connected to receive control signals from said data
processor at a time of a selected broadcast for causing said programmable tuner to
supply broadcast signals for the selected programs to the recording device, said
data processor being connected to a remote controller for said recording device to
supply control signals to said remote controller for powering on said recording
device, starting and stopping recording of the selected program and powering off
said recording device, further comprising a display means coupled to said data
processor, wherein said data processor is configured for a selectable display mode,
said display means being configured to present an initial display of said schedule
information stored in said storage means upon selection of said display mode, said
initial display automatically comprising schedule information for at least one of a
current time period and a current channel of said programmable tuner.
(FF 52). The language in claim 51 is found in the preceding claims in issue. Hence,
the prior interpretation of corresponding language in the preceding claims controls
the interpretation of language in claim 51.

f. Independent Claim 54

   Independent claim 54 reads:
   A system for controlling receipt of broadcast television programs to allow user
selection of broadcast programs from broadcast schedule information which is
selectively stored in a storage means, which comprises a data processor, a
programmable tuner configured to receive both the broadcast programs and the
broadcast schedule information connected to said data processor, means connected
between said programmable tuner and said data processor for separating the broadcast
schedule information from the broadcast programs and supplying the broadcast
schedule information to said data processor, a user selection input means connected
to said data processor, said data processor being configured to select programs from
the schedule information stored in said storage means based on user inputs, said
storage means being connected to receive a reminder calendar list comprising the
schedule information for programs selected by said data processor, said programmable
tuner being connected to receive control signals from said data processor at a time
of a selected broadcast for causing said programmable tuner to supply signals for
the selected broadcast programs to at least one signal receiver for the selected
broadcast programs, wherein said user inputs comprise a plurality of user program
selection criteria, said data processor being configured to combine said plurality
of user program selection criteria and to present a list of programs meeting said
combined program selection criteria, said user inputs further comprising a program
choice from said presented list of programs, said reminder calendar list comprising
information identifying titles for said programs selected by said data processor.
(FF 53). Much of the language in claim 54 is found in preceding independent claims
in issue and, hence, the prior interpretation of that language controls the
interpretation of the same language in claim 54. With respect to the language:

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 46
USITC Inv. No. 337-TA-454

i. The language "means connected between said programmable tuner and said data
processor for separating the broadcast schedule information from the broadcast
programs and supplying the broadcast schedule information to said data processor"

The parties agree that the language is a means plus function element and that the
function of the element is to segregate program schedule information from television
programs and to supply the program schedule information to the data processor.
(CPost at 147; PPost at 110). The parties also agree that the Fig. 4 embodiment, and
not the Fig. 3, is the correct embodiment to consider in determining the structures
that comprise the corresponding means. (CPost at 147; PPost at 110). Complainants
argued, however, that the corresponding means is the demodulator 169, while
respondents argued that the corresponding structures are the data demodulator 169
and the program data timing controller 168.

The specification of the '121 patent describes the following process for supplying
program schedule information to the data processor in the FIG. 4 embodiment:
     FIG. 4 is a block diagram of another receiver system 160, which may be used with
the transmitter system 50 shown in FIG. 2. Antenna 162 receives the TV broadcast
signal from the transmitter system 50 and supplies it to a programmable TV tuner 164
on line 166. The tuner 164 supplies the broadcast signal to a program data timing
controller 168 on line 170, to data demodulator 169 on line 171 and to a video
switcher 172 on line 174. The output of controller 168 is supplied to the
demodulator 169 on line 176. The demodulator 169 supplies the program schedule
information signals, which have been stripped from the TV broadcast signals and
digitized, to CPU 178 of system control unit 180 on line 182.
(col. 8, lns. 23-35). Therefore, the administrative law judge finds that the data
demodulator 169 is one of the corresponding structures in the FIG. 4 embodiment, as
it "supplies the program schedule information signals, which have been stripped from
the TV broadcast signals and digitized, to CPU 178." As to which structure or
structures separate the schedule information from the broadcast program respondents'
expert witness, Rhyne, testified that when the VBI was used to transmit program
schedule information the data demodulator could not be the only corresponding
structure to separate the program schedule information:
     Well, if you're going to pick data off of one or more lines in the vertical
blanking interval, you have to have a line counter. It's a process that's commonly
called data slicing; it's used, for example, in closed captioning at line 21 [of the
VBI].
     And that's what the that program timing controller is, it's not well described
in the patent. But as best I understand it, it was a counter that found the
appropriate line or lines and then pulls out a little snippet of electronic signal
that was supposed to carry the data, and passes it to the demodulator.
     Well if the demodulator didn't have that device in front of it, it would be
trying to demodulate all of the video signals on all of the lines and it would just
be producing gibberish.
(Tr. at 3596-97). The specification of the '121 patent is consistent with Rhyne's
testimony. The FIG. 3 embodiment is a receiver for use with a transmitter that
transmits the program schedule information separate from the broadcast programming.
(col. 6, lns. 20-24; col. 7, lns. 33-37). Therefore, the FIG. 3 embodiment does not
need to separate the schedule information from the broadcast programming. The FIG. 3
embodiment has a data demodulator 102 which converts the schedule information
signals to digital format and supplies the digital schedule information to the CPU
110, after the schedule information signals are "strip[ped]" from the FM broadcast
by the SCA sub carrier decoder 98. The FIG. 3 embodiment does not have the program
data timing controller. The FIG. 4 embodiment, which has to separate schedule
information from the broadcast programming, has a program data timing controller 168
and the program data timing controller 168 outputs directly to the data demodulator
169.

Accordingly, the administrative law judge finds that the corresponding 35 U.S.C. §
112, ¶ 6 structures are the data demodulator 169 and the program data timing
controller 168 or their 35 U.S.C. § 112, ¶ 6 equivalents.

g. Independent Claim 57

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 47
USITC Inv. No. 337-TA-454

Independent claim 57 reads:
   A television schedule system for controlling receipt of broadcast television
programs to allow user selection of broadcast programs from broadcast schedule
information displayed on a television, said broadcast schedule information
comprising broadcast schedule times, titles and channels, said system comprising:
   a data processor;
   a system clock connected to said data processor for providing a system time;
   a programmable tuner connected to said data processor and configured to receive
both the broadcast programs and the broadcast schedule information;
   signal separating means connected between said programmable tuner and said data
processor for separating the broadcast schedule information from the broadcast
programs, and for supplying the broadcast schedule information to said data
processor;
   display means connected to said data processor for displaying at least a portion
of said broadcast schedule information on said television;
   user selection input means connected to said data processor for providing user
inputs for selecting listings of programs from said displayed broadcast schedule
information; and
   storage means being connected to said data processor for storing schedule
information, wherein said data processor is configured to selected programs from
said displayed broadcast schedule information based on said user inputs, to retrieve
broadcast schedule information for said selected programs from said broadcast
schedule information supplied to said data processor, and to store said retrieved
schedule information in said storage means, said stored broadcast schedule
information identifying a broadcast schedule time and channel and a program title
for each said selected program; wherein
   said data processor provides control signals to said programmable tuner when the
system time matches a stored broadcast schedule time of one of said selected
programs, said control signals causing said programmable tuner to supply broadcast
program signals for the stored broadcast schedule channel of said one selected
program to at least one signal receiver; and wherein
   said data processor is configured for a selectable display mode, said display
means being configured to display a preselected initial display of said schedule
information stored in said storage means upon selection of said display mode, said
preselected initial display automatically comprising schedule information meeting
initial display selection criteria, said initial display selection criteria
including at least one of a current time period and a channel currently selected by
said programmable tuner.
(FF 54). Much of the language in claim 57 is found in preceding claims and, hence,
the interpretation of that language controls the interpretation of the same language
in claim 57.

   With respect to the language:
   signal separating means connected between said programmable tuner and said data
processor for separating the broadcast schedule information from the broadcast
programs, and for supplying the broadcast schedule information to said data
processor
the parties agree that this limitation should be construed the same as the
"separating means" limitation of claim 54, which is similarly worded. (PPost at 110,
CPost at 161). Accordingly, the administrative law judge finds that the
corresponding 35 U.S.C. § 112, ¶ 6 structures are the data demodulator 169 and the
program data timing controller 168 or their 35 U.S.C. § 112, ¶ 6 equivalents.

   Both complainants and respondents agree that the language:
   display means connected to said data processor for displaying at least a portion
of said broadcast schedule information on said television
is a means plus function limitation and that the function is to display schedule
information on a television. (CPost at 161; PPost at 119). Complainants argued
however that the corresponding structure is the video display generator 136 of FIG.
3 and 204 of FIG. 4 and a device for display, such as a television receiver. (CPost
at 162). Respondents argued that an additional structure comprises the means in
addition to the video display generator and television receiver, viz., the video
switcher (140/172).

              ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 48
USITC Inv. No. 337-TA-454

The schedule information is displayed in the FIG. 3 embodiment in the following
manner:
    The CPU 110 supplies information signals from the program schedule data on line
108, control inputs on line 114 and user inputs on line 120 to video display
generator 136 on line 138. Output video display signals from the generator 136 are
supplied to a video switcher 140 on line 142. The video switcher also receives TV
program signals from tuner 132 on line 144, and a control signal from CPU 110. The
video switcher 140 supplies the signals from the tuner 132 or the generator 142 to
the TV receiver 126 on line 148 and a video cassette recorder (VCR) 150 on line 152.
(col. 7, ln. 68 - col. 8, ln. 12). The display of schedule information in relation
to the FIG.4 embodiment is similar:
    From the user inputs on line 192 and the control program, the CPU generates
control signals for the programmable TV tuner 164, which are supplied to video
display generator 204 on line 206. The generator 204 converts the video display
information signals to video signals for the video switcher 172 on line 208. The CPU
178 supplies control signals for the video switcher 172 on line 210 to video signal
outputs of the video switcher 172 on lines 212 and 214 to the TV receiver 200 and
VCR 216 between schedule information video signals from the generator 204 and the
program video signals from tuner 164.
(col. 8, lns. 49-62).

    Therefore, as the above portions of the specification indicate, the video switcher
(140, 172) allows the CPU to control whether or not the IPG, incorporating the
schedule information, will be displayed or not. Without this ability, the user would
not be able to see the IPG or would only see the IPG, and would not be able to view
any television programming. In fact, as the following testimony by complainants'
expert witness, Faillace, reveals, a system in accordance to the '121 patent, but
omitting the video switcher, would be useless:
        Q. Without a working video switcher, the person who has spent a lot of money
for their brand new TV with a fancy -
        A. Guide.
        Q. - guide will simply have a regular old television, right?
        A. That's correct.
(Tr. at 2391).

    Therefore, the administrative law judge finds that the corresponding structure to
this limitation is (1) a video generator, a video switcher, and a television
receiver, or (2) their 35 U.S.C. § 112, ¶ 6 equivalents.

    The parties agree that the limitation "a selectable display mode" should be
interpreted the same way as the "selectable display mode" limitation of claim 42 was
interpreted. (CPost at 145; PPost at 114). Therefore, the administrative law judge
finds that this limitation requires a "selectable display," such that an user can
change the display by changing the Prime Time, Channel and Theme criteria, or the
time in which the display begins and in which the initial display comprises
information selected by the data processor in response to the user inputs, as well
as either the current channel that the television is tuned to or the current time.
See supra.

B. '268/'204 Patents

    In issue are claims 1 and 3 of the '268 patent and claims 14, 15, 16 and 17 of the
'204 patent.

    Claims 1 and 3 of the '268 patent (FF 59-61) read:

1. An interactive television schedule system, which comprises:

    a television display,
    means coupled to said television display for displaying the television schedule
on said television display as a grid of two-dimensionally arranged, adjacent
irregular cells which vary in length corresponding to time duration of programs,
with a title of a program being displayed in each of said irregular cells, said grid

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

having a plurality of channels listed in a first dimension and time listed in a
second dimension,
    user input means coupled to said means for displaying the television schedule,
said user input means including a program selector and a movement control for a
visual identification of ones of said irregular cells which initiates movement of
said visual identification in the first dimension, and irregular movement of said
visual identification in the second dimension in steps corresponding to variation in
cell size, responsive to an input by a user to said movement control, between first
and second ones of said irregular cells to select a desired one of said irregular
cells corresponding to program,
    a tuner coupled to said user input means for tuning to the desired program, and
    means coupled to said means for displaying the television schedule for
displaying a program note overlay including a program description for the desired
program on said television display.
    3. The interactive television schedule system of claim 1 additionally comprising
means coupled to said means for displaying the television schedule for selecting the
desired visually identified program in response to activation of said program
selector, and
    a recording device coupled to said means for selecting the desired program to
record the desired program.

    Independent claim 14 and dependent claims 15, 16 and 17 of the '204 patent (FF 62
to 65) read:
    14. An interactive television schedule system, which comprises:
    a television display,
    means coupled to said television display for displaying a television schedule on
said television display as a grid of two-dimensionally arranged, adjacent irregular
cells which vary in length corresponding to time duration of programs, with a title
of a program being displayed in each of said irregular cells, said grid having a
plurality of channels listed in a first dimension and time listed in a second
dimension,
    user input means coupled to said means for displaying the television schedule,
said user input means including a program selector and a movement control for a
visual identification of selected ones of said irregular cells which controls
movement of said visual identification in the first dimension and in the second
dimension from cell to cell, responsive to an input by a user to said movement
control to visually identify a desired one of said irregular cells corresponding to
a desired program,
    means coupled to said means for displaying the television schedule for selecting
the desired visually identified program in response to activation of said program
selector, and
    a programmable tuner coupled to said means for selecting the desired program for
tuning to a select channel for the desired program,
    said means for displaying the television schedule on said television display
further being configured to display an overlay containing information on a
television program being shown on said television display when a channel being shown
on said television display is changed.
    15. The interactive television schedule system of claim 14 in which the overlay
information on the television program includes program title, name of television
service, channel number, and time.
    16. The interactive television schedule system of claim 15 in which said means
for displaying the television schedule is further configured to provide an alternate
overlay including a program note with a program description for the television
program being shown on said television display.
    17. The interactive television schedule system of claim 14 in which said means
for displaying the television schedule is further configured to provide an alternate
display including a program note with a program description for the visually
identified program.

    Independent claim 31 and dependent claims 32 through 34 of the '204 patent (FF 66
to 69) read:
    31. An interactive process for operating a television schedule system, which
comprises:
    displaying a television schedule on a television display as a grid of two-

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dimensionally arranged, adjacent irregular cells which vary in length corresponding
to time duration of programs, with a title of a program being displayed in each of
said irregular cells, said grid having a plurality of channels listed in a first
dimension and time listed in a second dimension,
    providing a visual identification of a selected one of said irregular cells,
    moving said visual identification in the first dimension and in second dimension
between first and second ones of said irregular cells to select a desired one of
said irregular cells corresponding to a desired program,
    tuning a programmable tuner to a select channel based on position of said visual
identification for the desired program, and
    displaying an overlay containing information relating to a television program
being shown on said television set when a channel being shown on the television set
is changed.
    32. The interactive process for operating a television schedule system of claim
31 in which the information relating to the television program includes program
title, name of television service, channel number, and time.
    33. The interactive process for operating a television schedule system of claim
32 additionally comprising the step of displaying an overlay including a program
note with a program description for the television program being shown on said
television set.
    34. The interactive process for operating a television schedule system of claim
31 additionally comprising the step of displaying a program note with a program
description for the visually identified program.

    Based on the arguments of the parties, the following claimed language is in
dispute for the asserted claims of each of the '268 and '204 patents: "visual
identification," "means ... for displaying," and the language relating to the
movement and the program note limitations. Moreover, the language "tuning a
programmable tuner to a select channel based on position of said visual
identification" is also in dispute for the asserted claims of the ' 204 patent.

1. The language "visual identification" ('268/'204 Patents)

    Each of the asserted claims of the '268 and '204 patents refers to a  "visual
identification." The parties agree that "visual identification" is not a term of
art. (See, e.g., RFF 1296 and CRFF 1296). [FN13]

    Complainants argued that "visual identification" is defined by its ordinary
meaning, viz., any identifier that can be seen. (CFF 1387). It was further argued
that there is nothing in the claims, specification or prosecution history that
defines "visual identification" in a manner that is "unconventional" or inconsistent
with the ordinary meaning of the term. (CFF 1388).

    Respondents argued that the "visual identification" of each of the asserted,
independent claims of the '268 and '204 patents requires an "innovative cursor" as
defined in the specification as a cursor that (1) highlights the entire cell, (2)
identifies the current half-hour position within a cell that is longer than a half-
hour, and (3) differentially identifies the remaining portions of the cell; that the
intrinsic evidence conclusively demonstrates that the "innovative cursor" is not
merely a preferred embodiment, but is an essential part of the invention; and that
long before reaching the description of the preferred embodiment, a reader of the
specification would learn that the invention is the innovative cursor. (See, e.g.,
EPost at 117). The staff argued that the visual identification should be construed
as an identification that provides the user some sort of indication as to which
segment of a long program cell the visual identification is currently focused upon.
(SPost at 29).

    The "visual identification" is described by the claim language of all the asserted
claims as being a visual identification of an irregular cell comprising the two
dimensional grid of the television schedule. (CX-3, col. 14, lns. 56-57; CX-4 col.
17, lns. 1-2; col. 20, lns. 6-7). However, the term "visual identification" does not
appear in the '268 and the '204 patents' common specification.

    The "innovative cursor 32" is the only "visual identification" described in the

2002 WL 31556392                                                    Page 51
USITC Inv. No. 337-TA-454

Abstract, Summary of the Invention, and Detailed Description of the Invention
sections as being capable of attaining the objectives of the invention as set forth
in the Summary of the Invention section. The Abstract, which is identical in the
'268 and the '204 patents, describes a screen for a user interface of a television
schedule system consisting of a two-dimensional array of cells containing program
titles. Each cell corresponds to a program and the length of each cell is directly
proportional to the length of the corresponding program. The array is arranged as a
grid of three regular columns, each column delineating a duration of time of an half
hour in length, and twelve rows of program listings. Each program listing is
contained in a cell, with some of the program listings overlapping two or more of
the columns because of their length. (CX-3). The Abstract identifies a key problem
with a user interface that utilizes a conventional cursor in a grid made up of such
irregular cells:
    Because of the widely varying length of the cells (26), if a conventional cursor
used to select a cell location were to simply step from one cell to another, the
result would be abrupt changes in the screen (10) as the cursor moved from a cell
(26) of several hours length to an adjacent cell in the same row.
(CX-3).

  The Abstract then discloses the inventors' solution for these "abrupt changes in
the screen:"
    An effective way of taming the motion is to assume that behind every array  (24)
is an underlying array of regular cells. By restricting cursor movements to the
regular cells, abrupt screen changes will be avoided. With the cursor (32), the
entire cell (26) is 3-D highlighted, using a conventional offset shadow (34). The
offset shadow (34) is a black bar that underlines the entire cell and wraps around
the right edge of the cell. To tag the underlying position - which defines where the
cursor (32) is and thus, where it will move next - portions (36) of the black bar
outside the current underlying position are segmented, while the current position is
painted solid.
(CX-3). The cursor (32) described in the abstract is referred to as the  "innovative
cursor" in the Detailed Description of the Invention and is depicted in Figures 1
and 5 of both patents. (CX-3, Figs. 1 and 5). [FN14]

  The Summary of the Invention section, which is identical in the '268 and  '204
patents, states that the objects of the invention may be attained by a novel
television schedule system and method featuring a user interface with a novel
cursor. Thus it reads:
    The attainment of these and related objects may be achieved through use of the
novel television schedule system and process user interface herein disclosed. A
television schedule system including a user interface in accordance with this
invention has a display. A means is connected to the display for displaying the
television schedule on the display as an array of irregular cells which vary
dimensionally in length, corresponding to different television program time lengths.
A means is connected to the display for providing a cursor with the television
schedule on the display. The cursor has a variable length corresponding to the
length of a selected one of the irregular cells in which the cursor is located. A
means is connected to the means for providing the cursor for moving the cursor in
the array in a series of equal length steps. At least some of the irregular cells
have a length which is greater than the length of the steps.
    In the process of operating a television schedule system with the user interface
of this invention, the television schedule is displayed as an array of irregular
cells which vary dimensionally in length, corresponding to different television
program time lengths. A cursor is provided with the television schedule on the
display, the cursor has a variable length corresponding to the length of a selected
one of the irregular cells in which the cursor is located. The cursor is moved in
the array in a series of equal length steps, with at least some of the irregular
cells having a length which is greater than the length of the steps.
(CX-4, col. 2, ln. 52- col. 3, ln. 10) (Emphasis added).

  The Detailed Description of the Invention section, which is identical in the '268
and '204 patents, describes the problem created by using a conventional cursor with
a grid composed of irregular cells:
    Because of the widely varying length of the cells 26, if a conventional cursor

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 52
USITC Inv. No. 337-TA-454

used to select a cell location were to simply step from one cell to another, the
result would be abrupt changes in the screens 10, 12, 14, 18 and 20 as the cursor
moved from a cell 26 of several hours length to an adjacent cell in the same row.
Such abrupt changes disorient a user of the system.
(CX-4, col. 4, lns. 46-52) (Emphasis added). It further describes one way of
preventing abrupt changes that could otherwise "disorient a user of the system:"
    An effective way of taming the motion is to assume behind every array 24 is an
underlying array of regular cells. By restricting cursor movements to the regular
cells, abrupt screen changes will be avoided.
(CX-4, col. 4, lns. 46-52). However, the Detailed Description of the Invention
section immediately acknowledges that even this system would be "befuddling to
users," as
    there is now a potential ambiguity between the underlying cell which governs
cursor movement and visible cell 26 which holds the program title.
    Viz. if the cursor moves in half hour steps, and the cell length is, say four
hours, should the cursor be 1/2 hour long or four hours long? If the cursor only
spans the interval of the underlying cell (1/2 hour), the cursor appears to be
highlighting a segment of the cell, which is misleading. On the other hand, if the
cursor spans the entire four hours of the TV listing, the cursor underlying position
will be obscure. In this case, cursor right/left commands will appear inoperative
while traversing a long cell. The absence of feedback following a cursor command is
befuddling to users.
(CX-4, col. 4, ln. 56 - col. 5, ln. 2) (Emphasis added).

    It then states that "[t]herefore, an innovative cursor 32 (Fig. 1) for the
irregular array 24 is required which satisfies several conflicting requirements."
(CX-4, col. 5, lns. 3-5). (Emphasis added).

    Under the Detailed Description of the Invention section, the innovative curser is
described accordingly:
    With the cursor 32, the entire cell 26 is 3-D highlighted, using a conventional
offset shadow 34. The offset shadow 34 is a black bar that underlines the entire
cell and wraps around the right edge of the cell. To tag the underlying position -
which defines where the cursor 32 is and thus, where it will move next - portions 36
of the black bar outside the current underlying position are segmented, while the
current position is painted solid.
    For an half hour cell 26, the offset shadow's underline bar will always be
black. FIGS. 2 and 3 show the cursor 32 as it appears for a half-hour program. For
programs that go beyond 1/2 hour, only the current 1/2 hour position will be solid
black. All remaining positions will be striped. If the cursor is moved left or
right, the solid section will move accordingly, providing complete visual feedback.
(CX-3, col. 5, lns. 7-23).

    The Detailed Description of the Invention concludes:
    It should now be readily apparent to those skilled in the art that a system and
method incorporating a novel user interface capable of achieving the stated objects
of the invention has been provided. The user interface that is configured to
compensate for the particular nature of the television schedule information. The
user interface has a cursor operation that compensates for an irregular grid format
of the television schedule information. The user interface presents the schedule
information in a format that compensates for limited resolution of the television
display. The user interface presents supplemental schedule information in overlays
that obscure a minimum amount of useful other information. Order of presentation of
the schedule information in the interface is customizable by user preference.
(CX-3, col. 14 lns. 21-35)(Emphasis added).

    The features of the "innovative cursor" are readily observed from the Figures 1
and 5 of the '204 and the '268 patents. As seen in Figures 1 and 5 of the patents,
the "innovative cursor" described in the text of the patents highlights the first
half of the cell, which corresponds with first half hour of an hour long program,
with a solid black line, while highlighting the second half of the cell, which
corresponds to the last half hour of an hour long program, with a segmented line.
Thus Figure 1 of the '268 patent shows a two dimensional television program schedule
grid guide made up of cells of irregular length, wherein each cell contains a

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

program title and corresponds to a single television program. Time is displayed
horizontally, while channels are displayed vertically. (CX-3, Fig. 1). Therefore,
the cursor is able to highlight the entire cell and to indicate to the user its
exact position within the cell.

As seen from the foregoing, a conventional cursor, and especially its mode of
moving within a grid composed of irregular cells (i.e., moving to an adjacent cell
in response to each use of the movement controller by the user), was disclaimed by
the applicants. Furthermore, complainants' reliance on the doctrine of claim
differentiation is misplaced. As stated above, the doctrine of claim differentiation
is not determinative. See, supra. Furthermore, the limitation of claim 7 that the
"visual identification" comprise a cursor is not inconsistent with the
administrative law judge's finding that the "visual identification" is a cursor that
(1) highlights the entire cell, (2) identifies the current half-hour position within
a cell that is longer than a half-hour, and (3) differentially identifies the
remaining portions of the cell. A cursor is a "visual cue." (Mirriam Webster's
Collegiate Dictionary Online available at http://www.m-w.com/).). Therefore,
complainants' proposed construction of "visual identification" as being any
identification that is visible to render claim 7's limitation redundant.

Based on the foregoing, the administrative law judge finds that the claimed visual
identification of the '268 and '204 patents is the "innovative curser" defined in
the specification as a cursor that (1) highlights the entire cell, (2) identifies
the current half-hour position within a cell that is longer than a half-hour, and
(3) differentially identifies the remaining portions of the cell.

2. The language "means... for displaying" ('268/'204 Patents)

Claim 1 of the '268 patent recites:
    means coupled to said television display for displaying the television schedule
on said television display as a grid of two-dimensionally arranged, adjacent
irregular cells which vary in length corresponding to time duration of programs,
with a title of a program being displayed in each of said irregular cells, said grid
having a plurality of channels listed in a first dimension and time listed in a
second dimension.
(CX-3). In almost the exact same language, claim 14 of the '204 provides for the
same "means ... for displaying" element as provided for in claim 1 of the '268
patent. [FN15]

The parties agree that the "means ... for displaying" elements in claim 1 of the
'268 patent and claim 14 of the '204 patent are means plus function elements. (See,
e.g., CPost at 184; PPost at 123). Complainants contend that the corresponding
structures for this element are the CPU 228 and the Video Display Generator 224.
(CPost at 184, 222). Respondents and the staff argued that the corresponding
structures include, in addition to the CPU 228 and the Video Display Generator 224,
the Video Switcher 226. (PPost at 123-24; SPost at 29).

The administrative law judge rejects complainants' arguments that the 35 U.S.C. §
112 corresponding structures should be limited to the CPU 228 and the Video Display
Generator 224 to the exclusion of the Video Switcher 226. Thus, the specification
provides:
    For a What's on TV request, the listing stored in schedule memory 232 is
retrieved, processed by CPU 228, and outputted to video display generator 224. Video
switcher 226 is enabled by CPU output 246 to select the video display generator 224
output whenever schedule data is to be presented to the TV/monitor 210.
(CX-4, col. 13, lns. 12-17). Accordingly, Figures 22A and 22B, which are the only
block diagrams of systems incorporating the inventions of the '204 patents,
show that the CPU and the Video Display Generator in Figure 22A are connected to the
television display through the Video Switcher, and that, in Figure 22B, the CPU is
similarly connected to the television display. [FN16]

Furthermore, complainants' expert witness, Faillace, testified that each of the
video switchers, referred to in the '121, '204 and '268 patents, operated in the
same way, viz., it receives control signals from the CPU indicating which of the two

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 54
USITC Inv. No. 337-TA-454

inputs that it receives - i.e., the input from the tuner or the input from the video
display receiver - it should accept and pass through so that it is displayed on the
television set and switches to the selected input. (Tr. at 2387).

    In the context of the invention of the '121 patent, Faillace testified as to what
would happen if the video switcher was rendered inoperable:
        Q Now, this person watching television with this invention that's incorporated
    in the television, unbeknownst to him, the video switcher has gone on the blink. We
    won't go into the details, but it is struck. It's no longer able to respond to
    commands from the CPU, and it is simply letting the output from the turner go
    through to the television receiver.
        When that person presses the button on his remote to try to call up the guide,
    what will happen?
        A He won't see a guide.
        Q I'm sorry, not a guide. He will try pull up the program schedule
    information.
        A He won't see that either.
        Q In other words, it won't be generated on the display?
        A It will.

                                    * * *

        Q If the video switcher is inoperative as I described, the viewer will only
    receive the television program, the signal from the tuner, that's correct.
        A The broadcast program, that's right.
        Q The broadcast program. So then isn't it true that in order for the program
    information that is being generated by the video display generator to reach the TV
    receiver, that video switcher or its equivalent must be there in order to allow that
    information to reach the TV receiver and be displayed on the screen?
        A It is true in precisely the same sense that the line 142 must also be there.
        Q Without a working video switcher, the person who has spent a lot of money
    for their brand new TV with a fancy -
        A Guide.
        Q - guide will simply have a regular old television, right?
        A That's correct.
(Tr. at 2389-91). Moreover, complainants' in their post hearing brief responded to
respondents' inclusion of a video switcher as part of the corresponding "means ...
for displaying" accordingly: "Respondents [sic] proposed additional structure merely
enables the CPU (executing relevant software routines) and video display generator
to perform their stated functions." (CPost at 185 (Emphasis added)). Therefore,
complainants admit that the CPU and Video Display Generator need the Video Switcher
in order to accomplish their ascribed function of "displaying the television
schedule on said television display."

    Based on the foregoing, the administrative law judge finds that the corresponding
means to the "means ... for displaying" of claim 1 of the '268 patent and claim 14
of the '204 patent are (1) the CPU, the video display generator, and the video
switcher, or (2) their 35 U.S.C. § 112 equivalents.

3. The movement limitation ('268/'204 Patents)

    Independent claim 14 of the '204 patent requires
        a movement control for a visual identification of selected ones of said
    irregular cells which controls movement of said visual identification in the first
    dimension and in second dimension from cell to cell.
(CX-4, col. 17, lns. 1-5). Claim 14 recited that the cells comprising the television
grid guide would be "two dimensionally arranged," with "plurality of channels listed
in the first dimension and time listed in a second dimension." (CX-4, col. 16, lns.
58-65).

    Independent claim 31 provides for process that calls for:
        moving said visual identification in the first dimension and in the second
    dimension between first and second ones of said irregular cells to select a desired
    one of said irregular cells corresponding to a desired program.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(CX-4, col. 20, lns. 8-11). As with claim 14 of the '204 patent, "a plurality of
channels" is listed in the first dimension, while time is listed in the second
dimension. (CX-4, col. 20, lns. 3-5).

   As was observed above, see supra, claim 1 of '268 patent had the following
language:
     a movement control for a visual identification of ones of said irregular cells
which initiates movement of said visual identification in the first dimension, and
irregular movement of said visual identification in the second dimension in steps
corresponding to variation in cell size, responsive to an input by a user to said
movement control, between first and second ones of said irregular cells.
(CX-3, col. 14, lns. 56-65). Once again, "a plurality of channels" is listed in the
first dimension, while time is listed in the second dimension. (CX-3, col. 14, lns.
50-53).

   Complainants argued that the movement limitation only requires "that the  'visual
identification' be in one cell, in one instance, then in another cell, in a second
instance. As such, movement' of the 'visual identification' moves relative to the
physical dimensions of the television screen - irrespective of whether the grid
stays put, or whether the grid moves while the 'visual identification' stays put."
(CPost at 197). Respondents S-A and Pioneer and the staff argued that the movement
limitation of the asserted claims is only satisfied if the "visual identification"
moves within the grid guide, and is not satisfied if the "visual identification"
remains stationary while the grid guide itself moves. (See, S-A Post at 127-28;
PPost at 134-136; SPost at 50- 52).

   Respondent EchoStar argued that the movement limitation be construed such that the
cursor would move at regular intervals, so that some user inputs would cause the
cursor to move from cell to cell, but other user inputs would cause the cursor to
move its position within the cell. (EPost at 126-128). Under EchoStar's
construction, cell to cell movement would occur when the cursor was in a cell that
corresponded to the length of the cursor's regular movement. (Id.). For instance if
the cursor was moved at half hour intervals and happened to be in a cell
corresponding to a show that was a half hour in duration, it would exhibit cell to
cell movement to the next cell. If the cursor was in a cell that corresponded to a
program greater than a half hour it would exhibit movement within the cell. (Id).

   The administrative law judge rejects complainants' argument that the cursor does
not have to be able to move within the grid. The movement limitation requires that
the "visual identification" be able to be moved along both dimensions of the grid
guide. The administrative law judge finds that this movement limitation is supported
by both the plain language of the claims at issue and the specification. First, all
three claims specify that the "visual identification," not the grid guide, must be
able to be moved, in the first and second dimensions. The claims also make clear
that the dimensions in which the "visual identification" is being moved are the
dimensions of the "two - dimensionally arranged" grid guide. (CX-4, col. 16, lns.
58-65; col. 19, ln. 67 - col. 20, ln. 5; CX-3, col. 14, lns. 48-53).

   The administrative law judge further finds that the specification provides support
for the administrative law judge's construction of the movement limitation to
require that the "visual identification" must be able to be moved within the grid.
Thus, the Abstract discloses that it is the cursor, and not the grid guide, that is
to be moved: "To tag the underlying position -- which defines where the cursor (32)
is and thus, where it will move next ...." (Emphasis added). Similarly, the Summary
of the Invention section recites that "a means is connected ... for moving the
cursor in the array in series of equal length steps." (CX-4, col. 2, 64-66 (Emphasis
added); see also CX-4, col. 3, lns. 8-11 ("The cursor is moved in the array in a
series of equal length steps ....")). The Detailed Description of the Invention
section also makes reference to the "[m]ovement of the cursor." (CX-4, col. 5, ln.
23). A comparison of Figures 1, 2, and 3 illustrates the movement described in the
specification and the claims: the grid remains the same in all three figures, except
for the position of the cursor which has been moved from the cell with the title
"Young & Restless" in Figure 1, to the cell with the title "Judge (Part 1)" in
Figure 2 and to the cell with the title "Inside Edition" in Figure 3. In all three

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

figures, the grid has remained static and unchanged while the cursor has been moved
in the first and/or second dimension to highlight a new program.

   The administrative law judge also finds that the cursor's movement within the grid
must be done, consistent with EchoStar's proposed construction, in regular steps
that may result in cell to cell movement or movement within a cell, depending on the
length of the cell occupied by the "visual identification." He finds that regular
cell to cell movement would render the innovative cursor a nullity. The innovative
cursor (1) highlights the entire cell; (2) identifies its current half hour position
within a cell that is longer than a half hour; and (3) differentially identifies the
remaining portions of the cell. See supra. With regular cell to cell movement the
cursor would not have a half hour position within a cell longer than an half hour.
Moreover, the administrative law judge has already rejected construing the term
"visual identification" to include a conventional cursor, which utilizes cell-to-
cell movement, because the specifications of the '268 and '204 patents specifically
disclaimed such movement.

   Specifically, the specifications of the '204 and '268 patents state that one of
the objects of the inventions disclosed in those patents is "to provide such a user
interface having a cursor operation that compensates for an irregular grid format of
the television schedule information." (CX-4, col. 2, lns. 37-39). However, the
specifications explicitly disclaim any user interface using cell to cell movement
within the grid of irregular cells. For instance, in the Background of the Invention
section, cell to cell movement is described accordingly:
     If this array is navigated by a cursor that goes from cell to cell, a single
   cursor command can produce violent screen changes. For example, a cursor right
   command may cause an abrupt jump to a cell situated several hours from the current
   page. Not only is this unsettling, but may take considerable effort to recover.
   Clearly, a gentler cursor motion is needed for the irregular cells found in a grid
   TV guide.
(CX-4, col. 2, lns. 8-15). (Emphasis added). Furthermore, under the Detailed
Description of the Invention section, cell to cell movement is again dismissed as
being unsuitable for use with a grid of irregular cells:
     Because of the widely varying length of cells 26, if a conventional cursor used
   to select a cell location were simply step from one cell to another, the result
   would be abrupt changes in the screens 10, 12, 14, 18, and 20 as the cursor moved
   from a cell 26 of several hours in length to an adjacent cell in the same row. Such
   abrupt changes disorient a user of the system.
(CX-4, col. 4, lns. 46-52). (Emphasis added)

   Therefore, in light of the specification's description of cell to cell movement
being "disorient[ing]" and "unsettling," and resulting in "abrupt changes" and
"abrupt jumps," as well as "violent screen changes," the administrative law judge
finds that such movement was disclaimed by the patentees. [FN17]

   Accordingly, based on the foregoing, the administrative law judge finds that the
claims in issue require that the "visual identification" be able to be moved within
both dimensions of the two dimensional grid guide, in addition to being moved at
regular intervals.

4. The program note limitation ('268/'204 Patents)

   Claim 1 of the '268 patent requires the display of a "program note overlay
including a program description on said television display." Claims 17 and 34 of the
'204 patent require the display of "a program note with a program description for
the visually identified program," such limitation, according to S-A and EchoStar,
requires the "program note overlay" of claim 1. (S-A Post at 148, EPost at 130-31).
Complainants argued that the "program note" limitation of these claims should be
construed consistent with its ordinary meaning, viz., "a display of graphical or
textual information, about a program, that partially or completely covers the video
screen." (CPost at 212).

   The staff argued that the "term 'overlay' has a number of meanings in the software
and user interface area[s], and generally implies something that appears to come up

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and partially hide what had appeared on the screen previously." (SPost at 34-35).

   Respondents argued that the "program note" limitation can only be met by an
overlay that is superimposed on top of the grid guide and also, its position on the
screen must vary according to the location of the cursor, so as to avoid masking the
cursor. (See, e.g., S-A Post at 148-50; PPost at 145-48; EPost at 130-34).

   In the Background of the Invention section, the following need is identified:
      Printed grid television schedule guides often include additional information
   besides the program title and broadcast names. Such grids are also typically
   provided in combination with a more detailed printed schedule that contains a
   synopsis of each program, whether the program is a repeat, ratings for movies, and
   other information. When using a television set as a display for a schedule system,
   the size and resolution of the television display limit the amount of text that can
   be displayed with the grid. Improved techniques are required for conveying the most
   amount [sic] of information to the user in an easily understood manner within the
   limitations of the television display.
(CX-4, col. 2, lns. 16-27 (Emphasis added)).

   Similarly, in the Summary of the Invention section, one of the objects of the
invention is described as "to provide such a user interface in which supplemental
schedule information is presented in overlays[ [FN18]] that obscure a minimum amount
of useful other information." (CX-4, col. 2, lns. 45- 48). The Detailed Description
of the Invention section describes the "overlay" accordingly:
      FIG. 6 shows a television schedule grid screen 20 with a program note overlay
   52. With limited text capacity on TV displays, it is preferable to display as many
   lines of TV listings as feasible. To handle program notes, which are text intensive,
   on-demand overlays 52 are used ....
      Program notes for a selected program are overlaid over the grid guide upon
   request. The program note can be toggled off/on using a SELECT command. The program
   note 52 overlays and hides 3 or 4 listings of the guide. To minimize concealment of
   the guide an auto-roving note is used. The program note will overlay either the top
   half or bottom half of the screen, as necessary to avoid masking the title of the
   selected screen. If the cursor 32 is in the upper half of the screen, the note will
   appear in the bottom half, and vice versa. If the cursor 32 is moved to the lower
   half of the screen the note will automatically position itself in, [sic] the upper
   half of the screen.
(CX-4, col. 6, lns. 22-52) (Emphasis added). Thus in this section of the
specification program note overlays are described as temporarily covering the grid
guide. However, as a later section of the specification describing channel grazing
overlays makes clear, a program note overlay does not always have to cover the grid
guide:
      FIGS. 9 and 10 show channel grazing overlays 64 and 66 that provide information
   on current programs when switching channels while watching television. In the
   overlay 64, when scanning channels the title of each program is overlaid at 68,
   along with the name of the TV service (HBO, ABC etc.), the cable channel number, the
   current date, day of the week, and time in the channel information field 62. The
   overlay 66 is the same as the overlay 64 except that this overlay includes a program
   note 70, which is similar to the program note 52 in FIG. 6, but contains information
   to a program currently being broadcast on the selected channel. To access program
   notes, press the Select key. In addition to the program note 70, elapsed time is
   indicated by a percentage calibrated time bar 72. The bar is bracketed by S for
   start, and F for finish. By default, titles will appear automatically when channels
   are scanned. Grazing Titles may be de-activated using the CANCEL key. To restore
   auto-titles, press Select while viewing TV. The flow diagram governing
   titles/program notes, while viewing TV, is shown in Fig. 11.
(CX-4, col. 7, ln. 56 - col. 8, ln. 8) (Emphasis added). Hence the specification
makes clear that the overlay 66 is identical to program note overlay 52 except that
it "contains information to a program currently being broadcast on the selected
channel," even though the program note displayed as part of the channel grazing
overlay was displayed over a broadcast television show and not the grid guide. (Tr.
at 3653-54). Therefore, the administrative law judge rejects respondents' and the
staff's attempts to limit the "overlay" limitation to require that the program note
cover a portion of the grid guide. Instead, the administrative law judge construes

2002 WL 31556392                                                        Page 58
USITC Inv. No. 337-TA-454

this limitation to require merely that the overlay must cover a portion of the
screen, irrespective of what is being displayed on the screen.

    Furthermore, the administrative law judge rejects respondents' attempts to read
the auto-roving feature into the "program note" limitation. Respondents' argued that
the auto-roving feature must be read into the claims, because the invention needs
this feature in order to accomplish one of the stated objects of the invention,
viz., to present additional information about programs by using overlays that
obscure a minimum amount of useful information. (EPost at 132). However, even though
the specification states that the auto-roving function is used with the overlays to
"minimize concealment of the guide" ('204 patent, col. 6, lns. 44-45), such an auto-
roving feature would not enable the overlays to better accomplish the stated
objective of presenting additional information about programs by using overlays that
obscure a minimum amount of useful information. This is because an overlay as
described in the specification will always obscure three to four lines on a grid
guide even if the auto-roving function is used. The auto-roving feature merely
causes the overlay to appear (and thereby obscure a portion of the grid guide) on
the top or bottom of the grid guide depending on the position of the cursor, whereas
a non-auto-roving overlay would appear in the same place every time it is invoked,
irrespective of the location of the cursor. Therefore the same amount of information
is obscured whether an auto-roving or a non-auto-roving overlay is used. Moreover,
the program notes displayed as part of the channel grazing overlays do not exhibit
any auto-roving capability (Tr. at 4068-69), even though such program notes would be
subject to the same over all objective of presenting additional information about
programs by using overlays that obscure a minimum amount of useful information.

    Accordingly, the administrative law judge construes "program note" limitation of
claim 1 of the '268 patent and claims 17 and 34 of the '204 patent as to require
only the use of overlays that are invoked on demand, but does not require the
overlays to be auto-roving or to appear over part of the grid guide.

5. The language "tuning a programmable tuner to a select channel based on position
of said visual identification" ('204 patent)

    Claim 31 of the '204 patent recites "tuning a programmable tuner to a select
channel based on position of said visual identification" as an element. Respondents
argued that this limitation "requires that the channel changes in response to
movement of the visual identification without further user input, i.e., without
pressing the select button." (RFF 1521). Complainants argued that this limitation
can be met even if the select button had to be used as the final step to cause the
tuner to tune to the selected channel. (CORFF 1521 et seq.)

    The administrative law judge rejects respondents' proposed construction. The plain
language of the limitation is in no way inconsistent with a system or a process in
which the user can move a cursor to highlight cell on a grid guide corresponding to
a television show and then press the SELECT button to cause the tuner to tune to the
selected program. In such a system or process the tuner would still be tuning to a
particular channel based on the position of the cursor. Respondents claim that the
prosecution history supports their proposed construction, yet they are only able to
cite to the language of proposed claim 229 which was introduced in the Supplemental
Amendment of March 21, 1995. While applicant's remarks accompanying the Supplemental
Amendment make it clear that proposed claim 229 had a limitation which required that
the tuner to automatically tune to a particular channel, solely because of the
placement of the cursor (RX 3011 at 423), proposed claim 229 did not develop into
claim 31 and the wording of the limitation of proposed claim 229 is markedly
different from that of the corresponding limitation of claim 31. [FN19]

VI. INFRINGEMENT

    Complainants have the burden of proving, by a preponderance of the evidence, that
the claims in issue are infringed by the accused set-top boxes. See, e.g., Conroy v.
Reebok International, Ltd., 14 F.3d 1570, 1573 (Fed. Cir. 1994); Braun Inc. v.
Dynamics Corp., 975 F.2d 815 (Fed. Cir. 1992); Chisum, § 18.06(1). To find
infringement, the accused set-top boxes must meet each claim limitation, either

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 59
USITC Inv. No. 337-TA-454

literally or under the doctrine of equivalents. Charles Greiner & Co. v. Mari-med
Mfg. Inc., 962 F.2d 1031, 1034 (Fed. Cir. 1992). Literal infringement requires that
every limitation of the claim be found in the accused set-top boxes, exactly.
Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir.), cert.
denied, 116 S. Ct. 515 (1995).

  A device that does not literally infringe a claim can infringe under the doctrine
equivalents. [FN20] The "doctrine of equivalents" prevents an accused patent
infringer from avoiding liability for infringement by changing only minor or
insubstantial details of a claimed invention while retaining the invention's
essential identity. Festo Corp. v. Shoketsu Kinzoku Kogyo Mabashihi Co., 234 F.3d
558. (Fed. Cir. 2000), vacated, Slip op., 535 U.S., 2002 WL 1050479 (May 28, 2002).


A. '121 Patent

1. Pioneer

  Complainants argued that they have established that the accused Pioneer devices
infringe claims 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 31, 33, 36, 42, 43, 48, 50,
54, 57, 59, 60, 61 and 66 of the '121 patent. Each of the staff and Pioneer argued
that complainants have not met their burden.

a. Independent Claim 18 And Dependent Claims 19-24, 26-28 And 31

  {* * *}
  Moreover, the administrative law judge finds that the Pioneer set-top boxes do not
"combin[e] said user selection criteria" as required by claim 18. The Pioneer IPG
has three modes of operation: Time View, Theme View and Title View. The
administrative law judge finds that none of these modes of operation allows a user
to "combin[e] said user selection criteria." The Time View of Passport software is
the initial mode of the Pioneer IPG and displays a grid television guide that is
just like a newspaper TV guide. (Krakirian, Tr. at 2970-2971, 2890). Specifically,
the left hand column of the grid television guide provides a list of channels
offered by the cable provider, while the top column lists the time in half
increments. Titles of programs are contained in cells in the grid, corresponding to
the appropriate scheduled channel and time of broadcast. This channel list is preset
and pre-ordered by the cable operator. (Krakirian, Tr. at 2890; RX-4500A,
slide/video segment 5).

  A user of Passport software cannot change the sequence or order of the preset
channel line up. (Krakirian, Tr. at 2890; RX-4500A, slide/video segment 5). All that
a user may do in the Time View is browse the preset channel list that is
automatically called up by the Passport software in response to the user pressing
the "GUIDE" button, by using the page up or down keys or by using the up or down
directional arrow keys. (Krakirian, Tr. at 2970-2971). The grid shifts along the
appropriate axis and in the appropriate direction, each time one of these buttons
are used. For example, when the user presses the left or right arrow key, the grid
shifts along the time axis and a new grid is displayed with a new half-hour column
replacing one of the original columns. (CX-2367). Alternatively, the user can press
the fast forward or fast rewind key, causing a new grid to be shifted 4 hours
forward or backward, respectively, along the time axis. (CX-2303)

  However, the user cannot change the way the initial Time View is displayed.
(Krakirian, Tr. at 2890). For example, the user may not specify a particular time
range or channel range to display on the grid, as the Passport software controls
what part of the channel list and time range will be displayed. (Krakirian, Tr. at
2970-2971). Also, a user cannot enter commands to cause only particular channels to
be contained in the list shown in the left hand column of the grid guide.
(Krakirian, Tr. at 2892; RX-4500A, slides/video segments 5 & 6).

  The administrative law judge finds that no combining as that term was construed
with relation to claim 18 occurs in Pioneer's Time View. As required by claim 18,
the Time View mode does not allow the user to enter a plurality of criteria, which
are then used to select only those programs that meet the combined criteria, so that

2002 WL 31556392                                                          Page 60
USITC Inv. No. 337-TA-454

only those programs are displayed to the user. The administrative law judge finds
that the navigation that occurs in the Time View grid guide by browsing does not
utilize combining of search criteria within the meaning of claim 18, as a user
cannot cause the IPG to present to him particular programing that occurs at a
particular time or on a particular channel. Instead, the Pioneer IPG merely allows
the user to browse through the grid guide, either cell by cell or four hour time
interval by four hour interval, to find for himself the channel or time range that
he is interested in. The user must browse through the entirety of the information to
find desired programs just like one browses through the pages of a printed
television guide. (Rhyne, Tr. at 3577-78; Krakirian, Tr. at 2970-71). Thus the
administrative law judge finds that in the accused Pioneer set-top boxes, there is
no way for the user to reduce the number of programs that are presented to the user
in Time View, which is in conflict with the purpose of the '121 patent. As testified
by Faillace, complainants' expert witness, the purpose of the '121 patent is to
provide database techniques to take a vast sea of program schedule information, cut
it down to size, and enable the user to focus just on those programs most likely to
be of interest to him or her, so that instead of looking at thousands of
descriptions of programs, the user would be looking at just a handful of programs,
in order to be able to make an educated choice. (Faillace, Tr. at 1150). Faillace's
testimony is supported by the specification which states in the Background of the
Invention section that "[i]t would be desirable for a user to be able to reduce the
number of such listings to be consulted in making a program selection." ('121
patent, col. 2, ll. 63-65). The specification provides further that:

    Because the system will search through a volume of schedule information to find
programs meeting the viewer's selection criteria, the program selection is much
easier and more rapid with the system of this invention than with manual selection.
By way of example, the system can be used to select satellite programs from a larger
list of satellite programs by user selected satellite symbols, such as F1 or AB, to
be displayed by the scheduler, eliminating most of the program listings which are of
no value to the viewer. Similarly, for users without special decryption service, the
system will remove from display those satellite listings which are of no value to
the viewer because they are encrypted.
(col. 5, lns. 23-36) (Emphasis added). Therefore, the administrative law judge finds
that "combining" of selection criteria as required by claim 18 does not occur in the
IPG's Time View mode of Pioneer.

    The administrative law judge further finds that the use of the Pioneer set-top
boxes' Theme View or Title View modes does not satisfy the combining limitation of
claim 18, as no combining at all occurs in either the Passport's Theme View or Title
View as the user selects one criterion (an initial letter of a program's title or a
single theme) and the system presents the user with a list of program's meeting that
criterion, and whereupon the user must scroll through the list to find the desired
program. For instance, once in the Time View, a user may switch to the Theme View by
pressing the "B" button on the remote control. (Krakirian, Tr. at 2893; RX-4500A,
slide/video segment 7). There is no way, however, that a user of Passport software
may enter the Theme View without first entering the Time View. (Krakirian, Tr. at
2894; RX-4500A, slide/video segment 7). Similar to the operation of Theme View, once
in the Time View, a user may switch to the Title View by pressing the "C" key. (CX-
2336; CX-8006). However, there is no way that a user of Passport software may enter
the Title View without first entering the Time View by pressing the "Guide" key.
(Krakirian, Tr. 2894). On the left side of the screen in Title View, a list of
characters appears from which a user may choose the initial character of a title.
(Faillace, at Tr. 2265; RX-8006; CX-2336). With Passport software, the user can only
select one initial character while in Title View. (Faillace, Tr. at 2267-2268;
RX-8007; RX-8008). The system will then find all the programs having the initial
letter that the user selected and will present the user with a list of programs
beginning with that letter along with the programs' scheduled broadcast dates, times
and channels. (RX-8006; RX-8007; RX-8008). In Title View, the user cannot combine a
title search with an interval of time, but must rather navigate up and down the list
of programs presented as beginning with the initial letter selected by the user.
(Tr. at 3577).

    The Pioneer Passport software's Theme View operates the same way as the Title View
except the user is selecting a theme instead of an initial character. (Krakirian,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tr. at 2895). In the Passport software's Theme View, the user may apply only one
theme at a time and may not combine a theme with an interval of time. (Rhyne, Tr. at
3575-3572; RX-4747.93). The user may only navigate up or down the list of programs
by scrolling through the list. (Rhyne, Tr. at 3576- 77; RX-4747.93). Therefore, no
combining at all occurs in either the Passport's Theme View or Title View as the
user selects one criterion (an initial letter of a program's title or a single
theme) and the system presents the user with a list of program's meeting that
criterion, and whereupon the user must scroll through the list to find the desired
program.

   The administrative law judge further finds that Pioneer's Passport software does
not store the title of selected programs as required by claim 18. (Krakirian, Tr. at
2899-01). From any of the three views (Time, Theme or Title) the user may press the
"SELECT" button. (Krakirian, Tr. at 2899-2900). If the highlight is on a cell
corresponding to a program being currently broadcast, the Passport software will
select the channel for the highlighted row, take the viewer to that service and
allow the viewer to watch the selected program. The Passport software will then
store the channel, but not the title, of the program that the viewer selected.
(Krakirian, Tr. at 2899-2901). If the user presses "SELECT" and the highlight is
within a column for a future time, Passport software will ask whether the user
wishes to manually select the service for the highlighted position or set a timer so
that the user may, at a future time, record or be reminded to view the service
corresponding to the scheduled program that is highlighted. (Krakirian, Tr. at
2899). If the user elects to set an event timer, Passport software will set a timer
that causes the software to take future action. (Krakirian, Tr. at 2900). {* * *} {*
* *}

   Based on the foregoing the administrative law judge finds that the accused Pioneer
set-top boxes do not infringe independent claim 18 and dependent claims 19-24, 26-28
and 31.

b. Independent Claim 33

   The administrative law judges finds that the accused Pioneer devices do not
infringe independent claim 33. For the same reasons that he found that the accused
Pioneer devices do not store schedule information in the CPU, do not have a storage
means, and do not combine user selection criteria in relation to claim 18, he finds
that the accused devices lack these features and functions in relation to claim 33.
See supra. The administrative law judge further finds that the accused Pioneer
devices are incapable of "turning on" a VCR within the meaning of claim 33, i.e., to
cause electricity to be supplied to it. The Pioneer set-top boxes, when fitted with
an "IR Blaster", an optional accessory, can cause a VCR that is already turned on to
start to recording a selected channel. (Tr. at 2255-57). However the Pioneer set-top
boxes cannot turn power on for a VCR that is turned off. (Tr. at 1471-72, 3635).

   Based on the foregoing, the administrative law judge finds that the accused
Pioneer set-top boxes do not infringe independent claim 33.

c. Independent Claim 36

   The administrative law judges finds that the accused Pioneer devices do not
infringe independent claim 36. For the same reasons that he found that the accused
Pioneer devices do not store schedule information in the CPU, do not have a storage
means, do not combine user selection criteria and do not store the titles of
selected programs in relation to claim 18, he finds that the accused devices lack
these features and functions in relation to claim 36. See supra. Additionally, for
the same reason that he found that the accused Pioneer devices cannot turn on a VCR
in relation to claim 33, he finds that the Pioneer devices are incapable of
performing that function in relation to claim 36.

d. Independent Claim 42 And Dependent Claims 43, 48, 49 And 50

   The administrative law judge finds that the accused Pioneer devices do not
infringe independent claim 42 and dependent claims 43, 48, 49 and 50. For the same

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reasons that he found that the Pioneer devices did not satisfy the "storage means" limitation of claim 18, he finds that the Pioneer devices do not satisfy the "storage means" limitation of claim 42 and the claims depending therefrom.

The administrative law judge further finds that the accused Pioneer devices do not have the first input means required by claim 42 and the claims that depend from it. As found in the claim construction section, supra, the "first input means" is a means plus function element and the corresponding structures comprise either (1) an FM antenna, an FM receiver, a SCA subcarrier decoder, and data demodulator or (2) an antenna, a programmable tuner, a program data timing controller and a data demodulator; or (3) their 35 U.S.C. § 112, ¶ 6 equivalents. {* * *} {* * *}

It is undisputed that the digital technologies used by Pioneer's set-top boxes were developed after the issuance of the '121 patent. (Tr. at 1193-94, 1662-3). [FN21] Thus the digital technology relied upon by Pioneer cannot be a 35 U.S.C. § 112, ¶ 6 equivalent to the "first input means" because it was developed after the issuance of the '121 patent. As the Federal Circuit stated in Al-Site Corp. v. VSI International, Inc., 174 F.3d 1308, 1320 (Fed. Cir. 1999)

As this court has recently clarified, a structural equivalent under § 112 must have been available at the time of the issuance of the claim. See [Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1310 (Fed. Cir. 1998).] An equivalent structure or act under § 112 cannot embrace technology developed after the issuance of the patent because the literal meaning of a claim is fixed upon its issuance. An "after arising equivalent" infringes, if at all, under the doctrine of equivalents. See [Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 117 S.Ct. 1040, 1052 (1997);] Hughes Aircraft Co. v. U.S., 140 F.3d 1470, 1475, 46 U.S.P.Q.2d 1285, 1289 (Fed. Cir. 1998). .... In other words, an equivalent structure or act under § 112 for literal infringement must have been available under the doctrine of equivalents may arise after patent issuance and before the time of infringement. See Warner-Jenkinson, 117 S.Ct. at 1053.

The administrative law judge further finds that the accused Pioneer devices do not have a a "selectable display", in which the initial display comprises information selected by the data processor in response to the user inputs, as well as either the current channel that the television is tuned to or the current time. With the accused Pioneer devices, the user has no ability to select the way the initial Time View is displayed. No larger or smaller time interval than the one-and-a-half hours time period can be displayed on the Time View's grid guide in the horizontal dimension. (Krakirian, Tr. 2891; RX-4500A, slide/video segment 5). Furthermore, the Pioneer set-top boxes do not allow a user to store a user selected set of preferred themes that can be activated or deactivated by the user and therefore the user cannot have the Time View show only those programs coming within certain themes. (Krakarian, Tr. at 2893-95). Also, a user cannot enter commands to cause only particular channels to be listed.

Accordingly, based on the foregoing, the administrative law judge, finds that accused Pioneer devices do not infringe independent claim 42 and dependent claims 43, 48, 49 and 50.

e. Independent Claim 54

The administrative law judge finds that the accused Pioneer devices do not infringe independent claim 54. For the same reasons that he found that the Pioneer devices did not satisfy the "storage means" limitation of claim 18, he finds that the Pioneer devices do not satisfy the "storage means" limitation of claim 54. Furthermore, he finds that the Pioneer products at issue do not have the 35 U.S.C. § 112, ¶ 6 corresponding structures for the "means connected between said programmable tuner and said data processor for separating the broadcast schedule information from the broadcast programs and supplying the broadcast schedule information to said data processor."

Complainants argued that "[t]he separating means in all the accused devices is the{* * *}

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 63
USITC Inv. No. 337-TA-454

Based on the foregoing, the administrative law judge finds that the accused Pioneer devices do not infringe independent claim 54.

f. Independent Claim 57 And Dependent Claims 59, 60 And 61

The administrative law judge finds that the accused Pioneer devices do not infringe independent claim 57 and dependent claims 59, 60 and 61. For the same reasons that he found that the Pioneer devices did not satisfy the "storage means" limitation of claim 18, he finds that the Pioneer devices do not satisfy the "storage means" limitation of claim 57. For the same reasons that he found that the Pioneer devices did not satisfy the "separating means" limitation of claim 54, he finds that the Pioneer devices do not satisfy the "separating means" limitation of claim 57. Furthermore, for the same reason that he found that Pioneer products did not satisfy claim 42's "selectable display" limitation he finds that they do not satisfy claim 57's selectable display limitation.

Based on the foregoing, the administrative law judge finds that the accused Pioneer devices do not infringe independent claim 57 and dependent claims 59, 60 and 61.

g. Independent Claim 66

The administrative law judge finds that the accused Pioneer devices do not infringe independent claim 66. For the same reasons that he found that the accused Pioneer devices do not store schedule information in the CPU, do not have a storage means, and do not combine user selection criteria in relation to claim 18, he finds that the accused devices lack these features and functions in relation to claim 66. See supra. Accordingly, the accused Pioneer devices do not infringe independent claim 66.

2. EchoStar

Complainants argued that they have established that the accused EchoStar devices infringe claims 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 31, 32, 36, 54, 57, 58, 59, 60, 61 and 66 of the '121 patent. Each of the staff and EchoStar argued that complainants have not met their burden of proving infringement of these claims.

a. Independent Claim 18 And Dependent Claims 19-24, 26-28 And 31

{* * *}
The administrative law judge also finds that the accused EchoStar devices do not have the storage means required by claim 18 and the claims depending from it. {* * *} {* * *} {* * *}

After the accused EchoStar set-top boxes display screenful of events satisfying the user selected theme, the user can scroll down the list of selected programs. (CX-2326 et seq., Tr. at 1320-21). When the user scrolls past the last program listed on the screen, the system can display additional events beyond those displayed in the initial screen that match the selected theme{* * *}

While, the accused EchoStar devices allow a user to set the set-top boxeses to display only those programs that are to be broadcast on certain channels, (Tr. at 1323), such combining is logical "OR" combining, as the set-top boxes displays all of the programs that occurr on any of the selected channels, instead of displaying only programs that occur on all of the selected channels, as would be the case with logical "AND" combining. As found in the claim construction section, supra, the "combining" limitation requires that the set-top boxes perform both logical "OR" and logical "AND" combining. Therefore, the set-top boxes's ability to display the programs scheduled to be broadcast on selected channels does not satisfy the combining limitation.

The administrative law judge further finds that the accused EchoStar set-top boxeses{* * *} {* [FN22] * *}

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 64
USITC Inv. No. 337-TA-454

   Based on the foregoing, the administrative law judge finds that complainants have
failed to meet their burden of proving that the accused EchoStar devices infringe
independent claim 18 and dependent claims 19-24, 26-28 and 31 of the '121 patent.

b. Independent Claim 32

   The administrative law judge finds that complainants have not met their burden of
proving that the accused EchoStar devices infringe claim 32 of the '121 patent. {* *
*}as required by claim 32.

c. Independent Claim 36

   The administrative law judges finds that the accused EchoStar devices do not
infringe independent claim 36. For the same reasons, supra, that he found that the
accused EchoStar devices{* * *}he finds that the accused EchoStar devices lack these features
and functions with respect to claim 36. Additionally, complainants admitted that the
EchoStar devices cannot power on a VCR as is required by independent claim 36.

   Based on the foregoing, the administrative law judge finds that complainants have
failed to meet their burden of proving that the accused EchoStar devices infringe
claim 36.

d. Independent Claim 54

   The administrative law judge finds that complainants have not met their burden in
establishing that the accused EchoStar devices infringe independent claim 54. For
the same reasons that he found that the EchoStar devices{* * *}

   {* * *}
   {* * *}As stated above, in connection with the accused Pioneer products in
relation to claim 42, {* * *}

   Based on the foregoing, the administrative law judge finds that the accused
EchoStar devices do not infringe independent claim 54.

e. Independent Claim 57 And Dependent Claims 58, 59, 60 And 61

   The administrative law judge finds that complainants have not met their burden in
establishing that the accused EchoStar devices infringe independent claim 57 and
dependent claims 58, 59, 60 and 61. For the same reasons that he found that the
accused EchoStar devices{* * *}Moreover, for the same reasons that the
administrative law judge found that the EchoStar devices{* * *}

   Based on the foregoing, the administrative law judge finds that the accused
EchoStar devices do not infringe independent claim 57 and dependent claims 58, 59,
60 and 61.

f. Independent Claim 66

   The administrative law judge finds that complainants have not met their burden in
establishing that the accused EchoStar devices infringe independent claim 66. For
the same reasons that he found that the accused EchoStar devices { * * *}he finds
that the accused devices lack these features and functions in relation to claim 66.
See supra. Accordingly, the accused EchoStar devices do not infringe independent
claim 66.

3. S-A

   Complainants argued that they have established that the accused S-A devices
infringe claims 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 31, 33, 36, 42, 43, 48, 49,
50, 51, 54, 57, 59, 60, 61 and 66 of the '121 patent. Each of the staff and S-A
argued that complainants have not met their burden.

a. Independent Claim 18 And Dependent Claims 19-24, 26-28 And 31

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 65
USITC Inv. No. 337-TA-454

{* * *} {* * *}The grid shows a screen of five predetermined channels over an hour
and a half time interval. (Rhyne, Tr. at 3581-82; 3587). A user can cause the grid
to shift along its time axis or its channel axis by using directional arrows.
(Rhyne, Tr. at 3581-82; 3587). As found with respect to Pioneer, supra, such
navigation does not constitute "combining."

   Moreover, the S-A Standard Guide only allows the user to select from the stored
presorted relational database of IPG data by date or based on one theme or based on
the first character of a program title. (RX-474.91; RX-4747.88C; Rhyne Tr. at 3577;
3587-91; JX-12C at 556-61, 572, 626-28, 930-42). The theme and title-character
search can neither be combined nor applied successively to create a subset listing
only programs with the selected theme and title character. (RX-4747.91, Rhyne, Tr.
at 3575-77). Thus, in the accused S-A products having the Standard Guide, only a
single selection criterion can be used at a time. For example, the Theme, Title, or
Date View uses only a single criterion. The date key can be used following the Theme
View or Title View key to display only those programs with the selected theme or
initial letter of their title and are scheduled to be broadcast on the selected
date. (Rhyne, Tr. at 3588 and 3590-91; RX-4747.88; RX-4747.91; JX-62C at 272-73,
276- 77, 281-82). However, the administrative law judge finds that this does not
satisfy the "combining" limitation of claim 18, as Young had specifically disclaimed
sequential, hierarchal searches. See, supra.

   The S-A Flex Guide does not allow the user to select from the stored IPG data
based on the first character of a program title, date or theme. (Durden, Tr. at
2791; JX-12C at 10531-54; JX-49C at 106). In the accused S-A Flex Guide, the
administrative law judge finds that the Time View displays a grid guide that is just
like a newspaper TV guide. The Time View allows a user to scroll through pages of
the grid guide and browse through the schedule information. (Rhyne, Tr. at 3582-83,
3587). The user may not specify a particular time range or channel range to display.
(RX-4747.57; Rhyne, Tr. at 3537-38, 3622-23, 3631). Rather, the S-A Flex Guide
determines what part of the channel list and time range will be first displayed.
(Durden, Tr. at 2755). Once the Time View is chosen and displayed, the user can only
browse through a preset channel line up and preset sequential time range. (Rhyne,
Tr. at 3582-83). The user of the S-A Flex Guide may not change the sequence of
channels or sequence of times displayed, as these have been preset. (Rhyne, Tr.
3582-83). The user may page up or down one screen of pre-set channels at a time
using page keys, may use directional arrow keys to scroll the grid up or down one
channel row at a time along the pre-set channel list, and may use directional arrow
keys to scroll the grid forward or backwards in thirty-minute intervals. (JX-12C at
554-556; Durden, Tr. at 2757-2758). Also a user cannot enter commands to cause only
particular channels to be contained in the list shown in the left hand column of the
grid guide. (Rhyne, Tr. at 3583). After the S-A Flex Guide is opened to the Time
View the user's interaction with the Time View is limited to using the directional
keys on the remote control to scroll the grid forward or backwards in half-hour
increments. (Rhyne, Tr. at 3575-76, 3583, 3587; RX-4747.91). A user of the S-A Flex
Guide cannot enter commands that allow the user to view programs that are on at a
particular time without having to use the directional arrow keys, the page button,
or the "C" button to scroll to the desired time. (Rhyne, Tr. 3575-76, 3583, 3587;
RX-4747.91). In the S-A Standard Guide's Title View, the user may not combine a
title with a user-specified interval of time. The user may only navigate up or down
the list of programs having the same user selected initial character of the title.
(RPX-99, clips 24 and 25). Therefore, the administrative law judge finds that the
accused S-A products do not satisfy the "combining" limitation of claim 18.
Moreover, the administrative law judge finds that the accused S-A products do not
store titles of selected programs as required by claim 18. (FF 187, 188).

   Based on the foregoing, the administrative law judge finds that the complainants
have failed to meet their burden of proving that the accused S-A products infringe
independent claim 18 and dependent claims 19-24, 26-28 and 31.

b. Independent Claim 33

   The administrative law judges finds that complainants have not satisfied their

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

burden in establishing that the accused S-A devices infringe independent claim 33.
For the same reasons, supra, that he found that{* * *}See supra.

Based on the foregoing, the administrative law judge finds that the accused S-A
set-top boxes do not infringe independent claim 33.

c. Independent Claim 36

The administrative law judges finds that complainants have not met their burden in
establishing that the accused S-A devices infringe independent claim 36. For the
same reasons that he found that the accused S-A devices{* * *}and functions in
relation to claim 36.

d. Independent Claim 42 And Dependent Claims 43, 48, 49 And 50

The administrative law judge finds that complainants have not met their burden in
establishing that the accused S-A devices infringe independent claim 42 and
dependent claims 43, 48, 49 and 50. For the same reasons that he found that the S-A
devices did not satisfy the "storage means" limitation of claim 18 supra, he finds
that the S-A devices do not satisfy the "storage means" limitation of claim 42 and
the claims depending therefrom.

The administrative law judge further finds that complainants have not met their
burden in establishing that the accused S-A devices{* * *}As found in the claim
construction section, supra, the "first input means" is a means plus function
element and the corresponding structures comprises either (1) an FM antenna, an FM
receiver, a SCA subcarrier decoder, and data demodulator or (2) an antenna, a
programmable tuner, a program data timing controller and a data demodulator; or (3)
their 35 U.S.C. § 112, ¶ 6 equivalents. {* * *}

Furthermore, the administrative law judge finds that the S-A products {  * * *} {*
* *}The Time View of the S-A products displays a grid television guide that is just
like a newspaper TV guide. (Rhyne, Tr. at 3582-83, 3587). The user may not specify a
particular time range or channel range to display. (RX-4747.57; Rhyne, Tr. at 3537-
38, 3622-23, 3631). Rather, the S-A guide mandates what part of the channel list and
time range that will first be displayed. (Durden, Tr. at 2755). {* * *} (Rhyne, Tr.
at 3575-76, 3583, 3587). The user of an S-A guide has no ability to change the
displayed channels or the ordering of the channels. (Rhyne, Tr. at 3575-76, 3583,
3587). Nor can a user enter commands to cause only particular channels to be
contained in the list shown in the left hand column of the grid guide. (Rhyne, Tr.
at 3583).

Accordingly the administrative law judge finds that the accused S-A products do
not infringe independent claim 42 and dependent claims 43, 48, 49 and 50.

e. Independent Claim 51

The administrative law judge finds that complainants have not met their burden in
establishing that the accused S-A devices infringe independent claim 51. For the
same reasons that he found that the accused S-A devices do not have a storage means
in relation to claim 18, supra, and do not have the "first input means" and a
"selectable display" as required by claim 42, supra, he finds that the accused
devices lack these features and functions in relation to claim 51. Accordingly, the
accused S-A devices do not infringe independent claim 51.

f. Independent Claim 54

The administrative law judge finds that complainants have not met their burden in
establishing that the accused S-A devices do not infringe independent claim 54. For
the same reasons that he found that the S-A devices did not satisfy the "storage
means" limitation of claim 18, he finds that the S-A devices do not satisfy the
"storage means" limitation of claim 54. Furthermore, he finds that the S-A products
at issue{* * *}

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

{* * *}Therefore, the administrative law judge finds that the SA devices do not
have the means for separating required by claim 54.

g. Independent Claim 57 And Dependent Claims 59, 60 And 61

The administrative law judge finds that complainants have not met their burden in
establishing that the accused S-A devices infringe independent claim 57 and
dependent claims 59, 60 and 61. For the same reasons that he found that the S-A
devices did not satisfy the "storage means" limitation of claim 18, he finds that
the S-A devices do not satisfy the "storage means" limitation of claim 57. For the
same reasons that he found that the S-A devices did not satisfy the "separating
means" limitation of claim 54, he finds that the S-A devices do not satisfy the
"separating means" limitation of claim 57. Furthermore, for the same reason that he
found that S-A products did not satisfy claim 42's "selectable display" limitation
he finds that they do not satisfy claim 57's selectable display limitation.

Based on the foregoing, the administrative law judge finds that the accused S-A
devices do not infringe independent claim 57 and dependent claims 59, 60 and 61.

h. Independent Claim 66

The administrative law judge finds that complainants have not met their burden in
establishing that the accused S-A devices infringe independent claim 66. For the
same reasons that he found that the accused S-A devices{* * *}in relation to claim
18, supra, he finds that the accused devices lack these features and functions in
relation to claim 66. Accordingly, the accused S-A devices do not infringe
independent claim 66.

B. '268/'204 Patents

I. Pioneer

Complainants argued that they have established that the accused Pioneer products
infringe claims 1 and 3 of the '268 patent and claim 14, 15, 16, 17, 31, 32, 33 and
34 of the '204 patent. Each of Pioneer and the staff argued that complainants have
not met their burden.

a. Independent Claim 1 And Dependent Claim 3 Of The '268 patent.

The administrative law judge finds that complainants have not met their burden of
proving that the accused Pioneer products practice independent claim 1 and dependent
claim 3 of the '268 patent. {* * *} {* * *}

Furthermore, the administrative law judge finds that the accused Pioneer products
do not have a cursor that exhibits the movement required by the claims. {* * *}In
the claim construction section, the administrative law judge found that the cursor
must be able to be moved in regular intervals, and it must also be able to be moved
within the grid guide. See supra. The cursor of the Pioneer products cannot be moved
within the grid guide and do not move in regular intervals and therefore do not meet
this limitation.

The administrative law judge further finds that the accused Pioneer products do
not have the required innovative cursor. Instead, the Pioneer cursor is uniformly
black and fills the entire cell, irrespective of the length of the cell. (Tr. at
2918, RX-4500).

Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused Pioneer products infringe claims 1
and 3 of the '268 patent.

b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The '204 Patent

The administrative law judge finds that complainants have not met their burden of
proving that the accused Pioneer products infringe independent claim 14 and

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

dependent claims 15, 16, and 17 of the '204 patent. For the same reasons that the
administrative law judge found that the Pioneer products did not satisfy the "means
... for displaying" limitation, the innovative cursor requirement, or the movement
limitation in relation to claims 1 and 3 of the '268 patent, he finds that the
Pioneer products do not meet these limitations in relation to claim 14, 15, 16, and
17 of the '204 patent.

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused Pioneer products infringe
independent claim 14 and dependent claims 15, 16, and 17 of the '204 patent.

c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The '204 Patent

   The administrative law judge finds that complainants have not met their burden of
proving that the accused Pioneer products infringe independent claim 31 and
dependent claims 32, 33 and 34 of the '204 patent. For the same reasons that the
administrative law judge found that the Pioneer products did not satisfy the
innovative cursor requirement, or the movement limitation in relation to claims 1
and 3 of the '268 patent, he finds that the Pioneer products do not meet these
limitations in relation to claims 31, 32, 33 and 34 of the '204 patent.

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused Pioneer products infringe
independent claim 31 and dependent claims 32, 33, and 34 of the '204 patent.

2. S-A

   Complainants argued that they have established that the accused S-A products
infringe claims 1 and 3 of the '268 patent and claim 14, 15, 16, 17, 31, 32, 33 and
34 of the '204 patent. Each of S-A and the staff argued that complainants have not
met their burden.

a. Independent Claim 1 And Dependent Claim 3 Of The '268 patent.

   The administrative law judge finds that complainants have not met their burden of
proving that the accused S-A products practice independent claim 1 and dependent
claim 3 of the '268 patent. {* * *}the administrative law judge finds that
complainants have not met their burden of showing that the accused S-A products meet
the "means ... for displaying" limitation.

   Furthermore, the administrative law judge finds that the accused S-A products do
not have a cursor that exhibits the movement required by the claims in issue. {*
[FN23] * *}Therefore, for the same reasons that the administrative law judge found
that the Pioneer products did not satisfy the movement limitation, the
administrative law judge finds that the accused S-A products do not satisfy the
movement limitation. Complainants argued that the cursor in the S-A products still
exhibited the movement required by claims 1 and 3 of the '268 patent as the cursor
"mov[ed] from one cell to another". (CRRFF 2615.10). However, even if the
administrative law judge were to accept complainants' argument that the cursor in
the accused S-A products moves from one cell to another, such movement is still
insufficient to satisfy the movement limitation of the asserted claims. In the claim
construction section, the administrative law judge found that the claims require
that the cursor move at regular time intervals and it must also be able to be moved
within the grid guide. See supra. The cursor of the S-A products does not move at
regular time intervals and cannot be moved within the grid guide and therefore does
not satisfy the movement limitation.

   The administrative law judge further finds that the accused S-A products do not
have the required innovative cursor. Instead, the S-A cursor is uniformly black and
fills the entire cell, irrespective of the length of the cell. (Tr. at 3657-58, RX-
4748.10).

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused S-A products infringe claims 1 and

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

3 of the '268 patent.

b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The '204 Patent

   The administrative law judge finds that complainants have not met their burden of
proving that the accused S-A products infringe independent claim 14 and dependent
claims 15, 16, and 17 of the '204 patent. For the same reasons that the
administrative law judge found that the S-A products did not satisfy the "means ...
for displaying limitation", the innovative cursor requirement, or the movement
limitation in relation to claims 1 and 3 of the '268 patent, he finds that the S-A
products do not meet these limitations in relation to claim 14, 15, 16, and 17 of
the '204 patent.

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused S-A products infringe independent
claim 14 and dependent claims 15, 16, and 17 of the '204 patent.

c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The '204 Patent

   The administrative law judge finds that complainants have not met their burden of
proving that the accused S-A products infringe independent claim 31 and dependent
claims 32, 33 and 34 of the '204 patent. For the same reasons that the
administrative law judge found that the S-A products did not satisfy the the
innovative cursor requirement or the movement limitation in relation to claims 1 and
3 of the '268 patent, he finds that the S-A products do not meet these limitations
in relation to claims 31, 32, 33 and 34 of the '204 patent.

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused S-A products infringe independent
claim 31 and dependent claims 32, 33, and 34 of the '204 patent.

3. EchoStar

   Complainants' argued that they have established that the accused EchoStar products
infringe claims 1 and 3 of the '268 patent and claim 14, 15, 16, 17, 31, 32, 33 and
34 of the '204 patent. Each of EchoStar and the staff argued that complainants have
not met their burden.

a. Independent Claim 1 And Dependent Claim 3 Of The '268 Patent

   The administrative law judge finds that complainants have not met their burden of
proving that the accused EchoStar products practice independent claim 1 and
dependent claim 3 of the '268 patent. The accused EchoStar products, like the
accused Pioneer and S-A products, do not have a{* * *}as required by the "means ...
for displaying" limitation. (Tr. at 3142). {* * *}Therefore, the administrative law
judge finds that complainants have not met their burden of showing that the accused
EchoStar products meet the "means ... for displaying" limitation.

   The administrative law judge further finds that the accused EchoStar products do
not have the required innovative cursor. Instead, the EchoStar cursor is uniformly
black and highlights the entire cell, irrespective of the length of the cell. (Tr.
at 3988-89, RX-7483). Moreover, the administrative law judge finds that the accused
EchoStar products do not satisfy the movement limitation. The cursor in the EchoStar
products do not move in equal time increments. (Tr. at 3989-90). Instead, the cursor
moves cell to cell until it reaches the edge of the screen, where upon it starts
moving in half hour increments. (Tr. at 3989-90).

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused EchoStar products infringe claims 1
and 3 of the '268 patent.

b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The '204 Patent

   The administrative law judge finds that complainants have not met their burden of

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 70
USITC Inv. No. 337-TA-454

proving that the accused EchoStar products infringe independent claim 14 and
dependent claims 15, 16, and 17 of the '204 patent. For the same reasons that the
administrative law judge found that the EchoStar products did not satisfy the "means
... for displaying limitation, the movement limitation or the innovative cursor
requirement in relation to claims 1 and 3 of the ' 268 patent, he finds that the
EchoStar products do not meet these limitations in relation to claim 14, 15, 16, and
17 of the '204 patent.

Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused EchoStar products infringe
independent claim 14 and dependent claims 15, 16, and 17 of the ' 204 patent.

c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The '204 Patent

The administrative law judge finds that complainants have not met their burden of
proving that the accused EchoStar products infringe independent claim 31 and
dependent claims 32, 33 and 34 of the '204 patent. For the same reasons that the
administrative law judge found that the EchoStar products did not satisfy the
innovative cursor requirement or the movement limitation in relation to claims 1 and
3 of the '268 patent, he finds that the EchoStar products do not meet these
limitations in relation to claims 31, 32, 33 and 34 the '204 patent.

Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused EchoStar products infringe
independent claim 31 and dependent claims 32, 33, and 34 of the ' 204 patent.

VII. PATENT MISUSE

The staff and all of the respondents argued that complainants have committed
patent misuse through their licensing practices. [FN24] Complainants have denied any
patent misuse. A party invoking patent misuse must prove the acts constituting the
alleged misuse by a preponderance of evidence. See, e.g., GFI Inv. v. Frankling
Corp., 88 F. Supp. 2d 619, 621 (N. D. Miss. 2000).

Patent misuse is an affirmative equitable defense to an accusation of patent
infringement, the successful assertion of which "requires that the alleged infringer
show that the patentee has impermissibly broadened the 'physical or temporal scope'
of the patent grant with anticompetitive effect." Windsurfing Int'l, Inc. v. AMF,
Inc., 782 F.2d 995, 1001, 228 U.S.P.Q. 562, 566 (Fed. Cir. 1986). See Virginia Panel
Corp. v. Mac Panel Co., 133 F.3d 860, 868-69 (Fed. Cir. 1997) (Virginia Panel).
Because of the strong public policy underpinnings of the patent misuse defense, a
party asserting this defense need not show that it has been harmed by the misuse
directly. Rather,
    [i]t is the adverse effect upon the public interest of a successful infringement
suit, in conjunction with the patentee's course of conduct, which disqualifies him
to maintain the suit, regardless of whether the particular defendant has suffered
from the misuse of the patent.
Morton Salt Co. v. G.S. Suppiger Co., 314 U.S. 488, 494 (1942); See also Senza-Gel
Corp. v. Seiffhart, 803 F.2d 661, 668, n. 10 (Fed. Cir. 1986) (Senza-Gel).

Respondents have asserted that complainants in their licensing practices have
engaged, and are continuing to engage, in a variety of practices by which the
complainants are misusing their patents in the field of interactive program guides.
Thus it was argued that complainants' licenses contain unlawful grantbacks and
covenants not to sue (PPost at 263-77, SA-Post at 212-35, EPost at 386-412); that
complainants' licenses contain unlawful exclusivity and market penetration
provisions that tie out competition (PPost at 277-96, S-APost at 235-52, EPost at
363-86); and that complainants have misused their patents through tying
arrangements. (PPost at 252-72, S-A Post at 296-306, REPost at 338-63).

The staff argued that the record established that complainants have engaged in
patent misuse by using its large patent portfolio to impermissibly expand the scope
of their patents and hinder competition, which discourages innovation in the
technology in issue and substantially raise barriers to entry in the market in

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 71
USITC Inv. No. 337-TA-454

issue. (SPost at 67-68).

   The parties are in dispute as to what the applicable legal standards are for
finding patent misuse. For example, there is a dispute over the applicablity of the
Patent Misuse Reform Act of 1988 (35 U.S.C. § 271(d)) (The 1988 Act). [FN25] [FN26]
The staff and respondents contend that "tying" is per se patent misuse if the
patents confer market power. [FN27] Complainants' contend that Congress rejected the
theory that "tying" is per se patent misuse. (CPost at 426).

   The Federal Circuit in Virginia Panel, 133 F.3d at 869, specifically found:
      The courts have identified certain specific practices as constituting per se
patent misuse, including so-called 'tying' arrangements in which a patentee
conditions a license under the patent on the purchase of a separable, staple good,
.... Congress, however, has established that other specific practices may not
support a finding of patent misuse. See U.S.C. 271 (d) ... A 1988 amendment to §
271(d) provides that, inter alia, in the absence of market power, even a tying
arrangement does not constitute patent misuse....
(Emphasis added). Hence the administrative law judge finds that the Federal Circuit,
subsequent to the 1988 Act, did not reject the theory that "tying" is per se patent
misuse. [FN28] It did however, consistent with 35 U.S.C. § 271(d)(5), condition
finding a "tying" arrange to constitute patent misuse per se on a finding that the
patent holder has market power. Hence if it is shown that the patentholder has
market power, anticompetitive effect is conclusively presumed, with "tying"
arrangement.

A. Market Power

   The "outer boundaries of a product market[ [FN29]] are determined by the
reasonable interchangeability of use or the cross-elasticity of demand between the
product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S.
294, 325 (1962) (Brown Shoe). Market power is "the ability profitably to maintain
prices above, or output below, competitve levels for a significant period of time."
See US Dept. of Justice (DOJ) and Federtal Trade Commission (FTC), Antritrust
Guidelines for Licensing Intellectual Property § 2.2, reprinted in 49 Patent,
Trademark & Copyright J. (BNA) 714 (April 13, 1995) (Antitrust Guidelines). Thus it
is "the power to 'force a purchaser to do something that he would not do in a
competitive market'." Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 464,
(1992) (quoting Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 14 (1984)).
Market power has also been defined as "the ability of a single seller to raise price
and restrict output." Id. However, in Tic-X-Press v. Omni Promotions Co. 815 F.2d
1407, 1420 (11th Cir. 1987) (Tic-X-Press), the Eleventh Circuit stated that market
power "can be sufficient even though the seller does not dominate the market ...
Economic power may be inferred from the tying product's desirability to consumers or
from uniqueness in its attributes."

   To demonstrate market power, a party generally must: (1) define the relevant
market; (2) demonstrate that the defendant enjoys a sufficient share of the market;
and (3) demonstrate significant barriers to entry. See, e.g., Rebel Oil Co. v. Atl.
Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995). The common type of proof is
circumstantial evidence pertaining to the structure of the market. Id. The relevant
market is comprised of both the product market and the geographic market. Brokerage
Concepts, Inc. v. United States Healthcare, Inc., 140 F.3d 494, 513 (3d Cir. 1998).
The relevant market is the area of effective competition between the patent holder
and the infringer. Thus the area of effective competition in the known line of
commerce must be charted by careful selection of the market area in which the seller
operates, and to which the purchaser can practicably turn for supplies. See Tampa
Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327-28(1981). In Brown Shoe, 370 U.S.
at 324, the Supreme Court determined that the relevant market has two dimensions,
first the product market, which defines the products or services that compete with
each other, and second, the geographic market, the market in which the competition
is geographically defined.

   The product market includes those products that are "reasonably interchangeable by
consumers for the same purpose. Interchangeability implies that one product is

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

roughly equivalent to another for the use to which it is put; while there may be
some degree of preference for one over the other, either would work effectively."
Brokerage Concepts, Inc., 140 F.3d at 513 (citations and quotations omitted). A
technology market, i.e., intellectual property that is licensed, can constitute a
relevant market when "rights to intellectual property are marketed separately from
the products in which they are used." Antitrust Guidelines § 3.2.2. The geographic
market is "the area in which a potential buyer may rationally look for the goods or
services he or she seeks." Brokerage Concepts, Inc., 140 F.3d at 515.

    Barriers to entry, which are particular characteristics of a market which impede
entry by new firms into that market, may result from numerous market conditions,
including patents or license agreements. See Image Tech. Servs., Inc. v. Eastman
Kodak Co., 125 F.3d 1195, 1208 (9th Cir. 1997); Reazin v. Blue Cross & Blue Shield of
Kansas, Inc., 899 F.2d 951, 968 (10th Cir. 199). Even where some competitors have or
may enter a market, that entry must be "timely, likely, and sufficient in its
magnitude, character and scope to deter or counteract the competitive effects of
concern." See DOJ and FTC, Horizontal Merger Guidelines § 3.0, reprinted in
Department of Justice Manual (Aspen Law & Business v.5 2002 supp.).

    Respondents rely on testimony of experts Dr. Abram Hoffman and Professor David
Sibley in support of their allegation that complainants have committed patent
misuse, including the allegation that complainants have market power. Hoffman
testified that Gemstar has market power in a market for IPG technology and a market
for IPG products. (Tr. at 4583, 4630, 4635). Sibley testified that complainants
possess a very great degree of market power for IPG licensing technology and that
their licensing practices have enabled it to extend their market power to the market
for IPGs. (Tr. at 4768). Complainants argued that the testimony of Hoffman and
Sibley is misleading, is unreliable and lacks foundation.

    Hoffman was asked specifically to look at the issue of market power. (Tr. at
4583). The administrative law judge finds that he is qualified to assess market
power. He is not testifying as a lay person with no knowledge of the evidence. Thus
Hoffman, in developing his opinions on alleged patent misuse, including market
power, considered different types of evidence. He testified:
    We've reviewed a lot of information in this case. It consists of well over 100
licensees that Gemstar and its predecessor companies have entered into. It includes
the information exchanged by the parties in discovery, business records and
communications, et cetera. {* * *}We've also sought to get an understanding of the
IPG market and the market in which it operates through obtaining public information
that might be helpful in that regard. So it went beyond the record of documents
exchanged in discovery, to inform ourselves about the market in general. Also,
deposition testimony that's been taken in this case, and exhibits thereto, large
number of depositions that have been helpful in that regard, to our understanding of
the licensing practices and the intents of the parties, et cetera.
(Tr. at 4589-90). Additionally, Hoffman reviewed trial transcripts and attended
portions of the live testimony in this proceeding. (Hoffman, Tr. at 4590, 4593).
[FN30] Moreover, Hoffman is a principal at the consulting firm
PriceWaterhouseCoopers. Hoffman has a doctorate in business administration,
specializing in managerial economics and finance, from Harvard, and has been a
practicing economist for approximately 25 years. Hoffman regularly serves as a
consultant to businesses, trade associations and government agencies, analyzing
economic or financial data to determine the economic impact of business decisions.
He previously has served as an expert witness or consultant in addressing liability
and damages issues within the context of antitrust and unfair competition claims,
and damages issues in patent infringement and intellectual property matters. Hoffman
also has extensive experience as an expert analyzing antitrust issues including
collusive practices, price fixing, price discrimination and predatory pricing. He
has served as an expert witness or consultant in cases before the International
Trade Commission, has testified before the Federal Trade Commission, the Joint
Economic Committee of the United States Congress, and numerous state and federal
courts throughout the country. Hoffman has co-authored a book chapter concerning
economic and financial analysis in litigation and has given a presentation relating
to the valuation of intellectual property for the purposes of analysis under the
Hart-Scott Rodino Act. (See Tr. at 4579-83, RX-4336).

                    ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   The administrative law judge also finds Sibley qualified to assess market power.
Sibley testified, in developing his opinions, that he considered different types of
evidence such as: depositions of various parties, documents obtained during the
discovery process, publicly available documents, the contracts themselves,
conversations with senior EchoStar executives and the relevant economics literature.
Sibley also reviewed trial transcripts and attended portions of the live testimony
in this proceeding. (Sibley, Tr. at 4767). Sibley holds a Ph.D. in economics from
Yale University, which he received in 1973. After receiving his Ph.D., Sibley went
to work for Bell Laboratories, ultimately becoming head of the economic research
group at Bell Communications Research, a research and development entity created
after the AT&T break-up. Sibley also has been employed as a senior staff economist
at the Council of Economic Advisors and as a consultant for the Civil Aeronautics
Board. In 1991, he became the John Michael Stuart Centennial Professor of Economics
at the University of Texas at Austin, where he is employed today, and where he
teaches graduate and undergraduate courses in economics. Sibley's field of expertise
is industrial organization. He has been engaged as an expert economist by the
Federal Trade Commission and the Department of Justice in United States v. Microsoft
Corp., and by numerous private parties such as SBC Communications, Lucent
Technologies and GTE Corporation. See Tr. at 4762-66, RX-7449.

   In contrast, complainants' expert, Janusz A. Ordover, who has been a professor of
economics at New York University, in New York for the past 28 years (Tr. at 5719),
testified as to market power (Tr. at 5737-38):
        Q In reaching your conclusions, Professor Ordover, what role, if any, has the
analysis of market power played?
        A Frankly, I have not devoted substantial -- substantial amount of time,
almost any amount of time to the assessment of certain relevant markets in this
litigation, and the reason for that is quite simple, which is to say that I have
focused myself directly on the practices themselves and on their competitive
consequences without asking myself whether or not it is important to ensure that the
relevant markets are defined for that very purpose.
        Q If you were to assume, in fact, that GemStar has market power in a properly
defined relevant market, do your conclusions change?
        A No. As I testified a second ago, my focus is actually on the practices
themselves and their competitive effects, both in some of the alleged markets that
have been put forth by Sibley and Hoffman and in general.
        So my conclusions do not really turn on that, the finding, and therefore,
whether or not for example certain practices such as a tie is -- my conclusion, for
example, in regard to ties does not depend on the finding of market power, but
rather on the finding that these alleged licensing practices are not ties, and if
they were ties, they have not had any adverse competitive effect, at least in the
markets that seem to be alleged by Sibley and Hoffman. [Emphasis added]

1. Relevant Market(s) For Establishing Market Power

   To demonstrate market power a party must define the relevant market. See supra.
Therefore before the administrative law judge can evaluate the extent to which
GemStar exercises power in the alleged tying market, that market must be defined.

   IPG technology is something different from an IPG application. An IPG application
is an application that runs on a hardware device that allows a user to see and use
an IPG. IPG technology, however, involves patents. (Van Orden ITC dep. JX-54C at
16).

   Prior to the TV-Guide merger with Gemstar, SuperGuide licensed some of its IPG
technology to Gemstar. Also, between 1992 and 1996, StarSight licensed its IPG
technology to Scientific-Atlanta, Thomson, and Microsoft. In 1998 and 1999, Gemstar
International Group licensed some of its technology to Microsoft and AOL
respectively. Gemstar has admitted that the{* * *}agreements with Gemstar are
licenses covering Gemstar's IPG-related patents. (Boylan ITC dep. JX-8C at 679).
Additionally, Gemstar licenses its IPG technology to set-top box manufacturers for{*
* *}The license agreements Gemstar entered into with {  * * *}and other
manufacturers of{* * *}boxes are IPG patent licenses. (Yuen ITC Dep. JX-61C at 195 -

      ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

196; RX-144C; RX-857C). Furthermore, Gemstar has licensed its IPG technology to{* *
*}to make and sell the IPG on {  * * *}television sets. (RX-167C). Hoffman looked at
licenses that had been entered into by licensors and licensees for IPG technology
and found there was licensing activity throughout the 1990s between owners of
patents and those who sought to obtain licenses on the patents. (Tr. at 4602-05). By
its own admission, Gemstar's domestic industry includes "[c]omplainant's substantial
investment in the exploitation of the patents, including research and development
and licensing of technology to others." (Complaint at 28). Thus the administrative
law judge finds that there is a relevant market for IPG technology. The IPG
technology market consist of IPG-related intellectual property that is licensed and
its close substitutes.

The boundaries of the IPG technology market is determined by the reasonable
interchangeability of use or the cross-elasticity of demand between the Gemstar IPG
technology and its substitutes. See Brown Shoe, 370 U.S. at 325. The administrative
law judge finds that there is a lack of other licensable technology, beyond
Gemstar's, that can potentially be used independently to produce an IPG. (Hoffman,
Tr. at 4606 - 4607). He further finds that "there is a lack of other licensable
technology out there that can potentially be used independently to produce an IPG."
(See Hoffman, Tr. at 4607, RX-4661C at 2). With reference to the relevant geographic
market for IPG technology he finds that it is the United States by virtue of both
the licensing practices, the coverage of MSOs that are licensees as well as the
coverage of the patents. (Hoffman, Tr. at 4593-4594; RX-4654 at 1) (See RX-153; RX-
1C).

The administrative law judge also finds that the second relevant market, for the
administrative law judge's misuse inquiry, is the market for IPG products
(interactive electronic program guides, irrespective of the type of hardware those
programs reside on). [FN31] That finding is based on an analysis of the demand for
IPG products, the suppliers and buyers of IPG products, and the utility of IPG
products to consumers and cable multiple system operators (MSOs). [FN32] {* [FN33] *
*} {* [FN34] [FN35] [FN36] **}

Complainants also argued that electronic program guides (EPGs) arepart of the
relevant product market. Although the term EPG has been used interchangeably with
IPG, EPG is also used to refer to a guide that is not interactive. This term usually
refers to a scrolling guide where the program information scrolls on the television
screen and the user cannot interact with it or control the display of the program
information. (Van Orden ITC dep. JX-54C at 72- 74). {* * *}

The administrative law judge further finds that the current commercial suppliers
of IPG products include complainants, complainants' licensees (e.g., Microsoft, AOL,
and DirecTV set-top box manufacturers), respondents, Source Media, and Worldgate.
(Hoffman, Tr. at 4599; RX-4657C at 1). The buyers or licensees of IPG products
include cable MSOs such as Adelphia and Charter Communication, satellite or direct
broadcast satellite providers such as DirecTV, and EchoStar and consumer electronics
manufacturers (CEMs). (Hoffman, Tr. at 4599; RX-4658C at 1). Gemstar-TV Guide sells
or licenses products, software and data embodying IPG technology to MSOs. (Orlick
[FN37] ITC dep. JX-46C at 143 - 144). Gemstar-TV Guide also licenses its Guide Plus
and Guide Plus Gold IPGs to various television manufacturers for use on their
television sets, including Thompson (RCA, GE, ProScan), Phillips (Phillips,
Magnavox), Sony, Toshiba, Sharp, JVC, and Hitachi. (Macrae, Tr. at 510 - 511; RX-
646C - GITC-GA0914666). S-A and Pioneer offer IPG products that reside in cable set-
top boxes. (Walker DOJ dep. JX-114C, at 27; {* * *}EchoStar provides IPGs to its
direct broadcast satellite subscribers. (Ergen, Tr. at 2989).

{* [FN38] [FN39] * *}Hence the administrative law judge findsthe evidence
sufficient to demonstrate that the relevant geographic market for IPG products for
purposes of the patent misuse analysis is the United States.

2. Complainants' Share Of the Relevant Markets

After defining the relevant markets, the administrative law judge must determine
whether complainants (Gemstar) enjoy a sufficient share of the relevant markets to

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                     Page 75
USITC Inv. No. 337-TA-454

constitute market power. See supra. Congress chose not to define explicitly the
level of market power required before patent misuse could be found, but rather
allowed courts to determine this issue on a case by case basis. Market power is
defined generally as the ability of a market participant to raise prices or reduce
output without affecting consumer demand.

a. Gemstar's Market Share In The Relevant IPG Technology Market

   The administrative law judge finds that complainants have amassed a large
portfolio of IPG-related technology through acquisition of competitors in both the
IPG product and IPG technology markets, including TV Guide, Inc., VideoGuide,
StarSight, SuperGuide, and patents from inventor Michael Levine. See, e.g., RX-1962
at 3; Gemstar International Group Ltd. Form 10-K405 at 14- 15; RX-1923C at 4.
Gemstar stated that it has vehemently defended its intellectual property rights
through the court system. To date, the majority of infringement cases Gemstar has
brought to court have mostly been resolved through acquisition and/or merger with
the offending party, as was the case with StarSight in 1997 and TV Guide, Inc. in
2000. But in addition to merging with a party accused of infringing its IPG patents,
Gemstar has also settled with some parties. (RX-1914 at ES-0729-1004).

   Before Gemstar acquired StarSight in 1997, the '121, '268, and '204 patents were
owned by StarSight. The rights to the inventions disclosed in these patents were
acquired when Gemstar acquired StarSight Telecast, Inc. in 1997. {* * *} {* * *}

   Before Gemstar merged with TV Guide, Inc. in 2000, the '066 patent was owned by
United Video Properties, a predecessor of TV Guide, Inc. Gemstar acquired the right
to the invention disclosed in the '066 patent on January 22, 2001 pursuant to an
assignment from United Video Properties, Inc. {* * *}

   Complainants have market power in the IPG technology market, in part, because
Gemstar has acquired large former independent technology licensors, including former
competitors StarSight and TV Guide. {* * *} {* * *}

   Gemstar has more than 170 issued U.S. patents in the general area of audio-visual
technologies, and most of these patents are IPG-related patents. (Yuen, Tr. at 2548;
RX-2327). In November of 2000, Gemstar's Boylan stated that Gemstar has over 110 IPG
patents issued in the United States with over 2,100 claims; that it currently has
265 patents pending, which relate to IPGs with over 10,250 claims, many of which
already have notices of allowance; and that Gemstar has 87 IPG patents issued
internationally with over 1,700 claims and 621 IPG patents pending with 27,700
claims. (RX-647C at 13-14; RX-2101 at 1-4). In this proceeding, complainants listed
some 112 separate IPG-related patents that they own. (RX-1136 at 1-4; RX-1965C at 1-
4).

   {* * *}The administrative law judge finds that Gemstar clearly has a strong and
large portfolio of IPG-related patents, and as a result has a large share of the IPG
technology market.

b. Gemstar's Market Share In The Relevant IPG Product Market

   The administrative law judge finds that respondents have established that not only
has the mergers affected the number of parties that own IPG technology in the
technology market, but the mergers have also affected competition and availability
of products in the IPG product market. Prior to Gemstar's acquisition, StarSight, TV
Guide, and Prevue had their own IPG products. The record shows that as they were
acquired by Gemstar, each of these IPGs disappeared from the market. In 1997, for
example, S-A displayed five different IPGs from five different companies on its set-
top boxes at a trade show, including IPGs from StarSight, Prevue Networks, TV Guide,
Pioneer, and S-A's native guide. Gemstar has since acquired three of these companies
reducing the available products. {* * *}In December of 1996, VideoGuide, Inc. became
a wholly-owned subsidiary of Gemstar. (RX-2345 at SAITC900005162). The VideoGuide
service was terminated in September of 1997 because its signal provider went
bankrupt. (Macrae, Tr. at 503).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 76
USITC Inv. No. 337-TA-454

{* [FN40] * *}

   Gemstar's Allen testified that of the over 100 licenses Gemstar has entered into
with MSOs since the Gemstar/TV Guide merger, he was not aware that Gemstar had
licensed the StarSight product to any MSO. (Allen, Tr. at 5464). As of April of
2000, the StarSight IPG was being serviced as a legacy IPG. "There [were] no new
deployments of StarSight IPGs happening in the marketplace." (Kiener DOJ dep. JX-
108C at 134).

   Until March 1, 1999, TV Guide, Inc. was known as United Video Satellite Group,
Inc. (United Video). (RX-2480C at GITC-GA 0416467). United Video owned and operated
an IPG named Prevue Interactive, a passive EPG named Prevue Channel and an online
Guide named Prevue Online. Id. In 1999, United Video acquired all rights to the TV
Guide name and trademarks. United Video changed its name to TV Guide, Inc., and its
Prevue brand of products were re-branded and re-named TV Guide, Interactive, TV
Guide Channel, and TV Guide Online. Id. Prior to the Gemstar-TV Guide merger, TV
Guide/United Video Satellite Group competed with Gemstar and StarSight in the market
for interactive services such as IPGs. (RX-1049 at 9).

   On October 4, 1999, Gemstar announced that it had a definitive merger agreement
with TV Guide pursuant to which, TV Guide would become a wholly-owned subsidiary of
Gemstar. (RXC641 at GITC-GA0914554). Thomas testified that, { * * *} (JX-113C at
224). After the merger between TV Guide and Gemstar, the combined company continued
selling the TV Guide Interactive IPG product under the same name. (Boylan, Tr. at
5215). {* * *}

   As for MSOs and telephone companies, the administrative law judge finds that
complainants' products account for a significant portion of the cable and telephone
related IPG product market. {* * *}For example, Gemstar announced the long-term
agreement it entered into with Charter Communications and stated that TV Guide
Interactive "is the only IPG currently used by Charter Communications in 200 systems
representing over 600,000 digital households." (RX-2394). {* * *} {* * *}

   {* * *}In February of 2001, Gemstar's web-site stated that "TV Guide interactive
services are carried in systems owned by all the top 10 MSO's which include
Adelphia, AT&T, AOL Time Warner, Cablevision, Charter Communications, Comcast, Cox,
Insight, and DBS leader DirecTV." (RX-2394 at 1).

   {* [FN41] * *}

   Regarding direct broadcast satellite providers, [FN42] the administrative law
judge finds that Gemstar holds a significant share of the IPG market through its
licensing agreements with direct broadcast satellite providers. Thus in an interview
with the Wall Street Transcript before the merger between Gemstar and TV Guide,
Gemstar's Yuen stated that in the satellite sector, Gemstar collects a license fee
from all Direct TV decoders and, therefore, in approximately 70 percent of the
direct broadcast satellite systems deployed (all but EchoStar) (RX-2285C at 2). {* *
*} {* * *} {* * *} {* * *} {* * *}

   Based on the foregoing, the administrative law judge finds that Gemstar enjoys a
sufficient share of the relevant market.

c. Barriers To Entry

   To demonstrate market power, it is also necessary to demonstrate significant
barriers to entry. See supra. The administrative law judge finds that Gemstar's own
activities demonstrate its belief that it currently captures most of the market and
that there are significant barriers to entry to both the IPG products market and the
IPG technology market. {* * *}Gemstar's Yuen takes the position that the Gemstar-TV
Guide patent portfolio creates "a virtually insurmountable barrier of entry." (RX-
2173 at PN 043308). There is also an independent Financial Analyst Report prepared
by SG Cowen which concludes that Gemstar's patents create a formidable barrier to
entry. (CX-895 at 1).

                   ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   As Sibley, one of respondents' economic experts, testified Gemstar's licensing
practices erect entry barriers. (Sibley, Tr. at 4768). {* [FN43] [FN44] * *}

   In addition to the exclusivity provisions, the administrative law judge finds that
the{* * *}in complainants' licensing agreements [FN45] (see infra) create barriers
to entry. These provisions not only remove the incentive to innovate from the most
likely innovators in the IPG area, they also create a system where{* * *} (Hoffman,
Tr. at 4586; RX-4650C at 1).

   The administrative law judge further finds that{* * *}in the licenses contribute
to the barrier. {* * *}Like exclusivity provisions and penetration level provisions,
{* * *} {* * *} {* * *}

   Based on the foregoing, the administrative law judge finds that the exclusivity
provisions, the grantbacks of technology and covenants not to sue, and the switching
costs imposed in Gemstar's licensing agreements create significant barriers to entry
in the markets of IPG technology and products.

d. Gemstar's Pricing

   Gemstar's pricing also demonstrates market power. (Hoffman, Tr. at 4624, RXC-
4674). {* * *} {* [FN46] * *} {* * *}The administrative law judge finds that
respondents after established that Gemstar is able to control the market for IPG
products, thus enhancing the barriers to entry and finds further that the
constraints imposed upon respondents, MSOs, and CEMs in Gemstar's IPG licensing
agreements demonstrates Gemstar's ability to control the market for IPG technology.

e. Conclusion

   Based on the findings that Gemstar enjoys a sufficient share of the relevant
markets of IPG technology and IPG products, that there are significant barriers to
entry into the relevant markets created by Gemstar and that Gemstar has the ability
to control said relevant markets, the administrative law judge finds that
respondents have established that Gemstar has market power, required for a finding
of patent misuse based on inequitable tying arrangements.

B. Tying

   A patent holder commits misuse by tying when it broadens the scope of its patents
to nonpatented products, thereby "extend[ing] the monopoly of his patent to derive a
benefit not attributable to use of the patent's teachings." Zenith Radio Corp. v.
Hazeltine Research, Inc., 395 U.S. 100, 136 (1969). A patentee may not condition the
right to exploit his patent on the licensee's agreement to purchase, use, or sell,
or not to purchase, use, or sell, another article of commerce not within the scope
of his patent. Id. Although some parallels exist between patent misuse and the law
of antitrust, the patentee's conduct need not rise to the level of an antitrust
violation to be patent misuse:
         Thus, as the Supreme Court has said, the patentees' act may constitute patent
misuse without rising to the level of an antitrust violation. Zenith Radio Corp. v.
Hazeltine Research, Inc., [395 U.S. 100, 140 (1969)]. All that a successful defense
of patent misuse means is that a court of equity will not lend its support to
enforcement of a mis-user's patent.
Senze-Gel, 803 F.2d at 668. As set forth by the Federal Circuit in Senza-Gel, 803
F.2d at 668-70 and by the Patent Act, the following elements, in addition to the
patentholder having market power in the relevant market, establish patent misuse
based on "tying":

   (1) the patent or patented product and the allegedly tied product must be separate
products;

   (2) the tied item must be a "staple," i.e., capable of substantial non-infringing
use; and

   (3) there must be evidence of a forced or coerced tie.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In the patent misuse context, the test for separateness, the first element, is based on the nature of the claimed invention and whether the tied product is "a necessary concomitant of the invention or an entirely separate product." [FN47] Thus, the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into purchasing the tied product, which the buyer either did not want at all, or would have preferred to purchase elsewhere on different terms. Jefferson Parish Hosp. v. Hyde, 466 U.S. 2, 12 (1984). A tying arrangement, however, cannot exist unless two separate product markets have been linked. Id. at 21. Referring to the second element, a staple product is a product that is capable of substantial, non-infringing uses and which was not especially made or adapted for use in infringement of the patent. See Hodosh v. Block Drug Co., Inc., 833 F.2d 1575, 1578 (Fed. Cir. 1987).

The thrust of the inquiry for the third element, viz., a forced or coerced tie, is whether the buyer is left with a meaningful freedom of choice in the tied market. See Tic-X-Press, 815 F.2d at 1416. Proof of coercion can be derived from one or more of the following: (1) an express condition in a contract, see, e.g., Bogosian v. Gulf Oil Corp., 561 F.2d 434, 450-51 (3d Cir. 1977); (2) proof that acceptance of the tied product was the only viable economic option available to the buyer, Marts v. Xerox, Inc., 77 F.3d 1109, 1113 (8th Cir. 1996); (3) facts and circumstances surrounding the negotiation process tending to show coercion, Tic-X-Press, 815 F.2d at 1416-17; (4) evidence that at least one buyer would have gone elsewhere for the tied product given the opportunity, id.; and (5) proof that "appreciable number of buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient economic power in the tying product market," Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1217 (9th Cir. 1977). Coercion is implicit when one proves that sales of one product were conditioned upon purchase of another. Bogosian, 561 F.2d at 450. Moreover, even if the products are available separately, an illegal tying arrangement can exist if purchasing the items together is the "only viable economic option." Marts, 77 F.3d at 113. It is not necessary to show that a buyer objected to the tie to prove that the buyer had been coerced. Tic-X-Press, 815 F.2d at 1418.

1. Whether Gemstar Illegally Ties Its Licensing Of Its IPG Patents To The TV Guide Interactive IPG

{* * *} {* * *} {* * *} {* * *} {* [FN48] * *}{* * *}

Complainants argued that while Boylan testified that Gemstar's license agreements with MSOs include use rights to all of Gemstar's IPG-related patents, "that particular testimony is incorrect, perhaps because Mr. Boylan is not an attorney" (CRRFF 3696). Boylan, when he gave the testimony on August 23, 2001, was employed by Gemstar-TV Guide International as "co-president and COO, member of the office of chief executive," and has had that position since the completion of the merger on July 12, 2000. Before July 12, 2000, Boylan was president and member of the office of the chairman for TV Guide, Incorporated. [FN49] The administrative law judge rejects complainants' assertion that Boylan's testimony under oath is "incorrect."

{* [FN50] [FN51] * *} {* * *}

Respondents argued that Gemstar has misused the patents in issue by illegally tying its patent licenses to the TV Guide Interactive product. The administrative law judge finds that respondents have met their burden in establishing an illegal tying arrangement. Thus he finds that the record establishes that (1) Gemstar's IPG patents and Gemstar's TV Guide Interactive product are separate products; (2) the tied product (TV Guide Interactive product) is a staple article in commerce; and (3) the TV Guide Interactive product and Gemstar's IPG patents are actually tied. See Senza Gel, 803 F.2d at 664. Thus, IPG intellectual property rights can be marketed separately from IPG products. Prior to the Gemstar-TV Guide merger, and throughout the 1990s, there was licensing activity between various entities who had patents and those who sought licenses to those patents. {* * *} {* * *}Moreover, the TV Guide Interactive product is found to be a staple article in commerce. Even Gemstar has argued that its licenses with MSOs are product licenses.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 79
USITC Inv. No. 337-TA-454

{* [FN52] * *}It is uncontroverted that not all features or functions of the TV
Guide Interactive product are covered by Gemstar-TV Guide's IPG-related patents, and
that while there are patents that cover parts of the TV Guide Interactive product,
part of the product is not covered by the patents. See unobjected RFF 3922 and
unobjected RFF 3923. In response to Requests for Admission served by EchoStar,
Gemstar admitted:
    {* * *}
(RX-1966C at ¶ 60). Gemstar provided identical responses regarding the '204 and
'268 patents (RX-1966C ¶ ¶ 62, 63). [FN53] Moreover in this investigation, it has
been found that complainants' IPG products do not meet the technical prong of the
domestic industry requirement.

    {* * *}
    {* [FN54] * *} {* [FN55] * *}

    Complainants argued that Ergen responded to a "hypothetical question ... whether
the premise has been falsified by the record" and to the extent that respondents are
offering Mr. Ergen's testimony as an expert opinion, "it should be stricken because
Ergen was not identified as an expert pre-trial." (CORFF 3965). Complainants, as the
hearing transcript shows, made no objection to the question. Moreover Ergen, as CEO
of EchoStar, is in a position to give an opinion. See Rule 701 of Federal Rules of
Evidence. In addition, the administrative law judge at the hearing had ample
opportunity to observe the demeanor of Ergen. He found Ergen to be forthright and
straightforward in his testimony.

    {* * *} {* * *}
    Hence, as respondents' expert Sibley testified, Gemstar's IPG-related patents,
including the patents in issue, are separate from the TV Guide Interactive IPG
product. However, the patent licenses include both patents and TV Guide Interactive
product. Thus the tying product is Gemstar-TV Guide's IPG-related patents and the
tied product is the TV-Guide Interactive product. (Sibley, Tr. at 4806-07, RX-
4350C).

    Based on the foregoing the administrative law judge finds that the respondents
have met their burden in establishing, with respect to Gemstar's patent licenses,
that Gemstar's TV Guide Interactive product is a staple article in commerce and
separate from Gemstar's licensed patents and that both are actually tied in
Gemstar's licenses; and that Gemstar unlawfully ties its IPG technology, i.e.,
patents, to its TV Guide Interactive product, using its market power in the market
for IPG technology to coerce licensees to purchase Gemstar's TV Guide Interactive
IPG, the tie arising because the TV Guide Interactive IPG is not explicitly
contemplated in the claims of the patents in issue.

2. Whether Gemstar Illegally Ties Its IPG Technology/Products To Unpatented And
Separate Advertising

    Respondents and the staff asserted that Gemstar has misused the patents in suit by
illegally tying IPG technology/products to unpatented and separate advertising.
[FN57] To determine whether there is a tie in fact, the administrative law judge
must determine: (1) advertising and Gemstar's IPG are separate products; (2) the
tied product, in this case advertising, is a staple article in commerce; and (3) the
advertising and IPG are actually tied. See Senza Gel, 803 F.2d at 665.

    The administrative law judge finds that advertising content is a separate product,
as it is not covered by Gemstar's patents nor is it necessary to practice the
patented invention. None of the patents-in-issue cover advertising content or
advertising resale services. (RX-3001; RX-3002; RX-3003; RX-3004; RX-3005). {* *
*}The advertising capability of the current IPG is built into the Gemstar IPG
itself. (Yuen, Tr. at 2532; Allen dep., JX-2C at 414). The current version of
Gemstar's consumer electronics IPG, TV Guide Interactive, and some versions of the
StarSight IPG contain advertising. (Yuen, Tr. at 2582- 83). However, advertising
resale brokerage is a separate product or service. Thus, respondents' expert Hoffman
testified:

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 80
USITC Inv. No. 337-TA-454

     Q Did you evaluate whether or not advertising resale is a separate product?
     A Yes, advertising resale is unrelated to the patents, Gemstar's patents, it's
a service that existed before the advent of IPGs.
     Q And did you evaluate whether advertising resale is a staple product?
     A Yes, it is a staple product in that there are a number of providers of that
service and resell advertising of MSOs, cable companies, broadcast affiliates, so
that again, it's not related necessarily to IPGs or IPG patents.
(Tr. at 4679). {* * *} {* * *} {* * *} {* * *} {* * *} {* * *}

Based on the foregoing, the administrative law judge finds that respondents have
met their burden in establishing advertising is a separate product from the IPG
patents and IPG technology that Gemstar licenses; that advertising is also a staple
item in commerce, and it is not necessary to the IPG covered by the patents at issue
in issue or any of Gemstar's IPG patents; that Gemstar unlawfully ties its IPG
technology/products to unpatented and separate advertising content; and that Gemstar
uses its market power in the market for IPG technology/products to coerce its
licensees to carry advertising on the TV Guide Interactive IPG with Gemstar
dictating the advertising content.

C. Grantback Provisions Of Gemstar's Licenses

Respondents and the staff argued that complainants' (Gemstar's) grantback
provisions in their licenses constitute patent misuse. Gemstar argued that the
burden of establishing patent misuse has not been met.

A "grantback" is "an arrangement under which a licensee agrees to extend to the
licensor of intellectual property the right to use the licensee's improvements to
the licensed technology." Antitrust Guidelines § 5.6. Grantbacks "may adversely
affect competition ... if they substantially reduce the licensee's incentives to
engage in research and development and thereby limit rivalry in innovation markets."
Id. Such anticompetitive grantback provisions impermissibly broaden the physical and
temporal scope of the licensor's patent grant, and constitute patent misuse under
the "rule of reason." Virginia Panel, 133 F.3d at 868.

{* * *} {* * *} {* [FN58] * *} {* * *} {* [FN59] **}

Unlike the situation with tying arrangements, the administrative law judge must
evaluate Gemstar's grantback provisions under the "rule of reason." Transparent-Wrap
Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 648 (1947); see also Virginia
Panel, 133 F.3d at 869. According to the DOJ Guidelines, a court assessing a
grantback provision under the "rule of reason" should consider the "likely effects
[of a challenged practice] in light of the overall structure of the licensing
arrangement and conditions in the relevant markets." Antitrust Guidelines § 5.6.
The test essentially weighs the effect of a grantback clause on innovation and
competition. The DOJ Guidelines further explains:
     An important factor in the Agencies' analysis of a grantback will be whether the
licensor has market power in a relevant technology or innovation market. If the
Agencies determine that a particular grantback provision is likely to reduce
significantly licensees' incentives to invest in improving the licensed technology,
the Agencies will consider the extent to which the grantback provision has
offsetting procompetitive effects, such as (1) promoting dissemination of licensees'
improvements to the licensed technology, (2) increasing the licensors' incentives to
disseminate the licensed technology, or (3) otherwise increasing competition and
output in a relevant technology or innovation market.... In addition, the Agencies
will consider the extent to which grantback provisions in the relevant markets
generally increase licensors' incentives to innovate in the first place.
Antitrust Guidelines § 5.6. The Guidelines further warn that "[g]rantbacks may
adversely affect competition ... if they substantially reduce the licensee's
incentives to engage in research and development and thereby limit rivalry in
innovation markets." Id.

Applying the "rule of reason" analysis, the administrative law judge finds that
Gemstar's grantback provisions constitute patent misuse. {  * * *} {* [FN60] * *} {*
* *} {* * *}The free rider problem arises when, for example, "Mr. Smith works very

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

hard and comes up with a great product or invention that has a benefit, and Mr.
Jones is somehow able to, without breaking the law necessarily, appropriate the
benefit without compensating Mr. Smith." (Sibley, Tr. at 4792). The "main concern"
with the free rider is "a real incentive problem because prospectively, Mr. Smith.
knows that what he does may be appropriated without compensation by Mr. Jones, may
well decide not to go to the effort of producing that product at all. And in-that
would result in sort of too little innovation." (Sibley, Tr. at 4792). {* * *}

     The administrative law judge rejects complainants' arguments that there is no
evidence that any parties outside of Gemstar's covenant not to sue provisions or
Gemstar's grantback provision have reduced their efforts to participate in IPG
innovation because of the existence of said provisions. See, e.g., Sibley, Tr. at
4871-72, 4881-82. {* * *} {* * *} {* * *}

D. Blocking Effect

     Gemstar has argued that most, if not all, of its conduct should be immune from any
patent misuse because Gemstar has acquired a blocking position in the IPG technology
market that blocks all competing IPGs. Thus complainants argued that exclusivity is
anti-competitive only to the extent it precludes competition; that complainants have
a series of overlapping blocking patents which effectively block commercially
viable, unlicensed IPGs until 2012; and that exclusivity provisions in complainants'
license agreements, therefore, have no effect on lawful competition through at least
2012. (CPre at 242). Morton Salt Co., 314 U.S. at 492, however does not authorize
patent misuse where there are blocking patents. Thus the Court stated:
     The grant to the inventor of the special privilege of a patent monopoly carries
out a public policy adopted by the Constitution and laws of the United States, "to
promote the Progress of Science and useful Arts, by securing for limited Times to
... Inventors the exclusive Right ...' to their 'new and useful' inventions. United
States Constitution, Art. I, § 8, cl. 8; 35 U.S.C. § 31. But the public policy
which includes inventions within the granted monopoly excludes from it all that is
not embraced in the invention. It equally forbids the use of the patent to secure an
exclusive right or limited monopoly not granted by the Patent Office and which it is
contrary to public policy to grant.
     It is a principle of general application that courts, and especially courts of
equity, may appropriately withhold their aid where the plaintiff is using the right
asserted contrary to the public interest. Virginian Ry. Co. v. Federation, 300 U.S.
515, 552; Central Kentucky Co. v. Railroad Commission, 290 U.S. 264, 270-73;
Harrisonville v Dickey Clay Co., 289 U.S. 334, 337-38; Beasley v. Texas & Pacific
Ry. Co., 191 U.S. 492, 497; Securities & Exchange Comm'n v. U.S. realty Co., 310
U.S. 434, 455; United States v. Morgan, 307 U.S. 183, 194.

     Moreover the administrative law judge finds no substance in Gemstar's blocking
argument. Gemstar bases its "blocking patent" argument on the opinion of Bernard
Lechner. Lechner has spent a fair amount of his time consulting for ligation and has
testified before as an expert in issues of patent infringement, claim construction
and validity. (Tr. at 5560-61). In prior cases to prepare himself, he read the
patent in issue many times, as well as the file history of the patent in issue, and
read the relevant prior art concerning the patent in issue. (Tr. at 5661). In
contrast, Lechner for his work in this case testified (Tr. at 5561-66):
     A In this case I was not asked to look at patents that were in litigation that
were being -- wherein someone was accused of infringing a patent and wherein
validity was a question and so forth. I was merely asked to look at this portfolio
of patents, and based on my interpretation of the claims and the scope of the
claims, to render an opinion as to whether I believed they constituted a blocking
position, and that is what I did.
     Q Mr. Lechner, is it your understanding that you're testifying here in a case
where someone is not accused of infringement?
     A I understand that there are infringement issues in this case, but I was not
-- I am not involved, nor was I asked to be involved in that aspect of the case.
     Q Isn't it true, sir, that in connection with testifying here, you did not
read -- in your work on this case, you did not read any of the file histories of any
of the patents prior to your deposition being taken 30 days ago?
     A I'm not certain that is correct. I certainly have read the file

2002 WL 31556392                                                                Page 82
USITC Inv. No. 337-TA-454

histories of some of the patents. Whether I specifically referred to them in my work
on this case, I don't recall that I did, but I can't be absolutely certain that I
did not. I probably did not, as a matter of fact, but -
     Q I'm sorry, sir. Even though that wasn't a technical answer, I couldn't tell
whether you said yes or no.
     A What I said was that I can't recall specifically that I did or did not look
at any of the file histories during the course of my work on this case. I have
certainly looked at a number of the file histories over the last couple of years,
and I said I believe that I did not look at any of them in my work on this case, but
I'm not absolutely certain of that.
     Q Sir, isn't it true that you haven't even read each of the 95 patents cover
to cover?
     A I have not read some of the 95 patents cover to cover. I have read some of
them cover to cover more than once, but there are some that I have not read cover to
cover. I have read the appropriate portions of them, as I testified earlier, in
order to have a sufficient amount of information about the broadest of the
independent claims to understand that that claim would read on an interactive
program guide.
     Q Sir, and again, to use your words and your standard, you have not done a
detailed claim analysis of the patents in GemStar's portfolio, have you?
     A I have not done a detailed analysis to the extent of preparing claim charts
that, element by element, list the precise definitions of every term, as one would
do if one were dealing with a single patent in a litigation where there was an
infringement or validity issue. But I have looked at the claims in sufficient detail
and in light of the specification to believe that I understand what they read on and
to render an opinion that I believe they do read on interactive electronic program
guides to the point where they would block their implementation.
     Q You haven't looked at prior art as a part of your work in this case, have
you?
     A I have not looked at prior art specifically in my work in this case, that is
correct.
     Q And you simply presume that every claim of each of the 95 patents is valid;
isn't that true?
     A That is correct.
     Q You know that the validity of several of the patents that you're relying on
has, in fact, been challenged, don't you?
     A I'm not aware of any specific details with respect to that, but I understand
from what I've been told by some of the -- well, from what I've been told by you
and, I guess, Mr. Lamison, that some of the patents are being challenged on
validity, but I have no specific information of that.

                                    * * *

     Q Sir, is it your testimony that you are relying, as a part of your expert
analysis, on information that I have given you?
     A I believe you just told me in your previous question that some of the
patents in the group of 95 are being challenged on validity, and it's in that kind
of context that I am aware, I guess, that some of them are being challenged on
validity.
     Q Thank you.
     A But I have no personal knowledge of the details of any of those challenges.
     Q Are you saying that you until today had no personal knowledge that some of
the claims of some of the patents that you rely on, that the validity of those
claims is being challenged?
     A I don't believe that I have been given any written information that tells me
about the validity of any of those claims being challenged.

  Respondents have alleged that Lechner did not review even the file wrapper for the
'121 patent, claim 18. (RFF 2806). Complainants, in rebuttal, admitted that Lechner
in coming to his own interpretation of the clauses in claim 18 of the '121 patent,
had not looked at the file wrapper. (CRFF2806). Based on the foregoing, the
administrative law judges finds that Lechner has not read all of the patents in
complainants' portfolio and that he has not even read any file wrappers, which can
be crucial for a proper interpretation of any claimed subject matter of any patent.

                ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 83
USITC Inv. No. 337-TA-454

[FN61] Complainants argued that Lechner primarily relied on the plain language of
claim 18 of the '121 patent and can find support for the language in the
specification. Lechner's testimony however is lacking as to the specific support in
the '121 patent specification for each of the clauses of claim 18 of the '121
patent. Moreover, in the absence of an analysis of the file wrapper (including the
extensive reexamination proceeding) of the '121 patent, Lechner's testimony as to
the interpretation of claim 18 is found to carry no weight.

  Even assuming arguendo that some weight were given to certain testimony of
Lechner, when Lechner was asked if it would be technically feasible to design around
the GemStar portfolio, he answered (Tr. at 5551):
       A I'm not going to answer that with an absolute yes or no, but you're close.
What I'm saying is that you could design a guide that did not practice any of the
patents in the GemStar portfolio. And I think I gave an example of one such guide,
the scrolling guides that are used by some cable systems today, but I don't think
that if you tried to charge people money for those, that they are commercially
viable. I don't think you can sell them in competition with the kinds of guides that
are being sold today.
Thus, Lechner admitted that it is possible to design an interactive electronic
program guide that did not practice any of the patents in the Gemstar portfolio
which is a position inconsistent with complainants' position. While complainants
point to Lechner's conclusion that the product would not be commercially viable in
the sense that no one would pay for the product, the administrative law judge finds
no specific facts testified to by Lechner which support Lechner's conclusion.

  Based on the foregoing the administrative law judge gives no weight to the
testimony of Lechner as to the existence of any blocking patents. Hence he rejects
Gemstar's argument that Gemstar should be immune from respondents' patent misuse
defenses because Gemstar has acquired a blocking position in the IPG technology
market.

VIII. VALIDITY (Prior Art)

  Respondents have challenged the validity of the '121 patent, '268 patent and '204
patent based on certain prior art. Any invalidity defense must be established by
clear and convincing evidence. See, e.g., WMS Gaming, Inc. v. Int'l Game Tech, 184
F. 3d 1339, 1355 (Fed. Cir., 1999).

A. The '121 Patent

  Respondents argued that, under complainants' interpretation, the asserted claims
of the '121 patent are invalid based on an analysis presented in an Exhibit A
attached to S-A's post hearing brief [FN62] that relies on (1) a system developed by
the CableData Company of California the features of which are described in a
publication entitled "ViaCable," published in December 1981 by CableData (RX-4256);
(2) Honjo 2, a publication (RX-4297) which was filed on May 12, 1982 in Japan and
was laid open or published on November 16, 1983 (RFF 4412), (3) Honjo 1, a
publication (RX-4294) which was filed on February 10, 1982 in Japan and was laid
open or published on August 15, 1983, just a few months before the Honjo 2
publication was laid open or published (4) a U.S. patent (RX-4300) to Muguet; (5) a
system by Kruger, which was known as the ZPS system and resulted in a report
detailing the features of the ZPS system, which was made public at the German
national library in 1980 (JX-32 at 10-15, RX-3477, RX-3476); a German patent (JX-32
at 66-68, RX-3470, RX-3611 at 10-12), a U.S. patent (JX-32 at 81-86, RX-3026) and
various published articles (JX-32 at 72-75, 95-97, 99, RX-3474, RX-3495, RX-3480);
and (6) a system described by Reiter. (RX-4301).

  The Exhibit A analysis does not include independent claim 32 of the '121 patent
since complainants have not accused S-A of infringing independent claim 32.
Respondent EchoStar has been accused of infringing claim 32 and argued that
respondents' expert Grimes relied on at least the following prior art references to
invalidate claim 32: (1) the Honjo 1 publication, (2) Reiter system, (3) CableData
system, (4) the Muguet patent, (5) the Kruger system, (6) a Keiser reference (RX-
7468, RX-3022), (7) a Hashimoto reference (RX-7468, RX-4288) and (8) the VideoCipher

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 84
 USITC Inv. No. 337-TA-454

system (RX-7468, RX-3685) (EPost at 220-223). [FN63]

   Complainants argued that respondents have not met their burden of proof and were
not specific as to the applicability of the prior art. The staff argued that because
respondents' invalidity arguments rested upon the use of claim constructions that
the staff considered incorrect and which differ from respondents' own claim
constructions on the issue of infringement, the staff was of the view that
respondents have not carried their burden of establishing by clear and convincing
evidence that the claims at issue are invalid for obviousness or anticipation.
(SPost at 57, 58).

   Respondents' arguments that the asserted claims of the '121 patent are invalid on
the basis of prior art were premised on complainants' proposed claim constructions.
(See, e.g., EPost at 194; S-A Post at 175). Moreover, the analyses by Grimes and
Tjaden relied upon by respondents to meet their burden of proof regarding prior art
were provided in accordance with complainants' constructions of the disputed claim
elements. However, the administrative law judge has rejected complainants' proposed
constructions of claim elements with respect to all of the asserted claims of the
'121 patent.

   Thus with respect to independent claim 18, dependent claims 19-24, 26-28 and 31
and independent claim 36 of the '121 patent, the administrative law judge rejected
complainants' proposed constructions to find, consistent with respondents' and the
staff's proposed constructions: that "data processor" is a CPU; that "storage means"
consists of at least the program list, the screen, the prime time, the channel and
the theme buffers; that incoming schedule information had to be stored in the CPU
itself; that the data processor must be capable of logical "OR" and logical "AND"
combining; and that the schedule information that was to be stored for each selected
program included the program's title. See supra. The administrative law judge finds
that respondents have not met their burden of proving that those claims, when
properly construed, were anticipated or rendered obvious by the cited prior art
references.

   With respect to claim 32, the administrative law judge rejected complainants'
proposed constructions to find, consistent with respondents' and the staff's
proposed constructions, that: "data processor" is a CPU and that incoming schedule
information had to be stored in the CPU itself. See supra. The administrative law
judge finds that respondents have not met their burden of proving that claim 32 when
properly construed, was rendered obvious by the cited prior art references.

   With respect to independent claim 33, the administrative law judge rejected
complainants' proposed constructions to find, consistent with respondents' and the
staff's proposed constructions, that: "data processor" is a CPU; that "storage
means" consists of at least the program list, the screen, the prime time, the
channel and the theme buffers; that incoming schedule information had to be stored
in the CPU itself; that the data processor must be capable of logical "OR" and
logical "AND" combining; and that "turning on" a VCR means that the system must
cause power to be supplied to the VCR. See supra. The administrative law judge finds
that respondents have not met their burden of proving that claims 33, when properly
construed, was rendered obvious by the cited prior art references.

   With respect to independent claim 42, dependent claims 43, 48, 49 and 50 and
independent claim 51 the administrative law judge rejected complainants' proposed
constructions to find, consistent with respondents' and the staff's proposed
constructions, that: "storage means" consists of at least the program list, the
screen, the prime time, the channel and the theme buffers; the "first input means"
is limited to the corresponding structures disclosed in FIGs. 3 and 4 or their 35
U.S.C. § 112, ¶ 6 equivalents; and the selectable display consists of an initial
display comprising information selected by the data processor in response to user
inputs, as well as either the current channel that the television is tuned to or the
current time. See supra. The administrative law judge finds that respondents have
not met their burden of proving that those claims when properly construed, were
anticipated or rendered obvious by the cited prior art references.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 85
USITC Inv. No. 337-TA-454

    With respect to independent claim 54 the administrative law judge rejected
complainants' proposed constructions to find, consistent with respondents' and the
staff's proposed constructions, that: the "storage means" consists of at least the
program list, the screen, the prime time, the channel and the theme buffers; the
"first input means" is limited to the corresponding structures disclosed in FIGs. 3
and 4 or their 35 U.S.C. § 112 ¶ 6 equivalents; and the selectable display consists
of an initial display comprising information selected by the data processor in
response to user inputs, as well as either the current channel that the television
is tuned to or the current time. See supra. The administrative law judge finds that
respondents have not met their burden of proving that claim 54, when properly
construed, was anticipated or rendered obvious by the cited prior art references.

    With respect to independent claim 57 and dependent claims 58, 59, 60 and 61 the
administrative law judge rejected complainants' proposed constructions to find,
consistent with respondents' and the staff's proposed constructions, that: the
"storage means" consists of at least the program list, the screen, the prime time,
the channel and the theme buffers; the "separating means" is limited to the
corresponding structures disclosed in FIGs. 4a and 4b or their 35 U.S.C. § 112, ¶ 6
equivalents; and the selectable display consists of an initial display comprising
information selected by the data processor in response to user inputs, as well as
either the current channel that the television is tuned to or the current time. See
supra. The administrative law judge finds that respondents have not met their burden
of proving that those claims, when properly construed, were anticipated or rendered
obvious by the cited prior art references.

    With respect to claim 66, the administrative law judge rejected complainants'
proposed constructions to find, consistent with respondents' and the staff's
proposed constructions, that: "data processor" is a CPU; that "storage means"
consists of at least the program list, the screen, the prime time, the channel and
the theme buffers; that incoming schedule information has to be stored in the CPU
itself; and that the data processor must be capable of logical "OR" and logical
"AND" combining. See supra. The administrative law judge finds that respondents have
not met their burden of proving that claim 66, when properly construed, was
anticipated or rendered obvious by the cited prior art references.

    Based on the foregoing, the administrative law judge finds that respondents have
not met their burden of proving that the assessed claims of the '121 patent were
anticipated or rendered obvious by the cited prior art references. [FN64]

B. The '268/'204 Patents

    It was argued by respondents that the asserted claims of the '204 and '268 patents
are invalid under complainants' claim construction on the basis of prior art which
either anticipated or rendered obvious the asserted claims of the '204 and '268
patents. (See, e.g., EPost at 258; S-A Post at 179). However, the administrative law
judge has rejected complainants' proposed constructions of claim elements with
respect to all of the asserted claims of the '204 and '268 patents. See supra.

    With respect to independent claim 1 and dependent claim 3 of the '268 patents, the
administrative law judge rejected complainants' proposed constructions to find,
consistent with respondents' and the staff's proposed constructions: that "visual
identification" is the "innovative curser" defined in the specification as a cursor
that (1) highlights the entire cell, (2) identifies the current half-hour position
within a cell that is longer than a half-hour, and (3) differentially identifies the
remaining portions of the cell; that the movement requirement requires the cursor to
move in equal time intervals within a grid; and that "means ... for displaying"
includes a video switcher. See supra. Therefore, the administrative law judge finds
that respondents have not met their burden of proving that these claims were
anticipated or rendered obvious by the cited prior art references.

    With respect to independent claim 14 and dependent claims 15, 16 and 17 of the
'204 patent, the administrative law judge rejected complainants' proposed
constructions to find, consistent with respondents' and the staff's proposed
constructions, that: the "visual identification" is the "innovative curser" defined

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                              Page 86
USITC Inv. No. 337-TA-454

in the specification as a cursor that (1) highlights the entire cell, (2) identifies
the current half-hour position within a cell that is longer than a half-hour, and
(3) differentially identifies the remaining portions of the cell; the movement
requirement requires the cursor to move in equal time intervals within a grid; and
"means ... for displaying" includes a video switcher. See supra. Therefore, the
administrative law judge finds that respondents have not met their burden of proving
that these claims were anticipated or rendered obvious by the cited prior art
references.

With respect to independent claim 31 and dependent claims 32, 33 and 34 of the
'204 patent, the administrative law judge rejected complainants' proposed
constructions to find, consistent with respondents' and the staff's proposed
constructions: that "visual identification" is the "innovative curser" defined in
the specification as a cursor that (1) highlights the entire cell, (2) identifies
the current half-hour position within a cell that is longer than a half-hour, and
(3) differentially identifies the remaining portions of the cell, the movement
requirement requires the cursor to move in equal time intervals within a grid. See
supra. Therefore, the administrative law judge finds that respondents have not met
their burden of proving that those claims were anticipated or rendered obvious by
the cited prior art references.

IX. VALIDITY (Alleged Impermissible Broadening - Claims 18-31, 33, 34, 36 and 38 of
the '121 Patent)

Respondents argued that prior to the reexamination of the '121 patent, each
process claim required "supplying program schedule information to a data processor;"
that during the reexamination, claims 18-31, 33, 34, 36 and 38 were amended to read
"supplying program schedule information to storage means in a data processor;" and
that this amended claim language was also included in new claims 66 and 67. It was
argued that complainants construed the amended claim language "storage means in a
data processor" to mean "storage means that is part of or within a data processor;"
that because the data processor of the claims is the CPU, under complainants'
construction the claim language "supplying program schedule information to storage
means in a data processor" would be satisfied by supplying schedule information to
storage means that is a part of, but not in, a data processor; and that the original
process claims of the '121 patent required the supply of schedule information to a
data processor, and would not have been met by supplying schedule information to a
storage means that is a part of the '121 patent. Hence it was argued that
complainants' construction would broaden the scope of the '121 patent. Thus
respondents argued that, pursuant to the Federal Circuit's holding in Anderson v.
Int'l Eng'q & Mfg., Inc., 160 F. 3d 1345, 1369 (Fed. Cir. 1998), claims 18-31, 33,
34, 36 and 38 of the '121 patent are invalid for impermissable broadening. (See,
e.g., EPost at 231). [FN65]

The administrative law judge has found that the proper interpretation of the
"data processor" in the asserted claims of the '121 patent is a CPU. Hence
respondents' argument that certain claims of the '121 patent are invalid due to
impermissible broadening during reexamination has been mooted.

X. INVENTORSHIP ('121 Patent)

The patent statute provides that when an invention is made by two or more persons,
they shall apply for the patent jointly. 35 U.S.C. § 116. Where there is joint
inventorship, the patent must issue to all inventors. 35 U.S.C. § § 102(f), 116,
and 256. If nonjoinder of an actual inventor is proved by clear and convincing
evidence, the patent is rendered unenforceable. See Pannu v. Iolab Corp. 155 F.3d
1344, 1349 (Fed. Cir. 1998). In the absence of deceptive intent, the
unenforceability may be overcome by naming the non-joined inventor as an inventor of
the patent by court order or by application to the PTO, in accordance with the
procedures set forth in 35 U.S.C. § 256 Stark v. Advanced Magnetics, Inc., 119
F.3d 1551, 1555 (Fed. Cir. 1997).

The issuance of a patent creates a presumption that the named inventor(s) are the
true and only inventors. Ethicon, Inc. v. United States Surgical Corporation, 135

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.3d 1456, 1460 (Fed. Cir.), cert. denied, 119 S.Ct. 278 (1998) (Ethicon). To rebut
this presumption, "a party challenging validity for omission of an inventor must
present by clear and convincing evidence that the omitted individual actually
invented the claimed invention." See Acromed Corp. v. Sofamor Danek Group, Inc., 253
F.3d 1371, 1379 (Fed. Cir. 2001). The testimony of an alleged inventor, standing
alone, does not constitute corroboration, and cannot rise to the level of clear and
convincing proof. Ethicon, 135 F.3d at 1461, citing Price v. Symsek, 988 F.2d 1187,
1194 (Fed. Cir. 1993) (Price). [FN66]

   A "[c]onception is the touchstone of inventorship." Burroughs Wellcome Co. v. Barr
Laboratories, Inc., 40 F.3d 1223, 1227 (Fed. Cir. 1994), cert. denied, 516 U.S. 1070
(1996). It is the "formation in the mind of the inventor, of a definite and
permanent idea of the complete and operative invention as it is hereafter to be
applied in practice." Hybritech, Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367,
1376 (Fed. Cir. 1986) (Hybritech). An "idea is sufficiently 'definite and permanent'
when 'only ordinary skill' would be necessary to reduce the invention to practice,
without extensive research or experimentation" Ethicon, 135 F.3d at 1460. The
conceived invention "must include every feature of the subject matter claimed in the
patent." Ethicon 135 F.3d at 1460 citing Sewall v. Walters, 21 F.3d 411, 415 (Fed.
Cir. 1994).

   To be a joint inventor, "an individual must make a contribution to the conception
of the claimed invention that is not insignificant in quality, when that
contribution is measured against the dimension of the full invention." Fina Oil &
Chemical Co. v. Ewen, 123 F.3d 1466, 1473 (Fed. Cir. 1997) (Fina). However, each of
the joint inventors does not have to make the same type or amount of contribution to
the invention. Thus each needs to perform only a part of the task which produces the
invention. Ethicon, 135 F.2d at 1460. One does not qualify as a joint inventor by
merely assisting the actual inventor after conception of the claimed invention. A
coinventor however need not make a contribution to every claim of a patent. A
contribution to one claim is enough. Id. Thus, the critical question for joint
conception is "who conceived, as that term is used in the patent law, the subject
matter of the claims at issue." Id.

   Respondents argued that the '121 patent is invalid and unenforceable on the ground
that Patrick Young, the only inventor named on the patent, is not the sole inventor,
and that Edward Neil should have been named as a coinventor.

   Complainants, citing In the Matter of Certain EPROM, EEPROM, Flash Memory, and
Flash Microcontroller Semiconductor Devices, and Products Containing Same, Inv. No.
337-TA-395, "1998 ITC LEXIS 371 at 101 (July 9, 1998)" [FN67] (Eprom), argued that
respondents failed to even attempt to meet the governing ITC precedent on the issue
of joint inventorship. (CPost at 339).

   {* * *}
   The staff also argued, that with respect to the hardware used in the invention in
issue, it appears undisputed that Young had experience in FM technology prior to the
"brainstorming" sessions, citing{* * *}Neil, Tr. at 3398 and{* * *}The staff,
however, noted that Neil apparently had experience in the area of VBI technology
from his work on computer games, citing Neil, Tr. at 3347, and that Young in his
witness statement and testimony about his background never claimed to have
experience in that area, citing CX-1226. The staff further noted that Neil testified
that encoding information into the VBI "was Pat's area," citing Neil Tr. at 3399-
400. The staff also noted, with respect to the software needed to use the invention,
that Neil appeared to have had more experience than Young in the area of software
development, including spreadsheet technology, citing Neil, Tr. at 3334-39 and CX-
126, and that Neil had been head of software development at Advanced
Telecommunication Systems (ATS) where he met Young in 1984, citing Neil, Tr. at 3339
and Young, Tr. at 958. (SPost at 62). Thus, it was argued by the staff that the
circumstantial evidence of the relative backgrounds of Neil and Young suggest that
Neil may have contributed to the conception of the invention of the '121 patent with
respect to the use of spreadsheet technology and/or the use of the VBI. However it
was then argued by the staff that while the circumstances suggest that Neil could
have contributed to the hardware and/or software components of the invention

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 88
USITC Inv. No. 337-TA-454

disclosed in the '121 patent, Neil had no "contemporaneous documents" which Neil
prepared and that there was no testimony other than that of Neil himself to support
Neil's account. The staff argued that{* * *}However the staff concluded that the
evidence of the men's backgrounds does not rise to the level of clear and convincing
evidence in support of respondents' allegation of "misjoinder of invention" and
accordingly that the '121 patent should not be found invalid for "misjoinder of
inventor." (SPost at 62-63).

    Complainants are correct that governing ITC precedent on coinventorship is from
the Eprom case. In support complainants cited to a Commission opinion that was filed
on December 11, 2000 (12/11/00 op.). The law of the Eprom case on coinventorship
however is the Commission opinion of July 9, 1998 (7/9/98 op.), reported in Pub. No.
3136 (October 1998). Thus, Investigation No. 337-TA-395, was instituted in March
1997, and assigned to this administrative law judge. Before the administrative law
judge, respondents and intervenor argued that the '903 patent was invalid and/or
unenforceable because it allegedly did not identify other actual inventors in
addition to the named inventor Larry Jordan. Complainant argued that the evidence
presented supported the legal presumption that Jordan as the sole inventor of the
'903 patent. The staff argued that the evidence, taken as a whole, did not establish
clearly and convincingly that another person made such a substantive contribution in
the conception of the '903 patent so as to have required joinder of such a person as
a co-inventor of Jordan.

    In the final initial determination (ID), in Inv. No. 337-TA-395, which issued on
March 19, 1998, it was found that the '903 patent was not unenforceable for failure
to name a coinventor as argued by respondents and intervenor. Hence it was stated
(ID at 96-98):
    Though a joint inventor need not contribute to the subject matter of each claim
or even contribute equally to the overall invention under section 116, 'one does not
qualify as a joint inventor merely by assisting the actual inventor after conception
of the claimed invention' Ethicon, Inc. v U. S. Surgical Co., 45 U.S.P.Q.2d 1545
(Fed Cir. 1998) (Ethicon); Sewall v. Walters 21 F.3d at 416, 417, (Fed. Cir. 1994)
(Sewell); Shatterproof, 758 F.2d at 624. Conception is the formation in the mind of
the inventor, of a definite and permanent idea of the complete and operative
invention, as it is hereafter to be applied in practice. Hybritech,, 802 F.2d at
1376 (Fed.Cir.1986). Also, '[a]n inventor may use the services, ideas and aid of
others in the process of perfecting his invention without losing his right to a
patent.' Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980, (Fed.Cir.),
cert. denied, 117 S.Ct. 2459, (1997) (Hess). Finally, depending on the scope of a
patent's claims, one of ordinary skill in the art who simply reduced the inventor's
idea to practice is not necessarily a joint inventor, even if the specification
discloses that embodiment to satisfy the best mode requirement. Ethicon at 45
U.S.P.Q.2d at 1548; Sewall, 21 F.3d at 416.
    It is well established that '[p]atent issuance creates a presumption that the
named inventors are the true and only inventors.' Ethicon, 45 U.S.P.Q.2d at 1547
(citing Hess 106 F.3d at 980). This is a strong presumption to overcome on the basis
of nonjoinder: 'the burden of showing misjoinder or nonjoinder is a heavy one that
must be proved by clear and convincing evidence.' Hess, 106 F.3d at 980; Fina Oil &
Chemical Co. v. Ewen, 123 F.3d 1466, 1466 (Fed. Cir. 1997).
    In Ethicon, the Federal Circuit noted in proving inventorship, that:
    an inventor's testimony respecting the facts surrounding a claim of derivation
or priority of invention cannot, standing alone, rise to the level of clear and
convincing proof. Price v. Symsek, 988 F.2d 1187, 1194, 26 USPQ2d 1031, 1036
(Fed.Cir.1993). The rule is the same for an alleged co-inventor's testimony. See
Hess, 106 F.3d at 980. Thus, an alleged co-inventor must supply evidence to
corroborate his testimony. See Price, 988 F.2d at 1194. Whether the inventor's
testimony has been sufficiently corroborated is evaluated under a 'rule of reason'
analysis. Id. at 1195. Under this analysis, '[a]n evaluation of all pertinent
evidence must be made so that a sound determination of the credibility of the
[alleged] inventor's story may be reached.' Id.
    Corroborating evidence may take many forms. Often contemporaneous documents
prepared by a putative inventor serve to corroborate an inventor's testimony. See
id. at 1195-96. Circumstantial evidence about the inventive process may also
corroborate. See Knorr v. Pearson, 671 F.2d 1368, 1373, 213 USPQ 196, 200 (CCPA

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 89
USITC Inv. No. 337-TA-454

1982) ([S]ufficient circumstantial evidence of an independent nature can satisfy the
corroboration rule.). Additionally, oral testimony of someone other than the alleged
inventor may corroborate. See Price, 988 F.2d at 1195-96 [45 U.S.P.Q.2d at 1548].
It was then found in the ID, referring to the invention in issue of the '903 patent,
that:

     while Jordan used the skills of Gupta [the coinventor then alleged by the
     intervenor and respondents] to construct the physical embodiment of the invention in
     the '903 patent, the work he performed for Jordan was basic and well known
     implementations of ordinary electrical engineering skills. (FF 594, 602). Also ...
     Gupta asserted that he is not co-inventor and Jordan ... did not admit that Gupta or
     anyone else was responsible for the invention; ... [that] Jordan with a definite
     problem and a solution in his mind, the conception of Silicon Signature, sought out
     an engineer who had not the depth of experience to conceive Jordan's invention, but
     only the ability to supply his knowledge of materials and circuit elements to
     Jordan's specifications.
(ID at 99).

   Complainant petitioned for review of the ID of March 19, 1998. The Commission
determined to review most of the findings of said ID, including those relating to
the joint inventorship issue. Complainant argued before the Commission that the
evidence presented supported the legal presumption that Jordan was the sole inventor
of the '903 patent. The staff argued that the evidence, taken as a whole, did not
establish clearly and convincingly that another person made such a substantive
contribution in the conception of the '903 patent so as to have required joinder of
that person as a coinventor along with Jordan.

   On final disposition of Eprom in the 7/9/98 op., as reported in Pub. No. 3136, the
Commission found, inter alia, that the '903 patent was unenforceable for failure to
name a co-inventor. At that time there were only three Commissioners in office: then
Chairman Bragg, then Vice Chairman Miller, and Commissioner Crawford. Since former
Vice Chairman Miller did not participate in the investigation, the Commission's
7/9/98 op. was made by former Chairman Bragg and Commissioner Crawford. Commissioner
Crawford subsequently issued a statement on September 28, 1998 (also reported in
Pub. No. 3136) wherein she concluded that her decision on inventorship "would have
been different had the General Counsel provided me accurate information."

   On August 12, 1998, after issuance of the 7/9/98 op., complainant filed a petition
with the PTO to correct the inventorship of the '903 patent pursuant to PTO rule
324, 37 C.F.R. § 1.324. Complainant, reversing the position it took before the
administrative law judge, sought to correct the inventorship of the '903 patent by
adding Gupta as a coinventor along with Jordon. The PTO granted complainant's
petition on August 18, 1998, and issued a certificate of correction on October 6,
1998.

   On September 8, 1998, complainant filed with the Commission a "Petition For Relief
From Final Determination Finding U.S. Patent No. 4,451,903 Unenforceable."
Respondents and the staff filed responses to the petition. The Commission ruled on
complainant's petition on January 25, 1999, determining to treat complainant's
petition as a petition for reconsideration, granting the petition, and reopening the
record of the investigation for the limited purpose of resolving the issues arising
from the PTO's issuance of the certificate of correction for the '903 patent.
Investigation No. 337-TA-395 was remanded to this administrative law judge with
instructions to issue an initial determination (ID(2)) addressing the issues
presented.

   Complainant, respondents, intervenor, and the staff participated in the remand
proceeding. The ID(2) issued on May 17, 2000, with the following principal findings:
   Complainant committed inequitable conduct at the PTO in the procurement of the
certificate of correction for the '903 patent;
   The inventors listed on the PTO certificate of correction (Larry Jordan and Anil
Gupta) are not the correct inventors; and
   No inequitable conduct was shown to have taken place at the PTO in the the
prosecution of the original patent application that matured into the '903 patent.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complainant petitioned for review, inter alia, of the following findings made in
the ID(2): (1) that complainant committed inequitable conduct in the PTO correction
proceeding, and (2) that the inventors listed on the PTO certificate of correction
(Jordan and Gupta) were not the correct inventors. Complainant also alleged that the
administrative law judge in the remand proceeding exhibited such bias against it
that complainant was denied a fair hearing. The staff opposed complainant's petition
in part, but also petitioned for review, inter alia, the rulings on inequitable
conduct and inventorship. Respondents and intervenor filed a joint response in
opposition to the petitions for review.

On July 17, 2000, the Commission determined to review the issues which included:
    This administrative law judge's determination that the PTO certificate of
correction for the '903 patent was procured inequitably.
    This administrative law judge's determination that the inventors named on the
PTO certificate of correction (Jordan and Gupta) are incorrect.

The Commission, in its 12/11/00 op. [FN68] as to its principal determinations
concerning the '903 inventorship and inequitable conduct issues: (1) found that
complainant did not commit inequitable conduct before the PTO during the correction
proceedings; and (2) found that the correct inventors were listed on the certificate
of correction of the '903 patent. [FN69] The Commission, however, in its 12/11/00
op. repeatedly stated that the 7/9/98 op. is the "law of the case." See, e.g.,
12/11/00 op. at pp. 7 ("The Commission's Opinion of July 9, 1998 ... is the law of
the case"), 21 ("the Commission's 7/9/98 decision ... was the law of the case"), and
34 ("In this investigation, the law of the case is that [quoting from the 7/9/98
op.]"). Hence, the 12/11/00 op. is not the law from Inv. No. 337-TA-395 case on
coinventorship. Rather it is the 7/9/98 op.

The Commission, in its 7/9/98 op., in reversing the administrative law judge and
finding that the '903 patent was unenforceable unless and until the PTO or a court
makes the inventorship correction, [FN70] [FN71] stated that the administrative law
judge had "noted that both the named inventor (Larry Jordan) and the engineer (Anil
Gupta) who testified that he implemented Jordan's idea in silicon, attributed the
essential conception of the invention to Jordan; Engineer Gupta testified that he
implemented the elements of the invention of the '903 patent using well known
circuit techniques, and that as a young engineer he did not have the breadth of
experience to come up with Silicon Signature" [FN72] (7/9/98 op. at 7); and that at
the time of the issuance of the March 19, 1998 ID:
    Federal Circuit cases had sent mixed signals as to what constitutes conception
of an invention. One panel stated that [conception] is complete when one of ordinary
skill in the art could construct the apparatus without unduly extensive research or
experimentation. [citing Sewall]. Another panel stated that [conception] is the
formation in the mind of the inventor, of a definite and permanent idea of the
complete and operative invention, as it is hereafter to be applied in practice.
[citing Hybritech] The former statement appears to support the ALJ's finding on
inventorship, while the latter statement appears to indicate that named inventor
Jordan's contribution falls short of that which is necessary for a complete
conception of an invention. [7/9/98 op. at 8]
The 7/9/98 op. then stated that it appeared from the record that Jordan, the sole
named inventor of the '903 patent, was a marketing person who had never designed
semiconductor products in his career, citing hearing Tr. at 3104, [FN73] that
Jordan's testimony is to the effect that he had a "general concept" of Silicon
Signature in block diagram form, but that he had no involvement in the physical
realization of the invention, citing Tr. at 3107-08; that Jordan admitted that he
did not conceive any of the circuitry by which the elements of the '903 patent
claims at issue were realized, citing Tr. at 3108-10, [FN74] and that while Jordan's
"concept could be and was implemented using common circuit techniques without undue
experimentation," the disclosure of Jordan did not rise to the level of an
"operative invention" within the meaning of Hybritech (7/8/98 op. at 7-8). The
Commission then stated (Id. at 8- 9):
    Analysis of the inventorship issue is complicated by the fact that certain claim
elements of the '903 patent are written in means plus function language. A patent
specification must disclose some structure with respect to means plus function
elements that performs each of the claimed functions. Thus, a patent would not have

been granted on the basis of Jordan's disclosure alone. The question is whether the person(s) who selected particular circuit structures for each of the means plus function claim elements (presumably Gupta) is a co-inventor.

Since inventorship is a disfavored technical defense [citing Certain Double-Sided Floppy Disk Drives and Components Thereof, Inv. No. 337-TA-215, USITC Pub. 1860 (1986)] that must be proven by clear and convincing evidence, we are ordinarily reluctant to go behind an ALJ's findings on this issue. Since the ID issued, however, the Federal Circuit has issued an opinion [Ethicon] that answers the question posed.[ [FN75]] In Ethicon, Inv. v. United States Surgical Corp., 135 F.3d 1456 (Fed. Cir. 1998), the court dealt with the contribution of an electronics technician to an invention for a surgical instrument claimed in means plus function format. The court emphasized the Hybritech standard of a complete and operative invention. Of even more significance, however, is the following statement concerning inventorship in the means plus function context:

The contributor of any disclosed means of a means-plus-function claim element is a joint inventor as to that claim, unless one asserting sole inventorship can show that the contribution of that means was simply a reduction to practice of the sole inventor's broader concept [citing Sewell].

... We find that named inventor Jordan's involvement in the particulars of the circuit design in this investigation did not rise to the level of the sole inventor's involvement in Sewall.[ [FN76]] Jordan neither selected nor simulated the performance of any circuit means. Therefore, we conclude that the above stated exception in Ethicon does not apply.

On the basis of Ethicon, we find that '903 patent is unenforceable for failure to name an inventor....

The '121 patent in issue in this investigation was issued on November 10, 1987, based on an application filed on May 6, 1986 which in turn was a continuation-in-part of an abandoned application filed on July 12, 1985. (FF 23). The '121 patent was subsequently reexamined by the PTO and the PTO then issued a Reexamination Certificate on December 14, 1993. (FF 25). Before the filing of the initial application on July 12, 1985, the record shows no actual reduction to practice. [FN77] Hence, the critical issue is who conceived the claimed invention before the constructive reduction to practice on July 12, 1985.

Thus the Commission, in its 7/9/98 op., in finding that respondents and the intervenor met the clear and convincing burden of establishing that Jordan was not the sole inventor of the invention of the '903 patent, examined the background of Jordan and found that Jordan was a marketing person who had never designed semiconductor products in his career. The testimony relied on in the 7/9/98 op. does show that Jordan did conceive figure 1 of the '903 patent in the sense of the major elements. See, supra. Also the Commission in the 7/9/98 op. did find that Jordan's "concept could be and was implemented using common circuit techniques without undue experimentation."

In view of the 7/9/98 op., the background of the named inventor Young and the putative inventor Neil should be examined. According to Young's witness statement, Young graduated from U.C. Berkeley in 1958 with a Bachelor of Science degree in Electrical Engineering. (CX-1226). Young worked for Systems from 1960 to 1962 designing frequency counter instrumentation and systems. He left Systems in 1962 to work for Able Research to 1968. At Able Research, he created and built the first intelligent broadband microwave counter from 1970 to 1972. Young was the chief designer at a small start-up company called Dietzgen Electronics (Dietzgen), a engineering slide rule company. There he developed several digital products for Dietzgen. From 1972 to 1975, Young was the research and development manager for GT&E, developing a multifunction business transaction telephone. From 1975 to 1978, he worked for Advanced Memory Systems developing solid state memory cards for mid-size computers. From 1978 to 1980, Young was a research and development engineer for Electronic Telephone Co. where he developed the first all digital touch tone generator chip for use in telephones. The company was acquired by AT&E and Young continued to work there until July 1984. One of the products he worked on was a wrist pager that had a novel power scheme allowing a watch battery to operate the pager for long periods. The pager used the FM SCA band for distribution of the paging signals. Young went to work in August 1984 for Advanced Telecommunication

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 92
USITC Inv. No. 337-TA-454

Systems (ATS) on a product for controlling PCs from a remote location. (CX-1226 at
2). He left that position in December 1984, and remained unemployed until May 1985
when he became VP of engineering for Tiara Inc., a company that he founded with two
other people. Id. At Tiara, Young was overseeing a range of card products from
Taiwan for the IBM PC. He was also involved in redesigning the user interface of a
networking product to compete with the Ethernet. In May 1986, about ten months after
the original application for the '121 patent was filed on July 12, 1985, Young
founded a company called Insight Technology, which was later renamed StarSight
Telecast. (CX-1226 at 3). He retired from StarSight in September 1994. Id. Young's
position at StarSight was Chief Scientist for a portion of time running from 1986
until 1991. (Tr. at 937-938). Based on Young's background, the administrative law
judge finds that Young's experience up to July 12, 1985 is primarily in the area of
hardware and working with broadcast FM signals.

   Edward Neil obtained a bachelor's degree in computer science from Arizona State
University in 1972. (Neil, Tr. at 3333-34). Neil was hired after college by
Motorola, where he was a test engineer, writing software to test various kinds of
specialized integrated circuits. Thereafter, he transferred to the semiconductor
engineering group at Motorola where he was again involved with writing software for
testing and evaluation of various processes that the company was using. (Tr. at
3334). The next company Neil worked for was Bowmar Instruments, where he wrote the
specialized software for doing algorithms for calculations. He then went back to
work for Motorola as a teaching engineer and taught microprocessor technology to
other engineers and customers of Motorola. Next Neil worked for ASM America when he
designed control language for semiconductor processing equipment which allowed
customer to program their own customized processes. (Tr. at 3334-35). After that, at
around 1978 or 1979, he consulted for various companies as Mircao and Motorola. (Tr.
at 3336). In 1981, he moved to the Bay area (Silicon Valley, San Jose) and began
working at a company called Axlon in Silicon Valley, California. Axlon was in the
business of making specialized hardware and software for Atari home computers.
Neil's job was to write software that allowed the company's products to work
effectively on Atari home computers and he was involved in an effort to add
additional products and functionality to the Atari. (Neil, Tr. at 3336-37). After
working at Axlon, Neil worked for Human Engineered Software as manager of software
development. While at Human Engineered Software, Neil worked on software for Atari
and Commodore home computers, including games, productivity products, and
spreadsheets, and also traveled to Boston to see the early development of Lotus
computer spreadsheets and to learn about the techniques which the Lotus company was
using to present those spreadsheets. (Neil, Tr. at 3338, 3346). At that time, Lotus
was demonstrating the capability to search and sort through spreadsheet data based
upon certain various search criteria. (Neil, Tr. at 3346-47). Neil's next position
was at ATS as its manager of software development and chief coder. ATS manufactured
and sold a board that plugged into a personal computer to allow users to conference
between their personal computers. (Neil, Tr. at 3338). Neil's responsibility at ATS
was to write the software code for the functions of the board product. (Neil, Tr. at
3338). Neil also worked with computer spreadsheets while he was employed by ATS.
(Neil, Tr. at 3345 - 3346).

   After ATS, Neil started his own company in the 1985-86 time frame. (Tr. at 3336).
For the next five years, Neil did consulting work until he went to work for NEC
Technologies where he was manager of laser printer software development for almost
two years. (Tr. at 3336-37). He again did a short stint of consulting for Okidata
and a couple of small companies. Thereafter Neil went to a company called In Sight
Development and worked on a product that was Internet-related and for which he got a
patent. (Tr. at 3337). In 1996 Neil moved to his current address in Healdsburg,
Calif. where he did some consulting work for local wineries and also did about a
year with Watrories. Currently, he is the chief technology officer of a company
called Iris Solutions. (Tr. at 3337). Based on Neil's background, while the
administrative law judge finds that Young's experience when the initial application
for the '121 patent was filed on July 12, 1985, is primarily hardware and working
with broadcast FM signals, Neil's experience up and to July 12, 1985 by contrast is
found to be generally in the area of software engineering and includes experience in
home computers, video games and spreadsheet as well as VBI related work.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

   Aside from CX-1397 and CX-687, referenced by the staff, there are no
contemporaneous documents generated prior to the July 12, 1985 filing date that
relate to the conception of the claimed invention of the '121 patent. [FN78] Hence,
what is left is the live testimony of inventor Young and putative inventor Neil. As
Ethicon stated, which statment of Ethicon was quoted by the administrative law judge
in his March 19, 1998 ID. An alleged coinventor must supply evidence to corroborate
his testimony. However corroborating evidence may take many forms. Whether the
inventor's testimony has been sufficiently corroborated is evaluated under a "rule
of reason" analysis. Under this analysis, an evaluation of all pertinent evidence is
made. See supra.

   Regarding the foci of the invention of the '121 patent, complainants' expert
witness Faillace, testified:
      Q You told us this problem was the proliferation of channels. Collectively the
   claims of the '121 have a focus of addressing the problem?
      A Yes.
      Q What was that?
      A That was the focus, that was to help that average user use database
   techniques to take this sea, this vast sea of program schedule information, cut it
   down to size and enable that user to focus just on those programs most likely to be
   of interest to him, so that instead of looking at thousands of descriptions of
   programs, he would look at just maybe a half dozen or so and then be able to make an
   educated choice.
      Q Were there any other sort of principal focuses collectively of the claims of
   the '121?
      A I think it's combining that database feature with the programatic control
   feature, that is once you've identified from this tightly focused group of programs
   the ones you want to watch, then it's just a matter of hitting a button on the
   remote control to having it on your screen, if it's a current program, or to setting
   it up for tuning and recording in the future if it's a future program.
      Q Did the claims of the '121 collectively address in any way the manner of
   getting programs schedule information and what to do with it once it's gotten --
      A They address the issue, somewhere the program selection -- excuse me, the
   program schedule information upon which these choices are based, has to be in the
   data processor so that it can present them to the user.
(Tr. at 1150-51 (Emphasis added)). Accordingly, Faillace identified two key facets
of the invention of the '121 patent: (1) the use of database techniques to allow the
user to narrow the number of programs presented to him or her, and (2) allowing the
user to cause the television to tune to one of the selected programs or to cause the
VCR to be programmed to record one of the selected programs by "hitting a button on
the remote." The spreadsheet technology testified about, by Neil at the hearing,
accomplishes the first facet of the invention of the '121 patent, as well as other
aspects disclosed in individual claims.

   {* * *}Specifically, the use of a matrix-type spreadsheet allows a system or
process to display a television grid similar to two-dimensional grids that are used
to present printed schedule information. (Tr. at 3345-46). Spreadsheet technology
also allows the implementer to hide within the layers of the spreadsheet additional
information about the programs, beyond that which is displayed on the two
dimensional grid, so that a user could select a particular program in the
spreadsheet and, thereby, cause additional information about the program to appear
in another box on the screen. (Tr. at 3346). This additional information could also
be associated with the displayed programs, so as to allow searches for particular
categories or types of programs. (Tr. at 3352- 53). The ability to store additional
information, so as to allow searches, enables the television guide system to
"select[] those programs meeting the combined user selection criteria for viewing
from the program schedule information," as required by claim 18 and, by dependency,
claims 19-24, 26-28 and 31, as well as a similar limitations in claims 32, 33, 36,
42 (and, by dependency, claims 43, 48, 49 and 50), 54 and 66. Such a capability also
enables claim 28 and 29's requirement that there be{* * *}Such a feature enables
the{* * *}

   Neil's testimony is corroborated by his background which included{* * *} (CX-1397,
CX-687). Neil's primary work experience was in the{* * *}He had received a degree

        ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 94
USITC Inv. No. 337-TA-454

in{* * *}Neil's work experience also had encompassed{* * *}See supra. Neil was aware
of the{* * *}See supra.

   The original{* * *} (CX-1397). The disclosure described certain aspects of the{* *
*}as follows:
     {* * *}
(CX-1397 at 1) (Emphasis added). Furthermore, {* * *} (CX-1397 at 1).

   The administrative law judge finds that such characteristics listed in the {  * *
*}Consistent with Neil's suggestion to use{* * *}In the second version of the
product disclosure, which is styled as just{* * *} {* * *} [FN79]

   Moreover, all of the asserted claims of the '121 patent require supplying schedule
information to the data processor. See Section V(A), supra. The ' 121 patent only
discloses two methods of supplying the data processor with schedule information:
through an FM transmission system or through the VBI. Figure 1 depicts a
transmission system using an FM transmitter to broadcast schedule information, while
Fig. 3 depicts an embodiment capable of receiving such transmitted information and
supplying it to its CPU. Figure 2 shows a transmission system that transmits
schedule information through the VBI, while Figs. 4a and 4b depict embodiments of
the '121 patent capable of receiving such data and supplying it to their CPUs. Those
three embodiments are the only embodiments of the '121 patent depicted and described
in the specification, and two of them are designed to receive schedule information
through the VBI. Furthermore, the ability to transmit the schedule information, so
that it could be updated continuously, is also a key component to the '121
invention. For instance, under the Background of the Invention section, the '121
patent states: "[c]onventionally published program listings are not capable of
handling last minute schedule changes and additions." (col. 2, lns. 2-4). Similarly,
under the Summary of the Invention section, it is stated that "[i]t is another
object of this invention to provide such a system and process which is capable of
accommodating last minute schedule changes and additions." (col. 3, lns. 11-13).

   {* * *}
   Neil's testimony that he had suggested to Young that the VBI should be used to
supply the data processors with schedule information, is corroborated by the
backgrounds of Young and Neil as well as{* * *} (CX-687) and by Young's admission
that{* * *}Neil had experience with transmitting information in the VBI (or the
vertical retrace). See supra. He gained this experience during his employment at
Human Engineered Software. Young admitted that the only discussions that he had with
Neil regarding{* * *} {* * *} (Tr. at 894-95). Young had extensive experience
working{* * *} (Tr. at 857-58). The only experience with transmitting information
through the VBI that Young had, that is evidenced in the record, is in removing
nondisplay information encoded into the VBI of a video signal, which was a hardware
technique that Young knew well. (Tr. at 3400). [FN80]

   The original{* * *}described as follows: {* * *} {* * *}Accordingly, the
administrative law judge finds that{* * *} [FN81] The second version of the {  * *
*}687), purports to be the{* * *}

   The Supreme Court, in Marshall v. Lonberger, 459 U.S. 422, 434 (1983), has stated:
   As was aptly stated by the New York Court of Appeals, although in a case of
rather different substantive nature: 'Face to face with living witnesses the
original trier of the facts holds a position of advantage from which appellate
judges are excluded. In doubtful cases the exercise of his power of observation
often proves the most accurate method of ascertaining the fact... How can we say
the judge is wrong? We never saw the witnesses... To the sophistication and sagacity
of the trial judge the law confides the duty of appraisal.' Bovd v. Bovd, 252 N.Y.
422, 429, 169 N.E. 632, 634.
Having had the opportunity to observe both Neil and Young's demeanor at the hearing,
the administrative law judge finds Neil's demeanor was credible and straightforward,
while Young's demeanor was lacking those characteristics. [FN82] Moreover, he finds
testimony of Young, who was complainants' corporate deposition designee on the '121
patent conception, conflicts with documents and other testimony of Young. [FN83] For
example, at the hearing on December 5, 2001, as to conception of the claimed

2002 WL 31556392                                                      Page 95
USITC Inv. No. 337-TA-454

invention, Young testified (Tr. at 852- 65):
     Q Mr. Young, when do you first recall having the idea that led to the '121
patent?
     A This is the last week of the 1984 and the time frame to the first week of
1985, January.
     Q Mr. Young, how is it that you recall that date today?
     A This is the period of 49er playoff, and this is -- it happened in a year in
which they won the Super Bowl, and my wife is an avid fan of the 49ers, and I'm just
an interested party.
     Q What's the connection between the 49ers and your wife's interest in the
49ers and the invention of the '121 patent?
     A I spent quite a bit of time during this playoff recording games for her.
Basically I would set up the VCR, and my wife never learned to master the
programming steps required.
     Q What specifically was your wife's difficulty, Mr. Young?
     A I think she could not remember the sequence of steps required.
     Q What role did you play in helping your wife?
     A I tried to teach her, and in the end I wind up doing the entire programming
task.
     Q And at some point did you come up with a way to help your wife with
programming her 49er games?
     A Right. I think this is after I've been recording like the nth game for that
year, and I, for whatever the reason, I point to her that if I put the name, list of
49er games on the TV, will you be able to take this remote controller, point at it,
and pick the game you want, click the button, and in turn automatic programming
process will be done for you. And right away she liked the idea. She though that was
something she could handle.

                                    * * *

     Q I'd like to just take you back to the initial idea that you had. You say
that you were going to display something on a screen. What is it you had in mind at
that time in late December 1994 [sic], early January 1985 of displaying on the
screen?
     A I was trying to simply solve the problem for my life, and I was going to
just take a list of the 49ers schedule, put it on the screen, keep it as simple as
possible. I didn't want to complicate her -- she has trouble with following the
steps of programming. I didn't want to make this any more difficult. Show on the
screen, cursoring to the game, click on it, and the entire thing will be done.
     Q What do you mean by "cursoring to the game"?
     A So she [Young's wife] can select the particular games that she wanted to
record.
     Q Did there come a time when you considered expanding this idea beyond just
football games?
     A Right. Very quickly, I realized that if this is going to have any commercial
success, it will have to be far more than just games, and I went through that maybe
I can record all the sport games, list the sport games, maybe perhaps prime time
movies, things of this sort. But in the end, I realized that I could not make that -
- make those choices and decided to do an entire full-blown TV guide.
     Q What do you mean by a "full-blown TV guide"?
     A That would be a program that is like a weekly guide, seven-day listing on
all the channels, basically that point, yeah.
     Q When did this additional idea occur to you relative to the initial idea?
     A It happened within the same hour.
     Q At this time you were living in the San Francisco area; is that correct?
     A Yes.
     Q How many programs per week approximately were shown in San Francisco in that
period of time?
     A I estimate between -- per week -- about 5000 to 10,000.
     Q If you were to try to display all of those programs on the TV screen, about
how many screens would that information fill?
     A Roughly it would probably be like 500 to maybe 1000 pages.
     Q If that's all, for instance, your wife had to work with, how would she go
about finding a program for recording?

       ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                           Page 96
USITC Inv. No. 337-TA-454

A Obviously, if I just were to create a guide that is equivalent of thumbing through like a newspaper, she would have to page through all these pages which would basically defeat the entire idea of a simple tool for programming the VCR.

Q Did you see this as a problem or a limitation?

A It was -- I saw it as now a real challenge to somehow make a guide with five to 10,000 listings something for someone like my wife who is not technical, that she can master.

Q Did you address this challenge?

A Yes, I did. I began to think of ways of getting in a standard or a weekly guide, ways of, for example, putting in some kind of theme selection, and within a few selection strokes, I will be able to get that onto football.

Q Approximately when did you have this idea of creating themes?

A This is all that same very short time frame.

Q End of December 1984, early January 1985?

A Right. When I first started, I would say within that date or two, I was thinking of actually how to implement this.

Q What type of television broadcast technology did you envision using this approach with?

A Right; okay. The thing I didn't want to do is to have obviously manual interest of this 49ers schedule or even that was too prohibitive. So the technology I had in mind is a thing called FM si[sic SCA] band.

Q And is this a way that you came up with to implement this idea?

A No. It was in the beginning of how to do this.

About -- the previous company, two previous companies, I was working on a concept. I developed a wristwatch pager, and the wristwatch pager is a pager that operates off of this FM superior technology.

Q What was the name of that previous company?

A The company is called AT&E.

Q And what was the conclusion between this pager that you were working on at AT&E and this idea you had regarding television?

A Okay. It seems like it was the ideal technology.

It is a si [sic SCA] channel of the FM. It's underutilized. The only thing that I know that was utilizing it at that time to any degree was music, audio. The FM si [sic SCA] band can also carry digital information.

Q How would that technology -- how did you envision at this time using that technology in connection with your television idea?

A Right; okay. Now that I have a way of getting of raw TV schedule data into some kind of a box, then what I will need now is obviously some intelligence to collect that information, some intelligence on how to search through that information. The information eventually will be displayed on the screen. So I will need some kind of video generator, and the most important thing is will need an external programming tuner that will actually select the program.

I think this came about -- the VCR I had at the time I bought in '79. It did not have wires control features. You couldn't program it using an external programmable tuner. It was sort of a clunker. So this was the reason why I had an external programmable tuner in response to perform that function.

Q Can you identify the principal subcomponents of the system that you envisioned in this January 1985 time frame for implementing this idea that you had had?

A Right. I would need, in addition to the programmer tuner, obviously some very -- what I want right at the top is software, very intuitive software for searching, because the target user for my product is someone like my wife who is not technical.

The other piece I need now is to -- I have this -- well, I also need a generator. Once I have this thing listed on the screen, I will need now some kind of remote device to point to it, and once I point to it, I click it. Then I need to somehow control my VCR, and at that time I had an old-fashioned VCR. It didn't have a wires control. So in my original thinking, it was going to be a wire, direct wire to the pause control on the VCR. So that's pretty much that very initial idea.

Q How would -- can you explain how the wire leading to the VCR would control the VCR?

A Yes. It's somewhat of an awkward scheme. It will need to put my VCR into a record mode, and the machines, the very early machines at that time had -- it comes with like a 20-foot wire with a button on it, and then you use that to turn the

©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 97
 USITC Inv. No. 337-TA-454

recording off and on.

                                  * * *

     Q Did you consider searching to be an aspect of your idea at that point in
time?
     A Absolutely. If I did not have -- I call these tools for searching
navigational tools, and if I didn't come up with a good idea for doing that, it
won't fit the need of my wife and will not fit the need of what I think will be the
market for this product.
     Q Why was that?
     A I think a lot of products, for example VCR programs, that exist at that time
was extremely awkward. I estimated that maybe the majority of housewives can't
program VCR.

                                  * * *

     Q Did your idea at this time, did it address that problem that you just
described?
     A I felt that was one of the key problems. I don't think anyone ever, to my
knowledge, thought about now making this process what we call a cable map, how to
map names of cable services like ESPN, HBO, and map it actually to the cable system
that you have.
     Q Is cable mapping different than navigational tools?
     A Completely different, but it's absolutely essential to any automatic
navigation. You could not record any program in a cable system properly unless you
have a cable map.
     Q And can you contrast cable mapping with navigational tools?
     A Well, navigational -- you navigate, the way that I perceive navigation,
would always be dealing in terms of the cable provider service name. I don't want
people to think well, it should be channel 87. That's one of the problems of, I
think, the average user. I want them to think oh, this is Bravo, okay, and they look
at the chart and see Bravo. I want to make the rest of the operation fully
transparent, fully automatic.
     Q And what about the idea of sorting by themes?
     How does that differ from the concept of navigational tools?
     A It's one of the -- it's definitely one of the navigational features. The
storybook theme is absolutely essential. For example, my wife, most of the time, is
recording 49er games. I've got to get down from a raw listing of this five to 10,000
and in a couple keystroke -- it actually took a little bit more than that -- I
wanted to be able to narrow down to the sports, football, pro football, and then
bring up that screen.
     Q The ideas that you've just been discussing, were these all ideas that you
had in the December 1984/January 1985 time frame?
     A The navigational came at that time, the cable came maybe a day later.
     Q How about the VCR programming?
     A First, the VCR programming was the entire initial idea that got me into
thinking about this.
     Q At some point did you decide that you would try to patent your invention?
     A Yes.
(Emphasis added). In contrast to Young's hearing testimony about his conception of
the invention of the '121 patent in{* * *}i.e., in a very short time frame, in his
deposition on June 12, 2001, Young testified{* * *}

   {* * *}
     {* * *}
(Emphasis added). Moreover, {* * *} (CX-1398). In this document, Young recites the
following sequence of events: {* * *}

   {* * *} {* * *} [FN84]

   The administrative law judge finds that Young's recitation of events in CX-1398C,
contradicts the sequence of events to which Young testified at the hearing regarding
the conception of the invention claimed in the '121 Patent. For example the

                ©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 98
USITC Inv. No. 337-TA-454

introductory statement in{* * *}contradicts Young's trial testimony about the
various ideas he conceived during the hour surrounding Young's alleged revelation
regarding the recording of football games, which was the hour that Young testified
he allegedly conceived of the invention claimed in the '121 patent.

   {* * *}
   {* * *} {* * *} {* * *}
     {* * *}
   Young's testimony as to his conversations with Higgins is also conflicting. Thus
on direct examination, Young testified (Tr. at 899-00): {* * *}
     {* * *}
(Emphasis added). However, just hours later on the same day during cross-
examination, Young testified: {* * *}

   Furthermore, Young testified on cross-examination as to {* * *} (Tr. at 981- 82):
{* * *} (Emphasis added). In contrast to Young's hearing testimony, Young's
corporate designee deposition contains the following question and answer with
respect to the{* * *}
   Do you see where it states in the middle of the paragraph, quote:
     {* * *}
{* * *}Also, at the deposition, Young stated with regards to Higgins' description
of{* * *}set forth in RX-3812C (JX-60C at 864-65): {* * *}
     {* * *}
(Emphasis added)

   Even at the hearing on technical details, the administrative law judge found
Young's testimony to conflict with his deposition testimony as complainants'
corporate designee. For instance, Young testified (Tr. at 981-92):

   {* * *}
     {* * *} {* * *} {* * *}
(Emphasis added). Another example of conflicting testimony is the following{* * *}
{* * *}
     {* * *} {* * *}
(Emphasis added).

   Based on the foregoing, the administrative law judge finds that Edward Neil made a
contribution to the conception of the claimed invention of the '121 patent that was
not insignificant in quality, when that contribution is measured against the
dimension of the full invention claimed in the '121 patent. Accordingly, the
administrative law judge finds that respondents have established that the '121
patent is unenforceable for failure to name Neil as a coinventor.

XI. VALIDITY (Best Mode '268/'204 Patent)

   Respondents, relying primarily on deposition testimony of Roop, argued that the
inventors of the '268 and '204 patents failed to disclose the best mode known to the
inventor for carrying out the claimed invention. (See, e.g., EPost at 246). Hence,
respondents argued that the "hybrid method" (also called the "hybrid cursor") [FN85]
had been invented prior of the priority date of the ' 268 and '204 patents; and that
the inventors prior to the filing date of the '204 and '268 patents knew of the
"hybrid method," and believed it to be superior to the innovative cursor disclosed
in the '268 and '204 patents, but failed to disclose it. (EPost at 246-249).

   Complainants argued that Roop during his deposition had expressed uncertainty as
to when the hybrid method had been developed; that in his testimony during the
hearing he had testified that the hybrid method had been developed two years after
the filing date of the '204 and '268 patents; and that the hybrid method had been
developed by David Warden, who is not one of the named inventors of the '268 and
'204 patents. (CPost at 342-47).

   The staff did not address the issue of the alleged failure to disclose the best
mode with respect to the '268 and '204 patents.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 99
USITC Inv. No. 337-TA-454

    The administrative law judge rejects respondents' arguments relating to best mode.
Although, Roop's deposition testimony indicates that the inventors of the '268 and
'204 patents knew of the hybrid method prior to the filing date of the '204 and '268
patents (See, e.g., JX 48 at 124-25), Roop subsequently and unequivocally recanted
at the hearing his prior deposition testimony. (Tr. at 435-37). Thus, Roop testified
that the inventor of the hybrid method was David Warden, who is not one of the named
inventors of the '121 patent, and that Warden invented the hybrid method in 1992.
(Tr. at 303). Such contradictory testimony is not to be automatically ascribed to
bad faith on the part of Roop. The deposition occurred approximately 10 years after
the filing date of the '204 and '268 patents and the conception of the hybrid
cursor, and Roop had testified that his memory was refreshed during trial
preparation after the deposition and immediately before the hearing. Respondents
claimed that{* * *} (RFF 5156). However, CX-3816 is dated April 10, 1991 (Tr. at
288, 292-93; CX-3816), which is after the filing date of the '204 and '268 patents.
Moreover, {* * *} (Tr. at 288-93; CX-3816 at 20-22, 85-86).

    Based on the foregoing, the administrative law judge finds that respondents have
not met their burden of proving that the inventors of the '268 and '204 patents
withheld the best mode.

XII. VALIDITY (Indefiniteness - '121 Patent)

    S-A argued that independent claims 18, 36, and 66 and dependent claims 19, 20, 22,
24, 26, 27 and 31 [FN86], which recite the step of supplying "user program selection
criteria comprising a plurality of independent user chosen program selection
criteria and at least one program choice" to the data processor and the step in
which the data processor combines "said user selection criteria," are indefinite,
and hence invalid under 35 U.S.C. § 112, ¶ 2 because it is unclear as to which
antecedent - "user program selection criteria" or "independent user chosen program
selection criteria" - "said user selection criteria" refers. (S-A Post at 187-88).

    In light of the administrative law judge's finding, supra, that "said user
selection criteria" refers to "independent user chosen program selection criteria,"
the administrative law judge rejects S-A's argument that the antecedent to "said
user program selection criteria." is unclear. Accordingly he finds that S-A has not
met its burden of proving that independent claims 18, 36 and 66 and dependent claims
19, 20, 22, 24, 26, 27 and 31 are indefinite under 35 U.S.C. § 112, ¶ 2.

XIII. VALIDITY (Indefiniteness - '268/'204 Patents)

    Each of EchoStar and Pioneer argued that claims 1 and 3 of the '268 patent and
claims 14-17 of the '204 patent are indefinite under 35 U.S.C. § 112, ¶ 2 in light
of 35 U.S.C. § 112, ¶ 6. Thus, it was argued that those claims are written in
"means plus function" language and are therefore subject to 35 U.S.C. § 112, ¶ 6;
that applicants were required to set forth in the specification an adequate
description of the means required to perform the recited function; and that the
specifications of the two patents fail to disclose and describe software that
Gemstar's expert witness identified as being "required" to perform the recited
function of the claims. It was also argued that respondents' expert witnesses, Myers
and Rhyne, both testified that software is required to perform various functions
described in the asserted claims of the '268 patent and in claims 14-176 of the '204
patent (RFF 5419-5426); and that Myers testified that the specification of both the
'268 and '204 patents fails to disclose any algorithm relevant to any of the means
plus function elements of claims 1 and 3 of the '268 patent and claims 14-17 of the
'204 patent. (RFF 5428-5429). [FN87] Accordingly, Pioneer and Echostar argued that
the claims in issue are indefinite and invalid under 35 U.S.C. § 112, ¶ 2. (PPost
at 236-37, EPost at 274-76).

    Complainants argued that the actual legal test for indefiniteness is whether those
skilled in the art would understand the scope of the invention; that the only
evidence in the record that shows that persons skilled in the art would understand
the scope of the invention (CRRFF 5428.3); that respondents' own expert conceded
that the patents do describe the software required to perform the claimed function
(CRRFF 5428.1, CRRFF 5428.2); and that even for means plus function claims, actual

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 100
USITC Inv. No. 337-TA-454

software source code need not be disclosed in order to meet the definiteness
requirement. Complainants further argued that there was no testimony by any of
respondents' experts, or anyone else, that they did not understand the scope of the
claimed inventions (CRRFF 5428.4) and that not only was complainants' expert
witness, Faillace, able to construe the claimed limitations and apply them to the
accused products, but respondents' expert witness, Rhyne, was able to do the same.
(CRPost at 347-49).

    The administrative law judge finds that respondents have not met their burden of
proving that the claims in issue are indefinite. Although the claims and
specifications do not recite the exact computer code needed to implement the claims,
such specificity is not required. The Federal Circuit in In re Dossel, 115 F.3d 942,
946 (1997), found the claims in issue to be sufficiently definite even though no
computer code was recited and the specific algorithms used were undisclosed. Thus it
stated:
    [n]either the written description nor the claims uses the magic word
"computer," nor do they quote computer code that may be used in the invention.
Nevertheless, when the written description is combined with claims 8 and 9, the
disclosure satisfies the requirements of § 112 ¶ 2. As the written description
discloses, the clauses in question claim a device that receives digital data words
from a memory and data input from a user. The device then computes, from the
received data, the current distribution by mathematical operations including a
matrix inversion or pseudo inversion, an then outputs the result to a display. While
the written description does not disclose exactly what mathematical algorithm will
be used to compute the end result, it does state that "known algorithms" can be used
to solve standard equations which are known in the art.
(Emphasis added).

    With respect to the claims at issue, the specifications of the '268 and '204
patents do contain descriptions of the software used in the respective inventions.
For instance, respondents' own expert witness, Rhyne, testified that:
    Q What structure have you identified as corresponding to the structure?
    A It's identified in Exhibit 4748.25, CPU, the memory, and including both the
video display generator 224 and the video switcher 226, as well as the software that
follows the flow charts of figures 8, 11, 18 and 19, to produce the screen shots of
figures 1 through 3, 5 and 6.
    Q Why have you included software?
    A This is a programmable element, that CPU. And when you have a programmable
element of this type, it's my practice to always include the software and then I
don't find that you have a well defined structure until you link the two together,
so that you not only know what general programmable device but you also know the
software that it's going to execute when it performs the function.
(Tr. at 3668 (Emphasis added); see also RX 4748.25). Rhyne's testimony that the flow
charts depicted in figures 8, 11, 18 and 19 describes the software used by the
inventions disclosed in the '268 and '204 patents, is mirrored by complainants'
expert witness, Faillace:
    Q Will you agree with me and shorten up this examination, that the
corresponding structure, the corresponding software which you found is not
explicitly described anywhere in the patent?
    A There's nowhere in the patent that says software does this, software does
that. But there are flow charts and there are descriptions.
    Q Is the software that you found to be corresponding to this means, is that
illustrated or described in the patent?
    A I think the wording of the claim element, the description in the patent,
excuse me, flow charts, are all descriptive of software.
    Q I'm - - is it your testimony that the flow charts in this patent depict the
operation of the software which you have found to be part of the structure for this
particular means?
    A They're descriptive of it, they don't depict it.
    Q And they're descriptive in that they describe the software that works here?
(Tr. at 2373-74 (Emphasis added)).

    Based on the foregoing, the administrative law judge finds that respondents have
not satisfied their burden of proving that claims 1 and 3 of the '268 patent, and

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 101
USITC Inv. No. 337-TA-454

claims 14, 15, 16, and 17 of the '204 patent are invalid under 35 U.S.C. § 112, ¶ 2 because of indefiniteness.

XIV. VALIDITY  (Enablement - '121 Patent)

    S-A argued that the claims that recite a "storage means" located "in a data processor" are invalid due to lack of enablement under 35 U.S.C. § 112. (S-A Post at 182-84). Hence, it was argued that complainants' expert witness, Faillace, admitted that the limited amount of storage available in the Little Board/186 microcomputer in 1985 would have been insufficient to store the various buffers that make up the claimed "storage means;" that the '121 patent does not disclose or teach any location for storage of schedule information except in the Little Board/186 microcomputer; and that, therefore, the '121 specification fails to enable one of ordinary skill in the art to make or use the claimed invention to store schedule information in a "storage means" located "in a data processor." Accordingly S-A argued that independent claims 18, 33, 36 and 66 and dependent claims 19, 20, 22, 24, 26, 27 and 31 are invalid for lack of an enabling disclosure.

    The staff argued that S-A had not established by clear and convincing evidence that a person of ordinary skill in the art would not be able to practice the claimed invention without undue experimentation and that each of the respondents' expert witnesses were able to testify as to their understanding of the claims and how the claimed invention worked. (SPost at 58- 59).

    Complainants agreed with S-A that, if "data processor" were construed to be just a "CPU," the claims in issue are in valid due to enabling disclosure.

    The administrative law judge has already found that the claims that recite a "storage means" located "in a data processor" if the term "data processor" was construed to mean a "CPU," are not invalid because of lack of enablement. See supra. Accordingly, the administrative law judge finds that S-A has not met its burden of proving invalidity of independent claims 18, 33, 36 and 66 and dependent claims 19, 20, 22, 24, 26, 27 and 31 because of lack of an enabling disclosure under 35 U.S.C. § 112.

XV. INEQUITABLE CONDUCT

    Respondents argued that Young and InSight (StarSight's predecessor) engaged in a pervasive pattern of inequitable conduct during the prosecution and re-examination of the '121 patent (1) by purposefully submitting false or misleading statements to the Examiner in a sworn declaration, upon which the Examiner relied to conclude that the '121 patent contained patentable subject matter, [FN88] and (2) by Young's withholding from the Examiner material information regarding Neil's contribution to the invention claimed in the '121 patent, which Young did with the intent to deceive. (S-A at 188). Respondents further argued that Young mischaracterized the VCR Plus + system in his declaration to the PTO. (EBr at 239). Finally, respondents argued that Young failed to disclose to the Examiner that "watch one/record another" functionality was known in the prior art. (EBr at 237).

    A patent is unenforceable on grounds of "inequitable conduct" if the patentee withheld material information from the PTO with intent to mislead or deceive the PTO into allowing the claims. LaBounty Manufacturing, Inc. v. U.S. Int'l. Trade Comm., 958 F.2d 1066, 1070, 1074 (Fed. Cir. 1992) (LaBounty). Both materiality and intent must be proven by clear and convincing evidence. LaBounty, 958 F.2d at 1070, 1074; Kingsdown Medical Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 872 (Fed. Cir. 1988), cert. denied, 490 U.S. 1067 (1989) (Kingsdown).

    According to PTO rule 1.56 (37 C.R.F. § 1.56(a)), the duty to disclose information:
        exists with respect to each pending claim until the claim is canceled or withdrawn from consideration, or the application becomes abandoned. Information material to the patentability of a claim that is canceled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application. There

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 102
USITC Inv. No. 337-TA-454

is no duty to submit information which is not material to the patentability of any
existing claim.

   Generally, when withheld information is highly material, a lower showing of
deceptive intent will be sufficient to establish inequitable conduct. American Hoist
& Derrick Co. v. Sowa & Sons. Inc., 725 F.2d 1350, 1363 (Fed. Cir.), cert. denied,
469 U.S. 821 (1984). Moreover, "[d]irect proof of wrongful intent is rarely
available but may be inferred from clear and convincing evidence of the surrounding
circumstances." LaBounty, 958 F.2d at 1076; Hewlett-Packard Co. v. Bausch & Lomb,
Inc. 746 F.Supp. 1413 (N.D. Col. 1990), aff'd, 925 F.2d 1480 (Fed. Cir.), cert.
denied, 111 S.Ct. 2854 (1991). The conduct at issue must be viewed in light of all
the evidence, including evidence of good faith. Kingsdown, 863 F.2d at 876. Any
"[i]nformation is material where there is a substantial likelihood that a reasonable
examiner would consider it important in deciding whether to allow the application to
issue as a patent." LaBounty, 958 F.2d at 1074.

   One who alleges inequitable conduct arising from a failure to disclose prior art
must offer clear and convincing proof of the "materiality of the prior art,
knowledge chargeable to the applicant of that prior art and of its materiality, and
the applicant's failure to disclose the prior art, coupled with an intent to mislead
the PTO." Molins PLC v. Texron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995).

   An intent to deceive "cannot be inferred solely from the fact that information was
not disclosed; there must be a factual basis for a finding of deceptive intent."
Upjohn Co. v. Mova Pharmaceutical Corp., 225 F.3d 1306, 1312 (Fed. Cir. 2000)
(quoting Herbert v. Lisle Corp., 99 F.3d 1109, 1116 (Fed. Cir. 1996); Multiform
Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1482 (Fed. Cir. 1998) ("[I]nference
without any probative evidence is insufficient to show culpable intent.").
Inequitable conduct requires proof of the applicant's actual knowledge:
   Telsmith seeks to overcome the fatal lack of evidence that the relevant Nordberg
employees knew of the Saunders patent's existence by contending that "Federal
Circuit precedent does not require proof of actual knowledge of the withheld prior
art, but only ... proof that the applicant or its representatives 'should have known
of the art or information,"' citing our decisions in Molins PLC, 48 F.3d at 1178, 33
U.S.P.Q.2d at 1826, and FMC Corp. v. Manitowoc Co., 835 F.2d 1411, 1415, 5
U.S.P.Q.2d 1112, 1116 (Fed. Cir. 1987). We long ago rejected this contention
[citation omitted], and neither FMC Corp. nor Molins PLC held to the contrary ....
Telsmith's contention that the 'failure of disclosure' form of inequitable conduct
can be shown with proof that the applicant did not but should have known of a
reference's existence runs counter to American Hoist [Derrick Co. v. Sowa & Sons,
Inc., 725 F.2d 1350, 1362 (Fed. Cir. 1984)] and subsequent cases and must therefore
be rejected. As we held in American Hoist, the applicant's actual knowledge of the
reference's existence must be proved.
(Emphasis added); See also Nordberg, Inc. v. Telsmith, Inc., 82 F.3d 394, 397 (Fed.
Cir. 1996), (citing American Hoist) ("Nor does an applicant for patent, who has no
duty to conduct a prior art search, have an obligation to disclose any art of which,
is the [district] court's words, he 'reasonably should be aware."')).

   Contrary to respondents' arguments, Young in his declaration to the Examiner never
represented that the '121 invention was the world's first "point-and-select" system
for simplifying VCR programming. (RX-3008 at 133-87). Young did compare the '121
invention to VCR Plus +, a system that allows a consumer to key in a code which then
causes the VCR to automatically record a selected program. (RX-3008 at 135-36). In
comparing the systems, Young declared that "[t]he advantages of the InSight Telecast
product ... includ[e] the ability to select the program from a listing which could
be arranged by time, channel or theme." (RX-3008 at 135-36). Hence, Young did not
try to distinguish the '121 invention merely on its "point and select" capability,
but on that capability coupled with the capability of arranging listings by time,
channel or theme. Young continued his description of the invention of the '121
patent:
   In one embodiment of this invention, programming a VCR has been simplified to a
point-and- select method of operation. By merely selecting the title from a readily
available "on-line" television schedule the VCR can be programmed. Listings can be
stored by both cable source and cable channel number, so that cable channel

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 103
USITC Inv. No. 337-TA-454

conversion is automatic. There is no need for the user to convert cable source
listings to cable channel numbers. Furthermore, the broadcast schedule listings are
always specific to the particular cable network. Also, a program selected for
recording can be verified by displaying its title, and not merely time and channel
abstractions.
(RX-3008 at 137). Accordingly, although one feature of the embodiment that Young was
referring to had the "point-and-select" feature, it also had in combination with
this feature, the ability to store listings by both the channel number or cable
source and the ability to allow an user to verify a program selected for recording,
by title, as well as the time and channel.

   Young further represented that "the present invention allows the realization of a
point-and-select on-line guide." (RX-3008 at 137). However, this statement is found
in the concluding sentence of a paragraph. In the portion of the paragraph
immediately preceding this sentence, Young described how the invention of the '121
patent would realize "a point-and-select on-line guide":
      The need for an effective "on-line" TV guide" is also well know, due to the
shortcomings of printed TV guides. See Exhibit M. With a plethora of cable-TV
services, viewers are confused with which channels corresponds to which cable
system. For example, in the San Francisco Bay Area the consumer must chose between
approximately 14,8000 weekly television programs in their program guide. The present
invention allows the display of program listings by cable service name, such as HBO,
and automatically tunes the television apparatus or VCR to the correct cable channel
when that listing is selection. Also, cable channel information corresponding to the
local cable system is transmitted to the schedule system.
(RX-3008 at 137).

   Young also declared that:
      The Insight Telecast product will provide easy programming by means of an
intuitive point-and-select method that will be available at a comparatively low
price. Also, the Insight product will reprogram the VCR for any schedule changes of
the selected program. Also, the on-screen schedule will provide accurate and
accessible schedule information for the particular cable or network broadcasting
region.
(RX-3008 at 139).

   Thus, the invention's point and select functionality is only referred to in
connection with other features, viz., the ability to reprogram the VCR in the event
of any schedule changes of the selected programs and an on-screen schedule that will
provide accurate and accessible schedule information for the particular cable or
network broadcasting region.

   Accordingly, the administrative law judge finds nowhere in the declaration that
Young states that the '121 invention was the first to implement the "point-and-
select" method of program selection. Rather it is found, he merely declared that the
"point and select" functionality was one of a number of features contained in the
invention.

   The administrative law judge also finds that Young, in fact, had not improperly
failed to disclose the prior art "point-and-select" systems at issue to the
Examiner. Respondents argued that Young had failed in his declaration to disclose to
the Examiner the existence the guide invented by Kruger and used in the West German
VPS and VPV systems (S-A at 194) and the Cable Data system. However, there is no
evidence that Young knew or should have known that the Cable Data system was a point
and select system. To show Young's knowledge of the point and select features of the
Cable Data system, respondents relied on a February 16, 2000 letter from Michael
Faber, the then CEO of Insight, to Allen Krass (RX-3645), in which Faber wrote:
      [Young] also found an interactive home system for cable viewers. A company
called Cable Data delivered TV schedules to subscribers with local storage devices
for program selection. This system was launched and heavily advertised in 1980 and
1981 until it was ended, we think, in 1985 (attachment 5).
(RX-3645 at GITC-FA-0043558). Attachment 5 consists of photocopies of two one-page
advertisements for the Cable Data systems, both of which include pictures of a
television screen as well as text. However, the quality of the photocopies are poor,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and as a result the writing in the pictures of the screens is illegible. Nothing in
the advertisements, either in the pictures or in the text, or the letter itself
reveals that Young knew or should have known that the Cable Data system had a point
and select functionality. Attachment 5 also has a photocopy of the table of contents
of "Inside Cablevision." The administrative law judge finds nothing on this page to
indicate that the Cable Data system had a point and select functionality. Moreover,
Young made repeated attempts to get more information from Cable Data concerning
their system, but was rebuffed. (JX-60 at 588, 728). The only information that Young
was able to collect on the Cable Data system were copies of the advertisements
reproduced in Attachment A to RX-3645, which the administrative law judge finds did
not suggest to Young that the Cable Data system had a point and select
functionality. (JX-60 at 561). Accordingly, the administrative law judge finds that
Young did not know, and had no reason to know, of Cable Data system's point and
select functionality, if any, and therefore did not act with the intent to mislead
the Examiner in failing to bring the Cable Data system to the Examiner's attention
during re-examination.

    With respect to the Kruger guide and the West German VPS and VPV systems, the
administrative law judge finds that Young did in fact provide those references to
the Examiner. In his August 13, 1992 amendment, Young addressed the VPV system under
"Newly Cited Art" and, in a September 4, 1992 Information Disclosure Statement,
provided the examiner with a translated copy of the reference. (RX-3008 at 215-16,
239-50 ("Videotext Programmiert Videorecorder")). With respect to the Kruger
reference, the Examiner already knew of the Kruger patent prior to Young's
declaration. (See, e.g., 279-81 (Examiner citing Kruger as a basis for rejecting
certain claims); RX-3008 at 29 (Kruger in Request for Reexamination); RX-3008 at 102
(Kruger cited in Order Granting Reexamination); RX-3008 at 121 (Kruger cited in
Office Action in Reexamination)).

    Based on the foregoing, the administrative law judge finds that Young did not make
statements in his declaration with the intent to deceive or mislead the Examiner.

    With respect to respondents' inequitable conduct arguments as they relate to the
Zenith agreement and the failure to name Neal as a co-inventor, the administrative
law judge finds that they have been abandoned in accordance with ground rule 9(e),
which states:
    A statement of the issues to be considered at the hearing that sets forth with
particularity a party's contentions on each of the proposed issues, including
citations to legal authorities in support thereof. Any contentions not set forth in
detail as required herein shall be deemed abandoned, or withdrawn, except for
contentions of which a party is not aware and could not be aware in the exercise of
reasonable diligence at the time of filing the pre-hearing statements.
(Emphasis in original).

    None of the respondents set forth the Zenith agreement or the failure to name Neal
as co-inventor as possible bases for inequitable conduct in its pre-hearing brief
(See PPre at 96; EPre at 150-56; S-A Pre at 93-101). Moreover no respondent has
attempted to show that it was "not aware and could not have been aware in the
exercise of reasonable diligence at the time of filing the prehearing statements"
that the Zenith agreement or the failure to name Neal as a co-inventor could be
bases for inequitable conduct. Accordingly, the administrative law judge finds that
respondents have abandoned or withdrawn any contentions regarding to the Zenith
agreement and the failure to name Neal as a co-inventor as they relate to
inequitable conduct.

    The administrative law judge also rejects respondents' inequitable conduct
arguments which are based on the allegation that Young "failed to disclose to the
PTO that the VCR Plus+ system embodied claims of the '121 patent." (EBr at 239).
Respondents' arguments are based on two letters of August and September, 1990 sent
by the patent council of InSight to Gemstar alleging that the VCR Plus+ system
infringed the '121 patent. (RX-1612; RX-3591; RX-3625; RX-3636; RX-3641; CX-3375;
CX-3401; CX-891, ¶ ¶ 20-32). Gemstar disputed this assertion, and, eventually,
InSight abandoned its earlier claim that VCR Plus+ infringed the '121 patent, as is
shown by InSight's failure to continue to assert its original infringement opinion

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 105
USITC Inv. No. 337-TA-454

and its failure to seek redress through litigation. (Id.). An infringement opinion
abandoned two years prior to Young's declaration is not material, especially in
light of the fact that the Examiner knew of the actual VCR Plus + system. The
administrative law judge finds no reason in the record for believing that Young or
anyone at Insight believed that the abandoned opinion of Young and Insight about VCR
Plus+ was material.

   The administrative law judge also rejects respondents' argument that complainant
committed inequitable conduct by failing to disclose that "watch one/record another"
functionality was known in the prior art. Respondents have provided no evidence to
show InSight or Young knew of such prior art and had intended to deceive the
Examiner. [FN89] See 12/11/00 op., supra, at 21-23.

XVI. DOMESTIC INDUSTRY ('121, '268 and '204 Patents)

   Complainants bear the burden of demonstrating the existence of an industry in the
United States that practices the patents-at-issue and meets the requirements of
section 337(a)(3). Certain Microsphere Adhesives, Process for making Same, and
Products Containing Same, Including Self-Stick Repositionable Notes, Inv. No. 337-
TA-366, USITC Pub 2049, Comm'n Op. at 8 (January 1996); Certain Plastic Encapsulated
Integrated Circuits, Inv. No. 337-TA-315, USITC Pub. 2574.

   In proving the existence of a domestic industry under subparts (A) and (B) of 19
U.S.C. § 1337(a)(3) a complainant must establish that its activities in the United
States meet the threshold set forth in the statute (economic prong) and that those
activities are devoted to a product or process which is covered by the patent(s) in
issue (technical prong) In re Certain Removable Elec. Cards and Elec. Card Reader
Devices and Prods. Containing Same, Inv. No. 337-TA-396, 1998 WL 479084, Comm'n Op.
(Aug. 13, 1998). Specifically, complainants must establish that an industry in the
United States, relating to the articles protected by the patents in issue, exists or
is in the process of being established. The definition of domestic industry, as set
forth in subsection 337(a)(3), states that "for purposes of subparagraph (2), an
industry in the United States, with respect to the articles protected by the patent
concerned:
    significant investment in plant and equipment;
    significant employment of labor or capital; or
    substantial investment in its exploitation, including engineering, research and
development, or licensing."
The domestic industry requirement is satisfied by meeting the criteria of any one of
these three factors. Certain Concealed Cabinet Hinges and Mounting Plates, Inv. No.
337-TA-289, Comm'n Op. at 1920 (1990). Complainants bear the burden of establishing
that the domestic industry requirement is satisfied. Id. at 22.

   The technical prong of the domestic industry requirement requires complainants to
demonstrate that they practice the patents at issue.

   Although there must be a domestic industry with respect to each asserted patent,
there is no requirement that those claims asserted against respondents must
correspond with those practiced by the domestic industry. Certain Microsphere
Adhesives, Process for Making Same and Products Containing Same Including Self-Stick
Repositionable Notes, Inv. No. 337-TA-366, USITC Pub. 2949 (1996). Thus,
complainants need only show that their products meet one claim of every patent at
issue. Certain Lens Fitted Film Packages, Inv. No. 337-TA-406, Final Initial
Determination at 203 (Feb. 24, 1999), reviewed-in-part on other grounds (April 9,
1999); Certain Toothbrushes and Packages Thereof, Inv. No. 337-TA-391, Order 8,
Initial Determination (July 7, 1997), Commission's Determination Not to Review
(August 6, 1997).

   To satisfy the economic prong of the domestic industry requirement, complainants
must show that "specified activities in the United States exist with respect to the
articles identified by the technical prong." In re EPROM, EEPROM, Flash Memory, And
Flash Microcontroller Semiconductor Devices and Prods. Containing Same, Inv. No.
337-TA-395, 1998 WL 223194, Initial Determination (March 19, 1998).

                  ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A. Economic Prong

   Complainants argued that they have satisfied the economic prong of domestic
industry because (1) they have made a substantial investment in the exploitation of
their IPG patents, including the patents in issue, through licensing, (2) they have
made a substantial investment in the exploitation of their IPG patents through
research and development, including research and development of IPG products and
services that practice the IPG patents at issue and (3) complainants have made other
forms of substantial investments in the exploitation of their patented IPG
technology. {* * *} {* * *}However the staff, in its reply brief, argued that while
complainants have established that they have made investments in research and
development activities devoted to certain of their products, it has not been
established that those products practice the patents in issue, those investments
should not be considered part of a "domestic industry" for purposes of section 337.
The staff also argued that, with respect to complainants' licensing activities,
complainants have a very large patent portfolio, making it "nearly impossible" to
determine whether any of the licensing activities can be said to be devoted to the
exploitation of the '121, '268 and '204 patents. The staff concluded, under those
circumstances, that complainants have not established the existence of a licensing
industry with respect to the three patents in issue. Thus, the staff's position in
its reply brief is that complainants have not satisfied the economic prong of the
domestic industry requirement. (SRPost at 34).

   Respondents and the staff contend that the record is insufficient to establish the
economic prong of a domestic industry for complainants' IPG technology, products and
services related to the patents-in-issue. However respondents and the staff
simultaneously argued, when alleging that complainants have misused the patents-in-
issue, that the very same record compels the conclusion that complainants have
misused the patents-in-issue in their licensing program. The administrative law
judge finds that respondents and the staff in alleging misuse have implicitly
acknowledged that complainants licensing activities are attributable to
complainants' exploitation of the ' 121, '268 and '204 patents. Therefore,
complainants in order to satisfy the economic prong for the domestic industry
requirement need only prove that they have made at least substantial investment in
exploitation of the patents in issue, including licensing. The administrative law
judge finds that complainants have met that burden. Thus complainants license their
IPGs, including the patents at issue. For example see Yuen Tr. at 2464-66, CX-0138,
CX-0057, CX-1244, CX-0098, CX-0126, CX-0177, CX-0195. Moreover there is testimony
from Craig Waggy, the senior vice-president and chief financial officer of TV Guide,
which testimony is found credible, that complainants from April 1996 through June
2001, incurred substantial expense associated with their licensing program. (Tr. at
702, CX-1324).

B. Technical Prong ('121 Patent)

   Complainants argued that their Nova Guide practices claims 18, 19, 20, 21, 22, 23,
26, 27, 28, 32, 33, 36 and 66 of the '121 patent; that their Guide Plus practices
claims 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 31, 33, 36 and 66 of the '121; and
that their CESA guide practices claim 18 and 66 of the '121 patent. Accordingly, it
was argued that they satisfied the technical prong of the domestic industry
requirement. Respondents and the staff argued, inter alia, that complainants only
introduced evidence that the products that they were relying on to satisfy the
technical prong practiced the '121 patent under complainants' proposed claim
constructions, and failed to provide any evidence that the products in question
practiced the '121 patent under the respondents' and the staff's proposed
constructions.

   In their rebuttal brief complainants responded to respondents' and the staff's
arguments accordingly:
   Finally, Respondents complain that Complainants have not demonstrated that their
domestic industry products practice the patents-at-issue under Respondents' proposed
claim constructions. This is true, but ignores the equally salient fact that
Respondents have failed to introduce any evidence to rebut the fact that, under
Complainants' claim construction, the products do practice each of the claims-at-

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 107
USITC Inv. No. 337-TA-454

issue. (CRRF 5529.1 - CRRFF 5529.11). Therefore, if the Court adopts Complainants'
construction for even one claim of each patent, Complainants will have satisfied
their burden of demonstrating that they meet the technical prong of the domestic
industry requirement with respect to that patent. See Certain Lens Fitted Film
Packages, Inv. No. 337-TA-406, Final Initial Determination at 203 (Feb. 24, 1999),
reviewed-in-part on other grounds (April 9, 1999) (Complainants need only show that
their products meet one of each patent at issue).
(CRBr at 263)(Emphasis in original omitted; emphasis added). Hence complainants have
admitted that they have not shown that the products that they relied upon to satisfy
the domestic industry requirement meet the claim constructions respondents and the
staff proposed. With respect to independent claim 18, dependent claims 19-24, 26-28
and 31 and independent claim 36, the administrative law judge rejected complainants'
proposed constructions and found, consistent with respondents' and the staff's
proposed constructions: that "data processor" is a CPU; that "storage means"
consists of at least the program list, the screen, the prime time, the channel and
the theme buffers; that incoming schedule information had to be stored in the CPU
itself; that the data processor must be capable of logical "OR" and logical "AND"
combining; and that the schedule information that was to be stored for each selected
program included the program's title. See supra. The administrative law judge finds
that there is no evidence that complainants' products in question satisfy the proper
construction of claims 18, 19, 20-21, 22, 23, 24, 26, 27, 28, 31 and 36.
Accordingly, the administrative law judge finds that complainants have not met their
burden of proof regarding said claims of the '121 patent.

    With respect to claim 32, the administrative law judge rejected complainants'
proposed claim constructions to find, consistent with respondents' and the staff's
proposed constructions, that: "data processor" is a CPU and that incoming schedule
information had to be stored in the CPU itself. See supra. The administrative law
judge finds that there is no evidence that complainants' products in question
satisfy the proper construction of claim 32. Accordingly the administrative law
judge finds that complainants have not met their burden of proof regarding claim 32
of the ' 121 patent claim.

    With respect to claim 33, the administrative law judge rejected complainants'
proposed constructions to find, consistent with respondents' and the staff's
proposed constructions, that: "data processor" is a CPU; "storage means" consists of
at least the program list, the screen, the prime time, the channel and the theme
buffers; that incoming schedule information had to be stored in the CPU itself; the
data processor must be capable of logical "OR" and logical "AND" combining; and
"turning on" a VCR means that the system must cause the VCR to power on. See supra.
The administrative law judge finds that there is no evidence that complainants'
products in question satisfy the proper construction of claim 33. Accordingly, the
administrative law judge finds that complainants have not met their burden of proof
regarding claim 33 of the ' 121 patent.

    With respect to claim 66, the administrative law judge rejected complainants'
proposed constructions to find, consistent with respondents' and the staff's
proposed constructions, that: "data processor" is a CPU; "storage means" consists of
at least the program list, the screen, the prime time, the channel and the theme
buffers; that incoming schedule information has to be stored in the CPU itself; and
the data processor must be capable of logical "OR" and logical "AND" combining. See
supra. The administrative law judge finds that there is no evidence that
complainants' products in question satisfy the proper construction of claim 66.
Accordingly, the administrative law judge finds that complainants have not met their
burden of proof regarding claim 66 of the ' 121 patent.

C. The Technical Prong ('268 Patent)

  {* * *} {* * *} {* * *}

D. The Technical Prong ('204 patent)

  {* * *}

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

XVII. REMEDY

   The Commission has broad discretion in selecting the form, scope, and extent of
the remedy in section 337 proceedings. Integrated Circuit Telecommunication Chips,
Inv. No. 337-TA-337, Comm'n Op. (August 3, 1993), citing Viscofan, S.A. v. U.S.
Int'l Trade Comm'n, 787 F.2s 544, 548 (Fed. Cir. 1986). An exclusion order can
exclude from importation goods and products that directly or contributorily infringe
the patented technology. In the Matter of Certain Hardware Logic Emulation Systems &
Compnents Thereof, Inv. No. 337-TA-383, USITC Pub. 3089, Comm'n Op. at 27 (March
1998) (Hardware Logic). Direct infringement does not have to precede importation for
an exclusion order to reach components that contribute to the infringement of the
patents-in-issue. Hardware Logic, Comm'n Op. at 19-20. In Certain Personal Computers
& Components Thereof, Inv. No. 337-TA-140, USITC Pub. No. 1504, 1984 ITC LEXIS 218*
at *5 (March 1984), the Commission excluded from entry into the United States
personal computers and components thereof "which are less than complete when
imported but [which] are designed and intended to be employed by their owner,
importer, consignee or agent of either to make a personal computer which directly
infringes any of the [patents-in-suit]." The Commission also has the authority to
issue cease and desist orders where a respondent has a sufficient inventory of
infringing goods in the United States. See Certain Crystalline Cefadroxil
Monhydrate, Inv. No. 337-TA-293, Comm'n Op. on Remedy, the Public Interest and
Bonding at 37-42 (March 15, 1990); Certain Plastic Encapsulated Integrated Circuits,
Inv. No. 337-TA-315, USITC Pub. 2574, Comm'n Op. at 37 (November 1992). A
"sufficient inventory" may consist of one infringing product. See e.g., Hardware
Logic, Comm'n Op. at 26.

   A cease and desist order can issue in lieu of or in addition to an exclusion order
to prevent the sale, distribution, or other use of infringing imported products in
the United States. The scope of section 337 is broad enough to prevent every type
and form of unfair practice, including the transmission of infringing software by
electronic means, electronic transmission of software and/or data that induces an
infringing use of an imported product, and the servicing of imported products that
induce infringement. Hardware Logic, Comm'n Op. at 25-29; Certain Digital Satellite
Systems Receivers, Inv. No. 337-TA-392, USITC Pub. 3418, Initial Determination at
239-44 (Oct. 1997), Order No. 53 at 7-11 (June 9, 1997).

   Complainants argued that if the Commission determines that a section 337 violation
has occurred, it "shall direct that the articles concerned ... be excluded from
entry into the United States," unless public interest facts specified within the
statue are considered to counsel against it. 19 U.S.C. § 1337(d) and that the
evidentiary record and applicable law make it clear that the administrative law
judge should recommend the issuance of a limited exclusion order which excludes:
   importation of set-top boxes into which infringing software is installed after
importation;
   importation of set-top box components which are incorporated into set-top boxes
domestically, and into which infringing IPG software is installed;
   importation of new infringing IPG software, including updates, upgrades, and bug
fixes; and
   satellite transmissions of infringing IPG software and/or program schedule data
as an "importation." (CPost at 414-415).

   Referring to EchoStar, complainants argued that an effective limited exclusion
order must cover not only EchoStar's products and components, but also the satellite
transmission imported to the set-top boxes in order to download the IPG; that
EchoStar's accused products are the 2700, 2800, 3750, 3900, 4900, 6000, DP301
(versions D and E), DP 302, DP301, and DP501; that EchoStar admitted that the
motherboards for its set-top boxes currently are made on its behalf by SCI in{* *
*}and that its set-top boxes and/or motherboards are or have been manufactured by{*
* *}and by{* * *}that EchoStar further acknowledged that those set-top boxes and
motherboards are imported by it or on its behalf by SCI and{* * *}It was argued that
the record demonstrates that EchoStar's set-top boxes, at the time they leave the
manufacturer, { * * *}Complainants argued that EchoStar acknowledged that it
downloads the production software, the IPG, via its satellites and that program data
also is similarly downloaded. Hence complainants argued that the exclusion order

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should prohibit the importation of set-top boxes and/or components, including
motherboards, that enable the later downloading of IPG and program data from
satellites, as well as the actual satellite transmission of IPG and program data to
all existing EchoStar set-top boxes in the field that are capable of receiving such
transmissions. (CPost at 417-418).

  For the Pioneer set-top boxes, complainants argued that an effective exclusion
order must cover importation of all of the Pioneer Voyager set-top boxes, and the
transmission of cable signals that permit downloading and/or upgrading of IPG and/or
program data; that Pioneer's accused set-top boxes are the BD-V 1000 series and BD-V
3000 series, also known by the product name "Voyager;" that Pioneer admitted that it
currently manufactures those Voyager set-top boxes in Malaysia, and that it
previously manufactured them in Japan as well; that Pioneer further admitted that it
imports the accused Voyager set-top boxes; that the accused Voyager set-top boxes as
imported are equipped with hardware and contain certain third-party operating
software, which enables the later downloading, and updating of IPG schedule data by
the cable system operators; and that Pioneer supplies this entire software package,
known as Passport, to the cable system operators, permitting them to conduct the
appropriate downloading of the infringing Pioneer IPG. (CPost at 419).

  Complainants argued, with regard to S-A, that an effective exclusion order must
include S-A's set-top boxes as well as the transmission of cable signals that permit
downloading and/or upgrading of IPG and/or program data; that S-A's infringing
products are the Explorer 2000, 3000, 2100, and 3100; that all of S-A's Explorer
set-top boxes are made in Mexico; that the Explorer set-top boxes run either S-A's
SARA software or Pioneer's Passport software, both of which include the infringing
IPGs; that at the time of importation the set-top boxes contain{* * *}that S-A is
unaware of any end user who has actually employed an Explorer set-top box with SARA
software but without the SARA IPG software at the time S-A's set-top boxes are
imported; {* * *} {* * *}and that the record shows that S-A imports the infringing
set-top boxes with the intent that the S-A or Pioneer IPG software be loaded onto
the set-top box by the cable operator. (CPost at 419-421).

  EchoStar argued that any exclusion order should not bar electronic transmissions
of software. It was argued that in Hardware Logic, Comm'n Op. at 1 n.3, the focus of
the infringement case was on software that allegedly contributed to infringement
when employed in certain external systems, and that because Customs does not
regulate electronic transmissions, the Commission declined to adopt a recommendation
of the administrative law judge that an exclusion order (as distinct from a cease
and desist order) prohibit the electronic transmission of the software found to
infringe Hardware Logic, Comm'n Op. at 20. It was further argued that the rationale
of Hardware Logic applies with even greater force in this investigation; that the
provision of section 337 pertaining to exclusion orders provides for exclusion of
articles from entry into the United States; that unlike the electronic transmissions
in Hardware Logic, there is no "entry into the United States" because the software
and schedule data at issue never leaves the United States; that the software and
schedule data is transmitted to the accused products from an uplink center located
in the United States which transmits to satellites for ultimate transmission to
users; that like the uplink center, these users are in the United States; and that
while it is true that the satellites themselves are located in outer space, Gemstar
has not shown the satellites to be outside U.S. jurisdiction. (EPost at 418).

  It was also argued by EchoStar that any exclusion order should be written so as to
avoid ensnaring non-infringing products. EchoStar argued that the DP302{* * *}and
the accused 2700, 2800, 3900 and 4900 products all {  * * *}and that any recommended
determination on remedy should, therefore, specifically identify each product found
not to infringe and all components found to have substantial non-infringing uses,
and should indicate that these are not subject to any exclusion order, or in the
alternative, the order should require certification that a particular imported
product is not intended for infringing use, citing In the Matter of Certain
Condensers, Parts Thereof & Prods. Containing Same, Including Air Conditioners for
Automobiles, Inv. No. 337-TA-334 (Remand), USITC Pub. 3063, Comm'n Op., at 39 (Sept.
10, 1997). (EPost at 419).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 110
 USITC Inv. No. 337-TA-454

EchoStar further argued that any exclusion order should exempt the importation of replacement parts because there is no evidence that any hardware component contributes to or induces infringement and/or that third party purchasers of the original units knew or should have known that the devices were likely to infringe. (EPost at 420).

Pioneer also argued that any limited exclusion order should be directed only to specific models of set-top boxes imported by Pioneer and specific versions of Passport that are found to infringe the patents in issue because it can not be reasonably inferred that subsequent models are likely to infringe the patents-in-issue. Pioneer further argued that any exclusionary remedy should include proper procedures. e.g., a certification provision, to prevent products not destined for infringing use from being inadventently excluded. (PPost at 319, 329).

Complainants requested that the administrative law judge recommend issuance of a cease and desist order to enjoin each of Pioneer, S-A and EchoStar the distribution of:
    infringing IPG software for newly imported set-top boxes;
    infringing IPG software updates, upgrades, and bug fixes for set-top boxes already deployed;
    program schedule data for newly imported set-top boxes that contain or will contain infringing IPG software;
    program schedule data for already deployed set-top boxes that contain infringing IPG software;
    satellite transmissions of infringing IPG software and/or program schedule data; IPG software and/or program schedule data under respondents' control through its contractual and technical relationships with third parties, by whatever means necessary to effectively enjoin such distribution; and
    inventories of set-top boxes that contain or will contain infringing software in United States warehouses.

{* * *}and that Pioneer also should be precluded from downloading, or permitting or facilitating others to download, at any time, infringing IPG software to Pioneer set-top boxes. Hardware Logic, Comm'n Op. at 25-29.

{* * *} {* * *}that, at the time of importation, the set-top boxes contain {  * * *}that S-A is inducing customers to infringe by providing a set-top box specifically designed to use the infringing SARA or Passport IPG software and by providing instructions for customers to install and use the infringing software; and that thus S-A should be prohibited from downloading, or permitting or facilitating others to download, SARA software containing the infringing IPG, or Passport software containing the infringing Pioneer IPG, citing Hardware Logic, Comm'n Op. at 25-29.

{* * *}
S-A argued that should the Commission find that complainants are entitled to relief, the appropriate form of the relief against S-A should be no more than a cease and desist order directed to S-A's IPG, specially tailored to the type of infringement found, viz., induced infringement, contributory infringement or direct infringement. It was further argued that because of the rapid advances in IPG technology, any cease and desist order should be limited to features incorporated in the IPG software that are specifically found to infringe the patents at issue; that when fashioning an appropriate remedy, the Commission must consider the high likelihood of change in future generations of the accused products; and that as the Commission has noted:
    We do not believe that infringement of the patents in controversy by future imports, particularly future generation DRAM imports, can be inferred from the determination of infringement in this investigation. DRAM technology changes and evolved rapidly even within one generation. DRAM technology changes and evolved rapidly even within one generation. The likelihood of change in a future generation, such that TI's patents in controversy are not infringed, is high.
Certain Dynamic Random Access Memories, Components Thereof and Products Containing Same, Inv. No. 337-TA-242, USITC Pub. 2034, Commission Opinion on Violation, Remedy, Bonding, and Public Interest at 88 (November 1987). (S-A Post at 295-296).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

    Pioneer argued that the appropriate remedy should be only a cease and desist order preventing Pioneer from engaging in acts that allegedly induce infringement of the patents, specifically the use of promotional literature that shows its set-top boxes operating infringing guides. It was argued that complainants failed to meet their burden of proving that Pioneer has commercially significant inventory in the United States and hence a cease and desist order concerning existing U.S. inventory is not warranted.

    The staff argued that should a violation of section 337 be found, the appropriate remedy would be a limited exclusion order directed to the infringing set-top box(es), as well as a cease and desist order directed to the domestic respondent(s) ordering the subject party to cease the distribution of set-top boxes containing infringing IPG software. (SPost at 95).

    The administrative law judge has found that there has been importation by each of the respondents of the accused set-top boxes. However, he has found no violation of section 337 by said respondents and hence he is not recommending any remedy based on his finding of no violation. Should the Commission find a violation however, it is recommended that a limited exclusion order issue which prohibits entry of set-top boxes of each of the respondents and their affiliates which the Commission determines infringe any of the claims in issue of the asserted patents.

    The administrative law judge rejects the respondents' argument that any exclusion order should be directed only to specific models of set-top boxes. The Commission's long-standing practice is to direct its remedial orders to all products covered by the patent claims as to which a violation has been found, rather than limiting its orders to only those specific models selected for the infringement analysis. See, e.g., Certain Curable Fluoroelastomer Compositions And Precusrsors Thereof, Inv. No. 337-TA-364, Order at 2 (March 16, 995); Certain Neodymium-Iron-Borom Magnets, Magnet Alloys, And Articles Containing Same, Inv. No. 337-TA-372, Order at 2, (March 29, 1996); Certain Variable Speed Wind Turbines And Components Thereof, Inv. No. 337-TA-376, Order at 3 (August 30, 1996); Certain Toothbrushes And The Packaging Thereof, Inv. No. 337-TA-391, Limited Exclusion Order at 1-2 (Octover 15, 1997). While individual models may be evaluated to determine importation and infringement, the Commission's jurisdiction extends to all models of infringing products that are imported at the time of the Commission's determination and to all such products that will be imported during the life of the remedial orders. The central purpose of remedial orders is to ensure complete relief to the domestic industry. An exclusion order covering only specific models of an accused device could easily be circumvented, thereby denying complete relief to the domestic industry.

    The administrative law judge also rejects complainants' argument that any limited exclusion order should include satellite transmissions of infringing IPG software and/or program schedule date as on importation. In Hardware Logic the Commission did not adopt this administrative law judge's recommendation that the exclusion order prohibit the electronic transmission of respondents' software. Hardware Logic Comm'n Op at 1, n. 3. The administrative law judge has not found that the arguments of complainants warrant the exclusion of satellite transmissions of infringing IPG software and/or program schedule data in light of the Commission's holding in Hardware Logic.

    Should the Commission find a violation, the administrative law judge also recommends a cease and desist order enjoining each of the respondents from the distribution of set-top boxes that contain or will contain infringing software in United States warehouses. The Commission traditionally has issued cease and desist orders when "commercially significant" inventories of infringing goods are present in the United States See, e.g., Certain Condensers, Parts Thereof and Products Containing Same, Including Air Conditioners for Automobiles, Inv. No. 337-TA-334, Commission Opinion at 26-28 (August 1997); Certain Crystalline Cefadroxil Monohydrate, Inv. No. 337-TA-293 (March 1990); Certain Nonwoven Gas Filter Elements, Inv. No. 337-TA-275, USITC Pub. 2129 (September 1988); Certain Compound Action Metal Cutting Snips, Inv. No. 337-TA-197, USITC Pub. 1831 (March 1986). The administrative law judge finds the existence of commercially significant inventories for each of EchoStar and SA (FF 198 to 200, 204 to 208). He does not find commercially

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                           Page 112
USITC Inv. No. 337-TA-454

significant inventories for Pioneer. See FF 201-203. In addition as the Commission
did in Hardware Logic in adopting this administrative law judge's recommendation,
the administrative law judge recommends that any cease and desist order should
prohibit the electronic transmission of respondents' software which is found to
infringe the asserted claims in issue. As the Commission stated in Hardware Logic,
Comm'n Opin. at 28, it is will settled that the scope of section 337 is "broad
enough to prevent every-type and form of unfair practice." See also Certain Welded
Stainless Steel Pipe and Tube, Inv. No. 337-TA-29, USITC Pub. 863, Opinion of
Commissioners Minchew, Moore and Alberger at 39 (1978), quoting S. Rep. 595, 67th
Cong., 2d Sess., at 3; Certain Devices for Connecting Computers via Telephone Lines,
Inv. 337-TA-360, Comm'n Op. at 13-14 (December 12, 1994) ("the legislative history
does make clear ... the broad scope permitted for section 337 remedial orders.").

## XVIII. BOND

    Section 337 provides that the bond during the Presidential review period should be
set at an amount "sufficient to protect the Complainant from any injury ...." 19
U.S.C. § 1337(j)(3) (emphasis added). The Commission has set bonds as high as 460%
of entered value. See In re Reclosable Plastic Bags and Tubing, ITC Inv. No. 337-TA-
266 (1987). Complainants argued that the administrative law judge should recommend a
bond at 100% of either the entered value of the infringing set-top-boxes and/or
components thereof, or respondents' 2001 offering price for the infringing set-top
boxes and/or components thereof, whichever is higher. [FN90] It is argued that this
bond is necessary to preclude respondents from under pricing and dumping their
inventory during the bonding period. (CPost at 425).

    EchoStar argued that complainants do not produce a product for sale and therefore
product pricing is not a basis for a bond. Hence it was argued that if a bond is
appropriate, it should be based on a royalty rate appropriate to the patents and
industry, citing In the Matter of Certain Acid-Washed Denim Garments & Accessories,
Inv. No. 337-TA-324, USITC Pub. 2576, Comm'n Op., at 8 (Nov. 1992); {* * *}

    S-A argued that the lack of comparative pricing information, which would cause a
bond of 100 percent of the entered value, results from the nature of complainants'
business "built entirely around the licensing of its patent portfolio," that it is
well established that in patent-based cases the Commission may base the bond on a
reasonable royalty rate, particularly when accurate comparative pricing information
is unavailable; {* * *}

    Pioneer argued that because complainants do not manufacture or sell set-top boxes,
there is no price differential to consider and hence the bond should be based on a
royalty. Pioneer also argued that given the difficulty in calculating a reasonable
royalty based on complainants' existing licenses, if a bond is required, the royalty
should be nominal. (PPost at 324-25).

    The staff argued that while some of the licensing agreements in issue involve the
payment of lump sums and others involve a series of discounts, making it difficult
to calculate the "bottom line" fee per box, certain agreements, summarized below,
are relatively straightforward and can be used to determine a reasonable royalty
rate:

    {* [FN91] [FN92] * *} {* * *}comparative pricing information, the lack is due to
complainants' business which involves the licensing of patents. The administrative
law judge rejects the staff's argument that the royalty rate{* * *}

FN1. Pioneer Electronics USA, Inc. is the successor to Pioneer New Media and
Technologies, Inc. See Order No. 35 which issued on November 2, 2001.

FN2. The term "IPG" has been referred to by parties as "Interactive Program Guide."
A more lengthy definition, agreed to by the parties, is set forth in the "PATENT
MISUSE" section, infra.

FN3. All of the asserted claims are not in issue with respect to each of the
respondents. Specifically complainants have accused Pioneer of infringing claims 18-

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 113
 USITC Inv. No. 337-TA-454

24, 26-28, 31, 33, 36, 42-43, 48-50, 54, 57, 59-61 and 66. S-A is accused of
infringing claims 18-24, 26-28, 31, 33, 36, 42-43, 48, 51, 54, 57, 59-61 and 66.
Complainants have accused EchoStar of infinging claims 18-24, 26- 28, 31, 32, 36,
54, 57-61 and 66.

FN4. For substantive purposes, the specifications of the '204 and '268 patents are
identical. (Faillace, Tr. at 1147, Rhyne, Tr. at 3645-46; CX-3, CX-4).

FN5. This course of action has been sanctioned by the Court of Appeals for the
Federal Circuit, which, referring to Hardware Logic, stated that "by agreement, the
appeal turns on the proper construction of certain disputed terms in the three
asserted claims. The operation and structure of the accused device are neither
uncertain nor disputed. In sum we adopt the claim construction of the Commission
which was correct and derived according to our case law on appropriate methodology."
Mentor Graphics Co. v. United States International Trade Commission, 124 F.3d 226
(Fed. Cir. 1997).

FN6. See, e.g., Hill-Rom Co., Inc. v. Kinetic Concepts, Inc., 209 F.3d 1337, 1341, n
(Fed. Cir. 2000).

FN7. Complainants, in contrast to the argument involving the "Little Board/186
Microcompter" argued that the asserted claims should not be limited to analog
broadcasts or an analog tuning process. See infra.

FN8. In Genetech, the claimed process involved "cleavable fusion expression." The
Court, in finding a lack of enablement, stated (108 F.3d at 1365):
    There is no dispute that the portion of the specification chiefly relied upon by
Genentech and by the district court, column 7, lines 29-59 [for enablement], does
not describe in any detail whatsoever how to make hGH using cleavable fusion
expression. For example, no reaction conditions for the steps needed to produce hGH
are provided; no description of any specific cleavable conjugate protein appears.
The relevant portion of the specification merely describes three (or perhaps four)
applications for which cleavable fusion expression is generally well-suited and then
names an enzyme that might be used as a cleavage agent (trypsin), along with sites
at which it cleaves ("arg- arg or lys-lys, etc."). Thus, the specification does not
describe a specific material to be cleaved or any reaction conditions under which
cleavable fusion expression would work.
(Emphasis in the original) (footnote omitted).

FN9. Indeed, in describing changes in the details of his invention, the applicant
never suggested that other criteria could be used in conducting searches. (CX-1,
col. 21, ln. 65 - col. 22, ln. 26).

FN10. EchoStar has relied on IPPV Enterprises, LLC v. EchoStar Communications Corp.,
106 F. Supp. 2d 595 (D.Del 2000) (IPPV 1) to import an "analog" limitation into
claims asserted in this investigation. However, in a final decision from IPPV 1, the
Delaware court concluded that the claims as construed literally covered both digital
and analog television signals. (See 2002 U.S. Dist. LEXIS 5439 at 54 (D. Del. Mar.
27, 2002) (IPPV III)). The administrative law judge rejects the argument of EchoStar
in a letter to the administrative law judge, dated April 25, 2002, that IPPV III has
no effect on IPPV I because the court's IPPV III ORDER, in which it ruled on various
post-trial motions, stated that it did not affect its previous findings regarding a
'942 patent. To the contrary, in upholding the jury verdict of literal infringement
by EchoStar's digital broadcast signals, the Delaware court specifically pointed out
that the construction the court had given the jury for the claim term "television
program signal" was "based on the court's understanding ... that such a construction
would not exclude digital signals." (IPPV III at 56-57). The court also pointed out
that it had instructed plaintiff's counsel that counsel was free to "argue literal"
infringement to the jury because the court's "definition" of the term "television
program signal" included "digital as well as analog television broadcast[s]." Id. at
55.

FN11. The "independent user chosen program selection criteria" of claim 18 is found
to be identical to "user program selection criteria" of claim 32. Both sets of

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 114
USITC Inv. No. 337-TA-454

criteria consist of the program theme (theme), the scheduled time of the program's broadcast (prime time), and the channel on which it is to be broadcast (channels). Neither set includes a "program choice."

FN12. In contrast to the transmitter systems depicted in FIGs. 1 and 2, which the specification of the '121 patent describes as "conventional" and lacking "novelty," see supra, the specification of the '121 patent describes the receiver systems depicted in FIGs. 3, 4a and 4b in great detail and does not describe said receiver systems, or any structures thereof, as being conventional or lacking novelty.

FN13. For substantive purposes, the specifications of the '268 and '204 patents are identical.

FN14. While the innovative cursor is depicted in Figures 1 through 7, the innovative feature of the cursor - i.e., its ability to highlight an entire cell and indicate to the user the half-hour column that the cursor is currently located in - is only evident in Figures 1 and 5. In Figures 1 and 5 the cursors are positioned in cells representing shows that are greater than an half-hour in duration, and therefore the cell is more than one column in length. In each of Figures 1 and 5, the cursor highlights the entire cell. However the highlighting within the cell is varied so as to indicate the column that the cursor is in. For instance, in Figures 1 and 5, the portion of the cell corresponding to the column that the cursor is in is highlighted with a solid black line, while the remaining portion of the cell is highlighted with segmented line. With each of Figures 2, 3, 4, 6, and 7, the cursor is depicted as being positioned in a cell which corresponds to a program an half-hour in length, and therefore the cell occupies one column. In these figures, the cell is highlighted entirely with just a solid black line, since the position of the cursor and the cell are coterminous.

FN15. The only difference between this element as recited in claim 14 of the '204 patent and claim 1 of the '268 patent, is that claim 1 of the '268 patent refers to "the television schedule," while claim 14 of the '204 patent refers to "a television schedule."

FN16. Figure 22B does show a Video Display Generator.

FN17. Complainants argued that the plain language of claim 1 of the '268 patent, specifically the requirement that the movement of the "visual identification" be irregular and correspond with the variation of size of the irregular cells, is consistent with cell to cell movement, in that the length of the visual identification's movement would be vary in accordance to the length of the irregular cells. However, the administrative law judge finds that the language relied upon by complainants equally supports the position of EchoStar, in that the movement of the innovative cursor can be typified as "irregular" and vary in correspondence with the size of the irregular cells. With the innovative cursor, which moves in half hour increments while highlighting the entire cell that it occupies, a user, on occasions when the cursor is occupying a cell that corresponds to a half hour program, only has to push the arrow key once to cause the cursor to move to the next cell and highlight it. However, on other occasions, where the innovative cursor is occupying a cell that corresponds to a program longer than a half hour, the user has to push the arrow key multiple times. The administrative law judge further finds that such movement would occur "in steps corresponding to variation in cell size" as, for example, each movement of the innovative cursor in a cell corresponding to a two hour program, would be equal to a quarter of the cell's length, while if the cursor were located in a cell corresponding to an hour long program each of its movements would be equal to half the length of the cell.

FN18. An "overlay" is defined as "a covering either permanent or temporary." (Webster's Seventh New Collegiate Dictionary (1963) at 601).

FN19. Proposed claim 229 recited the limitation of "providing television signals for the particular program to the television receiver in response to position of the cursor at the one of the irregular cells corresponding to the particular program." (RX-3011 at 420-21).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 115
USITC Inv. No. 337-TA-454

FN20. As the PROCEDURAL HISTORY section stated, the administrative law judge granted respondents' Motion No. 454-111 to preclude complainants from asserting infringement under the doctrine of equivalents.

FN21. Pioneer's digital technology has greater speed of transmission, reliability, and total available capacity than analog technology. (Tr. at 3598- 60; RX-4747.46; RX-4760; RX-4762).

FN22. The administrative law judge finds that the accused EchoStar set-top boxes{* * *}

FN23. {* * *}

FN24. {* * *}

FN25. 35 U.S.C. § 271(d) states:
     No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the licensed or sale is conditioned. The primary emphasis of the 1988 Act was a limitation created in the misuse defense whereby an infringer will have to prove economic impact in the patented product market. Congress intended that this change "should have a procompetitive effect, insofar as [it] require[s] some linkage between the patent licensing practice and anticompetitive conduct." 134 Cong. Rec. H10, 648 (Daily Ed. Oct. 20, 1988).

FN26. The provisions of 35 U.S.C. § 271(d) effectively confer upon the patentee, as a lawful adjunct of his patent rights, a limited power to exclude others from competition in nonstaple goods. Dawson Chemical Company v. Rohm and Haas Company, 448 U.S. 176, 201 (1980).

FN27. Respondents argued that while "unlawful" grantbacks and covenants not to sue are not a per se category of patent misuse they do constitute patent misuse if they are employed in ways that harm competition. Transparent-Wrap Mach. Corp. v. Stokes & Smith Co., 329 U.S. 637, 646 (1947). (PEPost at 263). Respondents also argued that while package licensing in and of itself is not necessarily patent misuse, coercing a license to accept a package license without providing the option of licensing individual patents is patent misuse per se. (RPPost at 306-7). It was also argued that a provision in a patent license requiring a party not to deal in products that compete with the patented product, i.e., exclude or "tie-out" competition, constitutes patent misuse per se. (RPPost at 278).

FN28. Courts, in an antitrust context, have considered the four basic elements of a per se tying claim as:
     1) that there are two separate products, a "tying" product and a "tied" product; 2) that those products are in fact "tied" together - that is, the buyer was forced to buy the tied product to get the tying product; 3) that the seller possesses sufficient economic power in the tying product market to coerce buyer acceptance of the tied product; and 4) involvement of a "not insubstantial" amount of interstate commerce in the market of the tied product.
See Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566, 1574 (11th Cir. 1991).

FN29. The American College Dictionary at 745 (1970) defines market as "the field of trade or business: the best shoes in the market."

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 116
 USITC Inv. No. 337-TA-454

FN30. The information and documents Hoffman relied on are summarized in RX-4363.

FN31. In this investigation, complainants have defined "IPG" as follows:
    The term "IPG" means any interactive electronic program guide (interactive
viewing guide or interactive electronic viewing guide) for displaying on a
television information relating to current and future television programming and
which enables the viewer to select and implement various functions and features. The
term "IPG" also specifically includes, but is not limited to, interactive features
and functions included with an IPG, such as view current program, favorite channels,
sleep timer, pay-per view, video on demand, parental control, pass code, program
timer, and program recording.
(RX-4775C at 3). Respondents have not disputed the definition. See RFF 2949.
Complainants' IPG products include the following: (i) TV Guide Plus (ii) GuidePlus+
for use with consumer electronic devices (iii) GuidePlus+ for use by MPVDs with set-
top boxes (iv) GuidePlus+ for Windows (v) StarSight IPG (vi) VideoGuide IPG (vii)
Electronic TV Host (viii) TV Guide Interactive, and (ix) Prevue Express (RX-4775C at
17 (Interrogatory No. 9)). (Unobjected RFF 2954).

FN32. An "MSO" is a cable company that operates multiple cable systems. (Allen DOJ
dep. JX-100C, at 11).

FN33. {* * *}

FN34. For the past two years and three months, Mark Allen has served as President of
TV Guide Affiliate Sales and Vice President of other entities involved in contract
negotiations. (Allen, Tr. at 5437). Allen's principal responsibility is negotiating
contracts with large cable and satellite companies, almost exclusively focused on
the TV Guide Interactive IPG, (Allen, Tr. at 5437).

FN35. {* * *}

FN36. {* * *}

FN37. Jonathan Orlick has been the Vice-President of Intellectual Property and
General Counsel for StarSight Telecast since 1996 and the Vice-President of
Licensing for Gemstar since May/June 1997. (JX-110C, Orlick DOJ Dep. at 7-8).

FN38. Doughlas McCrae was president of Video Guide, Inc., a wholly-owned subsidiary
of Gemstar. (Tr. at 446).

FN39. James Knowles is the manager of service provider software in StarSight.  (Tr.
at 605).

FN40. Macrae testified that he founded VideoGuide in 1993 "to invent and design an
[IPG] that would allow the user to see TV schedule information" as well as
"information about news, sports and weather." (Macrae, Tr. at 501). At that time,
VideoGuide planned on designing a separate box that would connect to a television
set to give a user these features and capabilities.  Id. In 1995, this product
entered the market and was sold in various consumer electronic retail stores Id. at
501-502.

FN41. {* * *}

FN42. DirecTV and EchoStar's DISH Network are the two main players in the direct
broadcast satellite, or "DBS" industry. (RX-2333 at SA ITC 900000 4939).

FN43. See FF 73.

FN44. See FF 74.

FN45. See FF 71, 72.

FN46. {* * *}

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN47. Senza-Gel, 803 F.2d at 670 n. 14.

FN48. {* * *}

FN49. The record establishes that Peter C. Boylan, III, is the Co-President, Co-COO, member of the Board of Directors, and Member of the Office of the Chief Executive with Gemstar-TV Guide International. He is also chairman and CEO of a number of subsidiaries, including TV Guide Interactive. (Boylan ITC dep. JX-8C, at 6, 7; Boylan, Tr. at 5239, 5216-17). Boylan reports to Henry Yuen. (Boylan, Tr. at 5239). Boylan has been employed by Gemstar-TV Guide International and predecessor entities since 1994. (Boylan ITC dep. JX-8C, at 13 - 14, Boylan Superguide dep. JX-102C at 11). Boylan joined United Video Satellite Group in 1994 as Executive Vice President and Chief Financial Officer. (Boylan, Tr. at 5201 - 02). In March of 1999, United Video Satellite Group acquired TV Guide Magazine. (Boylan, Tr. at 5203). Prior to TV Guide, Inc.'s merger with Gemstar, Boylan served as President and COO, and was a member of the Board of Directors, of TV Guide, Inc. (Boylan DOJ dep. JX-101C at 8 - 9). Boylan had direct responsibility for the TV Guide Interactive business, among other business groups. (Boylan DOJ dep. JX-101C at 8). Boylan had a beneficial ownership of 1,640,830 shares of common stock in Gemstar-TV Guide International as of March 31, 2001 (13,597 shares and 1,627,233 options) (RX-2052 at 15). From July 12, 2000 (the date of the merger between Gemstar and TV Guide) through December 31, 2000, Boylan earned $548,444 in salary and bonus. (RX-2052 at 6-8).

FN50. See also FF 76.

FN51. {* * *}

FN52. That language is used in CRRFF3940.

FN53. It is uncontroverted that the '204 and '268 patents cover two-dimensional grid guides and that the TV Guide Interactive IPG is a listings guide, not a grid guide (unobjected RFF 3917, unobjected RFF 3918).

FN54. {* * *} {* * *}

FN55. {* * *}

FN56. {* * *}

FN57. {* * *}

FN58. {* * *}

FN59. See FF 72 for a list of Gemstar's license agreements with an explicit grantback provision.

FN60. {* * *}

FN61. Assuming arguendo, any weight is to be given to Lechner's opinion that Gemstar has a blocking portfolio, Lechner conceded that three of four Levine patents involved in alleged blocking layer A in his expert report all expired during the hearing in this investigation. (Lechner, Tr. at 5384-86).

FN62. This analysis is based on demonstrative exhibits used by respondents' experts Tjaden and Grimes to summarize their opinions regarding the presence and location of certain claim features in the prior art as of the priority date of the '121 patent. (S-A Post at 175). The appendix relates to claims 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 31, 33, 36, 42, 43, 48, 49, 50, 51, 54, 57, 58, 59, 60, 61 and 66 of the '121 patent asserted against S-A. Tjaden and Grimes relied on complainants' claim construction in testifying that the asserted claims are invalid based on prior art.

FN63. Pioneer incorporated by reference the arguments of S-A and EchoStar. (PPost at 1, 231).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 118
USITC Inv. No. 337-TA-454

FN64. Respondents asserted that some of the asserted claims are entitled to a priority date of the filing date of the abandoned parent application, viz., July 12, 1985 while other asserted claims are entitled only to the priority date of the continuation-in-part application, viz., May 6, 1986. Since the administrative law judge has found that respondents have not met their burden in establishing that any of the asserted claims are invalid over any prior art, irrespective of the priority date, the priority date issue is mooted.

FN65. S-A on May 9, 2001 filed Motion No. 454-7 for summary determination that claims 18-31, 33, 34, 36, 66 and 67 of the '121 patent had been broadened during reexamination and are thus invalid. Order No. 8, which issued on May 31 and denied without prejudice Motion No. 454-7, made reference to the early stage of the investigation and an affidavit of complainants' expert. However the order stated that extrinsic issue is not necessarily determinative of claim interpretation, citing Markman 52 F. 2d at 981.

FN66. Price involved a patent interference proceeding. In the proceeding, Richard C. Price filed an application containing claims from a '869 patent to provoke an interference. Price, the junior party, had the burden of proof. Price 988 F.2d at 1189, 1193. In that context, the Court stated that the case law is unequivocal, that an inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof. Id.

FN67. Although complainants' citation seems to indicate that they are citing to an opinion issued by the Commission on July 9, 1998, their citation is actually to an opinion issued by the Commission on December 11, 2000. Lexis had incorrectly entitled the December 11, 2000 opinion as the July 9, 1998 opinion. As will be seen, infra, the July 9, 1998 Commission opinion is controlling law on the issue of inventorship in the Eprom case.

FN68. The Secretary's Office has stated that then Chairman Koplan, then Vice Chairman Okun, and Commissioners Bragg, Miller, Hillman and Askey, participated in the 12/11/00 op.

FN69. As to the '903 violation issues other than that of inventorship, the Commission adopted Commissioner Bragg's Supplemental Views issued with the Commission's 7/9/98 op. and those views were attached as an Appendix to the 12/11/00 op.

FN70. The Commission, has no power in section 337 investigations to correct inventorship. 7/9/98 op. at 9.

FN71. While the Commission in its 12/11/00 op. at 16 stated that "the Commission had stated in its 7/9/98 Opinion that Gupta was 'presumably' the co-inventor," (the 7/9/98 op. at 20 stated that Gupta was presumably the circuitry designer for Silicon Signature, and hence a co-inventor), the 12/11/00 op. at 21 stated that "between his [Gupta's] 1997 testimony and the 1998 PTO correction proceedings, the Commission determined that Gupta's contributions rose to the level of inventorship under Ethicon." Hence it would appear that the Commission in its 12/11/00 op. is interpreting the 7/9/98 op. as indicating that Gupta was a coinventor.

FN72. The 7/9/98 op. quoted the following testimony:
     I [Gupta] at that time was a young engineer with a few years - this was my first job in nonvolatile memories. I, course, had not the breadth to come up with silicon signature. Mr. Jordan [the named inventor] had worked in nonvolatile memory field for a couple for years with his prior employer, Intel Corporation, and it was an idea with Mr. Jordan had come up [sic, with] after having seen the problems faces, which I don't have details right now, but he was very proud of this idea of silicon signature, and that's why I'm very hesitant to take the credit to say - because I was of the technician, you can say, implemented it into silicon.
(Dec., 1997 Hearing Tr. at 1062).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 119
 USITC Inv. No. 337-TA-454

FN73. The transcript in the Inv. No. 337-TA-395 Dec. 19, 1997 hearing at 3104- 05
reads as to the testimony of Jordan:
     Q Did you, well, have you ever designed and products in your career?
     A No.
     Q All right. Have you ever drawn the layouts of any products in your career?
     A No.
     Q Have you ever outlined the relative locations of circuit elements on a
semiconductor chip?
     A No.
     Q Did you set forth the elements in figure 1?
     A I described the concept that I wanted implemented and the issues that I
wanted solved, and the engineers implemented those concepts and then we sat and
discussed what was being implemented and was I comfortable that that was what I
wanted. And then I approved it.
     Q Did you conceive figure 1, the block diagram?
     A Yes.

                                    * * *

     Q As you understand the work and define the word "conceived."
     A I thought of and described that document, that figure in the sense of the
major elements.

                                    * * *

     Q Did you, using your understanding of the term "conceive," did you conceive
the block diagram shown in figure 1?
     A Yes.

FN74. Jordan's testimony at 3107-15 from the Dec. 19, 1997 hearing transcript read:
     Q Let's talk about that, then. What elements in figure 1 did you conceive?
     A The fact that there would be a high-voltage input on a high address, line A9
in this case.
     Q Okay.
     A And that it would, by applying a high-voltage signal, which is outside of
the normal operating range of the product, that it would access an additional
information array to bring out the stored information about the manufacturer's ID
and the information on how to program it.
     Q Now, did you, then, conceive of row decoder 16, that element?
     A I did not conceive something called row decoder 16. I had a concept that
said there is an input line which is shown as A9, and that input line has a high-
voltage detector on it that then puts it into the programming, the signature read
mode. And how it was implemented in terms of the physical implementation, I did not
have any concern about.
     Q Perhaps could we put up figure 3, then. Mr. Jordan, Exhibit 16, do you
recognize figure 3 from you patent?
     A Yes, I do.
     Q Do you see high-voltage detection circuit 102?
     A Yes.
     Q Did you conceive of high-voltage detection circuit 102?
     A I conceived of the concept that said there has to be a high-voltage input
detection circuit so that you can recognize the high voltage and do a different
operation.
     Q All right. Did you conceive of that fact that it had to have inverters,
high-voltage detection circuit 102 had to have inverters?
     A No, I did not.
     Q With regard to the high-voltage detection circuit, were you familiar with
the use of high voltage on an address pin before you joined SEEQ?
     A Yes.
     Q What was your familiarity?
     A There were a number of instances where high voltage has been used in test
environments, and I believe also in some reliability or QA environments.
     Q Is that how you knew that you could put a high voltage on an address pin to
implement the concept?

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A I knew that it was quite possible or practical to have a high-voltage detection circuit designed into a normal product which then allowed it to have a secondary function.

Q Now, did you conceive the use of element 204, which is a NOR gate, as part of the implementation of your concept?

A No, I did not.

Q All right.

A I conceived only that with the high-voltage input, when it goes into a, what we call super voltage, or called super voltage mode, outside of the normal range, that it turns off the normal functioning of that pin and the device and goes into the secondary mode, which is to read out the product information array.

Q Now, let's go back to figure 1 which is RPX 14.

A Yes.

Q Did you determine how, or did you conceive how that high voltage was going to, I think you said stop the normal operation of the array; is that correct?

A Yes.

* * *

Q Now, did you conceive of how to disable the normal operation of the device?

A No.

Q All right. Did you determine at all whether the column decoder 14 should be involved in being disabled?

* * *

THE WITNESS: The high-voltage input circuit disables the memory array, the main memory array, and enables the product information array. That still utilizes the column decoder, so they are not disabled.

BY MR. YOCHES:

Q No, I understand that. I want to know whether you conceived of whether or not to disable column decoder 14.

* * *

THE WITNESS: Yes, I conceived that the only pin, A9, not the pin but the address pin in the A9 area, meaning the high address pin, would be the one that affects what information is being read out and that none of the other pins would be affected in their normal operation. They would still do their normal thing.

BY MR. YOCHES:

Q They would still do their normal thing at what time in the operation of that product?

A Always.

Q All right. So that while you are reading out the product information array 30, pins A5 through A12 would operate normally?

A They would not be used because you are only picking up one row, and the decoding of that row was four address lines, which was the concept of the 16 bytes.

Q I'm sorry decoding of which rows were address bytes?

A The lower decoders. Zero through 3 is what is there, zero through 4 is what is shown because it's not limited to any number of decoders.

Q I understand that. But could you repeat again, what this column - - well. In your explanation, what effect does A0 through A4 have when you are reading out the product information array?

A It reads out individual bytes that are a part of the row and puts that information out onto - - well, it selects the byte which will be put out onto the output pins.

Q All right. Did you tell the engineers to design it that way?

A I described that was what I wanted to have done. I wanted to be able to access the product information array and then select and sequence out the information contained in the array.

Q How - - did you describe at all whether or not the product information array had to be an additional row of memory array or additional row attached to the memory array anyway?

A I described that it had to be low cost because the customers would not pay a

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                          Page 121
 USITC Inv. No. 337-TA-454

significant increase. So it had to be manufacturable, it had to not add
significantly to the die size and it had to be part of the entire product, meaning
it was built and manufactured as a single die.
     Q But did you determine whether or not it has to be a row attached to memory
array 12?
     A I specifically said that it would be either columns or rows. We chose a row,
I chose a row, because that gave me the information coming out on all output pins,
instead of a single, if I had chosen a column, then the information would have
sequenced out on an individual output, as opposed to on all outputs. And I wanted it
to come out easily and in bigger increments, so I chose a row.
     Q But do I understand you, then, that you also conceived of using another row,
that was your conception, and not engineers at SEEQ; is that correct?
     A My conception was, again, to do it the easiest way possible, and the
cheapest way. And that was decided that that was with a row, because you could use,
I understood you could use either a row or a column, but when we talked about the
issues involved and the ease of implementing, the rows was chosen.
     Q Who chose it?

                                    * * *

     THE WITNESS: I don't recall who chose it.

                                    * * *

     Q Who determined the product information array 30 should be this row, as
opposed to a separate register that did not use the column address gating 178 at the
column decoder 14?

                                    * * *

     THE WITNESS: I did not make those decisions, so it would have been
engineering.

FN75. As seen, supra, Ethicon issued before the March 19, 1998 ID and was quoted at
some length in the March 19, 1998 ID. The basis for Commissioner Crawford's
September 28, 1998 statement was that "the administrative law judge was able to
consider Ethicon in making his decision, and in fact cited to Ethicon several times
in his ID." (Pub. No. 3136, statement at 2).

FN76. It was noted that the named inventor in Sewall had formulated particular
circuit elements and simulated their performance, leaving the putative coinventor
with nothing to do except implement the circuits in silicon.

FN77. {* * *}

FN78. {* * *} {* * *}

FN79. {* * *}

FN80. {* * *}

FN81. {* * *} {* * *}

FN82. Neil was not represented by any of respondents' counsel. Although Neil met
with respondents' attorneys before testifying at the hearing and they gave him
background on the hearing, respondents' counsel did not go over with Neil any of the
questions that they asked him at the hearing. Neil was not being compensated in any
way for his time at the hearing other than having his air fare to the hearing and
hotel expenses, when at the hearing, paid for by respondents' attorneys. (Neil, Tr.
at 3417-18).

FN83. Complainants argued that Neil's testimony is inconsistent. The administrative
law judge finds the alleged inconsistencies in Neil's testimony trivial and do not
serve to undercut Neil's credibility.

                © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392
USITC Inv. No. 337-TA-454

FN84. {* * *}

FN85. The "hybrid method" is a method that uses a cursor that is moved from one cell to another with each press of the arrow key, until it reaches a cell that extends beyond the displayed grid guide, in which case the screen will scroll a half hour ahead with each press of the arrow key. (Tr. at 300-01).

FN86. In the heading for this section, S-A listed claim 54 in addition to the other claims. However, S-A made no reference to claim 54 in its arguments. Accordingly, the administrative law judge finds that S-A has not met its burden of proving that claim 54 of the '121 patent is invalid on account of indefiniteness.

FN87. Pioneer did not specifically identify which "means plus function" elements it was alleging to be indefinite, however, EchoStar, in its argument, made specific reference to claim 1's of the '268 patent limitation of a "means ... for displaying a program note overlay including a program description of the desired program on said television display" and, in connection with claims 14-17 of the '204 patent, "the means plus function element that displays the overlay." (RFF 1465).

FN88. Respondents identify two alleged false or misleading statements made to the Examiner by Young during re-examination: (1) Young's representation in the declaration that the '121 invention was the world's first "point-and-select" system for simplifying VCR programming and{* * *}

FN89. EchoStar did cite RX 3149, a deposition transcript, to support the proposition that Young knew of such art. However, RX 3149 was never admitted into evidence. (Tr. at 3149).

FN90. {* * *}

FN91. {* * *}

FN92. {* * *}

XIX. ADDITIONAL FINDINGS

A. Parties

  1. Gemstar is a Delaware corporation with its principal place of business in Pasadena, California. (SX-1C at 5).

  2. StarSight is a California corporation with its principal place of business in Fremont, California. (SX-1C at 5).

  3. StarSight is a wholly-owned subsidiary of Gemstar. (SX-2C at 3).

  4. StarSight is the owner of two of the patents asserted in this investigation. (CX-3; CX-4).

  5. Pioneer Corporation is a Japanese corporation with its principal place of business in Tokyo, Japan. (SX-5C at 4).

  6. Pioneer North America, Inc. (Pioneer North America) is a Delaware corporation with its principal place of business in Long Beach, California. Pioneer North America is a wholly-owned subsidiary of Pioneer Corporation. (SX-5C at 4).

  7. Pioneer Digital Technologies, Inc. (Pioneer Digital) is a Delaware corporation with its principal place of business in Burbank, California. Pioneer Digital is a wholly-owned subsidiary of Pioneer Corporation. (SX-5C at 4).

  8. Pioneer Electronics USA, Inc. (Pioneer USA) is the successor to Pioneer New Media Technologies, Inc. Pioneer USA is a wholly-owned subsidiary of Pioneer Corporation. (SX-5C at 4).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 123
USITC Inv. No. 337-TA-454

9. S-A is a Georgia corporation with its headquarters in Norcross, Georgia and a manufacturing facility for set-top boxes in Juarez, Mexico. (SX-8C at 5).

10. EchoStar Communications Corporation is a Nevada corporation with its headquarters in Littleton, Colorado. (SX-3C at 7).

11. EchoStar Technologies Corporation is a wholly-owned subsidiary of EchoStar DBS Corporation. EchoStar DBS Corporation is a wholly-owned subsidiary of EchoStar Broadband Corporation. EchoStar Broadband Corporation is a wholly-owned subsidiary of EchoStar Communications Corporation. (Ergen, Tr. at 2985; RX-1943C).

12. EchoStar Technologies Corporation has participated in the designing, importing, purchasing and/or licensing of EchoStar's accused EchoStar 4900, Philips 2800 and JVC 2800 products. (SX-3C at 12).

13. EchoSphere Corporation has participated in the importing, selling and/or distributing accused EchoStar 4900, Philips 2800 and JVC2800 set-top boxes named in the complaint. (SX-3C at 12).

14. Houston Tracker Systems, Inc. is a wholly-owned subsidiary of EchoStar DBS Corporation. (RX 1943C; Ergen, Tr. at 2985).

15. Houston Tracker Systems Corp. has participated in the importing, selling and/or distributing accused EchoStar 4900, Philips 2800 and JVC2800 set-top boxes named in the complaint. (SX-3C at 12).

16. EchoStar Satellite Corporation is a wholly-owned subsidiary of EchoStar DBS Corporation. (Ergen, Tr. at 2985; RX-1943C).

17. EchoStar Satallite Corp. has participated in the importing, selling and/or distributing accused EchoStar 4900, Philips 2800 and JVC2800 set-top boxes named in the complaint. (SX-3C at 12).

18. SCI Systems, Inc. (SCI) is a Delaware corporation with its headquarters in Huntsville, Alabama. (SX-4C at 7).

19. SCI manufactures accused products EchoStar 4900, Phillips 2800 and JVC 2900 set-top boxes named in the complaint. (CX-4C at 7).

20. SCI does not manufacture set-top boxes for EchoStar outside the United States. (CX-1126 at 8).

21. {* * *}

22. {* * *}

B. Patents at Issue

23. The '121 patent, entitled "TV Schedule System and Process," was issued on November 10, 1987, based on application Serial No. 860,077 filed on May 6, 1986, which in turn is a continuation-in-part of abandoned Serial No. 754,630 filed July 12, 1985. (CX-1, cover).

24. The named inventor on the '121 patent, Patrick Young, assigned the application to StarSight. (CX-11).

25. The '121 patent was subsequently re-examined by the U.S. Patent and Trademark Office (PTO) based on a reexamination request filed Dec. 6, 1991. The PTO issued Reexamination Certificate B1 4,706,121 on December 14, 1993. (CX-1).

26. The '268 patent, entitled "User Interface For Television Schedule System," was issued on December 26, 1995 based on application Serial No. 198,528 filed on February 18, 1994, which in turn is a continuation of abandoned Serial No. 579,555

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 124
USITC Inv. No. 337-TA-454

filed September 10, 1990, which is a continuation-in-part of Serial No. 219.971
filed July 15, 1988 (now U.S. Patent No. 4,977,455). (CX-3).

27. The named inventors on the '268 patent, Patrick Young, John H. Roop, Allan R.
Ebright, Michael W. Faber, and David Anderson, assigned the patent rights to
StarSight on May 31, 1993. (CX-13).

28. The '204 patent, entitled "User Interface for Television Schedule System," was
issued on September 15, 1998, based on application Serial No. 484,412 filed on June
7, 1995, which in turn is a continuation of Serial No. 198,538 filed on Feb. 18,
1994 (now U.S. Pat. No. 5,479,268 in issue). (CX-4).

29. The term of the '204 patent is subject to a terminal disclaimer and will
expire on December 26, 2012, the expiration date of U.S. Patent No. 5,479,268. (CX-
4).

30. The named inventor on the '204 patent, Patrick Young, John H. Roop, Alan R.
Ebright, Michael W. Faber and David Anderson, assigned the patent rights to
StarSight on November 23, 1995. (CX-14).

31. According to the '121 patent reexamination file history, claims 18, 21, 33,
36, 42, 51, and 54 were amended during re-examination, claims 19-20, 22-24, 26-28,
31, 43, 48-50 are dependent upon claims that were amended during re-examination, and
claims 57, 59-61 and 66 were added during re-examination. (CX-1, '121 patent, col.
2, line 62 - col. 3, line 2).

32. Of the claims of the '121 patent asserted against respondents, claims 18 and
32 are independent process claims, claims 19-24, 26-28 and 31 are process claims
that depend from at least claim 18, and claims 33.36 and 66 are also independent
process claims. (CX-1).

33. Asserted claim 18 of the '121 patent is an independent process claim that was
amended during re-examination to state as follows (in the following, underlined
language was added through the reexamination):
   A process for controlling the presentation of broadcast programs to a television
receiver, which comprises supplying program schedule information to storage means in
a data processor, supplying user program selection criteria to the data processor,
said user program selection criteria comprising a plurality of independent user
program selection criteria and at least one program choice, the data processor
combining said user selection criteria, selecting those programs meeting the
combined user selection criteria for viewing from the program schedule information
in said storage means in the data processor, storing information identifying the
selected programs, said stored information identifying broadcast schedule times.
channels and program titles, and using the stored information to tune the television
to the selected program.
(CX-1).

34. Asserted claim 19 of the '121 patent, a process claim that depends from
amended claim 18 of the '121 patent, states:
   The process of claim 18 in which the television receiver is used as a display by
the data processor for presenting messages to the user during the process.
(CX-1).

35. Asserted claim 20 of the '121 patent, a process claim that depends from
dependent claim 19 of the '121 patent (and hence also depends from amended claim 18
of the '121 patent), states:
   The process of claim 19 in which names of program services are displayed in the
schedule information.
(CX-1).

36. Asserted claim 21 of the '121 patent, a process claim that depends from
dependent claim 19 of the '121 patent (and hence also depends from amended claim 18
of the '121 patent), was amended during re-examination to state as follows (in the
following, underlined language was added through the reexamination):

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 125
USITC Inv. No. 337-TA-454

The process of claim 19 in which only a preselected portion of the schedule information is presented for the user selection, wherein said preselected portion is preselected according to a combination of said independent user chosen program selection criteria.
(CX-1).

37. Asserted claim 22 of the '121 patent, a process claim that depends from amended claim 18 of the '121 patent, states:
The process of claim 18 in which at least some of the user selection criteria are supplied to the data processor by presenting a menu from the data processor on a display and allowing the user to select an item from the menu.
(CX-1).

38. Asserted claim 23 of the '121 patent, a process claim that depends from amended claim 18 of the '121 patent, states:
The process of claim 18 further comprising the steps of checking for a conflict between a selected program and a previously selected program and providing an indication to the user of such conflict.
(CX-1).

39. Asserted claim 24 of the '121 patent, a process claim that depends from amended claim 18 of the '121 patent, states:
The process of claim 18 in which the program schedule information is supplied to the data processor by broadcast.
(CX-1).

40. Asserted claim 26 of the '121 patent, a process claim that depends from dependent claim 24 (and hence depends from amended claim 18 of the '121 patent), states:
The process of claim 24 in which the television receiver is used as a display by the data processor for presenting messages to the user during the process.
(CX-1).

41. Asserted claim 27 of the '121 patent, a process claim that depends from dependent claim 26 (and hence depends from dependent claim 24 of the ' 121 patent and amended claim 18 of the '121 patent), states:
The process of claim 26 in which at least some of the user selection criteria are supplied to the data processor by presenting a menu from the data processor on a display and allowing the user to select an item from the menu.
(CX-1).

42. Asserted claim 28 of the '121 patent, a process claim that depends from dependent claim 27 (and hence depends from dependent claims 24 and 26 of the '121 Patent and amended claim 18 of the '121 patent), states:
The process of claim 27 further comprising the steps of checking for a conflict between a selected program and a previously selected program and providing an indication to the user of such conflict.
(CX-1).

43. Asserted claim 31 of the '121 patent, a process claim that depends from dependent claim 24 (and hence depends from amended claim 18 of the '121 patent), states:
The process of claim 24 in which the program schedule information and the programs are broadcast together, the process additionally comprising the step of separating the program schedule information from the programs for supplying the program schedule information to the data processor.
(CX-1).

44. Asserted claim 32 of the '121 patent, is an independent process claim that reads:
A process for controlling the presentation of broadcast programs to a television receiver, which comprises supplying program schedule information to a data processor, supplying user program selection criteria to the data processor, using the user selection criteria to select programs for viewing from the program schedule

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 126
USITC Inv. No. 337-TA-454

information in the data processor, storing information identifying the selected
programs, using the stored information to tune the television receiver to the
selected programs, using the television receiver as a display by the data processor
for presenting messages to the user during the process, including time remaining for
a program being broadcast.
(CX-1).

    45. Asserted claim 33 of the '121 patent is an independent process claim that was
amended during re-examination to state as follows (in the following, underlined
language was added through the reexamination):
    A process for controlling the presentation of broadcast programs to a television
receiver, which comprises supplying program schedule information to storage means in
a data processor, supplying user program selection criteria to the data processor,
the data processor combining said user program selection criteria with automatic
criteria according to at least one of a current time and a current channel, using
the combination of user program selection criteria and automatic criteria to select
programs for viewing from the program schedule information in said data processor in
the data processor, storing information identifying the selected programs, using the
stored information to tune the television receiver to the selected programs, turning
on a broadcast program recording device for a selected broadcast program, recording
the selected broadcast program, and supplying a different program broadcast signal
to the television receiver than the broadcast signal for the selected program
supplied to the program recording device.
(CX-1).

    46. Asserted claim 36 of the '121 patent is an independent process claim that was
amended during re-examination to state: as follows (in the following, underlined
language was added through the reexamination, while bracketed ([]) language was
deleted):
    A process for controlling the presentation of broadcast programs to a television
receiver, which comprises supplying program schedule information to storage means in
a data processor, supplying user program selection criteria to the data processor,
said user program selection criteria comprising a plurality of independent user
chosen selection criteria and at least one program choice, the data processor
combining said user program selection criteria, using the combined user program
selection criteria to select programs for viewing from the program schedule
information in said storage means in the data processor, storing information
identifying the selected programs including broadcast schedule times, channels and
program titles, using the stored information to tune the television receiver to the
selected programs, turning on [the] a program recording device and recording the
selected broadcast program by supplying control signals to a remote controller for
the program recording device.
(CX-1).

    47. Asserted claim 42 of the '121 patent is an independent apparatus claim that
was amended during re-examination to state as follows (in the following, underlined
language was added through the reexamination):
    A system for controlling a recording device to allow user selection of broadcast
programs from schedule information, which comprises a data processor, a first input
means for the schedule information connected to said data processor, a second user
selection input means connected to said data processor, said data processor being
configured to select programs from the schedule information based on user inputs,
storage means connected to receive the schedule information for programs selected by
said data processor, a programmable tuner for connection to the recording device,
said programmable tuner being connected to receive control signals from said data
processor at a time of a selected broadcast for causing said programmable tuner to
supply broadcast signals for the selected programs to the recording device, and a
television receiver, said system being configured to allow said television receiver
to receive a different program than the broadcast signal for the selected program
supplied to said recording device, wherein said data processor is configured for a
selectable display mode, said data processor being configured to present an initial
display of said schedule information stored in said storage means upon selection of
said display mode, said initial display automatically comprising schedule
information for at least one of a current time period and a current channel of said

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392
USITC Inv. No. 337-TA-454

programmable tuner.
(CX-1).

    48. Asserted claim 43 of the '121 patent, an apparatus claim that depends from
amended claim 42 of the '121 patent, reads:
    The system of claim 42 additionally comprising a display means connected to
receive signals from said data processor for generating a display from the schedule
information and the user selections on said display means.
(CX-1).

    49. Asserted claim 48 of the '121 patent, an apparatus claim that depends upon
dependent claim 43 of the '121 patent (and hence also depends from independent claim
42 of the '121 patent), reads:
    The system of claim 43 in which said data processor is further configured to
provide signals to said display means for presenting a plurality of user selection
menus on said display means and said second user selection input means includes a
plurality of keys for making selections from the menus for choosing programs from
the schedule information.
(CX-1).

    50. Asserted claim 49 of the '121 patent, an apparatus claim that depends upon
dependent claim 48 of the '121 patent (and hence also depends from independent claim
42 of the '121 patent and dependent claim 43 of the ' 121 patent), reads:
    The system of claim 48 in which said data processor is further configured to
allow combinations of the menu selections for choosing programs from the schedule
information.
(CX-1).

    51. Asserted claim 50 of the '121 patent, an apparatus claim that depends from
independent claim 42 of the '121 patent, reads:
    The system of claim 42 in which said programmable tuner receives both the
schedule information and the broadcast signals for the selected programs, said
programmable tuner being connected as part of said first input means.
(CX-1).

    52. Asserted claim 51 of the '121 patent is an independent apparatus claim that
was amended during re-examination to state as follows (in the following, underlined
language was added through the reexamination):
    A system for controlling a recording device to allow user selection of broadcast
programs from schedule information, which comprises a data processor, a first input
means for the schedule information connected to said data processor, a second user
selection input means connected to said data processor, said data processor being
configured to select programs from the schedule information based on user inputs,
storage means connected to receive the schedule information for programs selected by
said data processor, a programmable tuner for connection to the recording device,
said programmable tuner being connected to receive control signals from said data
processor at a time of a selected broadcast for causing said programmable tuner to
supply broadcast signals for the selected programs to the recording device, said
data processor being connected to a remote controller for said recording device to
supply control signals to said remote controller for powering on said recording
device, starting and stopping recording of the selected program and powering off
said recording device, further comprising a display means coupled to said data
processor, wherein said data processor is configured for a selectable display mode,
said display means being configured to present an initial display of said schedule
information stored in said storage means upon selection of said display mode, said
initial display automatically comprising schedule information for at least one of a
current time period and a current channel of said programmable tuner.
(CX-1).

    53. Asserted claim 54 of the '121 patent is an independent apparatus claim that
was amended during re-examination to state as follows (in the following, underlined
language was added through the reexamination):
    A system for controlling receipt of broadcast television programs to allow user
selection of broadcast programs from broadcast schedule information which is

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 128
USITC Inv. No. 337-TA-454

selectively stored in a storage means, which comprises a data processor, a
programmable tuner configured to receive both the broadcast programs and the
broadcast schedule information connected to said data processor, means connected
between said programmable tuner and said data processor for separating the broadcast
schedule information from the broadcast programs and supplying the broadcast
schedule information to said data processor, a user selection input means connected
to said data processor, said data processor being configured to select programs from
the schedule information stored in said storage means based on user inputs, said
storage means being connected to receive a reminder calendar list comprising the
schedule information for programs selected by said data processor, said programmable
tuner being connected to receive control signals from said data processor at a time
of a selected broadcast for causing said programmable tuner to supply signals for
the selected broadcast programs to at least one signal receiver for the selected
broadcast programs, wherein said user inputs comprise a plurality of user program
selection criteria, said data processor being configured to combine said plurality
of user program selection criteria and to present a list of programs meeting said
combined program selection criteria, said user inputs further comprising a program
choice from said presented list of programs, said reminder calendar list comprising
information identifying titles for said programs selected by said data processor.
(CX-1).

    54. Asserted claim 57 of the '121 patent, added as a new independent apparatus
claim during re-examination, and asserted claim 58, added during reexamination as a
dependent claim to new independent claim 57 states:
    57. A television schedule system for controlling receipt of broadcast television
programs to allow user selection of broadcast programs from broadcast schedule
information displayed on a television, said broadcast schedule information
comprising broadcast schedule times, titles and channels, said system comprising:
    a data processor;
    a system clock connected to said data processor for providing a system time;
    a programmable tuner connected to said data processor and configured to receive
both the broadcast programs and the broadcast schedule information;
    signal separating means connected between said programmable tuner and said data
processor for separating the broadcast schedule information from the broadcast
programs, and for supplying the broadcast schedule information to said data
processor;
    display means connected to said data processor for displaying at least a portion
of said broadcast schedule information on said television;
    user selection input means connected to said data processor for providing user
inputs for selecting listings of programs from said displayed broadcast schedule
information; and
    storage means being connected to said data processor for storing schedule
information, wherein said data processor is configured to selected programs from
said displayed broadcast schedule information based on said user inputs, to retrieve
broadcast schedule information for said selected programs from said broadcast
schedule information supplied to said data processor, and to store said retrieved
schedule information in said storage means, said stored broadcast schedule
information identifying a broadcast schedule time and channel and a program title
for each said selected program; wherein
    said data processor provides control signals to said programmable tuner when the
system time matches a stored broadcast schedule time of one of said selected
programs, said control signals causing said programmable tuner to supply broadcast
program signals for the stored broadcast schedule channel of said one selected
program to at least one signal receiver; and wherein
    said data processor is configured for a selectable display mode, said display
means being configured to display a preselected initial display of said schedule
information stored in said storage means upon selection of said display mode, said
preselected initial display automatically comprising schedule information meeting
initial display selection criteria, said initial display selection criteria
including at least one of a current time period and a channel currently selected by
said programmable tuner.
(CX-1).
    58. The system of claim 57, wherein said data processor is configured to
update said program listings of broadcast schedule information and said stored

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                              Page 129
USITC Inv. No. 337-TA-454

schedule information for selected programs, in response to updated schedule
information being supplied to said data processor.

   55. Asserted claim 59 of the '121 patent, added during reexamination as a
dependent claim to new independent claim 57 of the '121 patent, reads:
   The television schedule system of claim 57, wherein said stored broadcast
schedule information identifies a program description for each said selected
program.
(CX-1).

   56. Asserted claim 60 of the '121 patent, added during reexamination as a
dependent claim to new independent claim 57 of the '121 patent, reads:
   The television schedule system of claim 57, wherein said preselected initial
display automatically comprises schedule information for a channel currently
selected by said programmable tuner, and wherein said display means further
comprises means for displaying on said television, upon a change to a new channel of
said programmable tuner, broadcast schedule information for a current program on
said new channel.
(CX-1).

   57. Asserted claim 61 of the '121 patent, added during reexamination as a
dependent claim to new independent claim 57 of the '121 patent, reads:
   The television schedule system of claim 60, wherein said displayed current
program broadcast schedule information comprises a title of said current program.
(CX-1).

   58. Asserted claim 66 of the '121 patent, added as a new independent process claim
during re-examination, reads:
   A process for controlling the presentation of broadcast programs to a television
receiver, which comprises supplying program schedule information to a storage means
in a data processor, supplying user program selection criteria to the data
processor, said user program selection criteria comprising a plurality of
independent user chosen selection criteria and at least one program choice, the data
processor combining said user selection criteria, selecting those programs meeting
the combined user selection criteria for viewing from the program schedule
information in said storage means in the data processor, storing information
identifying the selected programs and using the stored information to tune the
television receiver to the selected programs.
(CX-1).

   59. Asserted claim 1 of the '268 patent is an independent apparatus claim, while
asserted claims 3 is an apparatus claim that depends from claim 1. (RX-3005; CX-3 at
col. 14, line 42 - col. 15, line 4).

   60. Asserted claim 1 of the '268 patent states:

An interactive television schedule system, which comprises:
   a television display,
   means coupled to said television display for displaying the television schedule
on said television display as a grid of two-dimensionally arranged, adjacent
irregular cells which vary in length corresponding to time duration of programs,
with a title of a program being displayed in each of said irregular cells, said grid
having a plurality of channels listed in a first dimension and time listed in a
second dimension,
   user input means coupled to said means for displaying the television schedule,
said user input means including a program selector and a movement control for a
visual identification of ones of said irregular cells which initiates movement of
said visual identification in the first dimension, and irregular movement of said
visual identification in the second dimension in steps corresponding to variation in
cell size, responsive to an input by a user to said movement control, between first
and second ones of said irregular cells to select a desired one of said irregular
cells corresponding to a desired program,
   a tuner coupled to said user input means for tuning to the desired program, and
   means coupled to said means for displaying the television schedule for

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                         Page 130
USITC Inv. No. 337-TA-454

displaying a program note overlay including a program description for the desired
program on said television display.
(CX-3).

  61. Asserted claim 3 of the '268 patent, which depends from claim 1, states:
    The interactive television schedule system of claim 1 additionally comprising
means coupled to said means for displaying the television schedule for selecting the
desired visually identified program in response to activation of said program
selector, and a recording device coupled to said means for selecting the desired
program to record the desired program.
(CX-3).

  62. Asserted claim 14 of the '204 patent states:
    An interactive television schedule system, which comprises: a television
display,
    means coupled to said television display for displaying a television schedule on
said television display as a grid of two-dimensionally arranged, adjacent irregular
cells which vary in length corresponding to time duration of programs, with a title
of a program being displayed in each of said irregular cells, said grid having a
plurality of channels listed in a first dimension and time listed in a second
dimension,
    user input means coupled to said means for displaying the television schedule,
said user input means including a program selector and a movement control for a
visual identification of selected ones of said irregular cells which controls
movement of said visual identification in the first dimension and in the second
dimension from cell to cell, responsive to an input by a user to said movement
control to visually identify a desired one of said irregular cells corresponding to
a desired program,
    means coupled to said means for displaying the television schedule for selecting
the desired visually identified program in response to activation of said program
selector, and
    a programmable tuner coupled to said means for selecting the desired program for
tuning to a select channel for the desired program,
    said means for displaying the television schedule on said television display
further being configured to display an overlay containing information on a
television program being shown on said television display when a channel being shown
on said television display is changed.
(CX-4).

  63. Asserted claim 15 of the '204 patent, which depends from claim 14, states:
    The interactive television schedule system of claim 14 in which the overlay
information on the television program includes program title, name of television
service, channel number, and time.
(CX-4).

  64. Asserted claim 16 of the '204 patent, which depends from claim 15 (and hence
depends also from claim 14), states:
    The interactive television schedule system of claim 15 in which said means for
displaying the television schedule is further configured to provide an alternate
overlay including a program note with a program description for the television
program being shown on said television display.
(CX-4).

  65. Asserted claim 17 of the '204 patent, which depends from claim 14, states:
    The interactive television schedule system of claim 14 in which said means for
displaying the television schedule is further configured to provide an alternate
display including a program note with a program description for the visually
identified program. (CX-4).

  66. Asserted claim 31 of the '204 patent states:
    An interactive process for operating a television schedule, which comprises:
    displaying a television schedule on a television display as a grid of two-
dimensionally arranged, adjacent irregular cells which vary in length corresponding
to time duration of programs, with a title of a program being displayed in each of

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

said irregular cells, said grid having a plurality of channels listed in a first
dimension and time listed in a second dimension,
        providing a visual identification of a selected one of said irregular cells,
        moving said visual identification in the first dimension and in the second
dimension between first and second ones of said irregular cells to select a desired
one of said irregular cells corresponding to a desired program,
        tuning a programmable tuner to a select channel based on position of said
visual identification for the desired program, and displaying an overlay containing
information relating to a television program being shown on said television set when
a channel is being shown on the television set is changed.
(CX-4).

   67. Asserted claim 32 of the '204 patent, which depends from claim 31, states:
    The interactive process for operating a television schedule system of claim 31
in which the information relating to the television program includes program title,
name of television service, channel number, and time.
(CX-4).

   68. Asserted claim 33 of the '204 patent, which depends from claim 32 (and hence
depends also from claim 31), states:
    The interactive process for operating a television schedule system of claim 32
additionally comprising the step of displaying an overlay including a program note
with a program description for the television program being shown on said television
set.
(CX-4).

   69. Asserted claim 34 of the '204 patent, which depends from claim 31, states:
    The interactive process for operating a television schedule system of claim 31
additionally comprising the step of displaying a program note with a program
description for the visually identified program.
(CX-4).

C. Gemstar's Licenses

   70. {* * *}

   {* * *}
   {* * *} {* * *}
   71. {* * *}

   {* * *}
   {* * *}
   {* * *}
   72. {* * *}

   {* * *}
   {* * *}
   73. {* * *}

   {* * *}
   74. {* * *}

   75. {* * *}

   76. {* * *}

   77. {* * *}

   78. {* [FN1] * *} {* * *}

   {* * *}
   {* * *} {* * *}
   {* * *}
   79. {* * *}

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 132
USITC Inv. No. 337-TA-454

80. {* * *}

81. {* * *}

82. {* * *}

83. {* * *}

84. {* * *}

86. {* * *}

87. {* * *}

88. {* * *}

{* * *}
{* * *}
{* * *}

D. Person Of Ordinary Skill In the Art

89. A person of ordinary skill in the art of the '121 patent at the time of filing
would have had a Bachelor's degree in electrical engineering or computer
engineering, or the equivalent of that in experience, plus several years of
experience in the development of computer systems and television broadcasting.
(Tjaden, Tr. at 3803-04; Faillace, Tr. at 1098; Bristow, Tr. at 5076).

90. A person of ordinary skill in the art of the '268 and '204 patents as of
September 10, 1990 was a person with a Bachelor's degree in computer science or a
closely related field, and approximately two years of experience with user
interfaces and computer programming. (Myers, Tr. at 3965-66).

E. Reexamination Of The '121 Patent

91. Original claim 18 of the '121 patent, as it issued on Nov. 10, 1987 with fifty
six claims read: (CX-1):
    18. A process for controlling the presentation of broadcast programs to a
television receiver, which comprises supplying program schedule information to a
data processor, supplying user program selection criteria to the data processor,
combining user selection criteria, selecting those programs meeting the combined
user selection criteria for viewing from the program schedule information in the
data processor, storing information identifying the selected programs, and using the
stored information to tune the television receiver to the selected programs.
None of original claims 1 to 56 recited program titles.

92. A "Request for Reexamination" of claims 1 through 56 of the '121 patent was
filed on 12/6/91 by TV Answer, Inc. of Reston Virginia (TV Answer). (RX-3008 at 10).

93. The "Request for Reexamination" was granted by the PTO on February 11, 1992.
The Examiner agreed that substantial questions as to the patentability of claims 1-
56 of the '121 patent as issue have been raised by "the new references" cited by TV
Answer. (RX-3008 at 99, 102).

94. The PTO, in the first Office Action mailed June 8, 1992, rejected all of the
claimed subject matter, under 35 U.S.C. § 102(b) and 35 U.S.C. § 103, over certain
prior art. (RX-3008 at 110 to 127). Thus, in the Office Action in point 2, claims 1-
6, 8-10, 12, 15, 18-22, 24-27, 31, 33, 34, 39, 42-46, 48, 49 and 52 were rejected as
being anticipated by Yarbrough et al. U.S. Patent No. 4,305,101. (RX-3008 at 18,
111-118). In point 3 claims 1-8, 13, 15, 17, 18, 19, 21-28, 31-36, 38, 42-46, 51,
and 56 were rejected as being anticipated by Muguet U.S. Patent No. 4,787,063, the
Examiner stating, inter alia, that Muguet disclosed the "turning on and off the VCR
at start and en [sic] of the program or both." (RX-3008 at 24, 118). In point 5,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 133
USITC Inv. No. 337-TA-454

claims 1-12, 15, 18-22, 24- 27, 31, 33, 34, 37 and 39-56 were rejected as being
unpatentable over Yarbrough et al in view of Beyers, Jr. U.S. Patent No. 4,641,205
and Reiter U.S. Patent No. 4,751,578. (RX-3008 at 119-120). In point 6, claims 1, 2,
4-8, 11- 19, 21-35, 45 and 47-56 were rejected as being unpatentable over Beyers,
Jr. in view of Yarbrough et al, Kruger et al. U.S. Patent No. 4,388,179, Miller U.S.
Patent No. 4,081,753 and Muguet. (RX-3008 at 120-122). In point 7, claims 1, 33 and
42 were rejected as being unpatentable over Kruger et al. in view of Kato et al.
4,031,548. (RX-3008 at 122, 123). In point 8, claims 1, 2, 18, 19, and 49 were
rejected as being unpatentable over Kruger in view of Kram et al. 4,754,326. (RX-
3008 at 123-124). In point 9, claims 42-53 were rejected as being unpatentable over
Peers et al. U.S. Patent No. 4,689,022 in view of any of Kruger et al., Yarbrough et
al or Beyers, Jr. (RX-3008 at 124). In point 10, claims 13, 17, 35 and 38 were
rejected as being unpatentable over Kruger et al. in view of Miller or Muguet. (RX-
3008 at 124). In point 11, claims 1, 5, 7, 8, 12-15, 21-15, 26-36, 38, 40, 41, 42,
51, 52 and 56 were rejected as being unpatentable over Kruger et al. in view of
Muguet. (RX-3008 at 125-126).

   95. An August 5, 1992 declaration of Patrick Young filed in the '121 reexamination
proceeding recite that "the Insight product will reprogram the VCR for any schedule
changes of the selected program. Also, the on-screen schedule will provide accurate
and accessible schedule information for the particular cable or network broadcasting
region. These advantages of the claimed invention solve the problems that VCR owners
have experienced for a long time." (RX-3008 at 139).

   96. In an Amendment, received by the PTO on August 13, 1992. (RX-3008 at 189-
237), the applicant responded to the June 8, 1992 Office action by amending claim 12
and adding new claims 57-88 that recited, among other limitations, "a data processor
system." New independent claim 57 directed to a "television schedule system" defined
"broadcast schedule information" as "comprising broadcast schedule times, titles and
channels." Independent process claim 18 was not amended then and did not refer to
program titles. (RX-3008 at 189-204).

   97. In the amendment of August 13, 1992 it was argued that channel, theme, and
prime time buffers maintain the user's selected criteria. Thus it was stated:
   The Present Invention
   The present invention is a system that integrates the on-screen presentation of
television schedule information with automatic control of television apparatus
including a television receiver and a VCR. This integration enables immediate access
to and sharing of schedule information, which includes at least program titles,
channels, and times, to facilitate many of the advantageous features described below
and which allow an unskilled user to use the system of the present invention with
ease. The system may be implemented integrally with a VCR or as a separate unit, in
which case it may communicate with the VCR by remote control. The recitals of claim
1 include a data processor having a schedule information input means, a user input
means for selecting programs from stored schedule information, and several devices
controlled by the data processor; a television receiver, a program recorder, and a
programmable tuner. It should be understood that the data processor system may
include a plurality of microprocessors. The data processor system contains storage
for schedule information for selected programs and uses this information to control
operations of television apparatus. Actuating signals are sent to the recorder to
cause it to record a selected program, and the data processor system may allow the
television to receive a different program. The integration of television schedule
information, programmable tuner control, and VCR record control is one of the
important aspects of the present invention.
   The following features of a preferred embodiments are recited in various other
claims. A number of schedule selection criteria may be provided by the user into the
date processor system. Menus are displayed on the television screen, from which the
user may make selections with the user input device.
   Typical schedule selection criteria include accessible satellite symbols or
channel numbers, viewing times, or program themes (news, sports, comedy, etc.). The
system stores the schedule selection criteria, and the various selection criteria
may then be enabled or disabled by the user as desired. When schedule information is
presented to the user, the data processor system automatically combines all the
currently enabled schedule selection criteria and presents to the user only schedule

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

information meeting the requirements of the combined criteria. (RX-3008 at 206-207).

98. Applicant Young in the August 13, 1992 Amendment also stated:
     The integrated television schedule system of this invention allows for automatic updating of program schedules, both within the stored main schedule and within the stored record schedule list. When the schedule input means receives new schedule information, either in the normal course of periodic schedule updating or due to last minute rescheduling, the new information is provided to the integrated data processor system, which in turn incorporates the new information into the stored schedule information for both the main schedule and the record list. Updated schedule information is thus provided as an 'on-line' resource to be automatically incorporated into the stored schedule information.
     None of the cited references disclose a system integrating on-line television schedule information presentation and program selection with 'hands-on' television tuner control and/or VCR control by an integrated data process or system as disclosed and claimed in the present invention.
(RX-3008 at 209).

99. In the August 13, 1992 Amendment, the applicant stated: "In particular, it is noted that none of the prior art systems store the schedule information (which includes information of interest only to the user) of programs selected for recording from a schedule display; the only information stored as recording orders by the prior art systems is essentially simply numeric VCR programming information." (RX-3008 at 210).

100. In distinguishing his invention over Muguet, the applicant in the August 13, 1992 Amendment argued that Muguet used time, channel and a program identification "as opposed to" "schedule information," stating (RX-3008 at 212):
     Thus, the system of Muguet simply programs the VCR with standard programming information (channel, start & stop times) and/or program ID information. As explained below, because Muguet simply downloads the programming information required by the VCR, as opposed to the schedule information including program title, verification of record requests is very tedious and complex.

101. In the amendment dated August 13, 1992, the applicant stated (RX-3008 at 216):
     Independent process claims 18 and 32-38 all recite the process steps of providing schedule information to a data processor, selecting programs from the schedule information based on user inputs, storing schedule information for the selected programs, and using the stored schedule information to tune a television to receive the selected programs.

102. In the Amendment of August 13, 1992 applicant Young noted (RX-3008 at 216-217):
     Independent process claims 18 and 32-38 all recite the process steps of providing schedule information to a data processor, selecting programs from the schedule information based on user inputs, storing schedule information for the selected programs, and using the stored schedule information to tune a television to receive the selected programs.
     It should be noted that the term "schedule information", both as used in the present patent and as commonly understood, refers to a television schedule, i.e., a list of programs to be shown over a range of times, with at least program titles, program times, and, if for a plurality of channels, program channels. This usage is consistent with the dictionary meaning, wherein a schedule is defined as "a list of times of recurring events...; a timetable".

103. In distinguishing over prior art, the applicant in the Amendment of August 13, 1992 further stated (RX-3008 at 217):
     Of particular importance in distinguishing the present claims over the disclosure of Yarbrough are the claim recitals,
     'said data processor configured to select programs from the schedule information based on user inputs, storage means connected to receive the schedule information for programs selected by said data processor....' The first clause requires that the data processor select program listings from the schedule

2002 WL 31556392                                                  Page 135
 USITC Inv. No. 337-TA-454

information based on user inputs, as distinguished from selecting broadcast programs
based on the schedule information. The second clause requires that the selected
schedule information for the programs, previously selected by user inputs, is
stored. This claim language describes a situation in which a data processor acquires
program schedule information/listings, the user provides a selection input to select
one of the program listings from the acquired schedule information, then the
computer stores the selected program schedule information so that it may be used to
control a programmable tuner and/or a VCR to receive and/or record the program
corresponding to the selected program schedule listing.
(Emphasis in original)

   104. In the Amendment of August 13, 1992, with regards to a prior art reference to
Yarbrough, the applicant stated,
     The user enters a recording order, specifying program ID information, which is
stored. The user order is not selected by the data processor in any way. The stored
user order is then used to select only current broadcast programs based on the
program IDs. This is clearly different from using user inputs as claimed to select a
program listing from schedule information and thereafter store the schedule
information for the selected programs.
(RX-3008 at 218) (Emphasis in original).

   105. In distinguishing a prior art reference to Muguet, in the August 13, 1992
Amendment (RX-3008 at 189 to 237) the applicant stated:
     These recitations specify an integrated television schedule system in which a
data processor system first receives schedule information, then selects particular
programs from the schedule information based on user inputs, and then stores
schedule information for the selected programs; finally, this stored schedule
information is used for controlling a programmable tuner. The data processor thus
remains in 'hands on' control of the VCR and tuner, thereby enabling easy
verification of record requests, automatic updating of record schedules, and a
variety of other advantageous features.
(RX-3008 at 224).

   106. In the August 13, 1992 Amendment the applicant Young stated:
     Muguet, in contrast [to the '121 patent application], simply programs a VCR
timer with VCR programming information - channel, start/stop times, and program ID
in some implementations, as opposed to storing schedule information.
(RX-3008 at 224). In the August 13, 1992 Amendment Young also stated (RX-3008 at
227):
     Claims 33-55 include in their recitations the step of turning on a program
recorder for a selected program, whereas in Muguet the specialized VCR must remain
on continually, not just for the selected program.

   107. The applicant in the Amendment of August 13, 1992 analogized the schedule
information of the '121 patent to a television schedule in arguing that the '121
patent was not anticipated by the prior art:
     It is again respectfully submitted that the program description/ID information
of the Krüger system is not functional as the television schedule information
required by all currently pending claims. Firstly, Krüger's program information is
concurrently transmitted along side the program being currently broadcast, and
therefore cannot be used as a forecast schedule....

                                    * * *

     Furthermore, even if the system of Kram could be used as a television guide
controller for Kruger, the present system would not result. First, it is noted
systems such as Kram cannot custom assemble a new page of data combining a plurality
of listings earlier received. Systems such as Kram are only capable of associating
related but distinct pages of data which must be viewed one at a time. The Examiner
cited a "weather", then "city" operation in Kram. This type of operation is
explained in more detail from col. 24, line 52 to col. 26, line 41. If the user
selects a keyword topic "weather", the system constructs an index menu including
each page having the keyword "weather". Each such page will also have a particular
supplemental keyword which will be displayed on the index menu. The user then

            ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 136
USITC Inv. No. 337-TA-454

chooses one of the index entries to retrieve either a single page or a series (one at a time) of relational pages. The system of Kram cannot automatically combine two selection criteria such as "weather" and "channels 2, 5, and 11" to provide the user a custom assembled list of programs meeting the combined criteria. The system of Kram could only provide a first index in response to "weather", from which the user would have to select "channel 2" to receive that screen, and then select "channel 5" to receive that screen, and then select "channel 11" to receive that screen. Furthermore, as with Kato, Kram is very specific and does not remedy the general deficiencies of Kruger.
(RX-3008 at 230 to 232).

108. In an Office Action mailed on September 22, 1992, and in response to the 8/13/92 Amendment, the Examiner rejected the new claims as being broader than the original claims. The Examiner stated: "[c]laims 57-88 are rejected under 37 CFR 305 as broadening the scope of the claimed invention. It is noted that claims 57-88 fail to recite all of the limitations which are recited in any one of the patented claims and thereby enlarge the scope of the claimed invention. For example, all of these claims have been amended with respect to the original claims to recite 'a data processor system' instead of 'a data processor.' It is maintained that a 'data processor system' is broader than 'a data processor' in that it may include devices (displays, printers, light pens, etc.) which are peripheral to the 'data processor' itself." (RX-3008 at 254- 55).

109. In the Office Action of 9/22//92, the Examiner in point 6 also rejected claims 1, 5, 18, 19, 22, 24-27, 42, 43 and 45 as anticipated by or obvious over Levine U.S. Patent No. 4,963,994 alone, or, in view of Wright, U.K. published application 2.034,995 and Monteath et al. U.S. Patent No. 4,329,684. (RX-3008 at 256 to 261).

110. In point 6 of the Office Action of 9/22/62 it was also stated that the Examiner noted "with respect to claims 18, 19, 22 and 24-27 'combining user selection criterion' is maintained to read on the plurality of data needed to identify a single program to be recorded (i.e. the channel, time, etc...)." (RX-3008 at 261).

111. The Examiner, in his 9/22/92 Office Action in point 6 also stated that applicant's disclosed invention appears to operate by: a) displaying a list of TV programs (i.e., the schedule information) from which a user may select desired programs to be viewed/recorded; b) providing means by which a user can input data to the processor so that the processor can identify the programs from the list which have been selected by the user; and c) "automatically" controlling the receiving device based on the internally stored schedule information in response tot he user selections. (RX-3008 at 257, 258).

112. In point 7 of the Office Action of 9/22/92, claims 2-4, 9, 10, 12, 15, 18, 20, 21, 23, 28-30, 34, 37-41, 44, 48, 49, 52 and 58 were rejected as being unpatentable over Levine, Wright and Monteath et al as set forth in point 6. (RX-3008 at 261 to 264). In point 8, the Examiner rejected claims 6, 7, 11, 14, 31, 36, 41, 46, 47, 50, 51 and 54-56 as being unpatentable over Levine, Wright and Monteath et al. as was set forth in point 7 of the Office action in view of Muguet. (RX-3008 at 264 to 266). The Examiner in point 9 did state that claims 13, 17 and 35 avoid the act of record in that they at least recite selective actuation circuitry (alarm and recorder) which was not suggested or taught by the prior art and that claim 32 avoided the art of record in that it at least recited displaying data indicating the time remaining in a broadcast signal. It was concluded that such a display was not taught or suggested by the art of record. (RX-3008 at 266).

113. In an Amendment, responsive to the Office Action of 9/22/92 and filed on November 23, 1992 the applicant rewrote claim 36 and revised new claims 57-60, 66, 72 and 87. (RX-3008 at 269 to 286). Revised independent claim 57 to a "television schedule system" defined "broadcast schedule information" as comprising broadcast schedule times, title and channels." However independent claim 18 was not yet amended to refer to program titles. It was also argued, in the November 23, 1992 Amendment, that "a data processor system" was not broader than "a data processor."

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                  Page 137
USITC Inv. No. 337-TA-454

In particular, the applicant stated that "a data processor system must include more
elements than a data processor, and is therefore equal or narrower in scope than
simply a data processor." (RX-3008 at 275).

   114. In the Amendment dated filed November 23, 1992, the applicant, on page 8,
disputed certain prior art rejections stating: "These rejections are based on a
failure to recognize the fundamental distinction between 'schedule information' as
used in, e.g., Claim 1 or 'information identifying the selected programs' as used
in, e.g., Claim 18, and the program data used in the prior art, i.e., sufficient
data such as time, day, and channel to program a VCR or television set." (RX-3008 at
276)(emphasis in original).

   115. In the amendment filed November 23, 1992, the applicant, at page 8, argued
"Levine discloses a system which can prompt the user through the steps of
programming the VCR, and which in some embodiments can display schedule information
on the television screen" (RX-3008 at 276).

   116. In the Amendment filed November 23, 1992, applicant Young again stated that
storing schedule information for selected programs distinguished the invention over
the prior art:
       These rejections are based on a failure to recognize the fundamental
distinction between "schedule information" as used in, e.g., Claim 1 or "information
identifying the selected programs" as used in, e.g. Claim 18, and the program data
used in the prior art, i.e., sufficient data such as time, day and channel to
program a VCR or television set.

                                     * * *

       "Additionally, Applicant notes that Levine stores only conventional
programming data, not schedule information as presently claimed. As discussed in the
previous Amendment, the storage of schedule information as opposed to mere
programming data significantly enhances the user's ability to verify and later
identify the selected programs, and also enables the data processor to perform
additional functions, such as linking and tracking programs, i.e., allowing the user
to review a list of programs selected for future viewing or taping by presenting a
calendar as disclosed, rather than simple programming data for controlling a video
recorder. Some of the Examiner's current remarks appear to recognize the distinction
between these two types of information, but the relevance of this distinction to the
analysis of the claim language was not explicitly discussed. Applicant respectfully
submits that this distinction is an important one separating the claimed invention
from the prior art, and is sufficient to distinguish the claimed invention from the
prior art."
(RX-3008 at 278) (Emphasis in original).

   117. In the November 23, 1992 Amendment, the applicant referred to claim 18 as
storing "schedule information" for selected programs. The applicant stated (RX-3008
at 279):
       Process Claim 18 contains a similar limitation which distinguishes over the
prior art. Regarding the claimed 'combining of user selection criteria,' the
Examiner has asserted that this reads on the plurality of data needed to identify a
single program to be recorded (channel, time, etc.). This trivializing
simplification, however, ignores the plain meaning and interpretation of the claims,
which interpretation is also supported by the specification. Of course, programming
information such as channel and time might be used as selection criteria, but, such
as is recited in claim 18, the selection criteria must then be combined, the
combined criteria must be used to select programs from schedule information, and
then the schedule information for the selected program is stored. These steps are
clearly not met by the simple input and storage of programming data for a single
program.
(RX-3008 at 279) (Emphasis in original).

   118. With regards to prior art applicant Young in the November 23, a Amendment
stated:
       Claim 18 further requires "storing information identifying the selected

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

programs." It is respectfully submitted that data, channel and time data do not
sufficiently identify the selected programs. Date, channel and time data identify
time slots and channels without any identification of programs broadcast in the time
slots on the channels. Again, the distinction between identifying selected programs
and identifying only time slots and channels is critical for achieving many
benefits' tracking programs that have been selected with the system, i.e., allowing
the user to review a list of programs selected for future viewing or taping by
presenting identifying information on the program, rather than just an indication of
when recordings will be made; linking related programs with the schedule
information; and, automatically updating the stored schedule information for the
selected program when the schedule time for a previously selected program is
changed, as described in the '121 patent. Because the prior art does not combine
user selection criteria, use such combined user selection criteria to select
programs meeting the combined user selection criteria in the data processor, or
store information identifying the selected programs, the Levine, Wright and Monteath
prior art fails to teach or suggest the subject matter of Claim 18 or its dependent
claims 19-31.

    Similarly, independent Claim 33 requires 'using the user selection criteria to
select programs for viewing from the schedule information in the data processor,'
and 'storing information identifying the selected programs.' In Levine, Wright and
Monteath et al., the selection is made by user entry of date, channel and time,
without using the schedule information already in the data processor and the user
entered date, channel and time information does not identify the selected programs.
These limitations are also present in independent claims 34 and 36-38.
(RX-3008 at 280-81) (Emphasis in original).

  119. On December 23, 1992 and December 29, 1992, the applicant's attorney
conducted several telephonic interviews with the Examiner in which broadening matter
was discussed. (RX-3008 at 288).

  120. The Reexamination Interview Summary Form, mailed on January 5, 1993 in paper
# 15, and summarizing the December 23, 1992 Examiner interview stated, inter alia,
that "[t]he examiner indicated that he believed the language of the claims to be
broader than the scope of applicant's arguments filed 11/23/92 (see paper #15)."
(RX-3008 at 288).

  121. In a Final Office Action, mailed January 5, 1993, the Examiner rejected the
new claims 57-88 as broadening the scope of the claimed invention. In discussing
this rejection on pages 2-4 of the Office Action, the Examiner gave examples of how
the new claims are broadening. Thus it was stated (RX-3008 at 290-93):
    In view of applicant's amendment filed 11/23/92, the following is hereby noted
to exemplify how the claims have been broadened:
    I. Claim 57 does not recite:
    a) the supplying of the "actuating signal" recited in original claim 1; b) the
plurality of user selection menus recited in original claim 12; c) the "actuating
signal" in original claim; d) the "actuating signal" in original claim 14; e) the
"actuating signal" in original claim 15; f) the "linking information" in original
claim 16; g) the "alarm" in original claim 17; h) the "combining of user selection
criteria" in original claim 18; i) the "time remaining" message in original claim
32; j) the "television receiver" recited in original claim 37; k) the "terminating
[of] recording" recited in original claim 34; l) the "turning on [of] the recording
device" recited in original claim 35; m) the "remote controller" recited in original
claim 36; n) the "linking information" recited in original claim 37; o) the "alarm"
recited in original claim 38; p) the "user selection menu" recited in original claim
39; q) the "television receiver" recited in original claim 42; r) the "remote
controller" recited in original claim 51; s) the "recording device" recited in
original claim 52; f) the "linking information" recited in original claim 53; and g)
the storing means connected to "receive the schedule information for programs
selected by said processor" as in original claim 54. [Emphasis in original]
(RX-3008 at 290-93).

  122. In the Final Office Action, mailed January 5, 1993, the Examiner in point 2
with respect to claims 65, 67, 72, 76, 82, 84 and 87, noted that those claims differ
from the claims as originally filed in that they at least recited "a data

2002 WL 31556392                                                        Page 139
USITC Inv. No. 337-TA-454

processing.. system" instead of "a data processor;" that "applicant argued that a 'data processing system' must include more elements than a 'data processor' and therefore the limitation is more limiting." (Emphasis in original). The Examiner then stated specifically that he

    does not dispute applicant's position that a 'processor system' must include more elements, but, he points out that the recited connections to and processing performed by the processing system (as recited in these new claims) does not require connections to and processing performed by the processor itself (as recited in the original claims). Such processing/connections could be directed to said 'more elements.' Being such, these claims are clearly broader in scope than those originally filed.
(RX-3008 at 292) (Emphasis in original).

  123. The Examiner in the Office Action of January 5, 1993 in point 5 rejecting again claims 1, 5, 18, 19, 22, 24-27, 33, 42, 43 and 45 as being anticipated by Levine alone as set forth in the 9/22/92 office action found that the claim language of the original claims of the '121 patent failed to include language that would require that the '121 patent's claim's data processor select programs from previously provided schedule information. For example the Examiner, in giving a reason why pending claims were rejected as anticipated by Levine, stated (RX-3008 at 293-295):

  1) The examiner notes that applicant does not appear to dispute the receipt and display of "schedule information" in Levine [see lines 1-4 in the last paragraph on page 8 of the arguments filed 11/23/92]. Nor does applicant appear to dispute that a user may enter codes into the system of Levine, wherein said codes are obtained from the displayed "schedule information", such that the entered information directs the processor to control a video recorder to receive and record the selected programs [see the paragraph which starts on page 8 and extends to page 9 in the arguments filed 11/23/92].

  As disclosed, applicant's claimed invention also displays schedule information from which a user also selects the desired program to be recorded. The user then also enters data into the system which directs the processor to control a video recorder to receive and record the selected programs. Applicant's disclosed system differs from Levine in that the user inputs of applicant are used by the processor to actually access the stored information while the user inputs in Levine actually represent the stored information. The examiner maintains that the recitation that the processor is "configured to select programs from the schedule information based on user inputs" does not distinguish two systems. Specifically, the processors of both systems are directed to record selected programs based on user inputs [see applicant's arguments on page 9 and the first 7 lines of page 10].

  2) In the first full paragraph on page 10 of the argument's [sic], applicant argues that Levine stores only "conventional programming data" and not "schedule information" as claimed. This argument seems only to be directed to terminology (i.e. labels) and appears to be inconsistent with applicant's discussion in the last paragraph on page 8 in which applicant has acknowledged thestored [sic] data to be schedule information [see lines 52-59 in column 2 of Levine].
(RX-3008 at 293-95). (Emphasis in original)."

  124. The Examiner in point 5 of the Office Action of 1/5/93 further gave another reason why pending claims were anticipated by Levine in stating:

  2) In first full paragraph on page 10 of the argument's [sic], applicant argues that Levine stores only "conventional programming data" and not "schedule information" as claimed. The argument seems only to be directed to terminology (i.e. labels) and appears to be inconsistent with applicant's discussion in the last paragraph on page 8 in which applicant has acknowledge thestored data to be schedule information [see lines 52-59 in column 2 of Levine.]
(RX-3008 at 294, 295).

  125. The Examiner in point 5 of the Office Action of 1/5/93 gave another reason why pending claims were anticipated by Levine in stating:

  3) The examiner points out that neither the processor of applicant's disclosed system nor the processor of Levine are intelligent devices. That is, the only way either processor "selects" programs to be recorded is that the user provides inputs which instruct the processors which programs are to be selected. Although the

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

examiner acknowledges that the two processors operate differently to provide the
selections, the examiner maintains that the limitation that the processor is
"configured to select programs from the schedule information based on user inputs"
does not define such differences.
(RX-3008 at 295) (Emphasis added).

    126. The Examiner also in point 5 of the Office Action of 1/5/93 gave two other
reasons why pending claims were anticipated by Levine in stating:
    4) With respect to claim 18 (see arguments in the first full paragraph on page
11 of the amendment filed 11/23/92), the examiner maintains that the system
described by Levine selects "those programs" for recording based on a plurality of
criteria input by the user which was derived from stored schedule information
displayed on the receiver. Such is maintained to meet the limitations of claim 18
when the "data processor" is consider to include the means for storing the incoming
schedule information and the controller (26).
    5) With respect to claim 33 (see arguments which start on the bottom of page 12
and extend to page 13), the examiner refers applicant back to the discussion of
claim 18 above. Additionally, the examiner points out that the system of Levine must
include means for storing the user input criteria for the system to be able to
know/remember the selected programs which are to be recorded at some later date.
Further, it is noted that information such as date, time, and channel are used by
the processor in Levine to identify the programs to be recorded (the use of such
identifiers is common in most TV listings).
(RX-3008 at 295 - 96) (Emphasis added).

    127. The Examiner in his 1/5/93 Office action summarized all the reasons for
anticipation by Levine in the following:
    6) The examiner does not dispute that applicant's disclosed system operates
differently than that disclosed by Levine. It is maintained, however, that such
differences are not defined in the claims. Applicant's argument's simply appear to
be an attempt to specifically define terminology/labels used in the claims so as to
incorporate portions of the written description. Such arguments are not deemed to be
persuasive. (RX-3008 at 296) (Emphasis added)

    128. The Examiner, in the Office Action of 1/5/93, stated that claim 32 avoids the
art of record "as was set forth in paragraph 9 of paper ¶ 12 [viz., the Office
Action of 9/22/92]" (RX-3008 at 301).

    129. In a Proposed Amendment, attached to the Reexamination Interview Summary Form
concerning a telephonic interview on January 6, 1993, the language "electronic
memory associated with a data processor" was added to process claims 18, 33, 34, 36,
and 38, and the language "storage means comprising an electronic memory" was added
to system claims 1, 12, 14, 15, 39, 42, 51, 52, and 54. (RX-3008 at 364-70)
(Emphasis added). In claim 18, on the face of this proposed amendment, the language
"associated with" is bracketed, and replaced with the word "in." (RX-3008 at 366).
In the proposed amendment, proposed claim 18 did not refer to titles of programs:
(RX-3008 at 366). However the last proposed claim stated that "said data processor
identifies broadcast schedule times, titles and channels." (RX-3008 at 370).

    130. On January 21, 1993, the applicant faxed to Examiner a Proposed Amendment
(RX-3008 at 373, 391) incorporating the change that appears on the face of the
Proposed Amendment attached to the January 6, 1993 Reexamination Interview Summary
Form. However in claim 18, "electronic memory associated with" a data processor
which was found in the proposed amendment attached to the reexamination Interview
Summary Form concerning the telephonic interview on January 6, 1993 was amended to
read "electronic memory in" a data processor. (RX-3008 at 377). In the amendment
Young stated (RX-3008 at 388-89):
    During the interview on January 5, 1993, clarifying amendments to claim 18 and
others were presented for the Examiner's consideration. The amendments to claim 18
clarify that the schedule information is provided to an electronic memory in the
data processor, the data processor combines user selection criteria, and the
programs meeting the combined criteria are then selected from the schedule
information in the memory. During the interview on January 5, the Examiner agreed to
consider the proposed amendments to claim 18, and on January 6 confirmed that the

2002 WL 31556392                                                      Page 141
USITC Inv. No. 337-TA-454

proposed amendments were considered to avoid the prior art.
Proposed claim 18 yet did not include program titles. However proposed independent
claim 57 to a "television schedule system" did state "said stored broadcast schedule
information identifying a broadcast schedule time and channel and a program title
for each said selected program." (RX-3008 at 377- 86).

  131. An Amendment After Final, date-stamped at the PTO on January 29, 1993, (RX-
3008 at 393 - 410) was filed in response to the Office Acton on 1/5/93, to an in-
person interview on Jan. 5, 1993 (RX-3008 at 305), and a telephone interview on Jan.
6, 1993. In claim 1, handwritten brackets were placed around "comprising an
electronic memory" in the language "storage means comprising an electronic memory."
(RX-3008 at 394).

  132. In the amendment of 1/29/93 (RX-3008 at 393 - 410) applicant rewrote claims
1, 4, 12, 14-15, 18, 21, 29, 33-34, 36-39, 42, 51-52, 54 and 57-64. In the
Amendment, independent process claim 18 did not yet include titles of programs.
Rewritten claim 57 to a television schedule system did include the phrase "said
stored broadcast schedule information identifying a broadcast schedule time and
channel and a program title for each said related program."

  133. In the Amendment After Final, date-stamped at the PTO on January 29, 1993,
the applicant surrendered the "data processor system" language, and instead amended
independent process claims 18, 33, 34, 36 and 38 to recite the step of "supplying
program schedule information to electronic memory in a data processor, the data
processor combining user selection criteria, selecting those programs meeting the
combined user selection criteria for viewing from the program schedule information
in said electronic memory in" the data processor, storing information identifying
the selected programs, and using the stored information to tune the television
receiver to the selected programs. (RX-3008 at 397). (language added in this
amendment is underlined). (RX-3008 at 394-407).

  134. On February 11, 1993, the applicant's attorney conducted a telephone
interview with the Examiner, in which the Examiner "questioned" the support for the
new "electronic memory" recitations. (RX-3008 at 416).

  134A. In a Proposed Supplemental Amendment After Final, faxed to the Examiner on
February 16, 1993. (RX-3008 at 418 to 435), the applicant deleted the language
"comprising an electronic memory" from claim 1. (RX-3008 at 419). Young did not add
any claim language in this amendment to the independent process claim 18 to state
that the stored information identifies program times, channels and program titles.
However in the proposed amendment, independent claim 57 to a "television schedule
system" did include the language "said stored broadcast schedule information
identifying a broadcast schedule time and channel and a program title for each said
selected program." (RX-3008 at 422- 431).

  135. In a "Reexamination Interview Summary Form," mailed February 17, 1993, the
Examiner "questioned" whether the specification provided support/antecedent basis
for the retrieving of schedule information from an electronic memory, selecting data
therefrom, and restoring the selected data. (RX-3008 at 416).

  136. Telephonic interviews were conducted on each of January 6, 1993  (RX-3008 at
363), January 28, 1993 (RX-3008 at 372) and February 11, 1993 (RX-3008 at 416). In
the interview summary forms, there is no indication that applicant Young proposed
any claim language explicitly stating that the stored information identifies program
times, channels and program titles.

  137. In a Reexamination Advisory Action, mailed February 17, 1993, the Examiner
considered, but refused to enter, the Amendment After Final maintaining the
rejections from the previous Action. The Examiner extended the response period for
three months. (RX-3008 at 437).

  138. In the Reexamination Advisory Action of February 17, 1993 regarding the
applicant's proposal to add the "electronic memory" language, the Examiner noted
that:

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 142
USITC Inv. No. 337-TA-454

[a]pplicant agreed to file a supplemental amendment which would cancel the added
limitations in the amended claims directed to the storage and retrieval of schedule
information, to/from an electronic memory, in view of questions raised by the
examiner as to the lack of support in the specification for such limitations and in
view that applicant believed that such limitations were no longer needed."
(RX-3008 at 438).

   139. After the Reexamination Advisory Action of 2/17/93 was mailed, and prior to
its receipt, the applicant faxed on February 23, 1993 a Proposed Supplemental
Amendment After Final (RX-3008 at 441 to 463), adding "electronic memory" language
and including the same language in new process claims 67 and 68. (RX-3008 at 442-
58). For example new claims 67 and 68 read:
   67. A process for controlling the presentation of broadcast programs to a
television receiver, which comprises supplying program schedule information to
electronic memory in a data processor, supplying independent user chosen program
selection criteria to the data processor, the data processor combining said user
selection criteria, selecting those programs meeting the combined user selection
criteria for viewing from the program schedule information in said electronic memory
in the data processor, storing information identifying the selected programs, and
using the stored information to tune the television receiver to the selected
programs.
   68. A process for controlling the presentation of broadcast programs to a
television receiver, which comprises supplying program schedule information to
electronic memory in a data processor, supplying user program selection criteria to
the data processor, the data processor combining said user selection criteria,
selecting those programs meeting the combined user selection criteria for viewing
from the program schedule information in said electronic memory in the data
processor, storing information identifying the selected program, and using the
stored information to tune the television receiver to the selected programs, wherein
a group of said selection criteria are combined by the data processor as logical
alternatives so that the combination of said group of selection criteria is
satisfied whenever any one of said selection criteria of said group is met.
(Emphasis added). In this proposed supplemental amendment after final no proposal
was made to amend the specification. Existing claims were proposed to be amended
which included adding the language, "said stored information identifying broadcast
schedule times, channels, and program titles" to claim 18. (RX-3008 at 445-46).

   140. In the Proposed Supplemental Amendment After Final, with a fax date of
2/23/93 (RX 3008 at 441 - 63), the applicant argued that the specification
"inherently" and "implicitly" supports the "electronic memory" limitations, stating:
   A. Combining User Selection Criteria: A group of claims have been amended to
clarify that the schedule information is provided to a storage means (in some claims
recited as an electronic memory in the data processor), the data processor combines
user selection criteria, and programs meeting the combined criteria are then
selected from the schedule information in the storage means. Support for these
limitations can be found in a number of locations in the patent, including at column
8, lines 23 et seq., and at column 17, lines 33 et seq. It is believed inherent and
implicit that the list operations described in column 17 are performed on
information in an electronic memory.
(RX-3008 at 459).

   141. The applicant, in the Proposed Supplemental Amendment After Final (RX-3008 at
441-63) faxed on February 23, 1993, proposed amending certain claims "to further
clarify that the schedule information stored for the selected programs identifies
not only program channels and times, but also program titles." Thus it was stated:
   I. Clarifying Schedule Information: Independent claims 1, 12, 14-15, 18, 33-
34, 36-38 and 54 have been amended, in addition to the earlier clarifications agreed
upon by the Examiner, to further clarify that the schedule information stored for
the selected programs identifies not only program channels and times, but also
program titles. New claim 57 also contains this recitation. As previously noted,
prior art systems simply program the VCR with the channels and times for selected
programs; information identifying the title was not stored.

                                   * * *

       ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 143
USITC Inv. No. 337-TA-454

    Independent claims 65 and 68 [which became claims 64 and 67] now require that
at least some of the selection criteria are combined as alternatives. This is
supported, for example, at column 14, in the discussion of the Channel Restriction
selection criteria. Multiple channels may be specified, and the combined of
selection criteria by the present invention versus the 'combining' of paging
commands or other selections by the cited prior art systems.
(RX-3008 at 459-60).

    142. Applicant in the Proposed Supplemental Amendment After FINAL, faxed on
February 23, 1993, represented

A. Combining User Selection Criteria:

    A group of claims have been amended to clarify that the schedule information is
provided to a storage means (in some claims recited as an electronic memory in the
data processor), the data processor combines user selection criteria, and programs
meeting the combined criteria are then selected from the schedule information in the
storage means. Support of these limitations can be found in a number of locations in
the patent, including at column 8, lines 23 et. seq., and at column 17, lines 33 et
seq. It is believed inherent and implicit that the list operations described in
column 17 are performed on information in an electronic memory.
(RX-3008 at 459).

    143. The Examiner in a Reexamination Interview Summary Form, in reference to
interviews that took place on February 19 and 24, stated that he had "expressed
concerns that the term 'electronic memory' and the recitations that the schedule
data is stored and retrieved from such a memory did not appear to have clear support
in the disclosure." (RX-3008 at 465).

    144. In a February 26, 1993 Supplemental Amendment After Final (RX-3008 at 467-
496), Young attempted to overcome the Examiner's rejections with three amendments to
the '121 patent's specification: (1) changing from "A memory" at column 7, line 47
to "An electronic memory;" (2) amending column 17, line 38 to specify that the
"program listing" is stored in "program list buffer 303;" and (3) amending column
17, line 49 to read, "Program list buffer 303, screen buffer 353, and the other
buffers discussed above are located within an electronic memory coupled to the data
processor, such as electronic memory 111." (RX-3008 at 468). Young explained the
reason for these proposed amendments to the specification, including attempting to
explain why the claimed "electronic memory" was "inherent" and "implicit" in the
original specification, as follows:
    As suggested by the Examiner, various minor amendments have been made to the
specification to make explicit various aspects of the invention that were implicit
but not totally explicit in the original specification. At column 7, language was
added to make explicit the fact that the memory employed by the data processor is an
electronic memory. This is believed not to be new matter because it is inherent and
implicit in the original specification that in the disclosed embodiment the memory
used by the data processor is electronic (as opposed to human, for example).
    In several places throughout columns 15 and 16, clarifications were made so the
reminder calendar is consistently referred to as the "reminder calendar schedule."
This is believed not to be new matter because in this section of the specification
the term "schedule" was alternatively used to refer to the reminder calendar. The
amendments simply make a consistent usage that was inherent and implicit in the
original.
    In column 17 language was added to make explicit the facts that program listing
325 is stored in program list buffer 303, and that the various buffers are within
electronic memory coupled to the data processor. This is believed not to be new
matter because at column 16, lines 45 et. seq., it is stated that the CPU stores the
program data in program list buffer 303, and because it is inherent and implicit in
the original specification that in the disclosed embodiment the various buffers
manipulated by the data processor must be in the electronic memory, or the data
processor could not do the recited functions.
(RX-3008 at 486-87).

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 144
USITC Inv. No. 337-TA-454

145. Applicant, in the February 26, 1993 Supplement Amendment After Final, added the following limitation to claim 42 (RX-3008 at 477-478):

wherein said data processor is configured for a selectable display mode, said data processor being configured to present an initial display of said schedule information stored in said storage means upon selection of said display mode, said initial display automatically comprising schedule information for at least one of a current time period and a current channel of said programmable tuner.

146. In the February 26, 1993 Supplemental Amendment After Final (RX 3008 at 467-96), the applicant added new independent process claims that include the step of "supplying program schedule information to electronic memory in a data processor." Also certain claims were amended. The amendments included adding to claim 18 the phrase "said stored information identifying broadcast schedule times, channels, and program titles." (RX-3008 at 473, 485-86).

147. In the Supplemental Amendment After Final, stamped as received on February 26, 1993 by Group 260 of the PTO, the applicant proposed amendments to the specification pertaining to memory or storage which included the following: the applicant requested that "[i]n col. 7, line 47, please replace 'A memory' with --An electronic memory -;" the applicant requested that "[i]n col. 17, line 38, after 'program listing 352' and before 'is made' please insert --, stored in program list buffer 303,-;" and the applicant requested that "[i]n col. 17, line 49, after "TV." please insert -- Program list buffer 303, screen buffer 353, and the other buffers discussed above are located within an electronic memory coupled to the data processor, such as electronic memory 111.-" (RX-3008 at 468).

148. Consistent with the specification, the '121 patent file history specifically notes that the channel, theme, and prime time buffers maintain the user's selected criteria. (RX-3008 at 489). Thus in the February 26, 1993 Supplemental Amendment After Final, the applicant stated: "The user selection criteria may be entered and activated independently under different categories (theme, channel, prime time) and are maintained by the data processor whether currently activated or not." (RX-3008 at 489). (Emphasis in original) "Maintained" means kept in the buffers. (Rhyne, Tr. at 3777).

149. Applicant, in the February 26, 1993 Supplemental Amendment, represented  (RX-3008 at 490):

Automatically Focusing the Display
Also discussed were clarifications of the preselection of schedule information for display, directed to automatically focusing a display of schedule information according to a current time or a current channel. The Examiner has confirmed that the claims reciting this selective display are believed to be allowable. Support for this selective display can found [sic], for example, at column 10, lines 12-65. Lines 50-59 are an example display for preferred embodiment. Lines 45-46 explain that the listing starts at the nearest previous half-hour. Lines 46-47 explain that a pointer (not shown in the example screen) will be positioned at the last selection made (and thus indicate the current channel). Lines 60 to 62 explain that the screen also includes 3 lines of status information, which at lines 56-59 is shown to include for the currently selected channel the remaining time and program title schedule information. Similar disclosure also appears at column 1, lines 33-37.

150. In the February 26, 1993 Supplemental Amendment, applicant also stated (RX-3008 at 488-90):
Several of the present claims recite a process in which the user enters user program selection criteria, and the user enters user program selection criteria, and the data processor combines the program selection criteria, searches through the stored selection criteria, searches through the stored schedule information, and creates and stores a display list of program listings that meet the combined criteria. This is disclosed, for example, at col. 17 lines 33 et seq. The user may then make program selection choices (which the Examiner has characterized as further program selection criteria) from this display. The data processor then stores information fo these program sections, including information identifying program titles, in a reminder calender list.

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                  Page 145
USITC Inv. No. 337-TA-454

    Several claims recite the data processor combining a plurality of user
selection criteria other than the program choices. This is different from the
scenario that the Examiner has proposed would be inherent in Levine and similar art,
namely that the user could enter a date as a first selection criteria, then be
presented with a page of program listings, and then enter a program choice as a
second selection criteria to be "combined" with the date selection criteria. As
amended, several claims (such as claim 1) require the data processor combine a
plurality of selection criteria in addition to the program choice. The Examiner's
proposed data entry does not meet the requirement of combined selection criteria
even if entered as a series of page commands. Each page command simply establishes a
new requirement that supersedes and replaces the previous requirement rather than
being combined with it.

    In response to earlier arguments that the claims require schedule information
including program title to be stored for selected programs, the Examiner only argued
that the term "schedule information" was not defined so as to require program title.
Several claims have been amended to specify the storage of program title for the
selected programs and are thus believed to be allowable. As previously noted, prior
art systems simply program the VCR with the channels and times for selected
programs; information identifying the title was not stored.

    The user selection criteria may be entered and activated independently under
different categories (theme, channel, prime time) and are maintained by the data
processor whether currently activated or not. This is disclosed, for example, from
column 12 line 12 to column 15 line 17 (wherein it is stated that buttons can be
pressed to independently activate the THEME, PRIME-TIME, and CHANNEL selection
criteria) and from column 18 line 11 to column 20 line 38. Furthermore, the
selection criteria can be combined as alternatives (in a logical OR fashion), such
as a list of acceptable channels or a list of acceptable themes. This is far
different from even the cited teletext art, where search criteria are entered and
combined in a dependent, hierarchical fashion. At each stage in the cited teletext
art, the available search choices are determined by and dependent upon the previous
choices made. Furthermore, they are only combined in a logical AND fashion.

    Also the prior art does not allow complex entries (such as theme or channel
lists) to be deactivated yet saved in memory.

    151. Applicant, in the February 26, 1993 Amendment (RX-3008 at 467-96),
specifically asserted as to claims 18, 32, 33, 36, 42, 51, 54, 57 and 66 (RX-3008 at
492-95):

Claim 18

    This claim now requires that the data processor combine a plurality of
independent user program selection criteria in addition to a program choice, and
that it store information identifying titles for selected programs.

Claim 32

    This claim has been confirmed as patentable and recites the display of time
remaining for a program being broadcast.

Claim 33

    This claim now recites that the data processor automatically focuses the program
listing display according to at least one of a current time or channel.

                                    * * *

Claim 36

    This claim now requires that the data processor combine a plurality of
independent user program selection criteria in addition to a program choice, and
that it store information identifying titles for selected programs.

                                    * * *

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 146
USITC Inv. No. 337-TA-454


Claim 42

    This claim now recites the focusing of an initial display of schedule
information according to at least one of a current time period or channel.


Claim 51

    This claim now recites the focusing of an initial display of schedule
information according to at least one of a current time period or channel.

                                    * * *


Claim 54

    This claim now recites the presentation of entering a plurality user selection
criteria to be combined, allow user program selection from a menu of programs
meeting the combined selection criteria, and storing a reminder calendar including
titles for the chosen programs.

Claim 57

    This claim recites the focusing of an initial display of schedule information
according to at least one of a current time period or channel, and stores
information identifying titles for selected programs.

                                    * * *


Claim 66

    This claim requires that the data processor combine a plurality of independent
user program selection criteria in addition to a program choice.

    152. In the Office Action of March 26, 1993, the Examiner objected to the proposed
amendment as "new matter" and stated that "[a]pplicant is required to cancel the new
matter in the response to this Office Action." (RX-3008 at 507- 08).

    153. The Examiner in an Office Action of March 26, 1993 stated in part (RX-3008 at
507):
    2. The amendment filed 2/26/93 is objected to under 35 U.S.C. § 132 because it
introduces new matter into the specification. 35 U.S.C. § 132 states that no
amendment shall introduce new matter into the disclosure of the invention. The added
material which is not supported by the original disclosure is as follows:
    1) In column 7, line 47, "A memory" has been changed to -- an electronic memory-
-. This amendment is considered to introduce new matter because: a) it is not clear
from the disclosure as originally filed what kind of memories are included or
excluded by the term "electronic memories" (i.e. RAM, disc, tape, storage tubes,
etc...), and b) it appears to suggest that said memory is now intended to be limited
only to memories of some certain type (i.e. electronic) while the disclosure as
originally filed appears to have recited a generic memory (i.e. inclusive of all
types).
    2) In column 17, line 49 has been amended to recite that the program list buffer
303, screen buffer 353, and other discussed buffers are located within an electronic
memory coupled to the data processor, such as electronic memory 111. This amendment
is considered to add new matter because: a) it [The file wrapper does not finish the
sentence]

    Applicant is required to cancel the new matter in response to the Office action.

    154. In the same Office Action dated March 26, 1993, in which the Examiner
rejected the applicant's proposed amendments to column 7, line 47 and column 17,
line 49 of the specification, the Examiner also rejected, under 35 U.S.C. § 112, ¶
1, claims 1-12, 14, 15, 18-31, 33, 34, 36, 38, 54-56, and 64-67 on the basis that
the claims recited that the schedule information is stored in an electronic memory.
(RX-3008 at 508). The Examiner did state that if the claims were amended to overcome

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the § 112, ¶ 1 problems, they would be found patentable. (RX-3008 at 509).

155. In the Office Action dated March 26, 1993, the Examiner rejected the applicant's proposed amendment at column 17, line 49, which was proposed in a February 26, 1993 Supplemental Amendment After Final, and which stated that "the program list buffer 303, screen buffer 353, and other discussed buffers are located within an electronic memory coupled to the data processor, such as electronic memory 111." In the same Office Action, the Examiner rejected, under § 112 1, claims 1-12, 14, 15, 18-31, 33, 34, 36, 38, 54-56, and 64- 67 on the basis that the claims recited that the schedule information is stored in an "electronic memory," and that "[s]uch recitations do not appear to be supported by the specification as originally filed [see paragraph 1 of this Office Action]." (Bracketed material in original). Said paragraph 1 read:

    1) In column 7, line 47, "A memory" has been changed to -an electronic memory-. This amendment is considered to introduce new matter because: a) it is not clear from the disclosure as originally filed what kind of memories are included or excluded by the term "electronic memories" (i.e. RAM, disc, tape, storage tubes, etc...); and b) it appears to suggest that said memory is how intended to be limited only to memories of some certain type (i.e. electronic) while the disclosure as originally filed appears to have recited a generic memory (i.e. inclusive of all types).

(RX-3008 at 507-508). The Examiner also stated that claims 42 "as amended avoid the art of record and [is] patentable." The Examiner further stated that if the claims were amended to overcome the 35 U.S.C. § 112 problems, they would be found patentable. (RX-3008 at 509).

156. Because the Examiner rejected the proposed claim language "lectronic memory," the applicant in an amendment dated April 6, 1993 (Amendment E), substituted the term "electronic memory" in the claims (including independent process claims 18, 33, 34, 36, 38, 66 and 67) with "storage means" (RX-3008 at 512-34) and amended the sixth full paragraph of column 17 ln. 38 to include the language of its sentence as follows: "[p]rogram list buffer 303, screen buffer 353, and the other buffers discussed above are located within a data storage device coupled to the data processor." (RX-3008 at 513-514). The remainder of the paragraph was restored to the language which was found when the '121 patent issued on November 10, 1987. Old claim 18 had read in part: "selecting those programs meeting the combined user selection criteria for viewing from the program schedule information is said electronic memory in the data processor" (RX 3008 at 473). New claim 18 now read in part:

    selecting those programs meeting the combined user selection criteria for viewing from the program schedule information in said storage means in the data processor

(RX-3008 at 520).

157. Applicant in amendment dated April 6, 1993 explained:
    Applicant has amended the specification as requested by the Examiner, and has amended the claims to no longer refer to an electronic memory. It is respectfully submitted that the original specification fully supports the claims and that the objection to the specification and the § 112 rejection of claims is therefore overcome.

(RX-3008 at 534).

158. In a Reexamination Interview Summary Form regarding a telephonic interview held on April 19, 1993, the Examiner stated that "[a]pplicant agreed to change the last two lines in the sixth full paragraph of column 17 so as to avoid the issue of new matter" The last two lines was in reference to the following: "[p]rogram list buffer 303, screen buffer 353, and the other buffers discussed above are located within a data storage device coupled to the data processor." (RX-3008 at 536).

159. The following day, the applicant submitted a Supplemental Amendment dated April 20, 1993 (amendment F) (RX-3008 at 538-42), that amended the ' 121 patent's specification to set forth a definition of the term "data storage means," and deleting the language indicating that the storage means was "coupled" to the data processor so that the sixth full paragraph at col. 17 reads:

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 148
USITC Inv. No. 337-TA-454

A search of the program listing 352, stored in program list buffer 303, is made. The search is dependent on the status of the channel buffer, the theme buffer, the prime time buffer, and the direction of the search. If the page 356 is up, the search direction is forward starting from the list pointer. If the page is down 357, the search direction will be backward 358 from the current list pointer. When the search satisfies the above criteria, the program listing from program list buffer 303 is placed into the screen buffer 353. The search continues until the screen buffer is full 354 in which case the search is terminated. The status line information is passed to the screen buffer and displayed 355 by the TV. Program list buffer 303, screen buffer 353, and the other buffers discussed above comprise a data storage means.
(RX-3008 at 540-41; CX-1, RX-3001, 17:38-49; RX-3002 at 2:38-52  (underlined language amended by April 20, 1993 Supplemental Amendment)).

160. The applicant in the April 20, 1993 amendment explained that this final amendment was made at the Examiner's request: "During the telephone conversation of April 19, 1993, Applicant agreed to correct claim 29 to no longer refer to an electronic memory, agreed to present the earlier amendments to the specification in the format preferred for Reexaminations, and agreed to change the amendment to column 17 of the specification to simply refer to a data storage means. The Examiner indicated that these changes were believed to place the claims in condition for allowance. (RX-3008 at 541-42).

161. The applicant overcame the Examiner's rejection by amending the specification to state that the buffers "comprise a data storage means" and by amending the claim to describe a "storage means in a data processor." (CX-1 (Re-examination certificate), col. 2 lns. 50-52 and col. 5, ln. 17).

162. Column 2, lines 50-52 of the Re-examination certificate, contain an amendment to the patent's specification stating that that "[p]rogram list buffer 303, screen buffer 353, and the other buffers discussed above comprise a data storage means." The phrase "other buffers discussed above" has antecedent basis earlier in the same paragraph and includes the "channel buffer, the theme buffer, [and] the prime time buffer." (CX-1, '121 Reexamination Certificate, at col. 2, lns. 40-41).

163. In a Notice to Issue Reexamination Certificate, stamped as mailed on June 2, 1993, the Examiner used the term "data storage means" in place of the term "storage means." (RX-3008 at 563). A supplemental notice of intent to issue reexamination certificate issued on August 26, 1993. (RX-3008 at 569-91).

164. In the supplemental notice of intent to issue reexamination certificate mailed August 26, 1993 (RX-3008 at 569-91) the Examiner gave specific reasons as to how independent claims in issue avoid the art of record. Thus it was stated (RX-3008 at 582-90):
    H. Claims 18-31 avoid the art of record in at least the art of record does not show or suggest a process for controlling the presentation of broadcast programs to a television receiver which comprises:
    1) supplying program schedule information to storage means in a data processor;
    2) supplying user selection criteria, which comprises a plurality of independent user chosen program selection criteria and at least one program choice, to said data processor;
    3) combining said user selection criteria;
    4) selecting those programs meeting the combined selection criteria from the schedule information stored in the storage means;
    5) storing information identifying the selected programs and identifying broadcast schedule times, channels, and titles; and
    6) using the stored information to tune the television receiver to the selected programs.
    I. Claims 32 avoids the art of record in at least the art of record does not show or suggest a process for controlling the presentation of broadcast programs to a television receiver including:
    1) presenting messages to the user, via the television receiver, including the time remaining for a program being broadcast.
    J. Claim 33 avoids the art of record in at least the art of record does not show

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                              Page 149
 USITC Inv. No. 337-TA-454

or suggest a process for controlling the presentation of broadcast programs to a
television receiver which includes:
    1) combining user selection criteria with automatic criteria according to at
least one of current time period and a current channel via a data processor; and
    2) using the combined criteria to select programs for viewing from program
schedule information in a storage means in said data processor.

                                  * * *

    M. Claim 36 avoids the art of record in at least the art of record does not show
or suggest a process for controlling the presentation of broadcast programs to a
television receiver which includes:
    1) supplying user program selection criteria, which comprises a plurality of
independent user chosen selection criteria and at least on [sic] program choice, to
a data processor;
    2) combining said user selection criteria via the data processor;
    3) using the combined criteria to select programs for viewing from stored
schedule information;
    4) storing information identifying the selected programs wherein the information
includes broadcast schedule times, channels, and program titles; and
    5) recording the selected programs by supplying control signals to a remote
control device for a program recording device.

                                  * * *

    Q. Claims 42-52 avoid the art of record in at least the art of record does not
show or suggest a system for controlling a recording device to allow user selection
of broadcast programs from schedule information which comprises:
    1) a data processor which is configured to present an initial display of
schedule information stored in a storage means upon selection of a display mode
wherein said initial display automatically comprises schedule information for at
least one of a current time period and a current channel of a programmable tuner.

                                  * * *

    S. Claims 54-56 avoid the art of record in at least the art of record in at
least the art of record [sic] does not show or suggest a system for controlling
receipt of broadcast television programs to allow user selection of broadcast
programs from broadcast schedule information which is selectively stored in a
storage means wherein the system comprises:
    1) means for separating broadcast schedule information from the broadcast
programs;
    2) a processor configured to select programs from the schedule information
stored in the storage means based on user inputs wherein the user inputs comprise a
plurality of user program selection criteria;
    3) said processor being configured to combine said plurality of user selection
criteria and to present a list of programs meeting said combined criteria;
    4) wherein said user inputs further comprise a program choice from said
displayed list of programs; and
    5) said storage means being connected to receive a reminder calendar list
comprising information identifying titles for the programs selected by said data
processor.
    T. Claims 57-63 avoid the art of record for at least the same reasons as were
set forth for claims 42-52.
    U. Claims 64-67 avoid the art at record for at least the following reasons:

Claim 64

    This claim recites the presentation of entering a plurality user selection
criteria (including a plurality of channels) to be combined, allow user program
selection from a menu of programs meeting the combined selection criteria, and
storing a reminder calendar including titles for the chosen programs.

Claim 65

         ©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 150
USITC Inv. No. 337-TA-454

    This claim recites the presentation of entering a plurality user selection
criteria to be combined, where the selection criteria are under a pluralities of
categories that can be deactivated while still storing the selecting criteria in
addition to a program choice.

Claim 66

    This claim requires that the data processor combine a plurality of independent
user program selection criteria in addition to a program choice.
Similar language was found in the Examiner's "Notice Of Intent To Issue
Reexamination Certificate" (RX-3008 at 546-57) mailed June 2, 1993.

    165. Claim 18 of B1 4,706,121 which issued on December 14, 1993 read (CX-1, col.
5, lns. 14-19):
        A process for controlling the presentation of broadcast programs to a
television receiver, which comprises supplying program schedule information to
storage means in a data processor, supplying user program selection criteria to the
data processor, said user program selection criteria comprising a plurality of
independent user program selection criteria and at least one program choice, the
data processor combining said user selection criteria, selecting those programs
meeting the combined user selection criteria for viewing from the program schedule
information in said storage means in the data processor, storing information
identifying the selected programs, said stored information identifying broadcast
schedule times, channels and program titles, and using the stored information to
tune the television to the selected program. (underlined language was added in the
reexamination proceeding)

    166. The applicant used the terms "data processor" and "CPU" interchangeably in
prosecuting the '121 patent. A Supplemental Amendment After Final, file-stamped
February 26, 1993 provides an example that demonstrates the synonymous use of these
terms is provided by the applicant's rejected proposal that, "In col. 17, line 49,
after 'TV.' please insert -- Program list buffer 303, screen buffer 353, and the
other buffers discussed above are located within an electronic memory coupled to the
data processor, such as electronic memory 111." (RX-3008 at 468). The '121 patent's
specification states in describing Figure 3, "A memory 111 is connected to the CPU
110 at 113." (CX-1 at col 7, ln. 47). The parallel manner in which the applicant
described the "CPU" and "data processor" as connected or coupled to "memory 111"
demonstrates that the claimed "data processor" is the "CPU."

    167. Column 17, lns. 38-49 of the '121 patent, as it issued on November 10, 1987,
read (CX-1):
        A search of the program listing 352 is made. The search is dependent on the
status of the channel buffer, the theme buffer, the prime time buffer, and the
direction of search. If the page 356 is up, the search direction is forward starting
from the list pointer. If the page is down 357, the search direction will be
backward 358 from the current list pointer. When the search satisfies the above
criteria, the program listing is placed into the screen buffer 353. The search
continues until the screen buffer is full 354 in which case the search is
terminated. The status lines information is passed to the screen buffer and display
355 by the TV.

    168. The Supplemental Amendment After Final dated February 26, 2002 (CX-3008 at
71, 467-96), amended the paragraph at col. 17, lns. 38-49 of the '121 patent to read
(RX-3008 at 468, underlined material added by amendment):
        A search of the program listing 352 stored in program list buffer 303, is made.
The search is dependent on the status of the channel buffer, the theme buffer, the
prime time buffer and the direction of search. If the page 356 is up, the search
direction is forward starting from the listing pointer. If the page is down 357, the
search direction will be backward 358 from the current list pointer. When the search
satisfies the above criteria, the program listing from program list buffer 303 is
placed into the screen buffer 353. The search continues until the screen buffer is
full 354 in which case the search is terminated. The status lines information is
passed to the screen buffer and displayed 355 by the TV. Program list buffer 303,

                    ©   2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                              Page 151
 USITC Inv. No. 337-TA-454

screen buffer 353, and the other buffers discussed above are located within an
electronic memory coupled to the data processor, such as electronic memory 111.

F. Infringement

    169. {* * *}

    170. {* * *}

    171. {* * *}

    172. {* * *}

    173. {* * *}

    174. {* * *}

    175. {* * *}

    176. {* * *}

    177. {* * *}

    178. {* * *}

    179. {* * *}

    180. {* * *}

    181. {* * *}

    182. {* * *}

    183. {* * *}

    184. {* * *}

    185. {* * *}

    186. {* * *}

    187. {* * *}

    188. {* * *}

    189. {* * *}

    190. {* * *}

    191. {* * *}

    192. {* * *}

    193. {* * *}

    194. {* * *}

    195. {* * *}

    196. {* * *}

    197. {* * *} {* * *}

    198. {* * *}

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

199. {* * *}

200. {* * *}

201. {* * *}

202. {* * *}

203. {* * *}

204. {* * *}

205. {* * *}

206. {* * *}

207. {* * *}

208. {* * *}

FN1. {* * *}

XX. CONCLUSIONS OF LAW

   1. The Commission has in rem jurisdiction, subject matter jurisdiction and in
personam jurisdiction.

   2. There has been an importation of certain set-top boxes and components thereof
which are the subject of the alleged unfair trade allegation.

   3. No domestic industry exists, as required by subsection (a) (2) of section 337,
that exploits each of the '121, '268 and '204 patents because complainants have not
met their burden in satisfying the technical prong of the domestic industry
requirement.

   4. Respondents have failed to establish that the asserted claims of each of the
'121, '268 and '204 patents are not valid.

   5. Complainants have failed to establish that the claims of the '121, '268 and
'204 patents asserted against each of the respondents are infringed.

   6. It has been established that complainants misused the '121 patent.

   7. It has been established that the '121 patent is unenforceable for failure to
name a coinventor.

   8. Respondents are not in violation of section 337 based on any importation into
the United States, sale for importation, and sale within the United States after
importation of certain set-top boxes and components thereof which are the subject of
the alleged unfair trade allegation.

XXI. ORDER

   Based on the foregoing opinion, it is the administrative law judge's final initial
determination that there has been no violation by any of the respondents of section
337 in the importation into the United States, sale for importation, and the sale
within the United States after importation of certain set-top boxes and components
thereof.

   The administrative law judge hereby CERTIFIES to the Commission his final initial
determination together with the record consisting of the exhibits admitted into
evidence. The pleadings of the parties filed with the Secretary and the transcript
of the hearing, are not certified, since they are already in the Commission's

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                  Page 153
 USITC Inv. No. 337-TA-454

possession in accordance with Commission rules.

    Further it is ORDERED that:

    1. In accordance with Commission rule 210.39, all material heretofore marked in
camera because of business, financial, and marketing data found by the
administrative law judge to be cognizable as confidential business information under
Commission rule 201.6(a) is to be given in camera treatment continuing after the
date that this investigation is terminated.

    2. Counsel for the parties shall have in the hands of the administrative law judge
those portions of the final initial determination which contain bracketed
confidential business information to be deleted from any public version of said
determination, no later than July 12, 2002. Any such bracketed version shall not be
served by telecopy on the administrative law judge. If no such bracketed version is
received from a party it will mean that the party has no objection to removing the
confidential status, in its entirety, from this initial determination.

    3. This final initial determination, issued pursuant to Commission rule
210.42(h)(2), shall become the determination of the Commission forty-five (45) days
after the service thereof, unless the Commission, within that period shall have
ordered its review in its entirety or certain issues therein, or by order has
changed the effective date of said initial determination.

Paul J. Luckern

Administrative Law Judge

 2002 WL 31556392 (U.S.I.T.C.)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.