# EXHIBIT A

# Certain Set Top Boxes and Components Thereof

Investigation No. 337-TA-454

Publication 3564                                      November 2002



U.S. International Trade Commission

Washington, DC 20436

CORRECTED

# UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C. 20436

In the Matter of

**CERTAIN SET-TOP BOXES AND COMPONENTS THEREOF**

Inv. No. 337-TA-454

## NOTICE OF DECISIONS TO REVIEW IN PART, TAKE NO POSITION IN PART, AND NOT REVIEW IN PART THE ADMINISTRATIVE LAW JUDGE'S FINAL INITIAL DETERMINATION; NOTICE OF DECISIONS TO AFFIRM THREE RULINGS OF THE ADMINISTRATIVE LAW JUDGE; NOTICE OF DETERMINATION OF NO VIOLATION OF SECTION 337 OF THE TARIFF ACT OF 1930

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has determined to review in part, to take no position in part, and to not review in part the final initial determination ("final ID") issued by the presiding administrative law judge ("ALJ") on June 21, 2002, finding no violation of section 337 of the Tariff Act of 1930, 19 U.S.C. § 1337, in the above-captioned investigation. Specifically, the Commission determined to review the issue of the technical prong of the domestic industry as it relates to claim 42 of U.S. Letters Patent 4,706,121 for the purpose of making a finding as to claim 42 of that patent that was omitted by the ALJ. The Commission also determined to take no position on the issue of patent misuse and to not review the remainder of the final ID. Finally, the Commission determined to affirm three ALJ rulings (involving ALJ Order No. 62, an ALJ ruling excluding evidence concerning the doctrine of equivalents, and an ALJ ruling limiting the testimony time of one witness) that were appealed to the Commission by the complainants. In light of these determinations, the Commission determined that there is no violation of section 337 in this investigation.

**FOR FURTHER INFORMATION CONTACT:** Michael Liberman, Esq., or David Wilson, Esq., Office of the General Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephones (202) 205-3115 or (202) 708-2310, respectively. Copies of the public versions of the final ID and all other nonconfidential documents filed in connection with this investigation are or will be available for inspection during official business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephone (202) 205-2000. Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205-1810. General information concerning the Commission may also be

PUBLIC VERSION

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

| | |
|---|---|
| In the Matter of ) | |
| ) | Investigation No. 337-TA-454 |
| **CERTAIN SET-TOP BOXES AND** ) | |
| **COMPONENTS THEREOF** ) | |
| ) | |

Final Initial Determination

This is the administrative law judge's final initial determination, under Commission rule 210.42. The administrative law judge, after a review of the record developed, finds no violation by any respondent of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337).[1]

---

[1] Should the Commission find a violation the administrative law judge is making recommendations as to remedy and bonding in this final initial determination

and dependent claims 15, 16, and 17 of the '204 patent.

c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The '204 Patent

The administrative law judge finds that complainants have not met their burden of proving that the accused EchoStar products infringe independent claim 31 and dependent claims 32, 33 and 34 of the '204 patent. For the same reasons that the administrative law judge found that the EchoStar products did not satisfy the innovative cursor requirement or the movement limitation in relation to claims 1 and 3 of the '268 patent, he finds that the EchoStar products do not meet these limitations in relation to claims 31, 32, 33 and 34 the '204 patent.

Based on the foregoing, the administrative law judge finds that complainants have not met their burden of proving that the accused EchoStar products infringe independent claim 31 and dependent claims 32, 33, and 34 of the '204 patent.

## VII. PATENT MISUSE

The staff and all of the respondents argued that complainants have committed patent misuse through their licensing practices.[24] Complainants have denied any patent misuse. A party

---

[24] {

[Pages 151-218 of this Initial Determination have been omitted because they discuss patent misuse, an issue on which the Commission took no position.]

# EXHIBIT B

03/24/2004 WED 16:15 FAX 404 215 1455      USDC JUDGE WILLIS HUNT → NORTH      ☒002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta
MAR 24 2004
LUTHER ... 
BY: _____ Clerk
       Deputy Clerk

IN RE GEMSTAR DEVELOPMENT
CORPORATION PATENT LITIGATION

MDL-1274-WBH

RELATED TO
CIVIL ACTION FILE

No. 1:98-CV-3477-WBH (MDL)
No. 1:99-CV-1242-WBH (MDL)
No. 1:01-CV-2426-WBH (MDL)

## ORDER

Before the Court are Gemstar's[1] motions for partial summary judgment dismissing Plaintiffs'[2] advertising tying claims [608] and patent-product tying claims [607]. For the reasons set forth below, the motions are GRANTED.

## BACKGROUND[3]

Gemstar publically claims that its broad portfolio of IPG-related patents makes it impossible for any company to make, sell, or use a competitor's IPG without infringing Gemstar's patents. Gemstar representatives have made it clear that if multiple system

---

[1] "Gemstar" refers collectively to Defendants Gemstar-TV Guide International, Inc., Gemstar Development Corp., TV Guide, Inc., StarSight Telecast, Inc., and Index Systems, Inc.

[2] "Plaintiffs" refers collectively to EchoStar Communications Corp., EchoStar Satellite Corp., EchoStar Technologies Corp., and Scientific-Atlanta, Inc. These motions were also filed in case number 1:99-CV-1258 in which Pioneer Corp., Pioneer North America, Inc., and Pioneer New Media Technologies, Inc. were Plaintiffs, but that case settled on March 3, 2004.

[3] Because this case is before the Court on Gemstar's motion for summary judgment, the facts have been construed in the light most favorable to Plaintiffs, the non-movants. See Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918 (11th Cir. 1993).

AO 72A
(Rev. 6/82)

03/24/2004 WED 16:16 FAX 404 215 1455    USDC JUDGE WILLIS HUNT → NORTH    ☒003

operators ("MSOs") deploy a non-Gemstar IPG, they run the risk of being sued by Gemstar for patent infringement.[4] Faced with the prospect of being sued, numerous MSOs tried to obtain from Gemstar a "pure" patent license, i.e., a prospective, no-strings-attached license that would allow them to make, sell, and use an already existing non-Gemstar IPG or create their own IPG incorporating Gemstar's patented IPG technology. In some cases, Gemstar has flatly refused to grant a pure patent license, while in other cases, Gemstar has simply ignored requests for such a license. Since its merger with TV Guide in 2000, Gemstar has not executed a pure patent license with an MSO, taking the position that the only way for an MSO to avoid infringement liability is to accept Gemstar's IPG product.

When an MSO agrees to purchase the Gemstar IPG product, it enters into a detailed, written agreement with Gemstar (an "MSO agreement"). In general, these agreements grant the MSO the right to use the Gemstar IPG product, and they protect the MSO from claims of infringement for future use of the Gemstar IPG. When an MSO has previously used an IPG product, the MSO agreements also include provisions establishing payments to Gemstar for the MSO's past use of the IPG. In particular, the following three provisions are included in many MSO agreements and work together to resolve the claims of past infringement: the "legacy fee" provisions, the "covenant and release" provisions, and the "covenant to limit collections" provisions.

The following is an example of a typical legacy fee provision in a Gemstar MSO agreement:

---

[4] In their briefs, the parties use the term "MSO" loosely to refer to cable companies, satellite companies, consumer electronics manufacturers, and set-top box manufacturers. In this Order, the Court uses the term MSO in this manner as well.

2

AO 72A
(Rev 8/82)

> Legacy Fees: [Ashland Fiber Network] agrees to pay [Gemstar] a monthly fee for its use and distribution of IPGs, including the [Gemstar IPG product], for periods of time prior to the Effective Date of this Agreement. For IPGs other than [the Gemstar IPG] this monthly fee shall be calculated at the rates set forth in Exhibit D ("Legacy Fees") ... Subject to payment of the Legacy Fees, use and distribution of such IPGs prior to the Effective Date of this Agreement shall hereby be ratified by the parties and, except as provided in this Section 15, no other amounts shall be payable in connection with such prior use. ...

PSAF 24, Tab 28 at § 15. According to Gemstar executive Peter Boylan, the purpose of the legacy fee provision is to provide retroactive patent royalties to Gemstar for the prior use of an allegedly infringing device. Gemstar attorney Mark Allen explained that the legacy fee provision serves as a waiver of Gemstar's ability to sue an MSO for patent infringement. The following is a typical covenant and release provision:

> Covenant and Release. Subject to payment of the Legacy Fees, [Gemstar] will release and discharge [the MSO] from, and covenant not to sue for, any and all claims, actions, causes of action, suits, injuries, losses, damages, demands, or other liability or relief, of any nature whatsoever (including without limitation, patent infringement), arising out of, or in any way relating to, the purchase, license, use, promotion or sale of any IPG deployed prior to the Effective Date of this Agreement. ...

Id. Tab 28 at § 18. A number of the MSO agreements contain a covenant to limit collections, such as that contained in Gemstar's agreement with InfoStructure, Inc.:

> (i) Covenant to Limit Collections. [Gemstar] agrees and covenants that [Gemstar] shall pursue recovery of any damages or license fees awarded in connection with any and all claims and causes of action for patent infringement based on the use and distribution by Affiliate in its systems of IPGs other than the Service developed or manufactured by third parties primarily from such third parties to the extent possible without compromising [Gemstar's] position in any material way, and [Gemstar] shall limit its collection from Affiliate of any damages or license fees awarded in connection with any such patent infringement claim or cause of action to the total amount recoverable by Affiliate pursuant to any indemnification agreements Affiliate may have with such third parties, if Affiliate, has taken, or has not omitted to take, any and all reasonable actions necessary to fully preserve its rights to indemnification from such third parties.

3

Id. Tab 39 at ¶ 15(b)(i). Later in this section, the parties make it clear that this covenant is not a license:

> (ii) Covenant to Limit Collections Not A License. No license of any kind is granted nor deemed granted by estoppel, implication, exhaustion or other doctrine of law, equity or otherwise herein to Affiliate or any third party under any intellectual property rights owned or controlled by [Gemstar] or its affiliates with respect to IPGs other than the Service.

Id. at § 15(b)(ii).

While Gemstar grants protection from infringement liability based on use and deployment of its IPG product, it reserves the right to sue the MSO for use of a non-Gemstar IPG. For example, the agreement with Charter Communications provides: "[Gemstar] expressly reserves the right to ... obtain and enforce injunctive relief against [licensee] or any third party with respect to IPGs other than the Service." SUMF, Tab 1 at § 15(v)(ii).

In its MSO agreements, Gemstar requires its licensees to accept an advertising feature as part of the Gemstar IPG product. All of Gemstar's recent license negotiations for its IPG product, including those with Plaintiffs, have involved the offer of the Gemstar IPG product with the advertising component. In providing the advertising, Gemstar serves as the exclusive seller or reseller of the IPG advertising space, thereby controlling the advertising content. Additionally, Gemstar keeps the lion's share of the advertising revenues. Gemstar takes a sales commission of 15% off the gross revenues, then distributes up to 15% to the MSOs and keeps the remainder for itself. Plaintiffs' experts describe Gemstar's portion of the IPG advertising revenue as a "commission" for selling the advertising, and claim that the "exceedingly high" percentage of those revenues payable to Gemstar is possible only by virtue of an illegal advertising tie.

4

Many MSOs have expressed their preference for an IPG without any advertising, protesting that advertising clutters the screen, reduces the amount of television programming information that can be displayed, and generally offends television viewers. Despite this request, Gemstar has refused to provide an advertising-free IPG product. Other MSOs do not generally object to advertising on the IPG, but want to control the advertising inventory and select their own advertising broker. The MSO agreements essentially prohibit MSOs from choosing their own advertisements and give Gemstar exclusively a brokerage commission.

IPG advertising is big business. Analysts estimate that revenues from selling advertising spots on IPGs could exceed $1.3 billion in five years. For the three quarters ending September 30, 2002, Gemstar reported revenues from IPG advertising of approximately $43 million. Expert economist Roger Noll is of the opinion that Gemstar is using its IPG patents to become the only seller of IPG advertising and that Gemstar's IPG patents enable it to degrade the ability of other sellers of IPG advertising who may have a pre-existing "resource advantage" over Gemstar:

> Recall that Gemstar asserts that its market power rests in patents for essential IPG features, and that it expects to use licensing of its IPGs to become the only provider of advertising and t-commerce. By bundling all patents in a blanket license Gemstar assures that if it blocks (or has substantial market power in) only one IPG feature, it can enhance its chance of controlling other features and products, notably advertising and t-commerce, against potential entrants that, in Gemstar's own assessment, have a resource advantage in exploiting these possibilities. In essence, Gemstar seeks to foreclose competition from formidable potential competitors in these ancillary uses of an I'[G] by tying its advertising and t-commerce business to its IPG, and tying its IPG to its IPG technology.

Doc. 634 Tab 1 at ¶ 81.

5

## ANALYSIS

### *Summary judgment standard*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-movant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Resolving all doubts in favor of the non-moving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id.

### *Section 1 of the Sherman Act*

A tying claim under Section 1 of the Sherman Act requires, among other things, that there be two separate products, a "tying" product and a "tied" product, and that those products are in fact "tied" together – that is, the buyer was forced to buy the tied product to get the tying product. See Tic-X-Press, Inc. v. Omni Promotions Co., 815 F.2d 1407, 1414 (11th Cir. 1987).

6

AO 72A
(Rev. 8/82)

Plaintiffs contend that Gemstar has violated Section 1 of the Sherman Act by (1) conditioning a prospective pure patent license for Gemstar's IPG-related patents on the purchase of the Gemstar IPG product; and (2) conditioning the sale of Gemstar's IPG product on an agreement to carry the Gemstar-provided IPG advertising. In its motions for summary judgment, Gemstar argues that both tying claims must be dismissed because under either theory, there is no evidence that MSOs are forced to purchase two separate, tied products. The Court will address the tying claims separately.

### Patent-product tie claim

Plaintiffs claim that Gemstar forced MSOs to purchase and use Gemstar's IPG (the "tied product") as a condition for granting a license to Gemstar's IPG technology (the "tying product"). In its motion for summary judgment, Gemstar argues that there is no "tying product" because the agreements grant no license beyond the implied-by-law license that comes with the purchase of the IPG product.

As explained by the Federal Circuit in Hewlett-Packard Co. v. Repeat-O-Type Stencil Manufacturing Co.:

> Generally, when a seller sells a product without restriction, it in effect promises the purchaser that in exchange for the price paid, it will not interfere with the purchaser's full enjoyment of the product purchased. The buyer has an implied license under any patents of the seller that dominate the product or any uses of the product to which the parties might reasonably contemplate the product will be put.

123 F.3d 1445, 1451 (Fed. Cir. 1997). Such an implied-by-law "license" does not give the purchaser of the product a license to practice the patents at issue. Rather, the right is limited to use of the licensed product. See id. ("The authority to use and sell a purchased device, however, does not include the right to make a new device or to reconstruct one which has been spent.")

7

Gemstar argues that the undisputed evidence conclusively demonstrates that its MSO agreements do not provide a prospective license for Gemstar's patents; the agreements simply authorize the MSOs to use the Gemstar IPG without fear of being sued for such use. Stated another way, the agreements license only a single item: the IPG product itself, which comes with the appurtenant and inseparable right to use the product free from any risk of infringing the underlying intellectual property. Thus, Gemstar claims that in the absence of a separate conveyance of patent rights, there is no "tying product."

Plaintiffs concede that the MSO agreements settle claims for past infringement and also provide protection for past and future use of the Gemstar IPG. Plaintiffs argue that the MSO agreements go beyond the implied-by-law license and actually grant MSOs a prospective license to make, use, and deploy non-Gemstar IPGs. Plaintiffs argue that the three provisions in the MSO agreements which purport to settle past claims of infringement also provide a separate, prospective license to Gemstar's patent portfolio.

Plaintiffs argue that the legacy fee and the covenant and release provisions amount to a Gemstar promise not to sue the MSO for patent infringement on the basis of the MSOs' future use of a non-Gemstar IPG. This interpretation, however, is not supported by the clear language of the agreement. On their face, the legacy fee and the covenant and release provisions set up retroactive royalty payments for past use of IPGs and ratify such past use of an IPG. There is no expression of Gemstar's intent to waive its ability to sue for future use of non-Gemstar IPGs. In fact, Gemstar expressly retained the right to go to court for an injunction preventing such deployment. By settling responsibility for past infringement caused by the use and distribution of an IPG prior to the effective date of the agreement and

8

03/24/2004 WED 16:19 FAX 404 215 1455   USDC JUDGE WILLIS HUNT → → → NORTH   ☒010

by calculating a legacy fee payment, these provisions do not grant the MSOs a license to engage in future deployments of non-Gemstar IPGs.

Plaintiffs' argument that the covenant to limit collections provision amounts to a prospective license is similarly without support. The MSO agreements unambiguously provide that Gemstar's covenants to limit collections do not effect a grant of any license by estoppel, implication, or otherwise. In fact, the relevant sections in many MSO agreements are entitled, "Covenant to Limit Collections Not a License."

The Court finds, as a matter of law, that the language of the MSO agreements does not authorize MSOs to make, sell, or deploy on a going-forward basis non-Gemstar IPGs. These provisions deal exclusively with previously-deployed non-Gemstar IPGs, do not establish any royalty scheme for future non-Gemstar IPG deployments, and expressly reserve Gemstar's right to file suit to enjoin signatory MSOs from deploying infringing non-Gemstar IPGs in the future. Settlement for past infringement cannot be equated with a license for prospective use. See Ransburg Electro-Coating Corp. v. Spiller and Spiller, Inc., 489 F.2d 974, 977 (7th Cir 1973) (concluding that a settlement agreement in which one party agrees to pay liquidated damages for past infringements in return for the dismissal of an infringement suit is not the equivalent of a license for prospective use).

Plaintiffs also argue that Gemstar has publically admitted that the MSO agreements provide protection from patents beyond those practiced by the Gemstar IPG. Plaintiffs point out that in its Amended Complaint filed with the ITC, Gemstar stated that it:

> [has] issued licenses to various MSOs and set-top box manufacturers authorizing the use of [Gemstar's] IPG technology. Although these agreements do not generally name the patents licensed therein, the IPG technology licensed under the agreements includes all of the patents in suit.

9

AC 72A
(Rev.8/82)

PSAF, Tab 46 at ¶ 8.7. Mark Allen, who was responsible for negotiating Gemstar's MSO agreements for the Gemstar IPG testified as follows:

> Q: If I understood your direct testimony, most of your direct involvement in negotiations has been with the large MSOs?
>
> A: That's correct.
>
> Q: In those discussions, do you tell them, or words to the effect, that if they enter into a deal with TV Guide and take the TV Guide Interactive IPG, they would enjoy the full protection of Gemstar TV Guide patent portfolio, both currently issued patents and future patents?
>
> A: Yes, or words to that effect.

PSAF, Tab 11. Additionally, Mr. Boylan testified as follows:

> Q: When an operator licenses a TV Guide Interactive program, do they license the TV Guide patents with that as well?
>
> A: They take a service that enjoys the benefits of all of the companies' patents in that related field of use, in this case an IPG.

Id. at Tab 17. Thus, Plaintiffs argue that by admitting that Gemstar provides protection from Gemstar's entire patent portfolio – rather than from only those patents practiced by the IPG product – Gemstar has admitted to granting a pure patent license.

Contrary to Plaintiffs' assertions, these admissions do not create a fact issue. By telling its licensees that their use of Gemstar's IPG would have the full protection of Gemstar's patent portfolio, Gemstar was not granting the MSOs a prospective patent license to make, sell, or deploy non-Gemstar IPGs such as could constitute the sale of a tying product. It is abundantly clear that Gemstar was simply assuring those licensees that they could not be sued under any of Gemstar's IPG patents for using Gemstar's IPG product. The Court concludes that Plaintiffs have failed to demonstrate a genuine issue of material fact to support

10

the proposition that Gemstar's MSO licensing agreements convey to MSOs a pure patent license that can be said to constitute a tying product. Absent a tying product, Plaintiffs' patent-product tying claims fail as a matter of law. See Borschow Hosp. & Med. Supplies v. Cesar Castillo Inc., 96 F.3d 10, 17 (1st Cir. 1996) (finding summary judgment appropriate on an antitrust tying claim where there was no evidence of an illegal tie).

### Advertising-tie claim

In its motion for summary judgment on Plaintiffs' advertising-tie claim, Gemstar argues, among other things, that the advertising-tie claim is untenable because there is no forced purchase of advertising as a separate product. Gemstar maintains that when it sells its advertising, it does so on its own behalf, not as an agent for its customers, who have no rights to the underlying space on the Gemstar IPG where the advertisements are displayed. According to Gemstar, there is no second purchase because the MSOs are not purchasing anything, and the IPG advertising space does not belong to them. Comparing its IPG to a piece of real estate, Gemstar argues that it is entitled to make its own design decisions to control the look and feel of its IPG. Because MSOs do not buy the advertising, Gemstar argues, there is no "tied product."

In response, Plaintiffs admit that the MSOs do not purchase advertising, contending that the tied product is Gemstar's "brokered advertising content." Plaintiffs argue that Gemstar forces MSOs to carry the advertising content that Gemstar has sold to advertisers as a condition of licensing Gemstar's IPG product and technology. Absent Gemstar's tie, they argue, the MSOs might sell their own advertising on the IPG, or engage their own broker to sell the advertising at significantly less than the required payment to Gemstar of between 85 and 90 percent of advertising revenue as a brokerage fee. Plaintiffs maintain that they have

11

03/24/2004 WED 16:20 FAX 404 215 1455    USDC JUDGE WILLIS HUNT → NORTH    ☒013

demonstrated a forced purchase of a separate, tied product by showing that MSOs are forced (1) to use Gemstar as the broker for their IPG advertisements, (2) to forego selling the advertising spots on the IPG themselves, and (3) to forego using the services of a less expensive advertising broker.

The Court agrees with Gemstar that Plaintiffs' position rests on the assumptions that the MSOs own the IPG product and that the MSOs are entitled to control the look and feel of the IPG product. The Court also agrees with Gemstar that Plaintiffs have failed to provide evidence to support these assumptions. Plaintiffs give no explanation why Gemstar is not legally entitled to make its own design decisions – including the decision to include or not include advertising on its IPG. It is clear that the MSOs have not been forced to purchase anything, and the Court cannot see how the MSOs have foregone any rights by accepting an IPG containing advertising.

Plaintiffs' complaint is not that they were forced to purchase a second, unwanted product, but rather that they were forced to accept the Gemstar IPG in the first place, or, at a minimum, were forced to accept a guide containing advertising. Thus, it appears that this claim is merely a subset of Plaintiffs' complaint that they have not been allowed to obtain a license in Gemstar's IPG technology to create their own IPGs; if Plaintiffs could create their own IPGs, presumably they could decide what advertising, if any, would be displayed on them. The Court can discern no unlawful antitrust tie between the advertising and the IPG, and concludes as a matter of law that Gemstar's requirement that its MSO licensees accept advertising along with its IPG product does not amount to a forced separate purchase of a tied product. Because this essential element of Plaintiffs' Sherman Act claim is absent, Gemstar's

12

AO 72A
(Rev.8/82)

motion for summary judgment on this claim is GRANTED. See <u>Borschow Hosp. & Med. Supplies</u>, 96 F.3d at 17.

## CONCLUSION

For the reasons set forth above, Gemstar's motions for partial summary judgment dismissing Plaintiffs' advertising tying claims [608] and patent-product tying claims [607] are GRANTED.

It is so ORDERED this 24 day of March, 2004.

*/s/ Willis B. Hunt, Jr.*
Willis B. Hunt, Jr.
Judge, United States District Court

13

AO 72A
(Rev.8/82)