# EXHIBIT   M

Westlaw.

2002 WL 31556392                                                        Page 1
USITC Inv. No. 337-TA-454

United States International Trade Commission (U.S.I.T.C.)

Commission Determination

IN THE MATTER OF CERTAIN SET-TOP BOXES AND COMPONENTS THEREOF

FINAL INITIAL DETERMINATION

USITC Inv. No. 337-TA-454
June 21, 2002

APPEARANCES

FOR COMPLAINANTS GEMSTAR-TV GUIDE INTERNATIONAL, INC. AND STARSIGHT TELECAST, INC.

Lewis E. Leibowitz, Esq.

Steven P. Hollman, Esq.

Raymond Kurz, Esq.

Celine Crowson, Esq.

Stephen F. Propst, Esq.

HOGAN AND HARTSON LLP

Columbia Square

555 13th Street, NW

Washington, DC 20004-1109

Morris Waisbrot, Esq.

William F. Haigney, Esq.

James C. Hansen, Esq.

HOGAN AND HARTSON LLP

100 Park Avenue

New York, NY 10017

William H. Wright, Esq.

HOGAN AND HARTSON LLP

500 South Grand Avenue, Suite 1900

Los Angeles, CA 90071

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                        Page 2
USITC Inv. No. 337-TA-454

FOR COMPLAINANTS GEMSTAR-TV GUIDE INTERNATIONAL, INC. AND STARSIGHT TELECAST, INC.:

George M. Schwab, Esq.

Duane H. Mathiowetz, Esq.

K.T. Cherian, Esq.

Byron W. Cooper, Esq.

TOWNSEND AND TOWNSEND AND CREW LLP

Two Embarcadero Center, 8th Floor

San Francisco, CA 94111-3834

FOR COMPLAINANTS GEMSTAR-TV GUIDE INTERNATIONAL, INC. AND STARSIGHT TELECAST, INC.:

James E. Doroshow

David A. Dillard

Wesley W. Monroe

CHRISTIE, PARKER & HALE, LLP

350 W. Colorado Boulevard, Suite 500

Pasadena, California 91109-7068

Ian Simmons

O'MELVENY & MEYERS, LLP

555 13th Street, N.W.

Washington, DC 20004-1109

Mark A. Samuels, Esq.

O'MELVENY & MEYERS, LLP

400 South Hope Street, 15th Floor

Los Angeles, CA 90071-2899

John L. North

SUTHERLAND, ASBILL & BRENNAN

1275 Pennsylvania Avenue, N.W.

Washington, DC 20004-2415

Alexander J. Hadjis, Esq.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 3
USITC Inv. No. 337-TA-454

Brian R. Nester, Esq.

FISH & RICHARDSON P.C.

601 Thirteenth Street, N.W.

Washington, DC 20005

Frank E. Scherkenbach, Esq.

FISH & RICHARDSON P.C.

2200 Sand Hill Road

Suite 100

Menlo Park, California 94025

FOR RESPONDENT SCIENTIFIC-ATLANTA, INC.:

V. James Adduci, II, Esq.

Barbara A. Murphy, Esq.

ADDUCI, MASTRIANI & SCHAUMBERG, LLP

1200 Seventeenth Street, NW

Fifth Floor

Washington, DC 20036

Joseph Potenza, Esq.

Frederic M. Meeker, Esq.

BANNER & WITCOFF, LTD.

1001 G Street, NW

Washington, DC 20001

Joseph R. Bankoff, Esq.

KING & SPALDING

191 Peachtree Street, NE

Suite 4900

Atlanta, GA 30303-1763

Kevin R. Sullivan, Esq.

Joseph W. Dorn, Esq.

KING & SPALDING

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1730 Pennsylvania Avenue, NW

Washington, DC 20006-4706

FOR RESPONDENTS PIONEER CORPORATION, PIONEER DIGITAL TECHNOLOGIES, INC., PIONEER
NORTH AMERICA, INC. AND PIONEER NEW MEDIA TECHNOLOGIES, INC.:

Robert G. Krupka, Esq.

Alexander F. MacKinnon, Esq.

Christopher J. Heck, Esq.

Eric R. Lamison, Esq.

Lillian L. Lai, Esq.

KIRKLAND & ELLIS

777 South Figueroa St.

Los Angeles, CA 90017

FOR RESPONDENTS PIONEER CORPORATION, PIONEER DIGITAL TECHNOLOGIES, INC., PIONEER
NORTH AMERICA, INC. AND PIONEER NEW MEDIA TECHNOLOGIES, INC.:

Linda S. Resh, Esq.

Alexandra N. DeNeve, Esq.

C. Graham Gerst, Esq.

Laura A. TenBroeck, Esq.

KIRKLAND & ELLIS

200 East Randolph Drive

Chicago, IL 60601

Eugene F. Chay, Esq.

KIRKLAND & ELLIS

655 Fifteenth Street, NW

Washington, DC 20005

FOR RESPONDENTS ECHOSTAR COMMUNICATIONS CORPORATION AND SCI SYSTEMS, INC.:

F. David Foster, Esq.

Sturgis M. Sobin, Esq.

MILLER & CHEVALIER

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 5
 USITC Inv. No. 337-TA-454

655 Fifteenth Street, NW

Suite 900

Washington, DC 20005

Harold J. McElhinny, Esq.

Rachel Krevans, Esq.

MORRISON & FOERSTER LLP

425 Market Street

San Francisco, CA 94105

David C. Doyle, Esq.

Craig I. Celnicker, Esq.

MORRISON & FOERSTER LLP

3811 Valley Centre Drive

Suite 500

San Diego, CA 92130

FOR RESPONDENTS ECHOSTAR COMMUNICATIONS CORPORATION AND SCI SYSTEMS, INC.:

Stephen S. Durham, Esq.

MORRISON & FOERSTER LLP

5200 Republic Plaza

370 Seventeenth Street

Denver, CO 80202

Bryan A. Schwartz, Esq.

MORRISON & FOERSTER LLP

2000 Pennsylvania Ave., NW

Suite 5500

Washington, DC 20006-1812

FOR RESPONDENT ECHOSTAR COMMUNICATIONS CORPORATION:

T. Wade Welch, Esq.

T. WADE WELCH & ASSOCIATES

2401 Fountainview

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Suite 215

Houston, TX 77057

FOR RESPONDENT SCI SYSTEMS, INC.:

J. R. Brooks, Esq.

Frank M. Caprio, Esq.

LANIER FORD SHAVER & PAYNE P.C.

200 West Side Square

Suite 5000

Huntsville, AL 35804

Jerry B. Blackstock, Esq.

Linda C. Odum, Esq.

POWELL, GOLDSTEIN, FRAZER & MURPHY LLP

191 Peachtree Street, NE

Atlanta, GA 30303

STAFF:

Thomas S. Fusco, Esq.

   This is the administrative law judge's final initial determination, under
Commission rule 210.42. The administrative law judge, after a review of the record
developed, finds no violation by any respondent of section 337 of the Tariff Act of
1930, as amended (19 U.S.C. § 1337). [FN1]

FN1. Should the Commission find a violation the administrative law judge is making
recommendations as to remedy and bonding in this final initial determination.

                        TABLE OF CONTENTS

  I. PROCEDURAL HISTORY

  II. PARTIES

  III. JURISDICTION

  IV. PATENTED SUBJECT MATTER IN ISSUE

  V. CLAIM CONSTRUCTION
   A. '121 Patent
      1. Independent Claim 18
      a. The language "comprises supplying program schedule information to"
      b. The language "storage means in a data processor"
      c. The language "supplying user program selection criteria to the data

       © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 7
USITC Inv. No. 337-TA-454

processor, said user program selection criteria comprising a plurality of
independent user chosen program selection criteria and at least one program choice,
the data processor combining said user selection criteria, selecting those programs
meeting the combined user selection criteria for viewing from the program schedule
information in said storage means in the data processor"
    i. Whether a "program choice" is part of the "said user selection criteria"
combined by the data processor
    ii. Whether the "said user selection criteria" combined by the data processor
is limited to the criteria of theme, prime time and channels
    iii. Whether "combining", as used in claim 18, requires the use of logical
"AND" combining of the selection criteria or whether it can mean just the use of
logical "OR" combining
    iv. Whether the combining step could be performed through multiple sequential
searches or has to be performed prior to any search
    d. The language "storing information identifying the selected programs, said
stored information identifying broadcast schedule times, channels, and program
titles"
    e. The language "and using the stored information to tune the television
receiver to the selected programs"
    2. Other Claims In Issue
    a. Independent Claim 32
    i. The language "program schedule information"
    ii. The language "user program selection criteria"
    iii. The language "supplying program schedule information to the data
processor"
    iv. The language "during the process"
    b. Independent Claim 33
    i. The language "turning on"
    c. Independent Claim 36
    d. Independent Claim 42
    i. The language "a first input means for the schedule information connected
to said data processor"
    ii. The language "a second user selection input means connected to said data
processor"
    iii. The language "wherein said data processor is configured for a selectable
display mode, said data processor being configured to present an initial display of
said schedule information stored in said storage means upon selection of said
display mode, said initial display automatically comprising schedule information
for at least one of a current time period and a current channel of said
programmable tuner"
    e. Independent Claim 51
    f. Independent Claim 54
    i. The language "means connected between said programmable tuner and said
data processor for separating the broadcast schedule information from the broadcast
programs and supplying the broadcast schedule information to said data processor"
    g. Independent Claim 57
    B. '268/'204 Patents
    1. The language "visual identification" ('268/'204 Patents)
    2. The language "means ... for displaying" ('268/'204 Patents)
    3. The movement limitation ('268/'204 Patents)
    4. The program note limitation ('268/'204 Patents)
    5. The language "tuning a programmable tuner to a select channel based on
position of said visual identification" ('204 patent)

    VI. INFRINGEMENT
      A. '121 Patent
        1. Pioneer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                          Page 8
USITC Inv. No. 337-TA-454

```
        a. Independent Claim 18 And Dependent Claims 19-24, 26-28 And 31
        b. Independent Claim 33
        c. Independent Claim 36
        d. Independent Claim 42 And Dependent Claims 43, 48, 49, And 50
        e. Independent Claim 54
        f. Independent Claim 57 And Dependent Claims 59, 60 And 61
        g. Independent Claim 66
     2. EchoStar
        a. Independent Claim 18 And Dependent Claims 19 -24, 26-28 And 31
        b. Independent Claim 32
        c. Independent Claim 36
        d. Independent Claim 54
        e. Independent Claim 57 And Dependent Claims 58, 59, 60 And 61
        f. Independent Claim 66
     3. S-A
        a. Independent Claim 18 And Dependent Claims 19-24, 26-28 And 31
        b. Independent Claim 33
        c. Independent Claim 36
        d. Independent Claim 42 And Dependent Claims 43, 48, 49 and 50
        e. Independent Claim 51
        f. Independent Claim 54
        g. Independent Claim 57 And Dependent Claims 59, 60 And 61
        h. Independent Claim 66
  B. '268/'204 Patents
     1. Pioneer
        a. Independent Claim 1 And Dependent Claim 3 Of The '268 Patent
        b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The ' 204
Patent
        c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The ' 204
Patent
     2. S-A
        a. Independent Claim 1 And Dependent Claim 3 Of The '268 Patent
        b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The ' 204
Patent
        c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The ' 204
Patent
     3. EchoStar
        a. Independent Claim 1 And Dependent Claim 3 Of The '268 Patent
        b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The ' 204
Patent
        c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The ' 204
Patent

  VII. PATENT MISUSE
     A. Market Power
        1. Relevant Market(s) For Establishing Market Power
        2. Complainants' Share Of The Relevant Market
        a. Gemstar's Market Share In The Relevant IPG Technology Market
        b. Gemstar's Market Share In The Relevant IPG Product Market
        c. Barriers To Entry
        d. Gemstar's Pricing
        e. Conclusion
     B. Tying
        1. Whether Gemstar Illegally Ties Its Licensing Of Its IPG Patents To The TV
Guide Interactive IPG
        2. Whether Gemstar Illegally Ties Its IPG Technology/Products To Unpatented
And Separate Advertising
```

          © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                          Page 9
USITC Inv. No. 337-TA-454

   C. Grantback Provisions Of Gemstar's Licenses
   D. Blocking Effect

 VIII. VALIDITY (Prior Art)
   A. The '121 Patent
   B. The '268/'204 Patent

  IX. VALIDITY (Alleged Impermissible Broadening - Claims 18-31, 33, 34, 36 and 38
of the '121 Patent)

  X. INVENTORSHIP ('121 Patent)

  XI. VALIDITY (Best Mode - '268/'204 Patents)

  XII. VALIDITY (Indefiniteness - '121 Patent)

  XIII. VALIDITY (Indefiniteness - '268/'204 Patents)

  XIV. VALIDITY (Enablement - '121 Patent)

  XV. INEQUITABLE CONDUCT

  XVI. DOMESTIC INDUSTRY ('121, '268 and '204 Patents)
   A. Economic Prong
   B. Technical Prong ('121 Patent)
   C. Technical Prong ('268 Patent)
   D. Technical Prong ('204 Patent)

  XVII. REMEDY

  XVIII. BOND

  XIX. ADDITIONAL FINDINGS
   A. Parties
   B. Patents At Issue
   C. Gemstar's Licenses
   D. Person Of Ordinary Skill In The Art
   E. Reexamination Of The '121 Patent
   F. Infringement
   G. Remedy

  XX. CONCLUSIONS OF LAW

  XXI. ORDER

                         ABBREVIATIONS
CFF        Complainants' Proposed Findings Of Fact

CORFF      Complainants' Objection To Respondents' Proposed Finding Of Fact

CPost      Complainants' Initial Posthearing Brief

CPre       Complainants' Prehearing Brief

CRBr       Complainants' Reply Brief

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                              Page 10
 USITC Inv. No. 337-TA-454

CRRFF       Complainants' Rebuttal To Respondents' Proposed Finding Of Fact

CX          Complainants' Exhibit

EPost       EchoStar's Initial Posthearing Brief

ERBr        EchoStar's Reply Brief

EPre        EchoStar's Prehearing Brief

FF          Findings Of Fact

JX          Joint Exhibit

PPost       Pioneer's Initial Posthearing Brief

PPre        Pioneer's Prehearing Brief

PRBr        Pioneer's Reply Brief

RFF         Respondents' Proposed Findings of Fact

ROCFF       Respondents' Objection To Complainants' Proposed Finding Of Fact

RRCFF       Respondents' Rebuttal To Complainants' Proposed Finding Of Fact

RX          Respondents' Exhibit

S-A Post    S-A's Initial Posthearing Brief

S-A Pre     S-A's Prehearing Brief

S-A RBr     S-A's Reply Brief

SFF         Staff's Proposed Finding Of Fact

SPost       Staff's Initial Posthearing Brief

SPre        Staff's Prehearing Brief

SRBr        Staff's Reply Brief

SX          Staff's Exhibit

Tr.         Hearing Transcript Of Record


I. PROCEDURAL HISTORY

   By notice, issued on March 14, 2001, the Commission instituted an investigation,
pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, to
determine whether there is a violation of subsection (a)(1)(B) of section 337 in
the importation into the United States, the sale for importation into the United
States, or the sale within the United States after importation of certain set-top
boxes by reason of infringement of claims 18-24, 26-28, 31, 32, 33, 36, 42, 43, 48-
51, 54, 57-61 and 66 of United States Patent 4,706,121 (the '121 patent), claims 1-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5 and 10-14 of United States Patent 5,253,066 (the '066 patent), claims 1, 3, 8,
and 10 of United States Patent 5,479,268 (the '268 patent), and claims 14-17, 19,
and 31-35 of United States Patent 5,809,204 (the '204 patent) and whether there
exists an industry in the United States as required by subsection (a)(2) of section
337. The notice of investigation was published in the Federal Register on March 21,
2001. (66 Fed. Reg. No. 55 at 15,887-89).

   Complainants identified in the Commission notice were Gemstar-TV Guide
International, Inc. (Gemstar) and StarSight Telecast, Inc. (StarSight). As
respondents, the following were named in the notice: Pioneer Corporation, Pioneer
North America, Inc., Pioneer Digital Technologies, Inc., Pioneer New Media
Technologies, Inc. [FN1] (collectively, Pioneer), Scientific-Atlanta, Inc., (S-A),
EchoStar Communications Corporation, and SCI Systems, Inc. (collectively,
EchoStar).

   On March 21, 2001, the presiding Administrative Law Judge Morriss issued a notice
in which she advised the parties that she owned one of the accused products (an
EchoStar 4900 set-top box) and that she had an ongoing service contract with DISH
Network, which she believed was related to EchoStar. Judge Morriss stated that, if
any party requested her disqualification as the presiding administrative law judge,
she would seek to recuse herself from the investigation and directed each party to
file a written submission to her attorney-advisor, by April 2, indicating whether
the party requested her disqualification or whether the party consented to her
continuing to preside over the investigation. Judge Morriss directed that said
submission should not be filed or served on the other parties.

   By notice, issued on April 4, 2001, the Commission chairman directed that the
submissions ordered by Judge Morriss should be filed with the Commission by the
close of business on April 6. Respondent Pioneer subsequently filed a submission
with the Commission requesting disqualification of Judge Morriss. On April 10, the
Commission issued an order designating the undersigned as the presiding
administrative law judge in this investigation in place of Judge Morriss.

   Order No. 1, which issued on April 12, 2001, set a target date for completion of
this investigation of June 21, 2002. Revised Order No. 55, which issued on March
19, was an initial determination which extended the target date to October 21. On
April 24, the Commission issued a notice stating that it would not review said
initial determination.

   Order No. 2, which issued on April 2, 2001, was the protective order. Order No.
6, which issued on May 17, denied complainants' Motion No. 454-10 regarding
modification of Order No. 2. Order No. 6 further imposed a limitation on patent
prosecution attorneys subscribing to the protective order. Order No. 9, which
issued on May 31, granted Pioneer's Motion 454-13 to amend their response to
include two additional factual allegations to the Ninth Affirmative Defense and to
reference supplemental exhibits submitted by complainants.

   Order No. 17, which issued on July 9, 2001, granted EchoStar's Motion Nos. 454-
31 and 454-32 to modify the response to the complaint and the notice of
investigation by providing additional details regarding the products imported by or
in behalf of EchoStar. Order No. 18, which issued on July 12, denied EchoStar's
Motion No. 454-15 for an order sanctioning complainants.

   Order No. 24 was an initial determination, which issued on August 23, 2001, and
granted complainants' Motion No. 454-43 to attach copies of license agreements and
a list of licensees to the complaint, and to amend the complaint to reflect the
attachments. In a notice dated December 14, the Commission determined not to review

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                           Page 12
USITC Inv. No. 337-TA-454

Order No. 24.

   Order No. 25, which issued on August 28, 2001, denied complainants' Motion No.
454-45 to strike the First Affirmative Defense of Pioneer relating to patent
misuse. Order No. 29, which issued October 9, denied S-A's Motions Nos. 454-55 and
— 56 to take evidence relating to public interest and to certify to the Commission
the question of whether the administrative law judge can receive evidence relating
to public interest issues and to amend the notice of investigation to allow the
administrative law judge to take evidence relating to public interest issues. Order
No. 32, which issued on October 12, denied complainants' Motion No. 454-52 to
disqualify Miller & Chevalier from representing EchoStar in this investigation.
Order No. 46, which issued November 21, denied respondent Pioneer's motion to
disqualify Fish & Richardson from representing complainants in this investigation.

   Order No. 36, which issued on November 2, 2001, denied Motion No. 454-82 of non-
party Peter Vogel, the named inventor on the '066 patent, to compel the return of
allegedly privileged documents, and granted Pioneer's Motion No. 454-81 for in
camera review of those documents to determine if the documents in issue were
subject to any privilege. In the same order, complainants' Motion No. 454-80 to
exclude the use of those same documents in issue was denied.

   Order No. 37, which issued on November 6, 2001, granted respondents' joint Motion
No. 454-78 to amend responses to the complaint and to assert an additional
affirmative defense that the '066 patent is unenforceable because of inequitable
conduct. Order No. 38, which issued on November 7, denied complainants' Motion No.
454-50 for summary determination requesting dismissal of certain affirmative
defenses regarding patent misuse. Order No. 39, which issued on November 14, denied
complainants' Motion No. 454-92 for summary determination regarding the economic
prong of the domestic industry requirement. Order No. 41, which issued on November
15, granted S-A's Motion No. 454-89 to amend its response to the complaint and
notice of investigation to assert additional affirmative defenses that the '121
patent is unenforceable due to inequitable conduct and that the '121 patent is
invalid due to non-joinder of an actual inventor.

   Complainants, in a letter to the administrative law judge dated November 15,
2001, gave notice of their intention to remove all of the asserted claims of the
'066 patent, two claims of the '268 patent, and two claims of the '204 patent from
this investigation. Order No. 44, which issued on November 20, was an initial
determination granting complainants' Motion No. 454-103 to terminate the
investigation with respect to the '066 patent, claims 8 and 10 of the '268 patent,
and claims 19 and 35 of the '204 patent. On January 30, 2002 the Commission
determined not to review the initial determination. Thus, the claims that remain at
issue in this investigation are claims 18-24, 26-28, 31, 32, 33, 36, 42, 43, 48-51,
54, 57-61 and 66 of the '121 patent, claims 1 and 3 of the '268 patent, and claims
14-17, and 31-34 of the '204 patent.

   On December 3, 2001, the hearing commenced and continued through December 19.
During the hearing, the administrative law judge granted respondents' Motion No.
454-111 to preclude complainants from asserting infringement under the doctrine of
equivalents. (Tr. at 92). Also during the hearing, the administrative law judge
granted an unopposed motion by EchoStar to amend their answer to add defenses that
the '121 patent is unenforceable due to inequitable conduct and that the '121
patent is invalid due to non-joinder of an inventor similar to the relief granted
to S-A in Order No. 41. (Tr. at 5337-38).

   On January 17, 2002, respondents jointly moved to strike the testimony of
complainants' proffered expert witness, Dr. Philip Faillace, and related findings

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 13
USITC Inv. No. 337-TA-454

and exhibits on any topics relating to the IPG [FN2] source code for the accused
products. (Motion Docket No. 454-143A). Order No. 62, which issued on June 21
granted in part said motion.

Post hearing submissions have been made. The matter is now ready for decision.

The final initial and recommended determinations are based on the record compiled
at the hearing and the exhibits admitted into evidence. The administrative law
judge has also taken into account his observation of the witnesses who appeared
before him during the hearing. Proposed findings of fact submitted by the parties
not herein adopted, in the form submitted or in substance, are rejected as either
not supported by the evidence or as involving immaterial matters and/or as
irrelevant. Certain findings of fact included herein have references to supporting
evidence in the record. Such references are intended to serve as guides to the
testimony and exhibits supporting the findings of fact. They do not necessarily
represent complete summaries of the evidence supporting said findings.

II. PARTIES

See FF 1-22.

III. JURISDICTION

The complaint and notice of investigation state a cause of action under section
337 of the Tariff Act of 1930, as amended. Thus, the Commission has jurisdiction
over the subject matter of this investigation. See Amgen, Inc. v. U.S.
International Trade Commission, 902 F. 2d 1531, 1536 (Fed. Cir. 1990). Each of the
named respondents responded to the complaint and notice of investigation and
participated in the hearing. Thus, the Commission has personal jurisdiction over
each of the respondents.

While EchoStar appeared at the hearing, it argued that named respondent EchoStar
Communications Corporation (ECC) is not a proper respondent under section 337
because ECC is a holding company; that ECC does not import the accused devices;
that ECC does not sell the accused devices for importation; and that because there
is no evidence that ECC has committed the acts alleged by complainants to invoke
the Commission's jurisdiction under section 337, complainants have not met their
statutory burden under section 337. (EPost at 279-284). Charles Ergen, who
testified at the hearing, is the Chairman and Chief Executive Officer of ECC{* *
*}in that ETC is a wholly owned subsidiary of EchoStar DBS Corporation which is a
wholly owned subsidiary of EchoStar Broadband Corporation, a wholly owned
subsidiary of ECC. (Ergen, Tr. at 2985- 87, 3029, RX-1943, RX-7448). Ergen is an
officer of ETC. (Tr. at 3043). ETC has participated in the design of accused set-
top boxes. (Ergen, Tr. at 3046-47, CX-3773, No. 1). In addition, ETC participates
in the importing, purchasing and licensing of EchoStar set-top boxes. (Ergen Tr. at
3032-33). In view of Ergen's testimony and the referenced evidence, the
administrative law judge rejects EchoStar's argument that ECC is not a properly
named respondent.

Respondents argued that they cannot be found to have violated section 337 because
they do not import an alleged infringing article. (See, e.g., S-A Post at 294).
Complainants argued that respondents admitted that they imported the accused set-
top boxes and/or components thereof into the United States, or that such articles
were imported on their behalf; that the evidence established that all of the
accused set-top boxes and/or components thereof were imported with hardware and/or
software that enable the later downloading of infringing IPG software or resident
software applications(s) that contain an infringing IPG. The staff argued that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                  Page 14
USITC Inv. No. 337-TA-454

there is subject mater jurisdiction because the evidence of record established that
set-top boxes alleged to be part of an infringing system or process have been
manufactured abroad, imported into the United States, and sold within the United
States after importation. (SPost at 95).

   Subject matter jurisdiction in section 337 investigations is established by the
filing of a complaint alleging "unfair acts in the importation of articles ... into
the United States, or in the sale of such articles by the owner, importer, or
consignee." 19 U.S.C. § 1337(a)(1)(A). The term "unfair acts" has been construed
broadly to include infringement of patents, and the alleged unfair acts occurring
incident to importation of the articles or products involved or affected. See
Novelty Glasses, ITC Inv. No. 337-TA-55, USITC Pub. No. 991 (1979); Welded
Stainless Steel Pipe and Tube, Inv. No. 337- TA-29, USITC Pub. Np. 863 (1978); In
re von Clemm, 229 F. 2d 441 (C.C.P.A. 1955). In Hardware Logic Emulation Systems,
Inv. No. 337-TA-383, Final Initial Determination at 159 (July 31, 1997), this
administrative law judge rejected respondents' arguments that they must directly
infringe the patents-in-issue in order to violate section 337, stating that
"[t]here is nothing in the plain language of section 337(a)(1)(B), or the
legislative history that would limit articles that 'infringe a ... patent to only
those articles that directly infringe, and would exclude those articles that
contributorily infringe." See also Certain Flash Memory Circuits and Products
Containing Same, Inv. No. 337- TA-382, Comm'n Op. at 15-16 (June 9, 1997), Certain
Curable Fluoroelastomer Compositions and Precursors Thereof, Inv. No. 337-TA-364,
Unreviewed Initial Determination at 66 (December 15, 1994).

   The record does establish that set-top boxes alleged to be part of an infringing
system or process have been manufactured abroad imported into the United States,
and sold within the United States after importation by the named respondents. See,
e.g. SX-3 (EchoStar) at 18-23, SX-4 (SCI) at 14-15, SX-5 (Pioneer) at 12-13 and SX-
3 (S-A) at 11-17. {* * *}

   {* * *}In addition, while S-A relied on Greg Durden's testimony to support the
argument that an Explorer set-top box can be used without IPG software, Durden, who
has worked for S-A for around 21 years (Tr. at 2713), was unable to identify any
end user who has actually employed an Explorer set-top box with SARA software but
without SARA IPG software (Tr. at 2810).
        Q Is it correct that Scientific-Atlanta cannot identify any end user who has
actually employed an Explorer set-top box with SARA software but without SARA IPG
software (Tr. at 2810).
        A I believe that's correct, yes.
        Q Is it also true that Scientific-Atlanta is unaware of any MSO that has
installed Explorer boxes with SARA software but without the SARA IPG software?
        A As far as I know, yes.
Accordingly the administrative law judge rejects respondents' contention that they
cannot be found to have violated section 337 because they do not import an alleged
infringing article.

IV. PATENTED SUBJECT MATTER IN ISSUE

   In issue are certain claims of the '121 patent, the '268 patent and  the '204
patent. The '121 patent, entitled "TV Schedule System and Process," initially
issued to Patrick Young on November 10, 1987, based on Application Serial No.
860,077 filed on May 6, 1986. Serial No. 860,077 was a continuation-in-part of
abandoned Application Serial No. 754, 630 filed July 12, 1985. On December 14,
1993, Reexamination Certificate B1 4,706,121 issued to Patrick Young on the initial
'121 patent. (FF 23-25, 31, 32). In issue are independent claim 18 (and, by
dependency, claims 19-24, 26-28, and 31), independent claims 32, 33, 36, 42 (and,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 15
USITC Inv. No. 337-TA-454

by dependency, claims 43, 48-50), independent claims 51, 54, 57 (and, by
dependency, claims 58-61) and independent claim 66. [FN3]

    The '268 patent, entitled "User Interface for Television Schedule System," issued
to Patrick Young, John H. Roop, Alan R. Ebright, Michael W. Faber and David
Anderson on December 26, 1995, based on Application Serial No. 198,538 filed on
February 18, 1994. Serial No. 198,538 was a continuation of abandoned Application
Serial No. 579,555 filed on September 10, 1990, which in turn was a continuation of
abandoned Application Serial No. 579,555 filed September 10, 1990, which in turn
was a continuation-in-part of Application Serial No. 219,971, filed July 15, 1998,
which issued as U.S. Patent No. 4,977,455. In issue are independent claim 1 and
dependent claim 3. (FF 26, 27).

    The '204 patent, entitled "User Interface for Television Schedule System," issued
to Patrick Young, John H. Roop, Alan R. Ebright, Michael W. Faber and David
Anderson on September 15, 1998 based on Application Serial No. 484,412. filed on
June 7, 1995. [FN4] Serial No. 484,412 was a continuation of Application Serial No.
198,538, filed February 18, 1994 (now the '268 patent). (FF 28-30). In issue are
independent claims 14 and 31, claims 15 through 17, which are dependent upon claim
14, and claims 32 through 34, which are dependent upon claim 31.

V. CLAIM CONSTRUCTION

    Claim construction is a question of law to be decided by the administrative law
judge. Markman v. Westview Instruments, Inc., 52 F.3d 967, 978, 34 U.S.P.Q.2d 1321,
1328 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 376 (1996) (Markman). The construction
of the language of a claim should be made independently of what is being alleged to
infringe the claim. See Donald S. Chisum, Patents § 18.03.

    As for proper claim construction:
    It is well-settled that, in interpreting an asserted claim, the court should
look first to the intrinsic evidence of record i.e., the patent itself, including
the claims, the specification and, if in evidence, the prosecution history. Such
intrinsic evidence is the most significant source of the legally operative meaning
of disputed claim language.
Vitronics Corp. v. Conceptronic Inc., 90 F.3d 1576, 1582, 39 U.S.P.Q.2d 1573, 1576
(Fed. Cir. 1996) (citation omitted) (Emphasis added) (Vitronics). To construe the
claims of a patent "a court principally consults the evidence intrinsic to the
patent, including the claims, the written description, and the relevant prosecution
history." Watts v. XL Sys. Inc., 232 F.3d 877, 882 (Fed. Cir. 2000).

    In considering claim language, the "ordinary and customary meaning of a disputed
claim term is presumed to be the correct one." K-2 Corp. v. Salomon, S. A., 191
F.3d 1356, 1363 (Fed. Cir. 1999). "[T]he focus is on the objective test of what one
of ordinary skill in the art at the time of the invention would have understood the
term to mean." Markman, 52 F.3d at 986. A claim term must be given the same
interpretation whenever it is employed in the claims, i.e., the meaning of a claim
term should not vary from claim element or from claim to claim. Southwall
Technologies, Inc. v. Cardinal IG Co., 54 F.3d 1570, 1579 (Fed. Cir. 1995).

    The specification contains a written description of the invention that must
enable one of ordinary skill in the art to make and use the invention. For claim
construction purposes the written description may act as a dictionary, which
explains the invention and may define terms used in the claims. A patentee is free
to be his own lexicographer, although any special definition given to a word must
be clearly defined in the specification. Markman, 52 F.3d at 978, 979, 34
U.S.P.Q.2d at 1328, 1329; Vitronics, 90 F.3d at 1580.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                          Page 16
USITC Inv. No. 337-TA-454

The prosecution history is of "critical significance in determining the meaning of the claims" Vitronics, 90 F.3d at 1582 (Emphasis added). "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution" Id. at 1583 (quoting Southwall Technologies, 54 F.3d 1570, 1576 (Fed. Cir. 1995) (Emphasis added)). Claims may not be construed one way in order to obtain their allowance and in a different or inconsistent way against accused infringers. Spectrum International, Inc. v. Sterlite Corp., 164 F.3d 1372, 1379 (Fed. Cir. 1998). The Federal Circuit has made it clear that the public is entitled to rely on an applicant's representations. See Hockerson-Halberstadt, Inc. v. Avia Group International, Inc. 222 F.3d 951, 957 (Fed. Cir. 2000).

The administrative law judge may, in his discretion, receive extrinsic evidence to aid him in coming to a correct conclusion as to the true meaning of language employed in a patent. Markman, 52 F.3d at 981, 34 U.S.P.Q.2d at 1331. Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries and learned treatises. The evidence may be helpful to explain scientific principles and the meaning of technical terms, and terms of art that appear in the patent and prosecution history. It may also demonstrate the state of the prior art at the time of the invention. Extrinsic evidence, however, is not to be used for the purpose of clarifying ambiguities in claim terminology. Markman, 52 F.3d at 981, 34 U.S.P.Q.2d at 1331. Moreover, neither the patentee nor the alleged infringer may alter the scope of the claims. Thus,
    where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely.
Vitronics, 90 F.3d at 1538-39, 34 U.S.P.Q.2d at 1577. The testimony of an inventor on the proper construction of claims, based on the text of the patent, is entitled to no deference because it amounts to no more than legal opinion about the process of construction that the administrative law judge must undertake. No inquiry as to the subjective intent of the inventor or of the U.S. Patent and Trademark Office (PTO) is appropriate or even possible in the context of a patent infringement action. In fact, commonly the claims are drafted by the inventor's patent solicitor and they may even be drafted by the patent examiner in an examiner's amendment subject to the approval of the inventor's solicitor. Markman, 52 F.3d at 985, 34 U.S.P.Q.2d at 1334-35. The scope of a patent is defined by the claims, and not by the description of the preferred embodiment in the specification. Gart v. Logitech, Inc. 254 F.3d 1334, 59 U.S.P.Q.2d 1290 (Fed. Cir. 2001).
    35 U.S.C. § 112, ¶ 6 provides guidelines for interpreting means-plus-function limitations.

This section of the patent statute states:
    An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Only the disputed claim elements need be interpreted by the administrative law judge. See In the Matter Certain Hardware Logic Emulation Systems and Components Thereof, Inv. No. 337-TA-383, (July 31, 1997) (Hardware Logic); and In the Matter of Certain Ion Trap Mass Spectrometers and Components Thereof, Inv. 337-TA-393 at p. 24-25 (February 25, 1998). [FN5]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A. '121 Patent

   In issue are claims 18-24, 26-28, 31-33, 36, 42, 43, 48-51, 54, 57-61 and 66.

1. Independent Claim 18.

   Independent process claim 18 (FF 33), the earliest numbered claim in issue of the
'121 patent, reads:
      18. A process for controlling the presentation of broadcast programs to a
   television receiver, which comprises supplying program schedule information to
   storage means in a data processor, supplying user program selection criteria to the
   data processor, said user program selection criteria comprising a plurality of
   independent user chosen program selection criteria and at least one program choice,
   the data processor combining said user selection criteria, selecting those programs
   meeting the combined user selection criteria for viewing from the program schedule
   information in said storage means in the data processor, storing information
   identifying the selected programs, said stored information identifying broadcast
   schedule time, channels, and program titles, and using the stored information to
   tune the television receiver to the selected programs.

   The administrative law judge finds that the language of the preamble, viz.,  "[a]
process for controlling the presentation of broadcast programs to a television
receiver," pursuant to the plain meaning of the language, refers to a process for
controlling the presentation of broadcast programs to a conventional TV set. Such
interpretation is consistent with EchoStar's proposed construction that "television
receiver" is a conventional TV set (respondents' jointly proposed claim
constructions submitted pursuant to the administrative law judge's November 27,
2001 telephonic hearing) and complainants' proposed construction that "the
presentation of broadcast programs to a television receiver" refers to providing
television programs to a television set. (RX-3311 at 4). He further finds that the
language of process claim 18 describes a process in which several discrete steps
occur. First claim 18 recites that the process "comprises supplying program
schedule information to storage means in a data processor, [and] supplying user
program selection criteria to the data processor." (Emphasis added) (FF 33).
Therefore, claim 18 requires that during the process two things first occur:
program schedule information is supplied to the data processor's storage means and
user program selection criteria is supplied to the data processor. The claim
language does not expressly mandate that "program schedule information" and the
"user program selection criteria" be provided to the data processor in any given
order in relation to each other, i.e., the claim language does not state that the
"program schedule information" must be supplied before the "user program selection
criteria" is supplied, or vice versa, or whether both are to be supplied
simultaneously. The claim language however does expressly state that the "program
schedule information" is to be supplied to a particular location in the data
processor (viz., the data processor's storage means), whereas no particular part of
the data processor is specified with respect to the "user program selection
criteria."

   The administrative law judge further finds that claim 18 goes on to describe the
"user program selection criteria" that is supplied to the data processor in the
preceding step as "comprising a plurality of independent chosen program selection
criteria and at least one program choice." (FF 33). Therefore, from this clause the
claim discloses that the data processor had been provided two or more "independent
chosen program selection criteria" and one or more program choices. This clause
clearly refers to more than one "independent chosen program selection criteria" as
it refers to "a plurality of independent chosen program selection criteria," which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392
USITC Inv. No. 337-TA-454

is in stark contrast to the second part of the clause which specifies that "at
least one program choice" is to be provided to the data processor, instead of a
"plurality of program choices." Id. There is no indication as to when the
"plurality of independent chosen program selection criteria" or the "program
choice" must be supplied in relation to each other, i.e., the claim language does
not state that the "program choice" is to be supplied after the "independent chosen
program selection criteria," or vice versa, or whether both are to be supplied
simultaneously. Id.

   In the claim 18 process, the next step that is recited is that the data processor
"combin[es] said user selection criteria." (FF 33). The administrative law judge
finds from this language, that this step must occur after the data processor has
been supplied with "user selection data" as the data processor cannot combine the
"said user selection criteria" before it is supplied with the "user selection
criteria." However, the claim language does not specify whether the "said user
selection criteria" refers to the "user program selection criteria" or the
"independent user selection criteria." The next step in the process, pursuant to
the language of claim 18, is that the data processor selects the programs that meet
the "combined user selection criteria" from the "program schedule information" that
is stored in the data processor's storage means, which step must take place after
the data processor "combin[es] the user selection criteria," or else there would be
no "combined user selection criteria" and, since the data processor is selecting
from the "program schedule information in [its] storage means," the selection step
must also occur after the data processor's storage means has been supplied with
"program schedule information."

   The data processor then stores information identifying the programs that it had
just selected. The administrative law judge finds that this step must occur only
after the data processor has selected programs meeting the "combined user selection
criteria," or else there would no information identifying the selected programs to
store. The information identifying the programs is further described as identifying
the broadcast schedule times, channels, and the program titles. (CX-1, col. 5, lns.
26-27). The data processor then uses the "stored" information to tune the
television to the selected programs which is the last step in process claim 18.
(Emphasis added) (FF 33). As the plain language of this clause indicates, the
information identifying the selected programs must have been stored prior to the
data processor using it to tune the television receiver to the selected programs.

   The construction of claim 18, supra, as including a number of discrete steps is
consistent with the specification of the '121 patent, which states:
   The process of this invention includes the following steps. Program schedule
information is supplied to a data processor. User program selection criteria are
supplied to the data processor. The user selection criteria are used to select
programs for viewing from program schedule information in the data processor. The
stored information is used to tune the television receiver to the selected
programs.
(col. 4, lns. 53-60). The only difference in this description of the '121 invention
and that which is described in claim 18, is the description of the process in the
specification specifies that program schedule information is supplied to the data
processor first, and then the user program selection criteria is supplied to the
data processor, whereas claim 18 does not explicitly require one to be supplied
before the other.

   The prosecution history of the '121 patent is also consistent with the
administrative law judge's interpretation of claim 18 as comprising a number of
discrete steps. In its November 23, 1992 amendment to the '121 patent, filed during
the re-examination, the applicant described original claim 18 accordingly, in an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 19
USITC Inv. No. 337-TA-454

attempt to distinguish it from certain prior art references:
     Process claim 18 contains similar limitations which distinguish over the prior
art. Regarding the claimed "combining of user selection criteria," the Examiner has
asserted that this reads on the plurality of data needed to identify a single
program to be recorded (channel, time, etc.). This trivializing simplification,
however, ignores the plain meaning and interpretation of the claims, which
interpretation is also supported by the specification. Of course, programming
information such as channel and time might be used as selection criteria, but, such
as is recited in claim 18, the selection criteria must then be combined, the
combined criteria must be used to select programs from the schedule information,
and then the schedule information for the selected programs is stored. These steps
are clearly not met by the simple input and storage of programming data for a
single program.
(Emphasis in original omitted) (FF 91).

     During reexamination the applicant in a February 26, 1993 supplemental amendment
further described the process disclosed in several of the claims of the '121
patent:
     Several of the present claims recite a process in which the user enters user
program selection criteria, and the user enters user program selection criteria,
and the data processor combines the program selection criteria, and the data
processor combines the program selection criteria, searches through the stored
selection criteria, searches through the stored schedule information, and creates
and stores a display list of program listings that meet the combined criteria. This
is disclosed, for example, at co. 17 lines 33 et seq. The user may then make
program selection choices (which the Examiner has characterized as further program
selection criteria) from this display. The data processor then stores information
for these program selections, including information identifying program titles, in
a reminder calender list.
(FF 150).

     There follows the interpretation of the clauses of claim 18 that are recited
after the preamble and in the order in which they are recited.

a. The language "comprises supplying program schedule information to"

     Claim 18 recites, after the preamble, the clause "comprises supplying program
schedule information to storage means in a data processor." (FF 33). In issue is
the meaning of "program schedule information."

     Complainants argued that "program schedule information" is merely information
concerning scheduled television programs. (CFF 282). Respondents argued that the
'121 reexamination prosecution history in the context of the asserted claims of the
'121 patent explicitly provides that "schedule information" refers to times, titles
and channels. (RFF 640). The staff argued that the proper construction of "program
schedule information" requires that the term include the titles of programs, as
well as the scheduled broadcast time and the channels on which the broadcast is to
occur. (SPost at 7).

     Original claim 18 of the '121 patent was amended in the examination prosecution
to read (FF 33, 165):
     A process for controlling the presentation of broadcast programs to a
television receiver, which comprises supplying program schedule information to
storage means in a data processor, supplying user program selection criteria to the
data processor, said user program selection criteria comprising a plurality of
independent user program selection criteria and at least one program choice, the
data processor combining said user selection criteria, selecting those programs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                Page 20
USITC Inv. No. 337-TA-454

meeting the combined user selection criteria for viewing from the program schedule
information in said storage means in the data processor, storing information
identifying the selected programs, said stored information identifying broadcast
schedule times, channels and program titles, and using the stored information to
tune the television to the selected program. (CX-1, B '121 Patent at col. 5, lns.
14-29) (underlined language was added in the reexamination proceeding)
Thus, the language of claim 18 in issue conclusively shows that in the
reexamination proceeding, applicant Patrick Young specifically amended claim 18 to
identify the information in the storage means as "broadcast schedule times,
channels and program titles." (Emphasis added).

   Original independent process claim 18, as issued on November 10, 1987, did not
refer to "program titles." (FF 91). Moreover, the phrase "program titles" was
included in claim 18 in response to rejections by the Examiner. In reference to the
reexamination proceedings, the Examiner in an Office Action of June 8, 1992
rejected all of the claimed subject matter in light of certain prior art. (FF 94).
In an amendment received by the Patent Office on August 13, 1992, while new
independent claim 57 directed to a "television schedule system" defined "broadcast
schedule information" as "comprising broadcast schedule times, titles and
channels," independent process claim 18 was not amended to include program titles.
(FF 96).

   Following a rejection on September 22, 1992 in which the claimed subject matter
was rejected prior art (FF 108-112), applicant, in a response filed on November 23,
1992, rewrote the claims. (FF 113). While revised independent claim 57 relating to
a "television schedule system" again defined "broadcast schedule information" as
comprising broadcast schedule times, titles and channels, rewritten independent
process claim 18 did not include the phrase "program titles." (FF 113). In a Final
Office Action of January 5, 1993, claim 18, which still did not include "program
titles," was rejected by the Examiner in light of prior art. (FF 121-128). A
proposed amendment attached to a Reexamination Interview Summary Form and relating
to a telephonic interview on January 6, 1993 did not include "program titles" in
claim 18. (FF 129). On January 21, 1993, applicant faxed to the Examiner a proposed
amendment. Proposed claim 18 in the amendment was again devoid of any reference to
"program titles." (FF 130). Likewise applicant in an amendment after final date-
stamped at the Patent Office on January 29, 1993 and in a proposed supplemental
amendment after final faxed to the Examiner in February 16, 1993, each in response
to the Patent Office action of January 5, 1993, did not amend claim 18 to include
"program titles." (FF 132).

   Applicant, ultimately, in a proposed Supplemental Amendment After Final, faxed to
the Examiner on February 23, 1993, proposed to amend claim 18 by adding the
language "said stored information identifying broadcast schedule times, channels,
and program titles." (FF 141). In the accompanying remarks, it was stated that
independent claim 18, inter alia, had been amended "to further clarify that the
schedule information stored for the selected programs identifies not only program
channels and times, but also program titles." (FF 141). Likewise, in a February 26,
1993 Supplemental Amendment After Final, applicant added to claim 18 the phrase
"said stored information identifying broadcast schedule times, channels, and
program titles." (FF 146). In commenting on the amendment applicant specifically
stated (FF 150):
   In response to earlier arguments that the claims require schedule information
including program title to be stored for selected programs, the Examiner only
argued that the term "schedule information" was not defined so as to require
program title. Several claims have been amended to specify the storage of program
title for the selected programs and are thus believed to be allowable. As
previously noted, prior art systems simply program the VCR with the channels and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 21
USITC Inv. No. 337-TA-454

times for selected programs; information identifying the title was not stored.
(Emphasis added). Thereafter, the Examiner, in each of a Notice Of Intent To Issue
Reexamination Certificate dated June 2, 1993 and a supplemental notice dated August
26, 1993, specifically stated that claim 18 avoided the art of record in at least
the art of record did not show or suggest a process for controlling the
presentation of broadcast programs to a television receiver which comprises, inter
alia, "storing information identifying the selected programs and identifying
broadcast schedule times, channels and titles." (FF 163-164).

   Complainants argued that "schedule information" is used in two contexts in claim
18, and only the second context, in which schedule information for the selected
programs is stored, requires the inclusion of time, title, and channel for the
selected programs. The administrative law judge rejects complainants' argument
because pursuant to the plain language of independent claim 18, programs are
selected from schedule information already in the storage means in the data
processor. Hence, if the schedule information from which the selected programs are
selected did not already include time, title, and channel, the process would not be
able to store information identifying time, title and channel for the selected
programs.

   Based on the instrinsic evidence, the administrative law judge finds that the
claimed phrase "program schedule information" in claim 18 requires that it includes
the titles of programs, the scheduled broadcast times and the channels on which the
programs are to be broadcast.

b. The language "storage means in a data processor"

   Complainants argued that "storage means in a data processor" should be construed
as the "directly addressable" or "main memory" of a data processor's processing
unit. (CRRFF760). Complainants also argued that such memory, in addition to
constituting the storage means of claim 18, should also be considered to be part
of, and therefore within, a data processor. (CFF 305).

   Respondents argued that "storage means" should be construed as memory that
includes a program list buffer, screen buffer and a user pre-configured channel
buffer (containing a list of user-selected channels), user pre-configured theme
buffer (containing a list of user-selected themes), and user pre-configured prime
time buffer (containing a user selected time range). (PPost at 64, S-A Post at 61,
EPost at 58). Respondents also argued that "storage means in a data processor"
should be construed as meaning a "storage means in a central processing unit (CPU)"
(PPost at 72), i.e., a memory internal to the CPU (S-A at 87), such that the five
buffers constituting the storage means are within the CPU (EPost at 65). The staff
argued that evidence presented at the hearing established that the claim term "data
processor" refers to a CPU and that the meaning of the phrase "in a data processor"
means that the storage means must be within, and not merely connected to, the data
processor. (SPost at 13-17).

   The administrative law judge finds that the record establishes that the claimed
term "storage means" does not have a clear meaning to one of ordinary skill in the
art. However, he finds, based on the specification of the '121 patent and the re-
examination history, that "storage means" should be interpreted as including at
least five buffers that are disclosed in the '121 patent as constituting the
"storage means": viz., the "program list buffer," "theme buffer," "screen buffer,"
"channel buffer," and "prime time buffer."

   The specification defines the "storage means" as comprising the "program list
buffer," "theme buffer," "screen buffer," "channel buffer," and "prime time

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 22
USITC Inv. No. 337-TA-454

buffer." Thus it recites: "[p]rogram list buffer 303, screen buffer 353, and the
other buffers discussed above." (FF 168). This portion of the specification refers
to FIG. 8, which is a flow chart of software used with the systems shown in FIGs. 3
and 4. FIGs. 3 and 4 are block diagrams of receiver and television receiver control
systems that are to be used in conjunction with the systems to be used to broadcast
program schedule information depicted in FIGs. 1 and 2 and are the only systems
implementing the invention of the '121 patent disclosed in the '121 patent (col. 5,
lns. 64-66, col. 6, lns. 1-14). Moreover, the administrative law judge finds the
binding nature of this definition is reinforced by the '121 patent's reexamination
proceeding which demonstrates that the language added to the specification was
necessary to obtain the allowance of claim 18.

In a Proposed Amendment attached to a January 6, 1993, Reexamination Interview
Summary Form, Young added the language "storage means comprising an electronic
memory" to system claims 1, 12, 14, 15, 39, 42, 51, 52 and 54, and the language
"electronic memory associated with a data processor" to process claims 18, 33, 34,
36, and 38 in an attempt to overcome the rejection. (FF 129). However, the phrase
"comprising an electronic memory" was subsequently omitted in the February 16, 1993
Proposed Supplemental Amendment After Final. (FF 134).

In a Proposed Supplemental Amendment After Final, faxed on February 23, 1993,
Young attempted to find support in the specification that "electronic memory" could
comprise the claimed "storage means" (FF 142):
   A group of claims have been amended to clarify that the schedule information is
provided to a storage means (in some claims recited as an electronic memory in the
data processor), the data processor combines user selection criteria, and programs
meeting the combined criteria are then selected from the schedule information in
the storage means. Support of these limitations can be found in a number of
locations in the patent, including at column 8, lines 23 et. seq., and at column
17, lines 33 et seq. It is believed inherent and implicit that the list operations
described in column 17 are performed on information in an electronic memory.

The Examiner in a Reexamination Interview Summary Form, in reference to
interviews that took place on February 19 and 24, 1993, "expressed concerns that
the term 'electronic memory' and the recitations that the schedule data is stored
and retrieved from such a memory did not appear to have clear support in the
disclosure." (FF 143).

In a February 26, 1993 Supplemental Amendment After Final, Young attempted to
overcome the Examiner's rejections with three amendments to the '121 patent's
specification: (1) changing from "A memory" at column 7, line 47 to "An electronic
memory" (2) amending column 17, line 38 to specify that the "program listing" is
stored in "program list buffer 303;" and (3) amending column 17, line 49 to read,
"Program list buffer 303, screen buffer 353, and the other buffers discussed above
are located within an electronic memory coupled to the data processor, such as
electronic memory 111." (FF 144). Young explained the reason for these proposed
amendments to the specification as follows:
   As suggested by the Examiner, various minor amendments have been made to the
specification to make explicit various aspects of the invention that were implicit
but not totally explicit in the original specification. At column 7, language was
added to make explicit the fact that the memory employed by the data processor is
an electronic memory. This is believed not to be new matter because it is inherent
and implicit in the original specification that in the disclosed embodiment the
memory used by the data processor is electronic (as opposed to human, for example).

* * * *

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                          Page 23
USITC Inv. No. 337-TA-454

    In column 17 language was added to make explicit the facts that program listing
325 is stored in program list buffer 303, and that the various buffers are within
electronic memory coupled to the data processor. This is believed not to be new
matter because at column 16, lines 45 et. seq., it is stated that the CPU stores
the program data in program list buffer 303, and because it is inherent and
implicit in the original specification that in the disclosed embodiment the various
buffers manipulated by the data processor must be in the electronic memory, or the
data processor could not do the recited functions.
(FF 144).

    The Examiner in a Office Action dated March 26, 1993 rejected Young's attempt to
amend the specification so as to disclose an "electronic memory," stating (FF 153):
    In Column 7, line 47, 'A memory' has been changed to - - an electronic memory -
-. This amendment is considered to introduce new matter because: a) it is not clear
from the disclosure as originally filed what kind of memories are included or
excluded by the term "electronic memories" (i.e. RAM, disc, tape, storage tubes,
etc...); and b) it appears to suggest that said memory is now intended to be
limited only to memories of some certain type (i.e. electronic) while the
disclosure as originally filed appears to have recited a generic memory (i.e.
inclusive of all types).
Accordingly, the Examiner found that "[c]laims 1-12, 14, 15, 18-31, 33, 34, 36, 38,
54-56, and 64-67 recited that the schedule information is stored in an 'electronic
memory'. Such recitations do not appear to be supported by the specification as
originally filed" and thus he rejected those claims. However, the Examiner stated
that if this deficiency in the claim language were remedied, the claims at issue
would be patentable. (FF 154).

    Young next attempted to overcome this rejection in an amendment dated April 6,
1993 by again amending the claims to delete "comprising an electronic memory" or
"electronic memory," and adding the phrase "storage means." (FF 156). Furthermore,
Young proposed amending the specification to recite "[p]rogram list buffer 303,
screen buffer 353, and the other buffers discussed above are located within a data
storage device coupled to the data processor." Id. Young explained this proposed
amendment as follows,
    Applicant has amended the specification as requested by the Examiner, and has
amended the claims to no longer refer to an electronic memory. It is respectfully
submitted that the original specification fully supports the claims and that the
objection to the specification and the § 112 rejection of claims is therefore
overcome.
(FF 157). Applicant Young again, however, failed to describe the scope of the
pertinent claim term "storage means."

    In a Reexamination Interview Summary form regarding a telephonic interview held
on April 19, 1993, the Examiner stated that "[a]pplicant agreed to change the last
two lines in the sixth full paragraph of column 17 so as to avoid the issue of the
new matter" [The last two lines was a reference to the following: "[p]rogram list
buffer 303, screen buffer 353, and the other buffers discussed above are located
within a data storage device coupled to the data processor."] (FF 158).

    The next day, Young submitted a Supplemental Amendment dated April 20, 1993 that
amended the specification to change "data storage device coupled to a data
processor" to "data storage means" and to define explicitly that they comprise the
five recited buffers. (FF 159, 160). Young's remarks explain his motivation for
this supplemental amendment to the specification: "During the telephone
conversation of April 19, 1993, Applicant ... agreed to change the amendment to
column 17 of the specification to simply refer to a data storage means." (FF 160).
Furthermore, the Examiner stated in the April 19, 1993 Reexamination Interview

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Summary Form that: "[a]pplicant agreed to change the last two lines in the sixth
full paragraph of column 17 so as to avoid the issue of new matter." (FF 158). This
amendment was accepted and appears in the Reexamination Certificate at column 2,
lines 38-52. (FF 162). The Examiner then, on June 2, 1993, issued a Notice of
Intent to Issue Reexamination Certificate. (FF 163).

    Accordingly, in light of the specification and the prosecution history, the
administrative law judge finds that the "storage means" of claim 18 is composed of
at least the following buffers: the program list buffer, the screen buffer, the
channel buffer, the theme buffer, and the prime time buffer.

    The administrative law judge further finds based on the intrinsic evidence that
the claimed phrase "storage means in a data processor" refers to a storage means
within a CPU. Thus, the ordinary meaning of the term "in" when used to connote the
location of an object "in" another object is "within." In In the Matter of Certain
Digital Satellite Sys. (DSS) Receivers & Components Thereof, Inv. No. 337-TA-392,
USITC Pub. 3418. Initial Determination, (Oct. 20, 1997), this administrative law
judge construed the claim language "a predetermined signal in a television program
transmission." Id. at 248. Based in part on dictionary definitions of the term
"in," he concluded that the ordinary meaning of "'a predetermined signal in a
television program transmission' requires a 'predetermined signal' that is located
or positioned within an electronic transmission" Id. Likewise, it is found that the
plain meaning of the phrase "storage means in a data processor" indicates that the
"storage means" must be "within" the CPU.

    In addition the administrative law judge finds the abstract of the '121 patent,
which supplies relevant evidence for claim interpretation, [FN6] correlates the
claim limitation "data processor" with "CPU 110" four times. Thus the front page of
the patent has a diagram identifying the "CPU" as "110" (CX-1). The abstract then
states:
    A data processor (110) is connected to receive the schedule information ...
user remote control transmitter 116-remote receiver (118) combination supplies user
selection inputs to the data processor (110). The data processor (110) selects
programs from the schedule information based on the user inputs. The schedule
information for the selected programs is stored in a memory (111), and is used by
the data processor (110) to control a programmable TV tuner (132).
Id. The prosecution history of the '121 patent further supports the finding that
the claimed storage means is within a CPU. When Young first attempted, in a
proposed amendment attached to a Reexamination Interview Summary Form concerning a
telephonic interview on January 6, 1993, to add language to the first occurrence of
"a data processor" in claim 18, which language was the precursor of "storage means
in," he did so by adding the language "electronic memory associated with a data
processor." (FF 129). On the face of this proposed amendment to claim 18, hand-
written brackets were placed around the words "associated with" and the word "in"
was hand-written next to the end of that line of text. Id. This change was
incorporated into Young's next Proposed Amendment faxed on January 21, 1993 which
read "electronic memory in" a data processor. (FF 130). Thus, the Examiner did not
allow Young to claim an electronic memory that was "associated with," but not "in,"
a data processor.

    Also on two separate occasions, the Examiner rejected Young's attempts to amend
the specification to state that the buffers discussed at column 17, lines 38-49,
are located within some form of storage device coupled to, rather than in, the data
processor/CPU. First, in a February 26, 1993 supplemental amendment Young attempted
to amend column 17, line 49 to read, "Program list buffer 303, screen buffer 353,
and the other buffers discussed above are located within an electronic memory
coupled to the data processor, such a electronic memory 111." (FF 144). Young

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 25
USITC Inv. No. 337-TA-454

argued that this amendment made explicit various aspects of the invention, and the
changes to the specification were not "new matter because at column 16, lines 45 et
seq., it is stated that the CPU stores the program data in program list buffer
303." (FF 144). The Examiner, in an Office Action dated March 26, 1993, disagreed
and rejected this amendment as "new matter." (FF 152). The Examiner's explanation
as to why he considered this new matter was cut-off in the document. (FF 153).

   A subsequent amendment dated April 6, 1993 stated, "Program list buffer 303,
screen 353, and the other buffers discussed above are located within a data storage
device coupled to the data processor." (FF 156, 157). The Examiner, however, in a
Reexamination Interview Summary form regarding a telephonic interview held on April
19, 1993, rejected this amendment because he found that the language "are located
within a data storage device coupled to the data processor" constituted new matter.
(FF 158). In Young's next amendment to the specification, dated April 20, 1993,
Young changed "data storage device coupled to a data processor" to "data storage
means," as he had agreed he would in the April 19, 1993, "telephone conversation"
with the Examiner. (FF 159, 160). This amendment was accepted, and the claims were
allowed. (FF 160, 161). Hence, the administrative law judge finds that the Examiner
refused to allow Young to amend the specification to place the buffers that
comprise the storage means outside of the data processor/CPU.

   Complainants argued that if "data processor" is interpreted to mean a CPU without
any associated memory, such an interpretation would render the '121 patent invalid
for lack of an enabling disclosure and therefore such an interpretation should be
avoided. The basis for complainants' argument that interpreting "data processor" as
a CPU would invalidate the '121 patent is that the CPU disclosed as part of the
preferred enablement of the '121 invention using a Little Board/186 Microcomputer
does not have sufficient capacity in its internal memory to store the volume of
data that would be required to be stored by the claims in issue. (See, e.g., CRPost
at 62-65). Neither respondents nor the staff dispute that the Little Board/186
Microcomputer would be incapable of containing the data required to be held by the
storage means in the claim 18 invention.

   The '121 patent states, "[t]he systems shown in FIGS. 1-4 are preferably
implemented with the commercially available subsystems shown in the following
table." (col. 21, lns. 21-22). Among the "commercially available subsystems" so
identified is the "Little Board/186 Microcomputer," which is the subsystem
identified as being the preferred method of implementing system control units 106
(of Fig. 3) and 180 (of Fig. 4) (col. 21, lns. 30-31). System control units 106 and
180 each are depicted in FIGs. 3 and 4, respectively, as a block containing, inter
alia, another block representing a CPU. The Little Board/186 Microcomputer has an
integrated 80186 CPU and has either 128K or 512K of RAM. (Tr. at 3740-41; CX-3452).
Respondents' expert, Rhyne, agreed, with respect to the Little Board/186
Microcomputer and after examining the Little Board's specification sheet (CX 3542),
that it would be impossible to store the data required to be held in the storage
means available on the CPU. (Tr. at 3742). However, complainants made no allegation
before the administrative law judge that the Examiner, either during the original
prosecution or during the extensive reexamination proceedings (FF 92-168) was given
access or made aware of the Little Board's specification sheet.

   Furthermore, although the specification of the '121 patent identifies the Little
Board/186 Microcomputer as the preferred device to enable system control units 106
and 180, the specification does not state that the Little Board device is the only
device capable of being used to implement the control system units. Complainants
claimed that no CPU, as of 1985, was capable of storing the information on its
internal registers that claim 18 required to be stored on the storage means. [FN7]
In support of this argument, complainants relied upon the testimony of their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                     Page 26
USITC Inv. No. 337-TA-454

expert, Faillace, and that of respondents' experts, Grimes and Rhyne.

   Faillace testified that "[t]he most expensive microprocessor you could get in
1985 had in its internal registers that were available for storing things, about
two dozen bytes of storage," and that this would be inadequate to hold the
information required to be held in claim 18's storage means. (Tr. at 1208- 10;
5624-25). Faillace also testified as microcomputers existed in 1985 they would be
unable to hold the information required to be held by claim 18's storage means (Tr.
at 1219-20) and that one in the ordinary skill of the art as of 1985 would not have
interpreted the '121 patent to be referring to the internal registers of a CPU
because such an interpretation would not have read on the preferred embodiment.
(Tr. at 1225). Rhyne testified that he was unaware of a CPU with sufficient memory
within itself to meet the storage requirements, but testified that if such a CPU
existed it would have read on claim 18. (Tr. at 3785). In fact, both of
respondents' expert witnesses, Grimes and Rhyne, were unable to identify any CPU
that existed, as of 1985, that would have had sufficient memory internally to hold
the data required to be held by the storage means of the claims in question. (Tr.
at 3784-85; 4343-49).

   Under Talbert Fuel Systems Patents Co. v. Unocal Corp., 275 F.3d 1371 (Fed. Cir.
2002), it is complainants' burden to show that a preferred construction would
render the patent invalid for lack of an enabling disclosure. In Talbert the
federal circuit affirmed a district court's construction of a patent claim relating
to a "gasoline having a boiling point range of 121-345° F" in which the lower court
interpreted the claim "as limited to gasolines having a final boiling point of 345°
F, and excluding gasolines having a higher final boiling point," despite the
plaintiff's claim that the lower court's construction was "incorrect because it was
inoperable." Id. at 1374-76. In rejecting the plaintiff's argument, the federal
circuit observed that, "while it agreed that a construction that renders the
claimed invention inoperable should be viewed with extreme skepticism," the
plaintiff "did not demonstrate inoperability or provide any basis for judicially
interpreting the claim to adjust the temperature range that [the plaintiff] stat[ed
was] the inoperable limitation." The administrative law judge finds that
complainants have not met their burden in establishing that the invention disclosed
in claim 18 would be inoperable if the data processor were interpreted to be a CPU.

   In Genentech, Inc. v. Novo Nordisk, 108 F.3d 1361 (Fed. Cir. 1997), the Federal
Circuit observed that "[t]o be enabling, the specification of a patent must teach
those skilled in the art how to make and use the full scope of the claimed
invention without 'undue experimentation.'" Id. at 1365. The court further noted
that "[p]atent protection is granted in return for an enabling disclosure of
invention, not for vague intimations of general ideas that may or may not be
workable." Id. at 1366. [FN8]

   There is no question that the specification for the '121 patent is more than a
"vague intimation[] of general ideas that may or may not work." The only argument
that was raised concerning the enablement of the '121 patent was that there was no
CPU in 1985 that was capable of performing all the data storage functions of the
data processor of claim 18. While Rhyne and Grimes testified that they were unaware
of any microcomputer existing in 1985 that had sufficient internal memory to
satisfy the storage requirements of claim 18, there is no indication that either
one made any attempt to locate such a CPU. Such an omission is determinative,
because both Grimes and Rhyne were respondents' witnesses, and respondents were not
challenging the validity of their proposed construction. It was complainants'
burden to ascertain whether or not there were such CPUs available in 1985.

   Complainants' sole remaining evidence in support of their argument is the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 27
USITC Inv. No. 337-TA-454

testimony of Faillace, who made a conclusory statement that there were no such CPUs available in 1985. Faillace did not detail how he had determined that no such CPU had been available in 1985 nor did he identify what CPUs were available in 1985 and that any specific microcomputer was inadequate. An expert's opinion on the ultimate legal issue of enablement must be supported by something more than a conclusory statement. See In re Buchner, 929 F.2d 660, 661, 18 U.S.P.Q.2d 1331, 1332 (Fed. Cir. 1991). Thus the administrative law judge rejects complainants' argument that construing "data processor" to be "CPU" would render the '121 patent invalid on account of a lack of an enabling disclosure.

c. The language "supplying user program selection criteria to the data processor, said user program selection criteria comprising a plurality of independent user chosen program selection criteria and at least one program choice, the data processor combining said user selection criteria, selecting those programs meeting the combined user selection criteria for viewing from the program schedule information in said storage means in the data processor"

The parties disputed the proper interpretation of the terms "said selection criteria" and "combining" as used in the above portion of claim 18. Complainants argued that the "said user selection criteria" must include a "program choice" and are not limited to the criteria of theme, channels, and prime time. (CPost at 52). Respondents and the staff argued that "said user selection criteria" do not include a "program choice" and are limited to the criteria of theme, prime time and channels. (RFF 789, SPost at 11).

The parties also disputed whether the term "combining" as used in claim 18, requires the data processor to employ logical "AND" combining of the selection criteria, or whether the data processor can employ logical "OR" combining of the selection criteria instead of logical "AND" combining. Complainants argued that the data processor could employ just logical "OR" combining, such that the data processor would use the combined "user selection criteria" to select those programs that satisfied any of the user selection criteria. (CPost at 59-60). Respondents and the staff argued that the data processor must employ logical "AND" combining, such that the data processor, using the combined user selection criteria, would select only those programs that satisfied all of the combined selection criteria. (RFF 854; PPost at 82-83).

Finally, complainants argued that the combining step could be performed through multiple, sequential searches. (CRRFF 817.3). Respondents and the staff argued that the combining step had to be performed prior to any search by the data processor. (RFF 817).

Accordingly, there are four areas of dispute relating to the language: (1) whether a "program choice" is part of the "said user selection criteria" combined by the data processor, (2) whether the "said user selection criteria" combined by the data processor are limited to the criteria of theme, prime time, and channels, (3) whether "combining," as used in claim 18, requires the use of logical "AND" combining of the selection criteria or whether it can mean just the use of logical "OR" combining, and (4) whether the combining step could be performed through multiple sequential searches or has to be performed prior to any search. These four issues will be addressed ad seriatim.

i. Whether a "program choice" is part of the "said user selection criteria" combined by the data processor

The above portion of claim 18 mentions criteria in three contexts, viz., (1) "user program selection criteria," which is supplied to the data processor, (2)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 28
USITC Inv. No. 337-TA-454

"independent user chosen program selection criteria," which, in part, composes the
"user program selection criteria," and (3) "user selection criteria," which is
"combined" by the data processor. In addition, the phrase "user selection criteria"
is referred to as "said user selection criteria," but there is no preceding use of
the term "user selection criteria." In fact, claim 18 only uses criteria in
connection with two terms before reciting "said user selection criteria," viz.,
"user program selection criteria," and "independent user chosen program selection
criteria." Therefore, the administrative law judge finds that the plain language of
the claim indicates that "said user selection criteria" is referring to one of
those two terms. Referring to the plain language of claim 18, if "said user
selection criteria" were interpreted to refer to "user program selection criteria,"
"said user selection criteria" would include a "program choice," as well as
"independent user chosen program selection criteria." However, if "said user
selection criteria" were interpreted to refer only to "user chosen program
selection criteria," then this would exclude "program choice" from being a "said
user selection criteria," since "independent user chosen program selection
criteria" and "program choice" are separate and distinct components of "user
program selection criteria." Thus, a finding must be made as to whether "said user
program selection criteria" refers to "user program selection criteria" or
"independent user chosen program selection criteria."

From the plain language of claim 18 and the specification, the administrative law
judge finds that "said user selection criteria" refers to "independent user chosen
program selection criteria," exclusive of the program choice. A "program choice" is
the user's choice of a single television program at a specific date and time, as
the term "choice" means "the voluntary and deliberate action of picking, singling
out, or selecting from two or more that which is favored or superior.' (RX-7407 at
ES-7033-000671). Thus, a "program choice" is the deliberate selection or singling
out of a specific program, on a specific channel, at a specific time. The '121
patent's specification supports this construction. For example, the '121 patent's
specification (and its original claims) never use the term "program choice." Said
specification does, however, give examples of a user making a selection of a
particular program, provided on a particular channel, at a particular time and
date. (See, e.g., CX-1, at col. 16, lns. 18-23, col. 18, lns. 16-18). Hence the
administrative law judge finds that a "program choice" by the viewer, i.e., an
actual selection of a particular program to watch by the user, would render any
subsequent combining of "user selection criteria" so as to select those programs
for viewing from the stored program schedule information, needless. The user does
ultimately make a "program choice," but this is after the data processor has
combined the "user selection criteria" and has selected those programs satisfying
the combined criteria, so that the user makes his "program choice" from those
programs selected by the data processor.

Furthermore, interpreting "said user selection criteria" to mean only
"independent user chosen selection criteria" is consistent with the earlier use of
the term "said user program selection criteria," in the claim, which refers to the
antecedent "user program selection criteria," as the term "independent user chosen
program selection criteria" has not yet occurred in the claim. Therefore, when the
inventor wanted to refer to "user program selection criteria" he referred to it as
"said user program selection criteria." Hence "said user selection criteria" must
mean something other than "user program selection criteria."

The interpretation that "said user selection criteria" refers to "independent
user chosen selection criteria" is consistent with the language of the
specification which states:
    A search of the program listing 352 is made. The search is dependent on the
status of the channel buffer, the theme buffer, the prime time buffer, and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                              Page 29
USITC Inv. No. 337-TA-454

direction of the search. If the page 356 is up, the search direction is forward
starting from the list pointer. When the search satisfies the above criteria, the
program listing is placed into the screen buffer 353. The search continues until
the screen buffer is full 354 in which case the search is terminated. The status
lines information is passed to the screen and displayed by the TV.

* * *

    If an SEL key entry is detected at 370, the channel of the programmable tuner
132 or 164 will be set to the channel listed at 375 at the current cursor position
of the MG display.
(CX-1 at col. 17, ln. 38-col. 18., ln. 4). Therefore, as this excerpt from the
specification makes clear, the data processor's search of the program schedule
information does not take into account the viewer's selection of a particular
program to view, because such a selection occurs after the search.

   The interpretation of "said user selection criteria," as referring to
"independent user chosen program selection criteria," is supported by the
reexamination history, during which the applicant, in order to distinguish the use
of combined selection criteria by the invention disclosed in the '121 patent over
the selection of a single program, stated in the Amendment of November 23, 1992
that:
        Regarding the claimed 'combining of user selection criterion,' the Examiner
has asserted that this reads on the plurality of data needed to identify a single
program to be recorded (channel, time, etc.) This trivializing simplification,
however, ignores the plain meaning and interpretation of the claims, which
interpretation is also supported by the specification. Of course, programming
information such as channel and time might be used as selection criteria, but, such
as is recited in claim 18, the selection criteria must then be combined, the
combined criteria must be used to select programs from schedule information, and
then the schedule information for the selected programs is stored. These steps are
clearly not met by the simple input and storage of programming data for a single
program.
(FF 117) (Emphasis in original).

   Said interpretation is also consistent with the applicant's February 26, 1993
Supplemental Amendment After Final:

   Combining User Selection Criteria and Selecting Programs
      Several of the present claims recite a process in which the user enters user
program selection criteria, and the data processor combines the program selection
criteria, searches through the stored schedule information, and creates and stores
a display list of program listings that meet the combined criteria. This is
disclosed, for example, at col. 17 lines 33 et seq. The user may then make program
selection choices (which the Examiner has characterized as further program
selection criteria) from this display. The data processor then stores information
for these program selections, including information identifying program titles, in
a reminder calendar list.
      .Several claims recite the data processor combining a plurality of user
selection criteria other than the program choices. This is different from the
scenario that the Examiner has proposed would be inherent in Levine and similar
art, namely that the user could enter a date as a first selection criteria, then be
presented with a page of program listings, and then enter a program choice as a
second selection criteria to be "combined" with the date selection criteria. As
amended, several claims (such as claim 1) require the the [sic] data processor
combine a plurality of selection criteria in addition to the program choice. The
Examiner's proposed date entry does not meet the requirement of combined selection

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392
USITC Inv. No. 337-TA-454

criteria even if entered as a series of page commands. Each page command simply
establishes a new requirement that supersedes and replaces the previous requirement
rather than being combined with it.
(FF 150) (emphasis in original omitted and emphasis added).

Based on the foregoing, as complainants' representations to the Examiner during
the '121 patent's reexamination bear out, the administrative law judge finds that
the "said user selection criteria" that is combined by the data processor does not
include the "program choice," but instead consists of the "independent user chosen
program selection criteria." Hence, a "program choice" is found not to be a "said
user selection criteria" that is combined by the data processor.

ii. Whether the "said user selection criteria" combined by the data processor is
limited to the criteria of theme, prime time and channels

The claimed language in issue uses the word "criteria." Criteria is the plural of
criterion which is defined as "a standard on which a decision or judgement may be
based." (Webster's Third New Int'l Dictionary (1993)). Thus the administrative law
judge finds that "independent user chosen program selection criteria," which is
referred to by the "said program selection criteria," are two or more standards
used for the selection of programs by the data processor. Further he finds that the
plain language of "independent user chosen program selection criteria" indicates
that it is the user who determines which criteria are to be so used and sets those
criteria. As set forth in the specification:
     It is a further object of the invention to provide such a system in which the
user supplied selection criteria can be combined by the system to make program
selection.
(CX-1, col. 3, lns. 14-20).
     Because the system will search through a volume of schedule information to
find programs meeting the viewer's selection criteria, the program selection is
much easier and more rapid with the system of this invention than with manual
selection.
(CX-1, col. 5, lns. 19-36). However, the administrative law judge finds that the
intrinsic evidence, specifically, the specification and the re-examination
proceeding, makes it clear that the term "independent user chosen program selection
criteria" refers to the criteria of "theme" (i.e., selection of programs classified
in a particular theme, e.g., "news" or "drama"), "channel" (i.e., selection of
programs being broadcast on particular channels), and "prime time" (i.e., selection
of programs being scheduled for broadcast at a particular time slot), the
parameters of which can be pre-selected by the user. For example, the specification
describes what is shown on the screen when the claimed invention is working in the
"Master Guide (MG) mode:"
     At the bottom of the screen is a two line status display; showing the actual
time and date, and whether any of the search restrictions (prime, theme, and
channel) are activated.
(CX-1, col. 11, lns. 34-37 (emphasis added)).

The specification later describes how the invention, when working in the
"Program Guide (PG) mode," conducts searches of the program listings according to
the theme, prime time, and channel criteria as set by the user. (See CX-1, col. 12,
ln. 12 - col. 15, ln. 17; and, in particular, col. 12, ln. 45 - col. 13, ln. 58;
col. 13, ln. 60 - col. 14, ln. 34; and col. 14, ln. 36 - col. 15, ln. 17). Also, the
specification describes the invention as conducting searches only on the basis of
theme, channel, and prime time:
     For advanced users, the Program Master can be set up to list only the types
of programs (theme), only certain channels, and only programs within a certain
time, such as Prime Time.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 31
USITC Inv. No. 337-TA-454

(CX-1, col. 12, lns. 13-16). [FN9]

     Furthermore, during the re-examination of the '121 patent, the applicant
repeatedly indicated that "selection criteria" were prime time, theme, and channel.
For example, the applicant in his August 13, 1992 amendment distinguished his
invention over a prior art system of Kram by noting that the prior art "cannot
automatically combine two selection criteria such as 'weather' and 'channels 2, 5,
and 11."'). (FF 107). Thus, according to the applicant, the theme ("weather") and
the list of desired channels ("2, 5, and 11") are each a single criterion. Later in
the reexamination proceeding, the applicant reiterated that each of theme, channel,
and prime time is an individual selection criterion. For example, in the Amendment
of February 26, 1993, Young stated:
     The user selection criteria may be entered and activated independently under
different categories (theme, channel, prime time) and are maintained by the data
processor whether currently activated or not. This is disclosed, for example, from
column 12 line 12 to column 15 line 17 (wherein it is stated that buttons can be
pressed to independently activate the THEME, PRIME-TIME, and CHANNEL selection
criteria) and from Column 18 line 11 to column 20 line 38. Furthermore, the
selection criteria can be combined as alternatives (in a logical OR fashion), such
as a list of acceptable channels or a list of acceptable themes.
(FF 148) (emphasis added).

     Additionally, applicant Young in the August 10, 1992 Amendment, specifically
argued that his invention provided for prime time, channel and theme criteria that
could be independently activated and stored for use after being selected:
     Typical schedule selection criteria include accessible satellite symbols or
channel numbers, viewing times, or programs themes (news, sports, comedy, etc.) The
system stores the schedule selection criteria, and the various selection criteria
may then be enabled or disabled by the user as desired. When schedule information
is presented to the user, the data processor system automatically combines all the
currently enabled schedule selection criteria and presents to the user only
schedule information meeting the requirements of the combined criteria.
(FF 97). The applicant reaffirmed his position that his invention provided for
prime time, channel and theme criteria that could be independently activated and
stored for use after being selected in his February 26, 1993 Supplemental Amendment
After Final:
     The user selection criteria may be entered and activated independently under
different categories (theme, channel, prime time) and are maintained by the data
processor whether currently activated or not.... Also the prior art does not allow
complex entries such as theme or channel lists to be deactivated yet stored in
memory.
(FF 150) (Emphasis in original).

     As found, supra, the '121 patent describes a channel list as one of the three
user selection criteria that can be stored in a buffer and independently activated.
The administrative law judge finds the '121 prosecution history shows that a list
of favorite channels is a single user selection criterion, even though more than
one channel is included in the list. In the Amendment of August 13, 1992, Young
stated: "The system of Kram cannot automatically combine two selection criteria
such as 'weather' and 'channels 2, 5, and 11' to provide the user a custom
assembled list of programs meeting the combined criteria." (FF 107). By placing
quotes around "weather" and "channels 2, 5, and 11" Young identified the two
referenced selection criteria. If each channel were itself a selection criterion he
would have referenced four criteria (channels 2, 5 and 11 and weather) not two
(weather and channels).

     Furthermore, as Young explicitly stated in the February 23, 1993 Proposed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                          Page 32
USITC Inv. No. 337-TA-454

Supplemental Amendment After Final:
    III. Clarifying Manner of Combining: Independent claims 65 and 68 now require
that at least some of the selection criteria are combined as alternatives. This is
supported, for example, at column 14, in the discussion of the Channel Restriction
selection criteria. Multiple channels may be specified, and the combined channel
criterion is satisfied whenever any one of the selected individual channel criteria
matches a listing.
(FF 141) (Emphasis added). Thus, as Young made explicit during the reexamination
proceeding, even though more than one channel may be specified so as to restrict
the data processor's search, the channels so specified constitute collectively only
one selection criterion.

    Based on the foregoing, in view of the plain language of claim 18, the
specification of the '121 patent and its prosecution history, the administrative
law judge finds that the "user program selection criteria" are the theme, channel
and prime time criteria.

iii. Whether "combining," as used in claim 18, requires the use of logical "AND"
combining of the selection criteria or whether it can mean just the use of logical
"OR" combining

    Claim 18 requires "combining said user program selection criteria." The term
"combining," as used in claim 18, means the combining of "independent user chosen
program selection criteria" such that the programs selected in the subsequent
search satisfy all of the selection criteria. The administrative law judge finds
that the intrinsic evidence makes it clear that when combining the user selection
criteria (theme, prime time and channel) such combining is logical "AND" (the
selected programs must satisfy all of the combined criteria). However, the
administrative law judge further finds that the intrinsic evidence establishes that
the channel and theme selection criteria may be comprised of lists of multiple
themes or channels, wherein the channels or themes composing these lists are
combined in a logical "OR" manner, such that a selected programs must satisfy only
one of the listed themes or one of listed channels.

    Referring to the reexamination proceeding, the applicant, in his Amendment of
August 21, 1993, specifically stated:
    Furthermore, even if the system of Kram could be used as a television guide
controller for Kruger, the present system would not result. First, it is noted
systems such as Kram cannot custom assemble a new page of data combining a
plurality of listings earlier received. Systems such as Kram are only capable of
associating related but distinct pages of data which must be viewed one at a time.
The Examiner cited a "weather", then "city" operation in Kram. This type of
operation is explained in more detail from col. 24, line 52 to col. 26, line 41. If
the user selects a keyword topic "weather", the system constructs an index menu
including each page having the keyword "weather". Each such page will also have a
particular supplemental keyword which will be displayed on the index menu. The user
then chooses one of the index entries to retrieve either a single page or a series
(one at a time) of relational pages. The system of Kram cannot automatically
combine two selection criteria such as "weather" and "channels 2, 5, and 11" to
provide the user a custom assembled list of programs meeting the combined criteria.
The system of Kram could only provide a first index in response to "weather", from
which the user would have to select "channel 2" to receive that screen, and then
select "channel 5" to receive that screen, and then select "channel 11" to receive
that screen. Furthermore, as with Kato, Kram is very specific and does not remedy
the general deficiencies of Kruger.
(FF 107) (Emphasis added). From the wording of this statement the administrative
law judge finds that the applicant was distinguishing his invention from prior art,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

since his invention could automatically create a list of programs that related to
"weather" and were to scheduled to be broadcast on channel "2" or channel "5" or
channel "11." Moreover, this statement demonstrates the logical "AND" combining
between selection criteria (i.e., themes (weather) and channels (2, 5, and 11)) and
the logical "OR" combining between the individual channels comprising the channels
selection criterion (i.e., "2, 5, and 11"), that the invention was designed to
accomplish. This is apparent by the steps a user of the Kram system of would need
to carry out in order to duplicate the results of the '121 invention. Thus, the
user would have to first select "weather," and then the user would have to select
channel 2 to receive a listing of the programs relating to programs relating to
weather on channel 2 from the index provided to him by the Kram system. The user
would then need to select channel 5 to receive a listing of the programs relating
to weather on channel 5. Finally, the user would need to select channel 11 to
receive a listing of the programs relating to weather on channel 11. Upon
completition of those steps, the user of the Kram system would have received
listings of all of the programs relating to "weather" and occurring on channel 2 or
channel 5 or channel 11. While this result duplicates the '121 invention's logical
"AND" combining of the theme and channel selection criteria and its logical "OR"
combining of the list of channels comprising the channel selection criterion, the
administrative law judge finds that it does not duplicate the results of using only
logical "OR" combining because the user would not have received a list of all the
programs relating to weather (only those programs relating to weather and occurring
on channels 2, 5, and 11) and would not have received a listing of all the programs
occurring on channels 2, 5, and 11 (only those programs relating to weather).

   The administrative law judge finds that the claim 18 invention's requirement of
logical "AND" combining is consistent with the teaching of the '121 patent itself.
Thus, the '121 patent teaches the use of independent user chosen program selection
criteria to reduce the number of scheduled programs to a subset which have certain
characteristics of particular interest to the viewer. For example, the '121 patent
teaches using "combined" criteria to select a particular subset of the available
programs. (See, e.g., at col. 1, lns. 14-17; col. 3, ln. 14-17; col. 3, ln. 19-24;
col. 5, ln. 19-27). To eliminate programs that the viewer is not interested in,
programs containing the characteristics of each of the combined criteria are
selected. As amended, the specification provides:
   A search of the program listing 352, stored in program list buffer 303, is
made. The search is dependent on the status of the channel buffer, the theme
butter, the prime time buffer, and the direction of search. If the page is down
357, the search direction will be backward 358 from the current list pointer. When
the search satisfies the above criteria, the program listing from program list
buffer 303 is placed into the screen buffer 353.
('121 Reexam. Certificate col. 2, ln. 38-52 amending original '121 patent, col. 17,
lns. 38-49). As stated by complainants' expert, Faillace, the focus of the '121
patent was to help the average user use database techniques to take a vast sea of
program schedule information, cut it down to size, and enable that user to focus
just on those programs most likely to be of interest to him. (Failace, Tr. at
1150).

   Also Young, in a February 26, 1993 Amendment, stated:
   The user selection criteria may be entered and activated independently under
different categories (theme, channel, prime time) and are maintained by the data
processor whether currently activated or not. This is disclosed, for example, from
column 12 line 12 to column 15 line 17 (wherein it is stated that buttons can be
pressed to independently activate the THEME, PRIME-TIME, and CHANNEL selection
criteria) and from Column 18 line 11 to column 20 line 38. Furthermore, the
selection criteria can be combined as alternatives (in a logical OR fashion), such
as a list of acceptable channels or a list of acceptable themes.

   © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.