2002 WL 31556392                                        Page 34
USITC Inv. No. 337-TA-454

(FF 150) (emphasis omitted from original and emphasis added). In this statement, Young only mentions logical "OR" combining as occurring within individual selection criterion (i.e., within the list of acceptable channels or the list of acceptable themes) and not occurring between the selection criteria.

Claim 67, which was added during the reexamination in an Amendment dated February 23, 1993, explicitly requires logical "OR" combining. However, Young used specific language to so claim logical "OR" combining. Thus, while claim 67 requires "supplying user program selection criteria to the data processor" (CX-1 at col. 12, lns. 22-23), it does not further define the "user program selection criteria" to include a plurality of "independent user chosen program selection criteria." Claim 67 later specifies, "wherein a group of said selection criteria are combined by the date processor as logical alternatives so that the combination of said group of selection criteria is satisfied whenever any one of said selection criteria of said group is met." (Id. at col. 12, lns. 30-34). Hence, claim 67 describes the process of setting up selection criteria, which are then combined as logical alternatives, before being used to select programs meeting the combined criteria.

This interpretation of claim 67 and its use of the language "logical alternatives" is consistent with the reexamination proceedings, where Young explained in a Proposed Supplemental Amendment After Final faxed on February 23, 1993:
Independent claims 65 and 68 [which became claims 64 and 67] now require that at least some of the selection criteria are combined as alternatives. This is supported, for example, at column 14, in the discussion of the Channel Restriction selection criteria. Multiple channels may be specified, and the combined of selection criteria by the present invention versus the 'combining' of paging commands or other selections by the cited prior art systems.
(FF 141). Therefore, as Young stated, multiple channels are combined as alternatives (i.e., in a logical "OR" manner) to form the "channel criteria." However, Young gave no indication that the "theme", "channel" and "prime time" criteria, each one defined by a separate buffer, could be combined together in a logical "OR" fashion.

Hence, in light of the plain language of the claim, the specification of the '121 patent, and complainants' own representations to the patent examiner during the '121 patent's reexamination proceedings, the "said user selection criteria" are to be combined in a logical "AND" fashion, while lists of channels and themes comprising the channel and theme criteria are to be combined in a logical "OR" manner.

iv. Whether the combining step could be performed through multiple sequential searches or has to be performed prior to any search

Complainants argued that the "combining" step can be performed through multiple sequential and hierarchal searches, as long as these searches each use independent criterion. Thus, it was argued that the limitation would be satisfied by a system that allows a user to select a selection criterion, such as a particular title or theme, causing the system to find the programs with the selected theme or title. Complainants argued that the system then would display the programs satisfying the first selection criterion, at which point the user could choose another selection criterion, causing the system to display only those programs satisfying both the first and second selection criterion. (CRRFF 817.3). Respondents and the staff argued that for the "combining" step to be satisfied, the system had to combine the selection criteria and then conduct a single search instead of multiple searches. (RFF 817).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                              Page 35
USITC Inv. No. 337-TA-454

The parties are in agreement that the applicant disclaimed "dependent,
hierarchal" entry of search data during the prosecution history. (CRRFF 817).
Complainants argued, however, that the applicant did not disclaim "combining user
selection criteria in a 'hierarchal' fashion when the user selection criteria are
'independent."' (CRRFF 805.14). Thus, complainants contended that a system that
allows a user to select one "independent" selection criterion and displays the
programs meeting that criterion, then allows the user to select another
"independent" selection criterion and then displays only those programs satisfying
the first selection criterion and the second selection criterion would satisfy the
"combining" limitation because it involves hierarchal entry of independent user
selection criteria. (See CRRFF 805 et seq.).

The administrative law judge rejects complainants' argument. In support of their
argument, complainants relied upon the testimony of their expert witness, Faillace,
in an attempt to distinguish a "dependent hierarchial" search from a mere
"hierarchial" search. (CRRFF 805.13). Faillace testified as follows:
    In the context of the teletext art, this refers to the combination of criteria
for which the satisfaction of any one is entirely dependent on the satisfaction of
another, such as, for example, when soccer programs can only be requested if sports
programs have previously been requested.
(Faillace, Tr. at 5654). The administrative law judge finds that, Faillace's
testimony fails to make any distinguishment between mere "hierarchal" searches at
issue and "dependent, hierarchal" searches.

According to complainants, the ability of some of the accused systems to allow a
user to select a criterion, conduct a search, display the search results and allow
the user to choose a second selection criterion, and then conduct a search for
programs meeting both selection criteria is somehow different than Faillace's sport
programs/soccer example. However, in both systems the second selection criterion is
"determined by and dependent upon the previous choice[]." For example, in
Faillace's example, sports programs is selected as the first selection criterion,
and soccer is selected as the second criterion, causing the system to select only
those sports programs relating to soccer. If movies were chosen as the first
selection criterion, and soccer were chosen as the second criterion, the system
would find and display an entirely different list of results, i.e., movies relating
to soccer. Similarly, with some of the accused devices, a user can, for example,
select a particular theme, view a list of programs with that theme, and then select
a particular date, causing the system to display programs of the selected theme
scheduled to be broadcast on the selected date. The second criterion is completely
dependent upon the first criterion, because if the user selects a different first
selection criterion the search results will differ even though the user chose the
same second selection criterion.

In a February 26, 1993 Amendment, Young clearly disclaimed hierarchal entry of
data to distinguish his invention from prior art teletext devices:
    The user selection criteria may be entered and activated independently under
different categories (theme, channel, prime time) and are maintained by the data
processor whether currently activated or not. This is disclosed, for example, from
column 12 line 12 to column 15 line 17 (wherein it is stated that buttons can be
pressed independently activate the THEME, PRIME-TIME, and CHANNEL selection
criteria) and from column 18 line 11 to column 20 line 38.... This is far different
from even the cited teletext art, where search criteria are entered and combined in
a dependent, hierarchical fashion. At each stage in the cited teletext art, the
available search choices are determined by and dependent upon the previous choices
made....
(FF 150) (Emphasis in original).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Thus, the administrative law judge finds that the selection criteria must be combined prior to any search.

d. The language "storing information identifying the selected programs, said stored information identifying broadcast schedule times, channels, and program titles"

Complainants argued that "storing" means to place in an apparatus in which information can be retained; that "information identifying" means data sufficient "to serve as a means of identification for;" and that "the selected programs" refers to the programs that were chosen by the data processor using the combined user program selection criteria. (CFF 503). It was argued that the language in issue requires information to be stored (i.e., placed or retained) in the system's memory, and that such information be sufficient to allow the system to distinguish the selected programs from the remaining programs so that the selected programs can be tuned in. Complainants further argued that such information can include, for example, an address or a pointer or a link to an address in memory for the specified data or some other type of information, such as program times and channels. (CPost at 69). Respondents argued that the language "storing information identifying the selected programs" refers to "storing times, titles, and channels for the programs that the user has selected. (RFF 875, 876).

The plain language of the claim clearly indicates that "information identifying the selected programs" consists of the broadcast schedule times, channels, and program titles of the selected programs, and that this information is stored after the data processor selects the programs on the basis of combined user selection criteria. The prosecution history is consistent with this interpretation.

In the June 8, 1992 Office Action, the Examiner found that original claim 18, inter alia, of the '121 patent was subject to reexamination and rejected original claim 18 as being anticipated or rendered obvious in light of several pieces of prior art, including Yarbrough et al., U.S. Letters Patent 4, 305,101 (Yarbrough). (FF 94). In the August 10, 1992 Amendment, responsive to this Office Action, applicant Young, in an attempt to distinguish claim 18 from Yarbrough, made the following argument:

Independent process claims 18 and 32-38 all recite the process steps of providing schedule information to a data processor, selecting programs from the schedule information based on user inputs, storing schedule information for the selected programs, and using the stored schedule information to tune a television to receive the selected programs.

It should be noted that the term "schedule information", both as used in the present patent and as commonly understood, refers to a television schedule, i.e., a list of programs to be shown over a range of times, with at least program titles, program times, and, if for a plurality of channels, program channels. This usage is consistent with the dictionary meaning, wherein a schedule is defined as "a list of times of recurring events...; a timetable".
(FF 102).

Original claim 18 did not recite the "storing [of] schedule information for the selected programs," only the "storing [of] information identifying the selected programs." Therefore the applicant was clearly equating "information identifying the selected programs" with "schedule information," which is properly construed so as to include title. See supra. The applicant also makes clear that the "schedule information" of the selected programs is to be stored after the data processor has selected the programs, not before. Thus the Examiner, in the September 22, 1992 Office Action, again rejected the original claim 18, but this time as being anticipated by or obvious in light of Levine, U.S. Letters Patent, 4,963,994 (Levine) either alone or in view of Monteath et al., U.S. Letters Patent 4, 329,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                         Page 37
USITC Inv. No. 337-TA-454

684 and Wright, U.K. published application 2,034, 995. (FF 109, 112). The Examiner
made no mention of Yarbrough.

    In a November 23, 1992 Amendment responsive to the Office Action of September 22,
1992, the applicant stated that
    These rejections are based on a failure to recognize the fundamental
distinction between "schedule information" as used in, e.g., Claim 1 or
"information identifying the selected programs" as used in, e.g. Claim 18, and the
program data used in the prior art, i.e., sufficient data such as time, day and
channel to program a VCR or television set.

                                * * * *

    Additionally, Applicant notes that Levine stores only conventional programming
data, not schedule information as presently claimed. As discussed in the previous
Amendment, the storage of schedule information as opposed to mere programming data
significantly enhances the user's ability to verify and later identify the selected
programs, and also enables the data processor to perform additional functions, such
as linking and tracking programs, i.e., allowing the user to review a list of
programs selected for future viewing or taping by presenting a calendar as
disclosed, rather than simple programming data for controlling a video recorder.
Some of the Examiner's current remarks appear to recognize the distinction between
these two types of information, but the relevance of this distinction to the
analysis of the claim language was not explicitly discussed. Applicant respectfully
submits that this distinction is an important one separating the claimed invention
from the prior art, and is sufficient to distinguish the claimed invention from the
prior art.
(FF 116) (Emphasis in original).

    Young also represented that:
    Claim 18 further requires "storing information identifying the selected
programs." It is respectfully submitted that data, channel and time data do not
sufficiently identify the selected programs. Date, channel and time data identify
time slots and channels without any identification of programs broadcast in the
time slots on the channels. Again, the distinction between identifying selected
programs and identifying only time slots and channels is critical for achieving
many benefits" tracking programs that have been selected with the system, i.e.,
allowing the user to review a list of programs selected for future viewing or
taping by presenting identifying information on the program, rather than just an
indication of when recordings will be made; linking related programs with the
schedule information; and, automatically updating the stored schedule information
for the selected program when the schedule time for a previously selected program
is changed, as described in the '121 patent. Because the prior art does not combine
user selection criteria, use such combined user selection criteria to select
programs meeting the combined user selection criteria in the data processor, or
store information identifying the selected programs, the Levine, Wright and
Monteath prior art fails to teach or suggest the subject matter of Claim 18 or its
dependent claims 19-31.
(FF 118) (Emphasis in original). Therefore, again Young distinguished the prior art
from claim 18 on the basis that "information identifying the selected programs"
included the programs title.

    In the January 5, 1993 Office Action the Examiner maintained his rejection of
claim 18 stating, inter alia:
    1) The examiner notes that applicant does not appear to dispute the receipt and
display of "schedule information" in Levine [see lines 1-4 in the last paragraph on
page 8 of the arguments filed 11/23/92]. Nor does applicant appear to dispute that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 38
USITC Inv. No. 337-TA-454

a user may enter codes into the system of Levine, wherein said codes are obtained
from the displayed "schedule information", such that the entered information
directs the processor to control a video recorder to receive and record the
selected programs [see the paragraph which starts on page 8 and extends to page 9
in the arguments filed 11/23/92].

     As disclosed, applicant's claimed invention also displays schedule information
from which a user also selects the desired program to be recorded. The user then
also enters data into the system which directs the processor to control a video
recorder to receive and record the selected programs. Applicant's disclosed system
differs from Levine in that the user inputs of applicant are used by the processor
to actually access the stored information while the user inputs in Levine actually
represent the stored information. The examiner maintains that the recitation that
the processor is "configured to select programs from the schedule information based
on user inputs" does not distinguish two systems. Specifically, the processors of
both systems are directed to record selected programs based on user inputs [see
applicant's arguments on page 9 and the first 7 lines of page 10].

     2) In the first full paragraph on page 10 of the argument's [sic], applicant
argues that Levine stores only "conventional programming data" and not "schedule
information" as claimed. This argument seems only to be directed to terminology
(i.e. labels) and appears to be inconsistent with applicant's discussion in the
last paragraph on page 8 in which applicant has acknowledged thestored [sic] data
to be schedule information [see lines 52-59 in column 2 of Levine].
(FF 123). Lines 1-4 of last paragraph on page 8 of the argument filed on November
23, 1992 read:
     Levine discloses a system which can prompt the user through the steps of
programming the VCR and which in some embodiments can display schedule information
on the television screen.
(FF 115) (Emphasis added).

     Therefore the Examiner rejected applicant's attempt to distinguish Levine from
claim 18, because by the applicant's own admission Levine could utilize schedule
information, rendering the distinction between schedule information and programming
data made with respect to Yarbrough irrelevant.

     Applicant Young, next, in interviews with the Examiner and in submissions of
proposed amendments for the Examiner's evaluation, attempted to distinguish claim
18 from the prior art by specifying an "electronic memory" for the storage means.
See, supra. This attempt to define the "storage means" as an "electronic memory"
ultimately failed. See, supra. While attempting to so define "storage means,"
applicant Young also, in the February 23, 1993 Proposed Supplemental Amendment,
added the phrase "said stored information identifying broadcast schedule times,
channels, and program titles" and explained that amendment accordingly:
     I. Clarifying Schedule Information: Independent claims 1, 12, 14-15, 18, 33-34,
36-38, and 54 have been amended, in addition to the earlier clarifications agreed
upon by the Examiner, to further clarify that the schedule information stored for
the selected programs identifies not only program channels and times, but also
program titles. New claim 57 also contains this recitation. As previously noted,
prior art systems simply program the VCR with the channels and times for selected
programs; information identifying the title was not stored.
(FF 141).

     The phrase "said stored information identifying broadcast schedule times,
channels, and program titles" was retained in a February 26, 1993 Supplemental
Amendment After Final, as was the attempt to define storage means as an electronic
memory. (FF 144 to 151). In a March 26, 1993 Office Action, the Examiner rejected
claim 18 as modified, because of the attempt to define storage means as an
"electronic memory." (FF 152 to 155). The Examiner did not object to the addition

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 39
USITC Inv. No. 337-TA-454

of the phrase "said stored information identifying broadcast schedule times,
channels, and program titles." Id. In the April 6, 1993 Amendment, Young submitted
claim 18 with language referring to an electronic memory removed, but still with
the phrase "said stored information identifying broadcast schedule times, channels,
and program titles." (FF 156, 157). Claim 18 as modified was ultimately approved
for inclusion in the issuance of the reexamination certificate. (FF 158, 161, 162,
163, 164).

   Therefore, the prosecution history and the plain language of the claim, clearly
support the administrative law judge's interpretation of this language as meaning
that the "information identifying the selected programs" consists of the broadcast
schedule times, channels, and program titles of the selected programs, and that
this information is stored after the data processor selects the programs on the
basis of combined user selection criteria.

   e. The language "and using the stored information to tune the television receiver
to the selected programs"

   Complainants argued that the language means the data processor must use some of
the stored information about the selected programs to cause a programmable tuner
for the television receiver to tune in the selected programs. It was further argued
that "tun[ing] the television receiver" means isolating a desired signal for a
selected program from among a group of signals being received. (CPost at 74, 75).

   Respondents argued that "tun[ing] the television receiver" requires
"conventional tuning, i.e., the tuning to analog channels that was done by the
analog television in 1985 and 1990." (RFF 958). It was also argued that "tuning the
television receiver" excludes tuning a tuner that is external to the television
set. (RFF 981).

   There is nothing in the claim language, patent specification, or file history, to
limit the "programmable tuner" to an analog or digital tuner or evinces any need or
intent to limit the invention to analog tuning. There is no language in the claim
that limits "tuning" to analog tuning or which excludes digital tuning. On the
contrary, the only kind of tuning that the claims require is tuning to selected
programs. The administrative law judge finds no language in the claims which
defines or limits tuning to the selection of a frequency. Indeed, the express
language of claim 18 states that tuning means "tun[ing] the television receiver to
the selected programs."

   The administrative law judge also finds no statement in the specification that
tuning means selecting frequencies. Indeed, there is no reference at all in the
patent specification to selecting a frequency or frequencies or to tuning to a
frequency or frequencies and the '121 patent's specification does not expressly or
implicitly require analog broadcasts or an analog tuning process. Respondents have
failed to cite a single part of the specification that discusses tuning to a
frequency or equates tuning with selecting a frequency. [FN10] The administrative
law judge finds that the only requirement ascribed by the specification to the
invention's tuner is that it be "programmable." (CX-1, col. 4, lns. 46-48; col. 7,
lns. 60-61; col. 8, lns. 48- 56). A "programmable tuner" is a tuner "that is
capable of programmatic control, as control via control signals, as opposed to
control signals." (RFF 986). The specification clearly shows that the control
signals controlling the programmable tuner are generated by the data processor.
('121 patent, col. 7, lns. 60-61; col. 8, lns. 35-40). Likewise the administrative
law judge finds that the two places that specifically discuss tuning, state that
the television receiver must be "tuned" to selected programs or "channels for
selected programs," ('121 patent, col. 4, lns. 53-60; col. 11, lns. 60-65) without

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 40
USITC Inv. No. 337-TA-454

any indication of how the tuning is to be achieved. He also finds that the term
"channel" has not been used in the specification of file history to refer to a band
of frequencies. Rather, the '121 patent's specification repeatedly uses the term
"channel" to mean "service provider." Equating "channels" with service providers is
consistent with digital tuning because the tuner would be used to find a particular
provider not necessarily a particular frequency. The administrative law judge notes
that the patent specification uses the word "channel" synonymously with service
provider no fewer than 10 times, each underscored below:

    "In most metropolitan areas, a large variety of cable programming is available.
Since a cable channel will provide its signal on different numbered channels in
different areas, depending on which channels are otherwise unused, programming for
the cable channels is disseminated on a national or regional basis by the name of
the channel, rather than the particular channel number on which the signal is
supplied, while the television set must be tuned by the channel number. In the San
Francisco metropolitan area, for example, there are presently 15 different cable
channels that are listed by name, not channel number. A viewer will often not
remember the channel number on which a given cable service is furnished, especially
if that service is only watched occasionally. U.S. Pat. No. 4,405,946, issued Sept.
20, 1983 to Knight, discloses a system for providing an on-screen display of
channel numbers or an indication that a signal is coming from a recording device,
but with no teaching or suggestion of displaying a cable channel by name rather
than number."
(CX-1, col. 2, lns. 36-55).

    The administrative law judge finds, consistent with the way "channel" is used
throughout the specification ('121 patent, col. 2, lns. 36-35, col. 5, lns. 21-24,
col. 4., lns. 13-18, col. 10, lns. 24-37), channel refers to a programming source
typically identified by a number or a service name, such as Channel 2 or Channel 5
or HBO. Indeed, the '121 patent's specification, in the Summary of the Invention
section equates channel selection with program selection ('121 patent, col. 3, lns.
21-24). In fact, the specification expressly disclaims that it is providing any
novel teachings in the area of broadcast systems or processes. ('121 patent, col.
6, lns. 55-59, col. 7, lns. 24-30). Furthermore, the patent itself contemplated
that program schedule information could be supplied to the system of the invention
in digital form over the internet, from internet service providers such as
Compuserve ('121 patent, col. 21, ln. 65-col. 22, ln. 9). Such information could
not have been used by the patented system unless the techniques for isolating the
desired digital data was known in the art.

    Similarly, the administrative law judge rejects respondents' arguments that the
tuner being tuned to the selected channel must be within the television receiver.
Figures 3, 4a and 4b, the only depictions of embodiments of the '121 invention,
clearly depict the programmable tuner as being separate (i.e., outside) of the
television receiver.

2. Other Claims In Issue

    Remaining claims 19-24, 26-28, 31-33, 36, 42, 43, 48-51, 54, 57-61 and 66 in
issue are set forth in the section titled "ADDITIONAL FINDINGS." See FF 34 to 58.
There follows interpretation of disputed language of those claims.

a. Independent Claim 32

    Independent claim 32 reads:
    A process for controlling the presentation of broadcast programs to a
television receiver, which comprises supplying program schedule information to a
data processor, supplying user program selection criteria to the data processor,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

using the user selection criteria to select programs for viewing from the program
schedule information in the data processor, storing information identifying the
selected programs, using the stored information to tune the television receiver to
the selected programs, using the television receiver as a display by the data
processor for presenting messages to the user during the process, including time
remaining for a program being broadcast.
(FF 44). Much of the language in claim 32 is found in claim 18; and hence the
interpretation of that language controls the interpretation of the same language in
claim 32. However, based on the plain language of claim 32, the specification of
the '121 patent and the reexamination proceedings, and the arguments of the
parties, the following claimed language is in issue for interpretation: "program
schedule information," "user program selection criteria," "supplying program
schedule information to a data processor," and "during the process."

i. The language "program schedule information"

   Claim 32 recites, after the preamble, "comprises supplying program schedule
information to the data processor." In issue is the meaning of "program schedule
information." Complainants argued that "program schedule information" or "schedule
information" should be given its ordinary meaning. i.e., "information concerning
scheduled television programs." (CFF 282). In support of their argument
complainants asserted that the specification does not, explicitly or implicitly,
require that "schedule information" or "program schedule information" include the
time, channel or title of a program (CFF 287(a)) and that the specification's use
of the terms is consistent with the meaning urged by complainants. (CFF 287(b)).
Each of respondents and the staff argued that the phrase should be interpreted in
the same way as the identical phrase was interpreted in claim 18 and therefore that
the term includes the titles of programs, as well as the scheduled broadcast time,
and the channels.

   The language of claim 32, with respect to the term "program schedule
information," differs significantly from the language of claim 18. Thus, while
claim 18 contains the phrase "said stored information identifying broadcast
schedule times, channels and program titles," which the administrative law judge
found applicant specifically included in claim 18 due to rejections of claim 18 by
the Examiner, claim 32 does not have said phrase. See supra. Moreover, the Examiner
in finding that claim 32 avoided the art of record did not rely on the fact that
the art of record does not show or suggest a process for controlling the
presentation of broadcast programs to a television receiver which comprises storing
information identifying the selected programs and identifying broadcast schedule
times, channels and titles as he did for claim 18. As was found, supra, it was not
until February 26, 1993 that applicant amended claim 18 during reexamination to
include "titles" and represented that "[s]everal claims have been amended to
specify the storage of program title for the selected programs and are thus
believed to be allowable." (FF 150). However claim 32 in issue was never amended in
the reexamination proceeding.

   In the reexamination proceedings original claim 32 was rejected over certain
prior art in the Office Action of June 8, 1992. (FF 94). However in the next Office
Action of September 22, 1992, the Examiner specifically found that claim 32, which
does not recite "titles," avoided the art of record in that it at least recites
displaying data indicating the time remaining in a broadcast signal and that such a
display is not taught or suggested by the art of record. (FF 112). Moreover in the
next Office Action of January 5, 1993, the Examiner again stated that claim 32
avoids the art of record "as was set forth in paragraph 9 of paper #12 [viz., the
Office Action of September 22, 1992] (FF 128). Also in the supplemental notice of
intent to issue the reexamination certificate, mailed August 26, 1993, titles were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

absent from the specific reasons the Examiner found claim 32 avoided the art of
record. See FF 164. The Examiner never required that claim 32 include titles to
avoid the art of record. While respondents relied on arguments of applicant made in
a November 23, 1992 amendment, the Examiner in his Office Action of September 22,
1992 had already determined that claim 32 avoided the art of record. Hence the
administrative law judge rejects the argument of respondents and the staff that
"program schedule information" of claim 32 must include broadcast schedule times,
channels and program titles.

As to how "program schedule information" in claim 32 should be interpreted, the
specification states:
    This invention relates to an electronic system and a process which allows the
user to make broadcast selection using selection criteria that can be combined in
different ways. Most especially, the invention relates to such an electronic system
and process which receives the schedule information in broadcast form and then
processes the schedule information to make the selections.
(col. 1, lns. 11-21) (Emphasis added). Therefore, "schedule information," pursuant
to the specification, is the information that is used by the system or process to
select programs satisfying the selection criteria chosen by the user. As already
found, see supra, the selection criteria are prime time, channels, and theme. Hence
the "program information" must at least include: information concerning a program's
time of scheduled broadcast to satisfy the prime time criterion, the channel on
which it is to be broadcast to satisfy the channels criterion, and the theme of the
program to satisfy the theme criterion. This is the only information which is
required for the system or process to be able to conduct a search based on the
selection criteria.

This finding is consistent with the following portion of the specification:
    The process of this invention includes the following steps. Program schedule
information is supplied to a data processor. User program selection criteria are
supplied to the data processor. The user selection criteria are used to select
programs for viewing from program schedule information in the data processor. The
stored information is used to tune the television receiver to the selected
programs.
(col. 4, lns. 53-60). Thus, in this section of the specification, "program
schedule information" must be sufficient so as to allow the system or process to
search the "program schedule information" and select those programs satisfying the
"user selection criteria." Therefore according to said section, the "program
schedule information" must consist of information about a program's broadcast time,
the channel on which it is to be broadcast, and its theme.

Furthermore, in a subsequent portion of the specification, said portion under
"Broadcast Format," specifies that "[e]ach program listing is framed with the
following information[:]" "[s]tart time," "[d]uration of program," "[c]hannel
number," "[t]heme classification number," "[t]heme subclassification number,"
"[l]inking number (only for serial shows)," "[o]ptional expanded listing," "[e]nd
of program," "[s]atellite symbol," "[s]atellite name," and "[e]ncrypted and any
special broadcast indicators." (col. 20, ln. 65 - col. 21, ln. 15). Therefore, of
the information that is to frame the program listing, most of it is related to
either the program's time of broadcast ("[s]tart time," "[d]uration of program,"
and "[e]nd of program"), the program's theme ("[t]heme classification number" and
"[t]heme subclassification number"), or the channel on which it is to be broadcast
("[c]hannel number," "[s]atellite symbol," "[s]atellite name"). The remaining
information which does not fall under any of three selection criteria is not
transmitted for every program, but rather for only certain programs. The "[l]inking
number' is "only for serial shows," while the "expanded listing" is "[o]ptional,"
and the "[e]ncrypted and any special broadcast indicators" are for those shows that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are broadcast encrypted or deserving of a "special broadcast indicator[]."
Therefore, all program listings are to be broadcast with information relating to
the program's theme, time of broadcast, and the channel on which it is to be
broadcast, while certain programs may contain additional information.

Based on the foregoing, the administrative law judge finds that "program schedule
information", as used in claim 32, includes a program's theme information, the
channel on which it is scheduled to be broadcast, the time when it is to be
broadcast, and may, but does not have to, include other information relating to a
program, such as the program's title.

ii. The language "user program selection criteria"

According to the plain language of claim 32, which differs from the language of
claim 18, in that claim 32 does not recite "independent user chosen program
selection criteria" or "program choice," "user selection criteria" refers to "user
program selection criteria." [FN11] Insofar as claim 32 calls for the "user
selection criteria to select programs for viewing from the program schedule
information in the data processor," where the only method disclosed in the
specification for using "user selection criteria" to select programs is to combine
theme, channel and prime time selection criteria, and search for programs that
satisfy all of the combined criteria in a user program selection criteria see
supra, "user program selection criteria" as used in claim 32 is found to be the
"theme," "channel" and "prime time" selection criteria.

iii. The language "supplying program schedule information to the data processor"

The administrative law judge interprets "data processor" the same way he
interpreted it in claim 18, viz., a CPU. See supra. The administrative law judge
finds that the "program schedule information" must, as with the claim 18 invention,
be stored inside the data schedule processor. Unlike claim 18 there is no explicit
disclosure of a storage means in the data processor in claim 32. However claim 32
does recite that the "program schedule information" is "supplied to" the data
processor, such that the "program schedule information" is "in the data processor."
(col. 27, ln. 2). Therefore, the administrative law judge finds that claim 32
requires the "program schedule information" be supplied to and stored in the CPU.

iv. The language "during the process"

Claim 32 requires the television receiver be used "as a display by the data
processor for presenting messages to the user during the process, including time
remaining for a program being broadcast." Respondents argued that such messages had
to be displayed "before the television set is tuned to a program that the CPU
selected." (EPost at 114). This argument is based on the contention that the
process in claim 32 ends when the television set is tuned to the program. However,
the process in claim 32 includes "supplying program schedule information to a data
processor." The claim does not indicate when this "supplying" begins or ends.
Moreover, as the specification states, the program schedule information is
repeatedly broadcast:
    The microcomputer 22 of FIGS. 1 and 2 is programmed to repeat transmissions of
the program list for a number of times to allow for correction of uncorrectable
errors at the receiver 90 or 160 (FIGS. 3 and 4).
(col. 17, lns. 5-9). Also, the data processor is sent new program schedule
information to update the existing program schedule information:
    As each block of data is received, the data integrity is verified by error
checking logic at 302. If no error exists, the received data is stored in the
program list buffer 303, replacing the previous program list data.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 44
USITC Inv. No. 337-TA-454

(col. 16., lns. 60-63).

  Therefore, based on the '121 patent's specification, the process in claim 32 does
not have an "end," but rather it is always continuing. The administrative law judge
finds that claim 32 does not require that the television receiver be used as a
display before the selected program is tuned to.

b. Independent Claim 33

  Independent claim 33 reads:
    A process for controlling the presentation of broadcast programs to a
television receiver, which comprises supplying program schedule information to
storage means in a data processor, supplying user program selection criteria to the
data processor, the data processor combining said user program selection criteria
with automatic criteria according to at least one of a current time and a current
channel, using the combination of user program selection criteria and automatic
criteria to select programs for viewing from the program schedule information in
said storage means in the data processor, storing information identifying the
selected programs, using the stored information to tune the television receiver to
the selected programs, turning on a broadcast program recording device for a
selected broadcast program, recording the selected broadcast program, and supplying
a different program broadcast signal to the television receiver than the broadcast
signal for the selected program supplied to the program recording device.
(FF 45). Much of the language in claim 33 is found in claim 18 and hence, the
interpretation of that language controls the interpretation of the same language in
claim 33. Moreover, the parties are in agreement that the plain meaning of the
phrase "supplying a different program broadcast signal to the television receiver
than the broadcast signal data processor" is that while one signal for a selected
program is being supplied to a recording device, such as a VCR, the data processor
causes a different signal to be supplied to the television set. (Faillace, Tr. at
1499-00). This feature is referred to in the industry as the "watch one/record
another" capability. (Faillace, Tr. at 1500). The parties are also in agreement
that the '121 specification does not define said phrase in a manner that is
unconventional or inconsistent with the ordinary meaning of these terms. (CFF 741).

  The parties further do not dispute that "automatic criteria" are criteria
provided by the system and not the user. (CFF 700). Furthermore, as indicated by
the plain claim language "the data processor combining said user selection criteria
with automatic criteria according to at least one of a current time period and a
current channel," the parties are in agreement that the system must supply certain
program information for a given time interval. This program information must
include at least the current time or the program information for a set of channels,
which includes the currently tuned channel. (CFF 702). However, the phrase "turning
on" is in dispute.

i. The language "turning on"

  Complainants contend that this limitation means that the system causes a
"program recording device" to begin recording and to in fact record the selected
program, but does not mean that the system has to cause the provision of
electricity to the "recording device." (CPost at 109). Respondents and the staff
argued that the limitation requires the system to turn on the recording device's
power, so that it will be able to record the selected program. (SPost at 22).

  The administrative law judge finds that the ordinary meaning of "turn on"
requires that the system disclosed in claim 33 turn on the recording device's power
so that it will be able to record the selected program. "Turn on" means "to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 45
USITC Inv. No. 337-TA-454

activate or cause to flow, operate, or function by or as if by turning a control
<turn the water on full> <turn on the power>." (Mirriam-Webster's Collegiate
Dictionary Online available at http://www.m-w.com/) (Emphasis in original).
Furthermore, one of the express objects of the '121 patent's invention was "to
provide such a system and process in which the user is not required to leave the
VCR powered on for unattended recording." (col. 3, lns. 66-68). Similarly,

   [i]n one form of this invention, the system is connected to the remote control
   facilities of a VCR to turn on its power, start the recording, and stop recording
   of programs on the VCR. The user therefore not required to leave the VCR powered on
   for unattended recording.

(col. 5, lns. 48-53). Pursuant to this objective, the preferred embodiment of the
'121 patent's invention turns on the power to a connected VCR:

   Figure 4b is a block diagram of a modified form of the receiver 160, which may
   also be used with the transmitter system 50 shown in Figure 2. In the Figure 4b
   receiver 160, a remote VCR 216 and its wireless remote controller 1010, so that the
   remote VCR 216 need not be powered up in advance of unattended recording. The
   remote controller 1010 is connected by lines 1000 and 1002 to CPU 178. In response
   to the CPU 178, the remote controller 1010 transmits control signals to the remote
   VCR 216 in a conventional manner, as indicated at 1004. The remote controller 1010
   can either be a unit designed for the VCR, but modified to be electrically operated
   from the TV scheduler, or it can be an equivalent design of the remote controller
   with direct connections to the CPU 178. Instead of enabling the VCR from pause line
   214, when the CPU 178 determines that a program is to be recorded (see, e.g., block
   501 of FIG. 13) according to the selected programs, it issues a control signal to
   power up the VCR on control line 1000. This control signal generates a contact
   closure across the switch matrix of the remote controller 1010 power-on key. The
   contact closure may be obtained with a relay or an PET transistor switch. The
   control signal on line 1000 also generates a contact closure across the play key
   and the record key of the of the controller 1010 to initiate recording of the
   program. When the program ends, CPU 178 will issue a control signal on line 1002.
   Line 1002 generates a contact closure across the remote controller power-off key.
   When the CPU 178 determines another program is to be recorded, the above process is
   repeated.

(col. 9, lns. 5-35) (Emphasis added). Therefore, as the above language of the
specification of the '121 patent describes the operation of the '121 patent's
invention's unattended recording feature, the administrative law judge finds that
the VCR is powered on by the invention through a signal causing a closure in the
VCR's remote control's power on switch, which signal activates the remote control's
"play" and "record" buttons causing the powered on VCR to record the scheduled
program; and that when the scheduled program is over, the VCR's power is turned off
by a signal to the VCR's remote control's "power off" switch. The administrative
law judge finds nothing in the '121 patent that suggests that the invention of the
'121 patent can cause a VCR to record a selected program, without the VCR first
being powered on by the invention.

   Moreover, the administrative law judge finds that the specification disclosed
that the "turn-on"command to a VCR is different than the "record" command. In Fig.
13, box 506 is labeled "Turn On VCR & Record. (Emphasis added). The finding that
the "turn-on"command to a VCR is different than the "record" command is further
reinforced by the following section of the specification, which lists "turn-on" and
"record" as different operations:

   For unattended recording with the TV scheduler 160 of FIG. 4B, turn on of the
   remote VCR 216 is accomplished by means of the remote controller 1010 connected to
   the TV scheduler 160. Turn-on, record and turn-off are all actuated remotely as
   described above in connection with FIG. 4B.

(col. 20, lns. 59-64) (Emphasis added). Also, this difference between the "turn on"
and "record" functions is reflected in the plain language of the claim itself, as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                        Page 46
USITC Inv. No. 337-TA-454

the system must be capable of both "turning on a broadcast program recording device
and recording the selected broadcast program" (col. 6, lns. 39-31) (Emphasis
added).

   The reexamination proceedings also support the finding that "turning on" a VCR is
to cause electricity to go to the VCR, and not merely causing the VCR to record a
program. After the Examiner, in the June 8, 1992 Office Action, rejected claim 32-
36 as being "unpatentable as anticipated under 35 USC § 102 over Muguet, 4, 787,
063," because Muguet disclosed, inter alia, the "turning on and off the VCR at
start and en [sic] of the program or both." (FF 94). In the August 13, 1992,
amendment, Young distinguished Muguet from the rejected claims on the following
basis:
   Claims 33-35 include in their recitations the step of turning on a program
recorder for a selected program, whereas in Muguet the specialized VCR must remain
on continually, not just for the selected program.
(FF 106).

   Based on the plain language of the claim, the specification and the prosecution
history, the administrative law judge finds that "turning on" requires that the
system disclosed in claim 33 to turn on the recording device's power so that it is
able to record the selected program.

c. Independent Claim 36

   Independent claim 36 reads:
   A process for controlling the presentation of broadcast programs to a
television receiver, which comprises supplying program schedule information to
storage means in a data processor, supplying user program selection criteria to the
data processor, said user program selection criteria comprising a plurality of
independent user chosen selection criteria and at least one portion [sic] choice,
the data processor combining said user program selection criteria, using the
combined user program selection criteria to select programs for viewing from the
program schedule information in said storage means in the data processor, storing
information identifying the selected programs including broadcast schedule times,
channels and program titles, using the stored information to tune the television
receiver to the selected programs, turning on a program recording device and
recording the selected broadcast program by supplying control signals to a remote
controller for the program recording device.
(FF 46). All of the language in claim 36 is found in claim 18 or in claim 33.
Hence, the interpretation of that language in claim 18 or in claim 33 controls the
interpretation of the same language in claim 36.

d. Independent Claim 42

   Independent claim 42 reads:
   A system for controlling a recording device to allow user selection of
broadcast programs from schedule information, which comprises a data processor, a
first input means for the schedule information connected to said data processor, a
second user selection input means connected to said data processor, said data
processor being configured to select programs from the schedule information based
on user inputs, storage means connected to receive the schedule information for
programs selected by said data processor, a programmable tuner for connection to
the recording device, said programmable tuner being connected to receive control
signals from said data processor at a time of a selected broadcast for causing said
programmable tuner to supply broadcast signals for the selected programs to the
recording device, and a television receiver, said system being configured to allow
said television receiver to receive a different program than the broadcast signal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4cc5282e1dee06d4

2002 WL 31556392                                                          Page 47
USITC Inv. No. 337-TA-454

for the selected program supplied to said recording device, wherein said data
processor is configured for a selectable display mode, said data processor being
configured to present an initial display of said schedule information stored in
said storage means upon selection of said display mode, said initial display
automatically comprising schedule information for at least one of a current time
period and a current channel of said programmable tuner.
(FF 47). Much of the language in claim 42 is found in claim 18 and hence, the
interpretation of that language in claim 18 controls the interpretation of the same
language in claim 42. The parties have disputed: "a first input means for the
schedule information connected to said data processor," "a second user selection
input means connected to said data processor," and
     wherein said data processor is configured for a selectable display mode, said
data processor being configured to present an initial display of said schedule
information stored in said storage means upon selection of said display mode, said
initial display automatically comprising schedule information for at least one of a
current time period and a current channel of said programmable tuner.


i. The language "a first input means for the schedule information connected to said
data processor"

   Complainants argued that this claim limitation is not a means plus function
element, because it "does not recite a function; it only recites a structure well
known in the computer field;" that an "input means" which is, according to
complainants, simply a mechanism for supplying a data to the data processor, e.g.,
is an input port and wire; and that a person of ordinary skill in the art would
know that the input port of a computer is its input means. (CPost at 115).
Complainants also argued that if this limitation was construed to be a means plus
function element, the structures corresponding to the input means are the lines
running from the data demodulator in FIGs. 3 and 4 to the CPU (lines 108 and 182,
respectively) and the input ports to which they are connected. (CPost at 116).

   Respondents argued that this limitation is a means plus function limitation, the
claimed function being the receipt and supply of schedule information to the data
processor. (RFF 1114). Respondents also argued that two corresponding sets of
structures are disclosed in this specification: (1) in the Fig. 3 embodiment, the
corresponding structure is the FM antenna 92, the FM receiver 94, the SCA
subcarrier decoder 98, and the data demodulator 102, and (2) in the Fig. 4
embodiment, the corresponding structure is the antenna 162, programmable TV tuner
164, program data timing controller 168, and data demodulator 169. (RFF 112).

   The staff did not take a position regarding this limitation in its initial post
hearing brief.

   The use of term "means" creates a presumption of the applicability of 35 U.S.C. §
112, ¶ 6. See Sage Products, Inc. v. Devon Industries, Inc., 126 F. 3d 1420, 1427
(Fed. Cir. 1997); Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1584 (Fed.
Cir. 1996); Certain Flooring Products, Inv. No. 337-TA-443, Final Initial
Determination at 11-20 (Nov. 2, 2001), Comm'n Notice Finding No Violation (March
22, 2002). The administrative law judge rejects complainants' argument that this
limitation is not subject to 35 U.S.C. § 112, ¶ 6, because there is no function
recited. The limitation in question, "a first input means for the schedule
information connected to said data processor," recites a "means," which is
connected to the "data processor," for the "input" of "schedule information."
Therefore, the administrative law judge finds that this limitation should be
interpreted pursuant to 35 U.S.C. § 112, ¶ 6.

   The administrative law judge also rejects complainants' argument that if

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                     Page 48
USITC Inv. No. 337-TA-454

interpreted under 35 U.S.C. § 112, ¶ 6, this limitation should be construed to
mean only the lines running from the data demodulator in FIGs. 3 and 4 and the
input ports to which they are connected (lines 108 and 182, respectively). To the
contrary, the only instance the term "port" is used in the '121 specification of
the '121 patent is in connection with "conventional" transmitter systems which are
described as being without "novelty." Thus the specification does not disclose any
input ports being connected to the data processors depicted in FIGs. 3 and 4. The
only mention of a "port" at all in the specification is the "serial input/output
(I/O) port" 24 which, in conjunction with line 28, connects the microcomputer 22 to
the data modulator 26 in the transmitter depicted in FIG. 1. (col. 6, lns. 28-31).
In the transmitter depicted in FIG. 2, the microcomputer's 22 I/O port 24 is
connected to a buffer. (col. 6, lns. 64-67). The transmitter system 20 depicted in
FIG. 1 is described accordingly:

   Since the design and implementation of the system 20 is [sic] itself [sic]
conventional, and the novelty resides in the particular data processing signals
broadcast with the system 20, the design and operation of the system 20 will not be
described in further detail.
(col. 6, lns. 55-59) (Emphasis added). The transmitter system 50 depicted in Fig. 2
is described in similar terms. (See col. 7, lns. 26-30).


   While the only instance the term "port" is used in the specification of  the '121
patent is in connection with "conventional" transmitter systems which are without
"novelty," the specification makes the following description of the structures
involved in allowing the data processor in the first embodiment to receive the
information broadcast by the "conventional" transmitter systems:

   FIG. 3 is a block diagram of a receiver and television receiver control system
90 which is used in combination with the FM transmitter system 20 of FIG. 1. An FM
antenna 92 receives the broadcast signals from the system 20, which are supplied to
FM receiver 94 on line 96. FM receiver 94 supplies the FM broadcast signals to an
SCA subcarrier decoder 98 on line 100. The decoder 98 strips the schedule
information signals from the FM broadcast signals and supplies the schedule
information signals to a data demodulator 102 on line 104. The data demodulator 102
converts the schedule information signals to digital format and supplies the
digital schedule information signals to system control unit 106 on line 108, more
particularly, to CPU 110 of the system control unit 106.
(col. 7, lns. 33-46). Therefore, in accordance with the first embodiment the
following structures are needed in order to supply to the CPU the program schedule
information: an FM antenna (to receive the broadcast signals), an FM receiver (to
supply the broadcast signals to the SCA subcarrier decoder), a SCA subcarrier
decoder (to separate the program schedule information from the rest of the
broadcast signal), and a data demodulator (to convert the program schedule
information into digital format).


   In connection with the second embodiment, the specification of the '121  patent
(CX-1) describes the following structures and operations:

   FIG. 4 is a block diagram of another receiver system 160, which may be used
with the transmitter system 50 shown in FIG. 2. Antenna 162 receives the TV
broadcast signal from the transmitter system 50 and supplies it to a programmable
TV tuner 164 on line 166. The tuner 164 supplies the broadcast signal to a program
data timing controller 168 on line 170, to data demodulator 169 on line 171 and to
a video switcher 172 on line 174. The output of controller 168 is supplied to the
demodulator 169 on line 176. The demodulator 169 supplies the program schedule
information signals, which have been stripped from the TV broadcast signals and
digitized, to CPU 178 of system control unit 180 on line 182.
(col. 8, lns. 23-35). Therefore, supplying the CPU of the second embodiment with
program schedule information involves the following structure: an antenna (to
receive the broadcast signal), a programmable tuner (to route the broadcast signal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 49
USITC Inv. No. 337-TA-454

to a data demodulator) and a program data timing controller, and a data demodulator
(to digitize the schedule information).

   The administrative law judge finds that in neither the first or second
embodiments the term "port" is used, either in connection with supplying the CPU
with schedule information or otherwise. Additionally, with respect to the other
structures relied upon by complainants in their proposed constructions, viz., lines
108 and 182, the administrative law judge finds no description of those
"structures." Rather the specification merely states that the digitized schedule
information is supplied to the CPUs by the data demodulators along lines 108 and
182. The administrative law judge finds no indication that lines 108 and 182 are
capable of supplying schedule information to the CPUs without the structures
described above. [FN12]

   Based on the foregoing, the administrative law judge finds the first input means
of claim 42 comprises either (1) an FM antenna, an FM receiver, a SCA subcarrier
decoder, and data demodulator; or (2) an antenna, a programmable tuner, a program
data timing controller and a data demodulator; or (3) their 35 U.S.C. § 112, ¶ 6
equivalents.

ii. The language "a second user selection input means connected to said data
processor"

   Complainants argued that this limitation is not a means plus function element
because it does not recite a function, and, if it were construed as a means plus
function element, the corresponding structures are a remote controller and a remote
receiver, as well as line 120/192. (CPost at 117). Respondents argued that this
limitation was a means plus function element and that the corresponding structures
are a remote controller and a remote receiver, lines 120 and 192, and the keypad
and keys depicted in Fig. 5. (RRCFF 851). The staff took no position regarding the
construction of this element.

   The administrative law judge rejects complainants' argument that the limitation
in issue is not governed by 35 U.S.C. § 112, ¶ 6, because he finds that the
limitation does recite a function, viz., a "means" for the "input" of "user
selection[s]." Therefore, he finds that it should be construed under 35 U.S.C. §
112, ¶ 6, for the same reasons that that "first input means" of claim 42 was so
construed. See supra.

   The administrative law judge further finds that the structure corresponding to
the limitation in issue is a remote controller, with a keypad, and a remote
receiver or its 35 U.S.C. § 112, ¶ 6 equivalents. In support and with reference
to the first embodiment, the specification states that "[o]ther inputs are supplied
to the CPU 110 are supplied by a remote transmitter controller 116-remote receiver
118 combination on line 120." (col. 7, lns. 51- 53). With respect to the second
embodiment, "[u]ser program selections and other user inputs are provided by a
remote control transmitter 188-remote receiver 190 combination on line 192," (col.
8, lns. 42-44), the remote controller 116/188 is also clearly depicted in Fig. 5 as
having a keypad.

iii. The language "wherein said data processor is configured for a selectable
display mode, said data processor being configured to present an initial display of
said schedule information stored in said storage means upon selection of said
display mode, said initial display automatically comprising schedule information
for at least one of a current time period and a current channel of said
programmable tuner"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 50
USITC Inv. No. 337-TA-454

   Complainants argued that this limitation should be construed as requiring that
the data processor be capable of invoking a particular mode of displaying schedule
information in response to user inputs, that the "initial display of said schedule
information" refers to the first display of television schedule information that
appears when the user selects a particular "selectable display mode," and that this
initial display will include at least information about one program that is either
being currently broadcast, or is scheduled to be broadcast, on the channel to which
the system is already tuned. (CPost at 125).

   Respondents and the staff argued that limitation requires an initial display mode
that the user can select from multiple options for the display of schedule
information when the display is first invoked and that this information should
include information for programs selected for recording, and therefore, the initial
display should provide current programming information and programming information
for recording. (PPost at 114-15; SPost at 17).

   The limitation at issue was added to claim 42 during reexamination proceedings in
the applicant's February 26, 1993 Supplemental After Final amendment in response to
the Examiner's rejection of the claim in his January 5, 1993 Office Action. (FF 121
to 128). Young stated in the accompanying remarks:

   Automatically Focusing the Display
      Also discussed were clarifications of the preselection of schedule information
for display, directed to automatically focusing a display of schedule information
according to a current time or a current channel. The Examiner has confirmed that
the claims reciting this selective display are believed to be allowable. Support
for this selective display can found [sic], for example, at column 10, lines 12-65.
Lines 50-59 are an example display for preferred embodiment. Lines 45-46 explain
that the listing starts at the nearest previous half-hour. Lines 46-47 explain that
a pointer (not shown in the example screen) will be positioned at the last
selection made (and thus indicate the current channel). Lines 60 to 62 explain that
the screen also includes 3 lines of status information, which at lines 56-59 is
shown to include for the currently selected channel the remaining time and program
title schedule information. Similar disclosure also appears at column 1, lines 33-
37.
(FF 149). In a March 26, 1993 Office Action, the Examiner found that claim 42, "as
amended, avoid[s] the art of record and [is] patentable." (FF 155).

   Said remarks in the February 26 1993 Supplemental After Final refer to sections
of the specification, which disclose a "selectable display," such that an user can
change the display by changing the prime time, channel or theme criteria or the
time in which the display begins and in which the initial display comprises
information selected by the data processor in response to the user inputs, as well
as either the current channel that the television is tuned to or the current time.
Thus the "example display" referred to by Young discloses a list of six programs,
the start times of which run from 9:00 pm to 9:30 pm, and three additional lines of
information immediately below the last program listed. (col. 10, lns. 50-59). The
current time and date is contained in the three lines below the program listing.
Id. The current time is reported to be 9:23 pm, and because the "[l]isting always
starts at the previous half hour," the first time slot display is at "9:00." (col.
10. lns. 45-46). The listing is also restricted in accordance to the settings of
the prime time, channel and theme criteria. (col. 10, ln. 65 - col. 11, ln. 5). The
text discloses "that the pointer always is positioned at the last selection made,"
although no "pointer" is depicted in the sample display. (col. 10, lns. 46-47). The
display can be changed by changing the prime time, channel and theme criteria.
(col. 13, lns. 32-44; col. 14, lns. 16-28; and col. 14, ln. 55 - col. 15, ln. 16).
The user can also change the time that the display will start at. (col. 11, lns.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29-36).

     Based on the foregoing, the administrative law judge finds, consistent with the
portions of the '121 patent's specification cited by Young in his February 26, 1993
Supplemental After Final, that the limitation in issue requires a "selectable
display," such that an user can change the display by changing the prime time,
channel and theme criteria and in which the initial display comprises information
selected by the data processor in response to the user inputs, as well as either
the current channel that the television is tuned to or the current time.

e. Independent Claim 51

   Independent claim 51 reads:
     A system for controlling a recording device to allow user selection of
broadcast programs from schedule information, which comprises a data processor, a
first input means for the schedule information connected to said data processor, a
second user selection input means connected to said data processor, said data
processor being configured to select programs from the schedule information based
on user inputs, storage means connected to receive the schedule information for
programs selected by said data processor, a programmable tuner for connection to
the recording device, said programmable tuner being connected to receive control
signals from said data processor at a time of a selected broadcast for causing said
programmable tuner to supply broadcast signals for the selected programs to the
recording device, said data processor being connected to a remote controller for
said recording device to supply control signals to said remote controller for
powering on said recording device, starting and stopping recording of the selected
program and powering off said recording device, further comprising a display means
coupled to said data processor, wherein said data processor is configured for a
selectable display mode, said display means being configured to present an initial
display of said schedule information stored in said storage means upon selection of
said display mode, said initial display automatically comprising schedule
information for at least one of a current time period and a current channel of said
programmable tuner.
(FF 52). The language in claim 51 is found in the preceding claims in issue. Hence,
the prior interpretation of corresponding language in the preceding claims controls
the interpretation of language in claim 51.

f. Independent Claim 54

   Independent claim 54 reads:
     A system for controlling receipt of broadcast television programs to allow user
selection of broadcast programs from broadcast schedule information which is
selectively stored in a storage means, which comprises a data processor, a
programmable tuner configured to receive both the broadcast programs and the
broadcast schedule information connected to said data processor, means connected
between said programmable tuner and said data processor for separating the
broadcast schedule information from the broadcast programs and supplying the
broadcast schedule information to said data processor, a user selection input means
connected to said data processor, said data processor being configured to select
programs from the schedule information stored in said storage means based on user
inputs, said storage means being connected to receive a reminder calendar list
comprising the schedule information for programs selected by said data processor,
said programmable tuner being connected to receive control signals from said data
processor at a time of a selected broadcast for causing said programmable tuner to
supply signals for the selected broadcast programs to at least one signal receiver
for the selected broadcast programs, wherein said user inputs comprise a plurality
of user program selection criteria, said data processor being configured to combine

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 52
USITC Inv. No. 337-TA-454

said plurality of user program selection criteria and to present a list of programs
meeting said combined program selection criteria, said user inputs further
comprising a program choice from said presented list of programs, said reminder
calendar list comprising information identifying titles for said programs selected
by said data processor.

(FF 53). Much of the language in claim 54 is found in preceding independent claims
in issue and, hence, the prior interpretation of that language controls the
interpretation of the same language in claim 54. With respect to the language:


i. The language "means connected between said programmable tuner and said data
processor for separating the broadcast schedule information from the broadcast
programs and supplying the broadcast schedule information to said data processor"


   The parties agree that the language is a means plus function element and that the
function of the element is to segregate program schedule information from
television programs and to supply the program schedule information to the data
processor. (CPost at 147; PPost at 110). The parties also agree that the Fig. 4
embodiment, and not the Fig. 3, is the correct embodiment to consider in
determining the structures that comprise the corresponding means. (CPost at 147;
PPost at 110). Complainants argued, however, that the corresponding means is the
demodulator 169, while respondents argued that the corresponding structures are the
data demodulator 169 and the program data timing controller 168.


   The specification of the '121 patent describes the following process for
supplying program schedule information to the data processor in the FIG. 4
embodiment:
     FIG. 4 is a block diagram of another receiver system 160, which may be used
with the transmitter system 50 shown in FIG. 2. Antenna 162 receives the TV
broadcast signal from the transmitter system 50 and supplies it to a programmable
TV tuner 164 on line 166. The tuner 164 supplies the broadcast signal to a program
data timing controller 168 on line 170, to data demodulator 169 on line 171 and to
a video switcher 172 on line 174. The output of controller 168 is supplied to the
demodulator 169 on line 176. The demodulator 169 supplies the program schedule
information signals, which have been stripped from the TV broadcast signals and
digitized, to CPU 178 of system control unit 180 on line 182.

(col. 8, lns. 23-35). Therefore, the administrative law judge finds that the data
demodulator 169 is one of the corresponding structures in the FIG. 4 embodiment, as
it "supplies the program schedule information, which have been stripped
from the TV broadcast signals and digitized, to CPU 178." As to which structure or
structures separate the schedule information from the broadcast program
respondents' expert witness, Rhyne, testified that when the VBI was used to
transmit program schedule information the data demodulator could not be the only
corresponding structure to separate the program schedule information:
     Well, if you're going to pick data off of one or more lines in the vertical
blanking interval, you have to have a line counter. It's a process that's commonly
called data slicing; it's used, for example, in closed captioning at line 21 [of
the VBI].
     And that's what the that program timing controller is, it's not well described
in the patent. But as best I understand it, it was a counter that found the
appropriate line or lines and then pulls out a little snippet of electronic signal
that was supposed to carry the data, and passes it to the demodulator.
     Well if the demodulator didn't have that device in front of it, it would be
trying to demodulate all of the video signals on all of the lines and it would just
be producing gibberish.

(Tr. at 3596-97). The specification of the '121 patent is consistent with Rhyne's
testimony. The FIG. 3 embodiment is a receiver for use with a transmitter that
transmits the program schedule information separate from the broadcast programming.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(col. 6, lns. 20-24; col. 7, lns. 33-37). Therefore, the FIG. 3 embodiment does not
need to separate the schedule information from the broadcast programming. The FIG.
3 embodiment has a data demodulator 102 which converts the schedule information
signals to digital format and supplies the digital schedule information to the CPU
110, after the schedule information signals are "strip[ped]" from the FM broadcast
by the SCA sub carrier decoder 98. The FIG. 3 embodiment does not have the program
data timing controller. The FIG. 4 embodiment, which has to separate schedule
information from the broadcast programming, has a program data timing controller
168 and the program data timing controller 168 outputs directly to the data
demodulator 169.

    Accordingly, the administrative law judge finds that the corresponding 35 U.S.C.
§ 112, ¶ 6 structures are the data demodulator 169 and the program data timing
controller 168 or their 35 U.S.C. § 112, ¶ 6 equivalents.

g. Independent Claim 57

    Independent claim 57 reads:
    A television schedule system for controlling receipt of broadcast television
programs to allow user selection of broadcast programs from broadcast schedule
information displayed on a television, said broadcast schedule information
comprising broadcast schedule times, titles and channels, said system comprising:
    a data processor;
    a system clock connected to said data processor for providing a system time;
    a programmable tuner connected to said data processor and configured to receive
both the broadcast programs and the broadcast schedule information;
    signal separating means connected between said programmable tuner and said data
processor for separating the broadcast schedule information from the broadcast
programs, and for supplying the broadcast schedule information to said data
processor;
    display means connected to said data processor for displaying at least a
portion of said broadcast schedule information on said television;
    user selection input means connected to said data processor for providing user
inputs for selecting listings of programs from said displayed broadcast schedule
information; and
    storage means being connected to said data processor for storing schedule
information, wherein said data processor is configured to selected programs from
said displayed broadcast schedule information based on said user inputs, to
retrieve broadcast schedule information for said selected programs from said
broadcast schedule information supplied to said data processor, and to store said
retrieved schedule information in said storage means, said stored broadcast
schedule information identifying a broadcast schedule time and channel and a
program title for each said selected program; wherein
    said data processor provides control signals to said programmable tuner when
the system time matches a stored broadcast schedule time of one of said selected
programs, said control signals causing said programmable tuner to supply broadcast
program signals for the stored broadcast schedule channel of said one selected
program to at least one signal receiver; and wherein
    said data processor is configured for a selectable display mode, said display
means being configured to display a preselected initial display of said schedule
information stored in said storage means upon selection of said display mode, said
preselected initial display automatically comprising schedule information meeting
initial display selection criteria, said initial display selection criteria
including at least one of a current time period and a channel currently selected by
said programmable tuner.
(FF 54). Much of the language in claim 57 is found in preceding claims and, hence,
the interpretation of that language controls the interpretation of the same

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 54
USITC Inv. No. 337-TA-454

language in claim 57.

   With respect to the language:
    signal separating means connected between said programmable tuner and said data
processor for separating the broadcast schedule information from the broadcast
programs, and for supplying the broadcast schedule information to said data
processor
the parties agree that this limitation should be construed the same as the
"separating means" limitation of claim 54, which is similarly worded. (PPost at
110, CPost at 161). Accordingly, the administrative law judge finds that the
corresponding 35 U.S.C. § 112, ¶ 6 structures are the data demodulator 169 and
the program data timing controller 168 or their 35 U.S.C. § 112, ¶ 6 equivalents.

   Both complainants and respondents agree that the language:
    display means connected to said data processor for displaying at least a
portion of said broadcast schedule information on said television
is a means plus function limitation and that the function is to display schedule
information on a television. (CPost at 161; PPost at 119). Complainants argued
however that the corresponding structure is the video display generator 136 of FIG.
3 and 204 of FIG. 4 and a device for display, such as a television receiver. (CPost
at 162). Respondents argued that an additional structure comprises the means in
addition to the video display generator and television receiver, viz., the video
switcher (140/172).

   The schedule information is displayed in the FIG. 3 embodiment in the following
manner:
    The CPU 110 supplies information signals from the program schedule data on line
108, control inputs on line 114 and user inputs on line 120 to video display
generator 136 on line 138. Output video display signals from the generator 136 are
supplied to a video switcher 140 on line 142. The video switcher also receives TV
program signals from tuner 132 on line 144, and a control signal from CPU 110. The
video switcher 140 supplies the signals from the tuner 132 or the generator 142 to
the TV receiver 126 on line 148 and a video cassette recorder (VCR) 150 on line
152.
(col. 7, ln. 68 - col. 8, ln. 12). The display of schedule information in relation
to the FIG.4 embodiment is similar:
    From the user inputs on line 192 and the control program, the CPU generates
control signals for the programmable TV tuner 164, which are supplied to video
display generator 204 on line 206. The generator 204 converts the video display
information signals to video signals for the video switcher 172 on line 208. The
CPU 178 supplies control signals for the video switcher 172 on line 210 to video
signal outputs of the video switcher 172 on lines 212 and 214 to the TV receiver
200 and VCR 216 between schedule information video signals from the generator 204
and the program video signals from tuner 164.
(col. 8, lns. 49-62).

   Therefore, as the above portions of the specification indicate, the video
switcher (140, 172) allows the CPU to control whether or not the IPG, incorporating
the schedule information, will be displayed or not. Without this ability, the user
would not be able to see the IPG or would only see the IPG, and would not be able
to view any television programming. In fact, as the following testimony by
complainants' expert witness, Faillace, reveals, a system in accordance to the '121
patent, but omitting the video switcher, would be useless:
    Q. Without a working video switcher, the person who has spent a lot of money
for their brand new TV with a fancy -
    A. Guide.
    Q. - guide will simply have a regular old television, right?

          © 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                              Page 55
USITC Inv. No. 337-TA-454

    A. That's correct.
(Tr. at 2391).

   Therefore, the administrative law judge finds that the corresponding structure to
this limitation is (1) a video generator, a video switcher, and a television
receiver, or (2) their 35 U.S.C. § 112, ¶ 6 equivalents.

   The parties agree that the limitation "a selectable display mode" should be
interpreted the same way as the "selectable display mode" limitation of claim 42
was interpreted. (CPost at 145; PPost at 114). Therefore, the administrative law
judge finds that this limitation requires a "selectable display," such that an user
can change the display by changing the Prime Time, Channel and Theme criteria, or
the time in which the display begins and in which the initial display comprises
information selected by the data processor in response to the user inputs, as well
as either the current channel that the television is tuned to or the current time.
See supra.

B. '268/'204 Patents

   In issue are claims 1 and 3 of the '268 patent and claims 14, 15, 16 and 17 of
the '204 patent.

   Claims 1 and 3 of the '268 patent (FF 59-61) read:

1. An interactive television schedule system, which comprises:

    a television display,
    means coupled to said television display for displaying the television schedule
on said television display as a grid of two-dimensionally arranged, adjacent
irregular cells which vary in length corresponding to time duration of programs,
with a title of a program being displayed in each of said irregular cells, said
grid having a plurality of channels listed in a first dimension and time listed in
a second dimension,
    user input means coupled to said means for displaying the television schedule,
said user input means including a program selector and a movement control for a
visual identification of ones of said irregular cells which initiates movement of
said visual identification in the first dimension, and irregular movement of said
visual identification in the second dimension in steps corresponding to variation
in cell size, responsive to an input by a user to said movement control, between
first and second ones of said irregular cells to select a desired one of said
irregular cells corresponding to program,
    a tuner coupled to said user input means for tuning to the desired program, and
    means coupled to said means for displaying the television schedule for
displaying a program note overlay including a program description for the desired
program on said television display.
    3. The interactive television schedule system of claim 1 additionally
comprising means coupled to said means for displaying the television schedule for
selecting the desired visually identified program in response to activation of said
program selector, and
    a recording device coupled to said means for selecting the desired program to
record the desired program.

   Independent claim 14 and dependent claims 15, 16 and 17 of the '204 patent (FF 62
to 65) read:
    14. An interactive television schedule system, which comprises:
    a television display,
    means coupled to said television display for displaying a television schedule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 56
USITC Inv. No. 337-TA-454

on said television display as a grid of two-dimensionally arranged, adjacent
irregular cells which vary in length corresponding to time duration of programs,
with a title of a program being displayed in each of said irregular cells, said
grid having a plurality of channels listed in a first dimension and time listed in
a second dimension,
    user input means coupled to said means for displaying the television schedule,
said user input means including a program selector and a movement control for a
visual identification of selected ones of said irregular cells which controls
movement of said visual identification in the first dimension and in the second
dimension from cell to cell, responsive to an input by a user to said movement
control to visually identify a desired one of said irregular cells corresponding to
a desired program,
    means coupled to said means for displaying the television schedule for
selecting the desired visually identified program in response to activation of said
program selector, and
    a programmable tuner coupled to said means for selecting the desired program
for tuning to a select channel for the desired program,
    said means for displaying the television schedule on said television display
further being configured to display an overlay containing information on a
television program being shown on said television display when a channel being
shown on said television display is changed.
    15. The interactive television schedule system of claim 14 in which the overlay
information on the television program includes program title, name of television
service, channel number, and time.
    16. The interactive television schedule system of claim 15 in which said means
for displaying the television schedule is further configured to provide an
alternate overlay including a program note with a program description for the
television program being shown on said television display.
    17. The interactive television schedule system of claim 14 in which said means
for displaying the television schedule is further configured to provide an
alternate display including a program note with a program description for the
visually identified program.

    Independent claim 31 and dependent claims 32 through 34 of the '204 patent (FF 66
to 69) read:
    31. An interactive process for operating a television schedule system, which
comprises:
    displaying a television schedule on a television display as a grid of two-
dimensionally arranged, adjacent irregular cells which vary in length corresponding
to time duration of programs, with a title of a program being displayed in each of
said irregular cells, said grid having a plurality of channels listed in a first
dimension and time listed in a second dimension,
    providing a visual identification of a selected one of said irregular cells,
    moving said visual identification in the first dimension and in second
dimension between first and second ones of said irregular cells to select a desired
one of said irregular cells corresponding to a desired program,
    tuning a programmable tuner to a select channel based on position of said
visual identification for the desired program, and
    displaying an overlay containing information relating to a television program
being shown on said television set when a channel being shown on the television set
is changed.
    32. The interactive process for operating a television schedule system of claim
31 in which the information relating to the television program includes program
title, name of television service, channel number, and time.
    33. The interactive process for operating a television schedule system of claim
32 additionally comprising the step of displaying an overlay including a program
note with a program description for the television program being shown on said

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392
USITC Inv. No. 337-TA-454

television set.
    34. The interactive process for operating a television schedule system of claim
31 additionally comprising the step of displaying a program note with a program
description for the visually identified program.

    Based on the arguments of the parties, the following claimed language is in
dispute for the asserted claims of each of the '268 and '204 patents: "visual
identification," "means ... for displaying," and the language relating to the
movement and the program note limitations. Moreover, the language "tuning a
programmable tuner to a select channel based on position of said visual
identification" is also in dispute for the asserted claims of the ' 204 patent.

1. The language "visual identification" ('268/'204 Patents)

    Each of the asserted claims of the '268 and '204 patents refers to a  "visual
identification." The parties agree that "visual identification" is not a term of
art. (See, e.g., RFF 1296 and CRFF 1296). [FN13]

    Complainants argued that "visual identification" is defined by its ordinary
meaning, viz., any identifier that can be seen. (CFF 1387). It was further argued
that there is nothing in the claims, specification or prosecution history that
defines "visual identification" in a manner that is "unconventional" or
inconsistent with the ordinary meaning of the term. (CFF 1388).

    Respondents argued that the "visual identification" of each of the asserted,
independent claims of the '268 and '204 patents requires an "innovative cursor" as
defined in the specification as a cursor that (1) highlights the entire cell, (2)
identifies the current half-hour position within a cell that is longer than a half-
hour, and (3) differentially identifies the remaining portions of the cell; that
the intrinsic evidence conclusively demonstrates that the "innovative cursor" is
not merely a preferred embodiment, but is an essential part of the invention; and
that long before reaching the description of the preferred embodiment, a reader of
the specification would learn that the invention is the innovative cursor. (See,
e.g., EPost at 117). The staff argued that the visual identification should be
construed as an identification that provides the user some sort of indication as to
which segment of a long program cell the visual identification is currently focused
upon. (SPost at 29).

    The "visual identification" is described by the claim language of all the
asserted claims as being a visual identification of an irregular cell comprising
the two dimensional grid of the television schedule. (CX-3, col. 14, lns. 56-57;
CX-4 col. 17, lns. 1-2; col. 20, lns. 6-7). However, the term "visual
identification" does not appear in the '268 and the '204 patents' common
specification.

    The "innovative cursor 32" is the only "visual identification" described in the
Abstract, Summary of the Invention, and Detailed Description of the Invention
sections as being capable of attaining the objectives of the invention as set forth
in the Summary of the Invention section. The Abstract, which is identical in the
'268 and the '204 patents, describes a screen for a user interface of a television
schedule system consisting of a two-dimensional array of cells containing program
titles. Each cell corresponds to a program and the length of each cell is directly
proportional to the length of the corresponding program. The array is arranged as a
grid of three regular columns, each column delineating a duration of time of an
half hour in length, and twelve rows of program listings. Each program listing is
contained in a cell, with some of the program listings overlapping two or more of
the columns because of their length. (CX-3). The Abstract identifies a key problem

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 58
USITC Inv. No. 337-TA-454

with a user interface that utilizes a conventional cursor in a grid made up of such irregular cells:

Because of the widely varying length of the cells (26), if a conventional cursor used to select a cell location were to simply step from one cell to another, the result would be abrupt changes in the screen (10) as the cursor moved from a cell (26) of several hours length to an adjacent cell in the same row. (CX-3).

The Abstract then discloses the inventors' solution for these "abrupt changes in the screen:"

An effective way of taming the motion is to assume that behind every array (24) is an underlying array of regular cells. By restricting cursor movements to the regular cells, abrupt screen changes will be avoided. With the cursor (32), the entire cell (26) is 3-D highlighted, using a conventional offset shadow (34). The offset shadow (34) is a black bar that underlines the entire cell and wraps around the right edge of the cell. To tag the underlying position - which defines where the cursor (32) is and thus, where it will move next - portions (36) of the black bar outside the current underlying position are segmented, while the current position is painted solid.

(CX-3). The cursor (32) described in the abstract is referred to as the "innovative cursor" in the Detailed Description of the Invention and is depicted in Figures 1 and 5 of both patents. (CX-3, Figs. 1 and 5). [FN14]

The Summary of the Invention section, which is identical in the '268 and '204 patents, states that the objects of the invention may be attained by a novel television schedule system and method featuring a user interface with a novel cursor. Thus it reads:

The attainment of these and related objects may be achieved through use of the novel television schedule system and process user interface herein disclosed. A television schedule system including a user interface in accordance with this invention has a display. A means is connected to the display for displaying the television schedule on the display as an array of irregular cells which vary dimensionally in length, corresponding to different television program time lengths. A means is connected to the display for providing a cursor with the television schedule on the display. The cursor has a variable length corresponding to the length of a selected one of the irregular cells in which the cursor is located. A means is connected to the means for providing the cursor for moving the cursor in the array in a series of equal length steps. At least some of the irregular cells have a length which is greater than the length of the steps.

In the process of operating a television schedule system with the user interface of this invention, the television schedule is displayed as an array of irregular cells which vary dimensionally in length, corresponding to different television program time lengths. A cursor is provided with the television schedule on the display, the cursor has a variable length corresponding to the length of a selected one of the irregular cells in which the cursor is located. The cursor is moved in the array in a series of equal length steps, with at least some of the irregular cells having a length which is greater than the length of the steps. (CX-4, col. 2, ln. 52- col. 3, ln. 10) (Emphasis added).

The Detailed Description of the Invention section, which is identical in the '268 and '204 patents, describes the problem created by using a conventional cursor with a grid composed of irregular cells:

Because of the widely varying length of the cells 26, if a conventional cursor used to select a cell location were to simply step from one cell to another, the result would be abrupt changes in the screens 10, 12, 14, 18 and 20 as the cursor moved from a cell 26 of several hours length to an adjacent cell in the same row. Such abrupt changes disorient a user of the system.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(CX-4, col. 4, lns. 46-52) (Emphasis added). It further describes one way of
preventing abrupt changes that could otherwise "disorient a user of the system:"

An effective way of taming the motion is to assume behind every array 24 is an
underlying array of regular cells. By restricting cursor movements to the regular
cells, abrupt screen changes will be avoided.

(CX-4, col. 4, lns. 46-52). However, the Detailed Description of the Invention
section immediately acknowledges that even this system would be "befuddling to
users," as

there is now a potential ambiguity between the underlying cell which governs
cursor movement and visible cell 26 which holds the program title.

Viz. if the cursor moves in half hour steps, and the cell length is, say four
hours, should the cursor be 1/2 hour long or four hours long? If the cursor only
spans the interval of the underlying cell (1/2 hour), the cursor appears to be
highlighting a segment of the cell, which is misleading. On the other hand, if the
cursor spans the entire four hours of the TV listing, the cursor underlying
position will be obscure. In this case, cursor right/left commands will appear
inoperative while traversing a long cell. The absence of feedback following a
cursor command is befuddling to users.

(CX-4, col. 4, ln. 56 - col. 5, ln. 2) (Emphasis added).

It then states that "[t]herefore, an innovative cursor 32 (Fig. 1) for the
irregular array 24 is required which satisfies several conflicting requirements."
(CX-4, col. 5, lns. 3-5). (Emphasis added).

Under the Detailed Description of the Invention section, the innovative curser is
described accordingly:

With the cursor 32, the entire cell 26 is 3-D highlighted, using a conventional
offset shadow 34. The offset shadow 34 is a black bar that underlines the entire
cell and wraps around the right edge of the cell. To tag the underlying position -
which defines where the cursor 32 is and thus, where it will move next - portions
36 of the black bar outside the current underlying position are segmented, while
the current position is painted solid.

For an half hour cell 26, the offset shadow's underline bar will always be
black. FIGS. 2 and 3 show the cursor 32 as it appears for a half-hour program. For
programs that go beyond 1/2 hour, only the current 1/2 hour position will be solid
black. All remaining positions will be striped. If the cursor is moved left or
right, the solid section will move accordingly, providing complete visual feedback.

(CX-3, col. 5, lns. 7-23).

The Detailed Description of the Invention concludes:

It should now be readily apparent to those skilled in the art that a system and
method incorporating a novel user interface capable of achieving the stated objects
of the invention has been provided. The user interface that is configured to
compensate for the particular nature of the television schedule information. The
user interface has a cursor operation that compensates for an irregular grid format
of the television schedule information. The user interface presents the schedule
information in a format that compensates for limited resolution of the television
display. The user interface presents supplemental schedule information in overlays
that obscure a minimum amount of useful other information. Order of presentation of
the schedule information in the interface is customizable by user preference.

(CX-3, col. 14 lns. 21-35)(Emphasis added).

The features of the "innovative cursor" are readily observed from the Figures 1
and 5 of the '204 and the '268 patents. As seen in Figures 1 and 5 of the patents,
the "innovative cursor" described in the text of the patents highlights the first
half of the cell, which corresponds with first half hour of an hour long program,
with a solid black line, while highlighting the second half of the cell, which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 60
USITC Inv. No. 337-TA-454

corresponds to the last half hour of an hour long program, with a segmented line.
Thus Figure 1 of the '268 patent shows a two dimensional television program
schedule grid guide made up of cells of irregular length, wherein each cell
contains a program title and corresponds to a single television program. Time is
displayed horizontally, while channels are displayed vertically. (CX-3, Fig. 1).
Therefore, the cursor is able to highlight the entire cell and to indicate to the
user its exact position within the cell.

   As seen from the foregoing, a conventional cursor, and especially its mode of
moving within a grid composed of irregular cells (i.e., moving to an adjacent cell
in response to each use of the movement controller by the user), was disclaimed by
the applicants. Furthermore, complainants' reliance on the doctrine of claim
differentiation is misplaced. As stated above, the doctrine of claim
differentiation is not determinative. See, supra. Furthermore, the limitation of
claim 7 that the "visual identification" comprise a cursor is not inconsistent with
the administrative law judge's finding that the "visual identification" is a cursor
that (1) highlights the entire cell, (2) identifies the current half-hour position
within a cell that is longer than a half-hour, and (3) differentially identifies
the remaining portions of the cell. A cursor is a "visual cue." (Mirriam Webster's
Collegiate Dictionary Online available at http://www.m-w.com/).). Therefore,
complainants' proposed construction of "visual identification" as being any
identification that is visible would render claim 7's limitation redundant.

   Based on the foregoing, the administrative law judge finds that the claimed
visual identification of the '268 and '204 patents is the "innovative curser"
defined in the specification as a cursor that (1) highlights the entire cell, (2)
identifies the current half-hour position within a cell that is longer than a half-
hour, and (3) differentially identifies the remaining portions of the cell.

2. The language "means... for displaying" ('268/'204 Patents)

   Claim 1 of the '268 patent recites:
   means coupled to said television display for displaying the television schedule
on said television display as a grid of two-dimensionally arranged, adjacent
irregular cells which vary in length corresponding to time duration of programs,
with a title of a program being displayed in each of said irregular cells, said
grid having a plurality of channels listed in a first dimension and time listed in
a second dimension.
(CX-3). In almost the exact same language, claim 14 of the '204 provides for the
same "means ... for displaying" element as provided for in claim 1 of the '268
patent. [FN15]

   The parties agree that the "means ... for displaying" elements in claim 1 of  the
'268 patent and claim 14 of the '204 patent are means plus function elements. (See,
e.g., CPost at 184; PPost at 123). Complainants contend that the corresponding
structures for this element are the CPU 228 and the Video Display Generator 224.
(CPost at 184, 222). Respondents and the staff argued that the corresponding
structures include, in addition to the CPU 228 and the Video Display Generator 224,
the Video Switcher 226. (PPost at 123-24; SPost at 29).

   The administrative law judge rejects complainants' arguments that the  35 U.S.C.
§ 112 corresponding structures should be limited to the CPU 228 and the Video
Display Generator 224 to the exclusion of the Video Switcher 226. Thus, the
specification provides:
   For a What's on TV request, the listing stored in schedule memory 232 is
retrieved, processed by CPU 228, and outputted to video display generator 224.
Video switcher 226 is enabled by CPU output 246 to select the video display

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

generator 224 output whenever schedule data is to be presented to the TV/monitor 210.
(CX-4, col. 13, lns. 12-17). Accordingly, Figures 22A and 22B, which are the only block diagrams of systems incorporating the inventions of the '268 and '204 patents, show that the CPU and the Video Display Generator in Figure 22A are connected to the television display through the Video Switcher, and that, in Figure 22B, the CPU is similarly connected to the television display. [FN16]

Furthermore, complainants' expert witness, Faillace, testified that each of the video switchers, referred to in the '121, '204 and '268 patents, operated in the same way, viz., it receives control signals from the CPU indicating which of the two inputs that it receives - i.e., the input from the tuner or the input from the video display receiver - it should accept and pass through so that it is displayed on the television set and switches to the selected input. (Tr. at 2387).

In the context of the invention of the '121 patent, Faillace testified as to what would happen if the video switcher was rendered inoperable:
    Q Now, this person watching television with this invention that's incorporated in the television, unbeknownst to him, the video switcher has gone on the blink. We won't go into the details, but it is struck. It's no longer able to respond to commands from the CPU, and it is simply letting the output from the turner go through to the television receiver.
    When that person presses the button on his remote to try to call up the guide, what will happen?
    A He won't see a guide.
    Q I'm sorry, not a guide. He will try pull up the program schedule information.
    A He won't see that either.
    Q In other words, it won't be generated on the display?
    A It will.

                                    * * *

    Q If the video switcher is inoperative as I described, the viewer will only receive the television program, the signal from the tuner, that's correct.
    A The broadcast program, that's right.
    Q The broadcast program. So then isn't it true that in order for the program information that is being generated by the video display generator to reach the TV receiver, that video switcher or its equivalent must be there in order to allow that information to reach the TV receiver and be displayed on the screen?
    A It is true in precisely the same sense that the line 142 must also be there.
    Q Without a working video switcher, the person who has spent a lot of money for their brand new TV with a fancy -
    A Guide.
    Q - guide will simply have a regular old television, right?
    A That's correct.
(Tr. at 2389-91). Moreover, complainants' in their post hearing brief responded to respondents' inclusion of a video switcher as part of the corresponding "means ... for displaying" accordingly: "Respondents [sic] proposed additional structure merely enables the CPU (executing relevant software routines) and video display generator to perform their stated functions." (CPost at 185 (Emphasis added)). Therefore, complainants admit that the CPU and Video Display Generator need the Video Switcher in order to accomplish their ascribed function of "displaying the television schedule on said television display."

Based on the foregoing, the administrative law judge finds that the corresponding

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                        Page 62
USITC Inv. No. 337-TA-454

means to the "means ... for displaying" of claim 1 of the '268 patent and claim 14
of the '204 patent are (1) the CPU, the video display generator, and the video
switcher, or (2) their 35 U.S.C. § 112 equivalents.

3. The movement limitation ('268/'204 Patents)

   Independent claim 14 of the '204 patent requires
      a movement control for a visual identification of selected ones of said
   irregular cells which controls movement of said visual identification in the first
   dimension and in second dimension from cell to cell.
   (CX-4, col. 17, lns. 1-5). Claim 14 recited that the cells comprising the
   television grid guide would be "two dimensionally arranged," with "plurality of
   channels listed in the first dimension and time listed in a second dimension." (CX-
   4, col. 16, lns. 58-65).

   Independent claim 31 provides for process that calls for:
      moving said visual identification in the first dimension and in the second
   dimension between first and second ones of said irregular cells to select a desired
   one of said irregular cells corresponding to a desired program.
   (CX-4, col. 20, lns. 8-11). As with claim 14 of the '204 patent, "a plurality of
   channels" is listed in the first dimension, while time is listed in the second
   dimension. (CX-4, col. 20, lns. 3-5).

   As was observed above, see supra, claim 1 of '268 patent had the following
   language:
      a movement control for a visual identification of ones of said irregular cells
   which initiates movement of said visual identification in the first dimension, and
   irregular movement of said visual identification in the second dimension in steps
   corresponding to variation in cell size, responsive to an input by a user to said
   movement control, between first and second ones of said irregular cells.
   (CX-3, col. 14, lns. 56-65). Once again, "a plurality of channels" is listed in the
   first dimension, while time is listed in the second dimension. (CX-3, col. 14, lns.
   50-53).

   Complainants argued that the movement limitation only requires "that the 'visual
   identification' be in one cell, in one instance, then in another cell, in a second
   instance. As such, movement' of the 'visual identification' moves relative to the
   physical dimensions of the television screen - irrespective of whether the grid
   stays put, or whether the grid moves while the 'visual identification' stays put."
   (CPost at 197). Respondents S-A and Pioneer and the staff argued that the movement
   limitation of the asserted claims is only satisfied if the "visual identification"
   moves within the grid guide, and is not satisfied if the "visual identification"
   remains stationary while the grid guide itself moves. (See, S-A Post at 127-28;
   PPost at 134-136; SPost at 50- 52).

   Respondent EchoStar argued that the movement limitation be construed such that
   the cursor would move at regular intervals, so that some user inputs would cause
   the cursor to move from cell to cell, but other user inputs would cause the cursor
   to move its position within the cell. (EPost at 126-128). Under EchoStar's
   construction, cell to cell movement would occur when the cursor was in a cell that
   corresponded to the length of the cursor's regular movement. (Id.). For instance if
   the cursor was moved at half hour intervals and happened to be in a cell
   corresponding to a show that was a half hour in duration, it would exhibit cell to
   cell movement to the next cell. If the cursor was in a cell that corresponded to a
   program greater than a half hour it would exhibit movement within the cell. (Id).

   The administrative law judge rejects complainants' argument that the cursor does

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.