not have to be able to move within the grid. The movement limitation requires that the "visual identification" be able to be moved along both dimensions of the grid guide. The administrative law judge finds that this movement limitation is supported by both the plain language of the claims at issue and the specification. First, all three claims specify that the "visual identification," not the grid guide, must be able to be moved, in the first and second dimensions. The claims also make clear that the dimensions in which the "visual identification" is being moved are the dimensions of the "two - dimensionally arranged" grid guide. (CX-4, col. 16, lns. 58-65; col. 19, ln. 67 - col. 20, ln. 5; CX-3, col. 14, lns. 48-53).

The administrative law judge further finds that the specification provides support for the administrative law judge's construction of the movement limitation to require that the "visual identification" must be able to be moved within the grid. Thus, the Abstract discloses that it is the cursor, and not the grid guide, that is to be moved: "To tag the underlying position -- which defines where the cursor (32) is and thus, where it will move next ...." (Emphasis added). Similarly, the Summary of the Invention section recites that "a means is connected ... for moving the cursor in the array in series of equal length steps." (CX-4, col. 2, 64-66 (Emphasis added); see also CX-4, col. 3, lns. 8-11 ("The cursor is moved in the array in a series of equal length steps ....")). The Detailed Description of the Invention section also makes reference to the "[m]ovement of the cursor." (CX-4, col. 5, ln. 23). A comparison of Figures 1, 2, and 3 illustrates the movement described in the specification and the claims: the grid remains the same in all three figures, except for the position of the cursor which has been moved from the cell with the title "Young & Restless" in Figure 1, to the cell with the title "Judge (Part 1)" in Figure 2 and to the cell with the title "Inside Edition" in Figure 3. In all three figures, the grid has remained static and unchanged while the cursor has been moved in the first and/or second dimension to highlight a new program.

The administrative law judge also finds that the cursor's movement within the grid must be done, consistent with EchoStar's proposed construction, in regular steps that may result in cell to cell movement or movement within a cell, depending on the length of the cell occupied by the "visual identification." He finds that regular cell to cell movement would render the innovative cursor a nullity. The innovative cursor (1) highlights the entire cell; (2) identifies its current half hour position within a cell that is longer than a half hour; and (3) differentially identifies the remaining portions of the cell. See supra. With regular cell to cell movement the cursor would not have a half hour position within a cell longer than an half hour. Moreover, the administrative law judge has already rejected construing the term "visual identification" to include a conventional cursor, which utilizes cell-to-cell movement, because the specifications of the '268 and '204 patents specifically disclaimed such movement.

Specifically, the specifications of the '204 and '268 patents state that one of the objects of the inventions disclosed in those patents is "to provide such a user interface having a cursor operation that compensates for an irregular grid format of the television schedule information." (CX-4, col. 2, lns. 37-39). However, the specifications explicitly disclaim any user interface using cell to cell movement within the grid of irregular cells. For instance, in the Background of the Invention section, cell to cell movement is described accordingly:
    If this array is navigated by a cursor that goes from cell to cell, a single cursor command can produce violent screen changes. For example, a cursor right command may cause an abrupt jump to a cell situated several hours from the current page. Not only is this unsettling, but may take considerable effort to recover. Clearly, a gentler cursor motion is needed for the irregular cells found in a grid TV guide.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 64
USITC Inv. No. 337-TA-454

(CX-4, col. 2, lns. 8-15). (Emphasis added). Furthermore, under the Detailed
Description of the Invention section, cell to cell movement is again dismissed as
being unsuitable for use with a grid of irregular cells:

> Because of the widely varying length of cells 26, if a conventional cursor used
> to select a cell location were simply step from one cell to another, the result
> would be abrupt changes in the screens 10, 12, 14, 18, and 20 as the cursor moved
> from a cell 26 of several hours in length to an adjacent cell in the same row. Such
> abrupt changes disorient a user of the system.

(CX-4, col. 4, lns. 46-52). (Emphasis added)

Therefore, in light of the specification's description of cell to cell movement
being "disorient[ing]" and "unsettling," and resulting in "abrupt changes" and
"abrupt jumps," as well as "violent screen changes," the administrative law judge
finds that such movement was disclaimed by the patentees. [FN17]

Accordingly, based on the foregoing, the administrative law judge finds that the
claims in issue require that the "visual identification" be able to be moved within
both dimensions of the two dimensional grid guide, in addition to being moved at
regular intervals.

4. The program note limitation ('268/'204 Patents)

Claim 1 of the '268 patent requires the display of a "program note overlay
including a program description on said television display." Claims 17 and 34 of
the '204 patent require the display of "a program note with a program description
for the visually identified program," such limitation, according to S-A and
EchoStar, requires the "program note overlay" of claim 1. (S-A Post at 148, EPost
at 130-31). Complainants argued that the "program note" limitation of these claims
should be construed consistent with its ordinary meaning, viz., "a display of
graphical or textual information, about a program, that partially or completely
covers the video screen." (CPost at 212).

The staff argued that the "term 'overlay' has a number of meanings in the
software and user interface area[s], and generally implies something that appears
to come up and partially hide what had appeared on the screen previously." (SPost
at 34-35).

Respondents argued that the "program note" limitation can only be met by an
overlay that is superimposed on top of the grid guide and also, its position on the
screen must vary according to the location of the cursor, so as to avoid masking
the cursor. (See, e.g., S-A Post at 148-50; PPost at 145-48; EPost at 130-34).

In the Background of the Invention section, the following need is identified:

> Printed grid television schedule guides often include additional information
> besides the program title and broadcast names. Such grids are also typically
> provided in combination with a more detailed printed schedule that contains a
> synopsis of each program, whether the program is a repeat, ratings for movies, and
> other information. When using a television set as a display for a schedule system,
> the size and resolution of the television display limit the amount of text that can
> be displayed with the grid. Improved techniques are required for conveying the most
> amount [sic] of information to the user in an easily understood manner within the
> limitations of the television display.

(CX-4, col. 2, lns. 16-27 (Emphasis added)).

Similarly, in the Summary of the Invention section, one of the objects of the
invention is described as "to provide such a user interface in which supplemental
schedule information is presented in overlays[ [FN18]] that obscure a minimum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392
USITC Inv. No. 337-TA-454

amount of useful other information." (CX-4, col. 2, lns. 45- 48). The Detailed
Description of the Invention section describes the "overlay" accordingly:

FIG. 6 shows a television schedule grid screen 20 with a program note overlay
52. With limited text capacity on TV displays, it is preferable to display as many
lines of TV listings as feasible. To handle program notes, which are text
intensive, on-demand overlays 52 are used ....

Program notes for a selected program are overlaid over the grid guide upon
request. The program note can be toggled off/on using a SELECT command. The program
note 52 overlays and hides 3 or 4 listings of the guide. To minimize concealment of
the guide an auto-roving note is used. The program note will overlay either the top
half or bottom half of the screen, as necessary to avoid masking the title of the
selected screen. If the cursor 32 is in the upper half of the screen, the note will
appear in the bottom half, and vice versa. If the cursor 32 is moved to the lower
half of the screen the note will automatically position itself in, [sic] the upper
half of the screen.

(CX-4, col. 6, lns. 22-52) (Emphasis added). Thus in this section of the
specification program note overlays are described as temporarily covering the grid
guide. However, as a later section of the specification describing channel grazing
overlays makes clear, a program note overlay does not always have to cover the grid
guide:

FIGS. 9 and 10 show channel grazing overlays 64 and 66 that provide information
on current programs when switching channels while watching television. In the
overlay 64, when scanning channels the title of each program is overlaid at 68,
along with the name of the TV service (HBO, ABC etc.), the cable channel number,
the current date, day of the week, and time in the channel information field 62.
The overlay 66 is the same as the overlay 64 except that this overlay includes a
program note 70, which is similar to the program note 52 in FIG. 6, but contains
information to a program currently being broadcast on the selected channel. To
access program notes, press the Select key. In addition to the program note 70,
elapsed time is indicated by a percentage calibrated time bar 72. The bar is
bracketed by S for start, and F for finish. By default, titles will appear
automatically when channels are scanned. Grazing Titles may be de-activated using
the CANCEL key. To restore auto-titles, press Select while viewing TV. The flow
diagram governing titles/program notes, while viewing TV, is shown in Fig. 11.

(CX-4, col. 7, ln. 56 – col. 8, ln. 8) (Emphasis added). Hence the specification
makes clear that the overlay 66 is identical to program note overlay 52 except that
it "contains information to a program currently being broadcast on the selected
channel," even though the program note displayed as part of the channel grazing
overlay was displayed over a broadcast television show and not the grid guide. (Tr.
at 3653-54). Therefore, the administrative law judge rejects respondents' and the
staff's attempts to limit the "overlay" limitation to require that the program note
cover a portion of the grid guide. Instead, the administrative law judge construes
this limitation to require merely that the overlay must cover a portion of the
screen, irrespective of what is being displayed on the screen.

Furthermore, the administrative law judge rejects respondents' attempts to read
the auto-roving feature into the "program note" limitation. Respondents' argued
that the auto-roving feature must be read into the claims, because the invention
needs this feature in order to accomplish one of the stated objects of the
invention, viz., to present additional information about programs by using overlays
that obscure a minimum amount of useful information. (EPost at 132). However, even
though the specification states that the auto-roving function is used with the
overlays to "minimize concealment of the guide" ('204 patent, col. 6, lns. 44-45),
such an auto-roving feature would not enable the overlays to better accomplish the
stated objective of presenting additional information about programs by using
overlays that obscure a minimum amount of useful information. This is because an
overlay as described in the specification will always obscure three to four lines

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 66
USITC Inv. No. 337-TA-454

on a grid guide even if the auto-roving function is used. The auto-roving feature
merely causes the overlay to appear (and thereby obscure a portion of the grid
guide) on the top or bottom of the grid guide depending on the position of the
cursor, whereas a non-auto-roving overlay would appear in the same place every time
it is invoked, irrespective of the location of the cursor. Therefore the same
amount of information is obscured whether an auto-roving or a non-auto-roving
overlay is used. Moreover, the program notes displayed as part of the channel
grazing overlays do not exhibit any auto-roving capability (Tr. at 4068-69), even
though such program notes would be subject to the same over all objective of
presenting additional information about programs by using overlays that obscure a
minimum amount of useful information.

   Accordingly, the administrative law judge construes "program note" limitation of
claim 1 of the '268 patent and claims 17 and 34 of the '204 patent as to require
only the use of overlays that are invoked on demand, but does not require the
overlays to be auto-roving or to appear over part of the grid guide.

5. The language "tuning a programmable tuner to a select channel based on position
of said visual identification" ('204 patent)

   Claim 31 of the '204 patent recites "tuning a programmable tuner to a select
channel based on position of said visual identification" as an element. Respondents
argued that this limitation "requires that the channel changes in response to
movement of the visual identification without further user input, i.e., without
pressing the select button." (RFF 1521). Complainants argued that this limitation
can be met even if the select button had to be used as the final step to cause the
tuner to tune to the selected channel. (CORFF 1521 et seq.)

   The administrative law judge rejects respondents' proposed construction. The
plain language of the limitation is in no way inconsistent with a system or a
process in which the user can move a cursor to highlight cell on a grid guide
corresponding to a television show and then press the SELECT button to cause the
tuner to tune to the selected program. In such a system or process the tuner would
still be tuning to a particular channel based on the position of the cursor.
Respondents claim that the prosecution history supports their proposed
construction, yet they are only able to cite to the language of proposed claim 229
which was introduced in the Supplemental Amendment of March 21, 1995. While
applicant's remarks accompanying the Supplemental Amendment make it clear that
proposed claim 229 had a limitation which required that the tuner to automatically
tune to a particular channel, solely because of the placement of the cursor (RX
3011 at 423), proposed claim 229 did not develop into claim 31 and the wording of
the limitation of proposed claim 229 is markedly different from that of the
corresponding limitation of claim 31. [FN19]

VI. INFRINGEMENT

   Complainants have the burden of proving, by a preponderance of the evidence, that
the claims in issue are infringed by the accused set-top boxes. See, e.g., Conroy
v. Reebok International, Ltd., 14 F.3d 1570, 1573 (Fed. Cir. 1994); Braun Inc. v.
Dynamics Corp., 975 F.2d 815 (Fed. Cir. 1992); Chisum, § 18.06(1). To find
infringement, the accused set-top boxes must meet each claim limitation, either
literally or under the doctrine of equivalents. Charles Greiner & Co. v. Mari-med
Mfg. Inc., 962 F.2d 1031, 1034 (Fed. Cir. 1992). Literal infringement requires that
every limitation of the claim be found in the accused set-top boxes, exactly.
Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir.), cert.
denied, 116 S. Ct. 515 (1995).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                      Page 67
USITC Inv. No. 337-TA-454

A device that does not literally infringe a claim can infringe under the doctrine
equivalents. [FN20] The "doctrine of equivalents" prevents an accused patent
infringer from avoiding liability for infringement by changing only minor or
insubstantial details of a claimed invention while retaining the invention's
essential identity. Festo Corp. v. Shoketsu Kinzoku Kogyo Mabashihi Co., 234 F.3d
558. (Fed. Cir. 2000), vacated, Slip op., 535 U.S., 2002 WL 1050479 (May 28, 2002).

## A. '121 Patent

## 1. Pioneer

Complainants argued that they have established that the accused Pioneer devices
infringe claims 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 31, 33, 36, 42, 43, 48, 50,
54, 57, 59, 60, 61 and 66 of the '121 patent. Each of the staff and Pioneer argued
that complainants have not met their burden.

### a. Independent Claim 18 And Dependent Claims 19-24, 26-28 And 31

{* * *}
Moreover, the administrative law judge finds that the Pioneer set-top boxes do
not "combin[e] said user selection criteria" as required by claim 18. The Pioneer
IPG has three modes of operation: Time View, Theme View and Title View. The
administrative law judge finds that none of these modes of operation allows a user
to "combin[e] said user selection criteria." The Time View of Passport software is
the initial mode of the Pioneer IPG and displays a grid television guide that is
just like a newspaper TV guide. (Krakirian, Tr. at 2970-2971, 2890). Specifically,
the left hand column of the grid television guide provides a list of channels
offered by the cable provider, while the top column lists the time in half
increments. Titles of programs are contained in cells in the grid, corresponding to
the appropriate scheduled channel and time of broadcast. This channel list is
preset and pre-ordered by the cable operator. (Krakirian, Tr. at 2890; RX-4500A,
slide/video segment 5).

A user of Passport software cannot change the sequence or order of the preset
channel line up. (Krakirian, Tr. at 2890; RX-4500A, slide/video segment 5). All
that a user may do in the Time View is browse the preset channel list that is
automatically called up by the Passport software in response to the user pressing the
"GUIDE" button, by using the page up or down keys or by using the up or down
directional arrow keys. (Krakirian, Tr. at 2970-2971). The grid shifts along the
appropriate axis and in the appropriate direction, each time one of these buttons
are used. For example, when the user presses the left or right arrow key, the grid
shifts along the time axis and a new grid is displayed with a new half-hour column
replacing one of the original columns. (CX-2367). Alternatively, the user can press
the fast forward or fast rewind key, causing a new grid to be shifted 4 hours
forward or backward, respectively, along the time axis. (CX-2303).

However, the user cannot change the way the initial Time View is displayed.
(Krakirian, Tr. at 2890). For example, the user may not specify a particular time
range or channel range to display on the grid, as the Passport software controls
what part of the channel list and time range will be displayed. (Krakirian, Tr. at
2970-2971). Also, a user cannot enter commands to cause only particular channels to
be contained in the list shown in the left hand column of the grid guide.
(Krakirian, Tr. at 2892; RX-4500A, slides/video segments 5 & 6).

The administrative law judge finds that no combining as that term was construed
with relation to claim 18 occurs in Pioneer's Time View. As required by claim 18,
the Time View mode does not allow the user to enter a plurality of criteria, which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are then used to select only those programs that meet the combined criteria, so
that only those programs are displayed to the user. The administrative law judge
finds that the navigation that occurs in the Time View grid guide by browsing does
not utilize combining of search criteria within the meaning of claim 18, as a user
cannot cause the IPG to present to him particular programing that occurs at a
particular time or on a particular channel. Instead, the Pioneer IPG merely allows
the user to browse through the grid guide, either cell by cell or four hour time
interval by four hour interval, to find for himself the channel or time range that
he is interested in. The user must browse through the entirety of the information
to find desired programs just like one browses through the pages of a printed
television guide. (Rhyne, Tr. at 3577-78; Krakirian, Tr. at 2970-71). Thus the
administrative law judge finds that in the accused Pioneer set-top boxes, there is
no way for the user to reduce the number of programs that are presented to the user
in Time View, which is in conflict with the purpose of the '121 patent. As
testified by Faillace, complainants' expert witness, the purpose of the '121 patent
is to provide database techniques to take a vast sea of program schedule
information, cut it down to size, and enable the user to focus just on those
programs most likely to be of interest to him or her, so that instead of looking at
thousands of descriptions of programs, the user would be looking at just a handful
of programs, in order to be able to make an educated choice. (Faillace, Tr. at
1150). Faillace's testimony is supported by the specification which states in the
Background of the Invention section that "[i]t would be desirable for a user to be
able to reduce the number of such listings to be consulted in making a program
selection." ('121 patent, col. 2, ll. 63-65). The specification provides further
that:

Because the system will search through a volume of schedule information to find
programs meeting the viewer's selection criteria, the program selection is much
easier and more rapid with the system of this invention than with manual selection.
By way of example, the system can be used to select satellite programs from a
larger list of satellite programs by user selected satellite symbols, such as Fl or
AB, to be displayed by the scheduler, eliminating most of the program listings
which are of no value to the viewer. Similarly, for users without special
decryption service, the system will remove from display those satellite listings
which are of no value to the viewer because they are encrypted.
(col. 5, lns. 23-36) (Emphasis added). Therefore, the administrative law judge
finds that "combining" of selection criteria as required by claim 18 does not occur
in the IPG's Time View mode of Pioneer.

The administrative law judge further finds that the use of the Pioneer set-top
boxes' Theme View or Title View modes does not satisfy the combining limitation of
claim 18, as no combining at all occurs in either the Passport's Theme View or
Title View as the user selects one criterion (an initial letter of a program's
title or a single theme) and the system presents the user with a list of program's
meeting that criterion, and whereupon the user must scroll through the list to find
the desired program. For instance, once in the Time View, a user may switch to the
Theme View by pressing the "B" button on the remote control. (Krakirian, Tr. at
2893; RX-4500A, slide/video segment 7). There is no way, however, that a user of
Passport software may enter the Theme View without first entering the Time View.
(Krakirian, Tr. at 2894; RX-4500A, slide/video segment 7). Similar to the operation
of Theme View, a user may switch to the Title View by
pressing the "C" key. (CX-2336; CX-8006). However, there is no way that a user of
Passport software may enter the Title View without first entering the Time View by
pressing the "Guide" key. (Krakirian, Tr. at 2894). On the left side of the screen in
Title View, a list of characters appears from which a user may choose the initial
character of a title. (Faillace, at Tr. 2265; RX-8006; CX-2336). With Passport
software, the user can only select only one initial character while in Title View.
(Faillace, Tr. at 2267-2268; RX-8007; RX-8008). The system will then find all the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 69
USITC Inv. No. 337-TA-454

programs having the initial letter that the user selected and will present the user
with a list of programs beginning with that letter along with the programs'
scheduled broadcast dates, times and channels. (RX-8006; RX-8007; RX-8008). In
Title View, the user cannot combine a title search with an interval of time, but
must rather navigate up and down the list of programs presented as beginning with
the initial letter selected by the user. (Tr. at 3577).

The Pioneer Passport software's Theme View operates the same way as the Title
View except the user is selecting a theme instead of an initial character.
(Krakirian, Tr. at 2895). In the Passport software's Theme View, the user may apply
only one theme at a time and may not combine a theme with an interval of time.
(Rhyne, Tr. at 3575-3572; RX-4747.93). The user may only navigate up or down the
list of programs by scrolling through the list. (Rhyne, Tr. at 3576- 77; RX-
4747.93). Therefore, no combining at all occurs in either the Passport's Theme View
or Title View as the user selects one criterion (an initial letter of a program's
title or a single theme) and the system presents the user with a list of program's
meeting that criterion, and whereupon the user must scroll through the list to find
the desired program.

The administrative law judge further finds that Pioneer's Passport software does
not store the title of selected programs as required by claim 18. (Krakirian, Tr.
at 2899-01). From any of the three views (Time, Theme or Title) the user may press
the "SELECT" button. (Krakirian, Tr. at 2899-2900). If the highlight is on a cell
corresponding to a program being currently broadcast, the Passport software will
select the channel for the highlighted row, take the viewer to that service and
allow the viewer to watch the selected program. The Passport software will then
store the channel, but not the title, of the program that the viewer selected.
(Krakirian, Tr. at 2899-2901). If the user presses "SELECT" and the highlight is
within a column for a future time, Passport software will ask whether the user
wishes to manually select the service for the highlighted position or set a timer
so that the user may, at a future time, record or be reminded to view the service
corresponding to the scheduled program that is highlighted. (Krakirian, Tr. at
2899). If the user elects to set an event timer, Passport software will set a timer
that causes the software to take future action. (Krakirian, Tr. at 2900). {* * *}
{* * *}

Based on the foregoing the administrative law judge finds that the accused
Pioneer set-top boxes do not infringe independent claim 18 and dependent claims 19-
24, 26-28 and 31.

b. Independent Claim 33

The administrative law judges finds that the accused Pioneer devices do not
infringe independent claim 33. For the same reasons that he found that the accused
Pioneer devices do not store schedule information in the CPU, do not have a storage
means, and do not combine user selection criteria in relation to claim 18, he finds
that the accused devices lack these features and functions in relation to claim 33.
See supra. The administrative law judge further finds that the accused Pioneer
devices are incapable of "turning on" a VCR within the meaning of claim 33, i.e.,
to cause electricity to be supplied to it. The Pioneer set-top boxes, when fitted
with an "IR Blaster", an optional accessory, can cause a VCR that is already turned
on to start to recording a selected channel. (Tr. at 2255-57). However the Pioneer
set-top boxes cannot turn power on for a VCR that is turned off. (Tr. at 1471-72,
3635).

Based on the foregoing, the administrative law judge finds that the accused
Pioneer set-top boxes do not infringe independent claim 33.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 70
USITC Inv. No. 337-TA-454

c. Independent Claim 36

   The administrative law judges finds that the accused Pioneer devices do not
infringe independent claim 36. For the same reasons that he found that the accused
Pioneer devices do not store schedule information in the CPU, do not have a storage
means, do not combine user selection criteria and do not store the titles of
selected programs in relation to claim 18, he finds that the accused devices lack
these features and functions in relation to claim 36. See supra. Additionally, for
the same reason that he found that the accused Pioneer devices cannot turn on a VCR
in relation to claim 33, he finds that the Pioneer devices are incapable of
performing that function in relation to claim 36.

d. Independent Claim 42 And Dependent Claims 43, 48, 49 And 50

   The administrative law judge finds that the accused Pioneer devices do not
infringe independent claim 42 and dependent claims 43, 48, 49 and 50. For the same
reasons that he found that the Pioneer devices did not satisfy the "storage means"
limitation of claim 18, he finds that the Pioneer devices do not satisfy the
"storage means" limitation of claim 42 and the claims depending therefrom.

   The administrative law judge further finds that the accused Pioneer devices do
not have the first input means required by claim 42 and the claims that depend from
it. As found in the claim construction section, supra, the "first input means" is a
means plus function element and the corresponding structures comprise either (1) an
FM antenna, an FM receiver, a SCA subcarrier decoder, and data demodulator or (2)
an antenna, a programmable tuner, a program data timing controller and a data
demodulator; or (3) their 35 U.S.C. § 112, ¶ 6 equivalents. {* * *} {* * *}

   It is undisputed that the digital technologies used by Pioneer's set-top boxes
were developed after the issuance of the '121 patent. (Tr. at 1193-94, 1662-3).
[FN21] Thus the digital technology relied upon by Pioneer cannot be a 35 U.S.C. §
112, ¶ 6 equivalent to the "first input means" because it was developed after the
issuance of the '121 patent. As the Federal Circuit stated in Al-Site Corp. v. VSI
International, Inc., 174 F.3d 1308, 1320 (Fed. Cir. 1999)
   As this court has recently clarified, a structural equivalent under § 112 must
have been available at the time of the issuance of the claim. See [Chiuminatta
Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1310 (Fed. Cir.
1998).] An equivalent structure or act under § 112 cannot embrace technology
developed after the issuance of the patent because the literal meaning of a claim
is fixed upon its issuance. An "after arising equivalent" infringes, if at all,
under the doctrine of equivalents. See [Warner-Jenkinson Co. v. Hilton Davis Chem.
Co., 117 S.Ct. 1040, 1052 (1997);] Hughes Aircraft Co. v. U.S., 140 F.3d 1470,
1475, 46 U.S.P.Q.2d 1285, 1289 (Fed. Cir. 1998). .... In other words, an equivalent
structure or act under § 112 for literal infringement must have been available
under the doctrine of equivalents may arise after patent issuance and before the
time of infringement. See Warner-Jenkinson, 117 S.Ct. at 1053.

   The administrative law judge further finds that the accused Pioneer devices do
not have a a "selectable display", in which the initial display comprises
information selected by the data processor in response to the user inputs, as well
as either the current channel that the television is tuned to or the current time.
With the accused Pioneer devices, the user has no ability to select the way the
initial Time View is displayed. No larger or smaller time interval than the one-
and-a-half hours time period can be displayed on the Time View's grid guide in the
horizontal dimension. (Krakirian, Tr. 2891; RX-4500A, slide/video segment 5).
Furthermore, the Pioneer set-top boxes do not allow a user to store a user selected

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392
USITC Inv. No. 337-TA-454

set of preferred themes that can be activated or deactivated by the user and therefore the user cannot have the Time View show only those programs coming within certain themes. (Krakarian, Tr. at 2893-95). Also, a user cannot enter commands to cause only particular channels to be listed.

Accordingly, based on the foregoing, the administrative law judge, finds that accused Pioneer devices do not infringe independent claim 42 and dependent claims 43, 48, 49 and 50.

e. Independent Claim 54

The administrative law judge finds that the accused Pioneer devices do not infringe independent claim 54. For the same reasons that he found that the Pioneer devices did not satisfy the "storage means" limitation of claim 18, he finds that the Pioneer devices do not satisfy the "storage means" limitation of claim 54. Furthermore, he finds that the Pioneer products at issue do not have the 35 U.S.C. § 112, ¶ 6 corresponding structures for the "means connected between said programmable tuner and said data processor for separating the broadcast schedule information from the broadcast programs and supplying the broadcast schedule information to said data processor."

Complainants argued that "[t]he separating means in all the accused devices is the{* * *}

Based on the foregoing, the administrative law judge finds that the accused Pioneer devices do not infringe independent claim 54.

f. Independent Claim 57 And Dependent Claims 59, 60 And 61

The administrative law judge finds that the accused Pioneer devices do not infringe independent claim 57 and dependent claims 59, 60 and 61. For the same reasons that he found that the Pioneer devices did not satisfy the "storage means" limitation of claim 18, he finds that the Pioneer devices do not satisfy the "storage means" limitation of claim 57. For the same reasons that he found that the Pioneer devices did not satisfy the "separating means" limitation of claim 54, he finds that the Pioneer devices do not satisfy the "separating means" limitation of claim 57. Furthermore, for the same reason that he found that Pioneer products did not satisfy claim 42's "selectable display" limitation he finds that they do not satisfy claim 57's selectable display limitation.

Based on the foregoing, the administrative law judge finds that the accused Pioneer devices do not infringe independent claim 57 and dependent claims 59, 60 and 61.

g. Independent Claim 66

The administrative law judge finds that the accused Pioneer devices do not infringe independent claim 66. For the same reasons that he found that the accused Pioneer devices do not store schedule information in the CPU, do not have a storage means, and do not combine user selection criteria in relation to claim 18, he finds that the accused devices lack these features and functions in relation to claim 66. See supra. Accordingly, the accused Pioneer devices do not infringe independent claim 66.

2. EchoStar

Complainants argued that they have established that the accused EchoStar devices

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 72
USITC Inv. No. 337-TA-454

infringe claims 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 31, 32, 36, 54, 57, 58, 59, 60, 61 and 66 of the '121 patent. Each of the staff and EchoStar argued that complainants have not met their burden of proving infringement of these claims.

a. Independent Claim 18 And Dependent Claims 19-24, 26-28 And 31

{* * *}
   The administrative law judge also finds that the accused EchoStar devices do not have the storage means required by claim 18 and the claims depending from it. {* * *} {* * *} {* * *}

   After the accused EchoStar set-top boxes display screenful of events satisfying the user selected theme, the user can scroll down the list of selected programs. (CX-2326 et seq., Tr. at 1320-21). When the user scrolls past the last program listed on the screen, the system can display additional events beyond those displayed in the initial screen that match the selected theme{* * *}

   While, the accused EchoStar devices allow a user to set the set-top boxeses to display only those programs that are to be broadcast on certain channels, (Tr. at 1323), such combining is logical "OR" combining, as the set-top boxes displays all of the programs that occurr on any of the selected channels, instead of displaying only programs that occur on all of the selected channels, as would be the case with logical "AND" combining. As found in the claim construction section, supra, the "combining" limitation requires that the set-top boxes perform both logical "OR" and logical "AND" combining. Therefore, the set-top boxes's ability to display the programs scheduled to be broadcast on selected channels does not satisfy the combining limitation.

   The administrative law judge further finds that the accused EchoStar set-top boxeses{* * *} {* [FN22] * *}

   Based on the foregoing, the administrative law judge finds that complainants have failed to meet their burden of proving that the accused EchoStar devices infringe independent claim 18 and dependent claims 19-24, 26-28 and 31 of the '121 patent.

b. Independent Claim 32

   The administrative law judge finds that complainants have not met their burden of proving that the accused EchoStar devices infringe claim 32 of the '121 patent. {* * *}as required by claim 32.

c. Independent Claim 36

   The administrative law judges finds that the accused EchoStar devices do not infringe independent claim 36. For the same reasons, supra, that he found that the accused EchoStar devices{* * *}he finds that the accused devices lack these features and functions with respect to claim 36. Additionally, complainants admitted that the EchoStar devices cannot power on a VCR as is required by independent claim 36.

   Based on the foregoing, the administrative law judge finds that complainants have failed to meet their burden of proving that the accused EchoStar devices infringe claim 36.

d. Independent Claim 54

   The administrative law judge finds that complainants have not met their burden in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 73
USITC Inv. No. 337-TA-454

establishing that the accused EchoStar devices infringe independent claim 54. For
the same reasons that he found that the EchoStar devices{* * *}

{* * *}
{* * *}As stated above, in connection with the accused Pioneer products in
relation to claim 42, {* * *}

   Based on the foregoing, the administrative law judge finds that the accused
EchoStar devices do not infringe independent claim 54.

e. Independent Claim 57 And Dependent Claims 58, 59, 60 And 61

   The administrative law judge finds that complainants have not met their burden in
establishing that the accused EchoStar devices infringe independent claim 57 and
dependent claims 58, 59, 60 and 61. For the same reasons that he found that the
accused EchoStar devices{* * *}Moreover, for the same reasons that the
administrative law judge found that the EchoStar devices{* * *}

   Based on the foregoing, the administrative law judge finds that the accused
EchoStar devices do not infringe independent claim 57 and dependent claims 58, 59,
60 and 61.

f. Independent Claim 66

   The administrative law judge finds that complainants have not met their burden in
establishing that the accused EchoStar devices infringe independent claim 66. For
the same reasons that he found that the accused EchoStar devices { * * *}he finds
that the accused devices lack these features and functions in relation to claim 66.
See supra. Accordingly, the accused EchoStar devices do not infringe independent
claim 66.

3. S-A

   Complainants argued that they have established that the accused S-A devices
infringe claims 18, 19, 20, 21, 22, 23, 24, 26, 27, 28, 31, 33, 36, 42, 43, 48, 49,
50, 51, 54, 57, 59, 60, 61 and 66 of the '121 patent. Each of the staff and S-A
argued that complainants have not met their burden.

a. Independent Claim 18 And Dependent Claims 19-24, 26-28 And 31

   {* * *} {* * *}The grid shows a screen of five predetermined channels over an
hour and a half time interval. (Rhyne, Tr. at 3581-82; 3587). A user can cause the
grid to shift along its time axis or its channel axis by using directional arrows.
(Rhyne, Tr. at 3581-82; 3587). As found with respect to Pioneer, supra, such
navigation does not constitute "combining."

   Moreover, the S-A Standard Guide only allows the user to select from the stored
presorted relational database of IPG data by date or based on one theme or based on
the first character of a program title. (RX-474.91; RX-4747.88C; Rhyne Tr. at 3577;
3587-91; JX-12C at 556-61, 572, 626-28, 930-42). The theme and title-character
search can neither be combined nor applied successively to create a subset listing
only programs with the selected theme and title character. (RX-4747.91, Rhyne, Tr.
at 3575-77). Thus, in the accused S-A products having the Standard Guide, only a
single selection criterion can be used at a time. For example, the Theme, Title, or
Date View uses only a single criterion. The date key can be used following the
Theme View or Title View key to display only those programs with the selected theme
or initial letter of their title and are scheduled to be broadcast on the selected

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

date. (Rhyne, Tr. at 3588 and 3590-91; RX-4747.88; RX-4747.91; JX-62C at 272-73, 276-77, 281-82). However, the administrative law judge finds that this does not satisfy the "combining" limitation of claim 18, as Young had specifically disclaimed sequential, hierarchal searches. See, supra.

The S-A Flex Guide does not allow the user to select from the stored IPG data based on the first character of a program title, date or theme. (Durden, Tr. at 2791; JX-12C at 10531-54; JX-49C at 106). In the accused S-A Flex Guide, the administrative law judge finds that the Time View displays a grid guide that is just like a newspaper TV guide. The Time View allows a user to scroll through pages of the grid guide and browse through the schedule information. (Rhyne, Tr. at 3582-83, 3587). The user may not specify a particular time range or channel range to display. (RX-4747.57; Rhyne, Tr. at 3537-38, 3622-23, 3631). Rather, the S-A Flex Guide determines what part of the channel list and time range will be first displayed. (Durden, Tr. at 2755). Once the Time View is chosen and displayed, the user can only browse through a preset channel line up and preset sequential time range. (Rhyne, Tr. at 3582-83). The user of the S-A Flex Guide may not change the sequence of channels or sequence of times displayed, as these have been preset. (Rhyne, Tr. 3582-83). The user may page up or down one screen of pre-set channels at a time using page keys, may use directional arrow keys to scroll the grid up or down one channel row at a time along the pre-set channel list, and may use directional arrow keys to scroll the grid forward or backwards in thirty-minute intervals. (JX-12C at 554-556; Durden, Tr. at 2757-2758). Also a user cannot enter commands to cause only particular channels to be contained in the list shown in the left hand column of the grid guide. (Rhyne, Tr. at 3583). After the S-A Flex Guide is opened to the Time View the user's interaction with the Time View is limited to using the directional keys on the remote control to scroll the grid forward or backwards in half-hour increments. (Rhyne, Tr. at 3575-76, 3583, 3587; RX-4747.91). A user of the S-A Flex Guide cannot enter commands that allow the user to view programs that are on at a particular time without having to use the directional arrow keys, the page button, or the "C" button to scroll to the desired time. (Rhyne, Tr. 3575-76, 3583, 3587; RX-4747.91). In the S-A Standard Guide's Title View, the user may not combine a title with a user-specified interval of time. The user may only navigate up or down the list of programs having the same user selected initial character of the title. (RPX-99, clips 24 and 25). Therefore, the administrative law judge finds that the accused S-A products do not satisfy the "combining" limitation of claim 18. Moreover, the administrative law judge finds that the accused S-A products do not store titles of selected programs as required by claim 18. (FF 187, 188).

Based on the foregoing, the administrative law judge finds that the complainants have failed to meet their burden of proving that the accused S-A products infringe independent claim 18 and dependent claims 19-24, 26-28 and 31.

b. Independent Claim 33

The administrative law judges finds that complainants have not satisfied their burden in establishing that the accused S-A devices infringe independent claim 33. For the same reasons, supra, that he found that{* * *}See supra.

Based on the foregoing, the administrative law judge finds that the accused S-A set-top boxes do not infringe independent claim 33.

c. Independent Claim 36

The administrative law judges finds that complainants have not met their burden in establishing that the accused S-A devices infringe independent claim 36. For the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

same reasons that he found that the accused S-A devices{* * *}and functions in relation to claim 36.

d. Independent Claim 42 And Dependent Claims 43, 48, 49 And 50

   The administrative law judge finds that complainants have not met their burden in establishing that the accused S-A devices infringe independent claim 42 and dependent claims 43, 48, 49 and 50. For the same reasons that he found that the S-A devices did not satisfy the "storage means" limitation of claim 18 supra, he finds that the S-A devices do not satisfy the "storage means" limitation of claim 42 and the claims depending therefrom.

   The administrative law judge further finds that complainants have not met their burden in establishing that the accused S-A devices{* * *}As found in the claim construction section, supra, the "first input means" is a means plus function element and the corresponding structures comprises either (1) an FM antenna, an FM receiver, a SCA subcarrier decoder, and data demodulator or (2) an antenna, a programmable tuner, a program data timing controller and a data demodulator; or (3) their 35 U.S.C. § 112, ¶ 6 equivalents. {* * *}

   Furthermore, the administrative law judge finds that the S-A products {  * * *} {* * *}The Time View of the S-A products displays a grid television guide that is just like a newspaper TV guide. (Rhyne, Tr. at 3582-83, 3587). The user may not specify a particular time range or channel range to display. (RX-4747.57; Rhyne, Tr. at 3537-38, 3622-23, 3631). Rather, the S-A guide mandates what part of the channel list and time range that will first be displayed. (Durden, Tr. at 2755). {* * *} (Rhyne, Tr. at 3575-76, 3583, 3587). The user of an S-A guide has no ability to change the displayed channels or the ordering of the channels. (Rhyne, Tr. at 3575-76, 3583, 3587). Nor can a user enter commands to cause only particular channels to be contained in the list shown in the left hand column of the grid guide. (Rhyne, Tr. at 3583).

   Accordingly the administrative law judge finds that the accused S-A products do not infringe independent claim 42 and dependent claims 43, 48, 49 and 50.

e. Independent Claim 51

   The administrative law judge finds that complainants have not met their burden in establishing that the accused S-A devices infringe independent claim 51. For the same reasons that he found that the accused S-A devices do not have a storage means in relation to claim 18, supra, and do not have the "first input means" and a "selectable display" as required by claim 42, supra, he finds that the accused devices lack these features and functions in relation to claim 51. Accordingly, the accused S-A devices do not infringe independent claim 51.

f. Independent Claim 54

   The administrative law judge finds that complainants have not met their burden in establishing that the accused S-A devices do not infringe independent claim 54. For the same reasons that he found that the S-A devices did not satisfy the "storage means" limitation of claim 18, he finds that the S-A devices do not satisfy the "storage means" limitation of claim 54. Furthermore, he finds that the S-A products at issue{* * *}

   {* * *}Therefore, the administrative law judge finds that the SA devices do not have the means for separating required by claim 54.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392
USITC Inv. No. 337-TA-454

g. Independent Claim 57 And Dependent Claims 59, 60 And 61

The administrative law judge finds that complainants have not met their burden in establishing that the accused S-A devices infringe independent claim 57 and dependent claims 59, 60 and 61. For the same reasons that he found that the S-A devices did not satisfy the "storage means" limitation of claim 18, he finds that the S-A devices do not satisfy the "storage means" limitation of claim 57. For the same reasons that he found that the S-A devices did not satisfy the "separating means" limitation of claim 54, he finds that the S-A devices do not satisfy the "separating means" limitation of claim 57. Furthermore, for the same reason that he found that S-A products did not satisfy claim 42's "selectable display" limitation he finds that they do not satisfy claim 57's selectable display limitation.

Based on the foregoing, the administrative law judge finds that the accused S-A devices do not infringe independent claim 57 and dependent claims 59, 60 and 61.

h. Independent Claim 66

The administrative law judge finds that complainants have not met their burden in establishing that the accused S-A devices infringe independent claim 66. For the same reasons that he found that the accused S-A devices{* * *}in relation to claim 18, supra, he finds that the accused devices lack these features and functions in relation to claim 66. Accordingly, the accused S-A devices do not infringe independent claim 66.

B. '268/'204 Patents

I. Pioneer

Complainants argued that they have established that the accused Pioneer products infringe claims 1 and 3 of the '268 patent and claim 14, 15, 16, 17, 31, 32, 33 and 34 of the '204 patent. Each of Pioneer and the staff argued that complainants have not met their burden.

a. Independent Claim 1 And Dependent Claim 3 Of The '268 patent.

The administrative law judge finds that complainants have not met their burden of proving that the accused Pioneer products practice independent claim 1 and dependent claim 3 of the '268 patent. {* * *} {* * *}

Furthermore, the administrative law judge finds that the accused Pioneer products do not have a cursor that exhibits the movement required by the claims. {* * *}In the claim construction section, the administrative law judge found that the cursor must be able to be moved in regular intervals, and it must also be able to be moved within the grid guide. See supra. The cursor of the Pioneer products cannot be moved within the grid guide and do not move in regular intervals and therefore do not meet this limitation.

The administrative law judge further finds that the accused Pioneer products do not have the required innovative cursor. Instead, the Pioneer cursor is uniformly black and fills the entire cell, irrespective of the length of the cell. (Tr. at 2918, RX-4500).

Based on the foregoing, the administrative law judge finds that complainants have not met their burden of proving that the accused Pioneer products infringe claims 1 and 3 of the '268 patent.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                          Page 77
USITC Inv. No. 337-TA-454

b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The '204 Patent

   The administrative law judge finds that complainants have not met their burden of
proving that the accused Pioneer products infringe independent claim 14 and
dependent claims 15, 16, and 17 of the '204 patent. For the same reasons that the
administrative law judge found that the Pioneer products did not satisfy the "means
... for displaying" limitation, the innovative cursor requirement, or the movement
limitation in relation to claims 1 and 3 of the '268 patent, he finds that the
Pioneer products do not meet these limitations in relation to claim 14, 15, 16, and
17 of the '204 patent.

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused Pioneer products infringe
independent claim 14 and dependent claims 15, 16, and 17 of the '204 patent.

c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The '204 Patent

   The administrative law judge finds that complainants have not met their burden of
proving that the accused Pioneer products infringe independent claim 31 and
dependent claims 32, 33 and 34 of the '204 patent. For the same reasons that the
administrative law judge found that the Pioneer products did not satisfy the
innovative cursor requirement, or the movement limitation in relation to claims 1
and 3 of the '268 patent, he finds that the Pioneer products do not meet these
limitations in relation to claims 31, 32, 33 and 34 of the '204 patent.

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused Pioneer products infringe
independent claim 31 and dependent claims 32, 33, and 34 of the '204 patent.

2. S-A

   Complainants argued that they have established that the accused S-A products
infringe claims 1 and 3 of the '268 patent and claim 14, 15, 16, 17, 31, 32, 33 and
34 of the '204 patent. Each of S-A and the staff argued that complainants have not
met their burden.

a. Independent Claim 1 And Dependent Claim 3 Of The '268 patent.

   The administrative law judge finds that complainants have not met their burden of
proving that the accused S-A products practice independent claim 1 and dependent
claim 3 of the '268 patent. {* * *}the administrative law judge finds that
complainants have not met their burden of showing that the accused S-A products
meet the "means ... for displaying" limitation.

   Furthermore, the administrative law judge finds that the accused S-A products do
not have a cursor that exhibits the movement required by the claims in issue. {*
[FN23] * *}Therefore, for the same reasons that the administrative law judge found
that the Pioneer products did not satisfy the movement limitation, the
administrative law judge finds that the accused S-A products do not satisfy the
movement limitation. Complainants argued that the cursor in the S-A products still
exhibited the movement required by claims 1 and 3 of the '268 patent as the cursor
"mov[ed] from one cell to another". (CRRFF 2615.10). However, even if the
administrative law judge were to accept complainants' argument that the cursor in
the accused S-A products moves from one cell to another, such movement is still
insufficient to satisfy the movement limitation of the asserted claims. In the
claim construction section, the administrative law judge found that the claims
require that the cursor move at regular time intervals and it must also be able to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 78
USITC Inv. No. 337-TA-454

be moved within the grid guide. See supra. The cursor of the S-A products does not move at regular time intervals and cannot be moved within the grid guide and therefore does not satisfy the movement limitation.

The administrative law judge further finds that the accused S-A products do not have the required innovative cursor. Instead, the S-A cursor is uniformly black and fills the entire cell, irrespective of the length of the cell. (Tr. at 3657-58, RX-4748.10).

Based on the foregoing, the administrative law judge finds that complainants have not met their burden of proving that the accused S-A products infringe claims 1 and 3 of the '268 patent.

b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The '204 Patent

The administrative law judge finds that complainants have not met their burden of proving that the accused S-A products infringe independent claim 14 and dependent claims 15, 16, and 17 of the '204 patent. For the same reasons that the administrative law judge found that the S-A products did not satisfy the "means ... for displaying limitation", the innovative cursor requirement, or the movement limitation in relation to claims 1 and 3 of the '268 patent, he finds that the S-A products do not meet these limitations in relation to claim 14, 15, 16, and 17 of the '204 patent.

Based on the foregoing, the administrative law judge finds that complainants have not met their burden of proving that the accused S-A products infringe independent claim 14 and dependent claims 15, 16, and 17 of the '204 patent.

c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The '204 Patent

The administrative law judge finds that complainants have not met their burden of proving that the accused S-A products infringe independent claim 31 and dependent claims 32, 33 and 34 of the '204 patent. For the same reasons that the administrative law judge found that the S-A products did not satisfy the the innovative cursor requirement or the movement limitation in relation to claims 1 and 3 of the '268 patent, he finds that the S-A products do not meet these limitations in relation to claims 31, 32, 33 and 34 of the '204 patent.

Based on the foregoing, the administrative law judge finds that complainants have not met their burden of proving that the accused S-A products infringe independent claim 31 and dependent claims 32, 33, and 34 of the '204 patent.

3. EchoStar

Complainants' argued that they have established that the accused EchoStar products infringe claims 1 and 3 of the '268 patent and claim 14, 15, 16, 17, 31, 32, 33 and 34 of the '204 patent. Each of EchoStar and the staff argued that complainants have not met their burden.

a. Independent Claim 1 And Dependent Claim 3 Of The '268 Patent.

The administrative law judge finds that complainants have not met their burden of proving that the accused EchoStar products practice independent claim 1 and dependent claim 3 of the '268 patent. The accused EchoStar products, like the accused Pioneer and S-A products, do not have a{* * *}as required by the "means ... for displaying" limitation. (Tr. at 3142). {* * *}Therefore, the administrative law judge finds that complainants have not met their burden of showing that the accused

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 79
USITC Inv. No. 337-TA-454

EchoStar products meet the "means ... for displaying" limitation.

   The administrative law judge further finds that the accused EchoStar products do
not have the required innovative cursor. Instead, the EchoStar cursor is uniformly
black and highlights the entire cell, irrespective of the length of the cell. (Tr.
at 3988-89, RX-7483). Moreover, the administrative law judge finds that the accused
EchoStar products do not satisfy the movement limitation. The cursor in the
EchoStar products do not move in equal time increments. (Tr. at 3989-90). Instead,
the cursor moves cell to cell until it reaches the edge of the screen, where upon
it starts moving in half hour increments. (Tr. at 3989-90).

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused EchoStar products infringe claims
1 and 3 of the '268 patent.

b. Independent Claim 14 And Dependent Claims 15, 16 And 17 Of The '204 Patent

   The administrative law judge finds that complainants have not met their burden of
proving that the accused EchoStar products infringe independent claim 14 and
dependent claims 15, 16, and 17 of the '204 patent. For the same reasons that the
administrative law judge found that the EchoStar products did not satisfy the
"means ... for displaying limitation, the movement limitation or the innovative
cursor requirement in relation to claims 1 and 3 of the '268 patent, he finds that
the EchoStar products do not meet these limitations in relation to claim 14, 15,
16, and 17 of the '204 patent.

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused EchoStar products infringe
independent claim 14 and dependent claims 15, 16, and 17 of the '204 patent.

c. Independent Claim 31 And Dependent Claims 32, 33 And 34 Of The '204 Patent

   The administrative law judge finds that complainants have not met their burden of
proving that the accused EchoStar products infringe independent claim 31 and
dependent claims 32, 33 and 34 of the '204 patent. For the same reasons that the
administrative law judge found that the EchoStar products did not satisfy the
innovative cursor requirement or the movement limitation in relation to claims 1
and 3 of the '268 patent, he finds that the EchoStar products do not meet these
limitations in relation to claims 31, 32, 33 and 34 the '204 patent.

   Based on the foregoing, the administrative law judge finds that complainants have
not met their burden of proving that the accused EchoStar products infringe
independent claim 31 and dependent claims 32, 33, and 34 of the '204 patent.

VII. PATENT MISUSE

   The staff and all of the respondents argued that complainants have committed
patent misuse through their licensing practices. [FN24] Complainants have denied
any patent misuse. A party invoking patent misuse must prove the acts constituting
the alleged misuse by a preponderance of evidence. See, e.g., GFI Inv. v. Frankling
Corp., 88 F. Supp. 2d 619, 621 (N. D. Miss. 2000).

   Patent misuse is an affirmative equitable defense to an accusation of patent
infringement, the successful assertion of which "requires that the alleged
infringer show that the patentee has impermissibly broadened the 'physical or
temporal scope' of the patent grant with anticompetitive effect." Windsurfing
Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1001, 228 U.S.P.Q. 562, 566 (Fed. Cir.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 80
USITC Inv. No. 337-TA-454

1986). See Virginia Panel Corp. v. Mac Panel Co., 133 F.3d 860, 868-69 (Fed. Cir. 1997) (Virginia Panel). Because of the strong public policy underpinnings of the patent misuse defense, a party asserting this defense need not show that it has been harmed by the misuse directly. Rather,
    [i]t is the adverse effect upon the public interest of a successful infringement suit, in conjunction with the patentee's course of conduct, which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent.
Morton Salt Co. v. G.S. Suppiger Co., 314 U.S. 488, 494 (1942); See also Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 668, n. 10 (Fed. Cir. 1986) (Senza-Gel).

    Respondents have asserted that complainants in their licensing practices have engaged, and are continuing to engage, in a variety of practices by which the complainants are misusing their patents in the field of interactive program guides. Thus it was argued that complainants' licenses contain unlawful grantbacks and covenants not to sue (PPost at 263-77, SA-Post at 212-35, EPost at 386-412); that complainants' licenses contain unlawful exclusivity and market penetration provisions that tie out competition (PPost at 277-96, S-APost at 235-52, EPost at 363-86); and that complainants have misused their patents through tying arrangements. (PPost at 252-72, S-A Post at 296-306, REPost at 338-63).

    The staff argued that the record established that complainants have engaged in patent misuse by using its large patent portfolio to impermissibly expand the scope of their patents and hinder competition, which discourages innovation in the technology in issue and substantially raise barriers to entry in the market in issue. (SPost at 67-68).

    The parties are in dispute as to what the applicable legal standards are for finding patent misuse. For example, there is a dispute over the applicablity of the Patent Misuse Reform Act of 1988 (35 U.S.C. § 271(d)) (The 1988 Act). [FN25] [FN26] The staff and respondents contend that "tying" is per se patent misuse if the patents confer market power. [FN27] Complainants' contend that Congress rejected the theory that "tying" is per se patent misuse. (CPost at 426).

    The Federal Circuit in Virginia Panel, 133 F.3d at 869, specifically found:
    The courts have identified certain specific practices as constituting per se patent misuse, including so-called 'tying' arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good, .... Congress, however, has established that other specific practices may not support a finding of patent misuse. See U.S.C. 271 (d) ... A 1988 amendment to § 271(d) provides that, inter alia, in the absence of market power, even a tying arrangement does not constitute patent misuse....
(Emphasis added). Hence the administrative law judge finds that the Federal Circuit, subsequent to the 1988 Act, did not reject the theory that "tying" is per se patent misuse. [FN28] It did however, consistent with 35 U.S.C. § 271(d)(5), condition finding a "tying" arrange to constitute patent misuse per se on a finding that the patent holder has market power. Hence if it is shown that the patentholder has market power, anticompetitive effect is conclusively presumed, with "tying" arrangement.

A. Market Power

    The "outer boundaries of a product market[ [FN29]] are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962) (Brown Shoe). Market power is "the ability profitably to maintain prices above, or output below, competitve levels for a significant period of time."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                               Page 81
USITC Inv. No. 337-TA-454

See US Dept. of Justice (DOJ) and Federtal Trade Commission (FTC), Antritrust Guidelines for Licensing Intellectual Property § 2.2, reprinted in 49 Patent, Trademark & Copyright J. (BNA) 714 (April 13, 1995) (Antitrust Guidelines). Thus it is "the power to 'force a purchaser to do something that he would not do in a competitive market'." Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 464, (1992) (quoting Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 14 (1984)). Market power has also been defined as "the ability of a single seller to raise price and restrict output." Id. However, in Tic-X-Press v. Omni Promotions Co. 815 F.2d 1407, 1420 (11th Cir. 1987) (Tic-X-Press), the Eleventh Circuit stated that market power "can be sufficient even though the seller does not dominate the market ... Economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes."

To demonstrate market power, a party generally must: (1) define the relevant market; (2) demonstrate that the defendant enjoys a sufficient share of the market; and (3) demonstrate significant barriers to entry. See, e.g., Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995). The common type of proof is circumstantial evidence pertaining to the structure of the market. Id. The relevant market is comprised of both the product market and the geographic market. Brokerage Concepts, Inc. v. United States Healthcare, Inc., 140 F.3d 494, 513 (3d Cir. 1998). The relevant market is the area of effective competition between the patent holder and the infringer. Thus the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies. See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327-28(1981). In Brown Shoe, 370 U.S. at 324, the Supreme Court determined that the relevant market has two dimensions, first the product market, which defines the products or services that compete with each other, and second, the geographic market, the market in which the competition is geographically defined.

The product market includes those products that are "reasonably interchangeable by consumers for the same purpose. Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for one over the other, either would work effectively." Brokerage Concepts, Inc., 140 F.3d at 513 (citations and quotations omitted). A technology market, i.e., intellectual property that is licensed, can constitute a relevant market when "rights to intellectual property are marketed separately from the products in which they are used." Antitrust Guidelines § 3.2.2. The geographic market is "the area in which a potential buyer may rationally look for the goods or services he or she seeks." Brokerage Concepts, Inc., 140 F.3d at 515.

Barriers to entry, which are particular characteristics of a market which impede entry by new firms into that market, may result from numerous market conditions, including patents or license agreements. See Image Tech. Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1208 (9th Cir. 1997); Reazin v. Blue Cross & Blue Shield of Kansas, Inc., 899 F.2d 951, 968 (10th Cir. 199). Even where some competitors have or may enter a market, that entry must be "timely, likely, and sufficient in its magnitude, character and scope to deter or counteract the competitive effects of concern." See DOJ and FTC, Horizontal Merger Guidelines § 3.0, reprinted in Department of Justice Manual (Aspen Law & Business v.5 2002 supp.).

Respondents rely on testimony of experts Dr. Abram Hoffman and Professor David Sibley in support of their allegation that complainants have committed patent misuse, including the allegation that complainants have market power. Hoffman testified that Gemstar has market power in a market for IPG technology and a market for IPG products. (Tr. at 4583, 4630, 4635). Sibley testified that complainants possess a very great degree of market power for IPG licensing technology and that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

their licensing practices have enabled it to extend their market power to the
market for IPGs. (Tr. at 4768). Complainants argued that the testimony of Hoffman
and Sibley is misleading, is unreliable and lacks foundation.

Hoffman was asked specifically to look at the issue of market power. (Tr. at
4583). The administrative law judge finds that he is qualified to assess market
power. He is not testifying as a lay person with no knowledge of the evidence. Thus
Hoffman, in developing his opinions on alleged patent misuse, including market
power, considered different types of evidence. He testified:

> We've reviewed a lot of information in this case. It consists of well over 100
> licensees that Gemstar and its predecessor companies have entered into. It includes
> the information exchanged by the parties in discovery, business records and
> communications, et cetera. {* * *}We've also sought to get an understanding of the
> IPG market and the market in which it operates through obtaining public information
> that might be helpful in that regard. So it went beyond the record of documents
> exchanged in discovery, to inform ourselves about the market in general. Also,
> deposition testimony that's been taken in this case, and exhibits thereto, large
> number of depositions that have been helpful in that regard, to our understanding
> of the licensing practices and the intents of the parties, et cetera.

(Tr. at 4589-90). Additionally, Hoffman reviewed trial transcripts and attended
portions of the live testimony in this proceeding. (Hoffman, Tr. at 4590, 4593).
[FN30] Moreover, Hoffman is a principal at the consulting firm
PriceWaterhouseCoopers. Hoffman has a doctorate in business administration,
specializing in managerial economics and finance, from Harvard, and has been a
practicing economist for approximately 25 years. Hoffman regularly serves as a
consultant to businesses, trade associations and government agencies, analyzing
economic or financial data to determine the economic impact of business decisions.
He previously has served as an expert witness or consultant in addressing liability
and damages issues within the context of antitrust and unfair competition claims,
and damages issues in patent infringement and intellectual property matters.
Hoffman also has extensive experience as an expert analyzing antitrust issues
including collusive practices, price fixing, price discrimination and predatory
pricing. He has served as an expert witness or consultant in cases before the
International Trade Commission, has testified before the Federal Trade Commission,
the Joint Economic Committee of the United States Congress, and numerous state and
federal courts throughout the country. Hoffman has co-authored a book chapter
concerning economic and financial analysis in litigation and has given a
presentation relating to the valuation of intellectual property for the purposes of
analysis under the Hart-Scott Rodino Act. (See Tr. at 4579-83, RX-4336).

The administrative law judge also finds Sibley qualified to assess market power.
Sibley testified, in developing his opinions, that he considered different types of
evidence such as: depositions of various parties, documents obtained during the
discovery process, publicly available documents, the contracts themselves,
conversations with senior EchoStar executives and the relevant economics
literature. Sibley also reviewed trial transcripts and attended portions of the
live testimony in this proceeding. (Sibley, Tr. at 4767). Sibley holds a Ph.D. in
economics from Yale University, which he received in 1973. After receiving his
Ph.D., Sibley went to work for Bell Laboratories, ultimately becoming head of the
economic research group at Bell Communications Research, a research and development
entity created after the AT&T break-up. Sibley also has been employed as a senior
staff economist at the Council of Economic Advisors and as a consultant for the
Civil Aeronautics Board. In 1991, he became the John Michael Stuart Centennial
Professor of Economics at the University of Texas at Austin, where he is employed
today, and where he teaches graduate and undergraduate courses in economics.
Sibley's field of expertise is industrial organization. He has been engaged as an
expert economist by the Federal Trade Commission and the Department of Justice in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 83
USITC Inv. No. 337-TA-454

United States v. Microsoft Corp., and by numerous private parties such as SBC
Communications, Lucent Technologies and GTE Corporation. See Tr. at 4762-66, RX-
7449.

     In contrast, complainants' expert, Janusz A. Ordover, who has been a professor of
economics at New York University, in New York for the past 28 years (Tr. at 5719),
testified as to market power (Tr. at 5737-38):
     Q In reaching your conclusions, Professor Ordover, what role, if any, has the
analysis of market power played?
     A Frankly, I have not devoted substantial -- substantial amount of time,
almost any amount of time to the assessment of certain relevant markets in this
litigation, and the reason for that is quite simple, which is to say that I have
focused myself directly on the practices themselves and on their competitive
consequences without asking myself whether or not it is important to ensure that
the relevant markets are defined for that very purpose.
     Q If you were to assume, in fact, that GemStar has market power in a properly
defined relevant market, do your conclusions change?
     A No. As I testified a second ago, my focus is actually on the practices
themselves and their competitive effects, both in some of the alleged markets that
have been put forth by Sibley and Hoffman and in general.
     So my conclusions do not really turn on that, the finding, and therefore,
whether or not for example certain practices such as a tie is -- my conclusion, for
example, in regard to ties does not depend on the finding of market power, but
rather on the finding that these alleged licensing practices are not ties, and if
they were ties, they have not had any adverse competitive effect, at least in the
markets that seem to be alleged by Sibley and Hoffman. [Emphasis added]

1. Relevant Market(s) For Establishing Market Power

     To demonstrate market power a party must define the relevant market. See supra.
Therefore before the administrative law judge can evaluate the extent to which
GemStar exercises power in the alleged tying market, that market must be defined.

     IPG technology is something different from an IPG application. An IPG application
is an application that runs on a hardware device that allows a user to see and use
an IPG. IPG technology, however, involves patents. (Van Orden ITC dep. JX-54C at
16).

     Prior to the TV-Guide merger with Gemstar, SuperGuide licensed some of its IPG
technology to Gemstar. Also, between 1992 and 1996, StarSight licensed its IPG
technology to Scientific-Atlanta, Thomson, and Microsoft. In 1998 and 1999, Gemstar
International Group licensed some of its technology to Microsoft and AOL
respectively. Gemstar has admitted that the{* * *}agreements with Gemstar are
licenses covering Gemstar's IPG-related patents. (Boylan ITC dep. JX-8C at 679).
Additionally, Gemstar licenses its IPG technology to set-top box manufacturers
for{* * *}The license agreements Gemstar entered into with { * * *}and other
manufacturers of{* * *}boxes are IPG patent licenses. (Yuen ITC Dep. JX-61C at 195
- 196; RX-144C; RX-857C). Furthermore, Gemstar has licensed its IPG technology to{*
* *}to make and sell the IPG on { * * *}television sets. (RX-167C). Hoffman looked
at licenses that had been entered into by licensors and licensees for IPG
technology and found there was licensing activity throughout the 1990s between
owners of patents and those who sought to obtain licenses on the patents. (Tr. at
4602-05). By its own admission, Gemstar's domestic industry includes
"[c]omplainant's substantial investment in the exploitation of the patents,
including research and development and licensing of technology to others."
(Complaint at 28). Thus the administrative law judge finds that there is a relevant
market for IPG technology. The IPG technology market consist of IPG-related

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 84
USITC Inv. No. 337-TA-454

intellectual property that is licensed and its close substitutes.

   The boundaries of the IPG technology market is determined by the reasonable
interchangeability of use or the cross-elasticity of demand between the Gemstar IPG
technology and its substitutes. See Brown Shoe, 370 U.S. at 325. The administrative
law judge finds that there is a lack of other licensable technology, beyond
Gemstar's, that can potentially be used independently to produce an IPG. (Hoffman,
Tr. at 4606 - 4607). He further finds that "there is a lack of other licensable
technology out there that can potentially be used independently to produce an IPG."
(See Hoffman, Tr. at 4607, RX-4661C at 2). With reference to the relevant
geographic market for IPG technology he finds that it is the United States by
virtue of both the licensing practices, the coverage of MSOs that are licensees as
well as the coverage of the patents. (Hoffman, Tr. at 4593-4594; RX-4654 at 1) (See
RX-153; RX-1C).

   The administrative law judge also finds that the second relevant market, for the
administrative law judge's misuse inquiry, is the market for IPG products
(interactive electronic program guides, irrespective of the type of hardware those
programs reside on). [FN31] That finding is based on an analysis of the demand for
IPG products, the suppliers and buyers of IPG products, and the utility of IPG
products to consumers and cable multiple system operators (MSOs). [FN32] {* [FN33]
* *} {* [FN34] [FN35] [FN36] **}

   Complainants also argued that electronic program guides (EPGs) arepart of the
relevant product market. Although the term EPG has been used interchangeably with
IPG, EPG is also used to refer to a guide that is not interactive. This term
usually refers to a scrolling guide where the program information scrolls on the
television screen and the user cannot interact with it or control the display of
the program information. (Van Orden ITC dep. JX-54C at 72- 74). {* * *}

   The administrative law judge further finds that the current commercial suppliers
of IPG products include complainants, complainants' licensees (e.g., Microsoft,
AOL, and DirecTV set-top box manufacturers), respondents, Source Media, and
Worldgate. (Hoffman, Tr. at 4599; RX-4657C at 1). The buyers or licensees of IPG
products include cable MSOs such as Adelphia and Charter Communication, satellite
or direct broadcast satellite providers such as DirecTV, and EchoStar and consumer
electronics manufacturers (CEMs). (Hoffman, Tr. at 4599; RX-4658C at 1). Gemstar-TV
Guide sells or licenses products, software and data embodying IPG technology to
MSOs. (Orlick [FN37] ITC dep. JX-46C at 143 - 144). Gemstar-TV Guide also licenses
its Guide Plus and Guide Plus Gold IPGs to various television manufacturers for use
on their television sets, including Thompson (RCA, GE, ProScan), Phillips
(Phillips, Magnavox), Sony, Toshiba, Sharp, JVC, and Hitachi. (Macrae, Tr. at 510 -
511; RX-646C - GITC-GA0914666). S-A and Pioneer offer IPG products that reside in
cable set-top boxes. (Walker DOJ dep. JX-114C, at 27; {* * *}EchoStar provides IPGs
to its direct broadcast satellite subscribers. (Ergen, Tr. at 2989).

   {* [FN38] [FN39] * *}Hence the administrative law judge findsthe evidence
sufficient to demonstrate that the relevant geographic market for IPG products for
purposes of the patent misuse analysis is the United States.

2. Complainants' Share Of the Relevant Markets

   After defining the relevant markets, the administrative law judge must determine
whether complainants (Gemstar) enjoy a sufficient share of the relevant markets to
constitute market power. See supra. Congress chose not to define explicitly the
level of market power required before patent misuse could be found, but rather
allowed courts to determine this issue on a case by case basis. Market power is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 85
USITC Inv. No. 337-TA-454

defined generally as the ability of a market participant to raise prices or reduce output without affecting consumer demand.

a. Gemstar's Market Share In The Relevant IPG Technology Market

The administrative law judge finds that complainants have amassed a large portfolio of IPG-related technology through acquisition of competitors in both the IPG product and IPG technology markets, including TV Guide, Inc., VideoGuide, StarSight, SuperGuide, and patents from inventor Michael Levine. See, e.g., RX-1962 at 3; Gemstar International Group Ltd. Form 10-K405 at 14- 15; RX-1923C at 4. Gemstar stated that it has vehemently defended its intellectual property rights through the court system. To date, the majority of infringement cases Gemstar has brought to court have mostly been resolved through acquisition and/or merger with the offending party, as was the case with StarSight in 1997 and TV Guide, Inc. in 2000. But in addition to merging with a party accused of infringing its IPG patents, Gemstar has also settled with some parties. (RX-1914 at ES-0729-1004).

Before Gemstar acquired StarSight in 1997, the '121, '268, and '204 patents were owned by StarSight. The rights to the inventions disclosed in these patents were acquired when Gemstar acquired StarSight Telecast, Inc. in 1997. {* * *} {* * *}

Before Gemstar merged with TV Guide, Inc. in 2000, the '066 patent was owned by United Video Properties, a predecessor of TV Guide, Inc. Gemstar acquired the right to the invention disclosed in the '066 patent on January 22, 2001 pursuant to an assignment from United Video Properties, Inc. {* * *}

Complainants have market power in the IPG technology market, in part, because Gemstar has acquired large former independent technology licensors, including former competitors StarSight and TV Guide. {* * *} {* * *}

Gemstar has more than 170 issued U.S. patents in the general area of audio-visual technologies, and most of these patents are IPG-related patents. (Yuen, Tr. at 2548; RX-2327). In November of 2000, Gemstar's Boylan stated that Gemstar has over 110 IPG patents issued in the United States with over 2,100 claims; that it currently has 265 patents pending, which relate to IPGs with over 10,250 claims, many of which already have notices of allowance; and that Gemstar has 87 IPG patents issued internationally with over 1,700 claims and 621 IPG patents pending with 27,700 claims. (RX-647C at 13-14; RX-2101 at 1-4). In this proceeding, complainants listed some 112 separate IPG-related patents that they own. (RX-1136 at 1-4; RX-1965C at 1-4).

{* * *}The administrative law judge finds that Gemstar clearly has a strong and large portfolio of IPG-related patents, and as a result has a large share of the IPG technology market.

b. Gemstar's Market Share In The Relevant IPG Product Market

The administrative law judge finds that respondents have established that not only has the mergers affected the number of parties that own IPG technology in the technology market, but the mergers have also affected competition and availability of products in the IPG product market. Prior to Gemstar's acquisition, StarSight, TV Guide, and Prevue had their own IPG products. The record shows that as they were acquired by Gemstar, each of these IPGs disappeared from the market. In 1997, for example, S-A displayed five different IPGs from five different companies on its set-top boxes at a trade show, including IPGs from StarSight, Prevue Networks, TV Guide, Pioneer, and S-A's native guide. Gemstar has since acquired three of these companies reducing the available products. {* * *}In December of 1996, VideoGuide,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Inc. became a wholly-owned subsidiary of Gemstar. (RX-2345 at SAITC900005162). The VideoGuide service was terminated in September of 1997 because its signal provider went bankrupt. (Macrae, Tr. at 503).

{* [FN40] * *}

Gemstar's Allen testified that of the over 100 licenses Gemstar has entered into with MSOs since the Gemstar/TV Guide merger, he was not aware that Gemstar had licensed the StarSight product to any MSO. (Allen, Tr. at 5464). As of April of 2000, the StarSight IPG was being serviced as a legacy IPG. "There [were] no new deployments of StarSight IPGs happening in the marketplace." (Kiener DOJ dep. JX-108C at 134).

Until March 1, 1999, TV Guide, Inc. was known as United Video Satellite Group, Inc. (United Video). (RX-2480C at GITC-GA 0416467). United Video owned and operated an IPG named Prevue Interactive, a passive EPG named Prevue Channel and an online Guide named Prevue Online. Id. In 1999, United Video acquired all rights to the TV Guide name and trademarks. United Video changed its name to TV Guide, Inc., and its Prevue brand of products were re-branded and re-named TV Guide, Interactive, TV Guide Channel, and TV Guide Online. Id. Prior to the Gemstar-TV Guide merger, TV Guide/United Video Satellite Group competed with Gemstar and StarSight in the market for interactive services such as IPGs. (RX-1049 at 9).

On October 4, 1999, Gemstar announced that it had a definitive merger agreement with TV Guide pursuant to which, TV Guide would become a wholly-owned subsidiary of Gemstar. (RXC641 at GITC-GA0914554). Thomas testified that, { * * *} (JX-113C at 224). After the merger between TV Guide and Gemstar, the combined company continued selling the TV Guide Interactive IPG product under the same name. (Boylan, Tr. at 5215). {* * *}

As for MSOs and telephone companies, the administrative law judge finds that complainants' products account for a significant portion of the cable and telephone related IPG product market. {* * *}For example, Gemstar announced the long-term agreement it entered into with Charter Communications and stated that TV Guide Interactive "is the only IPG currently used by Charter Communications in 200 systems representing over 600,000 digital households." (RX-2394). {* * *} {* * *}

{* * *}In February of 2001, Gemstar's web-site stated that "TV Guide interactive services are carried in systems owned by all the top 10 MSO's which include Adelphia, AT&T, AOL Time Warner, Cablevision, Charter Communications, Comcast, Cox, Insight, and DBS leader DirecTV." (RX-2394 at 1).

{* [FN41] * *}

Regarding direct broadcast satellite providers, [FN42] the administrative law judge finds that Gemstar holds a significant share of the IPG market through its licensing agreements with direct broadcast satellite providers. Thus in an interview with the Wall Street Transcript before the merger between Gemstar and TV Guide, Gemstar's Yuen stated that in the satellite sector, Gemstar collects a license fee from all Direct TV decoders and, therefore, in approximately 70 percent of the direct broadcast satellite systems deployed (all but EchoStar) (RX-2285C at 2). {* * *} {* * *} {* * *} {* * *} {* * *}

Based on the foregoing, the administrative law judge finds that Gemstar enjoys a sufficient share of the relevant market.

c. Barriers To Entry

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 87
USITC Inv. No. 337-TA-454

To demonstrate market power, it is also necessary to demonstrate significant barriers to entry. See supra. The administrative law judge finds that Gemstar's own activities demonstrate its belief that it currently captures most of the market and that there are significant barriers to entry to both the IPG products market and the IPG technology market. {* * *}Gemstar's Yuen takes the position that the Gemstar-TV Guide patent portfolio creates "a virtually insurmountable barrier of entry." (RX-2173 at PN 043308). There is also an independent Financial Analyst Report prepared by SG Cowen which concludes that Gemstar's patents create a formidable barrier to entry. (CX-895 at 1).

As Sibley, one of respondents' economic experts, testified Gemstar's licensing practices erect entry barriers. (Sibley, Tr. at 4768). {* [FN43] [FN44] * *}

In addition to the exclusivity provisions, the administrative law judge finds that the{* * *}in complainants' licensing agreements [FN45] (see infra) create barriers to entry. These provisions not only remove the incentive to innovate from the most likely innovators in the IPG area, they also create a system where{* * *} (Hoffman, Tr. at 4586; RX-4650C at 1).

The administrative law judge further finds that{* * *}in the licenses contribute to the barrier. {* * *}Like exclusivity provisions and penetration level provisions, {* * *} {* * *} {* * *}

Based on the foregoing, the administrative law judge finds that the exclusivity provisions, the grantbacks of technology and covenants not to sue, and the switching costs imposed in Gemstar's licensing agreements create significant barriers to entry in the markets of IPG technology and products.

d. Gemstar's Pricing

Gemstar's pricing also demonstrates market power. (Hoffman, Tr. at 4624, RXC-4674). {* * *} {* [FN46] * *} {* * *}The administrative law judge finds that respondents after established that Gemstar is able to control the market for IPG products, thus enhancing the barriers to entry and finds further that the constraints imposed upon respondents, MSOs, and CEMs in Gemstar's IPG licensing agreements demonstrates Gemstar's ability to control the market for IPG technology.

e. Conclusion

Based on the findings that Gemstar enjoys a sufficient share of the relevant markets of IPG technology and IPG products, that there are significant barriers to entry into the relevant markets created by Gemstar and that Gemstar has the ability to control said relevant markets, the administrative law judge finds that respondents have established that Gemstar has market power, required for a finding of patent misuse based on inequitable tying arrangements.

B. Tying

A patent holder commits misuse by tying when it broadens the scope of its patents to nonpatented products, thereby "extend[ing] the monopoly of his patent to derive a benefit not attributable to use of the patent's teachings." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 136 (1969). A patentee may not condition the right to exploit his patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of his patent. Id. Although some parallels exist between patent misuse and the law of antitrust, the patentee's conduct need not rise to the level of an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                              Page 88
USITC Inv. No. 337-TA-454

antitrust violation to be patent misuse:

Thus, as the Supreme Court has said, the patentees' act may constitute patent misuse without rising to the level of an antitrust violation. Zenith Radio Corp. v. Hazeltine Research, Inc., [395 U.S. 100, 140 (1969)]. All that a successful defense of patent misuse means is that a court of equity will not lend its support to enforcement of a mis-user's patent. Senze-Gel, 803 F.2d at 668. As set forth by the Federal Circuit in Senza-Gel, 803 F.2d at 668-70 and by the Patent Act, the following elements, in addition to the patentholder having market power in the relevant market, establish patent misuse based on "tying":

(1) the patent or patented product and the allegedly tied product must be separate products;

(2) the tied item must be a "staple," i.e., capable of substantial non-infringing use; and

(3) there must be evidence of a forced or coerced tie.

In the patent misuse context, the test for separateness, the first element, is based on the nature of the claimed invention and whether the tied product is "a necessary concomitant of the invention or an entirely separate product." [FN47] Thus, the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into purchasing the tied product, which the buyer either did not want at all, or would have preferred to purchase elsewhere on different terms. Jefferson Parish Hosp. v. Hyde, 466 U.S. 2, 12 (1984). A tying arrangement, however, cannot exist unless two separate product markets have been linked. Id. at 21. Referring to the second element, a staple product is a product that is capable of substantial, non-infringing uses and which was not especially made or adapted for use in infringement of the patent. See Hodosh v. Block Drug Co., Inc., 833 F.2d 1575, 1578 (Fed. Cir. 1987).

The thrust of the inquiry for the third element, viz., a forced or coerced tie, is whether the buyer is left with a meaningful freedom of choice in the tied market. See Tic-X-Press, 815 F.2d at 1416. Proof of coercion can be derived from one or more of these factors: (1) an express condition in a contract, see, e.g., Bogosian v. Gulf Oil Corp., 561 F.2d 434, 450-51 (3d Cir. 1977); (2) proof that acceptance of the tied product was the only viable economic option available to the buyer, Marts v. Xerox, Inc., 77 F.3d 1109, 1113 (8th Cir. 1996); (3) facts and circumstances surrounding the negotiation process tending to show coercion, Tic-X-Press, 815 F.2d at 1416-17; (4) evidence that at least one buyer would have gone elsewhere for the tied product given the opportunity, id.; and (5) proof that "appreciable number of buyers have accepted burdensome terms, such as a tie-in, and there exists sufficient economic power in the tying product market," Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1217 (9th Cir. 1977). Coercion is implicit when one proves that sales of one product were conditioned upon purchase of another. Bogosian, 561 F.2d at 450. Moreover, even if the products are available separately, an illegal tying arrangement can exist if purchasing the items together is the "only viable economic option." Marts, 77 F.3d at 113. It is not necessary to show that a buyer objected to the tie to prove that the buyer had been coerced. Tic-X-Press, 815 F.2d at 1418.

1. Whether Gemstar Illegally Ties Its Licensing Of Its IPG Patents To The TV Guide Interactive IPG

{* * *} {* * *} {* * *} {* * *} {* [FN48] * *}{* * *}

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complainants argued that while Boylan testified that Gemstar's license agreements with MSOs include use rights to all of Gemstar's IPG-related patents, "that particular testimony is incorrect, perhaps because Mr. Boylan is not an attorney" (CRRFF 3696). Boylan, when he gave the testimony on August 23, 2001, was employed by Gemstar-TV Guide International as "co-president and COO, member of the office of chief executive," and has had that position since the completion of the merger on July 12, 2000. Before July 12, 2000, Boylan was president and member of the office of the chairman for TV Guide, Incorporated. [FN49] The administrative law judge rejects complainants' assertion that Boylan's testimony under oath is "incorrect."

{* [FN50] [FN51] * *} {* * *}

Respondents argued that Gemstar has misused the patents in issue by illegally tying its patent licenses to the TV Guide Interactive product. The administrative law judge finds that respondents have met their burden in establishing an illegal tying arrangement. Thus he finds that the record establishes that (1) Gemstar's IPG patents and Gemstar's TV Guide Interactive product are separate products; (2) the tied product (TV Guide Interactive product) is a staple article in commerce; and (3) the TV Guide Interactive product and Gemstar's IPG patents are actually tied. See Senza Gel, 803 F.2d at 664. Thus, IPG intellectual property rights can be marketed separately from IPG products. Prior to the Gemstar-TV Guide merger, and throughout the 1990s, there was licensing activity between various entities who had patents and those who sought licenses to those patents. {* * *} {* * *}Moreover, the TV Guide Interactive product is found to be a staple article in commerce. Even Gemstar has argued that its licenses with MSOs are product licenses.

{* [FN52] * *}It is uncontroverted that not all features or functions of the TV Guide Interactive product are covered by Gemstar-TV Guide's IPG-related patents, and that while there are patents that cover parts of the TV Guide Interactive product, part of the product is not covered by the patents. See unobjected RFF 3922 and unobjected RFF 3923. In response to Requests for Admission served by EchoStar, Gemstar admitted:
    {* * *}
(RX-1966C at ¶ 60). Gemstar provided identical responses regarding the '204 and '268 patents (RX-1966C ¶ ¶ 62, 63). [FN53] Moreover in this investigation, it has been found that complainants' IPG products do not meet the technical prong of the domestic industry requirement.

{* * *}
{* [FN54] * *} {* [FN55] * *}

Complainants argued that Ergen responded to a "hypothetical question ... whether the premise has been falsified by the record" and to the extent that respondents are offering Mr. Ergen's testimony as an expert opinion, "it should be stricken because Ergen was not identified as an expert pre-trial." (CORFF 3965). Complainants, as the hearing transcript shows, made no objection to the question. Moreover Ergen, as CEO of EchoStar, is in a position to give an opinion. See Rule 701 of Federal Rules of Evidence. In addition, the administrative law judge at the hearing had ample opportunity to observe the demeanor of Ergen. He found Ergen to be forthright and straightforward in his testimony.

{* * *} {* * *}
Hence, as respondents' expert Sibley testified, Gemstar's IPG-related patents, including the patents in issue, are separate from the TV Guide Interactive IPG product. However, the patent licenses include both patents and TV Guide Interactive product. Thus the tying product is Gemstar-TV Guide's IPG-related patents and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tied product is the TV-Guide Interactive product. (Sibley, Tr. at 4806-07, RX-4350C).

   Based on the foregoing the administrative law judge finds that the respondents have met their burden in establishing, with respect to Gemstar's patent licenses, that Gemstar's TV Guide Interactive product is a staple article in commerce and separate from Gemstar's licensed patents and that both are actually tied in Gemstar's licenses; and that Gemstar unlawfully ties its IPG technology, i.e., patents, to its TV Guide Interactive product, using its market power in the market for IPG technology to coerce licensees to purchase Gemstar's TV Guide Interactive IPG, the tie arising because the TV Guide Interactive IPG is not explicitly contemplated in the claims of the patents in issue.

2. Whether Gemstar Illegally Ties Its IPG Technology/Products To Unpatented And Separate Advertising

   Respondents and the staff asserted that Gemstar has misused the patents in suit by illegally tying IPG technology/products to unpatented and separate advertising. [FN57] To determine whether there is a tie in fact, the administrative law judge must determine: (1) advertising and Gemstar's IPG are separate products; (2) the tied product, in this case advertising, is a staple article in commerce; and (3) the advertising and IPG are actually tied. See Senza Gel, 803 F.2d at 665.

   The administrative law judge finds that advertising content is a separate product, as it is not covered by Gemstar's patents nor is it necessary to practice the patented invention. None of the patents-in-issue cover advertising content or advertising resale services. (RX-3001; RX-3002; RX-3003; RX-3004; RX-3005). {* * *}The advertising capability of the current IPG is built into the Gemstar IPG itself. (Yuen, Tr. at 2532; Allen dep., JX-2C at 414). The current version of Gemstar's consumer electronics IPG, TV Guide Interactive, and some versions of the StarSight IPG contain advertising. (Yuen, Tr. at 2582- 83). However, advertising resale brokerage is a separate product or service. Thus, respondents' expert Hoffman testified:
        Q Did you evaluate whether or not advertising resale is a separate product?
        A Yes, advertising resale is unrelated to the patents, Gemstar's patents, it's a service that existed before the advent of IPGs.
        Q And did you evaluate whether advertising resale is a staple product?
        A Yes, it is a staple product in that there are a number of providers of that service and resell advertising of MSOs, cable companies, broadcast affiliates, so that again, it's not related necessarily to IPGs or IPG patents.
(Tr. at 4679). {* * *} {* * *} {* * *} {* * *} {* * *} {* * *}

   Based on the foregoing, the administrative law judge finds that respondents have met their burden in establishing advertising is a separate product from the IPG patents and IPG technology that Gemstar licenses; that advertising is also a staple item in commerce, and it is not necessary to the IPG covered by the patents at issue in issue or any of Gemstar's IPG patents; that Gemstar unlawfully ties its IPG technology/products to unpatented and separate advertising content; and that Gemstar uses its market power in the market for IPG technology/products to coerce its licensees to carry advertising on the TV Guide Interactive IPG with Gemstar dictating the advertising content.

C. Grantback Provisions Of Gemstar's Licenses

   Respondents and the staff argued that complainants' (Gemstar's) grantback provisions in their licenses constitute patent misuse. Gemstar argued that the burden of establishing patent misuse has not been met.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                        Page 91
USITC Inv. No. 337-TA-454

A "grantback" is "an arrangement under which a licensee agrees to extend to the
licensor of intellectual property the right to use the licensee's improvements to
the licensed technology." Antitrust Guidelines § 5.6. Grantbacks "may adversely
affect competition ... if they substantially reduce the licensee's incentives to
engage in research and development and thereby limit rivalry in innovation
markets." Id. Such anticompetitive grantback provisions impermissibly broaden the
physical and temporal scope of the licensor's patent grant, and constitute patent
misuse under the "rule of reason." Virginia Panel, 133 F.3d at 868.

{* * *} {* * *} {* [FN58] * *} {* * *} {* [FN59] **}

Unlike the situation with tying arrangements, the administrative law judge must
evaluate Gemstar's grantback provisions under the "rule of reason." Transparent-
Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 648 (1947); see also
Virginia Panel, 133 F.3d at 869. According to the DOJ Guidelines, a court assessing
a grantback provision under the "rule of reason" should consider the "likely
effects [of a challenged practice] in light of the overall structure of the
licensing arrangement and conditions in the relevant markets." Antitrust Guidelines
§ 5.6. The test essentially weighs the effect of a grantback clause on innovation
and competition. The DOJ Guidelines further explains:
    An important factor in the Agencies' analysis of a grantback will be whether
the licensor has market power in a relevant technology or innovation market. If the
Agencies determine that a particular grantback provision is likely to reduce
significantly licensees' incentives to invest in improving the licensed technology,
the Agencies will consider the extent to which the grantback provision has
offsetting procompetitive effects, such as (1) promoting dissemination of
licensees' improvements to the licensed technology, (2) increasing the licensors'
incentives to disseminate the licensed technology, or (3) otherwise increasing
competition and output in a relevant technology or innovation market.... In
addition, the Agencies will consider the extent to which grantback provisions in
the relevant markets generally increase licensors' incentives to innovate in the
first place.
Antitrust Guidelines § 5.6. The Guidelines further warn that "[g]rantbacks may
adversely affect competition ... if they substantially reduce the licensee's
incentives to engage in research and development and thereby limit rivalry in
innovation markets." Id.

Applying the "rule of reason" analysis, the administrative law judge finds that
Gemstar's grantback provisions constitute patent misuse. { * * *} {* [FN60] * *}
{* * *} {* * *}The free rider problem arises when, for example, "Mr. Smith works
very hard and comes up with a great product or invention that has a benefit, and
Mr. Jones is somehow able to, without breaking the law necessarily, appropriate the
benefit without compensating Mr. Smith." (Sibley, Tr. at 4792). The "main concern"
with the free rider is "a real incentive problem because prospectively, Mr. Smith.
knows that what he does may be appropriated without compensation by Mr. Jones, may
well decide not to go to the effort of producing that product at all. And in-that
would result in sort of too little innovation." (Sibley, Tr. at 4792). {* * *}

The administrative law judge rejects complainants' arguments that there is no
evidence that any parties outside of Gemstar's covenant not to sue provisions or
Gemstar's grantback provision have reduced their efforts to participate in IPG
innovation because of the existence of said provisions. See, e.g., Sibley, Tr. at
4871-72, 4881-82. {* * *} {* * *} {* * *}

D. Blocking Effect

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2002 WL 31556392                                                    Page 92
USITC Inv. No. 337-TA-454

Gemstar has argued that most, if not all, of its conduct should be immune from any patent misuse because Gemstar has acquired a blocking position in the IPG technology market that blocks all competing IPGs. Thus complainants argued that exclusivity is anti-competitive only to the extent it precludes competition; that complainants have a series of overlapping blocking patents which effectively block commercially viable, unlicensed IPGs until 2012; and that exclusivity provisions in complainants' license agreements, therefore, have no effect on lawful competition through at least 2012. (CPre at 242). Morton Salt Co., 314 U.S. at 492, however does not authorize patent misuse where there are blocking patents. Thus the Court stated:

    The grant to the inventor of the special privilege of a patent monopoly carries out a public policy adopted by the Constitution and laws of the United States, "to promote the Progress of Science and useful Arts, by securing for limited Times to ... Inventors the exclusive Right ...' to their 'new and useful' inventions. United States Constitution, Art. I, § 8, cl. 8; 35 U.S.C. § 31. But the public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention. It equally forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant.

    It is a principle of general application that courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest. Virginian Ry. Co. v. Federation, 300 U.S. 515, 552; Central Kentucky Co. v. Railroad Commission, 290 U.S. 264, 270-73; Harrisonville v Dickey Clay Co., 289 U.S. 334, 337-38; Beasley v. Texas & Pacific Ry. Co., 191 U.S. 492, 497; Securities & Exchange Comm'n v. U.S. realty Co., 310 U.S. 434, 455; United States v. Morgan, 307 U.S. 183, 194.

Moreover the administrative law judge finds no substance in Gemstar's blocking argument. Gemstar bases its "blocking patent" argument on the opinion of Bernard Lechner. Lechner has spent a fair amount of his time consulting for ligation and has testified before as an expert in issues of patent infringement, claim construction and validity. (Tr. at 5560-61). In prior cases to prepare himself, he read the patent in issue many times, as well as the file history of the patent in issue, and read the relevant prior art concerning the patent in issue. (Tr. at 5661). In contrast, Lechner for his work in this case testified (Tr. at 5561-66):

    A In this case I was not asked to look at patents that were in litigation that were being -- wherein someone was accused of infringing a patent and wherein validity was a question and so forth. I was merely asked to look at this portfolio of patents, and based on my interpretation of the claims and the scope of the claims, to render an opinion as to whether I believed they constituted a blocking position, and that is what I did.

    Q Mr. Lechner, is it your understanding that you're testifying here in a case where someone is not accused of infringement?

    A I understand that there are infringement issues in this case, but I was not -- I am not involved, nor was I asked to be involved in that aspect of the case.

    Q Isn't it true, sir, that in connection with testifying here, you did not read -- in your work on this case, you did not read any of the file histories of any of the patents prior to your deposition being taken 30 days ago?

    A I'm not certain that is correct. I certainly have read the file histories of some of the patents. Whether I specifically referred to them in my work on this case, I don't recall that I did, but I can't be absolutely certain that I did not. I probably did not, as a matter of fact, but -

    Q I'm sorry, sir. Even though that wasn't a technical answer, I couldn't tell whether you said yes or no.

    A What I said was that I can't recall specifically that I did or did not look at any of the file histories during the course of my work on this case. I have certainly looked at a number of the file histories over the last couple of years,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.