# EXHIBIT F



## U.S. Securities and Exchange Commission

### Gemstar-TV Guide International Agrees to Settle SEC Enforcement Action Charging the Company with Overstating Its Revenues

**FOR IMMEDIATE RELEASE**
**2004-86**

*Washington, D.C., June 23, 2004* — The Securities and Exchange Commission today filed a complaint in federal court in Los Angeles charging Gemstar-TV Guide International, Inc. with improperly reporting its highly touted interactive program guide licensing and advertising revenues in its financial statements from 1999 through 2002.

Gemstar agreed to settle the case by, among other things, paying a $10 million civil penalty. That money will be distributed to harmed shareholders pursuant to Section 308 of the Sarbanes-Oxley Act of 2002. In assessing the penalty amount, the Commission considered the scope and severity of Gemstar's misconduct, Gemstar's initial failure to cooperate in the Commission's investigation or undertake remedial actions, and Gemstar's significant cooperation and remediation following a change in senior management and restructuring of its corporate governance.

Gemstar is a Los Angeles-based media and technology company that is publicly traded on the Nasdaq Stock Market. Among its business activities, Gemstar publishes *TV Guide* magazine and develops, licenses, and markets an interactive program guide (IPG), which is a technology that enables consumers to navigate through and select television programs. During the relevant period, Gemstar generated revenues from the IPG by licensing the technology to third parties and selling advertising space on the IPG.

"The magnitude of the improper conduct at Gemstar, together with its initial lack of effective cooperation or remedial efforts, warrant the imposition of a significant monetary penalty," said Randall R. Lee, Director of the Commission's Pacific Regional Office. "At the same time, we have credited the company for its extensive cooperation once new management took control," Lee added. "We are continuing to pursue our case against former Gemstar senior management."

The Commission's complaint alleges that Gemstar materially overstated its revenues by nearly $250 million through the following means.

First, Gemstar recorded revenue under expired, disputed, or non-existent agreements, and improperly reported this as IPG licensing and advertising revenue.

Second, Gemstar recorded and reported revenue from a long-term agreement on an accelerated basis in contravention of GAAP and Gemstar's

own stated and disclosed revenue recognition policy, which required the recording and reporting of such revenue ratably over the terms of the agreement.

Third, Gemstar inflated its IPG advertising revenue by improperly recording and reporting revenue amounts from multiple-element transactions. Gemstar's recording and reporting of this revenue was improper under GAAP because Gemstar could not determine the IPG advertising's fair value. Additionally, some of those improperly reported transactions included so-called "round-trip" transactions whereby Gemstar paid money to a third party that then used those funds to buy advertising from Gemstar. Gemstar also failed to disclose that it had structured certain settlements for the purpose of creating "cookie jars" of IPG advertising revenue.

Fourth, Gemstar improperly recorded and reported IPG advertising revenue from non-monetary and barter transactions. Gemstar's recording and reporting of this revenue was not in accordance with GAAP because it did not meet the revenue recognition requirements for such transactions and because Gemstar could not properly establish the IPG advertising's fair value.

Finally, Gemstar improperly reported certain revenues as IPG advertising revenues when in fact those revenues were derived from the sale of print advertising. Gemstar shifted revenues by invoicing advertisers for both IPG and print advertising, but recording the revenue only as IPG revenue.

The misstatements of revenue were reported in Forms 10-K, 10-Q, and 8-K filed with the Commission. These public statements misrepresented Gemstar's true financial performance and failed to disclose material information about that performance. The complaint further alleges that when Gemstar disclosed in its 2001 Form 10-K filed on April 1, 2002, that revenue from two transactions had been recorded under an expired licensing agreement and in a non-monetary transaction, Gemstar's stock price declined by approximately 37% the next day.

As part of its settlement, Gemstar, without admitting or denying the allegations in the Commission's complaint, agreed to a permanent injunction against future violations of the periodic reporting, recordkeeping, and internal controls provisions of the federal securities laws.

In determining to accept Gemstar's settlement offer, the Commission considered the following factors, among others, relating to the company's cooperation and remedial efforts:

- In April 2002, immediately after Gemstar filed its 2001 Form 10-K, the Commission contacted Gemstar and commenced an investigation. For nearly the next eight months, while Gemstar's former CEO and other senior officers remained in place, the company did not conduct a thorough or comprehensive internal investigation and did not take other appropriate remedial action, even when presented by the Commission with specific evidence of fraudulent conduct.

- As a result of its inadequate investigation, in August 2002 Gemstar issued a restatement reversing only approximately $20 million in

revenue. Gemstar consequently continued to report overstated revenues to the investing public even after the Commission's investigation began.

- In November 2002, in connection with the restructuring of its corporate governance, Gemstar replaced its CEO, CFO, and general counsel and adopted extensive new internal controls. The company also retained a new independent auditor and a new independent outside counsel.

- Following the change in senior management, Gemstar (i) initiated a comprehensive investigation and re-audit of its financial statements; (ii) restated its financials three more times, reversing revenues by a total of $377 million; (iii) provided extensive and valuable assistance to the Commission in its investigation; and (iv) voluntarily agreed not to make certain extraordinary severance payments to its former CEO and CFO for over six months, among other things.

For further information contact:

- Randall R. Lee, Regional Director, Pacific Regional Office
  (323) 965-3807
- Sandra J. Harris, Associate Regional Director, Pacific Regional Office
  (323) 965-3962
- Kelly Bowers, Assistant Regional Director, Pacific Regional Office
  (323) 965-3924

*http://www.sec.gov/news/press/2004-86.htm*

# EXHIBIT G

# EXHIBIT G
# REDACTED

# EXHIBIT H



FISH & NEAVE IP GROUP

ROPES & GRAY LLF

1251 AVENUE OF THE AMERICAS    NEW YORK, NY 10020-1104    212-596-9000    F 212-596-9090

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

Christopher J. Harnett
212-596-9125
212-596-9090 fax
Christopher.Harnett@ropesgray.com

July 17, 2006

**BY FACSIMILE**

Meredith Zinanni, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601

*TV Guide Online v. Tribune Media Services*
C.A. No. 05-CV-725-KAJ

Dear Meredith:



   I write in connection with your July 12, 2006 letter to me and further to the June 21, 2006 meet and confer between the parties.

   We are troubled by TMS's continuing delay in producing documents (and/or TMS's refusal to produce documents) relating to fundamental technical details of TMS's accused website. On May 11, 2006, TV Guide noticed for June 20 a Rule 30(b)(6) deposition of TMS. The noticed topics for that deposition included the structure and operation of TMS's accused website. Because TMS has produced few, if any, technical documents, it was necessary for TV Guide to postpone that Rule 30(b)(6) deposition.

   During the June 21 meet and confer, TMS agreed to accelerate its production of the requested technical documents.  Indeed, TMS stated that it expected to produce such documents later in that week.  We, however, did not receive any such documents.  In your July 12 letter, you stated that TMS "expects to produce additional" technical documents later in that week.  Again, however, we did not receive any such documents from TMS at that time.  Instead, we received just this morning about 4,500 pages of documents -- many of which concern TV Guide.  This appears to be a far cry from a complete production of TMS's technical documents.

   On July 7, 2006, I wrote to your colleague, Tina Hernandez, in connection with TMS's agreement to produce technical documents relating to the topics identified in TV Guide's May 17, 2006 Rule 30(b)(6) notice.  Specifically, I stated "[W]e would greatly appreciate it if you could: (1) let us know when TMS will be completing its document production with respect to the topics identified in TV Guide's May 17, 2006 Rule 30(b)(6) notice; and (2) propose some

ROPES & GRAY LLP

Meredith Zinanni, Esq.                        - 2 -                        July 17, 2006

potential dates to begin the deposition." We are troubled that your July 12 letter *does not even mention that long-outstanding Rule 30(b)(6) notice*.

Your position on the computer code issue is also troubling. TV Guide's March 2, 2006 requests for production of documents -- including requests nos. 4 and 5 -- plainly call for computer code relating to the operation of the Zap2it.com website. During the June 21, 2006 meet and confer, I made crystal clear that TV Guide was seeking production of that computer code. Both you and Ms. Hernandez said that you understood. Now, however, TMS argues for the first time that the Protective Order does not provide adequate protection for the production of computer code. TMS also argues that TV Guide's request for production of computer code needs to be "narrowed" to code relating to "the television listings search feature." Neither of TMS's arguments makes any sense.

The Protective Order provides that documents designated as confidential *must not be kept in any offices owned or used by a party*. As such, there is no possibility of unauthorized disclosure of the computer code. In any event, to avoid unnecessary delay and disagreement, TV Guide confirms its request that TMS produce the computer code as it relates to the television listings search, retrieval and display features of the Zap2it.com website. TV Guide will agree that, in the first instance, only TV Guide's outside counsel and outside technical experts who are qualified under the Protective Order to see TMS's confidential information will have access to that computer code.

In view of the foregoing, we request prompt confirmation of: (1) a date certain (which is no later than the end of this week), when TMS will be producing its remaining technical documents relating to the outstanding Rule 30(b)(6) deposition notice concerning the accused website; (2) the availability of TMS's Rule 30(b)(6) witness for commencement of the Rule 30(b)(6) deposition on August 9, 10 or 11; and (3) TMS's agreement to produce the requested computer code no later than July 28. If TMS will not provide such confirmation, we request a meet and confer either tomorrow (July 18) at 2:00 p.m. Eastern time or Wednesday, July 19, at 11:00 a.m. Eastern time so that we can try to resolve the issues without Court intervention.

On the subject of TMS's document requests, we explained to you during the June 21, 2006 meet and confer (and in TMS's April 10, 2006 responses and objections) that many of TMS's requests that are supposedly directed to TMS's improperly-pled "patent misuse" defense are hopelessly overbroad, burdensome and prejudicial to TV Guide. These include request nos. 22, 29-31, 74-76, 81-84, 86-88 and 92.

In your July 12, 2006 letter, you state that TMS is "unable" to narrow requests nos. 22, 29, 81 and 86-88 "any further." In that letter, you purport to have "narrowed" requests nos. 30, 31, 74, 75, 76, 82, 83, 84 and 92. The TMS document requests -- those that are "narrowed" and those that are reasserted in original form -- remain overly broad, burdensome





ROPES & GRAY LLP

Meredith Zinanni, Esq.                    - 3 -                    July 17, 2006

and prejudicial.  This is particularly so in view of TMS's assertion that, even with respect to the supposedly "narrowed" requests, TMS "reserve[s] the right to compel responses to the requests as propounded."  This simply confirms that TMS is on a fishing expedition in the hope of finding some evidence to support its legally unsound assertions of "patent misuse in the air."

In that regard, we were troubled to learn about the subpoenas that TMS sent last week to eight third-party law firms that previously represented Gemstar.  Those third-party subpoenas are simply an attempt by TMS to circumvent TV Guide's properly-interposed objections.  Please confirm immediately that TMS will withdraw those subpoenas.  If we do not receive such confirmation, we will seek appropriate relief in the Courts from which those subpoenas issued, and we will bring the issue to Judge Jordan's attention.

On July 5, 2006, TMS also served document and deposition subpoenas on Michael Levine and on the Gifford Krass law firm.  TMS will be receiving objections to those subpoenas later this week.  We understand that Mr. Levine is presently out of the country.  When Mr. Levine returns, we will contact you to discuss logistics (including scheduling and location) for his deposition and the deposition of the Gifford Krass firm.

Finally, certain aspects of your July 12, 2006 letter purporting to memorialize the substance of our meet and confer are not entirely accurate.  As I told you and Ms. Hernandez (and several of your other colleagues), we do not want discovery in this case to devolve into a letter writing campaign where the parties go back and forth correcting inaccurately recited "agreements."  I will discuss our apparent misunderstandings next time we speak.

Very truly yours,

Christopher J. Harnett

CJH:eb

cc:    Frederick L. Cottrell, III, Esq.
       Richard K. Herrmann, Esq.
       Tina Rae Hernandez, Esq.
       Michael A. Parks, Esq.
       Corey C. Watson, Esq.



# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Meredith Zinanni
To Call Writer Directly:
(312) 861-2010
mzinanni@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax (312) 660-8036

July 19, 2006

**Via Facsimile**

Christopher J. Harnett
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Dear Chris:

I write in response to your letter of July 17, 2006.

TV Guide continues to question TMS's production of "technical documents" related to the zap2it.com website. But TMS cannot produce documents that do not exist. TMS has conducted a thorough search of its files and is performing a final "belt and suspenders" check this week to confirm all responsive technical documents have been produced. Should any additional technical documents be located as a result of this check, TMS will produce such documents by July 31, 2006. TMS is currently working to complete its electronic discovery, and will prioritize this discovery so that technical documents regarding www.zap2it.com — should any exist — are produced first.

TMS will make its Rule 30(b)(6) designated witness available for deposition at our offices in Chicago on August 9, 2006.

TMS does not agree that the source code for www.zap2it.com is required for TV Guide to complete its infringement analysis. As TV Guide itself stated at the technology tutorial, this is very simple, easy to understand technology. However, TMS will agree to produce the source code for www.zap2it.com, subject to the following conditions:

- Source code will be made available in paper form only, and will be marked as CONFIDENTIAL - SOURCE CODE, TV Guide Online v. TMS, C.A. No. 05-725 (KAJ). All provisions of the protective order as relate to the treatment of confidential information will apply, except that under no circumstances will the designated in-house attorneys of the parties be given access to the source code. The source code will be seen only by outside counsel and outside technical experts who have been qualified to view confidential information under the protective order.

London    Los Angeles    Munich    New York    San Francisco    Washington, D.C.



Christopher J. Harnett
July 19, 2006
Page 2

- TV Guide will produce the source code for all portions of the www.tvguide.com website that TV Guide claims practice the '078 patent. If the zap2it.com source code is required to determine infringement, the tvguide.com source code is required to determine if and how TV Guide is practicing the patent.

- TMS will produce source code only for the TV listings lookup feature of the www.zap2it.com website. TV Guide has stated in its response to Interrogatory No. 1 that "infringement is demonstrated by comparing the plain and ordinary English language meaning of the claims to the features of Defendant's accused service." Under the plain and ordinary meaning of the claims of the '078 patent, the patent covers television programming information only. If TV Guide contends that the movie showtime listings fall within the scope of the '078 patent claims, as suggested by Exhibit A to TV Guide's Responses to TMS's Interrogatories, please set forth the basis for that contention, and TMS will consider producing the source code relating to the movie showtime lookup feature of www.zap2it.com.

Please let us know if these terms are acceptable to TV Guide, and we will prepare the source code for production. If not, we propose the parties schedule a meet and confer for Thursday, July 20, 2006, any time between 2 and 5 PM Central time.

TV Guide raised for the first time on our meet and confer yesterday its challenge to TMS's objection to TV Guide's Interrogatory No. 4 regarding the proper time period for which TMS provide revenue information. TMS maintains that its objection is proper. Nonetheless, TMS will provide a revenue summary for the period 1999-2005 for www.zap2it.com, which may be found at production number TMS 0021252.

Finally, Mr. Levine's absence from the country should not affect the availability of the Gifford Krass firm to complete its document production and make itself available for the requested deposition. Please provide the date by which the Gifford Krass firm will complete its production and the dates on which its designee would be available for deposition. Please also let us know when Mr. Levine plans to return to the U.S. so we can lock in his deposition date now.

Sincerely,

Meredith Zinanni

cc:     Frederick L Cottrell, III
        Richard K. Hermann





# ROPES & GRAY

### FISH & NEAVE IP GROUP

ROPES & GRAY LLP

1251 AVENUE OF THE AMERICAS    NEW YORK, NY 10020-1104    212-596-9000    F 212-596-9090

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON. DC    www.ropesgray.com

Stuart W. Yothers
212-596-9176
646-728-2957 fax
Stuart.Yothers@ropesgray.com

August 10, 2006

**VIA FACSIMILE**

Meredith Zinanni, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

*TV Guide Online v. Tribune Media Services*
C.A. No. 05-CV-725-KAJ

Dear Meredith:

On July 31, 2006, TV Guide Online produced 41,822 pages of .tif images to TMS, completing the majority of its production in this case. We will be producing a final set of electronic documents shortly.

As we are having a teleconference tomorrow to discuss the scheduling of depositions, please let us know the status or TMS's document production. On July 28, 2006, we agreed to produce electronic documents as .tifs. To date, we have not received any .tif electronic image files from TMS.

Sincerely yours,

Stuart W. Yothers

SWY:sj

cc:    Frederick L. Cottrell, III, Esq.
       Richard K. Herrmann, Esq.
       Michael A. Parks, Esq.
       Tina Rae Hernandez, Esq.

# EXHIBIT I

# EXHIBIT I
# REDACTED

# EXHIBIT J

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

312 861-2000

www.kirkland.com

Meredith Zinanni
To Call Writer Directly:
(312) 861-2010
mzinanni@kirkland.com

Facsimile:
312 861-2200
Dir. Fax: (312) 660-8036

August 10, 2006

**Via Facsimile**
646-728-2957

Stuart W. Yothers
Fish & Neave IP Group of Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020

> *Re:*    *TV Guide Online v. Tribune Media Services*

Dear Stuart:

I write to confirm TMS's final proposal regarding the production of source code. Please note that, as previously indicated, the source code related to the television listings feature of www.zap2it.com cannot be compiled and run without being connected to a web server and a database of television listings data. TMS will agree to provide the source code for www.zap2it.com under the following conditions:

- TMS will load a single copy of the complete source code for www.zap2it.com onto a laptop computer. The laptop computer will be maintained at the offices of Kirkland & Ellis in New York. In the event of depositions or court proceedings for which the source code is required, counsel for TV Guide shall notify Kirkland & Ellis of the need to have the source code available, and arrangements will be made to transport the laptop computer to the location where the deposition or court proceeding is to occur.

- No copies of the source code may be made, except to the extent copies of the source code are made on the laptop computer during the examination of the code, nor may the source code be connected or downloaded to a portable medium of any kind.

- At no time shall the laptop computer on which the source code is loaded be connected to the internet, a local area network, or any other computer or network.

- No in-house personnel, including the in-house counsel designated to receive confidential information under the Protective Order, shall have access to the source code. Only outside counsel and experts designated to receive confidential information under the Protective Order shall have access to the source code.

London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

Stuart W. Yothers
August 10, 2006
Page 2

- All other provisions of the Protective Order regarding the treatment of confidential information shall be applicable.

TMS will agree to the same restrictions for the production of the source code for www.tvguide.com, but requests that TV Guide make the source code available for inspection at a Chicago location, if possible.

The source code for www.zap2it.com is highly confidential, proprietary and sensitive information, and TMS must take the necessary measures to protect such material — particularly in light of TV Guide's request for the complete code for the zap2it.com website, rather than just those portions of the code related to the functionality at issue in this case. TMS will have the source code available for inspection in Kirkland & Ellis' New York office within 5 business days of TV Guide's acceptance of this proposal.

Sincerely,

Meredith Zinanni

cc:     Frederick I. Cottrell, III, Esq.
        Richard K. Hermann, Esq.

# ROPES & GRAY

## FISH & NEAVE IP GROUP

ROPES & GRAY LLP
1251 AVENUE OF THE AMERICAS     NEW YORK, NY 10020-1104     212-596-9000     F 212 596-9090
BOSTON     NEW YORK     PALO ALTO     SAN FRANCISCO     WASHINGTON, DC     www.ropesgray.com

Stuart W. Yothers
212-596-9176
646-728-2957 fax
Stuart.Yothers@ropesgray.com

August 11, 2006

**VIA FACSIMILE**

Meredith Zinanni, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601

*TV Guide Online v. Tribune Media Services*
C.A. No. 05-CV-725-KAJ

Dear Meredith:

I write in response to your letters of August 10, 2006 and August 8, 2006 and in connection with our discussion of August 9, 2006.  Your proposal to maintain source code at the office of the producing party's counsel is unacceptable.  As I told you in our conversation on Wednesday, August 2, 2006, TV Guide Online believes that the source code's confidentiality and security would be more than adequately maintained in the expert's possession.  Moreover, I explained that it was unreasonable for our expert to fly to your offices – whether in Chicago or New York – whenever he needs to work with the source code.

TV Guide Online has retained a reputable expert -- Mr. Cole -- who has years of experience handling parties' sensitive and highly confidential source code.  Mr. Cole has undertaken to be bound by the terms of the protective order entered by Judge Jordan and has subjected himself to the jurisdiction of the Court.  Providing TMS's source code to TV Guide Online's expert for study in his own office pursuant to the other terms you have proposed (e.g., not making copies of the source code, not connecting the device storing the source code to the Internet or any other network, etc.) will provide more than adequate security for TMS's source code.  Accordingly, Mr. Parks' suggestion Wednesday that this arrangement would amount to TMS's source code "floating out there" is simply incorrect.

TV Guide Online is seeking the source code for zap2it.com in the most complete electronic form possible, and TMS's repeated presentation of unacceptable terms can be read as nothing more than evidence of TMS's unwillingness to produce the source code and cooperate in the discovery process.  We have been around and around on the source code issue for several

ROPES & GRAY LLP

Meredith Zinanni, Esq.                    - 2 -                    August 11, 2006

weeks now. Unfortunately, every time we seem to come close to an agreement, TMS presents new obstacles to the production of the source code -- information that TMS's own 30(b)(6) witness confirmed earlier this week was highly relevant. We are obviously at an impasse and we intend to raise the issue with the Court in connection with the August 21 telephone conference.

Sincerely yours,

Stuart W. Yothers

SWY:sj

cc:    Frederick L. Cottrell, III, Esq.
       Richard K. Herrmann, Esq.
       Michael A. Parks, Esq.
       Tina Rae Hernandez, Esq.

# EXHIBIT K

# EXHIBIT K
# REDACTED

# EXHIBIT L

# EXHIBIT L
# REDACTED

# EXHIBIT M



# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Meredith Zinanni
To Call Writer Directly:
(312) 861-2010
mzinanni@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax: (312) 660-8036

July 12, 2006

**Via Facsimile**

Christopher J. Harnett
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Dear Chris:

I write as a follow up to our meet and confer of June 21, 2006 and your letter of July 7, 2006 to Tina Hernandez.

I.     **Issues Raised In Our June 9, 2006 Letter Relating to TV Guide's Responses to TMS's Document Requests.**

During our June 21, 2006 meet and confer, you confirmed that TV Guide is searching for and producing responsive documents in its possession, custody, or control, including documents in the possession, custody, or control of its parent companies, sister companies, corporate affiliates, or other related companies, including but not limited to Gemstar-TV Guide International, Inc. You also confirmed that, with the exception of its responses to Requests for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92, TV Guide is not limiting its collection or production of documents on the basis of any general or specific objection.

We expressed concern that we had not received any licensing agreements, negotiation documents, or other documents relating to our patent misuse claim. Although the parties stated that they would aim to complete their document production by July 31, 2006 for document requests served as of June 21, we had understood based on our June 21 conversation that TV Guide would produce documents to us on a rolling basis. Although TMS's document requests originally were served on March 2, 2006, we still have not received production of any documents relating to our patent misuse claims. You explained that TV Guide cannot produce a number of documents until you receive approval from third parties, but we remain concerned with the delay. Please let us know the status of your third-party-approval requests.

The parties agreed to produce documents created through January 1, 2006. For documents created after that time period, the requesting party may identify certain categories of



London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

Christopher J. Harnett
July 12, 2006
Page 2

documents for which it seeks documents created after January 1, 2006, and the parties will work at that time to resolve any disputes.

Several of TMS's document requests refer to the term "interactive program guide technology." As a result, in our June 9 letter, we made an effort to clarify that phrase in response to TV Guide's objections. Although you did not agree that the proposed definition of "interactive program guide technology" could be used universally, we understand that TV Guide is not limiting its document collection or production based on its objection to this phrase. You stated that TV Guide was not collecting documents relating to set-top box technology, although we understand that TV Guide is not limiting its collection or production of documents relating to interactive program guide technology or products simply because they are used on set-top boxes.

With respect to Request for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92, we continue to believe that these requests are proper as propounded and reserve the right to move to compel responses to the requests as propounded. In an effort to compromise and to avoid burdening the Court with a motion to compel, however, we are willing to receive documents responsive to Requests for Production Nos. 30-31, 74-76, 82-84, and 92 as narrowed below. "TV Guide" in the below requests has the same meaning as given in Definition A of TMS's First Set of Requests for the Production Documents and Things

**Request for Production No. 30:** All hearing and deposition transcripts and exhibits identified therein; all expert reports and exhibits and evidence referenced therein; all dispositive motions, post-hearing briefs, and related filings and exhibits and evidence referenced therein; the Complainants' and Respondents' proposed findings of fact and/or conclusions of law and the exhibits and evidence referenced therein; and the Final Initial Determination, findings of fact, and conclusions of law of Judge Luckern and the exhibits and evidence referenced therein relating to patent misuse and/or antitrust defenses or claims from one or more of the following proceedings: (1) In re Gemstar Development Corporation Patent Litigation, MDL-1274-WBH (N.D. Ga.), and (2) In the Matter of Certain Set-Top Boxes and Components Thereof, ITC Investigation No. 337-TA-454.

**Request for Production No. 31:** All documents produced or generated in connection with the Department of Justice investigation into the merger of Gemstar and TV Guide relating to actual or potential suppliers, purchasers, licensees, licensors, market conditions, competition, market share, market power, or the actual or potential effect of the proposed merger on any market for interactive program guides or interactive program guide technology.

**Request for Production No. 74:** All TV Guide licenses for interactive program guide technology that contain a grantback clause, non-assertion clause, or covenant not to sue.



Christopher J. Harnett
July 12, 2006
Page 3

**Request for Production No. 75:** All documents constituting, referring to, or relating to communications between TV Guide and any licensee or prospective licensee to negotiate or otherwise discuss the terms of any TV Guide license or other agreement relating to interactive program guide technology that contains a grantback clause, non-assertion clause, or covenant not to sue.

**Request for Production No. 76:** All documents constituting, referring to, or relating to communications among TV Guide's officers, directors, employees, contractors, or agents regarding the terms of any TV Guide license or other agreement relating to interactive program guide technology that contains a grantback clause, non-assertion clause, or covenant not to sue.

**Request for Production No. 82:** All communications, testimony, and correspondence between TV Guide and the Department of Justice, or any other government agency, relating to actual or potential suppliers, purchasers, licensees, licensors, market conditions, competition, market share, market power, or actual or potential anticompetitive behavior or antitrust violations relating to interactive program guide technology or the licensing of interactive program guide technology.

**Request for Production No. 83:** All communications, testimony, and correspondence between TV Guide and the Department of Justice, or any other government agency, relating to any future actions TV Guide would or would not take with respect to acquiring, licensing, or enforcing rights to interactive program guide technology.

**Request for Production No. 84:** All communications, testimony, and correspondence between TV Guide and the Department of Justice, or any other government agency, relating to the terms of TV Guide's actual or proposed licenses for interactive program guide technology.

**Request for Production No. 92:** All transcripts or minutes of any conference calls, meetings, discussions, or communications TV Guide has had with any third party analysts, investors, shareholders, or media personnel relating to actual or potential suppliers, purchasers, licensees, licensors, market conditions, competition, market share, market power, TV Guide's position within a market, potential or actual threats of litigation, or potential or actual anticompetitive behavior or antitrust violations relating to interactive program guide technology or the licensing of interactive program guide technology.

Please let us know by the close of business on Friday, July 14 whether Plaintiffs will produce documents responsive to these requests as revised. We are unable to narrow Request Nos. 22, 29, 81, and 86-88 any further.

Christopher J. Harnett
July 12, 2006
Page 4


**II.    Issues Raised In Our June 9, 2006 Letter Relating to TV Guide's Responses to TMS's Interrogatories.**

During our June 21 conference, we discussed issues raised in our June 9 letter regarding TV Guide's responses to TMS's interrogatories. With the exception of Interrogatory No. 19 (discussed below), you represented that TV Guide was not standing on its general or specific objections as a basis for not fully responding to TMS's interrogatories.

TV Guide agreed to supplement its interrogatory responses by July 14, 2006. TMS expects TV Guide's supplementation to include a supplemented response to TMS's Interrogatory No. 1 to respond to the issues raised in the June 13, 2006 letter from Michael Parks to you. The issues raised in Michael's letter should have been addressed by TV Guide *before* it sued TMS. Thus, TV Guide has no excuse for not providing the information now.

Regarding Interrogatory No. 19, you stated that TV Guide would limit its response to license agreements where the "field of use" included the '078 patent. Because that restriction was not clear to us, we asked for further clarification, such as whether we can expect a supplemental response to include, by way of example, TV Guide's licensing agreements with MSOs. You stated that we should wait for the supplemental response but that we are likely to receive what we were expecting in response to the interrogatory.

We will hold off on pursuing these issues further until we have a chance to review TV Guides' supplementation of its interrogatory responses on July 14.

**III.    TV Guide's Concerns Regarding Tribune's Discovery Responses.**

During our June 21 conference, we also discussed several issues that you raised regarding TMS's discovery responses, which I summarize here.

You asked whether TMS would produce documents responsive to its requests even if the documents were in the possession of Tribune Company or other TMS affiliates. This confirms that TMS has produced responsive documents from Tribune Company and other TMS affiliates, subject to our specific objections, unless those objections are otherwise resolved herein.

With regard to Request No. 24, TMS does not have a formal, written patent licensing policy.

TMS agrees to produce documents in response to Request No. 35 that reference all entities subsumed within TMS's definition of TV Guide. TMS has not withheld responsive documents because they refer to Gemstar and not one of the TV Guide Online entities.



Christopher J. Harnett
July 12, 2006
Page 5

At your request, we have reviewed TMS's responses to Request Nos. 30 and 53. We continue to believe that the objections are well-founded and will not withdraw them. The amount of money flowing, directly or indirectly, between TMS and its parents, subsidiaries, and/or affiliates is irrelevant to the issues in this case, as are the SEC filings of Tribune Company. TV Guide has not provided any reasonable argument as to how this information is relevant to the issues in this case, in which the single accused product is a product of TMS, not Tribune Company.

After further review of TV Guide's document requests, TMS does not agree that TV Guide's Request Nos. 4 and/or 5 seek source code. Even if Request Nos. 4 and 5 are construed to seek source code, the requests are overbroad in that they seek source code related to features of www.zap2it.com other than the television listings search feature. Furthermore, TV Guide did not raise this issue during the negotiation of the protective order, at which time the parties could have put in place specific provisions to deal with the production of source code. The current protective order does not provide sufficient protection for this highly sensitive information. Before TMS will agree to produce source code, it requires that TV Guide issue a properly narrowed request for the source code and propose a method for its production and safeguarding.

To the extent technical documents exist regarding the overall operation of www.zap2it.com, TMS has not withheld their production or redacted such documents such that only information regarding the television listings search feature has been produced, although TMS reiterates its position that the operation of other portions of the zap2it.com website are not relevant to this case. TMS expects to produce additional documents this week, including some documents regarding the operation of the zap2it.com website, and, as the parties agreed, will aim to complete production of the requested documents by July 31, 2006, although the processing of TMS's electronic files may require some additional time.

Pursuant to the parties' agreement to supplement their interrogatory responses TMS will supplement its responses to TV Guide's Interrogatory Nos. 4 and 14 to include the Bates numbers for the documents referenced in the response.

Sincerely,

Meredith Zinanni

cc:    Frederick L. Cottrell, III
       Richard K. Hermann
       Michael A. Parks
       Corey C. Watson



# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

777 South Figueroa Street
Los Angeles, California 90017

213 680-8400

www.kirkland.com

Facsimile:
213 680-8500

Tina Hernandez
To Call Writer Directly:
213 680-8662
themandez@kirkland.com

July 17, 2006

## VIA FACSIMILE

Christopher J. Harnett
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Dear Christopher:

I am writing to clarify our offer to compromise with respect to Plaintiffs' responses to Request for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92. We are not asking Plaintiffs' to respond to Request for Production Nos. 22, 29, 81, or 86-88. If Plaintiffs agree to respond to Request for Production Nos. 30-31, 74-76, 82-84, and 92 as narrowed, we will not pursue supplemental responses to these requests as served on March 2, 2006. We understand from the letter you sent earlier this afternoon that Plaintiffs reject that proposal. If that is not the case, please let us know immediately.

Sincerely,

Tina Hernandez

cc:     Frederick L. Cottrell, III
        Richard K. Herrmann
        Michael A. Parks
        Corey C. Watson

# EXHIBIT N

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 2 4 2004

LUTHER ____
BY: ____ ____ Clerk
Deputy Clerk

| | |
|---|---|
| IN RE GEMSTAR DEVELOPMENT CORPORATION PATENT LITIGATION | MDL-1274-WBH |
| | RELATED TO CIVIL ACTION FILE |
| | No. 1:98-CV-3477-WBH (MDL) No. 1:99-CV-1242-WBH (MDL) No. 1:01-CV-2426-WBH (MDL) |

## ORDER

Before the Court are Gemstar's[1] motions for partial summary judgment dismissing Plaintiffs'[2] advertising tying claims [608] and patent-product tying claims [607]. For the reasons set forth below, the motions are GRANTED.

## BACKGROUND[3]

Gemstar publically claims that its broad portfolio of IPG-related patents makes it impossible for any company to make, sell, or use a competitor's IPG without infringing Gemstar's patents. Gemstar representatives have made it clear that if multiple system

_____

[1] "Gemstar" refers collectively to Defendants Gemstar-TV Guide International, Inc., Gemstar Development Corp., TV Guide, Inc., StarSight Telecast, Inc., and Index Systems, Inc.

[2] "Plaintiffs" refers collectively to EchoStar Communications Corp., EchoStar Satellite Corp., EchoStar Technologies Corp., and Scientific-Atlanta, Inc. These motions were also filed in case number 1 99-CV-1258 in which Pioneer Corp., Pioneer North America, Inc., and Pioneer New Media Technologies, Inc. were Plaintiffs, but that case settled on March 3, 2004.

[3] Because this case is before the Court on Gemstar's motion for summary judgment, the facts have been construed in the light most favorable to Plaintiffs, the non-movants. See Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918 (11th Cir. 1993).

03/24/2004 WED 16:16 FAX 404 215 1455    USDC JUDGE WILLIS HUNT    →→→ NORTH    ☒003

operators ("MSOs") deploy a non-Gemstar IPG, they run the risk of being sued by Gemstar for patent infringement.[4] Faced with the prospect of being sued, numerous MSOs tried to obtain from Gemstar a "pure" patent license, i.e., a prospective, no-strings-attached license that would allow them to make, sell, and use an already existing non-Gemstar IPG or create their own IPG incorporating Gemstar's patented IPG technology. In some cases, Gemstar has flatly refused to grant a pure patent license, while in other cases, Gemstar has simply ignored requests for such a license. Since its merger with TV Guide in 2000, Gemstar has not executed a pure patent license with an MSO, taking the position that the only way for an MSO to avoid infringement liability is to accept Gemstar's IPG product.

When an MSO agrees to purchase the Gemstar IPG product, it enters into a detailed, written agreement with Gemstar (an "MSO agreement"). In general, these agreements grant the MSO the right to use the Gemstar IPG product, and they protect the MSO from claims of infringement for future use of the Gemstar IPG. When an MSO has previously used an IPG product, the MSO agreements also include provisions establishing payments to Gemstar for the MSO's past use of the IPG. In particular, the following three provisions are included in many MSO agreements and work together to resolve the claims of past infringement: the "legacy fee" provisions, the "covenant and release" provisions, and the "covenant to limit collections" provisions.

The following is an example of a typical legacy fee provision in a Gemstar MSO agreement:

---

[4] In their briefs, the parties use the term "MSO" loosely to refer to cable companies, satellite companies, consumer electronics manufacturers, and set-top box manufacturers. In this Order, the Court uses the term MSO in this manner as well.

2

AO 72A
(Rev 8/82)

> Legacy Fees: [Ashland Fiber Network] agrees to pay [Gemstar] a monthly fee for its use and distribution of IPGs, including the [Gemstar IPG product], for periods of time prior to the Effective Date of this Agreement. For IPGs other than [the Gemstar IPG] this monthly fee shall be calculated at the rates set forth in Exhibit D ("Legacy Fees") . . . Subject to payment of the Legacy Fees, use and distribution of such IPGs prior to the Effective Date of this Agreement shall hereby be ratified by the parties and, except as provided in this Section 15, no other amounts shall be payable in connection with such prior use. . . .

PSAF 24, Tab 28 at § 15. According to Gemstar executive Peter Boylan, the purpose of the

legacy fee provision is to provide retroactive patent royalties to Gemstar for the prior use of

an allegedly infringing device. Gemstar attorney Mark Allen explained that the legacy fee

provision serves as a waiver of Gemstar's ability to sue an MSO for patent infringement. The

following is a typical covenant and release provision:

> Covenant and Release. Subject to payment of the Legacy Fees, [Gemstar] will release and discharge [the MSO] from, and covenant not to sue for, any and all claims, actions, causes of action, suits, injuries, losses, damages, demands, or other liability or relief, of any nature whatsoever (including without limitation, patent infringement), arising out of, or in any way relating to, the purchase, license, use, promotion or sale of any IPG deployed prior to the Effective Date of this Agreement. . . .

Id. Tab 28 at § 18. A number of the MSO agreements contain a covenant to limit collections,

such as that contained in Gemstar's agreement with InfoStructure, Inc.:

> (i) Covenant to Limit Collections. [Gemstar] agrees and covenants that [Gemstar] shall pursue recovery of any damages or license fees awarded in connection with any and all claims and causes of action for patent infringement based on the use and distribution by Affiliate in its systems of IPGs other than the Service developed or manufactured by third parties primarily from such third parties to the extent possible without compromising [Gemstar's] position in any material way, and [Gemstar] shall limit its collection from Affiliate of any damages or license fees awarded in connection with any such patent infringement claim or cause of action to the total amount recoverable by Affiliate pursuant to any indemnification agreements Affiliate may have with such third parties, if Affiliate, has taken, or has not omitted to take, any and all reasonable actions necessary to fully preserve its rights to indemnification from such third parties.

3

Id. Tab 39 at ¶ 15(b)(i). Later in this section, the parties make it clear that this covenant is not a license:

> (ii) Covenant to Limit Collections Not A License. No license of any kind is granted nor deemed granted by estoppel, implication, exhaustion or other doctrine of law, equity or otherwise herein to Affiliate or any third party under any intellectual property rights owned or controlled by [Gemstar] or its affiliates with respect to IPGs other than the Service.

Id. at § 15(b)(i).

While Gemstar grants protection from infringement liability based on use and deployment of its IPG product, it reserves the right to sue the MSO for use of a non-Gemstar IPG. For example, the agreement with Charter Communications provides: "[Gemstar] expressly reserves the right to . . . obtain and enforce injunctive relief against [licensee] or any third party with respect to IPGs other than the Service." SUMF, Tab 1 at § 15(v)(ii).

In its MSO agreements, Gemstar requires its licensees to accept an advertising feature as part of the Gemstar IPG product. All of Gemstar's recent license negotiations for its IPG product, including those with Plaintiffs, have involved the offer of the Gemstar IPG product with the advertising component. In providing the advertising, Gemstar serves as the exclusive seller or reseller of the IPG advertising space, thereby controlling the advertising content. Additionally, Gemstar keeps the lion's share of the advertising revenues. Gemstar takes a sales commission of 15% off the gross revenues, then distributes up to 15% to the MSOs and keeps the remainder for itself. Plaintiffs' experts describe Gemstar's portion of the IPG advertising revenue as a "commission" for selling the advertising, and claim that the "exceedingly high" percentage of those revenues payable to Gemstar is possible only by virtue of an illegal advertising tie.

4

Many MSOs have expressed their preference for an IPG without any advertising, protesting that advertising clutters the screen, reduces the amount of television programming information that can be displayed, and generally offends television viewers. Despite this request, Gemstar has refused to provide an advertising-free IPG product. Other MSOs do not generally object to advertising on the IPG, but want to control the advertising inventory and select their own advertising broker. The MSO agreements essentially prohibit MSOs from choosing their own advertisements and give Gemstar exclusively a brokerage commission.

IPG advertising is big business. Analysts estimate that revenues from selling advertising spots on IPGs could exceed $1.3 billion in five years. For the three quarters ending September 30, 2002, Gemstar reported revenues from IPG advertising of approximately $43 million. Expert economist Roger Noll is of the opinion that Gemstar is using its IPG patents to become the only seller of IPG advertising and that Gemstar's IPG patents enable it to degrade the ability of other sellers of IPG advertising who may have a pre-existing "resource advantage" over Gemstar:

> Recall that Gemstar asserts that its market power rests in patents for essential IPG features, and that it expects to use licensing of its IPGs to become the only provider of advertising and t-commerce. By bundling all patents in a blanket license Gemstar assures that if it blocks (or has substantial market power in) only one IPG feature, it can enhance its chance of controlling other features and products, notably advertising and t-commerce, against potential entrants that, in Gemstar's own assessment, have a resource advantage in exploiting these possibilities. In essence, Gemstar seeks to foreclose competition from formidable potential competitors in these ancillary uses of an I'[G] by tying its advertising and t-commerce business to its IPG, and tying its IPG to its IPG technology.

Doc. 634 Tab 1 at ¶ 81.

5

## ANALYSIS

### *Summary judgment standard*

Summary judgment is proper when no genuine issue as to any material fact is present, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-movant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Resolving all doubts in favor of the non-moving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id.

### *Section 1 of the Sherman Act*

A tying claim under Section 1 of the Sherman Act requires, among other things, that there be two separate products, a "tying" product and a "tied" product, and that those products are in fact "tied" together – that is, the buyer was forced to buy the tied product to get the tying product. See Tic-X-Press, Inc. v. Omni Promotions Co., 815 F.2d 1407, 1414 (11th Cir. 1987).

6

Plaintiffs contend that Gemstar has violated Section 1 of the Sherman Act by (1) conditioning a prospective pure patent license for Gemstar's IPG-related patents on the purchase of the Gemstar IPG product; and (2) conditioning the sale of Gemstar's IPG product on an agreement to carry the Gemstar-provided IPG advertising. In its motions for summary judgment, Gemstar argues that both tying claims must be dismissed because under either theory, there s no evidence that MSOs are forced to purchase two separate, tied products. The Court wi 1 address the tying claims separately.

### Patent-product tie claim

Plaintiffs claim that Gemstar forced MSOs to purchase and use Gemstar's IPG (the "tied product") as a condition for granting a license to Gemstar's IPG technology (the "tying product"). In its motion for summary judgment, Gemstar argues that there is no "tying product" because the agreements grant no license beyond the implied-by-law license that comes with the purchase of the IPG product.

As explained by the Federal Circuit in <u>Hewlett-Packard Co. v. Repeat-O-Type Stencil Manufacturing Co.</u>:

> Generally, when a seller sells a product without restriction, it in effect promises the purchaser that in exchange for the price paid, it will not interfere with the purchaser's full enjoyment of the product purchased. The buyer has an implied license under any patents of the seller that dominate the product or any uses of the product to which the parties might reasonably contemplate the product will be put.

123 F.3d 1445, 1451 (Fed. Cir. 1997). Such an implied-by-law "license" does not give the purchaser of the product a license to practice the patents at issue. Rather, the right is limited to use of the licensed product. <u>See id.</u> ("The authority to use and sell a purchased device, however, does not include the right to make a new device or to reconstruct one which has been spent.")

7

Gemstar argues that the undisputed evidence conclusively demonstrates that its MSO agreements do not provide a prospective license for Gemstar's patents; the agreements simply authorize the MSOs to use the Gemstar IPG without fear of being sued for such use. Stated another way, the agreements license only a single item: the IPG product itself, which comes with the appurtenant and inseparable right to use the product free from any risk of infringing the underlying intellectual property. Thus, Gemstar claims that in the absence of a separate conveyance of patent rights, there is no "tying product."

Plaintiffs concede that the MSO agreements settle claims for past infringement and also provide protection for past and future use of the Gemstar IPG. Plaintiffs argue that the MSO agreements go beyond the implied-by-law license and actually grant MSOs a prospective license to make, use, and deploy non-Gemstar IPGs. Plaintiffs argue that the three provisions in the MSO agreements which purport to settle past claims of infringement also provide a separate, prospective license to Gemstar's patent portfolio.

Plaintiffs argue that the legacy fee and the covenant and release provisions amount to a Gemstar promise not to sue the MSO for patent infringement on the basis of the MSOs' future use of a non-Gemstar IPG. This interpretation, however, is not supported by the clear language of the agreement. On their face, the legacy fee and the covenant and release provisions set up retroactive royalty payments for past use of IPGs and ratify such past use of an IPG. There is no expression of Gemstar's intent to waive its ability to sue for future use of non-Gemstar IPGs. In fact, Gemstar expressly retained the right to go to court for an injunction preventing such deployment. By settling responsibility for past infringement caused by the use and distribution of an IPG prior to the effective date of the agreement and

8

by calculating a legacy fee payment, these provisions do not grant the MSOs a license to engage in future deployments of non-Gemstar IPGs.

Plaintiffs' argument that the covenant to limit collections provision amounts to a prospective license is similarly without support. The MSO agreements unambiguously provide that Gemstar's covenants to limit collections do not effect a grant of any license by estoppel, implication, or otherwise. In fact, the relevant sections in many MSO agreements are entitled, "Covenant to Limit Collections Not a License."

The Court finds, as a matter of law, that the language of the MSO agreements does not authorize MSOs to make, sell, or deploy on a going-forward basis non-Gemstar IPGs. These provisions deal exclusively with previously-deployed non-Gemstar IPGs, do not establish any royalty scheme for future non-Gemstar IPG deployments, and expressly reserve Gemstar's right to file suit to enjoin signatory MSOs from deploying infringing non-Gemstar IPGs in the future. Settlement for past infringement cannot be equated with a license for prospective use. See Ransburg Electro-Coating Corp. v. Spiller and Spiller, Inc., 489 F.2d 974, 977 (7th Cir. 1973) (concluding that a settlement agreement in which one party agrees to pay liquidated damages for past infringements in return for the dismissal of an infringement suit is not the equivalent of a license for prospective use).

Plaintiffs also argue that Gemstar has publically admitted that the MSO agreements provide protection from patents beyond those practiced by the Gemstar IPG. Plaintiffs point out that in its Amended Complaint filed with the ITC, Gemstar stated that it:

> [has] issued licenses to various MSOs and set-top box manufacturers authorizing the use of [Gemstar's] IPG technology. Although these agreements do not generally name the patents licensed therein, the IPG technology licensed under the agreements includes all of the patents in suit.

9

PSAF, Tab 40 at ¶ 8.7. Mark Allen, who was responsible for negotiating Gemstar's MSO

agreements for the Gemstar IPG testified as follows:

> Q:    If I understood your direct testimony, most of your direct involvement in
>        negotiations has been with the large MSOs?
>
> A:    That's correct.
>
> Q:    In those discussions, do you tell them, or words to the effect, that if they enter
>        into a deal with TV Guide and take the TV Guide Interactive IPG, they would
>        enjoy the full protection of Gemstar TV Guide patent portfolio, both currently
>        issued patents and future patents?
>
> A:    Yes, or words to that effect.

PSAF, Tab 11. Additionally, Mr. Boylan testified as follows:

> Q:    When an operator licenses a TV Guide Interactive program, do they license the
>        TV Guide patents with that as well?
>
> A:    They take a service that enjoys the benefits of all of the companies' patents in
>        that related field of use, in this case an IPG.

Id. at Tab 17. Thus, Plaintiffs argue that by admitting that Gemstar provides protection from

Gemstar's entire patent portfolio – rather than from only those patents practiced by the IPG

product – Gemstar has admitted to granting a pure patent license.

Contrary to Plaintiffs' assertions, these admissions do not create a fact issue. By

telling its licensees that their use of Gemstar's IPG would have the full protection of

Gemstar's patent portfolio, Gemstar was not granting the MSOs a prospective patent license

to make, sell, or deploy non-Gemstar IPGs such as could constitute the sale of a tying product.

It is abundantly clear that Gemstar was simply assuring those licensees that they could not be

sued under any of Gemstar's IPG patents for using Gemstar's IPG product. The Court

concludes that Plaintiffs have failed to demonstrate a genuine issue of material fact to support

10

03/24/2004 WED 16:19 FAX 404 215 1455    USDC JUDGE WILLIS HUNT  →→→ NORTH    ⌀012

the proposition that Gemstar's MSO licensing agreements convey to MSOs a pure patent license that can be said to constitute a tying product. Absent a tying product, Plaintiffs' patent-product tying claims fail as a matter of law. See Borschow Hosp. & Med. Supplies v. Cesar Castillo Inc., 96 F.3d 10, 17 (1st Cir. 1996) (finding summary judgment appropriate on an antitrust tying claim where there was no evidence of an illegal tie).

*Advertising-tie claim*

In its motion for summary judgment on Plaintiffs' advertising-tie claim, Gemstar argues, among other things, that the advertising-tie claim is untenable because there is no forced purchase of advertising as a separate product. Gemstar maintains that when it sells its advertising, it does so on its own behalf, not as an agent for its customers, who have no rights to the underlying space on the Gemstar IPG where the advertisements are displayed. According to Gemstar, there is no second purchase because the MSOs are not purchasing anything, and the IPG advertising space does not belong to them. Comparing its IPG to a piece of real estate, Gemstar argues that it is entitled to make its own design decisions to control the look and feel of its IPG. Because MSOs do not buy the advertising, Gemstar argues, there is no "tied product."

In response, Plaintiffs admit that the MSOs do not purchase advertising, contending that the tied product is Gemstar's "brokered advertising content." Plaintiffs argue that Gemstar forces MSOs to carry the advertising content that Gemstar has sold to advertisers as a condition of licensing Gemstar's IPG product and technology. Absent Gemstar's tie, they argue, the MSOs might sell their own advertising on the IPG, or engage their own broker to sell the advertising at significantly less than the required payment to Gemstar of between 85 and 90 percent of advertising revenue as a brokerage fee. Plaintiffs maintain that they have

11

AO 72A
(Rev. 8/82)

demonstrated a forced purchase of a separate, tied product by showing that MSOs are forced (1) to use Gemstar as the broker for their IPG advertisements, (2) to forego selling the advertising spots on the IPG themselves, and (3) to forego using the services of a less expensive advertising broker.

The Court agrees with Gemstar that Plaintiffs' position rests on the assumptions that the MSOs own the IPG product and that the MSOs are entitled to control the look and feel of the IPG product. The Court also agrees with Gemstar that Plaintiffs have failed to provide evidence to support these assumptions. Plaintiffs give no explanation why Gemstar is not legally entitled to make its own design decisions – including the decision to include or not include advertising on its IPG. It is clear that the MSOs have not been forced to purchase anything, and the Court cannot see how the MSOs have foregone any rights by accepting an IPG containing advertising.

Plaintiffs' complaint is not that they were forced to purchase a second, unwanted product, but rather that they were forced to accept the Gemstar IPG in the first place, or, at a minimum, were forced to accept a guide containing advertising. Thus, it appears that this claim is merely a subset of Plaintiffs' complaint that they have not been allowed to obtain a license in Gemstar's IPG technology to create their own IPGs; if Plaintiffs could create their own IPGs, presumably they could decide what advertising, if any, would be displayed on them. The Court can discern no unlawful antitrust tie between the advertising and the IPG, and concludes as a matter of law that Gemstar's requirement that its MSO licensees accept advertising along with its IPG product does not amount to a forced separate purchase of a tied product. Because this essential element of Plaintiffs' Sherman Act claim is absent, Gemstar's

12

motion for summary judgment on this claim is GRANTED.  See Borschow Hosp. & Med. Supplies, 96 F.3d at 17.

## CONCLUSION

For the reasons set forth above, Gemstar's motions for partial summary judgment dismissing Plaintiffs' advertising tying claims [608] and patent-product tying claims [607] are GRANTED.

It is so ORDERED this 24 day of March, 2004.

_____
Willis B. Hunt, Jr.
Judge, United States District Court

13