# EXHIBIT F

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Meredith Zinanni
To Call Writer Directly:
(312) 861-2010
mzinanni@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax: (312) 660-8036

July 12, 2006

**Via Facsimile**

Christopher J. Harnett
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Dear Chris:

I write as a follow up to our meet and confer of June 21, 2006 and your letter of July 7, 2006 to Tina Hernandez.

I.    **Issues Raised In Our June 9, 2006 Letter Relating to TY Guide's Responses to TMS's Document Requests.**

During our June 21, 2006 meet and confer, you confirmed that TV Guide is searching for and producing responsive documents in its possession, custody, or control, including documents in the possession, custody, or control of its parent companies, sister companies, corporate affiliates, or other related companies, including but not limited to Gemstar-TV Guide International, Inc. You also confirmed that, with the exception of its responses to Requests for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92, TV Guide is not limiting its collection or production of documents on the basis of any general or specific objection.

We expressed concern that we had not received any licensing agreements, negotiation documents, or other documents relating to our patent misuse claim. Although the parties stated that they would aim to complete their document production by July 31, 2006 for document requests served as of June 21, we had understood based on our June 21 conversation that TV Guide would produce documents to us on a rolling basis. Although TMS's document requests originally were served on March 2, 2006, we still have not received production of any documents relating to our patent misuse claims. You explained that TV Guide cannot produce a number of documents until you receive approval from third parties, but we remain concerned with the delay. Please let us know the status of your third-party-approval requests.

The parties agreed to produce documents created through January 1, 2006. For documents created after that time period, the requesting party may identify certain categories of

London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

Christopher J. Harnett
July 12, 2006
Page 2


documents for which it seeks documents created after January 1, 2006, and the parties will work at that time to resolve any disputes.

Several of TMS's document requests refer to the term "interactive program guide technology." As a result, in our June 9 letter, we made an effort to clarify that phrase in response to TV Guide's objections. Although you did not agree that the proposed definition of "interactive program guide technology" could be used universally, we understand that TV Guide is not limiting its document collection or production based on its objection to this phrase. You stated that TV Guide was not collecting documents relating to set-top box technology, although we understand that TV Guide is not limiting its collection or production of documents relating to interactive program guide technology or products simply because they are used on set-top boxes.

With respect to Request for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92, we continue to believe that these requests are proper as propounded and reserve the right to move to compel responses to the requests as propounded. In an effort to compromise and to avoid burdening the Court with a motion to compel, however, we are willing to receive documents responsive to Requests for Production Nos. 30-31, 74-76, 82-84, and 92 as narrowed below. "TV Guide" in the below requests has the same meaning as given in Definition A of TMS's First Set of Requests for the Production Documents and Things

**Request for Production No. 30:** All hearing and deposition transcripts and exhibits identified therein; all expert reports and exhibits and evidence referenced therein; all dispositive motions, post-hearing briefs, and related filings and exhibits and evidence referenced therein; the Complainants' and Respondents' proposed findings of fact and/or conclusions of law and the exhibits and evidence referenced therein; and the Final Initial Determination, findings of fact, and conclusions of law of Judge Luckern and the exhibits and evidence referenced therein relating to patent misuse and/or antitrust defenses or claims from one or more of the following proceedings: (1) In re Gemstar Development Corporation Patent Litigation, MDL-1274-WBH (N.D. Ga.), and (2) In the Matter of Certain Set-Top Boxes and Components Thereof, ITC Investigation No. 337-TA-454.

**Request for Production No. 31:** All documents produced or generated in connection with the Department of Justice investigation into the merger of Gemstar and TV Guide relating to actual or potential suppliers, purchasers, licensees, licensors, market conditions, competition, market share, market power, or the actual or potential effect of the proposed merger on any market for interactive program guides or interactive program guide technology.

**Request for Production No. 74:** All TV Guide licenses for interactive program guide technology that contain a grantback clause, non-assertion clause, or covenant not to sue.



Christopher J. Harnett
July 12, 2006
Page 5

At your request, we have reviewed TMS's responses to Request Nos. 30 and 53. We continue to believe that the objections are well-founded and will not withdraw them. The amount of money flowing, directly or indirectly, between TMS and its parents, subsidiaries, and/or affiliates is irrelevant to the issues in this case, as are the SEC filings of Tribune Company. TV Guide has not provided any reasonable argument as to how this information is relevant to the issues in this case, in which the single accused product is a product of TMS, not Tribune Company.

After further review of TV Guide's document requests, TMS does not agree that TV Guide's Request Nos. 4 and/or 5 seek source code. Even if Request Nos. 4 and 5 are construed to seek source code, the requests are overbroad in that they seek source code related to features of www.zap2it.com other than the television listings search feature. Furthermore, TV Guide did not raise this issue during the negotiation of the protective order, at which time the parties could have put in place specific provisions to deal with the production of source code. The current protective order does not provide sufficient protection for this highly sensitive information. Before TMS will agree to produce source code, it requires that TV Guide issue a properly narrowed request for the source code and propose a method for its production and safeguarding.

To the extent technical documents exist regarding the overall operation of www.zap2it.com, TMS has not withheld their production or redacted such documents such that only information regarding the television listings search feature has been produced, although TMS reiterates its position that the operation of other portions of the zap2it.com website are not relevant to this case. TMS expects to produce additional documents this week, including some documents regarding the operation of the zap2it.com website, and, as the parties agreed, will aim to complete production of the requested documents by July 31, 2006, although the processing of TMS's electronic files may require some additional time.

Pursuant to the parties' agreement to supplement their interrogatory responses TMS will supplement its responses to TV Guide's Interrogatory Nos. 4 and 14 to include the Bates numbers for the documents referenced in the response.

Sincerely,

Meredith Zinanni

cc:    Frederick L. Cottrell, III
       Richard K. Hermann
       Michael A. Parks
       Corey C. Watson

/17/2006 17:48 FAX 213 680 8500          KIRKLAND&ELLIS  LLP                                          ☑002/002

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

777 South Figueroa Street
Los Angeles, California 90017

213 680-8400

www.kirkland.com

Facsimile:
213 680-8500

Tina Hernandez
To Call Writer Directly:
213 680-8682
thernandez@kirkland.com

July 17, 2006

**VIA FACSIMILE**

Christopher J. Harnett
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Dear Christopher:

I am writing to clarify our offer to compromise with respect to Plaintiffs' responses to Request for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92. We are not asking Plaintiffs' to respond to Request for Production Nos. 22, 29, 81, or 86-88. If Plaintiffs agree to respond to Request for Production Nos. 30-31, 74-76, 82-84, and 92 as narrowed, we will not pursue supplemental responses to these requests as served on March 2, 2006. We understand from the letter you sent earlier this afternoon that Plaintiffs reject that proposal. If that is not the case, please let us know immediately.

Sincerely,

Tina Hernandez

cc:     Frederick L. Cottrell, III
        Richard K. Herrmann
        Michael A. Parks
        Corey C. Watson

Chicago        London        Munich        New York        San Francisco        Washington, D.C.

To-ROPES & GRAY LLP        Page 002

# EXHIBIT G



U.S. Securities and Exchange Commission

# Gemstar-TV Guide International Agrees to Settle SEC Enforcement Action Charging the Company with Overstating Its Revenues

**FOR IMMEDIATE RELEASE**
**2004-86**

*Washington, D.C., June 23, 2004* — The Securities and Exchange Commission today filed a complaint in federal court in Los Angeles charging Gemstar-TV Guide International, Inc. with improperly reporting its highly touted interactive program guide licensing and advertising revenues in its financial statements from 1999 through 2002.

Gemstar agreed to settle the case by, among other things, paying a $10 million civil penalty. That money will be distributed to harmed shareholders pursuant to Section 308 of the Sarbanes-Oxley Act of 2002. In assessing the penalty amount, the Commission considered the scope and severity of Gemstar's misconduct, Gemstar's initial failure to cooperate in the Commission's investigation or undertake remedial actions, and Gemstar's significant cooperation and remediation following a change in senior management and restructuring of its corporate governance.

Gemstar is a Los Angeles-based media and technology company that is publicly traded on the Nasdaq Stock Market. Among its business activities, Gemstar publishes *TV Guide* magazine and develops, licenses, and markets an interactive program guide (IPG), which is a technology that enables consumers to navigate through and select television programs. During the relevant period, Gemstar generated revenues from the IPG by licensing the technology to third parties and selling advertising space on the IPG.

"The magnitude of the improper conduct at Gemstar, together with its initial lack of effective cooperation or remedial efforts, warrant the imposition of a significant monetary penalty," said Randall R. Lee, Director of the Commission's Pacific Regional Office. "At the same time, we have credited the company for its extensive cooperation once new management took control," Lee added. "We are continuing to pursue our case against former Gemstar senior management."

The Commission's complaint alleges that Gemstar materially overstated its revenues by nearly $250 million through the following means.

First, Gemstar recorded revenue under expired, disputed, or non-existent agreements, and improperly reported this as IPG licensing and advertising revenue.

Second, Gemstar recorded and reported revenue from a long-term agreement on an accelerated basis in contravention of GAAP and Gemstar's

own stated and disclosed revenue recognition policy, which required the recording and reporting of such revenue ratably over the terms of the agreement.

Third, Gemstar inflated its IPG advertising revenue by improperly recording and reporting revenue amounts from multiple-element transactions. Gemstar's recording and reporting of this revenue was improper under GAAP because Gemstar could not determine the IPG advertising's fair value  Additionally, some of those improperly reported transactions included so-called "round-trip" transactions whereby Gemstar paid money to a third party that then used those funds to buy advertising from Gemstar. Gemstar also failed to disclose that it had structured certain settlements for the purpose of creating "cookie jars" of IPG advertising revenue.

Fourth, Gemstar improperly recorded and reported IPG advertising revenue from non-monetary and barter transactions. Gemstar's recording and reporting of this revenue was not in accordance with GAAP because it did not meet the revenue recognition requirements for such transactions and because Gemstar could not properly establish the IPG advertising's fair value.

Finally, Gemstar improperly reported certain revenues as IPG advertising revenues when in fact those revenues were derived from the sale of print advertising. Gemstar shifted revenues by invoicing advertisers for both IPG and print advertising, but recording the revenue only as IPG revenue.

The misstatements of revenue were reported in Forms 10-K, 10-Q, and 8-K filed with the Commission. These public statements misrepresented Gemstar's true financial performance and failed to disclose material information about that performance. The complaint further alleges that when Gemstar disclosed in its 2001 Form 10-K filed on April 1, 2002, that revenue from two transactions had been recorded under an expired licensing agreement and in a non-monetary transaction, Gemstar's stock price declined by approximately 37% the next day.

As part of its settlement, Gemstar, without admitting or denying the allegations in the Commission's complaint, agreed to a permanent injunction against future violations of the periodic reporting, recordkeeping, and internal controls provisions of the federal securities laws.

In determining to accept Gemstar's settlement offer, the Commission considered the following factors, among others, relating to the company's cooperation and remedial efforts:

- In April 2002, immediately after Gemstar filed its 2001 Form 10-K, the Commission contacted Gemstar and commenced an investigation. For nearly the next eight months, while Gemstar's former CEO and other senior officers remained in place, the company did not conduct a thorough or comprehensive internal investigation and did not take other appropriate remedial action, even when presented by the Commission with specific evidence of fraudulent conduct.

- As a result of its inadequate investigation, in August 2002 Gemstar issued a restatement reversing only approximately $20 million in

revenue. Gemstar consequently continued to report overstated revenues to the investing public even after the Commission's investigation began.

• In November 2002, in connection with the restructuring of its corporate governance, Gemstar replaced its CEO, CFO, and general counsel and adopted extensive new internal controls. The company also retained a new independent auditor and a new independent outside counsel.

• Following the change in senior management, Gemstar (i) initiated a comprehensive investigation and re-audit of its financial statements; (ii) restated its financials three more times, reversing revenues by a total of $377 million; (iii) provided extensive and valuable assistance to the Commission in its investigation; and (iv) voluntarily agreed not to make certain extraordinary severance payments to its former CEO and CFO for over six months, among other things.

For further information contact:

• Randall R. Lee, Regional Director, Pacific Regional Office (323) 965-3807
• Sandra J. Harris, Associate Regional Director, Pacific Regional Office (323) 965-3962
• Kelly Bowers, Assistant Regional Director, Pacific Regional Office (323) 965-3924

*http://www.sec.gov/news/press/2004-86.htm*

o