# EXHIBIT   A

 

# Antitrust Guidelines
# for the Licensing
# of Intellectual Property

Issued by the

**U.S. Department of Justice**[*]

and the

**Federal Trade Commission**

April 6, 1995

[*] These Guidelines supersede section 3.6 in Part I, "Intellectual Property Licensing Arrangements," and cases 6, 10, 11, and 12 in Part II of the U.S. Department of Justice 1988 Antitrust Enforcement Guidelines for International Operations.

# Table of Contents

1. Intellectual property protection and the antitrust laws ................ 1

2. General principles ....................................................... 2
   2.1 Standard antitrust analysis applies to intellectual property ............. 3
   2.2 Intellectual property and market power .................................. 4
   2.3 Procompetitive benefits of licensing ................................... 5

3. Antitrust concerns and modes of analysis .......................... 7
   3.1 Nature of the concerns ............................................... 7
   3.2 Markets affected by licensing arrangements .......................... 7
       3.2.1 Goods markets ............................................... 8
       3.2.2 Technology markets ......................................... 8
       3.2.3 Reseach and development: Innovation markets ............... 10
   3.3 Horizontal and vertical relationships ................................ 14
   3.4 Framework for evaluating licensing restraints ...................... 16

4. General principles concerning the Agencies' evaluation of
   licensing arrangements under the rule of reason ................... 18
   4.1 Analysis of anticompetitive effects ................................. 18
       4.1.1 Market structure, coordination, and foreclosure .............. 18
       4.1.2 Licensing arrangements involving exclusivity ................. 19
   4.2 Efficiencies and justifications ..................................... 21
   4.3 Antitrust "safety zone" ............................................. 22

5. Application of general principles ................................... 24
   5.1 Horizontal restraints ............................................... 24
   5.2 Resale price maintenance ........................................... 25
   5.3 Tying arrangements ................................................. 26
   5.4 Exclusive dealing ................................................... 27
   5.5 Cross-licensing and pooling arrangements .......................... 28
   5.6 Grantbacks ........................................................ 30
   5.7 Acquisition of intellectual property rights ......................... 31

6. Enforcement of invalid intellectual property rights .................. 32

## 1. Intellectual property protection and the antitrust laws

**1.0** These Guidelines state the antitrust enforcement policy of the U.S. Department of Justice and the Federal Trade Commission (individually, "the Agency," and collectively, "the Agencies") with respect to the licensing of intellectual property protected by patent, copyright, and trade secret law, and of know-how.[1] By stating their general policy, the Agencies hope to assist those who need to predict whether the Agencies will challenge a practice as anticompetitive. However, these Guidelines cannot remove judgment and discretion in antitrust law enforcement. Moreover, the standards set forth in these Guidelines must be applied in unforeseeable circumstances. Each case will be evaluated in light of its own facts, and these Guidelines will be applied reasonably and flexibly.[2]

In the United States, patents confer rights to exclude others from making, using, or selling in the United States the invention claimed by the patent for a period of seventeen years from the date of issue.[3] To gain patent protection, an invention (which may be a product, process, machine, or composition of matter) must be novel, nonobvious, and useful. Copyright protection applies to original works of authorship embodied in a tangible medium of expression.[4] A copyright protects only the expression, not the underlying

---

[1] These Guidelines do not cover the antitrust treatment of trademarks. Although the same general antitrust principles that apply to other forms of intellectual property apply to trademarks as well, these Guidelines deal with technology transfer and innovation-related issues that typically arise with respect to patents, copyrights, trade secrets, and know-how agreements, rather than with product-differentiation issues that typically arise with respect to trademarks.

[2] As is the case with all guidelines, users should rely on qualified counsel to assist them in evaluating the antitrust risk associated with any contemplated transaction or activity. No set of guidelines can possibly indicate how the Agencies will assess the particular facts of every case. Parties who wish to know the Agencies' specific enforcement intentions with respect to any particular transaction should consider seeking a Department of Justice business review letter pursuant to 28 C.F.R. § 50.6 or a Federal Trade Commission Advisory Opinion pursuant to 16 C.F.R. §§ 1.1–1.4.

[3] *See* 35 U.S.C. § 154 (1988). Section 532(a) of the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809, 4983 (1994) would change the length of patent protection to a term beginning on the date at which the patent issues and ending twenty years from the date on which the application for the patent was filed.

[4] *See* 17 U.S.C. § 102 (1988 & Supp. V 1993). Copyright protection lasts for the author's life plus 50 years, or 75 years from first publication (or 100 years from creation, whichever expires first) for works made for hire. *See* 17 U.S.C. § 302 (1988). The principles stated in these Guidelines also apply to protection of mask works fixed in a semiconductor chip product (*see* 17 U.S.C. § 901 *et seq.* (1988)), which is analogous to copyright protection for works of authorship.

ideas.[5] Unlike a patent, which protects an invention not only from copying but also from independent creation, a copyright does not preclude others from independently creating similar expression. Trade secret protection applies to information whose economic value depends on its not being generally known.[6] Trade secret protection is conditioned upon efforts to maintain secrecy and has no fixed term. As with copyright protection, trade secret protection does not preclude independent creation by others.

The intellectual property laws and the antitrust laws share the common purpose of promoting innovation and enhancing consumer welfare.[7] The intellectual property laws provide incentives for innovation and its dissemination and commercialization by establishing enforceable property rights for the creators of new and useful products, more efficient processes, and original works of expression. In the absence of intellectual property rights, imitators could more rapidly exploit the efforts of innovators and investors without compensation. Rapid imitation would reduce the commercial value of innovation and erode incentives to invest, ultimately to the detriment of consumers. The antitrust laws promote innovation and consumer welfare by prohibiting certain actions that may harm competition with respect to either existing or new ways of serving consumers.

## 2. General principles

2.0  These Guidelines embody three general principles:  (a) for the purpose of antitrust analysis, the Agencies regard intellectual property as being essentially comparable to any other form of property; (b) the Agencies do not presume that intellectual property creates market power in the antitrust context; and (c) the Agencies recognize that intellectual property licensing allows firms to combine complementary factors of production and is generally procompetitive.

---

[5] *See* 17 U.S.C. § 102(b) (1988).

[6] Trade secret protection derives from state law. *See generally Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470 (1974).

[7] "[T]he aims and objectives of patent and antitrust laws may seem, at first glance, wholly at odds. However, the two bodies of law are actually complementary, as both are aimed at encouraging innovation, industry and competition." *Atari Games Corp. v. Nintendo of America, Inc.,* 897 F.2d 1572, 1576 (Fed. Cir. 1990).

## 2.1 Standard antitrust analysis applies to intellectual property

The Agencies apply the same general antitrust principles to conduct involving intellectual property that they apply to conduct involving any other form of tangible or intangible property. That is not to say that intellectual property is in all respects the same as any other form of property. Intellectual property has important characteristics, such as ease of misappropriation, that distinguish it from many other forms of property. These characteristics can be taken into account by standard antitrust analysis, however, and do not require the application of fundamentally different principles.[8]

Although there are clear and important differences in the purpose, extent, and duration of protection provided under the intellectual property regimes of patent, copyright, and trade secret, the governing antitrust principles are the same. Antitrust analysis takes differences among these forms of intellectual property into account in evaluating the specific market circumstances in which transactions occur, just as it does with other particular market circumstances.

Intellectual property law bestows on the owners of intellectual property certain rights to exclude others. These rights help the owners to profit from the use of their property. An intellectual property owner's rights to exclude are similar to the rights enjoyed by owners of other forms of private property. As with other forms of private property, certain types of conduct with respect to intellectual property may have anticompetitive effects against which the antitrust laws can and do protect. Intellectual property is thus neither particularly free from scrutiny under the antitrust laws, nor particularly suspect under them.

The Agencies recognize that the licensing of intellectual property is often international. The principles of antitrust analysis described in these Guidelines apply equally to domestic and international licensing arrangements. However, as described in the 1995 Department of Justice and Federal Trade Commission Antitrust Enforcement Guidelines for International Operations, considerations particular to international operations, such as jurisdiction and comity, may affect enforcement decisions when the arrangement is in an international context.

---

[8] As with other forms of property, the power to exclude others from the use of intellectual property may vary substantially, depending on the nature of the property and its status under federal or state law. The greater or lesser legal power of an owner to exclude others is also taken into account by standard antitrust analysis.

## 2.2 Intellectual property and market power

Market power is the ability profitably to maintain prices above, or output below, competitive levels for a significant period of time.[9] The Agencies will not presume that a patent, copyright, or trade secret necessarily confers market power upon its owner. Although the intellectual property right confers the power to exclude with respect to the *specific* product, process, or work in question, there will often be sufficient actual or potential close substitutes for such product, process, or work to prevent the exercise of market power.[10] If a patent or other form of intellectual property does confer market power, that market power does not by itself offend the antitrust laws. As with any other tangible or intangible asset that enables its owner to obtain significant supracompetitive profits, market power (or even a monopoly) that is solely "a consequence of a superior product, business acumen, or historic accident" does not violate the antitrust laws.[11] Nor does such market power impose on the intellectual property owner an obligation to license the use of that property to others. As in other antitrust contexts, however, market power could be illegally acquired or maintained, or, even if lawfully acquired and maintained, would be relevant to the ability of an intellectual property owner to harm competition through unreasonable conduct in connection with such property.

## 2.3 Procompetitive benefits of licensing

---

[9] Market power can be exercised in other economic dimensions, such as quality, service, and the development of new or improved goods and processes. It is assumed in this definition that all competitive dimensions are held constant except the ones in which market power is being exercised; that a seller is able to charge higher prices for a higher-quality product does not alone indicate market power. The definition in the text is stated in terms of a seller with market power. A buyer could also exercise market power (e.g., by maintaining the price below the competitive level, thereby depressing output).

[10] The Agencies note that the law is unclear on this issue. *Compare Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 16 (1984) (expressing the view in dictum that if a product is protected by a patent, "it is fair to presume that the inability to buy the product elsewhere gives the seller market power") *with id.* at 37 n.7 (O'Connor, J., concurring) ("[A] patent holder has no market power in any relevant sense if there are close substitutes for the patented product."). *Compare also Abbott Laboratories v. Brennan*, 952 F.2d 1346, 1354–55 (Fed. Cir. 1991) (no presumption of market power from intellectual property right), *cert. denied*, 112 S. Ct. 2993 (1992) *with Digidyne Corp. v. Data General Corp.*, 734 F.2d 1336, 1341–42 (9th Cir. 1984) (requisite economic power is presumed from copyright), *cert. denied*, 473 U.S. 908 (1985).

[11] *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *see also United States v. Aluminum Co. of America*, 148 F.2d 416, 430 (2d Cir. 1945) (Sherman Act is not violated by the attainment of market power solely through "superior skill, foresight and industry").

Intellectual property typically is one component among many in a production process and derives value from its combination with complementary factors. Complementary factors of production include manufacturing and distribution facilities, workforces, and other items of intellectual property. The owner of intellectual property has to arrange for its combination with other necessary factors to realize its commercial value. Often, the owner finds it most efficient to contract with others for these factors, to sell rights to the intellectual property, or to enter into a joint venture arrangement for its development, rather than supplying these complementary factors itself.

Licensing, cross-licensing, or otherwise transferring intellectual property (hereinafter "licensing") can facilitate integration of the licensed property with complementary factors of production. This integration can lead to more efficient exploitation of the intellectual property, benefiting consumers through the reduction of costs and the introduction of new products. Such arrangements increase the value of intellectual property to consumers and to the developers of the technology. By potentially increasing the expected returns from intellectual property, licensing also can increase the incentive for its creation and thus promote greater investment in research and development.

Sometimes the use of one item of intellectual property requires access to another. An item of intellectual property "blocks" another when the second cannot be practiced without using the first. For example, an improvement on a patented machine can be blocked by the patent on the machine. Licensing may promote the coordinated development of technologies that are in a blocking relationship.

Field-of-use, territorial, and other limitations on intellectual property licenses may serve procompetitive ends by allowing the licensor to exploit its property as efficiently and effectively as possible. These various forms of exclusivity can be used to give a licensee an incentive to invest in the commercialization and distribution of products embodying the licensed intellectual property and to develop additional applications for the licensed property. The restrictions may do so, for example, by protecting the licensee against free-riding on the licensee's investments by other licensees or by the licensor. They may also increase the licensor's incentive to license, for example, by protecting the licensor from competition in the licensor's own technology in a market niche that it prefers to keep to itself. These benefits of licensing restrictions apply to patent, copyright, and trade secret licenses, and to know-how agreements.

Example 1[12]

*Situation:* ComputerCo develops a new, copyrighted software program for inventory management. The program has wide application in the health field. ComputerCo licenses the program in an arrangement that imposes both field of use and territorial limitations. Some of ComputerCo's licenses permit use only in hospitals; others permit use only in group medical practices. ComputerCo charges different royalties for the different uses. All of ComputerCo's licenses permit use only in specified portions of the United States and in specified foreign countries.[13] The licenses contain no provisions that would prevent or discourage licensees from developing, using, or selling any other program, or from competing in any other good or service other than in the use of the licensed program. None of the licensees are actual or likely potential competitors of ComputerCo in the sale of inventory management programs.

*Discussion:* The key competitive issue raised by the licensing arrangement is whether it harms competition among entities that would have been actual or likely potential competitors in the absence of the arrangement. Such harm could occur if, for example, the licenses anticompetitively foreclose access to competing technologies (in this case, most likely competing computer programs), prevent licensees from developing their own competing technologies (again, in this case, most likely computer programs), or facilitate market allocation or price-fixing for any product or service supplied by the licensees. (*See* section 3.1.) If the license agreements contained such provisions, the Agency evaluating the arrangement would analyze its likely competitive effects as described in parts 3–5 of these Guidelines. In this hypothetical, there are no such provisions and thus the arrangement is merely a subdivision of the licensor's intellectual property among different fields of use and territories. The licensing arrangement does not appear likely to harm competition among entities that would have been actual or likely potential competitors if ComputerCo had chosen not to license the software program. The Agency therefore would be unlikely to object to this arrangement. Based on these facts, the result of the antitrust analysis would be the same whether the technology was protected by patent, copyright, or trade secret. The Agency's conclusion as to likely competitive effects could differ if, for example, the license barred licensees from using any other inventory management program.

---

[12] The examples in these Guidelines are hypothetical and do not represent judgments about, or analysis of, any actual market circumstances of the named industries.

[13] These Guidelines do not address the possible application of the antitrust laws of other countries to restraints such as territorial restrictions in international licensing arrangements.

## 3. Antitrust concerns and modes of analysis

### 3.1 Nature of the concerns

While intellectual property licensing arrangements are typically welfare-enhancing and procompetitive, antitrust concerns may nonetheless arise. For example, a licensing arrangement could include restraints that adversely affect competition in goods markets by dividing the markets among firms that would have competed using different technologies. *See, e.g.*, Example 7. An arrangement that effectively merges the research and development activities of two of only a few entities that could plausibly engage in research and development in the relevant field might harm competition for development of new goods and services. *See* section 3.2.3. An acquisition of intellectual property may lessen competition in a relevant antitrust market. *See* section 5.7. The Agencies will focus on the actual effects of an arrangement, not on its formal terms.

The Agencies will not require the owner of intellectual property to create competition in its own technology. However, antitrust concerns may arise when a licensing arrangement harms competition among entities that would have been actual or likely potential competitors[14] in a relevant market in the absence of the license (entities in a "horizontal relationship"). A restraint in a licensing arrangement may harm such competition, for example, if it facilitates market division or price-fixing. In addition, license restrictions with respect to one market may harm such competition in another market by anticompetitively foreclosing access to, or significantly raising the price of, an important input,[15] or by facilitating coordination to increase price or reduce output. When it appears that such competition may be adversely affected, the Agencies will follow the analysis set forth below. *See generally* sections 3.4 and 4.2.

### 3.2 Markets affected by licensing arrangements

Licensing arrangements raise concerns under the antitrust laws if they are likely to affect adversely the prices, quantities, qualities, or varieties of goods and services[16] either currently or potentially available. The competitive effects of licensing arrangements often can be

---

[14] A firm will be treated as a likely potential competitor if there is evidence that entry by that firm is reasonably probable in the absence of the licensing arrangement.

[15] As used herein, "input" includes outlets for distribution and sales, as well as factors of production. *See, e.g.*, sections 4.1.1 and 5.3–5.5 for further discussion of conditions under which foreclosing access to, or raising the price of, an input may harm competition in a relevant market.

[16] Hereinafter, the term "goods" also includes services.

Page 7

adequately assessed within the relevant markets for the goods affected by the arrangements. In such instances, the Agencies will delineate and analyze only goods markets. In other cases, however, the analysis may require the delineation of markets for technology or markets for research and development (innovation markets).

### 3.2.1 Goods markets

A number of different goods markets may be relevant to evaluating the effects of a licensing arrangement. A restraint in a licensing arrangement may have competitive effects in markets for final or intermediate goods made using the intellectual property, or it may have effects upstream, in markets for goods that are used as inputs, along with the intellectual property, to the production of other goods. In general, for goods markets affected by a licensing arrangement, the Agencies will approach the delineation of relevant market and the measurement of market share in the intellectual property area as in section 1 of the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines.[17]

### 3.2.2 Technology markets

Technology markets consist of the intellectual property that is licensed (the "licensed technology") and its close substitutes—that is, the technologies or goods that are close enough substitutes significantly to constrain the exercise of market power with respect to the intellectual property that is licensed.[18] When rights to intellectual property are marketed separately from the products in which they are used,[19] the Agencies may rely on technology markets to analyze the competitive effects of a licensing arrangement.

---

Example 2

*Situation:* Firms Alpha and Beta independently develop different patented process technologies

[17] U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines (April 2, 1992) (hereinafter "1992 Horizontal Merger Guidelines"). As stated in section 1.41 of the 1992 Horizontal Merger Guidelines, market shares for goods markets "can be expressed either in dollar terms through measurement of sales, shipments, or production, or in physical terms through measurement of sales, shipments, production, capacity or reserves."

[18] For example, the owner of a process for producing a particular good may be constrained in its conduct with respect to that process not only by other processes for making that good, but also by other goods that compete with the downstream good and by the processes used to produce those other goods.

[19] Intellectual property is often licensed, sold, or transferred as an integral part of a marketed good. An example is a patented product marketed with an implied license permitting its use. In such circumstances, there is no need for a separate analysis of technology markets to capture relevant competitive effects.

to manufacture the same off-patent drug for the treatment of a particular disease. Before the firms use their technologies internally or license them to third parties, they announce plans jointly to manufacture the drug, and to assign their manufacturing processes to the new manufacturing venture. Many firms are capable of using and have the incentive to use the licensed technologies to manufacture and distribute the drug; thus, the market for drug manufacturing and distribution is competitive. One of the Agencies is evaluating the likely competitive effects of the planned venture.

*Discussion:* The Agency would analyze the competitive effects of the proposed joint venture by first defining the relevant markets in which competition may be affected and then evaluating the likely competitive effects of the joint venture in the identified markets. (*See* Example 4 for a discussion of the Agencies' approach to joint venture analysis.) In this example, the structural effect of the joint venture in the relevant goods market for the manufacture and distribution of the drug is unlikely to be significant, because many firms in addition to the joint venture compete in that market. The joint venture might, however, increase the prices of the drug produced using Alpha's or Beta's technology by reducing competition in the relevant market for technology to manufacture the drug.

The Agency would delineate a technology market in which to evaluate likely competitive effects of the proposed joint venture. The Agency would identify other technologies that can be used to make the drug with levels of effectiveness and cost per dose comparable to that of the technologies owned by Alpha and Beta. In addition, the Agency would consider the extent to which competition from other drugs that are substitutes for the drug produced using Alpha's or Beta's technology would limit the ability of a hypothetical monopolist that owned both Alpha's and Beta's technology to raise its price.

---

To identify a technology's close substitutes and thus to delineate the relevant technology market, the Agencies will, if the data permit, identify the smallest group of technologies and goods over which a hypothetical monopolist of those technologies and goods likely would exercise market power—for example, by imposing a small but significant and nontransitory price increase.[20] The Agencies recognize that technology often is licensed in ways that are not readily quantifiable in monetary terms.[21] In such

---

[20] This is conceptually analogous to the analytical approach to goods markets under the 1992 Horizontal Merger Guidelines. *Cf.* § 1.11. Of course, market power also can be exercised in other dimensions, such as quality, and these dimensions also may be relevant to the definition and analysis of technology markets.

[21] For example, technology may be licensed royalty-free in exchange for the right to use other technology, or it may be licensed as part of a package license.

circumstances, the Agencies will delineate the relevant market by identifying other technologies and goods which buyers would substitute at a cost comparable to that of using the licensed technology.

In assessing the competitive significance of current and likely potential participants in a technology market, the Agencies will take into account all relevant evidence. When market share data are available and accurately reflect the competitive significance of market participants, the Agencies will include market share data in this assessment. The Agencies also will seek evidence of buyers' and market participants' assessments of the competitive significance of technology market participants. Such evidence is particularly important when market share data are unavailable, or do not accurately represent the competitive significance of market participants. When market share data or other indicia of market power are not available, and it appears that competing technologies are comparably efficient,[22] the Agencies will assign each technology the same market share. For new technologies, the Agencies generally will use the best available information to estimate market acceptance over a two-year period, beginning with commercial introduction.

### 3.2.3  Research and development: innovation markets

If a licensing arrangement may adversely affect competition to develop new or improved goods or processes, the Agencies will analyze such an impact either as a separate competitive effect in relevant goods or technology markets, or as a competitive effect in a separate innovation market. A licensing arrangement may have competitive effects on innovation that cannot be adequately addressed through the analysis of goods or technology markets. For example, the arrangement may affect the development of goods that do not yet exist.[23] Alternatively, the arrangement may affect the development of new or improved

---

[22] The Agencies will regard two technologies as "comparably efficient" if they can be used to produce close substitutes at comparable costs.

[23] E.g., *Sensormatic*, FTC Inv. No. 941-0126, 60 Fed. Reg. 5428 (accepted for comment Dec. 28, 1994); *Wright Medical Technology, Inc.*, FTC Inv. No. 951-0015, 60 Fed. Reg. 460 (accepted for comment Dec. 8, 1994); *American Home Products*, FTC Inv. No. 941-0116, 59 Fed. Reg. 60,807 (accepted for comment Nov. 28, 1994); *Roche Holdings Ltd.*, 113 F.T.C. 1086 (1990); *United States v. Automobile Mfrs. Ass'n*, 307 F. Supp. 617 (C.D. Cal. 1969), *appeal dismissed sub nom. City of New York v. United States*, 397 U.S. 248 (1970), *modified sub nom. United States v. Motor Vehicles Mfrs. Ass'n*, 1982–83 Trade Cas. (CCH) ¶ 65,088 (C.D. Cal. 1982).

goods or processes in geographic markets where there is no actual or likely potential competition in the relevant goods.[24]

An innovation market consists of the research and development directed to particular new or improved goods or processes, and the close substitutes for that research and development. The close substitutes are research and development efforts, technologies, and goods[25] that significantly constrain the exercise of market power with respect to the relevant research and development, for example by limiting the ability and incentive of a hypothetical monopolist to retard the pace of research and development. The Agencies will delineate an innovation market only when the capabilities to engage in the relevant research and development can be associated with specialized assets or characteristics of specific firms.

In assessing the competitive significance of current and likely potential participants in an innovation market, the Agencies will take into account all relevant evidence. When market share data are available and accurately reflect the competitive significance of market participants, the Agencies will include market share data in this assessment. The Agencies also will seek evidence of buyers' and market participants' assessments of the competitive significance of innovation market participants. Such evidence is particularly important when market share data are unavailable or do not accurately represent the competitive significance of market participants. The Agencies may base the market shares of participants in an innovation market on their shares of identifiable assets or characteristics upon which innovation depends, on shares of research and development expenditures, or on shares of a related product. When entities have comparable capabilities and incentives to pursue research and development that is a close substitute for the research and development activities of the parties to a licensing arrangement, the Agencies may assign equal market shares to such entities.

---

[24] *See* Complaint, *United States v. General Motors Corp.*, Civ. No. 93-530 (D. Del., filed Nov. 16, 1993).

[25] For example, the licensor of research and development may be constrained in its conduct not only by competing research and development efforts but also by other existing goods that would compete with the goods under development.

Page 11

**Example 3**

*Situation:* Two companies that specialize in advanced metallurgy agree to cross-license future patents relating to the development of a new component for aircraft jet turbines. Innovation in the development of the component requires the capability to work with very high tensile strength materials for jet turbines. Aspects of the licensing arrangement raise the possibility that competition in research and development of this and related components will be lessened. One of the Agencies is considering whether to define an innovation market in which to evaluate the competitive effects of the arrangement.

*Discussion:* If the firms that have the capability and incentive to work with very high tensile strength materials for jet turbines can be reasonably identified, the Agency will consider defining a relevant innovation market for development of the new component. If the number of firms with the required capability and incentive to engage in research and development of very high tensile strength materials for aircraft jet turbines is small, the Agency may employ the concept of an innovation market to analyze the likely competitive effects of the arrangement in that market, or as an aid in analyzing competitive effects in technology or goods markets. The Agency would perform its analysis as described in parts 3–5.

If the number of firms with the required capability and incentive is large (either because there are a large number of such firms in the jet turbine industry, or because there are many firms in other industries with the required capability and incentive), then the Agency will conclude that the innovation market is competitive. Under these circumstances, it is unlikely that any single firm or plausible aggregation of firms could acquire a large enough share of the assets necessary for innovation to have an adverse impact on competition.

If the Agency cannot reasonably identify the firms with the required capability and incentive, it will not attempt to define an innovation market.

**Example 4**

*Situation:* Three of the largest producers of a plastic used in disposable bottles plan to engage in joint research and development to produce a new type of plastic that is rapidly biodegradable. The joint venture will grant to its partners (but to no one else) licenses to all patent rights and use of know-how. One of the Agencies is evaluating the likely competitive effects of the proposed joint venture.

*Discussion:* The Agency would analyze the proposed research and development joint venture using an analysis similar to that applied to other joint ventures.[26] The Agency would begin by defining the relevant markets in which to analyze the joint venture's likely competitive effects.

---

[26] *See, e.g.,* U.S. Department of Justice and Federal Trade Commission, Statements of Enforcement Policy and Analytical Principles Relating to Health Care and Antitrust 20–23, 37–40, 72–74 (September 27, 1994). This type of transaction may qualify for treatment under the National Cooperative Research and Production Act of 1993, 15 U.S.C.A §§ 4301–05.

Page 12

In this case, a relevant market is an innovation market—research and development for biodegradable (and other environmentally friendly) containers. The Agency would seek to identify any other entities that would be actual or likely potential competitors with the joint venture in that relevant market. This would include those firms that have the capability and incentive to undertake research and development closely substitutable for the research and development proposed to be undertaken by the joint venture, taking into account such firms' existing technologies and technologies under development, R&D facilities, and other relevant assets and business circumstances. Firms possessing such capabilities and incentives would be included in the research and development market even if they are not competitors in relevant markets for related goods, such as the plastics currently produced by the joint venturers, although competitors in existing goods markets may often also compete in related innovation markets.

Having defined a relevant innovation market, the Agency would assess whether the joint venture is likely to have anticompetitive effects in that market. A starting point in this analysis is the degree of concentration in the relevant market and the market shares of the parties to the joint venture. If, in addition to the parties to the joint venture (taken collectively), there are at least four other independently controlled entities that possess comparable capabilities and incentives to undertake research and development of biodegradable plastics, or other products that would be close substitutes for such new plastics, the joint venture ordinarily would be unlikely to adversely affect competition in the relevant innovation market (*cf.* section 4.3). If there are fewer than four other independently controlled entities with similar capabilities and incentives, the Agency would consider whether the joint venture would give the parties to the joint venture an incentive and ability collectively to reduce investment in, or otherwise to retard the pace or scope of, research and development efforts. If the joint venture creates a significant risk of anticompetitive effects in the innovation market, the Agency would proceed to consider efficiency justifications for the venture, such as the potential for combining complementary R&D assets in such a way as to make successful innovation more likely, or to bring it about sooner, or to achieve cost reductions in research and development.

The Agency would also assess the likelihood that the joint venture would adversely affect competition in other relevant markets, including markets for products produced by the parties to the joint venture. The risk of such adverse competitive effects would be increased to the extent that, for example, the joint venture facilitates the exchange among the parties of competitively sensitive information relating to goods markets in which the parties currently compete or facilitates the coordination of competitive activities in such markets. The Agency would examine whether the joint venture imposes collateral restraints that might significantly restrict competition among the joint venturers in goods markets, and would examine whether such collateral restraints were reasonably necessary to achieve any efficiencies that are likely to be attained by the venture.

## 3.3 Horizontal and vertical relationships

Page 13

As with other property transfers, antitrust analysis of intellectual property licensing arrangements examines whether the relationship among the parties to the arrangement is primarily horizontal or vertical in nature, or whether it has substantial aspects of both. A licensing arrangement has a vertical component when it affects activities that are in a complementary relationship, as is typically the case in a licensing arrangement. For example, the licensor's primary line of business may be in research and development, and the licensees, as manufacturers, may be buying the rights to use technology developed by the licensor. Alternatively, the licensor may be a component manufacturer owning intellectual property rights in a product that the licensee manufactures by combining the component with other inputs, or the licensor may manufacture the product, and the licensees may operate primarily in distribution and marketing.

In addition to this vertical component, the licensor and its licensees may also have a horizontal relationship. For analytical purposes, the Agencies ordinarily will treat a relationship between a licensor and its licensees, or between licensees, as horizontal when they would have been actual or likely potential competitors in a relevant market in the absence of the license.

The existence of a horizontal relationship between a licensor and its licensees does not, in itself, indicate that the arrangement is anticompetitive. Identification of such relationships is merely an aid in determining whether there may be anticompetitive effects arising from a licensing arrangement. Such a relationship need not give rise to an anticompetitive effect, nor does a purely vertical relationship assure that there are no anticompetitive effects.

The following examples illustrate different competitive relationships among a licensor and its licensees.

---

**Example 5**

*Situation:* AgCo, a manufacturer of farm equipment, develops a new, patented emission control technology for its tractor engines and licenses it to FarmCo, another farm equipment manufacturer. AgCo's emission control technology is far superior to the technology currently owned and used by FarmCo, so much so that FarmCo's technology does not significantly constrain the prices that AgCo could charge for its technology. AgCo's emission control patent has a broad scope. It is likely that any improved emissions control technology that FarmCo could develop in the foreseeable future would infringe AgCo's patent.

*Discussion:* Because FarmCo's emission control technology does not significantly constrain AgCo's competitive conduct with respect to its emission control technology, AgCo's and FarmCo's emission control technologies are not close substitutes for each other. FarmCo is a consumer of AgCo's technology and is not an actual competitor of AgCo in the relevant market for superior emission control technology of the kind licensed by AgCo. Furthermore, FarmCo

Page 14

is not a likely potential competitor of AgCo in the relevant market because, even if FarmCo could develop an improved emission control technology, it is likely that it would infringe AgCo's patent. This means that the relationship between AgCo and FarmCo with regard to the supply and use of emissions control technology is vertical. Assuming that AgCo and FarmCo are actual or likely potential competitors in sales of farm equipment products, their relationship is horizontal in the relevant markets for farm equipment.

**Example 6**

*Situation:* FarmCo develops a new valve technology for its engines and enters into a cross-licensing arrangement with AgCo, whereby AgCo licenses its emission control technology to FarmCo and FarmCo licenses its valve technology to AgCo. AgCo already owns an alternative valve technology that can be used to achieve engine performance similar to that using FarmCo's valve technology and at a comparable cost to consumers. Before adopting FarmCo's technology, AgCo was using its own valve technology in its production of engines and was licensing (and continues to license) that technology for use by others. As in Example 5, FarmCo does not own or control an emission control technology that is a close substitute for the technology licensed from AgCo. Furthermore, as in Example 5, FarmCo is not likely to develop an improved emission control technology that would be a close substitute for AgCo's technology, because of AgCo's blocking patent.

*Discussion:* FarmCo is a consumer and not a competitor of AgCo's emission control technology. As in Example 5, their relationship is vertical with regard to this technology. The relationship between AgCo and FarmCo in the relevant market that includes engine valve technology is vertical in part and horizontal in part. It is vertical in part because AgCo and FarmCo stand in a complementary relationship, in which AgCo is a consumer of a technology supplied by FarmCo. However, the relationship between AgCo and FarmCo in the relevant market that includes engine valve technology is also horizontal in part, because FarmCo and AgCo are actual competitors in the licensing of valve technology that can be used to achieve similar engine performance at a comparable cost. Whether the firms license their valve technologies to others is not important for the conclusion that the firms have a horizontal relationship in this relevant market. Even if AgCo's use of its valve technology were solely captive to its own production, the fact that the two valve technologies are substitutable at comparable cost means that the two firms have a horizontal relationship.

As in Example 5, the relationship between AgCo and FarmCo is horizontal in the relevant markets for farm equipment.

### 3.4  Framework for evaluating licensing restraints

In the vast majority of cases, restraints in intellectual property licensing arrangements are evaluated under the rule of reason.  The Agencies' general approach in analyzing a licensing restraint under the rule of reason is to inquire whether the restraint is likely to have anticompetitive effects and, if so, whether the restraint is reasonably necessary to achieve procompetitive benefits that outweigh those anticompetitive effects.  *See Federal Trade Commission v. Indiana Federation of Dentists,* 476 U.S. 447 (1986); *NCAA v. Board of Regents of the University of Oklahoma,* 468 U.S. 85 (1984); *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1 (1979); 7 Phillip E. Areeda, *Antitrust Law* § 1502 (1986).  *See also* part 4.

In some cases, however, the courts conclude that a restraint's "nature and necessary effect are so plainly anticompetitive" that it should be treated as unlawful per se, without an elaborate inquiry into the restraint's likely competitive effect.  *Federal Trade Commission v. Superior Court Trial Lawyers Association,* 493 U.S. 411, 433 (1990); *National Society of Professional Engineers v. United States,* 435 U.S. 679, 692 (1978).  Among the restraints that have been held per se unlawful are naked price-fixing, output restraints, and market division among horizontal competitors, as well as certain group boycotts and resale price maintenance.

To determine whether a particular restraint in a licensing arrangement is given per se or rule of reason treatment, the Agencies will assess whether the restraint in question can be expected to contribute to an efficiency-enhancing integration of economic activity.  *See Broadcast Music,* 441 U.S. at 16–24.  In general, licensing arrangements promote such integration because they facilitate the combination of the licensor's intellectual property with complementary factors of production owned by the licensee.  A restraint in a licensing arrangement may further such integration by, for example, aligning the incentives of the licensor and the licensees to promote the development and marketing of the licensed technology, or by substantially reducing transactions costs.  If there is no efficiency-enhancing integration of economic activity and if the type of restraint is one that has been accorded per se treatment, the Agencies will challenge the restraint under the per se rule.  Otherwise, the Agencies will apply a rule of reason analysis.

Application of the rule of reason generally requires a comprehensive inquiry into market conditions. (*See* sections 4.1–4.3.)  However, that inquiry may be truncated in certain circumstances.  If the Agencies conclude that a restraint has no likely anticompetitive effects, they will treat it as reasonable, without an elaborate analysis of market power or the justifications for the restraint.  Similarly, if a restraint facially appears to be of a kind that

would always or almost always tend to reduce output or increase prices,[27] and the restraint is not reasonably related to efficiencies, the Agencies will likely challenge the restraint without an elaborate analysis of particular industry circumstances.[28] *See Indiana Federation of Dentists*, 476 U.S. at 459–60; *NCAA*, 468 U.S. at 109.

---

**Example 7**

*Situation:* Gamma, which manufactures Product X using its patented process, offers a license for its process technology to every other manufacturer of Product X, each of which competes world-wide with Gamma in the manufacture and sale of X. The process technology does not represent an economic improvement over the available existing technologies. Indeed, although most manufacturers accept licenses from Gamma, none of the licensees actually uses the licensed technology. The licenses provide that each manufacturer has an exclusive right to sell Product X manufactured using the licensed technology in a designated geographic area and that no manufacturer may sell Product X, however manufactured, outside the designated territory.

*Discussion:* The manufacturers of Product X are in a horizontal relationship in the goods market for Product X. Any manufacturers of Product X that control technologies that are substitutable at comparable cost for Gamma's process are also horizontal competitors of Gamma in the relevant technology market. The licensees of Gamma's process technology are technically in a vertical relationship, although that is not significant in this example because they do not actually use Gamma's technology.

The licensing arrangement restricts competition in the relevant goods market among manufacturers of Product X by requiring each manufacturer to limit its sales to an exclusive territory. Thus, competition among entities that would be actual competitors in the absence of the licensing arrangement is restricted. Based on the facts set forth above, the licensing arrangement does not involve a useful transfer of technology, and thus it is unlikely that the restraint on sales outside the designated territories contributes to an efficiency-enhancing integration of economic activity. Consequently, the evaluating Agency would be likely to challenge the arrangement under the per se rule as a horizontal territorial market allocation scheme and to view the intellectual property aspects of the arrangement as a sham intended to cloak its true nature.

---

[27] Details about the Federal Trade Commission's approach are set forth in *Massachusetts Board of Registration in Optometry*, 110 F.T.C. 549, 604 (1988). In applying its truncated rule of reason inquiry, the FTC uses the analytical category of "inherently suspect" restraints to denote facially anticompetitive restraints that would always or almost always tend to decrease output or increase prices, but that may be relatively unfamiliar or may not fit neatly into traditional per se categories.

[28] Under the FTC's *Mass. Board* approach, asserted efficiency justifications for inherently suspect restraints are examined to determine whether they are plausible and, if so, whether they are valid in the context of the market at issue. *Mass. Board*, 110 F.T.C. at 604.

If the licensing arrangement could be expected to contribute to an efficiency-enhancing integration of economic activity, as might be the case if the licensed technology were an advance over existing processes and used by the licensees, the Agency would analyze the arrangement under the rule of reason applying the analytical framework described in this section.

In this example, the competitive implications do not generally depend on whether the licensed technology is protected by patent, is a trade secret or other know-how, or is a computer program protected by copyright; nor do the competitive implications generally depend on whether the allocation of markets is territorial, as in this example, or functional, based on fields of use.

---

## 4. General principles concerning the Agencies' evaluation of licensing arrangements under the rule of reason

### 4.1 Analysis of anticompetitive effects

The existence of anticompetitive effects resulting from a restraint in a licensing arrangement will be evaluated on the basis of the analysis described in this section.

### 4.1.1 Market structure, coordination, and foreclosure

When a licensing arrangement affects parties in a horizontal relationship, a restraint in that arrangement may increase the risk of coordinated pricing, output restrictions, or the acquisition or maintenance of market power. Harm to competition also may occur if the arrangement poses a significant risk of retarding or restricting the development of new or improved goods or processes. The potential for competitive harm depends in part on the degree of concentration in, the difficulty of entry into, and the responsiveness of supply and demand to changes in price in the relevant markets. *Cf.* 1992 Horizontal Merger Guidelines §§ 1.5, 3.

When the licensor and licensees are in a vertical relationship, the Agencies will analyze whether the licensing arrangement may harm competition among entities in a horizontal relationship at either the level of the licensor or the licensees, or possibly in another relevant market. Harm to competition from a restraint may occur if it anticompetitively forecloses access to, or increases competitors' costs of obtaining, important inputs, or facilitates coordination to raise price or restrict output. The risk of anticompetitively foreclosing access or increasing competitors' costs is related to the proportion of the markets affected by the licensing restraint; other characteristics of the relevant markets, such as concentration,

difficulty of entry, and the responsiveness of supply and demand to changes in price in the relevant markets; and the duration of the restraint. A licensing arrangement does not foreclose competition merely because some or all of the potential licensees in an industry choose to use the licensed technology to the exclusion of other technologies. Exclusive use may be an efficient consequence of the licensed technology having the lowest cost or highest value.

Harm to competition from a restraint in a vertical licensing arrangement also may occur if a licensing restraint facilitates coordination among entities in a horizontal relationship to raise prices or reduce output in a relevant market. For example, if owners of competing technologies impose similar restraints on their licensees, the licensors may find it easier to coordinate their pricing. Similarly, licensees that are competitors may find it easier to coordinate their pricing if they are subject to common restraints in licenses with a common licensor or competing licensors. The risk of anticompetitive coordination is increased when the relevant markets are concentrated and difficult to enter. The use of similar restraints may be common and procompetitive in an industry, however, because they contribute to efficient exploitation of the licensed property.

### 4.1.2 Licensing arrangements involving exclusivity

A licensing arrangement may involve exclusivity in two distinct respects. First, the licensor may grant one or more *exclusive licenses*, which restrict the right of the licensor to license others and possibly also to use the technology itself. Generally, an exclusive license may raise antitrust concerns only if the licensees themselves, or the licensor and its licensees, are in a horizontal relationship. Examples of arrangements involving exclusive licensing that may give rise to antitrust concerns include cross-licensing by parties collectively possessing market power (*see* section 5.5), grantbacks (*see* section 5.6), and acquisitions of intellectual property rights (*see* section 5.7).

A non-exclusive license of intellectual property that does not contain any restraints on the competitive conduct of the licensor or the licensee generally does not present antitrust concerns even if the parties to the license are in a horizontal relationship, because the non-exclusive license normally does not diminish competition that would occur in its absence.

A second form of exclusivity, *exclusive dealing*, arises when a license prevents or restrains the licensee from licensing, selling, distributing, or using competing technologies. *See* section 5.4. Exclusivity may be achieved by an explicit exclusive dealing term in the license or by other provisions such as compensation terms or other economic incentives. Such restraints may anticompetitively foreclose access to, or increase competitors' costs of obtaining, important inputs, or facilitate coordination to raise price or reduce output, but they

also may have procompetitive effects. For example, a licensing arrangement that prevents the licensee from dealing in other technologies may encourage the licensee to develop and market the licensed technology or specialized applications of that technology. *See, e.g.,* Example 8. The Agencies will take into account such procompetitive effects in evaluating the reasonableness of the arrangement. *See* section 4.2.

The antitrust principles that apply to a licensor's grant of various forms of exclusivity to and among its licensees are similar to those that apply to comparable vertical restraints outside the licensing context, such as exclusive territories and exclusive dealing. However, the fact that intellectual property may in some cases be misappropriated more easily than other forms of property may justify the use of some restrictions that might be anticompetitive in other contexts.

As noted earlier, the Agencies will focus on the actual practice and its effects, not on the formal terms of the arrangement. A license denominated as non-exclusive (either in the sense of exclusive licensing or in the sense of exclusive dealing) may nonetheless give rise to the same concerns posed by formal exclusivity. A non-exclusive license may have the effect of exclusive licensing if it is structured so that the licensor is unlikely to license others or to practice the technology itself. A license that does not explicitly require exclusive dealing may have the effect of exclusive dealing if it is structured to increase significantly a licensee's cost when it uses competing technologies. However, a licensing arrangement will not automatically raise these concerns merely because a party chooses to deal with a single licensee or licensor, or confines his activity to a single field of use or location, or because only a single licensee has chosen to take a license.

---

**Example 8**

*Situation:* NewCo, the inventor and manufacturer of a new flat panel display technology, lacking the capability to bring a flat panel display product to market, grants BigCo an exclusive license to sell a product embodying NewCo's technology. BigCo does not currently sell, and is not developing (or likely to develop), a product that would compete with the product embodying the new technology and does not control rights to another display technology. Several firms offer competing displays, BigCo accounts for only a small proportion of the outlets for distribution of display products, and entry into the manufacture and distribution of display products is relatively easy. Demand for the new technology is uncertain and successful market penetration will require considerable promotional effort. The license contains an exclusive dealing restriction preventing BigCo from selling products that compete with the product embodying the licensed technology.

*Discussion:* This example illustrates both types of exclusivity in a licensing arrangement. The license is exclusive in that it restricts the right of the licensor to grant other licenses. In

Page 20

addition, the license has an exclusive dealing component in that it restricts the licensee from selling competing products.

The inventor of the display technology and its licensee are in a vertical relationship and are not actual or likely potential competitors in the manufacture or sale of display products or in the sale or development of technology. Hence, the grant of an exclusive license does not affect competition between the licensor and the licensee. The exclusive license may promote competition in the manufacturing and sale of display products by encouraging BigCo to develop and promote the new product in the face of uncertain demand by rewarding BigCo for its efforts if they lead to large sales. Although the license bars the licensee from selling competing products, this exclusive dealing aspect is unlikely in this example to harm competition by anticompetitively foreclosing access, raising competitors' costs of inputs, or facilitating anticompetitive pricing because the relevant product market is unconcentrated, the exclusive dealing restraint affects only a small proportion of the outlets for distribution of display products, and entry is easy. On these facts, the evaluating Agency would be unlikely to challenge the arrangement.

## 4.2 Efficiencies and justifications

If the Agencies conclude, upon an evaluation of the market factors described in section 4.1, that a restraint in a licensing arrangement is unlikely to have an anticompetitive effect, they will not challenge the restraint. If the Agencies conclude that the restraint has, or is likely to have, an anticompetitive effect, they will consider whether the restraint is reasonably necessary to achieve procompetitive efficiencies. If the restraint is reasonably necessary, the Agencies will balance the procompetitive efficiencies and the anticompetitive effects to determine the probable net effect on competition in each relevant market.

The Agencies' comparison of anticompetitive harms and procompetitive efficiencies is necessarily a qualitative one. The risk of anticompetitive effects in a particular case may be insignificant compared to the expected efficiencies, or vice versa. As the expected anticompetitive effects in a particular licensing arrangement increase, the Agencies will require evidence establishing a greater level of expected efficiencies.

The existence of practical and significantly less restrictive alternatives is relevant to a determination of whether a restraint is reasonably necessary. If it is clear that the parties could have achieved similar efficiencies by means that are significantly less restrictive, then the Agencies will not give weight to the parties' efficiency claim. In making this assessment, however, the Agencies will not engage in a search for a theoretically least restrictive alternative that is not realistic in the practical prospective business situation faced by the parties.

When a restraint has, or is likely to have, an anticompetitive effect, the duration of that restraint can be an important factor in determining whether it is reasonably necessary to achieve the putative procompetitive efficiency. The effective duration of a restraint may depend on a number of factors, including the option of the affected party to terminate the arrangement unilaterally and the presence of contract terms (e.g., unpaid balances on minimum purchase commitments) that encourage the licensee to renew a license arrangement. Consistent with their approach to less restrictive alternative analysis generally, the Agencies will not attempt to draw fine distinctions regarding duration; rather, their focus will be on situations in which the duration clearly exceeds the period needed to achieve the procompetitive efficiency.

The evaluation of procompetitive efficiencies, of the reasonable necessity of a restraint to achieve them, and of the duration of the restraint, may depend on the market context. A restraint that may be justified by the needs of a new entrant, for example, may not have a procompetitive efficiency justification in different market circumstances. *Cf. United States v. Jerrold Electronics Corp.*, 187 F. Supp. 545 (E.D. Pa. 1960), *aff'd per curiam*, 365 U.S. 567 (1961).

## 4.3 Antitrust "safety zone"

Because licensing arrangements often promote innovation and enhance competition, the Agencies believe that an antitrust "safety zone" is useful in order to provide some degree of certainty and thus to encourage such activity.[29] Absent extraordinary circumstances, the Agencies will not challenge a restraint in an intellectual property licensing arrangement if (1) the restraint is not facially anticompetitive[30] and (2) the licensor and its licensees collectively account for no more than twenty percent of each relevant market significantly affected by the restraint. This "safety zone" does not apply to those transfers of intellectual property rights to which a merger analysis is applied. *See* section 5.7.

Whether a restraint falls within the safety zone will be determined by reference only to goods markets unless the analysis of goods markets alone would inadequately address the effects of the licensing arrangement on competition among technologies or in research and development.

---

[29] The antitrust "safety zone" does not apply to restraints that are not in a licensing arrangement, or to restraints that are in a licensing arrangement but are unrelated to the use of the licensed intellectual property.

[30] "Facially anticompetitive" refers to restraints that normally warrant per se treatment, as well as other restraints of a kind that would always or almost always tend to reduce output or increase prices. *See* section 3.4.

If an examination of the effects on competition among technologies or in research development is required, and if market share data are unavailable or do not accurately represent competitive significance, the following safety zone criteria will apply. Absent extraordinary circumstances, the Agencies will not challenge a restraint in an intellectual property licensing arrangement that may affect competition in a technology market if (1) the restraint is not facially anticompetitive and (2) there are four or more independently controlled technologies in addition to the technologies controlled by the parties to the licensing arrangement that may be substitutable for the licensed technology at a comparable cost to the user. Absent extraordinary circumstances, the Agencies will not challenge a restraint in an intellectual property licensing arrangement that may affect competition in an innovation market if (1) the restraint is not facially anticompetitive and (2) four or more independently controlled entities in addition to the parties to the licensing arrangement possess the required specialized assets or characteristics and the incentive to engage in research and development that is a close substitute of the research and development activities of the parties to the licensing agreement.[31]

The Agencies emphasize that licensing arrangements are not anticompetitive merely because they do not fall within the scope of the safety zone. Indeed, it is likely that the great majority of licenses falling outside the safety zone are lawful and procompetitive. The safety zone is designed to provide owners of intellectual property with a degree of certainty in those situations in which anticompetitive effects are so unlikely that the arrangements may be presumed not to be anticompetitive without an inquiry into particular industry circumstances. It is not intended to suggest that parties should conform to the safety zone or to discourage parties falling outside the safety zone from adopting restrictions in their license arrangements that are reasonably necessary to achieve an efficiency-enhancing integration of economic activity. The Agencies will analyze arrangements falling outside the safety zone based on the considerations outlined in parts 3–5.

The status of a licensing arrangement with respect to the safety zone may change over time. A determination by the Agencies that a restraint in a licensing arrangement qualifies for inclusion in the safety zone is based on the factual circumstances prevailing at the time of the conduct at issue.[32]

---

[31] This is consistent with congressional intent in enacting the National Cooperative Research Act. *See* H.R. Conf. Rpt. No. 1044, 98th Cong., 2d Sess., 10, *reprinted in* 1984 U.S.C.C.A.N. 3105, 3134–35.

[32] The conduct at issue may be the transaction giving rise to the restraint or the subsequent implementation of the restraint.

# 5. Application of general principles

**5.0** This section illustrates the application of the general principles discussed above to particular licensing restraints and to arrangements that involve the cross-licensing, pooling, or acquisition of intellectual property. The restraints and arrangements identified are typical of those that are likely to receive antitrust scrutiny; however, they are not intended as an exhaustive list of practices that could raise competitive concerns.

## 5.1 Horizontal restraints

The existence of a restraint in a licensing arrangement that affects parties in a horizontal relationship (a "horizontal restraint") does not necessarily cause the arrangement to be anticompetitive. As in the case of joint ventures among horizontal competitors, licensing arrangements among such competitors may promote rather than hinder competition if they result in integrative efficiencies. Such efficiencies may arise, for example, from the realization of economies of scale and the integration of complementary research and development, production, and marketing capabilities.

Following the general principles outlined in section 3.4, horizontal restraints often will be evaluated under the rule of reason. In some circumstances, however, that analysis may be truncated; additionally, some restraints may merit per se treatment, including price fixing, allocation of markets or customers, agreements to reduce output, and certain group boycotts.

**Example 9**

*Situation:* Two of the leading manufacturers of a consumer electronic product hold patents that cover alternative circuit designs for the product. The manufacturers assign their patents to a separate corporation wholly owned by the two firms. That corporation licenses the right to use the circuit designs to other consumer product manufacturers and establishes the license royalties. None of the patents is blocking; that is, each of the patents can be used without infringing a patent owned by the other firm. The different circuit designs are substitutable in that each permits the manufacture at comparable cost to consumers of products that consumers consider to be interchangeable. One of the Agencies is analyzing the licensing arrangement.

*Discussion:* In this example, the manufacturers are horizontal competitors in the goods market for the consumer product and in the related technology markets. The competitive issue with regard to a joint assignment of patent rights is whether the assignment has an adverse impact on competition in technology and goods markets that is not outweighed by procompetitive efficiencies, such as benefits in the use or dissemination of the technology. Each of the patent owners has a right to exclude others from using its patent. That right does not extend, however, to the agreement to assign rights jointly. To the extent that the patent rights cover technologies that are close substitutes, the joint determination of royalties likely would result in higher royalties and higher goods prices than would result if the owners licensed or used their technologies independently. In the absence of evidence establishing efficiency-enhancing integration from the joint assignment of patent rights, the Agency may conclude that the joint marketing of competing patent rights constitutes horizontal price fixing and could be challenged as a per se unlawful horizontal restraint of trade. If the joint marketing arrangement results in an efficiency-enhancing integration, the Agency would evaluate the arrangement under the rule of reason. However, the Agency may conclude that the anticompetitive effects are sufficiently apparent, and the claimed integrative efficiencies are sufficiently weak or not reasonably related to the restraints, to warrant challenge of the arrangement without an elaborate analysis of particular industry circumstances (*see* section 3.4).

## 5.2  Resale price maintenance

Resale price maintenance is illegal when "commodities have passed into the channels of trade and are owned by dealers." *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 408 (1911). It has been held per se illegal for a licensor of an intellectual property right in a product to fix a licensee's *resale* price of that product. *United States v. Univis Lens Co.*, 316 U.S. 241 (1942); *Ethyl Gasoline Corp. v. United States*, 309 U.S. 436 (1940).[33]

---

[33] *But cf. United States v. General Electric Co.*, 272 U.S. 476 (1926) (holding that an owner of a product patent may condition a license to manufacture the product on the fixing of the *first* sale price

Consistent with the principles set forth in section 3.4, the Agencies will enforce the per se rule against resale price maintenance in the intellectual property context.

## 5.3 Tying arrangements

A "tying" or "tie-in" or "tied sale" arrangement has been defined as "an agreement by a party to sell one product . . . on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that [tied] product from any other supplier." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 112 S. Ct. 2072, 2079 (1992). Conditioning the ability of a licensee to license one or more items of intellectual property on the licensee's purchase of another item of intellectual property or a good or a service has been held in some cases to constitute illegal tying.[34] Although tying arrangements may result in anticompetitive effects, such arrangements can also result in significant efficiencies and procompetitive benefits. In the exercise of their prosecutorial discretion, the Agencies will consider both the anticompetitive effects and the efficiencies attributable to a tie-in. The Agencies would be likely to challenge a tying arrangement if: (1) the seller has market power in the tying product,[35] (2) the arrangement has an adverse effect on competition in the relevant market for the tied product, and (3) efficiency justifications for the arrangement do not outweigh the anticompetitive effects.[36] The Agencies will not presume that a patent, copyright, or trade secret necessarily confers market power upon its owner.

---

of the patented product). Subsequent lower court decisions have distinguished the *GE* decision in various contexts. *See, e.g., Royal Indus. v. St. Regis Paper Co.*, 420 F.2d 449, 452 (9th Cir. 1969) (observing that *GE* involved a restriction by a patentee who also manufactured the patented product and leaving open the question whether a nonmanufacturing patentee may fix the price of the patented product); *Newburgh Moire Co. v. Superior Moire Co.*, 237 F.2d 283, 293–94 (3rd Cir. 1956) (grant of multiple licenses each containing price restrictions does not come within the *GE* doctrine); *Cummer-Graham Co. v. Straight Side Basket Corp.*, 142 F.2d 646, 647 (5th Cir.) (owner of an intellectual property right in a process to manufacture an unpatented product may not fix the sale price of that product), *cert. denied*, 323 U.S. 726 (1944); *Barber-Colman Co. v. National Tool Co.*, 136 F.2d 339, 343–44 (6th Cir. 1943) (same).

[34] *See, e.g., United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 156–58 (1948) (copyrights); *International Salt Co. v. United States*, 332 U.S. 392 (1947) (patent and related product).

[35] *Cf.* 35 U.S.C. § 271(d) (1988 & Supp. V 1993) (requirement of market power in patent misuse cases involving tying).

[36] As is true throughout these Guidelines, the factors listed are those that guide the Agencies' internal analysis in exercising their prosecutorial discretion. They are not intended to circumscribe how the Agencies will conduct the litigation of cases that they decide to bring.

Package licensing—the licensing of multiple items of intellectual property in a single license or in a group of related licenses—may be a form of tying arrangement if the licensing of one product is conditioned upon the acceptance of a license of another, separate product. Package licensing can be efficiency enhancing under some circumstances. When multiple licenses are needed to use any single item of intellectual property, for example, a package license may promote such efficiencies. If a package license constitutes a tying arrangement, the Agencies will evaluate its competitive effects under the same principles they apply to other tying arrangements.

## 5.4 Exclusive dealing

In the intellectual property context, exclusive dealing occurs when a license prevents the licensee from licensing, selling, distributing, or using competing technologies. Exclusive dealing arrangements are evaluated under the rule of reason. *See Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961) (evaluating legality of exclusive dealing under section 1 of the Sherman Act and section 3 of the Clayton Act); *Beltone Electronics Corp.*, 100 F.T.C. 68 (1982) (evaluating legality of exclusive dealing under section 5 of the Federal Trade Commission Act). In determining whether an exclusive dealing arrangement is likely to reduce competition in a relevant market, the Agencies will take into account the extent to which the arrangement (1) promotes the exploitation and development of the licensor's technology and (2) anticompetitively forecloses the exploitation and development of, or otherwise constrains competition among, competing technologies.

The likelihood that exclusive dealing may have anticompetitive effects is related, inter alia, to the degree of foreclosure in the relevant market, the duration of the exclusive dealing arrangement, and other characteristics of the input and output markets, such as concentration, difficulty of entry, and the responsiveness of supply and demand to changes in price in the relevant markets. (*See* sections 4.1.1 and 4.1.2.) If the Agencies determine that a particular exclusive dealing arrangement may have an anticompetitive effect, they will evaluate the extent to which the restraint encourages licensees to develop and market the licensed technology (or specialized applications of that technology), increases licensors' incentives to develop or refine the licensed technology, or otherwise increases competition and enhances output in a relevant market. (*See* section 4.2 and Example 8.)

## 5.5 Cross-licensing and pooling arrangements

Cross-licensing and pooling arrangements are agreements of two or more owners of different items of intellectual property to license one another or third parties. These arrangements may provide procompetitive benefits by integrating complementary technologies, reducing transaction costs, clearing blocking positions, and avoiding costly infringement litigation. By promoting the dissemination of technology, cross-licensing and pooling arrangements are often procompetitive.

Cross-licensing and pooling arrangements can have anticompetitive effects in certain circumstances. For example, collective price or output restraints in pooling arrangements, such as the joint marketing of pooled intellectual property rights with collective price setting or coordinated output restrictions, may be deemed unlawful if they do not contribute to an efficiency-enhancing integration of economic activity among the participants. *Compare NCAA* 468 U.S. at 114 (output restriction on college football broadcasting held unlawful because it was not reasonably related to any purported justification) *with Broadcast Music,* 441 U.S. at 23 (blanket license for music copyrights found not per se illegal because the cooperative price was necessary to the creation of a new product). When cross-licensing or pooling arrangements are mechanisms to accomplish naked price fixing or market division, they are subject to challenge under the per se rule. *See United States v. New Wrinkle, Inc.,* 342 U.S. 371 (1952) (price fixing).

Settlements involving the cross-licensing of intellectual property rights can be an efficient means to avoid litigation and, in general, courts favor such settlements. When such cross-licensing involves horizontal competitors, however, the Agencies will consider whether the effect of the settlement is to diminish competition among entities that would have been actual or likely potential competitors in a relevant market in the absence of the cross-license. In the absence of offsetting efficiencies, such settlements may be challenged as unlawful restraints of trade. *Cf. United States v. Singer Manufacturing Co.,* 374 U.S. 174 (1963) (cross-license agreement was part of broader combination to exclude competitors).

Pooling arrangements generally need not be open to all who would like to join. However, exclusion from cross-licensing and pooling arrangements among parties that collectively possess market power may, under some circumstances, harm competition. *Cf. Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284 (1985) (exclusion of a competitor from a purchasing cooperative not per se unlawful absent a showing of market power). In general, exclusion from a pooling or cross-licensing arrangement among competing technologies is unlikely to have anticompetitive effects unless (1) excluded firms cannot effectively compete in the relevant market for the good incorporating the licensed technologies and (2) the pool participants collectively possess market power in the relevant market. If these circumstances exist, the Agencies will evaluate

Page 28

whether the arrangement's limitations on participation are reasonably related to the efficient development and exploitation of the pooled technologies and will assess the net effect of those limitations in the relevant market. *See* section 4.2.

Another possible anticompetitive effect of pooling arrangements may occur if the arrangement deters or discourages participants from engaging in research and development, thus retarding innovation. For example, a pooling arrangement that requires members to grant licenses to each other for current and future technology at minimal cost may reduce the incentives of its members to engage in research and development because members of the pool have to share their successful research and development and each of the members can free ride on the accomplishments of other pool members. *See generally United States v. Mfrs. Aircraft Ass'n, Inc.*, 1976-1 Trade Cas. (CCH) ¶ 60,810 (S.D.N.Y. 1975); *United States v. Automobile Mfrs. Ass'n*, 307 F. Supp. 617 (C.D. Cal 1969), *appeal dismissed sub nom. City of New York v. United States*, 397 U.S. 248 (1970), *modified sub nom. United States v. Motor Vehicle Mfrs. Ass'n*, 1982–83 Trade Cas. (CCH) ¶ 65,088 (C.D. Cal. 1982). However, such an arrangement can have procompetitive benefits, for example, by exploiting economies of scale and integrating complementary capabilities of the pool members, (including the clearing of blocking positions), and is likely to cause competitive problems only when the arrangement includes a large fraction of the potential research and development in an innovation market. *See* section 3.2.3 and Example 4.

---

### Example 10

*Situation:* As in Example 9, two of the leading manufacturers of a consumer electronic product hold patents that cover alternative circuit designs for the product. The manufacturers assign several of their patents to a separate corporation wholly owned by the two firms. That corporation licenses the right to use the circuit designs to other consumer product manufacturers and establishes the license royalties. In this example, however, the manufacturers assign to the separate corporation only patents that are blocking. None of the patents assigned to the corporation can be used without infringing a patent owned by the other firm.

*Discussion:* Unlike the previous example, the joint assignment of patent rights to the wholly-owned corporation in this example does not adversely affect competition in the licensed technology among entities that would have been actual or likely potential competitors in the absence of the licensing arrangement. Moreover, the licensing arrangement is likely to have procompetitive benefits in the use of the technology. Because the manufacturers' patents are blocking, the manufacturers are not in a horizontal relationship with respect to those patents. None of the patents can be used without the right to a patent owned by the other firm, so the patents are not substitutable. As in Example 9, the firms are horizontal competitors in the relevant goods market. In the absence of collateral restraints that would likely raise price or reduce output in the relevant goods market or in any other relevant antitrust market and that are

> not reasonably related to an efficiency-enhancing integration of economic activity, the evaluating Agency would be unlikely to challenge this arrangement.

## 5.6 Grantbacks

A grantback is an arrangement under which a licensee agrees to extend to the licensor of intellectual property the right to use the licensee's improvements to the licensed technology. Grantbacks can have procompetitive effects, especially if they are nonexclusive. Such arrangements provide a means for the licensee and the licensor to share risks and reward the licensor for making possible further innovation based on or informed by the licensed technology, and both promote innovation in the first place and promote the subsequent licensing of the results of the innovation. Grantbacks may adversely affect competition, however, if they substantially reduce the licensee's incentives to engage in research and development and thereby limit rivalry in innovation markets.

A non-exclusive grantback allows the licensee to practice its technology and license it to others. Such a grantback provision may be necessary to ensure that the licensor is not prevented from effectively competing because it is denied access to improvements developed with the aid of its own technology. Compared with an exclusive grantback, a non-exclusive grantback, which leaves the licensee free to license improvements technology to others, is less likely to have anticompetitive effects.

The Agencies will evaluate a grantback provision under the rule of reason, *see generally Transparent-Wrap Machine Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 645–48 (1947) (grantback provision in technology license is not per se unlawful), considering its likely effects in light of the overall structure of the licensing arrangement and conditions in the relevant markets. An important factor in the Agencies' analysis of a grantback will be whether the licensor has market power in a relevant technology or innovation market. If the Agencies determine that a particular grantback provision is likely to reduce significantly licensees' incentives to invest in improving the licensed technology, the Agencies will consider the extent to which the grantback provision has offsetting procompetitive effects, such as (1) promoting dissemination of licensees' improvements to the licensed technology, (2) increasing the licensors' incentives to disseminate the licensed technology, or (3) otherwise increasing competition and output in a relevant technology or innovation market. *See* section 4.2. In addition, the Agencies will consider the extent to which grantback provisions in the relevant markets generally increase licensors' incentives to innovate in the first place.

Page 30

## 5.7 Acquisition of intellectual property rights

Certain transfers of intellectual property rights are most appropriately analyzed by applying the principles and standards used to analyze mergers, particularly those in the 1992 Horizontal Merger Guidelines. The Agencies will apply a merger analysis to an outright sale by an intellectual property owner of all of its rights to that intellectual property and to a transaction in which a person obtains through grant, sale, or other transfer an exclusive license for intellectual property (i.e., a license that precludes all other persons, including the licensor, from using the licensed intellectual property).[37] Such transactions may be assessed under section 7 of the Clayton Act, sections 1 and 2 of the Sherman Act, and section 5 of the Federal Trade Commission Act.

---

**Example 11**

*Situation:* Omega develops a new, patented pharmaceutical for the treatment of a particular disease. The only drug on the market approved for the treatment of this disease is sold by Delta. Omega's patented drug has almost completed regulatory approval by the Food and Drug Administration. Omega has invested considerable sums in product development and market testing, and initial results show that Omega's drug would be a significant competitor to Delta's. However, rather than enter the market as a direct competitor of Delta, Omega licenses to Delta the right to manufacture and sell Omega's patented drug. The license agreement with Delta is nominally nonexclusive. However, Omega has rejected all requests by other firms to obtain a license to manufacture and sell Omega's patented drug, despite offers by those firms of terms that are reasonable in relation to those in Delta's license.

*Discussion:* Although Omega's license to Delta is nominally nonexclusive, the circumstances indicate that it is exclusive in fact because Omega has rejected all reasonable offers by other firms for licenses to manufacture and sell Omega's patented drug. The facts of this example indicate that Omega would be a likely potential competitor of Delta in the absence of the licensing arrangement, and thus they are in a horizontal relationship in the relevant goods market that includes drugs for the treatment of this particular disease. The evaluating Agency would apply a merger analysis to this transaction, since it involves an acquisition of a likely potential competitor.

---

[37] The safety zone of section 4.3 does not apply to transfers of intellectual property such as those described in this section.

## 6. Enforcement of invalid intellectual property rights

The Agencies may challenge the enforcement of invalid intellectual property rights as antitrust violations. Enforcement or attempted enforcement of a patent obtained by fraud on the Patent and Trademark Office or the Copyright Office may violate section 2 of the Sherman Act, if all the elements otherwise necessary to establish a section 2 charge are proved, or section 5 of the Federal Trade Commission Act. *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965) (patents); *American Cyanamid Co.*, 72 F.T.C. 623, 684–85 (1967), *aff'd sub. nom. Charles Pfizer & Co.*, 401 F.2d 574 (6th Cir. 1968), *cert. denied*, 394 U.S. 920 (1969) (patents); *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639, 647 (S.D.N.Y. 1992) (copyrights). Inequitable conduct before the Patent and Trademark Office will not be the basis of a section 2 claim unless the conduct also involves knowing and willful fraud and the other elements of a section 2 claim are present. *Argus Chemical Corp. v. Fibre Glass-Evercoat, Inc.*, 812 F.2d 1381, 1384–85 (Fed. Cir. 1987). Actual or attempted enforcement of patents obtained by inequitable conduct that falls short of fraud under some circumstances may violate section 5 of the Federal Trade Commission Act, *American Cyanamid Co., supra.* Objectively baseless litigation to enforce invalid intellectual property rights may also constitute an element of a violation of the Sherman Act. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 113 S. Ct. 1920, 1928 (1993) (copyrights); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1289 (9th Cir. 1984), *cert. denied*, 469 U.S. 1190 (1985) (patents); *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 992–96 (9th Cir. 1979), *cert. denied*, 444 U.S. 1025 (1980) (patents); *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842 (1st Cir. 1985) (trade secrets), *cert. denied*, 475 U.S. 1016 (1986).

# EXHIBIT   B

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Meredith Zinanni
To Call Writer Directly:
(312) 861-2010
mzinanni@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax: (312) 660-8038

July 12, 2006

**Via Facsimile**

Christopher J. Harnett
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Dear Chris:

I write as a follow up to our meet and confer of June 21, 2006 and your letter of July 7, 2006 to Tina Hernandez.

I.    **Issues Raised In Our June 9, 2006 Letter Relating to TV Guide's Responses to TMS's Document Requests.**

During our June 21, 2006 meet and confer, you confirmed that TV Guide is searching for and producing responsive documents in its possession, custody, or control, including documents in the possession, custody, or control of its parent companies, sister companies, corporate affiliates, or other related companies, including but not limited to Gemstar-TV Guide International, Inc. You also confirmed that, with the exception of its responses to Requests for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92, TV Guide is not limiting its collection or production of documents on the basis of any general or specific objection.

We expressed concern that we had not received any licensing agreements, negotiation documents, or other documents relating to our patent misuse claim. Although the parties stated that they would aim to complete their document production by July 31, 2006 for document requests served as of June 21, we had understood based on our June 21 conversation that TV Guide would produce documents to us on a rolling basis. Although TMS's document requests originally were served on March 2, 2006, we still have not received production of any documents relating to our patent misuse claims. You explained that TV Guide cannot produce a number of documents until you receive approval from third parties, but we remain concerned with the delay. Please let us know the status of your third-party-approval requests.

The parties agreed to produce documents created through January 1, 2006. For documents created after that time period, the requesting party may identify certain categories of

London          Los Angeles          Munich          New York          San Francisco          Washington, D.C.

Christopher J. Harnett
July 12, 2006
Page 2

documents for which it seeks documents created after January 1, 2006, and the parties will work at that time to resolve any disputes.

Several of TMS's document requests refer to the term "interactive program guide technology." As a result, in our June 9 letter, we made an effort to clarify that phrase in response to TV Guide's objections. Although you did not agree that the proposed definition of "interactive program guide technology" could be used universally, we understand that TV Guide is not limiting its document collection or production based on its objection to this phrase. You stated that TV Guide was not collecting documents relating to set-top box technology, although we understand that TV Guide is not limiting its collection or production of documents relating to interactive program guide technology or products simply because they are used on set-top boxes.

With respect to Request for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92, we continue to believe that these requests are proper as propounded and reserve the right to move to compel responses to the requests as propounded. In an effort to compromise and to avoid burdening the Court with a motion to compel, however, we are willing to receive documents responsive to Requests for Production Nos. 30-31, 74-76, 82-84, and 92 as narrowed below. "TV Guide" in the below requests has the same meaning as given in Definition A of TMS's First Set of Requests for the Production Documents and Things

**Request for Production No. 30:** All hearing and deposition transcripts and exhibits identified therein; all expert reports and exhibits and evidence referenced therein; all dispositive motions, post-hearing briefs, and related filings and exhibits and evidence referenced therein; the Complainants' and Respondents' proposed findings of fact and/or conclusions of law and the exhibits and evidence referenced therein; and the Final Initial Determination, findings of fact, and conclusions of law of Judge Luckern and the exhibits and evidence referenced therein relating to patent misuse and/or antitrust defenses or claims from one or more of the following proceedings: (1) In re Gemstar Development Corporation Patent Litigation, MDL-1274-WBH (N.D. Ga.), and (2) In the Matter of Certain Set-Top Boxes and Components Thereof, ITC Investigation No. 337-TA-454.

**Request for Production No. 31:** All documents produced or generated in connection with the Department of Justice investigation into the merger of Gemstar and TV Guide relating to actual or potential suppliers, purchasers, licensees, licensors, market conditions, competition, market share, market power, or the actual or potential effect of the proposed merger on any market for interactive program guides or interactive program guide technology.

**Request for Production No. 74:** All TV Guide licenses for interactive program guide technology that contain a grantback clause, non-assertion clause, or covenant not to sue.

Christopher J. Harnett
July 12, 2006
Page 3

**Request for Production No. 75:** All documents constituting, referring to, or relating to communications between TV Guide and any licensee or prospective licensee to negotiate or otherwise discuss the terms of any TV Guide license or other agreement relating to interactive program guide technology that contains a grantback clause, non-assertion clause, or covenant not to sue.

**Request for Production No. 76:** All documents constituting, referring to, or relating to communications among TV Guide's officers, directors, employees, contractors, or agents regarding the terms of any TV Guide license or other agreement relating to interactive program guide technology that contains a grantback clause, non-assertion clause, or covenant not to sue.

**Request for Production No. 82:** All communications, testimony, and correspondence between TV Guide and the Department of Justice, or any other government agency, relating to actual or potential suppliers, purchasers, licensees, licensors, market conditions, competition, market share, market power, or actual or potential anticompetitive behavior or antitrust violations relating to interactive program guide technology or the licensing of interactive program guide technology.

**Request for Production No. 83:** All communications, testimony, and correspondence between TV Guide and the Department of Justice, or any other government agency, relating to any future actions TV Guide would or would not take with respect to acquiring, licensing, or enforcing rights to interactive program guide technology.

**Request for Production No. 84:** All communications, testimony, and correspondence between TV Guide and the Department of Justice, or any other government agency, relating to the terms of TV Guide's actual or proposed licenses for interactive program guide technology.

**Request for Production No. 92:** All transcripts or minutes of any conference calls, meetings, discussions, or communications TV Guide has had with any third party analysts, investors, shareholders, or media personnel relating to actual or potential suppliers, purchasers, licensees, licensors, market conditions, competition, market share, market power, TV Guide's position within a market, potential or actual threats of litigation, or potential or actual anticompetitive behavior or antitrust violations relating to interactive program guide technology or the licensing of interactive program guide technology.

Please let us know by the close of business on Friday, July 14 whether Plaintiffs will produce documents responsive to these requests as revised. We are unable to narrow Request Nos. 22, 29, 81, and 86-88 any further.

Christopher J. Harnett
July 12, 2006
Page 4

**II.    Issues Raised In Our June 9, 2006 Letter Relating to TV Guide's Responses to TMS's Interrogatories.**

During our June 21 conference, we discussed issues raised in our June 9 letter regarding TV Guide's responses to TMS's interrogatories. With the exception of Interrogatory No. 19 (discussed below), you represented that TV Guide was not standing on its general or specific objections as a basis for not fully responding to TMS's interrogatories.

TV Guide agreed to supplement its interrogatory responses by July 14, 2006. TMS expects TV Guide's supplementation to include a supplemented response to TMS's Interrogatory No. 1 to respond to the issues raised in the June 13, 2006 letter from Michael Parks to you. The issues raised in Michael's letter should have been addressed by TV Guide *before* it sued TMS. Thus, TV Guide has no excuse for not providing the information now.

Regarding Interrogatory No. 19, you stated that TV Guide would limit its response to license agreements where the "field of use" included the '078 patent. Because that restriction was not clear to us, we asked for further clarification, such as whether we can expect a supplemental response to include, by way of example, TV Guide's licensing agreements with MSOs. You stated that we should wait for the supplemental response but that we are likely to receive what we were expecting in response to the interrogatory.

We will hold off on pursuing these issues further until we have a chance to review TV Guides' supplementation of its interrogatory responses on July 14.

**III.    TV Guide's Concerns Regarding Tribune's Discovery Responses.**

During our June 21 conference, we also discussed several issues that you raised regarding TMS's discovery responses, which I summarize here.

You asked whether TMS would produce documents responsive to its requests even if the documents were in the possession of Tribune Company or other TMS affiliates. This confirms that TMS has produced responsive documents from Tribune Company and other TMS affiliates, subject to our specific objections, unless those objections are otherwise resolved herein.

With regard to Request No. 24, TMS does not have a formal, written patent licensing policy.

TMS agrees to produce documents in response to Request No. 35 that reference all entities subsumed within TMS's definition of TV Guide. TMS has not withheld responsive documents because they refer to Gemstar and not one of the TV Guide Online entities.

Christopher J. Harnett
July 12, 2006
Page 5

At your request, we have reviewed TMS's responses to Request Nos. 30 and 53. We continue to believe that the objections are well-founded and will not withdraw them. The amount of money flowing, directly or indirectly, between TMS and its parents, subsidiaries, and/or affiliates is irrelevant to the issues in this case, as are the SEC filings of Tribune Company. TV Guide has not provided any reasonable argument as to how this information is relevant to the issues in this case, in which the single accused product is a product of TMS, not Tribune Company.

After further review of TV Guide's document requests, TMS does not agree that TV Guide's Request Nos. 4 and/or 5 seek source code. Even if Request Nos. 4 and 5 are construed to seek source code, the requests are overbroad in that they seek source code related to features of www.zap2it.com other than the television listings search feature. Furthermore, TV Guide did not raise this issue during the negotiation of the protective order, at which time the parties could have put in place specific provisions to deal with the production of source code. The current protective order does not provide sufficient protection for this highly sensitive information. Before TMS will agree to produce source code, it requires that TV Guide issue a properly narrowed request for the source code and propose a method for its production and safeguarding.

To the extent technical documents exist regarding the overall operation of www.zap2it.com, TMS has not withheld their production or redacted such documents such that only information regarding the television listings search feature has been produced, although TMS reiterates its position that the operation of other portions of the zap2it.com website are not relevant to this case. TMS expects to produce additional documents this week, including some documents regarding the operation of the zap2it.com website, and, as the parties agreed, will aim to complete production of the requested documents by July 31, 2006, although the processing of TMS's electronic files may require some additional time.

Pursuant to the parties' agreement to supplement their interrogatory responses TMS will supplement its responses to TV Guide's Interrogatory Nos. 4 and 14 to include the Bates numbers for the documents referenced in the response.

Sincerely,

Meredith Zinanni

cc:    Frederick I. Cottrell, III
       Richard K. Hermann
       Michael A. Parks
       Corey C. Watson

# EXHIBIT   C

AO 88 (Rev. 11/94) Subpoena in a Civil Case

Issued by the

# UNITED STATES DISTRICT COURT

__Northern__  DISTRICT OF __Georgia__

TV Guide Online, Inc. and TV Guide
Online, LLC

**SUBPOENA IN A CIVIL CASE**

v.

Tribune Media Services, Inc.

Case Number:[1] 05-725-KAJ
District of Delaware

TO: Sutherland Asbill & Brennan LLP c/o John L. North
999 Peachtree Street, NE
Atlanta, Georgia 30309-3996

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See Exhibit A.

| PLACE | DATE AND TIME |
|---|---|
| Atlanta Attorney Service | August 4, 2006, 5:00 pm |
| 2814 Spring Road, S.E., Suite 1201 | |
| Atlanta, GA 30339 | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Attorney for Defendant_ | July 12, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND TELEPHONE NUMBER
Tina Hernandez, Kirkland & Ellis LLP
777 South Figueroa Street, Los Angeles, CA 90017, (213) 680-8400

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)

[1] If action is pending in district other than district of issuance, state district under case number.

AO-88

AO 88 (Rev. 11/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|

**SERVED**

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

**(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.**

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to

the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**(d) DUTIES IN RESPONDING TO SUBPOENA.**

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# EXHIBIT A

## DEFINITIONS

For purposes of this subpoena only, the following terms shall have the meaning set forth below:

1.    "Law Firm" refers to Sutherland Asbill & Brennan LLP and its current and former members, partners, employees, counsel, agents, consultants, representatives, and any other persons acting on behalf of any of the foregoing, and includes its affiliates, offices, assigns, predecessors and successors in interest, and any other legal entities, whether foreign or domestic, that own or control, or are owned or controlled by it, and all predecessors and successors in interest to such entities.

2.    "You" or "your" means Law Firm, as previously defined.

3.    "Person" or "persons" means any natural person, individual, firm, association, corporation, partnership, foundation, proprietorship, joint venture, organization, or entity, including all governmental entities, agencies, officers, and departments.

4.    "Document" means all material and things defined in Federal Rule of Civil Procedure 34 that are or have been at any time under Law Firm's possession, custody or control, referring, relating, or pertaining in any way to the subject matter to which the requests for production refer and includes, without limitation, originals, all file copies, all other non-identical copies, no matter how prepared, and all drafts prepared in connection with such documents, whether used or not, in any form, including documents stored electronically, any kind of written, typewritten, printed, graphic, or recorded material whatsoever, including, but without limitation, notes, memoranda, correspondence, letters, reports, studies, e-mail, telegrams, publications, contracts, manuals, business plans, proposals, licenses, charts, drawings, designs, data sheets, laboratory notebooks, diaries, logs, journals, specifications, brochures, product or service descriptions, advertisements, promotional materials, periodicals, prior art, schematics, blueprints, recordings, summaries, pamphlets, books, prospectuses, interoffice and intra-office communications, offers, notations of any sort of conversations, working papers, applications,

permits, surveys, indices, telephone calls, meeting minutes, film, video tape, audio recordings, tapes, databases, electronic files, software, source code, transcriptions of recordings, computer data, computer tapes, diskettes, or other magnetic media, bank checks, vouchers, charge slips, invoices, expense account reports, hotel charges, receipts, freight bills, maps, agreements, corporate resolutions, minutes, books, binders, accounts, photographs, and business records. The term "thing" includes, without limitation, models, molds, prototypes, software disks, hard disks, floppy disks, CD ROMs, back-up tapes or disks, electronic database files, electronic files, and samples of any device, apparatus, or program.

5. The term "relating to" means in whole or in any part alluding to, responding to, concerning, connected with, involving, commenting on, in respect of, about, associated with, discussing, evidencing, showing, describing, reflecting, analyzing, summarizing, memorializing, consisting of, constituting, identifying, stating, tending to support, tending to discredit, referring to, or in any way touching upon.

6. "Communication" means any transmission, exchange, or transfer of information by any means, including, but not limited to, letters, numbers, images, symbols, data, photographs and sound.

7. "And" and "or" shall be construed both conjunctively and disjunctively and each shall include the other whenever such construction will serve to bring within the scope of these requests for production any information that would otherwise not be brought within their scope.

8. "Including" means including but not limited to.

9. "Any" or "each" should be understood to include and encompass "all."

10. The singular shall include the plural, the plural shall include the singular, and the masculine gender shall include the feminine and the gender neutral and vice versa.

## INSTRUCTIONS

1. The requests herein shall be deemed to include any and all documents within the possession, custody, or control of Law Firm, including without limitation documents located in

2

the files of any and all past and present members, partners, agents, representatives, employees, and attorneys of Law Firm.

2.    Documents should be produced for inspection as they are kept in the ordinary course of business, or organized and labeled to correspond to the categories in the requests. Documents from any single file should be produced in the same order as they were found in such file. If copies of documents are produced in lieu of the originals, such copies should be legible and bound or stapled in the same manner as the original. Each request for production seeks production of each document in its entirety, including all attachments or other matters attached thereto.

## DOCUMENTS REQUESTED

1.    All deposition transcripts and exhibits identified therein relating to patent misuse and/or antitrust defenses or claims from the following proceedings: (1) *In re Gemstar Development Corporation Patent Litigation*, MDL-1274-WBH (N.D. Ga.), and (2) *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

2.    All hearing transcripts and exhibits identified therein relating to patent misuse defenses or claims from *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

3.    All expert reports and exhibits and evidence referenced therein relating to patent misuse and/or antitrust defenses or claims from the following proceedings: (1) *In re Gemstar Development Corporation Patent Litigation*, MDL-1274-WBH (N.D. Ga.), and (2) *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

4.    All dispositive motions, post-hearing briefs, related declarations or affidavits, and exhibits and evidence referenced therein relating to patent misuse defenses or claims from *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

5.    The Final Initial Determination, findings of fact, and conclusions of law of Judge Luckern and the exhibits and evidence referenced therein relating to patent misuse defenses or

claims from *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

6.     The Complainants' and Respondents' proposed findings of fact, conclusions of law, and the exhibits and evidence referenced therein relating to patent misuse defenses or claims from *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

# EXHIBIT  D

AO 88 (Rev. 11/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

### DISTRICT OF <u>Columbia</u>

TV Guide Online, Inc. and TV Guide
Online, LLC

          **SUBPOENA IN A CIVIL CASE**

       v.

Tribune Media Services, Inc.      Case Number: ¹ 05-725-KAJ
                             District of Delaware

TO: Morrison & Foerster c/o Peter J. Davis
    2000 Pennsylvania Avenue, N.W., Suite 5500
    Washington, DC 20006-1888

[  ]   YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to
      testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
| | |
| | DATE AND TIME |
| | |

[  ]   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in
      the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
| --- | --- |
| | |

[X]   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
    place, date, and time specified below (list documents or objects):
See Exhibit A.

| PLACE<br>Kirkland & Ellis LLP<br>655 Fifteenth Street, N.W.<br>Washington, D.C. 20005-5793 | DATE AND TIME<br>August 4, 2006, 5:00 pm |
| --- | --- |

[  ]   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br><br>Attorney for Defendant | DATE<br><br>July 12, 2006 |
| --- | --- |

ISSUING OFFICER'S NAME ADDRESS AND TELEPHONE NUMBER
Tina Hernandez, Kirkland & Ellis LLP
777 South Figueroa Street, Los Angeles, CA 90017, (213) 680-8400

(See Rule 45, Federal Rules of Civil Procedure, parts C & D on reverse)

¹ If action is pending in district other than district of issuance, state district under case number.

                                                            AO-88

AO 88 (Rev. 11/94) Subpoena in a Civil Case

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to

the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or the demanding party to contest the claim.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## EXHIBIT A

## DEFINITIONS

For purposes of this subpoena only, the following terms shall have the meaning set forth below:

1.      "Law Firm" refers to Morrison & Foerster LLP and its current and former members, partners, employees, counsel, agents, consultants, representatives, and any other persons acting on behalf of any of the foregoing, and includes its affiliates, offices, assigns, predecessors and successors in interest, and any other legal entities, whether foreign or domestic, that own or control, or are owned or controlled by it, and all predecessors and successors in interest to such entities.

2.      "You" or "your" means Law Firm, as previously defined.

3.      "Person" or "persons" means any natural person, individual, firm, association, corporation, partnership, foundation, proprietorship, joint venture, organization, or entity, including all governmental entities, agencies, officers, and departments.

4.      "Document" means all material and things defined in Federal Rule of Civil Procedure 34 that are or have been at any time under Law Firm's possession, custody or control, referring, relating, or pertaining in any way to the subject matter to which the requests for production refer and includes, without limitation, originals, all file copies, all other non-identical copies, no matter how prepared, and all drafts prepared in connection with such documents, whether used or not, in any form, including documents stored electronically, any kind of written, typewritten, printed, graphic, or recorded material whatsoever, including, but without limitation, notes, memoranda, correspondence, letters, reports, studies, e-mail, telegrams, publications, contracts, manuals, business plans, proposals, licenses, charts, drawings, designs, data sheets, laboratory notebooks, diaries, logs, journals, specifications, brochures, product or service descriptions, advertisements, promotional materials, periodicals, prior art, schematics, blueprints, recordings, summaries, pamphlets, books, prospectuses, interoffice and intra-office communications, offers, notations of any sort of conversations, working papers, applications,

permits, surveys, indices, telephone calls, meeting minutes, film, video tape, audio recordings, tapes, databases, electronic files, software, source code, transcriptions of recordings, computer data, computer tapes, diskettes, or other magnetic media, bank checks, vouchers, charge slips, invoices, expense account reports, hotel charges, receipts, freight bills, maps, agreements, corporate resolutions, minutes, books, binders, accounts, photographs, and business records. The term "thing" includes, without limitation, models, molds, prototypes, software disks, hard disks, floppy disks, CD ROMs, back-up tapes or disks, electronic database files, electronic files, and samples of any device, apparatus, or program.

5.     The term "relating to" means in whole or in any part alluding to, responding to, concerning, connected with, involving, commenting on, in respect of, about, associated with, discussing, evidencing, showing, describing, reflecting, analyzing, summarizing, memorializing, consisting of, constituting, identifying, stating, tending to support, tending to discredit, referring to, or in any way touching upon.

6.     "Communication" means any transmission, exchange, or transfer of information by any means, including, but not limited to, letters, numbers, images, symbols, data, photographs and sound.

7.     "And" and "or" shall be construed both conjunctively and disjunctively and each shall include the other whenever such construction will serve to bring within the scope of these requests for production any information that would otherwise not be brought within their scope.

8.     "Including" means including but not limited to.

9.     "Any" or "each" should be understood to include and encompass "all."

10.    The singular shall include the plural, the plural shall include the singular, and the masculine gender shall include the feminine and the gender neutral and vice versa.

## INSTRUCTIONS

1.     The requests herein shall be deemed to include any and all documents within the possession, custody, or control of Law Firm, including without limitation documents located in

2

the files of any and all past and present members, partners, agents, representatives, employees, and attorneys of Law Firm.

    2.     Documents should be produced for inspection as they are kept in the ordinary course of business, or organized and labeled to correspond to the categories in the requests. Documents from any single file should be produced in the same order as they were found in such file. If copies of documents are produced in lieu of the originals, such copies should be legible and bound or stapled in the same manner as the original. Each request for production seeks production of each document in its entirety, including all attachments or other matters attached thereto.

## DOCUMENTS REQUESTED

    1.     All deposition transcripts and exhibits identified therein relating to patent misuse and/or antitrust defenses or claims from the following proceedings: (1) *In re Gemstar Development Corporation Patent Litigation*, MDL-1274-WBH (N.D. Ga.), and (2) *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

    2.     All hearing transcripts and exhibits identified therein relating to patent misuse defenses or claims from *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

    3.     All expert reports and exhibits and evidence referenced therein relating to patent misuse and/or antitrust defenses or claims from the following proceedings: (1) *In re Gemstar Development Corporation Patent Litigation*, MDL-1274-WBH (N.D. Ga.), and (2) *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

    4.     All dispositive motions, post-hearing briefs, related declarations or affidavits, and exhibits and evidence referenced therein relating to patent misuse defenses or claims from *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

    5.     The Final Initial Determination, findings of fact, and conclusions of law of Judge Luckern and the exhibits and evidence referenced therein relating to patent misuse defenses or

claims from *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.

6.      The Complainants' and Respondents' proposed findings of fact, conclusions of law, and the exhibits and evidence referenced therein relating to patent misuse defenses or claims from *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454.