# EXHIBIT E

# KIRKLAND & ELLIS LLP
AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Meredith Zinanni
To Call Writer Directly:
(312) 861-2010
mzinanni@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax (312) 660-8035

July 12, 2006

**Via Facsimile**

Christopher J. Harnett
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Dear Chris:

    I write as a follow up to our meet and confer of June 21, 2006 and your letter of July 7, 2006 to Tina Hernandez.

I.   **Issues Raised In Our June 9, 2006 Letter Relating to TV Guide's Responses to TMS's Document Requests.**

    During our June 21, 2006 meet and confer, you confirmed that TV Guide is searching for and producing responsive documents in its possession, custody, or control, including documents in the possession, custody, or control of its parent companies, sister companies, corporate affiliates, or other related companies, including but not limited to Gemstar-TV Guide International, Inc. You also confirmed that, with the exception of its responses to Requests for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92, TV Guide is not limiting its collection or production of documents on the basis of any general or specific objection.

    We expressed concern that we had not received any licensing agreements, negotiation documents, or other documents relating to our patent misuse claim. Although the parties stated that they would aim to complete their document production by July 31, 2006 for document requests served as of June 21, we had understood based on our June 21 conversation that TV Guide would produce documents to us on a rolling basis. Although TMS's document requests originally were served on March 2, 2006, we still have not received production of any documents relating to our patent misuse claims. You explained that TV Guide cannot produce a number of documents until you receive approval from third parties, but we remain concerned with the delay. Please let us know the status of your third-party-approval requests.

    The parties agreed to produce documents created through January 1, 2006. For documents created after that time period, the requesting party may identify certain categories of

London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

Christopher J. Harnett
July 12, 2006
Page 2

documents for which it seeks documents created after January 1, 2006, and the parties will work at that time to resolve any disputes.

Several of TMS's document requests refer to the term "interactive program guide technology." As a result, in our June 9 letter, we made an effort to clarify that phrase in response to TV Guide's objections. Although you did not agree that the proposed definition of "interactive program guide technology" could be used universally, we understand that TV Guide is not limiting its document collection or production based on its objection to this phrase. You stated that TV Guide was not collecting documents relating to set-top box technology, although we understand that TV Guide is not limiting its collection or production of documents relating to interactive program guide technology or products simply because they are used on set-top boxes.

With respect to Request for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92, we continue to believe that these requests are proper as propounded and reserve the right to move to compel responses to the requests as propounded. In an effort to compromise and to avoid burdening the Court with a motion to compel, however, we are willing to receive documents responsive to Requests for Production Nos. 30-31, 74-76, 82-84, and 92 as narrowed below. "TV Guide" in the below requests has the same meaning as given in Definition A of TMS's First Set of Requests for the Production Documents and Things

**Request for Production No. 30:** All hearing and deposition transcripts and exhibits identified therein; all expert reports and exhibits and evidence referenced therein; all dispositive motions, post-hearing briefs, and related filings and exhibits and evidence referenced therein; the Complainants' and Respondents' proposed findings of fact and/or conclusions of law and the exhibits and evidence referenced therein; and the Final Initial Determination, findings of fact, and conclusions of law of Judge Luckern and the exhibits and evidence referenced therein relating to patent misuse and/or antitrust defenses or claims from one or more of the following proceedings: (1) In re Gemstar Development Corporation Patent Litigation, MDL-1274-WBH (N.D. Ga.), and (2) In the Matter of Certain Set-Top Boxes and Components Thereof, ITC Investigation No. 337-TA-454.

**Request for Production No. 31:** All documents produced or generated in connection with the Department of Justice investigation into the merger of Gemstar and TV Guide relating to actual or potential suppliers, purchasers, licensees, licensors, market conditions, competition, market share, market power, or the actual or potential effect of the proposed merger on any market for interactive program guides or interactive program guide technology.

**Request for Production No. 74:** All TV Guide licenses for interactive program guide technology that contain a grantback clause, non-assertion clause, or covenant not to sue.

Christopher J. Harnett
July 12, 2006
Page 3

    **Request for Production No. 75:** All documents constituting, referring to, or relating to communications between TV Guide and any licensee or prospective licensee to negotiate or otherwise discuss the terms of any TV Guide license or other agreement relating to interactive program guide technology that contains a grantback clause, non-assertion clause, or covenant not to sue.

    **Request for Production No. 76:** All documents constituting, referring to, or relating to communications among TV Guide's officers, directors, employees, contractors, or agents regarding the terms of any TV Guide license or other agreement relating to interactive program guide technology that contains a grantback clause, non-assertion clause, or covenant not to sue.

    **Request for Production No. 82:** All communications, testimony, and correspondence between TV Guide and the Department of Justice, or any other government agency, relating to actual or potential suppliers, purchasers, licensees, licensors, market conditions, competition, market share, market power, or actual or potential anticompetitive behavior or antitrust violations relating to interactive program guide technology or the licensing of interactive program guide technology.

    **Request for Production No. 83:** All communications, testimony, and correspondence between TV Guide and the Department of Justice, or any other government agency, relating to any future actions TV Guide would or would not take with respect to acquiring, licensing, or enforcing rights to interactive program guide technology.

    **Request for Production No. 84:** All communications, testimony, and correspondence between TV Guide and the Department of Justice, or any other government agency, relating to the terms of TV Guide's actual or proposed licenses for interactive program guide technology.

    **Request for Production No. 92:** All transcripts or minutes of any conference calls, meetings, discussions, or communications TV Guide has had with any third party analysts, investors, shareholders, or media personnel relating to actual or potential suppliers, purchasers, licensees, licensors, market conditions, competition, market share, market power, TV Guide's position within a market, potential or actual threats of litigation, or potential or actual anticompetitive behavior or antitrust violations relating to interactive program guide technology or the licensing of interactive program guide technology.

    Please let us know by the close of business on Friday, July 14 whether Plaintiffs will produce documents responsive to these requests as revised. We are unable to narrow Request Nos. 22, 29, 81, and 86-88 any further.

Christopher J. Harnett
July 12, 2006
Page 4

## II. Issues Raised In Our June 9, 2006 Letter Relating to TV Guide's Responses to TMS's Interrogatories.

During our June 21 conference, we discussed issues raised in our June 9 letter regarding TV Guide's responses to TMS's interrogatories. With the exception of Interrogatory No. 19 (discussed below), you represented that TV Guide was not standing on its general or specific objections as a basis for not fully responding to TMS's interrogatories.

TV Guide agreed to supplement its interrogatory responses by July 14, 2006. TMS expects TV Guide's supplementation to include a supplemented response to TMS's Interrogatory No. 1 to respond to the issues raised in the June 13, 2006 letter from Michael Parks to you. The issues raised in Michael's letter should have been addressed by TV Guide *before* it sued TMS. Thus, TV Guide has no excuse for not providing the information now.

Regarding Interrogatory No. 19, you stated that TV Guide would limit its response to license agreements where the "field of use" included the '078 patent. Because that restriction was not clear to us, we asked for further clarification, such as whether we can expect a supplemental response to include, by way of example, TV Guide's licensing agreements with MSOs. You stated that we should wait for the supplemental response but that we are likely to receive what we were expecting in response to the interrogatory.

We will hold off on pursuing these issues further until we have a chance to review TV Guides' supplementation of its interrogatory responses on July 14.

## III. TV Guide's Concerns Regarding Tribune's Discovery Responses.

During our June 21 conference, we also discussed several issues that you raised regarding TMS's discovery responses, which I summarize here.

You asked whether TMS would produce documents responsive to its requests even if the documents were in the possession of Tribune Company or other TMS affiliates. This confirms that TMS has produced responsive documents from Tribune Company and other TMS affiliates, subject to our specific objections, unless those objections are otherwise resolved herein.

With regard to Request No. 24, TMS does not have a formal, written patent licensing policy.

TMS agrees to produce documents in response to Request No. 35 that reference all entities subsumed within TMS's definition of TV Guide. TMS has not withheld responsive documents because they refer to Gemstar and not one of the TV Guide Online entities.

Christopher J. Harnett
July 12, 2006
Page 5

At your request, we have reviewed TMS's responses to Request Nos. 30 and 53. We continue to believe that the objections are well-founded and will not withdraw them. The amount of money flowing, directly or indirectly, between TMS and its parents, subsidiaries, and/or affiliates is irrelevant to the issues in this case, as are the SEC filings of Tribune Company. TV Guide has not provided any reasonable argument as to how this information is relevant to the issues in this case, in which the single accused product is a product of TMS, not Tribune Company.

After further review of TV Guide's document requests, TMS does not agree that TV Guide's Request Nos. 4 and/or 5 seek source code. Even if Request Nos. 4 and 5 are construed to seek source code, the requests are overbroad in that they seek source code related to features of www.zap2it.com other than the television listings search feature. Furthermore, TV Guide did not raise this issue during the negotiation of the protective order, at which time the parties could have put in place specific provisions to deal with the production of source code. The current protective order does not provide sufficient protection for this highly sensitive information. Before TMS will agree to produce source code, it requires that TV Guide issue a properly narrowed request for the source code and propose a method for its production and safeguarding.

To the extent technical documents exist regarding the overall operation of www.zap2it.com, TMS has not withheld their production or redacted such documents such that only information regarding the television listings search feature has been produced, although TMS reiterates its position that the operation of other portions of the zap2it.com website are not relevant to this case. TMS expects to produce additional documents this week, including some documents regarding the operation of the zap2it.com website, and, as the parties agreed, will aim to complete production of the requested documents by July 31, 2006, although the processing of TMS's electronic files may require some additional time.

Pursuant to the parties' agreement to supplement their interrogatory responses TMS will supplement its responses to TV Guide's Interrogatory Nos. 4 and 14 to include the Bates numbers for the documents referenced in the response.

Sincerely,

Meredith Zinanni

cc:   Frederick L. Cottrell, III
      Richard K. Herrmann
      Michael A. Parks
      Corey C. Watson

**EXHIBIT F**

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 16456 (N.D.Ill.)
(Cite as: 1990 WL 16456 (N.D.Ill.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division
ALLEN-BRADLEY COMPANY, INC., Plaintiff,
v.
AUTOTECH CORPORATION, Microfast Controls Corp.,
and Shalabh Kumar, Defendants.
No. 86 C 8514.

Feb. 8, 1990.

On Motion for Separate Trial
LINDBERG, District Judge.

*1 Plaintiff has moved for a separate trial of defendants' third, fourth, fifth, and sixth counterclaims. FRCP 42(b). In a separate Memorandum Opinion and Order, this court has this day dismissed defendants' fourth, fifth, and sixth counterclaims, the first two without prejudice and the last with prejudice. Therefore, at this time, it is only necessary to determine whether there should be a separate trial of defendants' third counterclaim.

Rule 42(b) provides:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any ... counterclaim ..., always preserving inviolate the right of trial by jury.

* * *

FRCP 42(b).

In their third counterclaim, defendants assert a common-law unfair competition claim alleging, *inter alia*:

9. Allen-Bradley has engaged in a course of conduct to unfairly compete with Autotech and MicroFast in the sale of their respective products in that Allen-Bradley has taken the following actions:

(a) has brought a series of patent infringement claims against Autotech and MicroFast even though Allen-Bradley is aware that Autotech and MicroFast did not infringe Allen-Bradley's patents;

* * *

(d) have used the aforesaid patent infringement claims as an unfair marketing device by informing customers of Autotech and MicroFast not to purchase their products;

(e) have misused the patent claims by asserting rights that do not exist under said patents and attempting to prevent purchase of non-infringing products by customers of Autotech and HicroFast;

(f) by attempting to prevent customers of Allen-Bradley from purchasing the products of Autotech and MicroFast, even though Allen-Bradley knows or should know that the products of Autotech and MicroFast are superior to the competitive products offered by Allen-Bradley; and,

(g) by resorting to expensive and burdensome litigation and requesting confidential trade secret information from Autotech and MicroFast solely for the purpose of eliminating lawful competition by Autotech and MicroFast.

Although it would not be dispositive of this claim in its entirety, a resolution of the patent claims would greatly simplify the consideration of the allegations in this counterclaim. A resolution of the patent claims in favor of plaintiff would result in the elimination of several of the allegations in the third counterclaim; a resolution of the patent claims in favor defendants would obviate the necessity of proving several of the allegations in the third counterclaim. For reasons similar to those present when patent type antitrust counterclaims are tried separately from patent claims, the court believes that a separate trial of the third counterclaim will be more convenient and will be conducive to expedition and economy. See *In re Innotron Diagnostics*, 800 F.2d 1077, 1084-85 (FedCir1986).

Reasons of convenience, expedition, and economy also support a stay of discovery on the third counterclaim pending resolution of the patent claims. A stay of discovery on that counterclaim will avoid the necessity of taking discovery on any issues foreclosed by the resolution of the patent claims.

*2 ORDERED: Plaintiff's motion for a separate trial of defendants' third, fourth, fifth, and sixth counterclaims is gran-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 16456 (N.D.Ill.)
**(Cite as: 1990 WL 16456 (N.D.Ill.))**

ted in part and denied in part. A separate trial of defendants' third counterclaim is ordered, and discovery with respect to the third counterclaim is stayed until the resolution of the patent claims in this action. A separate trial of defendants' fourth, fifth, and sixth counterclaims is denied because the dismissal of those counterclaims has rendered moot the issue of their separate trial.

Not Reported in F.Supp., 1990 WL 16456 (N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT G**



Home | Previous Page

**U.S. Securities and Exchange Commission**

## Gemstar-TV Guide International Agrees to Settle SEC Enforcement Action Charging the Company with Overstating Its Revenues

**FOR IMMEDIATE RELEASE**
**2004-86**

*Washington, D.C., June 23, 2004* — The Securities and Exchange Commission today filed a complaint in federal court in Los Angeles charging Gemstar-TV Guide International, Inc. with improperly reporting its highly touted interactive program guide licensing and advertising revenues in its financial statements from 1999 through 2002.

Gemstar agreed to settle the case by, among other things, paying a $10 million civil penalty. That money will be distributed to harmed shareholders pursuant to Section 308 of the Sarbanes-Oxley Act of 2002. In assessing the penalty amount, the Commission considered the scope and severity of Gemstar's misconduct, Gemstar's initial failure to cooperate in the Commission's investigation or undertake remedial actions, and Gemstar's significant cooperation and remediation following a change in senior management and restructuring of its corporate governance.

Gemstar is a Los Angeles-based media and technology company that is publicly traded on the Nasdaq Stock Market. Among its business activities, Gemstar publishes *TV Guide* magazine and develops, licenses, and markets an interactive program guide (IPG), which is a technology that enables consumers to navigate through and select television programs. During the relevant period, Gemstar generated revenues from the IPG by licensing the technology to third parties and selling advertising space on the IPG.

"The magnitude of the improper conduct at Gemstar, together with its initial lack of effective cooperation or remedial efforts, warrant the imposition of a significant monetary penalty," said Randall R. Lee, Director of the Commission's Pacific Regional Office. "At the same time, we have credited the company for its extensive cooperation once new management took control," Lee added. "We are continuing to pursue our case against former Gemstar senior management."

The Commission's complaint alleges that Gemstar materially overstated its revenues by nearly $250 million through the following means.

First, Gemstar recorded revenue under expired, disputed, or non-existent agreements, and improperly reported this as IPG licensing and advertising revenue.

Second, Gemstar recorded and reported revenue from a long-term agreement on an accelerated basis in contravention of GAAP and Gemstar's

own stated and disclosed revenue recognition policy, which required the recording and reporting of such revenue ratably over the terms of the agreement.

Third, Gemstar inflated its IPG advertising revenue by improperly recording and reporting revenue amounts from multiple-element transactions. Gemstar's recording and reporting of this revenue was improper under GAAP because Gemstar could not determine the IPG advertising's fair value. Additionally, some of those improperly reported transactions included so-called "round-trip" transactions whereby Gemstar paid money to a third party that then used those funds to buy advertising from Gemstar. Gemstar also failed to disclose that it had structured certain settlements for the purpose of creating "cookie jars" of IPG advertising revenue.

Fourth, Gemstar improperly recorded and reported IPG advertising revenue from non-monetary and barter transactions. Gemstar's recording and reporting of this revenue was not in accordance with GAAP because it did not meet the revenue recognition requirements for such transactions and because Gemstar could not properly establish the IPG advertising's fair value.

Finally, Gemstar improperly reported certain revenues as IPG advertising revenues when in fact those revenues were derived from the sale of print advertising. Gemstar shifted revenues by invoicing advertisers for both IPG and print advertising, but recording the revenue only as IPG revenue.

The misstatements of revenue were reported in Forms 10-K, 10-Q, and 8-K filed with the Commission. These public statements misrepresented Gemstar's true financial performance and failed to disclose material information about that performance. The complaint further alleges that when Gemstar disclosed in its 2001 Form 10-K filed on April 1, 2002, that revenue from two transactions had been recorded under an expired licensing agreement and in a non-monetary transaction, Gemstar's stock price declined by approximately 37% the next day.

As part of its settlement, Gemstar, without admitting or denying the allegations in the Commission's complaint, agreed to a permanent injunction against future violations of the periodic reporting, recordkeeping, and internal controls provisions of the federal securities laws.

In determining to accept Gemstar's settlement offer, the Commission considered the following factors, among others, relating to the company's cooperation and remedial efforts:

- In April 2002, immediately after Gemstar filed its 2001 Form 10-K, the Commission contacted Gemstar and commenced an investigation. For nearly the next eight months, while Gemstar's former CEO and other senior officers remained in place, the company did not conduct a thorough or comprehensive internal investigation and did not take other appropriate remedial action, even when presented by the Commission with specific evidence of fraudulent conduct.

- As a result of its inadequate investigation, in August 2002 Gemstar issued a restatement reversing only approximately $20 million in

revenue. Gemstar consequently continued to report overstated revenues to the investing public even after the Commission's investigation began.

- In November 2002, in connection with the restructuring of its corporate governance, Gemstar replaced its CEO, CFO, and general counsel and adopted extensive new internal controls. The company also retained a new independent auditor and a new independent outside counsel.

- Following the change in senior management, Gemstar (i) initiated a comprehensive investigation and re-audit of its financial statements; (ii) restated its financials three more times, reversing revenues by a total of $377 million; (iii) provided extensive and valuable assistance to the Commission in its investigation; and (iv) voluntarily agreed not to make certain extraordinary severance payments to its former CEO and CFO for over six months, among other things.

For further information contact:

## CERTIFICATE OF SERVICE

I hereby certify that on August 28, 2006 I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered to the following:

Richard K. Herrmann, Esquire
Mary B. Matterer, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
Wilmington, DE 19899-0951

I hereby certify that on August 28, 2006, I have sent by Federal Express, the foregoing document to the following non-registered participants:

Mark A. Pals, P.C., Esquire
Kirkland & Ellis, LLP
200 East Randolph Drive
Chicago, IL 60601

Steven J. Fineman (#4025)

RLF1-2983269-1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand Delivered to the following:

> Richard K. Herrmann, Esquire
> Mary B. Matterer, Esquire
> Morris James Hitchens & Williams
> 222 Delaware Avenue, 10th Floor
> Wilmington, DE 19801

I hereby certify that on September 5, 2006, I have sent by Federal Express, the foregoing document to the following non-registered participants:

> Mark A. Pals, P.C., Esquire
> Kirkland & Ellis, LLP
> 200 East Randolph Drive
> Chicago, IL 60601

/s/ Steven J. Fineman
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
fineman@rlf.com

RLF1-2978403-1