# EXHIBIT  I

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| TV GUIDE ONLINE, INC. AND | ) | |
| TV GUIDE ONLINE, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 05-725-KAJ |
| | ) | |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TRIBUNE MEDIA SERVICES, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' INITIAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Court's March 10, 2006 Scheduling Order ("Order"), TV Guide Online, Inc. and TV Guide Online, LLC (collectively "Plaintiffs") submit the following initial disclosures to Tribune Media Services, Inc. ("Defendant"). These disclosures are based on information now reasonably available to Plaintiffs, and represent a good faith effort to identify information Plaintiffs reasonably believe to be required by the Federal Rules and the Court's Order. Plaintiffs reserve the right to amend or supplement these disclosures, use documents not described herein, and rely on witnesses not identified herein, if necessary, based on their continuing investigations and discovery.

In making these disclosures, Plaintiffs do not represent that they are producing every document, or identifying every tangible thing or witness possibly relevant to this action. Nor do Plaintiffs waive their rights to object: (a) to the production of any document or tangible thing disclosed on the basis of privilege, work product

immunity, relevancy, competency, materiality, hearsay, undue burden or any other proper ground of objection; (b) to the use of any such information, for any purpose, in whole or in part, in any proceeding in this action or in any other action; or (c) on any and all grounds, at any time, to any other discovery request or proceeding involving or relating to the subject matter of this disclosure in any proceeding in this action or in any other action.

**A.    Individuals Likely To Have Discoverable Information**

Fed. R. Civ. P. 26(a)(1)(A) requires the parties to disclose:

> the name and, if known, the address and telephone number of each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses.

Based on Plaintiffs' current information, the individuals identified below may have discoverable factual information that may be used to support Plaintiffs' claims and defenses to counterclaims. The address for each individual, where known, is provided based on current information. Plaintiffs do not consent to or authorize Defendant or its counsel to communicate with any of Plaintiffs' current or former employees. *Any such individual should be contacted only through Plaintiffs' undersigned attorneys.*

In making these disclosures, Plaintiffs do not waive their right to object, pursuant to the applicable Federal and Local Rules, to discovery of information from any of the individuals listed below, including without limitation by deposition, based on the attorney-client privilege, work product immunity, or both. Plaintiffs reserve the right to identify additional individuals as appropriate and based on their continuing investigations and discovery.

2

Subject to the foregoing, Plaintiffs identify the following subject areas and individuals knowledgeable of each of these subject areas.

*Individuals with knowledge of U.S. patent No. 5,988,078 ("the patent-in-suit").* The following individuals are likely to have discoverable information concerning the events relating to the development of the inventions disclosed and/or claimed in the patent-in-suit, and the state of the art of the patent-in-suit:

> Michael R. Levine
> 2122 Northwest 60th Circle
> Boca Raton, FL 33496
> (561) 994-4711
>
> Allen M. Krass
> John G. Posa
> Gifford, Krass, Groh, Sprinkle, Anderson &
> Citkowski, P.C.
> 2701 Troy Center Drive, Suite 330
> Post Office Box 7021
> Troy, MI 48007
> (248) 647-6000

*Individuals with knowledge of Defendant's products and Plaintiffs' related claims.* The following individuals are likely to have discoverable information relating to the structure, operation and function of Defendant's products as they relate to Plaintiffs' claims:

> Samir B. Armaly
> Senior Vice President, Intellectual Property &
> Licensing
> Gemstar - TV Guide International, Inc.
> 6922 Hollywood Blvd.
> Hollywood, CA 90028
> (323) 817-4600

3

One or more as yet unidentified employees or agents of Defendant.

One or more as yet unidentified expert witnesses.

*Individuals with knowledge of facts relevant to Plaintiffs' damages claim.* The following individuals are likely to have discoverable information relating to Plaintiffs' claim for damages:

Richard Cusick
Sr. Vice President and General Manager,
Digital Media
Gemstar - TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, CA 90028
(323) 817-4600

Samir B. Armaly
Senior Vice President, Intellectual
Property & Licensing
Gemstar - TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, CA 90028
(323) 817-4600

Marcelino Ford-Levine
former Sr. Director Business
Development
Gemstar-TV Guide International, Inc.

One or more as yet unidentified
employees or agents of Plaintiffs.

4

*Individuals with knowledge of facts relevant to Defendant's misuse claim and Plaintiffs' defense.* The following individuals are likely to have discoverable information relating to the licensing negotiations that Defendant asserts to be the basis of its patent misuse claim:

Richard Cusick
Sr. Vice President and General Manager,
Digital Media
Gemstar - TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, CA 90028
(323) 817-4600

Samir B. Armaly
Senior Vice President, Intellectual
Property & Licensing
Gemstar - TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, CA 90028
(323) 817-4600

Mike McKee
Chief Operating Officer & President, IPG
Gemstar - TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, CA 90028
(323) 817-4600

Marcelino Ford-Levine
former Sr. Director Business
Development
Gemstar-TV Guide International, Inc.

Barbara Needleman
former VP Entertainment Products
Tribune Media Services

Jay Fehnel
VP Entertainment Products
Tribune Media Services
Suite 1300
435 N. Michigan Ave.
Chicago, IL 60611

5

One or more as yet unidentified
employees or agents of the defendant.

**B.     Relevant Documents**

Fed. R. Civ. P. 26(a)(1)(B) requires the parties to exchange documents and things "that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses." Categories of materials to be produced include documents and things related to the patent-in-suit, the file history of the patent-in-suit, the cited prior art, licensing negotiations between Plaintiffs and Defendant, Defendant's website, licenses, if any, covering the patent-in-suit, and www.tvguide.com. These documents are located in one or more of Plaintiffs' offices, including 6922 Hollywood Blvd., Hollywood, CA 90028 and 1211 Avenue of the Americas, New York, NY 10036.

Simultaneous with the service of these disclosures, Plaintiffs are making a preliminary production of documents in their possession, custody, or control that are not privileged and that support their claim that Defendant is infringing the patent-in-suit. Plaintiffs are in the process of collecting and reviewing additional documents that will be produced in response to Defendant's requests under Fed. R. Civ. P. 34. In due course, Plaintiffs will provide Defendant with a privilege log for documents that Plaintiffs are withholding on the bases of attorney-client privilege, work-product immunity or any other privileges or immunities in due course and at a date agreed to by the parties.

RLF1-2992773-1

**C.    Computation of Damages**

Fed. R. Civ. P. 26(a)(1)(C) requires "a computation of any category of damages claimed by the disclosing party." Because discovery with respect to damages has not begun, Plaintiffs cannot compute their damages with certainty at this time. Pursuant to 35 U.S.C. § 284, Plaintiffs seek damages adequate to compensate them for Defendant's infringement, not less than a reasonable royalty, together with pre-judgment interest, post-judgment interest, and costs. Pursuant to 35 U.S.C. §§ 284 and 285, Plaintiffs also seek an award of treble damages and their reasonable attorneys' fees.

**D.    Insurance Agreement**

Fed. R. Civ. P. 26(a)(1)(D) requires the parties to identify:

> any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment.

As currently advised, Plaintiffs are unaware of any pertinent insurance agreement(s). Plaintiffs reserve the right to supplement this disclosure if any pertinent insurance agreement(s) are later identified.

7

OF COUNSEL:
Robert C. Morgan
Christopher J. Harnett
Stuart W. Yothers
FISH & NEAVE IP GROUP
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Ronald E. Naves, Jr.
Sr. Vice President
Legal Affairs and Litigation
Gemstar - TV Guide International, Inc.
6922 Hollywood Blvd. 4th floor
Hollywood, CA 90028
(323) 817-4600


Dated: March 17, 2006

Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Steven J. Fineman (#4025)
RICHARDS, LAYTON & FINGER PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
moyer@rlf.com
fineman@rlf.com

Attorneys for Plaintiffs TV Guide Online,
Inc. and TV Guide Online, LLC

8

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2006 true and correct copies of the foregoing were caused to be served on counsel of record at the following address as indicated:

**BY HAND DELIVERY**
Richard K. Herrmann, Esquire
Mary B. Matterer, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

**BY FEDERAL EXPRESS**
Mark A. Pals, P.C., Esquire
Kirkland & Ellis, LLP
200 East Randolph Drive
Chicago, IL 60601


Steven J. Fineman (#4025)

# EXHIBIT   J

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

777 South Figueroa Street
Los Angeles, California 90017

Tina Hernandez
To Call Writer Directly:
213 680-8662
thernandez@kirkland.com

213 680-8400

www.kirkland.com

Facsimile:
213 680-8500

August 4, 2006

<u>VIA FACSIMILE</u>

Christopher J. Harnett
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Re:     *TV Guide Online v. Tribune Media Services*

Dear Christopher:

I am writing to follow up on the issues raised in my July 26, 2006 letter regarding TMS's third-party subpoenas seeking documents related to its patent misuse affirmative defense and counterclaim. As I said, we are not interested in unnecessarily burdening third parties for documents that TV Guide has in its possession, custody, or control. TMS asked TV Guide months ago for the documents requested in TMS's subpoenas to law firms that represented TV Guide in the matters of *In re Gemstar Development Corporation Patent Litigation*, MDL-1274-WBH (N.D. Ga.), and/or *In the Matter of Certain Set-Top Boxes and Components Thereof*, ITC Investigation No. 337-TA-454,[1] but TV Guide has not produced the documents. Again, despite our inquiries, we do not know whether TV Guide does not have the requested documents or is simply unwilling to produce them. We note, for example, that TV Guide itself may not have certain categories of documents requested by these subpoenas because the protective order in the ITC case limited access to confidential information to outside counsel for the parties to the investigation.

In a further effort to understand the facts, we ask that TV Guide do the following: (i) if TV Guide has in its possession, custody, or control *all* documents requested in our third-party subpoenas to the law firms retained by TV Guide in prior litigation involving patent misuse claims (i.e., none of the documents requested have been lost or destroyed and all of the

---

[1]  The law firms that represented TV Guide in these matters include O'Melveny & Myers LLP; Fish & Richardson P.C.; Christie, Parker & Hale, LLP; Stroock & Stroock & Lavan LLP; Hogan & Hartson LLP; Sutherland Asbill & Brennan LLP; and Townsend and Townsend and Crew, LLP.

Chicago        London        Munich        New York        San Francisco        Washington, D.C.

08/04/2006 14:38 FAX 213 680 8500          KIRKLAND&ELLIS LLP                    ☑003/003

## KIRKLAND & ELLIS LLP

Christopher J. Harnett.
August 4, 2006
Page 2

documents requested are within TV Guide's power to produce), please say so in writing by Monday, August 7 and (ii) if TV Guide has *all* responsive documents in its possession, custody, or control, please confirm in your letter that TV Guide will immediately produce those documents assuming they are being withheld based on TV Guide's objections and the Court resolves any such objections in TMS's favor.

Sincerely,

*Tina Hernandez*

Tina Hernandez

cc:    Frederick L. Cottrell, III
       Richard K. Herrmann
       Michael A. Parks
       Corey C. Watson

# EXHIBIT   K

08-07-06    17:26    From-ROPES & GRAY LLP                          T-293   P:002/003   F-102



FISH & NEAVE IP GROUP

ROPES & GRAY LLP
1251 AVENUE OF THE AMERICAS    NEW YORK, NY 10020-1104    212-596-9000    F 212-596-9090
BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

Christopher J. Harnett
212-596-9125
212-596-9090 fax
Christopher.Harnett@ropesgray.com

August 7, 2006

**BY FACSIMILE**

Tina Rae Hernandez, Esq.
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA 90017

*TV Guide Online v. Tribune Media Services*
C. A. No. 05-CV-725-KAJ

Dear Tina:

    I write in response to your August 4, 2006 letter concerning the sixteen third-party subpoenas that TMS has delivered in the past few weeks. You state that TMS is "not interested in unnecessarily burdening third parties." We find it curious that TMS elected to shoot first and ask questions later.

    Your after-the-fact inquiry as to whether TV Guide is in possession of "all documents requested in our third-party subpoenas" highlights the objectionable nature of TMS's oppressively overbroad document demands. To respond to your inquiry, TV Guide would be required to review potentially millions of pages of documents that do not relate to the '078 patent-in-suit. Your inquiry also puts TV Guide in the impossible position of affirmatively confirming a negative proposition -- we cannot possibly say that we have every single document that someone else might have. That, of course, cannot justify TMS's burdensome third-party discovery fishing expedition.

    Very truly yours,

    Christopher J. Harnett

CJH:epb
cc:   Frederick L. Cottrell, III, Esq.
      Richard K. Herrmann, Esq.

# EXHIBIT   L

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

777 South Figueroa Street
Los Angeles, California 90017

Tina Hernandez
To Call Writer Directly:
213 680-8662
thernandez@kirkland.com

213 680-8400

www.kirkland.com

Facsimile:
213 680-8500

July 17, 2006

**VIA FACSIMILE**

Christopher J. Harnett
Fish & Neave IP Group
Ropes & Gray LLP
1251 Avenue of the Americas
New York, NY 10020-1104

Dear Christopher:

I am writing to clarify our offer to compromise with respect to Plaintiffs' responses to Request for Production Nos. 22, 29-31, 74-76, 81-84, 86-88, and 92. We are not asking Plaintiffs' to respond to Request for Production Nos. 22, 29, 81, or 86-88. If Plaintiffs agree to respond to Request for Production Nos. 30-31, 74-76, 82-84, and 92 as narrowed, we will not pursue supplemental responses to these requests as served on March 2, 2006. We understand from the letter you sent earlier this afternoon that Plaintiffs reject that proposal. If that is not the case, please let us know immediately.

Sincerely,

Tina Hernandez

cc:    Frederick L. Cottrell, III
       Richard K. Herrmann
       Michael A. Parks
       Corey C. Watson

Chicago      London      Munich      New York      San Francisco      Washington, D.C.

# EXHIBIT   M



Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 495458 (D.Del.)
**(Cite as: 1990 WL 495458 (D.Del.))**

Page 1

**c**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
APPLIED BIOSYSTEMS, INC., Plaintiff,
v.
CRUACHEM, INC., Defendant.
**Civ.A. No. 89-579-JRR.**

Aug. 3, 1990.

Jeffrey M. Weiner, Wilmington, DE (Arthur M. Lieberman, David A. Kalow and Henry Pitman, of Lieberman, Rudolph & Nowak, New York City, of counsel).

Donald F. Parsons, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, DE (Robert J. Koch and David M. Foster, of Fulbright & Jawroski, Washington, DC, of counsel).

MEMORANDUM OPINION
ROTH, District Judge.

*1 Plaintiff Applied Biosystems ("ABIO") commenced this action for patent infringement on October 20, 1989, against defendant Cruachem, Inc. ("Cruachem"). ABIO alleges that Cruachem has infringed U.S. Patent Nos. 4,415,732 and 4,458,066, of which ABIO is the exclusive licensee. The patents-in-suit involve methods and chemistries for constructing DNA fragments in the field of biotechnology and genetic engineering. Cruachem denies infringement and asserts that the patents-in-suit are invalid. Cruachem also counterclaims under section 2 of the Sherman Act, 15 U.S.C. § 2, the Virginia Antitrust Act, Va.Code Ann. § 59.1-9.6, and asserts patent misuse by ABIO. ABIO has moved to sever the patent issues in this case from the antitrust issues and to stay discovery of the antitrust issues. ABIO's motion is presently before the Court.

Also before the Court is Cruachem's motion to compel discovery. Both parties filed motions to compel discovery in December, 1989. The Court denied

these motions in open court on January 26, 1990, and strongly encouraged the parties to resolve their discovery disputes on their own. Later, on May 8, 1990, the Court entered a stipulated scheduling order which provided that production in response to first requests for documents be completed by May 17, 1990. Cruachem moved to compel when ABIO failed to comply with this order. We will deal with each motion in turn.

*I. Cruachem's Motion to Compel*
Discovery in this case is governed by the stipulated scheduling order of May 8, 1990. (D.I. 35) Paragraph 1(a) of that order provides:

Production in response to first requests for documents under Fed.R.Civ.P. 34. This discovery, including identification of documents being withheld from production on grounds of attorney-client privilege or work-product immunity, shall be completed in accordance with the Federal Rules of Civil Procedure by May 17, 1990.

Despite this order, on May 17 ABIO withheld production of documents that it deems related to the antitrust claims, served no objections under Fed.R.Civ.P 34, submitted a "draft" list of privileged documents, and did not produce a "final" list of privileged documents until June 14. ABIO does not interpret the order to require it to conduct discovery on the antitrust issues in this case because of its pending motion to sever the antitrust issues from the patent issues. This amounts to a unilateral stay of discovery on antitrust issues by ABIO.

This Court dealt with a similar situation in *Willemijn Houdstermaatschaapij BV v. Apollo Computer, Inc.,* 707 F.Supp. 1429 (D.Del.1989). In that case the defendant moved for a separate trial on damages and to stay discovery on damages. The defendant then refused to respond to discovery on damages pending a hearing on its motion to sever. This Court ruled that "unless and until it is granted a stay, defendant should be required to conduct discovery as if no motion had been filed at all." *Willemijn,* 707 F.Supp. at 1441.

*2 So here, the fact that ABIO has pending a motion to sever antitrust issues from patent issues does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 2
Not Reported in F.Supp., 1990 WL 495458 (D.Del.)
(Cite as: 1990 WL 495458 (D.Del.))

impact upon its duty under the Federal Rules of Civil Procedure and under the stipulated order to conduct discovery on all issues in this case. In fact, ABIO's motion to sever was not filed until the day after the May 17 discovery deadline. ABIO's motion has no effect on its duty to provide discovery, and, even if it did, the deadline had come and gone before it was filed. ABIO will be ordered to respond fully to Cruachem's first request for production of documents within two weeks of this memorandum opinion.

ABIO may assert the attorney-client privilege for those documents listed on ABIO's "draft" privileged document list on May 17. The attorney-client privilege is waived as to all documents not listed as of May 17. *See, e.g., Krewson v. City of Quincy,* 120 F.R.D. 6, 7 (D.Mass.1988) (defendant waived objections to document request by failing to serve timely response); *Perry v. Golub,* 74 F.R.D. 360, 363 (N.D.Ala.1976) (objection on the grounds of privilege waived by failure to file timely objection); *United States v. 58.16 Acres of Land,* 66 F.R.D. 570, 572 (E.D.Ill.1975) ("an objection that the information sought is privileged, is waived by a failure to make it within the proper time limits"). ABIO, as the party asserting the attorney-client privilege, bears the burden of showing it is entitled to the privilege. *Willemijn,* 707 F.Supp. at 1443; *International Paper Co. v. Fiberboard Corp.,* 63 F.R.D. 88, 93 (D.Del.1974). ABIO's service of a "final" list of privileged documents on June 14 does not cure its failure to comply with the May 17 deadline or its failure to assert privilege as to documents left off its "draft" list. ABIO may, however, augment its description of those documents listed as privileged as of May 17 if it deems added description to be necessary. We permit this unorthodox procedure only because ABIO apparently believed in good faith that it was not required to do more than list its privileged documents by the May 17 discovery deadline. We note, however, that the settled law in this District is to the contrary. *See Willemijn,* 707 F.Supp. at 1443 (denying party opportunity to augment its description of privileged documents in its brief). [FN1]

## II. *ABIO's Motion to Sever Trial and to Stay Antitrust Discovery*

Turning to ABIO's motion to sever the antitrust is-

sues from the patent issues, we note that Cruachem does not seriously oppose ABIO's request to sever these issues for trial. Separate trials in this case would be "in furtherance of convenience [and] conducive to expedition and economy." Fed.R.Civ.P. 42(b). Both the patent and antitrust aspects of this case will require extended trials involving complex issues. Accordingly we will sever this case for trial on the merits. *See In re Innotron Diagnostics,* 800 F.2d 1077, 1084 (Fed.Cir.1986).

For the following reasons, however, we will not stay antitrust discovery. It is within this Court's discretion to decide whether to limit discovery on issues that have been separated for trial. This is so even in patent cases where antitrust and patent issues are to be tried separately. *Innotron,* 800 F.2d at 1078; *Alarm Device Mfg. Co. v. Alarm Prod. Int'l, Inc.,* 60 F.R.D. 199 (E.D.N.Y.1973); *Standard Pressed Steel Co. v. Astoria Plating Corp.,* 162 U.S.P.Q. 441, 442 (N.D.Ohio 1969).

*3 A stay of discovery at this stage of the proceedings is inappropriate in light of the extensive antitrust discovery that has already taken place. Cruachem has responded fully to ABIO's first set of interrogatories and first request for the production of documents (totalling nearly 50,000 pages of documents). This discovery included substantial material relevant to Cruachem's antitrust and patent misuse counterclaims. ABIO has yet to respond in kind to Cruachem's requests for antitrust discovery. Therefore there has been roughly nine months of unilateral discovery on antitrust issues by ABIO.

ABIO will not be burdened by going forward with antitrust discovery. It has stated that it is ready, willing and able to produce the antitrust documents it has thus far withheld. Moreover, much of the "antitrust" discovery objected to by ABIO is potentially relevant to patent issues. These include the issues of damages, and secondary indicia of nonobviousness, such as commercial success.

Severance of discovery at this stage of the proceedings would not necessarily save time or expense. It appears that Cruachem will seek trial on the merits of its antitrust counterclaims whether or not ABIO pre-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 495458 (D.Del.)
**(Cite as: 1990 WL 495458 (D.Del.))**

vails on the merits of the infringement issues. Crua-chem's counterclaim allegations include overbroad licensing practices by ABIO and tying the sale of patented products to the sale of unpatented products. Discovery and trial on these issues may have to proceed even if ABIO prevails on its patent claims.

Nor has ABIO shown that the number of depositions will be materially reduced by staying discovery related to the antitrust and patent misuse issues. The vast majority of deposition witnesses will give testimony relevant to both patent and antitrust issues. These witnesses include ABIO, University Patents, Inc., and University of Colorado personnel, as well as ABIO's customers. A stay of antitrust discovery may necessitate multiple depositions of these witnesses.

The Court also notes that discovery in this case has been characterized by the parties' mutual inability to agree on anything. If past experience is a harbinger of things to come, a stay of antitrust discovery will merely serve to multiply discovery disputes inordinately. For example, the parties already disagree over what is "antitrust-related" discovery. Such bickering will serve only to waste the Court's and the parties' time. This factor militates against a stay of antitrust discovery. *Willemijn, 707 F.Supp. at 1435.*

Finally, it was not made clear to the Court at the scheduling conference on May 8 that any of the discovery due on May 17 was in the antitrust category. It is unfair for ABIO to have stipulated to a discovery production date without making it perfectly clear that it intended to withhold discovery on "antitrust" issues.

### CONCLUSION

Cruachem's motion to compel will be granted. ABIO's motion to sever will be granted as to trial. The patent issues in this case will be tried separately from the antitrust and patent misuse issues. Discovery of antitrust issues will not be stayed pending trial on the patent issues. An appropriate order will issue.

> FN1. We also deny ABIO's motion for leave to file a rebuttal to Cruachem's reply brief (D.I. 52), and ABIO's request for oral argu-

ment on the discovery issue. (D.I. 53)

Not Reported in F.Supp., 1990 WL 495458 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:89CV00579 (Docket) (Oct. 20, 1989)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   N



Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)
**(Cite as: 1996 WL 756766 (D.Del.))**

Page 1

**c**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
DENTSPLY INTERNATIONAL, INC., and Tulsa
Dental Products, Inc., Plaintiffs,
v.
NEW TECHNOLOGY COMPANY (aka NT Company), Tycom Corporation, and Tycom Dental
Corporation, Defendants.
**Civ.A. No. 96-272 MMS.**

Dec. 19, 1996.

Edward B. Maxwell, 2nd, and Josy W. Ingersoll,
Young Conaway Stargatt & Taylor, Wilmington, DE
(Dale M. Heist, Albert J. Marcellino, and Lynn A.
Malinoski, Woodcock Washburn Kurtz Mackiewicz
& Norris, Philadelphia, PA, of counsel), for
plaintiffs.

Jack B. Blumenfeld, and Julia Heaney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE (Don W.
Martens, Craig S. Summers, and Stephen M. Lobbin,
Knobbe, Martens, Olson & Bear, Newport Beach,
CA, George L. Graff, and Davis S. Benyacar, Paul,
Hastings, Janofsky & Walker LLP, New York (City),
of counsel), for defendants.

*MEMORANDUM OPINION*
MURRAY M. SCHWARTZ, Senior District Judge.

### I. INTRODUCTION

*1 Plaintiff corporations Dentsply International, Inc.
("Dentsply") and Tulsa Dental Products, Inc.
("Tulsa") (collectively, "plaintiffs"), have brought
three claims against defendant corporations New
Technology Co. ("New Technology"), NT Acquisition Corp. ("NT Acquisition"), and Tycom Dental
Corp. ("Tycom Dental") (collectively, "defendants").
Docket Item Number ("D.I.") 7. The claims arise
from the alleged infringement of two Dentsply patents--U.S. Patent Number ("No.") 4,934,934 entitled
"Dental File/Reamer Instrument" and U.S. Patent No.
5,464,362 entitled "Endodontic Instrument." D.I. 7 at

Exhibits ("Exh.") 1, 2. In Count I of the Amended
Complaint, plaintiffs allege patent infringement. D.I.
7 at 3. In Count II, plaintiffs allege trade secret misappropriation, D.I. 7 at 4, and in Count III, plaintiffs
allege breach of contract, D.I. 7 at 8. Plaintiffs invoke
this Court's jurisdiction under 28 U.S.C. §§ 1338 and
1367.

Defendants answered and brought a four-count counterclaim. D.I. 12. Their first count seeks a declaration
of noninfringement and invalidity of Dentsply's two
patents. D.I. 12 at 6. Their second count alleges violations of the Sherman Antitrust Act, 15 U.S.C. § 2.
D.I. 12 at 7. Counts III and IV allege violations of
Delaware law; specifically, Count III alleges tortious
interference with business relations, and Count IV asserts plaintiffs engaged in unfair competition. D.I. 12
at 8, 9. After oral argument, defendants dropped
Counts III and IV of their counterclaim. D.I. 67.

Plaintiffs have moved to: (1) bifurcate the antitrust
counterclaim pursuant to Rule 42(b) of the Federal
Rules of Civil Procedure; and (2) stay all discovery
on the antitrust counterclaim until trial on the patent
infringement issues has concluded. D.I. 23. [FN1]
For the reasons below, the Court will grant the motion to bifurcate, but the motion to stay will be
denied.

> FN1. Plaintiffs also moved to dismiss the
> state law counterclaims for an alleged failure
> to plead sufficient information to outline the
> elements of the claims and an alleged failure
> to plead with specificity pursuant to Rule
> 9(b) of the Federal Rules of Civil Procedure.
> D.I. 23. This aspect of plaintiffs' motion was
> mooted when defendants agreed to the voluntary dismissal of the state law counterclaims without prejudice. D.I. 67.

### II. DISCUSSION
A. Motion to Bifurcate

Rule 42(b) of the Federal Rules of Civil Procedure
provides that a district court, "in furtherance of convenience or to avoid prejudice, or when separate tri-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                  Page 2
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)
(Cite as: 1996 WL 756766 (D.Del.))

als will be conducive to expedition and economy, may order a separate trial of any claim [or] ... counterclaim." The decision on whether to order separate trials under Rule 42(b) is a matter of "informed discretion" by the district court. *Lis v. Robert Packer Hosp.*, 579 F.2d 819, 824 (3d Cir.) (citations omitted), *cert. denied*, 439 U.S. 955 (1978). [FN2]

> FN2. Defendants argue that the Court should only grant the motion to bifurcate upon a showing of substantial prejudice by the plaintiffs. D.I. 33 at 11 (quoting 5 MOORE'S FEDERAL PRACTICE ¶42.03, at 43-46). This request is belied by the plain text of the bifurcation Rule itself. The Rule clearly provides bifurcation may be ordered "in furtherance of convenience *or* to avoid prejudice, *or* when separate trials will be conducive to expedition and economy ...." Fed. R. Civ. P. 43(b) (emphasis added).

Plaintiffs offer four justifications as to why bifurcation is warranted in this case. First, they assert that bifurcation will remove patent and trade secret issues from the counterclaim, thus simplifying or even eliminating the antitrust count of the counterclaim. Second, they contend there will be little or no overlap in evidence on the patent and antitrust claims. Third, they state that bifurcation, given the complex nature of this case, will reduce confusion of the jury. Finally, they submit, an order of separate trials will streamline the resolution of the entire controversy. According to plaintiffs, these four factors--all subserving the ideal of thorough and efficient justice--militate toward an order of bifurcation under Rule 42(b). *See In re Innotron Diagnostics*, 800 F.2d 1077, 1085 (Fed. Cir. 1986) (considering substantially similar factors).

*2 Defendants, on the other hand, weigh these four factors much differently. They argue that the Court, after deliberating on all of the factors in this case, should refrain from ordering separate trials. The Court turns now to the contentions of each side.

### 1. Will Bifurcation Simplify or Eliminate the Antitrust Counterclaim?

In their antitrust counterclaim, defendants allege plaintiffs acted in three ways to monopolize the market for endodontic files [FN3] in violation of the antitrust laws; by:

> FN3. Endodontic files are flexible dental instruments, used in dental surgery, including root canal surgery. The files at issue in this lawsuit are configured to follow a curved tooth root canal. D.I. 7 at Exh. 1.

(a) Instituting this litigation in bad faith and without good grounds to believe, founded upon reasonable inquiry that defendants have infringed one or more of the patents-in-suit, have misappropriated any valid trade secrets or breached any contract, for the express purpose of hindering and preventing defendants from engaging in lawful competition.

(b) Acquiring competitors and potential competitors with the purpose and effect of eliminating lawful competition.

(c) Using their monopoly power in an effort to compel customers to enter into long-term supply contracts in order to foreclose entry into the market of lawful competition.

D.I. 12 at 7, ¶15.

In the first count of its counterclaim, defendants allege plaintiffs violated the antitrust laws by engaging in "sham" litigation--using spurious claims as a thug tactic of intimidation and harassment. In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), the Supreme Court established a two-part test to identify such "sham" litigation. First, a lawsuit must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and second, the litigant's "subjective motivation" must have been "to interfere *directly* with the business relationships of a competitor." 508 U.S. at 60-61 (quoting *Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)). Further, "[o]nly if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Id.*

Thus, plaintiffs are correct in their assertion that if they can convince a jury that defendants have infringed their patent, an important aspect of the de-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                     Page 3
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)
(Cite as: 1996 WL 756766 (D.Del.))

fendants' antitrust counterclaim--their allegations of "sham" litigation-- will be mooted. A winning lawsuit cannot be considered a "sham," despite a subjective, anti-competitive motive by the litigant. *Professional Real Estate Investors, 508 U.S. at 60 n.5* ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."); *U.S. Philips Corp. v. Sears Roebuck & Co., 55 F.3d 592, 597 (Fed. Cir.)* ("The charge that Philips' patent infringement suit in Florida was sham can not be deemed to have substance, for Philips prevailed in Florida on that issue."), *cert. denied,* 116 S. Ct. 567 (1995); *Columbia Pictures Indus., Inc. v. Redd Horne, Inc., 749 F.2d 154, 161 (3d Cir. 1984)* (holding that success on the merits of an infringement action demonstrates clearly that it would be impossible to prove bad faith necessary for antitrust claim of "sham" litigation); *Levine v. Mclesky. 881 F. Supp. 1030, 1042 (E.D. Va. 1995).* Further, although defendants contend plaintiffs must prevail in a first trial on both the patent and trade secret counts of their claim for an accusation of "sham" to be dismissed, they have not supported this contention with law. In fact, courts have indicated that litigation will not be considered a "sham" so long as at least one claim in the lawsuit has objective merit. *See Professional Real Estate Investors, 508 U.S. at 60* (specifying "*lawsuit* must be objectively baseless") (emphasis added); *Eden Hannon & Co. v. Sumitomo Trust & Banking Co., 914 F.2d 556, 565 (4th Cir. 1990)* (holding since plaintiff succeeded on one of four claims, suit was "hardly a sham."), *cert. denied,* 499 U.S. 947 (1991). Therefore, if plaintiffs prevail on one of their counts, the sham aspect of the antitrust counterclaim must fail.

*\*3* But as defendants point out, the "sham" allegation is just one aspect of their antitrust counterclaim. Defendants also allege two other instances of unlawful behavior by plaintiffs: the unlawful acquisition of competitors and the use of monopoly power to coerce customers into long-term supply contracts. See D.I. 12 at 7, ¶15. Even if plaintiffs prevail in a first trial, defendants argue, these two bases for an antitrust claim would still be viable and ripe for determination.

Defendants' vision of the antitrust claims surviving an adverse patent ruling is somewhat clouded. There is a possibility that all aspects of the antitrust counterclaim--including the two non-"sham" allegations--could be resolved by a first trial on patent infringement. A patent gives a patent owner the right to exclude others from the marketplace for a statutory number of years. Accordingly, a patent confers upon its owner the ability to bring monopolistic characteristics to the marketplace--the very antithesis of a prime purpose of antitrust legislation. "[W]here a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws." *SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1206 (2d Cir. 1981),* cert. denied, 455 U.S. 1016 (1982); *Crucible, Inc. v. Stora Kopparbergs Bergslags AB, 701 F. Supp. 1157, 1160 (W.D. Pa. 1988)* (quoting *Xerox*). Thus, if the validity of the patents at issue is sustained, and a jury determines defendants have produced infringing products, defendants' allegations about illegal acquisition of competitors may be irrelevant. *See Axis, S.P.A. v. Micafil, Inc., 870 F.2d 1105, 1107 (6th Cir.)* (dismissing antitrust allegation of illegal acquisition of competitors because patents were "impenetrable barrier" to plaintiff company's entry into market), *cert. denied,* 493 U.S. 823 (1989); *Valley Products, Inc. v. Landmark, 877 F. Supp. 1087, 1091-93 (W.D. Tenn. 1994)* (following reasoning of *Axis,* above); *United States v. L.D. Caulk Co., 126 F. Supp. 693, 705 (D. Del. 1954)* (reasoning that "a holder of a valid patent monopoly and without any unlawful combination or conspiracy with others is not limited to any percentage of control of that article which is covered by the patent. Such I think is the very purpose of the patent laws ...."). Further, plaintiffs have asserted they have not entered into long-term contracts that extend beyond the applicable terms of its patents; a portion of the antitrust counterclaim alleges such long-term contracts exist. Like the allegations of illegal acquisition of competitors, this could be the subject of a summary judgment motion in a later proceeding. [FN4]

> FN4. There is also a distinct possibility defendants lack standing to press the counterclaims based on illegal acquisition of competitors and long-term contracts. At oral argument, counsel for defendants fleshed out its antitrust argument; by acting in violation

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)
(Cite as: 1996 WL 756766 (D.Del.))

of the antitrust laws, plaintiffs had kept the price for endodontic instruments artificially high, thereby allowing defendants to adopt a favorable pricing structure. Accordingly, there is reason to question whether defendants have suffered an antitrust injury, a prerequisite to a justiciable antitrust claim. *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 582- 83 (1986)* ("[R]espondents [cannot] recover damages for any conspiracy by petitioners to charge higher than competitive prices in the ... market. Such conduct would indeed violate the Sherman Act, but it could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price.") (internal citations omitted).

Defendants also warn the merits of the patent, trade secret and contract claims brought by plaintiffs will have to be completely relitigated to a second antitrust jury. The Federal Circuit Court of Appeals does not share this concern. In *In re Innotron Diagnostics, 800 F.2d 1077 (Fed. Cir. 1986)*, the court ordered a separation of patent and antitrust trials and explained why such concerns are misplaced. "Economy is served," the court wrote, "because in the trial of the patent issues the validity of the patent ... will be determined and become law of the case and thus removed from trial on the original antitrust issues." *Id.* at 1085. Thus, if defendants' prevail at a first trial and demonstrate the invalidity of plaintiffs' patents, they need not again prove the same issues at a second trial. *Id.*

**\*4** Defendants stress these situations are mere possibilities and all of the antitrust issues may not be resolved in a first trial. This argument, however, misapprehends the goal of bifurcation. Separate trials may be warranted so long as some of the issues in a second trial would be simplified, *Akzona, Inc. v. E.I. Du Pont de Nemours & Co., 607 F. Supp. 227, 232 (D. Del 1984)*; all of the issues in a second trial need not be implicated in the first. *See Baxter Travenol Lab. v. LeMay, 536 F. Supp. 247, 252 (S.D. Ohio 1982)* (explaining "while Defendant's antitrust counterclaim is not based entirely on the allegedly 'sham' litigation, the Court deems it appropriate ... to permit

Plaintiffs' complaint to go to trial first, in order to aid in the determination of whether said complaint is baseless.").

2. Is There An Overlap of Proofs?
Plaintiffs argue that bifurcation is further warranted because there is no overlap in proofs between the allegations in the complaint and the antitrust counterclaim. To prove the allegations in the complaint, plaintiffs anticipate introducing evidence regarding the patents, defendants' products, and the manner in which the defendants' products were developed and made. By contrast, plaintiffs assert evidence of a very different sort will be needed for the antitrust claim; proofs will focus on plaintiffs' actions in initiating this lawsuit, on the companies acquired by plaintiffs, on plaintiffs' business practices with its own customers, and proofs that endodontic instruments comprise a relevant product market in which plaintiffs exercised a monopoly. Thus, plaintiffs forcefully argue, the minuscule overlap in proof does not warrant a single trial.

Defendants concede there is not much overlap in proofs when the elements of the antitrust claims are compared with the elements of plaintiffs' claims. Defendants do expect a significant overlap of proofs, however, if and when the plaintiffs try to establish damages. According to defendants, plaintiffs will try to establish damages by calculating their loss in profits caused by the alleged infringement of their patents. But these profits should be reduced, defendants posit, because plaintiffs have "augment[ed] their profitability by virtue of their unlawfully acquired market power[.]" D.I. 33 at 9. Defendants attach an affirmation by an economist to demonstrate that the determination of damages in claims such as plaintiffs' generally depends upon what proportion of the alleged infringer's sales would have been recouped by plaintiff. See D.I. 33 at Exh. A. Thus, defendants argue, they are entitled to present evidence that plaintiffs engaged in anticompetitive activities as a defense to plaintiffs' damage claims; even if bifurcation is ordered, the parties would have to present the same issues twice, to two juries.

Plaintiffs respond by pointing out that no damage theories have been determined, and no damage proofs

Not Reported in F.Supp.                                                                                    Page 5
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)
(Cite as: 1996 WL 756766 (D.Del.))

have been collected. But even if lost profits are pursued, plaintiffs argue, defendants have not pled any affirmative defenses based on antitrust or patent misuse allegations. [FN5] Finally, plaintiffs state they are willing to sever and stay any damage proceedings so that damages could be adjudicated either in a separate trial, or in conjunction with any antitrust claims that may remain viable for a second trial. See *Smith v. Alyeska Pipeline Serv. Co.*, 538 F. Supp. 977, 982-86 (D. Del. 1982) (ordering separate trials for liability and damages in patent case because issue of damages was complex), *aff'd mem.*, 758 F.2d 668 (Fed. Cir. 1984), *cert. denied*, 471 U.S. 1066 (1985).

> FN5. Patent misuse is "an affirmative defense that must be pleaded and proved." *Bio-Rad Lab., Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 617 (Fed. Cir.), *cert. denied*, 469 U.S. 1038 (1984). Further, plaintiffs have cited authority which indicates if such an affirmative defense were proved, it would be a complete bar to the enforceability of a patent; there would not be any damages. *United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457, 465 (1957) (holding "courts will not aid a patent owner who has misused his patents to recover *any* of their emoluments accruing during a period of misuse or thereafter until the effects of such misuse have been dissipated ...") (emphasis added).

### 3. Will Bifurcation Avoid Jury Confusion and Expedite Trial?

*5 This is the primary end to which any order of separate trials under Rule 42(b) is directed. All of the arguments advanced by both parties so far address, directly or indirectly, the issues of judicial economy and jury comprehension. In plaintiffs' view, if all of the diverse and complex evidence is presented in a single trial, the jury will be left numb and bewildered; application of Rule 42(b) will permit the jury to adroitly separate the antitrust chaff from the central patent and trade secret claims. Plaintiffs point out that, if both the complaint and counterclaims were presented in a single trial, a jury would not only have to determine whether the plaintiffs' patents were valid and infringed, but also whether its trade secrets were mis-

appropriated--rigorous chores in and of themselves. If the antitrust counterclaims were tried at the same time, the jury would also have to consider, at a minimum, intricate factual and economic analyses regarding (1) the relevant market before and after plaintiffs' allegedly acquired competitors, (2) actual and potential shares in that market, (3) barriers to defendants' entry into the market, (4) long-term contracts plaintiffs' may or may not have had with customers, and whether those contracts violated the antitrust laws, (5) the issue of whether the claims of the complaint were, viewed both objectively and subjectively, baseless, (6) antitrust damages, and (7) all the remaining concomitant antitrust considerations.

Defendants have countered by arguing a jury cannot eliminate antitrust considerations from its deliberations on plaintiffs' claims without severely prejudicing its defense. But this ignores the fact that courts have been bifurcating antitrust claims and patent infringement claims on a frequent and long-standing basis. Indeed, the Federal Circuit has endorsed the "now-standard practice of separating for trial patent issues and those raised in an antitrust counterclaim." *Innotron*, 800 F.2d at 1084. *See also Fischer & Porter Co. v. Sheffield Corp.*, 31 F.R.D. 534, 540 (D. Del. 1962) (quoting recommendation from Report of the Attorney General's National Committee To Study the Antitrust Laws that antitrust and patent issues should be considered in separate trials); *but see Genentech Inc. v. The Wellcome Found. Ltd.*, 14 U.S.P.Q.2d 1363, 1373 (D. Del. 1990) (denying bifurcation because proof that plaintiffs knew of prior art but intentionally withheld information from patent office bears on both defense to patent infringement and antitrust counterclaim). In this case, the only real and significant overlap of evidence defendants can delineate pertains to damages. This is not enough. Separate trials are warranted, and will be granted, pursuant to Rule 42(b).

### B. Motion to Stay Discovery on Antitrust Counterclaim

Although separate trials have been ordered, there remains a distinct and important issue: whether the Court should order a stay in discovery on the antitrust counterclaims. Replicating much of its argument in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 756766 (D.Del.)
**(Cite as: 1996 WL 756766 (D.Del.))**

favor of bifurcation, plaintiffs argue that antitrust dis-
covery should await a disposition of a first trial, since
the first trial may remove some of antitrust claims.
Plaintiffs also express their dread at engaging separ-
ate antitrust counsel for antitrust discovery; a stay in
discovery would, no doubt, spare them considerable
expense.

**\*6** The Court is skeptical about plaintiffs' concern
about expense; after all, they brought the suit and are
asking for discovery in their own right. Moreover,
they should have expected an antitrust counterclaim,
now commonplace in patent litigation. More import-
antly, a stay of discovery on antitrust issues would
most likely devolve into a series of time-consuming
and expensive discovery disputes as to whether par-
ticular discovery is directed at the patent or antitrust
claims. Efficiency dictates that discovery on all
claims, including the antitrust counterclaims, contin-
ue apace.

An order will be entered granting plaintiffs' motion to
bifurcate the patent and trade secret trial from the an-
titrust trial. Plaintiffs' motion to stay antitrust discov-
ery, however, will be denied.

Not Reported in F.Supp., 1996 WL 756766 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:96CV00272 (Docket) (May. 28, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   O



Not Reported in F.Supp.2d                                                         Page 1
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: 2003 WL 21402512 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
ENZO LIFE SCIENCES, INC., Plaintiff/Counterclaim Defendant,
v.
DIGENE CORPORATION, Defendant/Counterclaim Plaintiff
v.
ENZO BIOCHEM, INC., Additional Counterclaim Defendant.
**No. Civ.A. 02-212-JJF.**

June 10, 2003.

Josy W. Ingersoll, and Sara Beth Reyburn of Young, Conaway, Stargatt & Taylor, L.L.P., Wilmington, Delaware, for Plaintiff, Enzo Life Sciences, Inc. and Additional Counterclaim Defendant, Enzo Biochem, Inc., Richard L. DeLucia, Jeffrey M. Butler, and Paul M. Richter, Jr., of Kenyon & Kenyon, New York, New York, of counsel.

Richard D. Kirk, of Morris, James, Hitchens & Williams L.L.P., Wilmington, Delaware, for Defendant, Digene Corporation, Mark R. Labgold, Ph.D., Kevin M. Bell, Laura A. Donnelly, of Patton Boggs L.L.P., McLean, Virginia. Richard J. Oparil, of Patton Boggs L.L.P., Washington, DC, of counsel.

OPINION

FARNAN, J.

*1 A teleconference was held in this case on Wednesday, June 4, 2003, to discuss the pending motions. During the teleconference, the Court ruled on several motions. Specifically, for the reasons discussed below, the Court: 1) denied Enzo Biochem, Inc.'s ("Enzo Biochem") Motion to Strike the Expert Report of Stephen Jizmagian (D.I.144); (2) granted in part and denied in part Enzo Biochem's and Enzo Life Sciences Inc.'s ("Enzo Life Sciences") Joint Motion to Bifurcate Trial on Digene's Business Tort Claims (Counterclaims III-V) and Stay Discovery on Them (D.I.145); 3) denied Digene Corporation's ("Digene") Motions for Protective Orders (D.I.104, 113); and 5) denied Enzo Life Sciences' Motion to Compel (D.I.94).

*I. Factual Background*

This is a patent infringement action brought by Plaintiff Enzo Life Sciences against defendant Digene involving U.S. Patent No. 6,221,581B1 (the " '581 Patent"), issued on April 24, 2001. Both Enzo Life Sciences and Digene are companies involved in the development, manufacture and distribution of proprietary RNA and DNA testing systems. The '581 Patent concerns hybrid capture technology used in diagnostic medical applications.

Plaintiff, Enzo Life Sciences has alleged that Digene is infringing claims 16- 26, 30-40, 44-53, 73-87, 91-100 and 104-107 of the '581 Patent by making, selling and offering for sale its "Hybrid Capture" diagnostic products. This action began on March 15, 2002 when Digene filed a Summons and Complaint for Declaratory Judgment. Enzo Life Sciences filed a separate lawsuit for patent infringement on March 20, 2002. During a May 2, 2002 status conference, the Court suggested that the parties stipulate to a dismissal of Digene's declaratory judgment Complaint, without prejudice and proceed with Enzo Life Sciences' patent infringement complaint. The Court further explained that Digene would be permitted to bring other claims against any Enzo entity, including Enzo Biochem, as permissive counterclaims. Thereafter, the parties filed a Stipulated Proposed Scheduling Order dismissing Digene's declaratory judgment action without prejudice, and the parties agreed to proceed with all pending and all related claims in Enzo Life Sciences' patent infringement action. Additionally, Digene filed Counterclaims against Enzo Life Sciences and Enzo Biochem.

On June 28, 2002, Enzo Life Sciences, Inc. and Enzo Biochem, Inc. moved to dismiss Digene's Counterclaims. On March 31, 2003, the Court denied the motion to dismiss Digene's Counterclaims. (D.I.124).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: 2003 WL 21402512 (D.Del.))**

Fact discovery closed on February 24, 2003 and the parties are currently conducting expert discovery which is scheduled to close on June 20, 2003.

II. *Enzo Biochem's Motion to Strike the Expert Report of Stephen Jizmagian (D.I.144)*

A. *Parties' Contentions*

Enzo Biochem contends that the expert report of Dr. Stephen Jizmagian should be stricken in its entirety. Specifically, it contends that Digene's counterclaims III-V should be limited to those that were actually pled in the case, namely those that are based upon the two, 2001 press releases by Enzo Biochem regarding the '581 Patent. Enzo Biochem points out that Digene, in its counterclaims, alleging causes of action under: 1) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); 2) Unfair Competition under the Delaware Deceptive Trade Practices Act, 6 Del. C. §§ 2531 et seq. (Count IV); and 3) Tortious Interference With Prospective Business Relations (Count V), listed two press releases as the factual basis for such claims. However, at this juncture, Enzo Biochem argues that Dr. Jizmagian's expert report concerning damages as to these claims does not mention the press releases, but rather details alleged instances that are not asserted in Digene's counterclaims. For instance, Enzo, points out that the report states that Dr. Jizmagian was told by Digene that Enzo Biochem somehow prevented Digene from obtaining one million dollars in capital through Goldman Sachs in 2000. As a result, Enzo argues that Digene's new claim, as suggested by the expert report, is not that Enzo Biochem interfered with customers seeking to purchase the Hybrid Capture product, but that Enzo Biochem somehow interfered with Digene's ability to raise capital through Goldman Sachs, which allegedly led to lost sales. Based on these facts, Enzo Biochem claims that it is improper for Digene to amend its counterclaims through Dr. Jizmagian's expert report, and therefore, the report should be stricken in its entirety.

**\*2** In response, Digene asserts that its responses to Enzo Biochem's interrogatories plainly set forth the factual basis for its damages claims, where Digene listed all parties that it had contracts and/or agree-

ments with from as early as 1992 that were terminated. *See* Ex. 1 to Kirk Decl. Further, in regard to the time period of damages, Digene contends that it affirmatively stated that Biochem's actions before or at the time the case was filed resulted in direct harm to Digene, where in an interrogatory response they stated:

> As a direct result of Biochem's actions Digene was forced to respond to, participate in or otherwise conduct extensive due diligence, including requests from potential funding entities as well as requests from potential joint venturers. Such requests include but are not limited to requests made when Digene completed its IPO and subsequent follow-on private placement transaction and includes potential follow-on public offering and potential strategic partners such as requests from Cytyc, Affymetrix, Applera Corporation and Roche.

Ex. 1 to Kirk Decl. Further, Digene argues that all of the documents relied on by Dr. Jizmagian were produced during discovery, with the bulk of the disclosures, consisting of four hundred boxes of documents, produced as early as October 2002. Moreover, Digene argues that Enzo Biochem failed to pursue available discovery, because it did not take any depositions until the last week of extended fact discovery and points to the fact that during Ms. Seyfried's, Digene's Vice President of Business Development, deposition, she mentioned that the financing opportunities which were adversely affected by Enzo's actions included Goldman Sachs. *See* Ex. 6 to Kirk Decl. at 176-180. Digene contends that based on the fact that the Court determined that it properly pled the allegations in its Business Tort Counterclaims in its Memorandum Opinion regarding the motion to dismiss (D.I.124), and the fact that Digene provided all necessary discovery, Enzo's motion to strike should be denied.

B. *Discussion*

The Motion to Strike will be denied because the Court concludes that Digene pled the necessary elements and provided the relevant discovery.

First, in its Memorandum Opinion denying Enzo's Motion to Dismiss, the Court stated that: 1) the alleged factual basis for the counterclaims were the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 3
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: 2003 WL 21402512 (D.Del.))**

press releases, and 2) that in the context of interference with business relationships Biochem's alleged actions constitute attempts to induce third parties, namely customers buying Digene's Hybrid Capture® products, not to enter into or continue their business relations with Digene. (D.I. 124 at 2-3, 12). However, after finding that Digene had properly pled these counterclaims for purposes of a motion to dismiss, the Court qualified its conclusions and noted that "there are discovery mechanisms, such as interrogatories, for ascertaining more details regarding the allegations of the complaint." (D.I. 124 at 14).

**\*3** Here, Digene's Counterclaims involve claims under: 1) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); 2) Unfair Competition under the Delaware Deceptive Trade Practices Act, 6 Del. C. §§ 2531 et seq. (Count IV); and 3) Tortious Interference With Prospective Business Relations (Count V). Although Digene listed two press releases as the factual basis for such counterclaims in its Complaint, all that it was required to do in its Complaint, under notice pleading, was to provide a short and plain statement showing that they are entitled to relief. Fed.R.Civ.P. 8(a)(2). The Court, in its Opinion regarding Enzo's Motion to Dismiss Digene's Counterclaims determined that Digene had fulfilled this requirement. (D.I.124). After this, and in line with the Court's suggestion, the parties conducted fact discovery to ascertain more details regarding the factual allegations of the Complaint. Although Digene did not give Enzo a factual roadmap for all of its allegations, it disclosed all the documents relied upon by Dr. Jizmagian in his report, disclosed potential contractual relationships and financial opportunities affected, including Goldman Sachs, and the relevant time periods, through discovery mechanisms such as interrogatories and depositions. In this case, Digene pled all relevant causes of action, and the parties were supposed to parse out the facts underlying those allegations through discovery. The Court concludes that the facts outlined by Enzo as not disclosed, were in fact disclosed through discovery, and were facts; not new causes of action as Enzo contends. Further, because Dr. Jazmagian's report does not discuss any new causes of action, and the dispute is not raised in the context of a Pretrial Order, the cases relied on by

Enzo are inapposite. See, e.g., Wilson v. Muckula, 303 F.3d 1207, 1216 (10 th Cir.2003) (finding insufficient support in the amended complaint and ambiguous pretrial order to support a claim for negligent infliction of emotional distress); Sound Video Unlimited, Inc. v. Video Shack, Inc., 700 F.Supp. 127, 148-149 (S.D N.Y.1998) (dealing with time period for calculation of damages in the context of a dispute over a proposed pretrial order). Based on the following: 1) the Court has already determined that Digene has properly pled all the causes of action alleged in their Business Tort Counterclaims; 2) no new causes of action are raised by Dr. Jizmagian's report; and 3) all documents relied upon by Dr. Jizmagian have been provided to Enzo through discovery mechanisms such as interrogatories, depositions and document production, the Motion to Strike will be denied.

III. *Enzo Biochem and Enzo Life Science's Joint Motion to Bifurcate and Stay Discovery (D.I.145)*

A. *Parties' Contentions*

Enzo Biochem and Enzo Life Sciences (collectively "Enzo") contend that whether or not Dr. Jizmagian's report is stricken, further discovery on Digene's Counterclaims should be stayed and any trial on them should be bifurcated from the patent infringement claims. First, Enzo contends that trial of these Counterclaims and any further discovery would be simplified if not mooted upon a finding of invalidity or infringement of the '581 Patent. Further, Enzo claims that the issues raise by Counts III-V of Digene's Counterclaims are prime for bifurcation because many of the issues to be tried on the Counterclaims have little or no evidentiary overlap with the issues to be tried in the patent infringement action. For instance, Enzo points out that in the patent infringement trial, evidence regarding the amount of Digene's sales will be at issue, whereas these topics will not be raised in the context of the Counterclaims. Instead, Enzo argues, the Counterclaim trial will deal with issues related to Digene's relationship with third parties and how Digene contends that Enzo harmed these relationships. Enzo also contends that bifurcation is called for because of the complexities involved with having a trial involving not only the issues of infringement and validity but also the issues involved

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                   Page 4
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: 2003 WL 21402512 (D.Del.))**

in the Counterclaims. Finally, Enzo argues that if Dr. Jizmagian's expert report is not stricken, bifurcating the Business Tort Counterclaims and staying discovery on them is even more appropriate and urgent. Specifically, it argues that it should not be denied a speedy trial on the issue of patent infringement, while additional discovery is taken regarding Dr. Jizmagian's expert report. For example, Enzo points out that it would need to seek discovery regarding the financing of Goldman Sachs and would have to serve subpoenas on Goldman Sachs and its intellectual property counsel to determine why the funds were unavailable to Digene.

**\*4** In response, Digene contends that Enzo's request for bifurcation is neither warranted nor proper given the facts of the case. First, Digene contends that there is significant evidentiary overlap between the Counterclaims and the patent claims. For example, Digene's validity defenses which contend that Enzo's amended claims (1) are not supported by the specifications; (2) claim subject matter that Enzo did not invent; and (3) encompass prior art known to both Enzo an Digene, are the facts that Enzo intends to rely on for its willful infringement, are the same facts which Digene will rely on in support of its validity arguments and in turn are the same facts which Digene relies on in its Counterclaims. Therefore, Digene argues, bifurcation is not warranted because it would require the Court and the jury to hear the same facts as many as three times. Further, Digene argues that recent discovery has shown the interrelated nature of the Counterclaims, where documents received in the past two weeks from Johnson & Johnson demonstrate that the claims of the '581 Patent are not supported by the patent specification and that those limited embodiments which were disclosed in the patent specification were derived from another party. Digene argues that these documents further demonstrate the bad faith and anti-competitive nature of Enzo's acts which preceded the filing of this action and form a basis for Digene's Counterclaims. Finally, Digene argues that Enzo's request to stay further discovery on the Business Tort Counterclaims is untimely, where Enzo has been given unfettered access to Counterclaim discovery and has failed to pursue such discovery as evidenced by its failure to take any depositions until the

last week of an already extended fact discovery.

*B. Discussion*

The Court concludes that the Counterclaim and patent issues will be bifurcated in order to avoid jury confusion on complex legal issues. Federal Rule of Civil Procedure 42(b) ("Rule 42(b)") governs the bifurcation of trials and, in relevant part, provides:
> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim ... or of any separate issue or ... issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Fed.R.Civ.P. 42(b).

Under Rule 42(b), "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management." *Gardco Mfg., Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1212 (Fed.Cir.1987); *see also* 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2388 (2d ed. 2002) ("Ultimately the question of separate trials under Rule 42(b) should be, and is, a matter left to the discretion of the trial court...."). Courts, when exercising their broad discretion to bifurcate issues for trial under Rule 42(b), should consider whether bifurcation will avoid prejudice, conserve judicial resources, and enhance juror comprehension of the issues presented in the case. *Union Carbide Corp. v. Montell N.V.,* 28 F.Supp.2d 833, 837 (S.D.N.Y.1998). "In deciding whether one trial or separate trials will best serve [the above factors] ... the major consideration is directed toward the choice most likely to result in a just final disposition of the litigation." *In re Innotron Diagnostics,* 800 F.2d 1077, 1084 (Fed.Cir.1986); *see also* Wright & Miller, *supra,* § 2388.

**\*5** In the context of patent cases, "[e]xperienced judges use bifurcation and trifurcation both to simplify the issues in patent cases and to maintain manageability of the volume and complexity of the evidence presented to a jury." Thomas L. Creel & Robert P. Taylor, *Bifurcation, Trifurcation, Opinions of Coun-*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: 2003 WL 21402512 (D.Del.))**

*sel. Privilege and Prejudice,* 424 PLI/Pat 823, 826 (1995); *see also Manual for Complex Litigation* (Third) § 33.62 (1995) (advising trial judges to bifurcate or trifurcate overly complex patent trials). In fact, bifurcation of complex patent trials has become common. Steven S. Gensler, *Bifurcation Unbound,* 75 Wash. L.Rev. 705, 725 (2000) ("Bifurcation is also common in patent litigation...."); Creel & Taylor, *supra,* at 825 ("Bifurcation or even trifurcation is common in patent cases.").

Typically, courts bifurcate patent cases into liability and damage trials. *Swofford v. B & W, Inc.,* 336 F.2d 406 (5th Cir.1964), *cert. denied,* 379 U.S. 962 (1965) (bifurcating patent case into liability and damage trials). Courts also bifurcate complex patent cases in such a way to prevent jury confusion. *Smith v. Alyeska Pipeline Service Co.,* 538 F.Supp. 977, 984 (D.Del.1982) (finding "that one trial of both issues [i.e., liability and damages] would tend to clutter the record and to confuse the jury."). This reasoning is also applicable to cases involving both patent and non-patent claims.

Bifurcation is an important discretionary tool that district courts can use to ensure that the cases are resolved in a just manner by juries that understand the complex issues before them.

> Many scholars have endorsed bifurcation in complex cases as a method of improving juror comprehension. Specifically, bifurcation might enhance jury decision making in two ways: (1) by presenting the evidence in a manner that is easier for the jurors to understand, and (2) by limiting the number of legal issues the jury must address at any particular time.

Gensler, *supra,* at 751.

In this case, the bifurcation of issues would prevent jury confusion, in that it would enable a jury to concentrate on one complex body of law at a time. Also, in order to enhance jury comprehension and avoid prejudice, the Court will separate the issues into three sequential phases for trial in the following manner: 1) infringement; 2) validity; and 3) Business Tort Counterclaims. Although the Court recognizes that there is some evidentiary overlap, the parties will not be prejudiced by separate trials and the procedure will pro-

duce an efficient and fair disposition of the parties' claims.

The issue of staying discovery on the Counterclaims, however, is a more difficult question. The discovery phase in this case has already been extended and the Court is concerned that a stay of discovery on the Business Tort Counterclaims will prevent a fair and efficient resolution to the Counterclaims. Although the Court recognizes that the Counterclaims may be mooted or simplified depending on the outcome of the patent issues, this must be weighed against the importance of judicial efficiency and fairness. After weighing the relevant factors, the Court will deny the motion to stay because the Court finds that the interest in efficiently moving on with the resolution of the Counterclaims outweighs Enzo's concerns. Additionally, the Court concludes that the interest of fairness is served by a further extension of fact discovery as to those claims. Thus, the Motion to Bifurcate and Stay discovery will be granted in part and denied in part.

IV. *Digene's Protective Orders* (D.I.104, 113)

*6 Digene has filed two Protective Orders in the instant case. The first, D.I. 104, asks the Court for a Protective Order to preclude Enzo from disclosing Digene's confidential or outside counsel only information to Enzo's proposed expert Dr. James Wetmur. The Court concludes that Digene has not met its burden of proof with regard to this issue and also concludes that the Stipulated Protective Order is sufficient at this time. Therefore, Digene's Motion for a Protective Order (D.I.104), will be denied.

The second motion requests a Protective Order precluding Enzo Life Sciences from taking Digene's Deposition pursuant to Rule 30(b)(6) because it is unnecessarily duplicative and unduly burdensome. After reviewing the parties' arguments, the Court finds that the deposition notice was not unreasonably duplicative or unduly burdensome, and therefore, Digene's Motion for a Protective Order (D.I.113) will be denied.

An appropriate Order will be entered.

ORDER

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
**(Cite as: 2003 WL 21402512 (D.Del.))**

NOW THEREFORE, For The Reasons discussed in the Opinion issued this date, IT IS HEREBY ORDERED this 10th day of June 2003, that:

1) Enzo Biochem's Motion to Strike the Expert Report of Stephen Jizmagian (D.I.144) is *DENIED;*

2) Enzo Biochem's and Enzo Life Sciences' Joint Motion to Bifurcate and Stay Discovery (D.I.145) is *GRANTED* as to Bifurcation of issues but *DENIED* as to the Stay of Discovery on the Business Tort Counterclaims;

3) Fact Discovery as to the Business Tort Counterclaims shall be extended so as to be completed by August 15, 2003;

4) Digene's Motion for Protective Order (D.I.104) is *DENIED;*

5) Digene's Motion for Protective Order (D.I.113) is *DENIED;*

6) Plaintiff's Motion to Compel Digene to Produce a 30(b)(6) Deponent is *DENIED* as moot because the Parties have resolved the issue;

7) As discussed at the teleconference on Wednesday, June 4, 2003, Enzo counsel is permitted to show their clients an unredacted version of Dr. Jizmagian's expert report;

8) The parties shall submit a letter with a Proposed Agreed Upon Trial Date for February or March, 2004;

9) A Pretrial Conference will be held on Thursday, November 6, 2003 at 2:30 p.m., in Courtroom No. 4B on the 4th Floor, Boggs Federal Building, Wilmington, Delaware.

### Motions, Pleadings and Filings (Back to top)

• 2004 WL 3809655 (Trial Motion, Memorandum and Affidavit) Plaintiff Enzo Life Sciences' Claim Construction Brief (May 24, 2004)Original Image of this Document (PDF)

• 2003 WL 24334378 (Expert Report and Affidavit) Export Report of James G. Wetmur, Ph.D. Regarding

the Validity of U.S. Patent No. 6,221,581 (Apr. 16, 2003)Original Image of this Document (PDF)

• 2002 WL 33118450 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Digene Corporation's Motion for Partial Summary Judgment of Invalidity (By Reason of Indefiniteness) (Nov. 22, 2002)Original Image of this Document (PDF)

• 2002 WL 33118447 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Digene Corporation's Motion for Partial Summary Judgment of Invalidity (By Reason of Indefiniteness) (Sep. 19, 2002)Original Image of this Document (PDF)

• 2002 WL 33118448 (Trial Motion, Memorandum and Affidavit) Opening Brief of Counterclaim Defendant Enzo Biochem, Inc. in Support of its Motion to Dismiss Digene Corporation's Counterclaims (Jun. 28, 2002)Original Image of this Document (PDF)

• 1:02CV00212 (Docket) (Mar. 20, 2002)

• 2002 WL 33118449 (Trial Pleading) Complaint and Jury Demand (2002)Original Image of this Document (PDF)

• 2000 WL 34635240 (Expert Report and Affidavit) Declaration of Dr. Dean L. Engelhardt in Opposition to Digene's Motion for Partial Summary Judgment of Invalidity (Jul. 13, 2000)Original Image of this Document (PDF)

• 1995 WL 17775544 (Expert Report and Affidavit) Declaration of Dr. James G. Wetmur (Jun. 7, 1995)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.