IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| TV GUIDE ONLINE, INC. AND<br>TV GUIDE ONLINE, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>TRIBUNE MEDIA SERVICES, INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 05-725-***

**REDACTED - PUBLIC VERSION**

## SECOND SUPPLEMENTAL EXPERT REPORT OF
## DR. CHRISTOPHER A. VELLTURO

OF COUNSEL:

Robert C. Morgan
Christopher J. Harnett
Ching-Lee Fukuda
Stuart W. Yothers
Danielle C. Schillinger
FISH & NEAVE IP GROUP
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Ronald E. Naves, Jr.
Sr. Vice President
Legal Affairs and Litigation
Gemstar-TV Guide International, Inc.
6922 Hollywood Boulevard
Hollywood, California 90028
(323) 817-4600

Dated:  June 21, 2007

Frederick L. Cottrell, III (#2555)
Cottrell@rlf.com
Jeffrey L. Moyer (#3309)
Moyer@rlf.com
Steven J. Fineman (#4025)
Fineman@rlf.com
Richards, Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

Attorneys for Plaintiffs
TV Guide Online, Inc. and
TV Guide Online, LLC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TV Guide Online, Inc. and TV Guide Online, LLC | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 05-CV-725-KAJ<br>Confidential – Subject to Protective Order |
| Tribune Media Services, Inc., | ) ) | |
| Defendant. | ) ) ) | |

# SECOND SUPPLEMENTAL EXPERT REPORT OF
# DR. CHRISTOPHER A. VELLTURO

## I.    OVERVIEW

1.    I am the founder and president of Quantitative Economic Solutions, LLC, an economic
consulting firm.  I was retained by Ropes & Gray LLP, counsel for TV Guide Online,
Inc. and TV Guide Online LLC ("TV Guide")[1] in connection with this litigation.[2]  I was
asked to perform economic analysis to assess an appropriate measure and quantum of

---

[1] I understand TV Guide Online, Inc. and TV Guide Online LLC are both wholly-owned subsidiaries of Gemstar-TV
Guide International, Inc.  I use "TV Guide" to refer to the operations of Gemstar relevant to the television
information services business at Gemstar.



damages in the event a trier of fact determines liability for infringement of United States Patent No. 5,988,078 ("the '078 patent"). The '078 patent entitled "Method and Apparatus for Receiving Customized Television Programming Information by Transmitting Geographic Location to a Service Provide Through a Wide-Area Network," issued on November 23, 1999.

2.    I submitted an Expert Report in this action on December 15, 2006 ("Original Report").[3] In the Original Report, I determined TV Guide sustained damages in the form of lost profits on the bulk of TMS' allegedly infringing activity, and a reasonable royalty for TMS' residual infringing activity.

# REDACTED

3.    Since the submission of my Original Report (and the supplemental report noted in footnote 3), I have been provided with additional information produced in this matter as well as additional deposition testimony. A list of the additional documents and depositions I have considered and the names of TV Guide personnel with whom I spoke in forming my opinion is attached as Second Supplemental Exhibit 2.

4.    I provide this Second Supplemental Expert Report to incorporate this additional information, and to recalculate my reasonable royalty analysis to account for two computational miscalculations. Both issues relate to the computation of the Edgeworth Box, which provides an economic framework to determine the range of reasonable royalty rates that TV Guide would accept in a hypothetical licensing negotiation at the time of initial infringement, and the range of reasonable royalty rates TMS would be willing to pay in said negotiation.

---

[3] I also submitted a Supplemental Expert Report on December 29, 2006 that addressed minor typographical and

5.     With respect to my reasonable royalty analysis, the changes in the plausible royalty rates for TV Guide and TMS change significantly as a result of the recalculations. Therefore, I also provide a revised Georgia Pacific analysis to determine the appropriate reasonable royalty rate. In this regard, the reasonable royalty analysis provided herein is intended to replace the analyses provided in my Original Report.

6.     In addition, I restate lost profits damages in this report to account for some minor computational adjustments with respect to lost profits associated with TMS' infringing provision of Zap2it.com and syndicated/affiliate television program listing services. The lost profits analysis provided in my prior reports remains unchanged,

## REDACTED

7.     With respect to damages in this supplemental report, I find:

- TV Guide Online, Inc. sustained lost profits through lost advertising revenue. "But for" TMS' infringement, TV Guide Online, Inc. would have earned greater advertising revenue at TVGuide.com, and through additional revenues generated through incremental syndication agreements for TV Guide's online program listing services.

## REDACTED

---

referential issues but did not change my determination of damages.

REDACTED

8.     The remainder of this supplemental report presents the replacement reasonable royalty
       analysis, and provides details on the changes to the calculations of lost profits damages.  I
       then provide details on my revised damages calculations.  Finally, for clarity, I provide a
       complete set of Second Supplemental damages-related Exhibits to replace the Exhibits
       provided in my Original Report.  Since the bulk of damages sustained by TV Guide are
       assessed and quantified based upon lost profits, the overall damages claim provide in this
       supplemental report differs only modestly from that provided in my Original Report.

## II.    REVISED ANALYSIS: REASONABLE ROYALTY ON RESIDUAL INFRINGEMENT

REDACTED

4

# REDACTED

10.    Under a reasonable royalty approach to damages, I determine the likely royalty rate that Index Systems, Inc. and TMS would have agreed upon for a license to the '078 patent about the time of initial infringement. I understand that as part of this hypothetical negotiation, both parties consider the patent at issue to be valid and infringed by the technology that is to be licensed. This hypothetical licensing negotiation is considered to take place at about the time the infringement commenced.

### A.    Reasonable Royalty Rate

11.    I determine a reasonable royalty through a two-step process. First, I evaluate the incentives that Index Systems, Inc. and TMS would have had at about the time of first infringement to enter into a royalty agreement. **REDACTED**

This analysis ("Edgeworth Box Analysis" or the application of *Georgia-Pacific* Factor 15) provides a range of likely royalty rates which the parties would *both* consider economically reasonable. Having determined this range of royalty rates, I apply the remaining fourteen *Georgia-Pacific* factors (excluding Factor 15)[4] to determine which of the feasible royalty rates represents the most plausible royalty rate to which the parties would have agreed.

### B.    Initial Conditions and Parameters

#### 1.    Date of Negotiation

# REDACTED

---

[4] *Georgia-Pacific Corp. v. United States Plywood*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

5

REDACTED

### 2.    Nature of License

13.    Despite the hypothetical nature of the exercise, I create a licensing scenario that closely
matches what a real-world licensing session at the time of first infringement would have
looked like.

14.    Given that the revenues and profits associated with a license to the '078 patent are
derived from several sources REDACTED
the reasonable royalty rate would need to be applied along a
dimension that captures the value of the patented technology across all revenue-
generating products and services.  In this context, I evaluate the reasonable royalty by
determining the value of the patent license on a dollar per thousand website page view
basis.

15.    Furthermore, I also evaluate the parties' incentives to agree to a license (and the implied
reasonable royalty rate) as expressed on a metric of dollars per unique website visitors
(within a given month).  At the time of the hypothetical negotiation        website
traffic (for the purposes of considering per-impression advertising payments) was
considered on a per thousand page view basis and on the basis of unique website visitors.
With technological developments since that time, accurate assessments of page views
have become muddled.  For example, many systems presently allow the advertisement on
a particular page to automatically refresh on a periodic basis, which provides

REDACTED

6

opportunities for additional "views" of advertisements but does not result in an incremental page view.[7]  Also, web technology now allows content embedded on a webpage to be regularly updated without requiring the page to be refreshed or reloaded, when regular content updates would previously have resulted in multiple incremental page views.[8]

REDACTED

### 3.    Patent Validity, Enforceability and Infringement

17.    I assume that the parties would arrive at the negotiating table with a common understanding that the '078 patent is valid and enforceable, and that TMS' television listings method and system would infringe on at least one claim of the '078 patent.

---

[7] See, e.g., http://www.techweb.com/wire/showArticle.jhtml?articleID=165702733 and http://www.micropersuasion.com/2006/12/the_iminent_dem.html, last accessed June 21, 2007.

[8] See, e.g., ESPN.com's Major League Baseball scoreboard website which will automatically update scores without the user having to reload the page.  (http://scores.espn.go.com/mlb/scoreboard, last accessed June 20, 2007.)

REDACTED

### 4.    Reasonable Foresight

18.    Finally, I assume that the parties had reasonable foresight as to trends in the online
television information industry going forward and the ongoing importance of the '078
patent to the ability of TMS to successfully compete for internet traffic (and related
advertising revenues) associated with television listing information.  Therefore, in
forecasting the expected benefits to TMS of taking a license and the expected cost to
Index Systems, Inc. of granting such a license, I assume the parties would have
reasonable foresight with which to estimate projected values.

### C.    Edgeworth Box Analysis (Application of *Georgia-Pacific* Factor 15)

19.    Under an Edgeworth Box Analysis, the likely price at which an agreement can be struck
between two parties to exchange a good or asset is bounded by the expected valuations
each party anticipates it would lose if the transaction does not take place.  The rate that
the parties would agree to is bounded by the maximum TMS would be willing to pay for
a license to the patent at issue and the minimum Index Systems, Inc. would be willing to
accept.

### 1.    TMS' Maximum Willingness to Pay

20.    For TMS, I estimate the maximum willingness to pay based on the profits it would expect
to lose by not taking a license.  Absent a license, TMS would not be in a position to offer
its infringing method and system either directly to end users through Zap2it.com or
through its syndication services to other websites, and would not be in a position to earn
related advertising revenues associated with internet traffic directed to its site. Most
likely under this scenario, TMS would have continued to offer access to movie-related
listings and content through Zap2it.com (directly and through syndication).  Given the
revealed importance of the patented method and system, however, without a license, the
television-related traffic into Zap2it.com and the syndication services TMS would have
been able to sell would have been sharply reduced (if not eliminated entirely).

8

21.   At a minimum, TMS would have recognized that the financial implications of not obtaining a license to the '078 patent would be lost advertising revenue and associated profits due to reduced direct end user volume at Zap2it.com, and due to reduced syndication-related traffic at TMS. Further, the reduced syndication traffic would have a potential further adverse impact on traffic more generally at sites owned and operated by various Tribune Company subsidiaries that utilize TMS syndication services. For example, the absence of localized TV listings at the Los Angeles Times website (owned and operated by Tribune Publishing) likely would have led to fewer visits and reduced activity throughout the site, and not just reduced activity at the TV listings pages. In this sense, the analysis provided here provides a lower bound on the maximum willingness to pay at TMS.

22.   In Second Supplemental Exhibit 18, I estimate the operating margin that TMS would have expected to earn through the television portion of Zap2it.com and its syndication business under license to the '078 patent  REDACTED          Without a license, TMS would likely have been unable to generate any meaningful traffic and associated revenue (either directly or through syndication) that related to television-based interest on the part of the end user. With a license, TMS would have been in a position to offer the infringing television-based aspects of Zap2it.com and syndication business legally.

REDACTED

## 2.    Index Systems, Inc.'s Minimum Willingness to Accept

25.    From the licensor's perspective, Index Systems, Inc. would not be willing to grant TMS a license to the '078 patent unless the royalties it expected to receive under such a license would exceed the additional advertising revenues/profits and related royalties that would be received if it did not license TMS. As detailed extensively above, through their TVGuide.com and Zap2it.com offerings, Index Systems, Inc.'s corporate affiliate TV Guide Online, Inc. and TMS were and continue to be significant rivals and the Levine patented method and system would have represented an important competitive advantage for TVGuide.com over Zap2it.com. Given the important competitive advantage the patented method and system afforded TV Guide Online, Inc. over a principal rival, a relatively high royalty rate would be required by Index Systems, Inc. as compensation for eliminating this advantage.

REDACTED

27.    Furthermore, TV Guide may have anticipated that some of the traffic that TMS would have generated would have (in the absence of a license to TMS) involved the participation of other generators of web-based traffic.

REDACTED

REDACTED

10

REDACTED        I account for this factor in my consideration of the

*Georgia-Pacific* Factors below.  In this context, I note that the present analysis in this

regard reflects an upper bound on the minimum acceptable rate to TV Guide.

REDACTED

REDACTED

11

REDACTED

3.    **Summary of Range**

REDACTED

32.   This analysis provides insight into the starting points in a hypothetical negotiation
      between the parties regarding a license to the '078 patent. Often, the Edgeworth Box
      analysis reveals the strong disincentives a patent holder has to license an actual (or
      potential) direct rival relative to the rival's willingness to pay for a license. As noted
      above, Index Systems, Inc. would have commanded a relatively high rate, as the license
      would have resulted in the loss of highly profitable marginal website traffic at
      TVGuide.com. To the contrary, the licensed volumes at TMS would have been part of
      TMS' entry into this market space, and therefore would have been considered more on an
      overall (rather than incremental) profit basis. The difference in incentives on a per unit
      basis between TMS and Index Systems, Inc. exists because TMS would have been able to
      avoid certain startup and fixed costs associated with licensed volumes if it did not obtain
      a license to the '078 patent.

REDACTED

REDACTED

**D.     Consideration of the Remaining *Georgia-Pacific* Factors**

34.     In this section, I consider the data and evidence available in this action to determine how the various bargaining dynamics proposed in the *Georgia-Pacific* factors would have affected the final rate between the parties. I consider each of the *Georgia-Pacific* factors below.

       **1.     The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.**

REDACTED

---
[15] TG060701-27.

REDACTED

REDACTED

14

REDACTED

REDACTED

15

REDACTED

REDACTED

16

REDACTED

43.    With respect to Index Systems, Inc., the more modest rate reflects the fact that, under the license, TMS (and not TV Guide) would face some of the significant business risks associated with developing the Zap2it.com site. For example, at the time of launch, there was some significant probability that the site would not generate traffic and revenues as forecast, and TMS would sustain the losses associated with its start up. Such losses would not be passed on to TV Guide (other than through lost royalty revenues) - that is TMS would bear these risks. REDACTED

44.    With respect to TMS, as detailed below, the development of its web-based TV listings business is part of a broader internet-based offering at Zap2it.com, and through its Tribune Company affiliate sites. REDACTED

To the extent the demand complementarities are substantial, access to the '078 patent is important to revenues earned through the visitor viewing of movie-based content, as, without a license, such visitors may seek out their entertainment content from other sites with more full service offerings.[29]

45.    With respect to TMS' owned and operated sites, the TV listings that would be offered using a license to the '078 patent support a business model not unlike that of other web destinations and portals, such as MSN and Yahoo  As part of a menu of service offerings, syndicated TV listing services at TMS owned sites add value above and beyond that calculated by its stand alone profit contribution, as the overall package of services are enhanced by the presence of TV listings. As noted in Section II, *supra*, in this context, localized TV listings represent an important component of content offered on

---

[29] This economic issue is also considered under Factor 13, *infra*.

entertainment related sites, or more general sites with a substantial entertainment-related offering.[30]

REDACTED

2.    **The rates paid by the licensee for the use of other patents comparable to the patent in suit.**

REDACTED

3.    **The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

48.    As noted earlier in this section, the hypothetical license would be non-exclusive, as TV Guide Online, Inc. would continue to use the patented technology on its own site. This dynamic is implicitly captured in the Edgeworth Box analysis (*Georgia-Pacific* Factor 15) I undertook *supra*, and thus no incremental adjustment is warranted here.

4.    **The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

---

[30] This economic issue is also considered under Factor 6, *infra*.

REDACTED

18

49.    See Factor 1.  Index Systems, Inc. through TV Guide Online, Inc. has licensed its intellectual property (including the '078 patent).  Patent owners who do not seek to maintain their monopoly tend to license patents at lower rates than those who do seek to maintain their patent monopoly.  However, I have already significantly accounted for this policy in determining the maximum and minimum willingness to pay as considered in the previous section, and therefore, I give this factor little additional weight in considering the likely rate the parties would reach in the context of rates identified through the Edgeworth Box analysis.

     5.    **The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are the inventor and promoter.**

50.    As noted above, TV Guide Online, Inc. and TMS are direct competitors for end user traffic related to television (and other entertainment) information and content through their respective sites, TVGuide.com and Zap2it.com.  Moreover, as discussed above, the parties are direct competitors (and, essentially exclusive competitors) in the provision of syndicated online television listing services to third parties.  As a matter of economics, firms seek higher royalty rates from competitors than non-competitors, as the business garnered by the rival under the license is likely to come – to some degree – at the expense of the licensor.  The licensor would take this financial impact into account in its willingness to license.

# REDACTED

6.   **The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales**

52.   REDACTED   In this context, consumer awareness, use, and satisfaction with TV Guide.com and their satisfaction with the listing services available as a result of the deployment of the inventions claimed in the '078 patent exert a positive influence (referred to by economists as a positive "externality" or "feedback effect"[33]) on the brand as a whole. This enhanced value associated with TV Guide's use of the '078 patent would provide Index Systems, Inc. with greater incentive to maintain proprietary rights to the technology, and thereby raise the royalty rate they would seek in a hypothetical negotiation.

REDACTED

54.   I find this Factor indicates a royalty rate toward the top end of the rates indicated by the Edgeworth Box analysis.

7.   **The duration of the patent and the term of the license.**

55.   The patent issued at the time of the hypothetical negotiation, and would have had its full term to run under the license. Typically, I find this factor to be neutral as to the likely royalty rate, unless the patent is close to expiration (in which case the value of the license

---

REDACTED

[33] See Paul A. Samuelson and William D. Nordhaus, *Economics, Seventeenth Edition* (New York, NY 2001), pp. 372-384.

20

may be very short-lived compared to the costs of implementing the patented advantage). As this is not the case here, I find this factor to be neutral as to the likely royalty rate.

### 8.    The established profitability of the product made under the patent; its commercial success; and its current popularity.

56.    As noted above, users of TVGuide.com and Zap2it.com make extensive use of these sites' features that allows users to obtain localized television program listings based on geographical information provided through the users' computers.

57.    A review of the major internet portal sites that provide TV listing services to end users accessing their "home" pages (and listed services) demonstrates that every such portal site offers online localized television program listings through a feature that enables the user to receive localized program grids based on geographical information provided through the user's computer. In addition, the most significant (in terms of unique visitor traffic counts) television/entertainment-related websites utilize a search capability in which geographical information (zip code or city/state) is provided through the user's computer to receive a localized program grid.



REDACTED

21

REDACTED

61.  This factor would tend to indicate a relatively high royalty rate relative to those indicated by the Edgeworth Box analysis.

>  **9.  The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.**

62.  See Factor 8. This factor suggests a royalty rate toward the higher end of the range.

>  **10.  The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

63.  See Factor 8. This factor suggests a royalty rate toward the higher end of the range.

>  **11.  The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.**

REDACTED

64.    See Factor 8.  This factor suggests a royalty rate toward the higher end of the range.

> **12.    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.**

REDACTED

66.    I find this factor provides no incremental insight (beyond its incorporation into my assessment of Factor 1) as to the likely royalty rate here.

> **13.    The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.**

67.    Both TVGuide.com and Zap2it.com include additional listings information relating to movies, and original content directed at television, movies, and other forms of entertainment.  As noted above, however, I limit the traffic considered under the financial evaluation of the license here to be traffic specifically generated by the use of the '078 patent.  In other words, traffic at Zap2it.com unrelated to television listings and content are determined to remain with Zap2it.com, with or without a license to the '078 patent.[42] In this context, non-patented elements are explicitly considered in my determination of the Edgeworth Box, and therefore, no incremental consideration is warranted here.

REDACTED

---

[42] As explained in footnote 89 of my Original Report, I believe this to be conservative assumption that understates the importance/value of the invention claimed in the '078 patent.



23



### 14. The opinion testimony of qualified experts.

69. In forming my opinions on this matter, I reviewed and considered the report of Mr. Tipton Cole for input on the technical aspects of the '078 patent, TV Guide's patented method and system, and TMS' infringing method and system.

> **15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.**

70. This factor represents a restatement of the Edgeworth Box Analysis I originally undertook to establish the likely boundaries of a hypothetical negotiation. Thus, this factor has already been considered in determining the likely rate the parties would reach in the context of rates identified through the Edgeworth Box analysis.

### E. Conclusions on the Reasonable Royalty Rate

REDACTED

---

REDACTED

24

REDACTED

72.    As noted in Section B.2, I also evaluate the reasonable royalty appropriate for a damages consideration in this action using a dollar per unique running royalty metric. Details of these computations are provided in Second Supplemental Exhibit 20-A.

REDACTED



### F.    Royalty Base

73.    For reasons noted in my Original Report (see Section II.B.2), I assess the reasonable royalty rate on a dollar-per-thousand-page view basis, and limit the application of the royalty rate to those pages at the licensee that directly relate to television content. Under such an approach, the reasonable royalty rate determined above is applied to each television-related page view at Zap2it.com.

### G.    Residual Royalty Damages

REDACTED

## III.    ADJUSTMENTS TO LOST PROFITS COMPUTATIONS

75.    As noted at the outset of this supplemental report, I also undertake some computational adjustments to the lost profits analysis provided in my Original Report. These

adjustments related to the lost profits claimed as a result of TMS' infringement through its Zap2it.com and TMS' syndicated listings business, and, in any event do not represent any change in the analytic approach to lost profits consideration. I provide details on each change in Appendix 1. REDACTED

## IV.  SUMMARY OF DAMAGES

### A.  Total Lost Profits and Reasonable Royalty Damages

REDACTED

26

**B.    Prejudgment Interest**

78.    In order to compensate TV Guide Online, Inc. for the time value of money and the implicit risk TV Guide Online, Inc. undertook as an unwilling investor in TMS over the period of infringement, I have calculated appropriate prejudgment interest. "But for" TMS' infringement, TV Guide Online, Inc. should have earned additional profits as a result of increased advertising revenue and licensee royalties. In the real world, TMS has retained these sums and put them to work in the development of its businesses. In this sense, TV Guide Online, Inc. has been an unwilling investor in TMS, and is entitled to, at a minimum, the same return on its investment that other investors in TMS have sought and earned.

79.    To this end, I have calculated the interest rate factors for TMS' cost of debt in Second Supplemental Exhibit 25. In Second Supplemental Exhibit 26, I apply the appropriate factor to the damages sustained by TV Guide Online, Inc. as a result of TMS' infringement. REDACTED

**C.    Total Damages (Including Prejudgment Interest)**

REDACTED

**V.    ALTERNATIVE DAMAGES APPROACH**

REDACTED

June 21, 2007

Dr. Christopher A. Vellturo

28

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2007 I electronically filed the foregoing document with

the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

Richard K. Herrmann, Esquire
Mary B. Matterer, Esquire
Morris JamesLLP
500 Delaware Avenue, Suite 1500
Wilmington, DE   19899


I hereby certify that on June 21, 2007, I have sent by Electronic Mail, the foregoing

document to the following non-registered participants:

Mark A. Pals, Esquire
Kirkland & Ellis, LLP
200 East Randolph Drive
Chicago, IL  60601

Steven J. Fineman (#4025)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2007 I electronically filed the foregoing document with

the Clerk of Court using CM/ECF which will send notification of such filing(s) and Electronic

Mail to the following:

Richard K. Herrmann, Esquire
Mary B. Matterer, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE   19899


I hereby certify that on July 12, 2007, I have sent by Electronic Mail, the foregoing

document to the following non-registered participants:

Mark A. Pals, Esquire
Kirkland & Ellis, LLP
200 East Randolph Drive
Chicago, IL  60601

Steven J. Fineman (#4025)

RLF1-2983269-1