IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TV GUIDE ONLINE, INC. AND TV GUIDE ONLINE, LLC, | ) ) ) ) | |
| Plaintiffs, Counterclaim-Defendants, | ) ) ) | C.A. No. 05-CV-725-*** |
| v | ) ) ) | JURY TRIAL DEMANDED |
| TRIBUNE MEDIA SERVICES, INC. | ) ) ) | |
| Defendants, Counterclaim-Plaintiffs. | ) ) ) | REDACTED PUBLIC VERSION |

## TV GUIDE'S OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Robert C. Morgan
Christopher J. Harnett
Ching-Lee Fukuda
Stuart W. Yothers
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

Ronald E. Naves, Jr.
Jeffrey A. Fehervari
Vladamir V. Radovanov
Gemstar-TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, CA 90028
(323) 817-4600

Dated: October 5, 2007

Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Steven J. Fineman (#4025)
Richards, Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
moyer@rlf.com
fineman@rlf.com

*Attorneys for Plaintiffs TV Guide Online, Inc and TV Guide Online, LLC*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................. ii

I        INTRODUCTION .................................................................................... 1

II.      NATURE AND STAGE OF THE PROCEEDING ......................................... 2
         A       The Pleadings ........................................................................... 2
         B.      The Case Schedule .................................................................... 2

III      SUMMARY OF THE ARGUMENT ........................................................... 3

IV.      STATEMENT OF FACTS ........................................................................ 7
         A       Overview of the Patent-in-Suit ................................................. 7
         B.      The Asserted Claims of the Patent-in-Suit ................................ 9
         C.      The Prosecution History of the Patent-in-Suit .......................... 10

V.       THE LAW OF CLAIM CONSTRUCTION ................................................ 10
         A       Claim Terms Should Be Construed In Light Of The Intrinsic Evidence ............ 10
         B       Reliance On Extrinsic Evidence ................................................ 12

VI.      THE PROPER CONSTRUCTION OF THE DISPUTED TERMS ................. 13
         A.      "Viewing Location" ................................................................. 13
         B.      "Available To A Particular One Of The Viewing Locations" ...... 17
         C.      "Information . . . Regarding/Pertaining To The Geographical Location/Area" ...... 18
         D.      "Transmitting"/"Transmit" ..................................................... 20
         E.      "Receiving" ............................................................................. 22
         F       "Modem" ................................................................................. 25
         G.      "Wide-Area Network" .............................................................. 27
         H.      "Operator Input" ..................................................................... 29
         I.      "Receive Information Through The Operator Input" ................... 31
         J.      "Schedule Of The Television Programming" .............................. 31
         K       Controller Limitations ............................................................. 33
                 1.      "Controller" ................................................................. 34
                 2.      "The Controller Being Programmed To Perform" ........... 35

VII.     CONCLUSION ...................................................................................... 36

i

## TABLE OF AUTHORITIES

Page

### CASES

*Amazon com, Inc. v. Barnesandnoble.com, Inc.,*
239 F.3d 1343 (Fed. Cir. 2001) ............................................................10, 28

*Biagro W. Sales, Inc. v. Grow More, Inc.,*
423 F.3d 1296 (Fed. Cir. 2005) ....................................................................13

*Cook Biotech Inc. v. Acell, Inc.,*
460 F.3d 1365 (Fed. Cir. 2006) ....................................................................11

*Gart v. Logitech, Inc.,*
254 F.3d 1334 (Fed. Cir. 2001) .................................................................7, 11

*Irdeto Access, Inc. v. Echostar Satellite Corp.,*
383 F.3d 1295 (Fed. Cir. 2004) ....................................................................11

*Markman v. Westview,*
517 U.S. 370 (1996)......................................................................................10

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) ..............................................................passim

*Salazar v. Procter & Gamble Co.,*
414 F.3d 1342 (Fed. Cir. 2005) ....................................................................12

*Sorensen v. Int'l Trade Comm'n,*
427 F.3d 1375 (Fed. Cir. 2005) ....................................................................12

*TAP Pharm. Prods., Inc. v. OWL Pharms., LLC,*
419 F.3d 1346 (Fed. Cir. 2005) ....................................................................13

*Tate Access Floors, Inc. v. Maxcess Techs., Inc.,*
222 F.3d 958 (Fed. Cir. 2000) .................................................................12, 16

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.,*
473 F.3d 1173 (Fed. Cir. 2006) ...............................................................12, 25

*Vitronics Corp. v. Conceptronic, Inc.,*
90 F.3d 1576 (Fed. Cir. 1996) ......................................................................10

ii

I.    **INTRODUCTION**

Plaintiffs TV Guide Online, Inc. and TV Guide Online, LLC (collectively "TV Guide") respectfully submit this opening brief concerning the construction of the patent claims asserted by TV Guide in this action.

As we explain in detail below, TV Guide is proposing definitions for the disputed limitations of the asserted claims that are fully consistent with: (1) the language and context of the asserted and unasserted claims; (2) the patent specification; (3) the history of prosecution of the asserted claims before the United States Patent and Trademark Office; and (4) the confirming extrinsic evidence including contemporaneous dictionaries and texts. Accordingly, the claim construction proposed by TV Guide is straightforward, consistent with controlling Federal Circuit precedent and will be helpful to the jury in resolving questions of infringement and validity.

In contrast, the definitions being proposed by TMS -- which have been a constantly moving target -- are not grounded in the intrinsic evidence of the patent-in-suit. TMS's proposed definitions are also unsupported by any reliable extrinsic evidence. Instead, TMS offers definitions including extraneous verbiage that improperly limits the scope of some claim terms and improperly broadens the scope of others. TMS does so in a transparent attempt to manufacture non-infringement and validity defenses where none exist. Controlling Federal Circuit authority confirms that TMS's efforts in this regard are improper.

1

## II.   NATURE AND STAGE OF THE PROCEEDING

### A.   The Pleadings

On October 12, 2005, TV Guide filed its complaint (D.I. 1) in this action charging Tribune Media Services, Inc. ("TMS") with infringement of U.S. Patent No. 5,988,078 ("the '078 patent"), which is attached hereto as Ex. A [1] TMS has denied TV Guide's assertion of infringement and asserted, *inter alia*, defenses and counterclaims of invalidity and patent misuse (D I 6)

On February 21, 2006, TV Guide filed a motion to dismiss and strike TMS's patent misuse allegations (D.I. 11). On July 24, 2006, TMS filed a motion to amend its pleadings to add additional parties -- Gemstar-TV Guide International, Inc. and Gemstar-TV Guide Interactive, Inc. -- to its patent misuse counterclaim. The parties, with approval of the Court, stipulated to bifurcate trial and stay discovery concerning TMS's affirmative defense and counterclaim of patent misuse (D I. 131). On November 20, 2006, TMS filed a motion to dismiss TV Guide Online, Inc. as a plaintiff. TV Guide opposed that motion, which is currently pending.

### B.   The Case Schedule

In accordance with the Court's Amended Scheduling Order, the parties concluded all discovery on February 28, 2007. The parties filed several stipulations to extend the remaining deadlines so that the parties could pursue settlement discussions  Those discussions, unfortunately, did not result in a mutually satisfactory business resolution. Expert depositions were completed by August 16, 2007. Case dispositive motions are due to be submitted

---

[1] As used herein, "Ex. __" refers to the stated exhibit to the Declaration of Stuart W. Yothers, which is submitted concurrently with this brief

2

concurrently with the parties' opening claim construction briefs. All remaining dates in this matter -- including hearings for argument on claim construction and summary judgment, pretrial conference and trial -- have been deferred until appointment of a replacement for Judge Jordan who had presided over this matter. Because TMS was not willing to consent to the appointment of Magistrate Judge Thynge for resolving case dispositive motions or for trial, TV Guide filed on August 28, 2007 a motion for reassignment of this action to one of the three District Judges That motion is pending.

III.   SUMMARY OF THE ARGUMENT

The technology described and claimed in TV Guide's '078 patent allows a television viewer to access television schedule information for his or her viewing location using a computer. TV Guide has accused TMS of infringing nine claims of the '078 patent -- claims 1-8 and 10

The Court's Scheduling Order provided that the parties were required to exchange proposed constructions for the claim terms that they believed would require construction no later than October 16, 2006 -- nearly one year ago. TV Guide fully complied with the Scheduling Order and identified six terms that required construction and proposed definitions for those terms (Ex. B).

In contrast, TMS's proposed constructions have been a moving target. On October 16, 2006, TMS identified eight terms and proposed definitions for those eight terms (Ex. C) On December 15, 2006 -- *almost two months after the deadline and after receiving TV Guide's infringement contentions* a week and a half earlier -- TMS changed its constructions (Ex. D). TMS proffered entirely new constructions for several of the eight terms and added new

3

proposed definitions for five additional terms[2]  TMS's expert did not attempt to provide any support for those newly proposed constructions in the intrinsic or extrinsic evidence.

Remarkably, TMS's new proposed constructions were submitted *after* TV Guide's expert, Mr. Cole, had opined on infringement (Cole Ex. A[3]).  Then, on January 18, 2007 -- *more than three months after the deadline* -- TMS provided a third set of proposed claim constructions in the form of a second version of its "Revised Proposed Constructions" (Ex. F). In his rebuttal report on infringement, TMS's expert adopted and tried to support TMS's third proposed constructions and added even more new proposed definitions for additional terms[4] (Ex. G).

Then, just a few days before the due date for submission of opening claim construction briefs (a date that was extended on several occasions at TMS's request) -- TMS asserted that several claim terms for which TMS had previously proposed definitions should be construed according to their "plain and ordinary meaning."  TMS's eleventh-hour assertion is difficult to understand because TMS's technical expert had based his opinions on the various definitions advanced by TMS.  TMS's expert did not base his opinions on the so-called "plain and ordinary meaning."

---

[2] TMS submitted its revised and new constructions concurrently with its expert report on invalidity (Ex. D).

[3] As used herein, "Cole Ex. __" refers to the stated exhibit to the Affidavit of J. Tipton Cole, which is submitted concurrently with this brief.

[4] Indeed, because TMS keeps changing its claim construction positions, it is unclear if all of the terms identified in its initial proposed construction are still at issue  Specifically, the claim terms "download," "electronic terminal unit," and "electronic television interface" were identified on October 16, 2006, but were not included in TMS's Revised Proposed Constructions on January 18, 2007  If TMS addresses these terms in its Opening Claim Construction Brief, TV Guide reserves the right to present all of its arguments concerning these terms in its Rebuttal Claim Construction Brief

4

It appears, therefore, that TMS is attempting to avoid having the Court pass judgment on TMS's proposed definitions now and instead, later seek to introduce testimony at trial from its expert that TMS's previously-advanced definitions are, in fact, the "plain and ordinary meaning." That is improper. When asked, TMS did not deny that this is its intention (Ex X). To avoid such a situation, TV Guide explains herein why the definitions proposed by TMS for these claim terms are legally incorrect.

In any event, TV Guide's proposed definitions for all of the terms in the asserted claims are consistent with the controlling principles of claim construction as articulated by the Federal Circuit. TV Guide offers straightforward constructions that are grounded in the intrinsic evidence -- that is, the patent's claims, specification and prosecution history. *See generally Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-17 (Fed. Cir. 2005) (*en banc*)

In contrast, TMS's proposed claim construction is not premised on the intrinsic evidence or even supported by the extrinsic evidence -- rather, it is the product of TMS's litigation objectives. The following examples illustrate the problems that permeate TMS's claim construction proposals.

1. *TMS adds extraneous language to several claim limitations in an attempt to improperly limit their scope and create non-infringement arguments.* This is exemplified by TMS's proposed construction of the term "receiving." TMS argues that the term "receiving" means "having data transferred to a computer such that a user can perform database-type manipulations directly on the transferred data without being connected to the original source of the data." There is nothing in the intrinsic record that supports such a restrictive definition. TMS adds verbiage such as "perform database-type manipulations directly on the transferred data without being connected" in a transparent attempt to improperly limit and narrow the claims

5

in order to manufacture a non-infringement defense where none exists.

# REDACTED

TV Guide's proposed constructions do no suffer from these defects. For example, as explained *infra*, TV Guide's definition of the "receiving" limitation is "receiving electronically," which is consistent with the plain and ordinary meaning of the claims' terms and with the specification.

2. *TMS adds extraneous language to other claim limitations in an attempt to broaden their scope and create invalidity arguments.* This is exemplified by TMS's proposed construction of the term "information . . regarding the geographic location of a particular viewing location." For this term, TMS proposes the construction:

> Any information *irrespective of how the information is encoded*, that expressly indicates in geographic language (e.g. name of continent, country, province, state, city, town, region, street address, zip code, area code, etc.) *the approximate portion of the planet* in which a particular "television viewing location," as defined above, is located (emphasis added).

Again, there is no basis in the intrinsic record supporting TMS's proposed inclusion of extraneous language such as "irrespective of how the information is encoded" and "the approximate portion of the planet." TMS's proposed expansive definition is a transparent attempt to improperly broaden this claim to manufacture an invalidity defense where none exists.

In contrast, TV Guide's proposed construction of that claim limitation avoids such gerrymandering by adhering to the construction supported by the intrinsic record. That language

6

means what it says – it refers to geographic information regarding the site -- i e., the residence or other building -- at which a television signal can be received

        3.    *TMS tries to limit the claims to a single preferred embodiment.* As a matter of law, a patentee's claims are not limited to the scope of a single or preferred embodiment that is included for purposes of illustration in the patent's specification. *See, e g., Gart v. Logitech, Inc*, 254 F.3d 1334, 1343 (Fed Cir. 2001). TMS seeks to avoid this controlling legal principle. This is illustrated by TMS's proposed definition of the term "viewing location." According to TMS, that claim term must be defined as "the specific room within a building where a television set is positioned and watched by a user" and, as such, should be limited to a single preferred embodiment disclosed in the specification. TMS's efforts to limit the claims to the preferred embodiment are, therefore, improper as a matter of law. This is particularly so in this case because the patent expressly discusses alternative embodiments that are inconsistent with TMS's proposed constructions. For example, the specification specifically describes embodiments in which the "viewing location" covers at least two rooms, with the computer receiving schedule information in one room and the television in another room. Accepting TMS's proposed construction in this circumstance would require ignoring the express language of the claim which does not include the limitation of a single embodiment.

## IV.   STATEMENT OF FACTS

### A.   Overview of the Patent-In-Suit

        The patented technology, which was developed during the early days of the Internet, allows a television viewer to access television listings for his or her particular viewing location using a computer. Prior to this invention, viewers had available only passive program guides, *e g.*, magazines, newspapers, and listings on television screens provided by the cable systems, to receive information about scheduled television programming. Because of the large

number of television providers, the desired information was not always easily accessible or accurate for each viewer.

The '078 patent is entitled "Method and Apparatus For Receiving Customized Television Programming Information By Transmitting Geographic Location To A Service Provider Through A Wide-Area Network" and was invented by Michael R. Levine. Mr. Levine developed his television program guide technology after being increasingly frustrated with the technology available in the late 1980s and early 1990s that required repeated programming of his VCR Plus.

REDACTED  This led Mr. Levine to conclude that, by using a geographic identifier, e.g. a ZIP code, one could determine an accurate channel line-up and television program schedule, which would be beneficial in a number of different ways (Ex. I at 20-22).

In that regard, the specification of the '078 patent teaches that a computer can be used to obtain customized television listings:

> The method and apparatus of the present invention further utilizes a conventional personal computer, generally indicated at 18, incorporating a main computer housing 20, a keyboard 22 and a monitor 24. The term "personal computer" is used broadly to incorporate work stations, mini-computers and portable units. (Ex. A at col. 3:16-21.)

By reference to specific exemplary embodiments, the specification of the '078 patent also teaches that:

> [T]he schedule information is provided to the personal computer 18 from a remote database 40, which may constitute a database provider such as 'COMPUSERVE,' 'PRODIGY' or the like . . . The operator of the personal computer system 18 may communicate with the schedule source over phone lines 42 using modems 44 at each end." (Ex. A at col. 3:46-58.)

The '078 patent specification further provides that the "schedule information could be provided to the personal computer via cablecast or broadcast." (Ex. A at col. 3:65-67.)

8

The '078 patent also makes plain that the information received from the database provider "may be customized for the cable service 38 available to the system through an initialization routine in which the computer operator keys in the postal ZIP code of his location . . ." (Ex. A at col. 3:50-53). Then, the "head end database uses this information to provide the computer 18 with the schedule of programming for that service" (Ex. A at col. 3:54-56).

B.     The Asserted Claims Of The Patent-in-Suit

TV Guide is asserting that TMS's Zap2it.com service infringes claims 1-8 and 10 of the '078 patent.

Claims 1, 6 and 8 are "independent" claims, meaning that they stand on their own without referring to any other claim. Claims 2-5, 7 and 10 are "dependent" claims that refer back to (i.e., "depend from") an independent claim. As such, the dependent claims include all of the limitations appearing in that claim plus those in the referenced independent claim.

As a representative example, claim 1 of the '078 patent is set forth below with the disputed claim terms in bold-face type:

> In a television distribution arrangement wherein a plurality of geographically dispersed television viewing locations receive television programming from a source of such programming, a method of receiving information specific to the type of programming available to a particular one of the **viewing locations**, the method comprising the steps of:
>
> providing a computerized unit at the particular **viewing location**, the unit including an operator input and a **modem**;
>
> establishing a connection to a **wide-area network** through the modem;
>
> **transmitting**, from the computerized unit, **information** to a service provider through the wide-area network **regarding the geographical location of the particular viewing location**; and
>
> receiving, from the service provider, information specific to the type of programming available to the particular viewing location.

9

C.    The Prosecution History of the Patent-in-Suit

The application leading to the '078 patent was filed on October 9, 1997.  This application was a continuation of application No. 08/287,343 (which resulted in U.S. Patent No 5,692,214) filed on August 8, 1994, which is a continuation-in-part of now abandoned application No. 07/848,338 filed March 9, 1992.  The applicant overcame rejections initially interposed by the Examiner without amending the application claims.

V.    THE LAW OF CLAIM CONSTRUCTION

Claim construction is a matter of law exclusively for the Court, not the jury. *Markman v Westview*, 517 U.S. 370, 372 (1996). "It is a 'bedrock' principle of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (citation omitted). "[T]he claims must be interpreted and given the same meaning for purposes of both validity and infringement analysis." *Amazon com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir 2001).

A.    Claim Terms Should Be Construed In Light Of The Intrinsic Evidence

A proper claim construction must comport with the "intrinsic" evidence:  the words of the claims themselves, the patent's written description of the invention in the specification, and the history of the patent application's prosecution before the PTO.  *See generally Phillips*, 415 F 3d at 1314-17. Preferably, the patent claims are construed based on the intrinsic evidence because the claims, patent specification and prosecution history serve a public notice function.  "The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely." *Vitronics Corp v Conceptronic, Inc*, 90 F 3d 1576, 1583 (Fed. Cir. 1996).

The Claim Language.  Claim construction begins with the words of the claims themselves. *Phillips*, 415 F.3d at 1314.  The claims "provide substantial guidance as to the

10

meaning of particular claim terms." *Id.* When construing claims, we consider how one of ordinary skill in the art would understand the claim terms at the time of the invention. *Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1373 (Fed. Cir. 2006). Moreover, the Federal Circuit has stated that:

> "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." "[O]ur cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."

*Id.* (*quoting Phillips*, 415 F.3d at 1313, 1316) (internal citation omitted). Accordingly, although claim construction begins with the claim language, it does not end there.

The Patent Specification. The "[Federal Circuit] and its predecessors have long emphasized the importance of the specification in claim construction." *Phillips*, 415 F.3d at 1315 ("'Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'") (citation omitted). "It is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317. When the patent specification contains an explicit definition of a claim term, that definition is dispositive over any ordinary meaning. *Id.* at 1316; *see also Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("It is well established that the patentee can act as his own lexicographer . . .").

Although the specification is an invaluable source for the meaning of claim terms, it is "well established that broad claims supported by the written description should not be limited in their interpretation to a preferred embodiment." *Gart*, 254 F.3d at 1343. Adding limitations to claims not required by the claim terms themselves, or unambiguously required by the specification or prosecution history, is impermissible. *Id.* Furthermore, "'although the

11

specification may well indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than such embodiments '" *Tate Access Floors, Inc. v. Maxcess Techs., Inc*, 222 F.3d 958, 966 (Fed. Cir. 2000) (citation omitted); *see also Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments ") (citations omitted).

The Prosecution History. The prosecution history is another tool to supply the proper context for claim construction because it "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317  "Statements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005). Furthermore, statements made by the applicant during prosecution can limit the construction of a claim if that interpretation was disavowed during prosecution; however "[d]isclaimers based on disavowing actions or statements during prosecution  . . must be both clear and unmistakable." *Sorensen v Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005). Statements made during the prosecution of one patent application have no relevance for construction of a different claim term in a related application. *Ventana Med. Sys., Inc v. Biogenex Labs., Inc*, 473 F.3d 1173, 1182 (Fed. Cir. 2006)

B.    **Reliance On Extrinsic Evidence**

In addition to the intrinsic evidence that a court must consider, a court may consider extrinsic evidence, such as expert and inventor testimony, dictionaries and learned treatises. *Phillips*, 415 F.3d at 1317  Such sources can aid the Court, for example, by providing a source of "accepted meanings of terms used in various fields of science and technology," or by

12

providing "background on the technology at issue." *Id.* at 1317-18    As the Federal Circuit explained:

> [E]xtrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field

*Id.* at 1318.  *See also TAP Pharm. Prods., Inc. v. OWL Pharms., LLC*, 419 F.3d 1346 (Fed. Cir. 2005)  Although the Federal Circuit has made clear that courts may look to extrinsic evidence, such as expert testimony, to aid in claim interpretation, "a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'" *Phillips*, 415 F.3d at 1318 (citation omitted)  Extrinsic evidence, therefore, "may be useful in claim construction, but it should be considered in the context of the intrinsic evidence." *Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005).

## VI.   THE PROPER CONSTRUCTION OF THE DISPUTED TERMS

In the following sections, TV Guide identifies the terms to be construed, the parties' proposed claim constructions and the areas of dispute.  TV Guide explains why its proposed definitions are consistent with the intrinsic evidence and the confirming extrinsic evidence and should be adopted.[5]

### A.   "Viewing Location"

The term "viewing location" appears throughout claims 1 through 7.  For example, the term appears multiple times in claim 1:

---

[5] Attached hereto as Exhibit A is a chart summarizing the terms to be construed and TV Guide Online's proposed constructions.

In a television distribution arrangement wherein a plurality of geographically dispersed television *viewing locations* receive television programming from a source of such programming, a method of receiving information specific to the type of programming available to a particular one of the *viewing locations*, the method comprising the steps of:

providing a computerized unit at the particular *viewing location*, the unit including an operator input and a modem;

establishing a connection to a wide-area network through the modem;

transmitting, from the computerized unit, information to a service provider through the wide-area network regarding the geographical location of the particular *viewing location*; and

receiving, from the service provider, information specific to the type of programming available to the particular *viewing location*.

The parties' dispute regarding the term "viewing location" is set forth below:

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| "viewing location" | "residence or building at which a television signal can be received" | "The physical spot where a television set is positioned and watched by a user." | "The specific room within a building where a television set is positioned and watched by a user" |

TV Guide's proposed definition is straightforward and consistent with the intrinsic evidence. Claim 1 makes clear that a computerized unit is provided at the television viewing location. In other words, the viewing location is at least large enough to cover the space inhabited by both a computer and a television. The patent specification further discloses that the computer which receives the schedule information may be located in one room and the television "*may be located in another room.*" (Ex. A at col. 4:45-49 (emphasis added).) The specification discloses another embodiment in which a computer is located in one room and the VCR is located "*in another room of the house.*" (Ex A at col 6:13-16 (emphasis added).) TV Guide's proposed construction of a "residence or building at which a television signal can be received" is

14

supported by the disclosure of the specification that a "viewing location" is large enough to cover two different rooms.

TMS's proposed construction is inconsistent with the teachings of the specification, and attempts to improperly narrow the scope of "viewing location" to the "specific room . . where a television set is positioned."[6]

REDACTED

_____

[6] TMS proposes this construction in an obvious attempt to manufacture a noninfringement argument with regard to the claim 1 and claim 6 requirement that a computer or controller is provided at the "viewing location." TMS has stated its intent to argue that the users of Zap2it.com are not required to sit in the same room as the television, and therefore, Zap2it.com somehow does not infringe (Ex. M). That makes no sense because TMS's proposed construction is inconsistent with the intrinsic evidence and, in any event, Zap2it.com certainly can be used in the same room as a television.

REDACTED

TMS's construction is flawed for at least two reasons. First, there is no requirement in the asserted claims for a VCR or any recording of a television program. TMS's expert even admits this. (Ex. H at 45-46 and 48-49.) Moreover, the specification -- in describing an embodiment that does involve a VCR -- discloses exactly the opposite of what TMS is claiming. The computer and recorder can be located in *two different rooms*, and the infrared transmitter can be replaced by a *radio* transmitter:

> The embodiment of the invention illustrated in FIG. 7 is utilized in systems where the cassette recorder 14 is located a large distance from the personal computer 18, such as *in another room of the house*. In this system *the remote I/R transmitter 26 is replaced by a radio transmitter 60*. (Ex. A at col. 6:13-16) (emphasis added)

To the extent TMS seeks to argue that the construction of "viewing location" should be limited to any specific embodiment, the law prohibits such improper construction. *See Tate*, 222 F.3d at 966 ("'[P]articular embodiments appearing in the specification will not be read into the claims when the claim language is broader than such embodiments.'") (citation omitted). Beyond that, TMS cannot get past the express disclosure of embodiments in which the computer is located in a different room from the television.

In an attempt to ignore this disclosure, TMS asserts a "prosecution history estoppel" argument. Specifically, TMS points to the following statement made during prosecution of the '078 patent in which the applicant stated that the claimed invention "[i]ncludes the step . . . [of] transmitting, from a viewing location, information . . . regarding the geographical location of the particular viewing location." (Ex. G at ¶ 106, citing TG002253 (Ex. J)). Even a casual review of that statement does not require that the "viewing location" be

16

restricted to the "specific room . where a television set is positioned" and does not exclude the embodiment discussed above. There is nothing in the prosecution history that limits the definition of viewing location to one room.

When all is said and done, TMS's proposed construction is merely an attempt to manufacture a noninfringement defense where none exists. There is nothing in the intrinsic record that limits the construction of this term in this way. In contrast, as set forth above, the specification expressly supports TV Guide's proposed construction.

The Court should reject TMS's attempt to improperly limit the scope of the claims. The term "viewing location" should be construed to mean "residence or building at which a television signal can be received."

B.    **"Available To A Particular One Of The Viewing Locations"**

The term "available to a particular one of the viewing locations" appears in Claim 1. With "viewing location" defined, this term does not require construction.

| Claim Language | TV Guide's Proposed Construction | TMS' Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| "a method of receiving information specific to the type of programming *available to a particular one of the viewing locations*"<br><br>"receiving, from the service provider, information specific to the type of programming *available to the particular viewing location*." | No construction needed. | No definition provided | "Deliverable from a programming source to a specific 'television viewing location,' as defined above." |

TMS initially agreed with TV Guide that this phrase does not require any further construction. Nearly two months after the deadline to provide proposed constructions, however,

17

TMS asserted a new construction. Then, just days before claim construction briefs were due to be submitted, TMS asserted that this limitation should be given its "plain and ordinary meaning." To the extent that TMS plans to argue that its earlier-proposed construction somehow reflects the "plain and ordinary meaning" of this claim limitation, TV Guide explains below why that is incorrect.

Specifically, TMS's construction mirrors its unjustifiably narrow construction of "television viewing location." In an ambiguous addition, it substitutes a new word "deliverable" for a word readily understood by anyone who watches television, "available." Indeed, "available" is the word used in the patent specification:

> schedule information is provided to the personal computer . . . this information
> may be customized for the cable service *available* to the system through an
> initialization route in which the computer operator keys in the postal ZIP code of
> his location. . the database uses this information to provide the computer with
> the schedule of programming. (Ex. A at col 3:46-56) (emphasis added).

C.     "Information  .  .  .  Regarding/Pertaining  To  The  Geographical
       Location/Area"

This term appears in various phrases in claims 1 and 6-8. The parties' dispute is set forth below:

18

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| <u>Claim 1</u>: "Information . . regarding the geographical location of a particular viewing location." (Ex. A at col. 6:49-53 ) | "geographic information regarding the residence or other building at which a television signal can be received." | No construction provided. | "Any information, irrespective of how the information is encoded, that expressly indicates in geographic language (e.g., name of a continent, country, province, state, city, town region, street address, zip code, area code, etc.) the approximate portion of the planet in which a particular 'television viewing location,' as defined above, is located." |
| <u>Claim 6 & 7</u>: "Information . . . regarding the geographical area of the viewing location." (Ex A at col 7:13-16; col. 7:21-24) | (same as above) | | |
| <u>Claim 8</u>: "information . . . pertaining to the geographic location of the television receiver." (Ex. A at col. 8:12-14) | "geographic information pertaining to the residence or other building at which a television receiver is located." | | |

TV Guide's definition is consistent with the intrinsic evidence and its definition of

viewing location. As discussed above, the patent discloses that the "computer operator keys in

*the postal ZIP code of his location*." (Ex. A at col. 3:52-54 (emphasis added).) This disclosure

supports TV Guide's construction because a ZIP code designates a specific geographic location,

such as a location of a building or residence. Elsewhere, the patent specification discloses that

"geographic information" may be entered through the computer keyboard, and expressly

identifies "zip code" as an example of "geographic information." (Ex. A at col 6:8-10 and 5:41-

42.)

In contrast, there is no support for TMS's proposed construction in the intrinsic

record. The method of the claim involves "transmitting information . . . regarding the

geographical location of a particular viewing location" *so as to* "receiv[e] . . . information

19

specific to the type of programming available to the particular viewing location." The

specification describes this tie between the two steps:

> In the preferred embodiment of the invention the schedule information is provided to the personal computer 18 from a remote database 40 . . . .  This information may be customized for the cable service 38 available to the system through an initialization routine in which *the computer operator keys in the postal ZIP code of his location* and, if necessary, an identification of the cable service provider. *The head end database uses this information to provide the computer 18 with the schedule of programming* for that service.  (Ex. A at col. 3:46-56 (emphasis added).)

REDACTED

TMS's definition, therefore, ignores the context of the entire claim.

Under TMS's definition, the information transmitted to the service provider could

be extremely broad, *e.g.*, North America or the Northern Hemisphere, and would not provide any

meaningful information which would allow the user to receive information specific to his

location. Accordingly, TMS's proposed construction is an obvious attempt for TMS to broaden

the claim to manufacture an invalidity defense where none exists. There is no basis in the

intrinsic evidence for TMS's proposed construction. Accordingly, TMS's proposed construction

should be rejected.

**D.     "Transmitting"/"Transmit"**

The term "transmitting" or "transmit" appears in the independent claims 1, 6

and 8. TMS has not provided an alternative construction. Accordingly, there appears to be no

dispute.

20

| Claim Language | TV Guide's Proposed Construction | TMS's Proposed Construction |
|---|---|---|
| Claim 1: "*transmitting*, from the computerized unit, information to a service provider through the wide-area network regarding the geographical location of the particular viewing location" (Ex. A at col. 6:49-52).<br><br>Claim 6: "*transmitting* . . information to a service provider through the wide-area network regarding the geographical area of the viewing location" (Ex. A at col. 7: 12-15).<br><br>Claim 8: "*transmit* the information pertaining to the geographic location of the television receiver to the service provider" (Ex. A at col. 8:12-14). | "sending electronically" "send electronically" | No construction provided. |

TV Guide's proposed construction is consistent with the intrinsic evidence   The claims discuss "transmitting . .  through a wide-area network" (Claim 1 and 6) and "transmit[ting] the information .  . to the service provider" via a "modem." (Claim 8)  The preferred embodiment discloses the use of a "personal computer" in which "the computer operator keys in the postal ZIP code of his location" and transmits that information to the "head end database" (Ex A at col. 3:47-54)  Because the transmission of the "ZIP code" to the database is sent from a computer, it is clear from the '078 specification that the transmission of the ZIP code is accomplished electronically  REDACTED

TMS apparently agrees with TV Guide's construction of this term.

E.    "Receiving"

The term "receiv[ing], [ed], or [e]" appears in independent claims 1, 6 and 8 and dependent claim 3. The parties' dispute regarding this term is set forth below

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| Claim 1, e.g.: "receiving . . . information specific to the type of programming available to the particular viewing location" (Ex. A at col. 6: 53-55). See also Ex. A at col. 6:41-42. | "receiving electronically" | "Having data transferred to a computer such that a user can manipulate the transferred data." | "Having data transferred to a computer such that a user can perform database-type manipulations directly on the transferred data without being connected to the original source of the data." |
| Claim 6, e.g.: "receiving . . . television programming information specific to the viewing location" (Ex. A at col. 7:16-18). See also Ex. A at col. 7:5-6 | Same as above | | |
| Claim 3: "information received from the service provider includes television programming available to a particular viewing location" (Ex. A at col. 6:59-62). | "received electronically" | | |
| Claim 8: "receive . . . the information specific to the type of television programming available to the receiver" (Ex. A at col. 8:15-17). See also Ex. A at col. 8:8-10. | "receive electronically" | | |

TV Guide's construction is consistent with the plain and ordinary meaning of the term in the context of the patent. All of the claims refer to "receiving" information over a wide-area network or another type of electronic device, which requires electronic reception.

REDACTED

REDACTED            Therefore, the term "receive" in the context of the

'078 patent must be construed to mean "receive electronically."

Despite the admissions of its own expert, TMS advances its contrived construction adding unnecessary verbiage that finds no support in the intrinsic record. For example, TMS argues that the claim term somehow includes a requirement that the user must be able to perform database manipulations on a local computer. Not only that, the users must apparently be able to do so "without being connected to the original source of the data."

TMS's motivation for proposing its claim construction -- which is inconsistent with the intrinsic record and with controlling case law -- is readily apparent from the report and deposition testimony of TMS's expert on the subject of infringement.

REDACTED

23

REDACTED

It is difficult to imagine a more goal-oriented proposed construction. TMS's contrived construction imposes extraneous limitations on the term "receive" that, if adopted, would purportedly render the claim meaningless when applied to Zap2it.com. There is nothing in the intrinsic record to suggest that the term "receive" require any database manipulations be performed, or that the patentee wished to depart from the plain and ordinary meaning and gave a special meaning to that term. (Cole Ex. A at ¶ 66).

TMS's proposed construction is fully at odds with the intrinsic evidence. In TMS's expert's report on infringement, Dr. Tjaden cites to excerpts from the specification in an attempt to support TMS's proposed definition (Ex. G at ¶ 83). But none of those excerpts, in fact, provide support. TMS first cites passages from the specification that describe the database as the data source which provides the schedule information to be presented to the user (*see e g* , "[f]uture programming schedule information may be provided to the personal computer from a remote database" (Ex. A at col 1:65-66). That has nothing whatsoever to do with what "receiving" the schedule information means. Indeed, if anything, it means that the data was

24

"manipulated" by the data source before it was sent, *not by the user after receiving it*. Next, TMS refers to excerpts from the specification that describe the use of the information for controlling the operation of a television or VCR  (*See, e g* Ex A at col 5:59-63.)  The latter context is inapplicable to the asserted claims which have nothing to do with television or VCR control. TMS's attempt to limit the claims to one of the specific embodiments is improper as a matter of law. *Phillips*, 415 F.3d at 1323.

   During discovery, TMS suggested that the term "receive" should be limited because of an argument that was made during the prosecution of an abandoned application in the '078 patent's lineage (*See* Ex. E at 5 and Ex. L at TG000779-780)  In that regard, TMS points to an argument directed to different claim terms in different claims that relate to "schedul[ing] a particular video program for future recording."  In other words, those different claims in the abandoned application were directed to storing a database of schedule information and using that stored database to program a VCR. No such limitations are found in the asserted claims of the '078 patent.  As a matter of law, statements made during the prosecution of a different application regarding different claim terms cannot be used to limit the claims at issue here. *Ventana Med. Sys , Inc* , 473 F.3d at 1182.  If anything, the difference in terms indicates that the constructions ought to be different.

  F. "Modem"

   The term "modem" appears in independent claims 1, 6 and 8 of the '078 patent The parties' dispute regarding the term "modem" is set forth below:

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| Claim 1: "providing a computerized unit at the particular viewing location, the unit including an operator input and a *modem*"<br><br>Claim 1 & 6: "establishing a connection to a wide-area network through the *modem*"<br><br>Claim 6: "a controller interfaced to a bidirectional *modem*"<br><br>Claim 8: "establish a connection to a service provider through the *modem*" | "A data signal conversion device that connects data terminal equipment to a communication line." | "A device that converts digital signals to analog signals (and vice versa) and allows a computer to exchange data over a standard dial-up telephone line." | "A data signal conversion device that converts digital signals to analog signals (and vice versa) and allows a computer to exchange data over a standard dial-up telephone line." |

TV Guide's construction of "modem" is consistent with the intrinsic evidence and the understanding of one of ordinary skill in the art. At the time the application leading to the '078 patent was filed -- during the very early days of the Internet -- it was understood that the term "modem" encompassed several types of devices and was not limited to a specific type of modem so long as it was a "data signal conversion device that connects data terminal equipment to a communication line." (Cole Ex. A at ¶ 49.) Indeed, the specification discloses communication over "phone lines" and "via cablecast or broadcast." (Ex. A at col. 3:57; col. 3:65-66.) Accordingly, there were, *e.g.*, dial-up modems, DSL modems, and cable modems. Each serves the function of connecting data terminal equipment -- computer -- to a communication line. Contemporaneous technical dictionaries confirm this definition:

> "modem (1) (data transmission) A contraction of MOdulator-DEModulator, an equipment that connects data terminal equipment to a communication line." *The New IEEE Standard Dictionary of Electrical and Electronics Terms (5th ed.)*, IEEE, 1993 (Cole Ex. A at ¶ 49; and Ex. K at TG0194150)

26

TMS's proposed definition is inconsistent with the understanding of one of ordinary skill in the art and imports unnecessary extraneous limitations into the claims  TMS's definition restricts the term "modem" to dial-up telephone modems that convert analog to digital signals and vice versa.    REDACTED

However, the '078 patent specification does not even mention the terms "analog" or "digital" let alone restrict the term "modem" to such a narrow definition  Moreover, the '078 patent expressly discloses methods of communication -- cablecast or broadcast -- other than over standard dial-up telephone lines.  (Ex. A at col. 3:65-67).

Accordingly, the term "modem" should not be limited to dial-up conversion of analog and digital signals and TMS's attempt to import extraneous limitations into the claims should be rejected.

G.    "Wide-Area Network"

The term "wide-area network" appears in claims 1, 6 and 7.  The parties' dispute regarding this term is set forth below:

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| "wide-area network" | No construction needed | No construction provided. | "A data communication network that is not a local area network." |

TV Guide believes no further construction of this term is needed and, at the time of the Court-ordered deadline to exchange proposed constructions, TMS agreed.  TMS then proposed the definition set forth above.  Then, just days before claim construction briefs were due to be filed, TMS asserted that the "wide area network" limitation should be given its "plain

27

and ordinary meaning." To the extent that TMS intends to argue that the "plain and ordinary meaning" is the definition it previously proposed, TV Guide explains below why TMS is incorrect.

In March 1992, the priority date of the '078 patent, the definition of "wide-area network" was well established in the art (Cole Ex. C at ¶ 44). The term was known, and is known, to mean exactly what it says, a network that covers a wide area (or geographically dispersed areas). Now, however, TMS's expert insists that even if such a meaning were understood by one of ordinary skill in the art, the '078 patent fails to disclose such a network. This assertion is simply incorrect. As explained above, the '078 patent describes public telephone lines, cablecast and broadcast options for delivering schedule information and Claim 1 describes "geographically dispersed television viewing locations." Each of these is a wide area network. Therefore, not only was the plain and ordinary meaning of "wide-area network" known to individuals of ordinary skill in the art, it was expressly set forth in the specification of the '078 patent

TMS's belatedly-asserted construction is inconsistent with the intrinsic evidence and with the understanding of one of ordinary skill in the art.[7] If, by its proposed definitions,

---

[7] TMS now also asserts that the term "wide area network" is indefinite in order to manufacture an additional argument that the asserted claims are invalid. This belated argument cannot stand. It is telling that TMS never mentioned indefiniteness in its October 2006 invalidity expert report.

REDACTED

28

TMS means that a wide area network is bigger than a local area network, then there may be no real dispute. Both parties agree that the Internet is a wide area network. (Ex. H at 20:23-21:3.) However, if TMS is contending that this definition precludes a wide area network from including one or more local area networks or excludes connection to a wide area network through a local area network, there is nothing in the intrinsic record to support TMS's contention. Moreover, a person of ordinary skill in the art would not understand the term wide-area network to exclude computers, which also are connected to a local area network. Indeed, to do so would exclude from the Internet (a wide area network) all the local area network connected computers that make up the Internet. (*See* Cole Ex. C at ¶¶ 43 and 69, Ex. F at 16 ("interconnecting the Local Area Networks (LANs) to form . . . Wide Area Networks").)

### H.    "Operator Input"

The term "operator input" appears in independent claims 1 and 8. This term does not require construction by the Court because it would be readily understood by the jury. The parties' dispute regarding the term "operator input" is set forth below.

---



It is axiomatic that the claims "must be interpreted and given the same meaning for purposes of both validity and infringement analysis." *Amazon.com, Inc.*, 239 F.3d at 1351.

Moreover, TMS itself has used various -- even if erroneous -- definitions of "wide area

REDACTED

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| Claim 1: "providing a computerized unit at the particular viewing location, the unit including an *operator input* and a modem"<br><br>Claim 8: "the system comprising: an electronic terminal unit including an *operator input*"<br><br><br>"a controller in communication with the *operator input*<br><br>"receive information through the *operator input* pertaining to the geographic location of the television receiver." | No construction necessary. | "A keyboard or other device for entering data into a computer." | "A keyboard or other device for manually entering data into a computer" |

The construction that TMS proposed improperly limits the term operator input to devices which require "manually" entering data. There is nothing in the intrinsic evidence that would limit the term "operator input" to a device for "manually entering data" such as a "keyboard." The language of the claims does not require such limitation. A person of ordinary skill in the art would understand that "operator input" can come in many forms, such as when providing voice commands to a computer that recognizes voice commands (Cole Ex. B at ¶ 112.) As it did for several other limitations, TMS asserted -- just days before claim construction briefs were due -- that the "operator input" limitation should be given its "plain and ordinary meaning" TV Guide, once again, explains herein why TMS's proposed definitions for these terms are incorrect so that TMS cannot later argue that its proposed definitions are, in fact, the "plain and ordinary meaning." They are not

30

The term "operator input" should be accorded the full scope of its ordinary meaning, and TMS's attempt to limit the scope of the claims should be rejected.

I.     "Receive Information Through The Operator Input"

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| Claim 8: "the controller being programmed to perform the following functions . . *receive information through the operator input*" | No construction necessary. | No construction provided. | "Signals produced by the operator input in response to user actions and transferred to the controller in the electronic terminal unit." |

TMS initially agreed with TV Guide that this term did not require construction. TMS's belatedly-presented definition is, simply put, incomprehensible. (Cole Ex. B at ¶ 130) TMS does not -- and cannot -- point to any intrinsic evidence that supports the unnecessary and extraneous verbiage that it proposes. Now, TMS appears to have withdrawn its proposed construction.

J.     "Schedule Of The Television Programming"

The term "schedule of the television programming" appears only in dependent claim 3. The almost identical term "television programming schedule" appears in independent claim 6. The parties' dispute regarding this term is set forth below:

31

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| Claim 3: "the information received from the service provider includes a *schedule of the television programming* available to the particular viewing location." | No construction necessary. | No construction provided. | "A list, not necessarily ordered in any way, containing at least one item of television programming." |
| Claim 6: "A method of receiving customized *television programming schedule* information, comprising . . . receiving, from the service provider, *television programming schedule* information specific to the viewing location. | | | |

The term "schedule of the television programming" does not require construction by the Court because it would be readily understood by the jury. At the time of the Court-ordered identification of proposed claim definitions, TMS apparently agreed. Then, however, TMS and its expert asserted that the term "schedule" is a "list, *not necessarily ordered in any way*." Again, just days before claim construction briefs were due, TMS asserted that these limitations should be given their "plain and ordinary meaning." As TV Guide explains below, the plain and ordinary meaning of these limitations is *not* the definition proposed by TMS.

In the context of television programming, the ordinary meaning of the term "schedule" is not a simple list. Everyone knows that it involves organization of program identification, channel and time. (Cole Ex. B at ¶ 127.) The patent itself discloses that:

> to assist in the selection of television programs to be recorded at future times . . . the computer to receive data representing a *schedule of future programs*."
> (Ex. A at Abstract)

32

> [t]his invention related to a . . . method and apparatus which provides a display of
> a *schedule of future programming* available to the recorder on the personal
> computer. (Ex. A at col. 1:17-22)
>
> [i]n the preferred embodiment of the invention the *schedule information* is
> provided to the personal computer . . . To select a listed program for future
> recording the operator may move a cursor into super-position with the listing
> this selection transfers information relating to the programming selection to a
> memory 35 within the IR unit 26 (FIG. 3). The unit 26 also includes a
> microprocessor 37, real time clock 39 and a power supply battery 41. The
> microprocessor 37 continually compares the present time signal from the clock 39
> with the start time of the programs to be recorded as stored in the memory"
> (Ex. A at col 3:46-4:17)

These disclosures show that the schedule of television programming do, in fact, include a time

and date component. Indeed, dictionary definitions confirm that "schedule" means, "a

procedural plan that indicates the time and sequence of each operation." Webster's Ninth New

Collegiate Dictionary

      In contrast, TMS's proposed construction is inconsistent with the plain meaning

of the term "schedule" and with the express teachings of the specification The intrinsic record

does not support the definition of schedule to be a "list, not necessarily ordered in any way."

What TMS and TMS's expert are trying to do in order to manufacture an invalidity argument is

to broaden the definition of a "schedule of television programming" to include any reference to a

single television program. That is inconsistent with the use of the term in the specification as

understood by a person of ordinary skill in the art.

    K.    <u>Controller Limitations</u>

      The term "controller" appears in independent claims 6 and 8. The term

"controller being programmed to perform" appears in claim 8. The parties' dispute regarding

these terms is set forth below:

33

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| <u>Claim 6</u>: "a *controller* interfaced to a bidirectional modem"<br><br><u>Claim 8</u>: "a *controller* in communication with the operator input and the modem" | "a programmable electronic device" | "A device that controls the transfer of data between a computer and a peripheral device such as a monitor." | "An electronic device for manipulating information including at least memory for storing and executing computer programs and I/O ports for connecting to peripheral devices, such peripheral devices including modems and display devices." |
| <u>Claim 8</u>: "*the controller being programmed to perform* the following functions" | No construction necessary. | No construction provided. | "Computer applications programs are installed on the 'controller,' as defined above prior to its use by a user to perform." |

1.    <u>"Controller"</u>

TV Guide's proposed construction of "controller" is consistent with the context of the claim language and the teaching of the specification. (Cole Ex. A at ¶ 85.)   The '078 patent describes a personal computer that receives schedule information from a remote database (Ex. A at col. 3:46-48). Furthermore, the specification describes an "initialization routine in which the computer operator keys in the postal ZIP code of his location." (Ex. A at col. 3:51-53). Such a device would be understood by one of ordinary skill in the art to comprise a "programmable electronic device." The term "controller" is used in the claims in conjunction with a modem and with operator input, so that term is understood to encompass "programmable electronic devices" that could communicate or interface with a modem and operator.

In contrast, TMS's definition is inconsistent with how a person of ordinary skill in the art would understand the term in the context of the '078 patent (Cole Ex. B at ¶ 118.) TMS

34

has improperly translated generic pictures of a personal computer into a very specific itemized list. There is nothing in the intrinsic evidence that requires the term "controller" to include "memory for storing and executing computer programs" and "I/O ports for connecting to peripheral devices, such peripheral devices including modems and display devices," or to require the "controller" to "manipulate information." Accordingly, TMS's artificial construction of the term "controller" should be rejected.

### 2.    "The Controller Being Programmed To Perform"

TMS's definition unnecessarily and improperly includes a time restriction on "being programmed to perform" by including the limitation "installed . . . prior to its use by a user to perform." This construction is inconsistent with the intrinsic evidence and inconsistent with how one of ordinary skill in the art would understand the claim language. For example, under TMS's definition, this term could be interpreted to mean that prior to a user even turning on his computer, specific computer programs would need to be installed. There is nothing in the patent that limits this term in this way          REDACTED

The language of the term -- "being programmed" -- expressly allows the programming to take place concurrently with the performance of the steps. Indeed, it was common in the early 1990's, as it is today, for programs to be placed on a computer connected to a network as the computer is being used. (*See* Cole Ex. B at ¶¶ 121-123; Cole Ex. C at ¶ 37, Exs D, E and F )

*         *         *

Just days before the parties' claim construction briefs were due to be filed, TMS advised TV Guide that it would accept TV Guide's proposed definition of "controller" but would maintain its proposed definition of "controller being programmed to perform." Thus, it is not

35

entirely clear what disputes exist between the parties and, if necessary, TV Guide will address these limitations further in its responsive brief.

## VII.   CONCLUSION

For the foregoing reasons, the Court should adopt TV Guide's proposed constructions and reject TMS's proposed constructions.

OF COUNSEL:

Robert C. Morgan
Christopher J. Harnett
Ching-Lee Fukuda
Stuart W. Yothers
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY  10036
(212) 596-9000

Ronald E. Naves, Jr.
Jeffrey A. Fehervari
Vladamir V. Radovanov
Gemstar-TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, CA  90028
(323) 817-4600

Dated:  October 5, 2007

Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Steven J. Fineman (#4025)
Richards, Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
cottrell@rlf.com
moyer@rlf.com
fineman@rlf.com

*Attorneys for Plaintiffs TV Guide Online, Inc. and TV Guide Online, LLC*

36

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 5, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

Richard K. Herrmann, Esquire
Mary B. Matterer, Esquire
Morris James, LLP
500 Delaware Avenue
Suite 1500
Wilmington, DE 19801-1494

I hereby certify that on October 5, 2007, I have sent by Federal Express, the foregoing

document to the following non-registered participant:

Mark A. Pals, P.C., Esquire
Kirkland & Ellis, LLP
200 East Randolph Drive
Chicago, IL 60601

Frederick L. Cottrell, III (#2555)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
cottrell@rlf.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

    Richard K. Herrmann, Esquire
    Mary B. Matterer, Esquire
    Morris James, LLP
    500 Delaware Avenue
    Suite 1500
    Wilmington, DE 19801-1494

I hereby certify that on October 15, 2007, I have sent by Federal Express, the foregoing

document to the following non-registered participant:

    Mark A. Pals, P.C., Esquire
    Kirkland & Ellis, LLP
    200 East Randolph Drive
    Chicago, IL 60601

                                        Steven J. Fineman (#4025)
                                        Richards, Layton & Finger, P.A.
                                        One Rodney Square
                                        P.O. Box 551
                                        Wilmington, Delaware 19899
                                        (302) 651-7700
                                        fineman@rlf.com