# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TV GUIDE ONLINE, INC. and | ) |
| TV GUIDE ONLINE, LLC, | ) |
| | ) |
| Plaintiffs and Counterclaim Defendants, | ) |
| | ) |
| v. | ) C.A. No.: 05-725-*** |
| | ) |
| TRIBUNE MEDIA SERVICES, INC., | ) |
| | ) |
| Defendant and Counterclaim Plaintiff. | ) |
| | ) |

## TRIBUNE MEDIA SERVICES, INC.'S ANSWERING *MARKMAN* BRIEF

Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I.D. No. 2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
302.888.6800
rherrmann@morrisjames.com

Mark A. Pals, P.C.
Linda S. DeBruin, P.C.
Michael A. Parks
Meredith Zinanni
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
312.861.2000

*Counsel for Defendant Tribune Media Services, Inc.*

Dated: November 21, 2007

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................................ 1

II.    ARGUMENT ............................................................................................................... 2

    A.    The Proper Construction Of "Viewing Location" Is "The Specific Room
        Within A Building Where A Television Set Is Positioned And Watched." .......... 2

    B.    "Information … Regarding The Geographical Location Of The Particular
        Viewing Location."............................................................................................... 6

    C.    The Proper Construction of "Modem" Is "A Data Signal Conversion Device
        That Converts Digital Signals To Analog Signals (And Vice Versa) And
        Allows A Computer To Exchange Data Over A Standard Dial-Up Telephone
        Line." ..................................................................................................................... 8

    D.    The Proper Construction Of "Transmit/Transmitting" Is "Make/Making an
        Affirmative Indication."........................................................................................ 14

    E.    The Proper Construction of "Receiving … Information Specific To The
        Type of Programming Available To The Particular Viewing Location" Is
        "Having Data Transferred To A Computer Such That A User Can Perform
        Database-Type Manipulations Directly On The Transferred Data Without
        Being Connected To The Original Source Of The Data." ..................................... 15

    F.    The Proper Construction Of "The Controller Being Programmed To Perform"
        Is That "Computer Application Programs Are Installed On The Controller
        Prior To Its Use By A User To Perform." ............................................................. 19

    G.    Undisputed Claim Terms ...................................................................................... 23

III.    CONCLUSION............................................................................................................ 24

# TABLE OF AUTHORITIES

## CASES

*Chef America, Inc. v. Lamb-Weston, Inc.*,
    358 F.3d 1371 (Fed. Cir. 2004)...................................................................... 5

*Desper Prods., Inc. v. QSound Labs, Inc.*,
    157 F.3d 1325 (Fed. Cir. 1998).................................................................... 17

*Environmental Instruments, Inc. v. Sutron Corp.*,
    877 F.2d 1561 (Fed. Cir. 1989)...................................................................... 6

*Exigent Tech., Inc. v. Atrana Solutions, Inc.*,
    442 F.3d 1301 (Fed. Cir. 2006).................................................................... 17

*Johnson v. Johnston*,
    285 F.3d 1046 (Fed. Cir. 2002)...................................................................... 5

*Jonsson v. Stanley Works*,
    903 F.2d 812 (Fed. Cir. 1990)...................................................................... 18

*Kopykake Enters., Inc. v. Lucks Co.*,
    264 F.3d 1377 (Fed. Cir. 2001).................................................................... 20

*Liquid Dynamics Corp. v. Vaughan Co.*,
    355 F.3d 1361 (Fed. Cir. 2004)................................................................... 6-7

*Microsoft Corp. v. Multi-Tech Systems, Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004)........................................................... 9, 10, 18

*MIT v. Abacus Software*,
    462 F.3d 1344 (Fed. Cir. 2006)......................................................... 10, 17, 20

*Oak Technology, Inc. v. International Trade Commission*,
    248 F.3d 1316 (Fed. Cir. 2001)...................................................................... 6

*PC Connector Solutions LLC v. SmartDisk Corp.*,
    406 F.3d 1359 (Fed. Cir. 2005).................................................................... 20

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................. 4, 5, 11

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
    315 F.3d 1335 (Fed. Cir. 2003)................................................................. 20-21

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997)........................................................................... 16, 17, 23

*Vanderlande Indus. Nederland BV v. I.T.C.*,
    366 F.3d 1311 (Fed. Cir. 2001).................................................................................. 23

*Ventana Medical Systems, Inc. v. Biogenex Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006).................................................................................. 18

*Wang Labs., Inc. v. America Online, Inc.*,
    197 F.3d 1377 (Fed. Cir. 1999).................................................................................. 18

## I.      INTRODUCTION

TMS established in its opening *Markman* brief why the '078 patent's claim language, specification and extensive prosecution history mandate TMS's proposed claim constructions. In contrast, TV Guide relies largely on rhetoric to advance its proposed constructions. Stripped of the rhetoric, TV Guide's arguments do not refute TMS's proposed constructions.

Much of TV Guide's rhetoric involves TMS having revised its proposed constructions. However, the Scheduling Order in this case expressly provides that the parties were to meet and confer regarding claim construction issues before raising the issues with the Court. *See* D.I. 27, Scheduling Order at ¶ 12.  TV Guide's litany of complaints regarding TMS's revised claim construction positions is meritless given this express direction in the scheduling order, and is not relevant to the claim construction issues presented to the Court now. Also consistent with the direction in the Scheduling Order, TMS dropped several of its proposed constructions prior to filing *Markman* briefs, and told TV Guide it was doing so. TMS's purpose was to narrow the issues, conserve the Court's and the parties' resources, and streamline the *Markman* process by agreeing with TV Guide that six limitations do not need to be briefed or construed by the Court, but rather should be given their plain and ordinary meaning. This reduced by half the number of claim terms for the Court to construe. Nonetheless, TV Guide briefed the constructions TMS dropped, wasting the Court's resources, while failing to brief other disputed constructions. TMS briefed six terms—TV Guide briefed twelve. TMS sorts this out below. Suffice it to say here, the Court need not address the dropped constructions. There are only six constructions for the Court to address, and, for each one, TMS's proposed construction is the one dictated by the intrinsic evidence.

## II.     ARGUMENT

### A.     The Proper Construction Of "Viewing Location" Is "The Specific Room Within A Building Where A Television Set Is Positioned And Watched."

The correct construction of "viewing location," proposed by TMS, has two independent components: (1) a building where a television set *is* watched, such as a person's home, as opposed to merely a building where a television signal *can be* received, such as the office; and (2) the specific room within that building where the television set is positioned.  These independent components combine to form the proper construction: The specific room within a building where a television set is positioned and watched.  TV Guide ignores the first component in its opening *Markman* brief, devotes its entire argument to the second component, and incorrectly asserts that TMS's arguments for the first component apply to the second.

From TV Guide's failure to address the first issue—that the television viewing location must be in a building where a television set is watched—it appears TV Guide no longer contends that the viewing location is merely the building where a television signal *can be* received.  It appears TV Guide now concedes the "viewing location" must be somewhere in the building where the television set is actually watched.  Consistent with this concession, TV Guide acknowledges in its brief that "Claim 1 makes clear that a computerized unit is provided at the television viewing location.  In other words, the viewing location is large enough to cover *the space inhabited by both a computer and a television*," thus excluding from the claim scope the scenario where the computer is in a different building than the television set, *e.g.*, where the computer is at the office and the television set is at the home.  D.I. 205, TV Guide *Markman* Br. at 14 (emphasis added).

This is exactly what the plain language of Claim 1 mandates: "*providing a computerized unit at the particular viewing location*," as well as "transmitting, from the computerized unit,

information to a service provider…regarding the geographical location of the particular viewing location" and "receiving, from the service provider, information specific to the type of programming available to the particular viewing location."  '078 patent at claim 1 (A7) (emphasis added); *see also id.* at claim 6 ("providing, at a television viewing location, a controller" … "transmitting, from the television viewing location, information to a service provider … regarding the geographical area of the viewing location" … "receiving, from the service provider, television programming schedule information specific to the viewing location") (A8).

As the named inventor Michael Levine repeatedly argued during prosecution of these claims, the requirement of the computer being situated at the television viewing location applies to all of the claims, including the independent apparatus claim 8, which has different language than the independent method claims 1 and 6:

- "***All of Applicant's independent claims include the limitation***, in one form or another, of <u>transmitting</u>, ***from a computerized unit situated at a viewing location***, information regarding geographical location.  The Young patent does not disclose or suggest such a limitation."  5/18/99 Resp. to Office Action, at 1 (A117) (underlining in original; other emphases added).

- "***[A]ll of Applicant's independent claims include the step <u>or apparatus</u>*** associated with transmitting, ***from a viewing location***, information to a service provider through a wide-area network regarding ***the geographical location of the particular viewing location***."  11/30/98 Amend., at 2 (A107) (emphases added).

TV Guide confuses TMS's argument about this prosecution history in its *Markman* brief and instead argues a completely different point: that this prosecution history "does not require that the 'viewing location' be restricted to the '***specific room***…where a television set is positioned'…."  D.I. 205, TV Guide *Markman* Br. at 16-17 (emphasis added).  TMS does not argue that this prosecution history requires the viewing location to be the specific room where the television set is positioned (that requirement comes from the patent specification as explained

below).  Rather, as shown above and in TMS's Opening *Markman* Brief at Section IV.A, the prosecution history requires that in all claims "television viewing location" is a building where a television set is watched, such that users must access a service provider using a computer situated at the same location where they watch their television set, *i.e.*, their home.  At a bare minimum, TV Guide's proposed construction should be rejected and the first component of TMS's construction should be adopted in the Court's construction.

Whether "television viewing location" requires the computer to be in the same room as the television set is an independent issue.  This appears to be the only issue TV Guide disputes for the limitation, as it is the only issue TV Guide briefed.  The '078 patent specification resolves this issue.  *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1315 (Fed. Cir. 2005) (reaffirming that "the specification…is the single best guide to the meaning of a disputed term") (internal quotation omitted).  The specification requires construing "television viewing location" to be the specific room where the television set is positioned because the specification discloses alternative embodiments where the computer and television set are in different rooms and explains, in those cases, they are ***not*** "located" in the same place as the claims asserted here require.  For example:

- "FIG. 7 is an illustration of a second embodiment of the invention in which the personal computer and video recorder are ***located remotely from one another*** and the output signals from the personal computer are transmitted by radio to an infrared transmitter for control of the video recorder."  '078 patent at 2:58-62 (emphasis added) (A5);

- "Alternatively the unit 26 may be detachable from the computer 18 so that after it is loaded with data on programs to be recorded it may be detached and moved into proximity with the receiver system 10, which may be ***located in another room***."  *Id.* at 4:45-49 (emphasis added) (A6); and

- "The embodiment of the invention illustrated in FIG. 7 is utilized in systems where the cassette recorder 14 is ***located a large distance*** from the personal computer 18, such as in another room of the house."  *Id.* at 6:13-16 (emphasis added) (A7).

TV Guide's reliance on these alternative embodiments with the computer and television set in different rooms is belied by its repeated argument that the computer and television can be "located" in different rooms yet still be in the same "location" as the claims require.  *See, e.g.,* D.I. 205, TV Guide *Markman* Br. at 14 ("a computer is located in one room and the VCR is located 'in another room of the house'").  TV Guide's reliance is additionally misplaced because none of the claims asserted here contain any limitation directed to the infrared transmitter required by these alternative embodiments.

TV Guide also misses the point when it accuses TMS of limiting the claims to the embodiment using a personal computer to control a VCR with infrared signals.  *Id.* at 15-17.  TMS does not propose any such requirement.  The named inventor Levine repeatedly used the term "located" in the specification to characterize the alternative embodiments where the computer and television set are not in the same room of the house as being "located remotely from one another," "located in another room," "located a large distance" from one another, and not in "proximity."  The specification is the best guide to what a claim term means.  *See Phillips*, 415 F.3d at 1315.  Likewise, Levine chose to use the term "viewing location" in the claims (not "building" or "building where a television resides"), and TV Guide is bound by Levine's use of that claim term.  The claim must be construed "as written, not as the patentees wish they had written it."  *Chef America, Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004).  This is not a case of TMS reading in a limitation from the preferred embodiment, as TV Guide contends, but rather TV Guide mistakenly proposing the claims must read on every alternative embodiment as well.  This is not the law.  An embodiment that is disclosed but not claimed is dedicated to the public.  *See id.*; *Johnson v. Johnston*, 285 F.3d 1046, 1050 (Fed. Cir. 2002) (holding that a patent applicant who discloses subject matter in the specification but does not

claim it has dedicated it to the public); *Oak Technology, Inc. v. International Trade Commission*, 248 F.3d 1316, 1329 (Fed. Cir. 2001) (refusing to expand claim language to cover embodiments in specification because "these embodiments would not be covered by the language selected by the claim drafter"); *Environmental Instruments, Inc. v. Sutron Corp.*, 877 F.2d 1561, 1564 (Fed. Cir. 1989) (applying plain meaning claim construction that did not cover figure in patent because "The disclosure of the patent is in the public domain save as the claims forbid. The claims alone delimit the right to exclude; only they may be infringed.").

Accordingly, the proper construction of "viewing location" is "the specific room within a building where a television set is positioned and watched," such that users must access a service provider using a computer situated at the same location where they watch television, *i.e.*, from home, not work.

### B. The Proper Construction Of "Information … Regarding The Geographical Location Of The Particular Viewing Location" Is The One Proposed By TMS.

The limitation "information…regarding the geographical information of the particular viewing location" can be broken down into two parts: (1) "***geographical information***" ("information…regarding the geographical location," "information…regarding the geographical area" and "information…pertaining to the geographic location"); and (2) "***viewing location***" ("of a particular viewing location," "of the viewing location" and "of the television receiver"). TV Guide errs in its construction of these terms with regard to both parts. *First*, TV Guide merely states that these terms call for "geographic information," while providing no explanation of what "geographic information" is. The purpose of claim construction is to provide guidance to the fact finder, here a jury, concerning the metes and bounds of the asserted claims. *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1367 (Fed. Cir. 2004) ("Courts construe claims by considering the evidence necessary to resolve disputes about claim terms and to assign a

fixed, unambiguous, legally operative meaning to the claim."). A construction such as TV Guide's that does *not* provide guidance to a jury is not helpful and should be rejected. *Second*, TV Guide uses its own construction of "viewing location" in its construction of these terms. As explained above, TV Guide's construction of "viewing location" is overbroad and should not be used in the construction of these terms, either.

In contrast, TMS's construction: (1) provides guidance to the jury as to what "geographical information" is, namely "information that expressly indicates in geographic language (*e.g.*, name of a continent, country, province, state, city, town, region, street address, zip code, area code, etc.) the approximate portion of the planet"; and (2) uses the correct construction of "viewing location." Because it provides guidance to the jury and comports with the teachings of the patent regarding the "viewing location," TMS's construction for these terms should be adopted.

TV Guide's critique of TMS's construction of this term—that it ignores the context of the claim and impermissibly broadens the claim—is at odds with TV Guide's own construction for this term. *See* D.I. 205, TV Guide *Markman* Br. at 19-20. TV Guide argues that the specificity of the "geographic information" called for by the claims should be somehow limited, but does not explain *how* it should be limited. And nothing in TV Guide's constructions serves to limit the scope of "geographic information" as used in this term. In fact, it is TMS's construction, not TV Guide's, that states that geographic information could be as specific as a city, street address, zip code or area code. If TV Guide intended to limit the claims to zip codes only, it would have done so. Instead, TV Guide claimed "geographic information." Nothing in TMS's construction serves to broaden the claims beyond that.

7

**C.    The Proper Construction of "Modem" Is "A Data Signal Conversion Device That Converts Digital Signals To Analog Signals (And Vice Versa) And Allows A Computer To Exchange Data Over A Standard Dial-Up Telephone Line."**

The correct construction of "modem" has two components: a data signal conversion device that (1) converts digital signals to analog signals (and vice versa) and (2) allows a computer to exchange data over a standard dial-up telephone line.  The "data signal conversion device" preface to the construction is undisputed.  TMS revised its initially proposed construction to incorporate "data signal conversion" from TV Guide's proposed construction in order to refine the issues for the Court, as depicted in TV Guide's brief comparing TMS's initial and revised constructions.  This is but one example why TV Guide's complaint about TMS's revised constructions is inappropriate mudslinging.

The parties apparently agree that "modem" is a term of art that must be construed as one of ordinary skill in the art would have understood it in the context of the specification in 1992, with technical dictionaries therefore being instructive.  As TMS anticipated, in its opening *Markman* brief TV Guide bases its construction of "modem" on a single dictionary definition and its expert's report adopting that definition verbatim, while neglecting to address the numerous other definitions—which support TMS's proposed construction—within the same dictionary and other dictionaries referenced by TV Guide's own expert in the same report. 12/15/06 Cole Rpt. at ¶ 49 n.30 (B63); *see also id.* at Ex. E, Documents Reviewed (B65). [1]

---

[1]    TV Guide's expert quotes the definition of "modem" from two different editions of the same dictionary: *The New IEEE Standard Dictionary of Electrical and Electronics Terms* 815 (5th ed. 1993) and *The Authoritative Dictionary of IEEE Standards Terms* 701 (7th ed. 2000).  (B63).  TMS's Opening *Markman* Brief quoted the 2000 Seventh Edition but cited to and included the 1993 Fifth Edition in its Appendix.  D.I. 216, TMS *Markman* Br. at 22-23, A485.  TV Guide's Opening *Markman* Brief, filed simultaneously with TMS's Brief, cited only the 1993 Fifth Edition.  D.I. 205, TV Guide *Markman* Br. at 26.  For completeness, the Appendix to this Brief includes both the 2000 Seventh Edition and 1996 Sixth Edition definitions of "modem," which are identical.  (B9-21).

Moreover, the "modem" definition TV Guide uses does not apply to the '078 patent. First, it is from a withdrawn 1985 standard, as indicated by the designation "599-1985w." (A485); *see also* (B15 and B21) (same). The introductory section "How to use this dictionary" instructs "if a designation is followed by the letter w, it means that edition of the standard was withdrawn and not replaced by a revision." *See, e.g., The Authoritative Dictionary of IEEE Standards Terms* vi (7th ed. 2000) (B18). Further, the 1996 and 2000 editions, which add a categorization for each definition, show that the "modem" definition TV Guide uses is from the "Power Engineering" category (designated "PE") and, thus, does not apply in the personal computer context of the '078 patent. *See, e.g., The Authoritative Dictionary of IEEE Standards Terms* vi-vii, 701 (7th ed. 2000) (B18-21). For all these reasons, TV Guide's proposal that the Court adopt this definition verbatim as the proper construction should not be accepted.

TMS demonstrated in its opening *Markman* brief that numerous accepted technical dictionaries referenced by TV Guide's expert support TMS—not only as of 1992, but also in subsequent editions through 1997, the year the '078 patent was filed. D.I. 216, TMS *Markman* Br. at 23-24. In particular, the *Microsoft Press Dictionary* and *Newton's Telecom Dictionary* support both components of TMS's construction with the following "modem" definitions:

> Short for modulator/demodulator, a communications device that enables a computer to transmit information **over a standard telephone line** ….

*Microsoft Press Computer Dictionary* 230 (1st ed. 1991) (A528); *id.* at 259 (2d ed. 1994) (A509); *id.* at 311 (3d ed. 1997) (with slight variations in punctuation) (A518). [2,3]

---

[2]   The Federal Circuit relied upon the First Edition of the *Microsoft Press Computer Dictionary* for claim construction purposes in *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1345 n.2, 1347 n.3 (Fed. Cir. 2004).

[3]   All emphases in dictionary definitions are added.

The following definition from *Newton's Telecom Dictionary* instructs that a "modem" is "used to send data signals (digital) over the telephone network" and explains why digital to analog conversion (and vice versa) is required:

> Acronym for MOdulator/DEModulator.  Equipment which **converts digital signals to analog signals and vice-versa.  Modems are used to send data signals (digital) over the telephone network**, which usually is analog.  The Modem modulates the "1s" and "0s" into tones which can be carried by the phone network.  At the other end, the demodulator part of the modem converts the tones back into digital 1s and 0s.

*Newton's Telecom Dictionary* 296 (3d ed. 1990) (A496); *id.* at 397 (4th ed. 1991) (A504); *id.* at 574 (5th ed. 1992) (A537).[4]  Numerous other technical dictionaries confirm the "modem" definitions in the *Microsoft Press Dictionary* and *Newton's Telecom Dictionary*, as follows:

> [ELECTR]  A combination modulator and demodulator **at each end of a telephone line to convert binary digital information to audio tone signals suitable for transmission over the line, and vice versa**.  Also known as dataset.  Derived from modulator-demodulator.

*McGraw-Hill Dictionary of Scientific and Technical Terms* 1215 (4th ed. 1989) (B24); *id.* at 1283 (5th ed. 1994) (B27).[5]

> Acronym for **mo**dulator/**dem**odulator, a device that **translates digital pulses from a computer into analog signals for telephone transmission, and analog signals from the telephone into digital pulses** the computer can understand.  Provides communication capabilities between pieces of computer equipment **over common telephone facilities**.

*Webster's New World Dictionary of Computer Terms* 376 (5th ed. 1994) (B3).

> A device that **converts the digital signals** generated by the computer's serial port **to the modulated, analog signals required for transmission over a telephone line and transforms incoming analog signals to their digital equivalents**.  In personal

---

[4]  The Federal Circuit relied upon the Fifth Edition of *Newton's Telecom Dictionary* for claim construction purposes in *Microsoft*, 357 F.3d at 1345 n.2

[5]  The Federal Circuit relied upon the Fifth Edition of the *McGraw Hill Dictionary of Scientific and Technical Terms* for claim construction purposes in *MIT v. Abacus Software*, 462 F.3d 1344, 1351-52 (Fed. Cir. 2006).

> computing, people frequently use modems to exchange programs and data with other computers, and to access on-line information services such as the Dow Jones News/Retrieval Service.
>
> Modem stands for MOdulator/DEModulator.  The modulation is necessary because **telephone lines** were designed to handle the human voice, which warbles between 300 Hz and 3,000 Hz in ordinary telephone conversations (from a growl to a shriek)....

*Que's Computer User's Dictionary* 346 (2d ed. 1991) (B30).

TV Guide objects to TMS's proposed construction by arguing that the '078 specification does not use the terms digital or analog.  D.I. 205, TV Guide *Markman* Br. at 27.  However, the specification's repeated and consistent disclosure of using modems over a standard telephone line inherently involves digital to analog conversion (and vice versa).  This is established by the above definitions explaining in one way or another that digital to analog conversion is "required for transmission over a telephone line."  *See Que's Computer User's Dictionary* 346 (2d ed. 1991) (B30).  The specification discloses transmitting over a standard telephone line in Figure 2, the Summary of the Invention, and the Detailed Description of the Preferred Embodiment.  '078 patent at Fig. 2 (A2), 1:65-2:1 (A5), 3:46-58 (A6).  Significantly, the specification discloses using a modem to communicate **only** over a standard dial-up telephone line.  Likewise, the specification discloses the claimed customized program guide with transmission of geographical information **only** over standard phone lines using modems at each end.  *See id.* at 3:46-58 (A6).  These dictionary definitions offered by TMS of "modem" being over a standard telephone line with digital to analog conversion comport with the specification and therefore are the correct definitions.  *See Phillips,* 415 F.3d at 1321 (admonishing that dictionaries must be used in the context of the specification for claim construction).

TV Guide makes a passing reference to the specification's disclosure of "cablecast or broadcast," without any attempt to show how this applies to the claim term "modem."  D.I. 205,

TV Guide *Markman* Br. at 26-27.  After disclosing the "modem" embodiment, the '078 patent

discloses: "As another alternative, diskettes could [sic] mailed out to the personal computer on a

subscription basis or the schedule information could be provided to the personal computer via

cablecast or broadcast."  '078 patent at 3:63-67 (A6).  Thus, the specification uses the claim term

"modem" as one embodiment, expressly ***in contrast*** to alternative embodiments of "diskettes"

and "cablecast or broadcast."  In other words, the specification defines "modem" as different

from "cablecast or broadcast."  TV Guide itself recognizes this distinction in its Opening Brief in

Support of Its Motion for Summary Judgment of Infringement: "The computer receives schedule

information from the schedule source via a modem, cablecast, or broadcast.  (Ex. A ['078 patent]

at col. 3:56-67)."  D.I. 204, TV Guide Infr. Br. at 7.

As TMS explained in its opening brief, both the "diskettes" and "via cablecast or

broadcast" alternative embodiments are merely a vestige from the 1981 application.  They are

distinct from, and do not apply to, the "modem" embodiment added in the 1992 application and

claimed in the '078 patent.  The corresponding disclosure from the 1981 application, contained

in Levine's '713 application, provides: "The present invention also incorporates means for

recording a future program schedule which may either by [sic] provided ***via airwave or cable***

***broadcast*** or alternatively may be inserted into the device in the form of a throw-away read-only

memory."  '713 Patent at 2:52-56 (emphasis added) (B38).  The '078 patent explains the

distinction between cablecast and broadcast (*i.e*., airwave), as those terms are used in the

specification:  cablecast uses "a cable tuner and descrambler box 16" as disclosed in Figure 1, as

opposed to "broadcast receiver systems which do not employ a cable box and to satellite

receivers."  '078 patent at 3:2-10 (A6).

Moreover, one of ordinary skill in the art would understand that both cablecast and broadcast refer to one-way transmission of information, *i.e.*, from a transmitter to a receiver such as a cable box or satellite box, not to a modem.  2/9/07 Tjaden Rpt. at ¶ 115 (B60).  The specification does not even purport to disclose also transmitting geographical information from a personal computer "via cablecast or broadcast."  Instead, the specification discloses only that "the schedule information could be provided to the personal computer via cablecast or broadcast," not that the geographic information could be transmitted from the personal computer via cablecast or broadcast.  *See* '078 patent at 3:63-67 (A6).  TV Guide conveniently omits this qualification from its quotation of "via cablecast or broadcast," mischaracterizing the '078 specification as generally disclosing "communication" via cablecast or broadcast.  D.I. 205, TV Guide *Markman* Br. at 26-27.  Neither TV Guide nor its expert's report on this point contends that it would be possible for the user to transmit geographical location "via cablecast or broadcast" (which is not possible), illustrating the distinction between a modem, on the one hand, and "cablecast or broadcast," on the other hand.  *See* 2/28/07 Cole Supp. Rpt. at ¶ 24 ("the 'cablecast' and 'broadcast' deliver information to the viewing location in response to the geographical location information transmitted earlier," without addressing how the geographical information was transmitted) (B70).  The "via cablecast or broadcast" alternative embodiment simply does not apply to the claim term "modem."

Thus, the proper construction of "modem" as one of ordinary skill in the art would have understood it in the context of the specification in 1992 is "a data signal conversion device that converts digital signals to analog signals (and vice versa) and allows a computer to exchange data over a standard dial-up telephone line."

**D.     The Proper Construction Of "Transmit/Transmitting" Is "Make/Making an Affirmative Indication."**

Prior to filing opening *Markman* briefs, TMS explicitly notified TV Guide that it disputed TV Guide's "transmit/transmitting" construction and proposed the alternative construction "make/making an affirmative indication."  *See* 9/21/07 Ltr. from M. Zinanni to C. Harnett (B46-48).  TV Guide's opening brief misrepresents that "TMS has not provided an alternative construction," "there appears to be no dispute," and "TMS apparently agrees with TV Guide's construction."  D.I. 205, TV Guide *Markman* Br. at 20-21.  As explained in TMS's opening brief, TMS disputes TV Guide's proposed construction of transmitting as "send/sending electronically" for two reasons: (1) it ignores the "transmitting" prosecution history; and (2) it is effectively no construction at all, like TV Guide's similar construction of "receive/receiving" discussed below, because it is already clear that the claimed invention uses a personal computer and thus is electronic.  TV Guide's opening *Markman* brief likewise ignores the "transmitting" prosecution history and is disingenuous at best when it claims that "TMS apparently agrees with TV Guide's construction" by TMS's expert having acknowledged that the transmission is electronic.

However, TV Guide cannot avoid Levine's unequivocal prosecution history disclaimer explicitly directed at the claim term "transmit."  Levine successfully overcame the rejection to all of the proposed '078 claims based on the Young '121 patent by arguing:

> In contrast [to the Young patent], Applicant's claim 19 clearly sets forth the active <u>transmittal</u> of "geographical location of the particular viewing location."  This language explicitly requires data transmission from the user "to a wide-area-network through [a] modem" before retrieval of the desired information can occur.  ***The user of Applicant's device must transmit an affirmative indication*** of his viewing location before receiving programming data.

5/18/99 Resp. to Office Action, at 2 (A118) (underlining in original; bold, italics added).  Levine used the mandatory language "must" in distinguishing the "transmit" limitation from the prior art

14

based on ***transmitting an affirmative indication***.  It could not be more clear that this is required.

In light of this prosecution history, the proper construction of "transmitting" is "making an affirmative indication," not merely "sending electronically" as TV Guide proposes.

> **E.     The Proper Construction of "Receiving … Information Specific To The Type of Programming Available To The Particular Viewing Location" Is "Having Data Transferred To A Computer Such That A User Can Perform Database-Type Manipulations Directly On The Transferred Data Without Being Connected To The Original Source Of The Data."**

The Court can easily dispense with TV Guide's attempts to evade the prosecution history disclaimer that requires the "receive" limitation to be construed as TMS proposes: "having data transferred to a computer such that a user can perform database-type manipulations directly on the transferred data without being connected to the original source of the data."  TV Guide misses the point with all three of its arguments that "receive" should be construed to mean merely "receive electronically."

***First***, as with the "transmit" limitation discussed above, TV Guide argues that because TMS's expert "agrees" that "receive" must be electronic, "the term 'receive' in the context of the '078 patent must be construed to mean 'receive electronically.'"  D.I. 205, TV Guide *Markman* Br. at 22-23.  This is a non-sequitor.  Regardless of whether the electronic requirement is explicitly articulated in the Court's construction, the issue remains whether the "receive" limitation requires having data transferred to a computer such that a user can perform database-type manipulations directly on the transferred data without being connected to the original source of the data.  Indeed, the electronic requirement is inherent in TMS's proposed construction. Moreover, as noted above, TV Guide's argument that TMS's expert agrees with TV Guide's electronic constructions is disingenuous at best.

Of course, in the personal computer context of these claims, "receive" must be electronic (as opposed to receiving a hard-copy magazine with program guides in the mail).  But the fact

that it must be electronic does not mean that the term "receive" itself need not be construed. Rather, the converse is true—the fact that "receive" must be electronic is so abundantly clear and immaterial to infringement (there is no non-infringement or invalidity defense that hinges on whether receive is electronic) that it provides no clarity for the jury and need not be spelled out in the construction.  The Federal Circuit has explained this point:

> Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy.

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) .

***Second***, in an act of desperation, TV Guide's summary judgment brief misrepresents that TMS's claim construction "further requires such manipulation to be performed with 'a commercially available database manipulation program running on the user's personal computer to identify or select a particular television program based on some property of the program such as time, title, subject or provider,'" quoting TMS's expert's report out of context.  D.I. 204, TV Guide Infr. Br. at 18.  In its *Markman* brief TV Guide likewise blatantly attempts to twist the deposition testimony of TMS's expert on this point, claiming that if there is no commercially available product to enable Zap2it.com or "any website" to meet this construction then the construction cannot be right.[6]  D.I. 205, TV Guide *Markman* Br. at 23-24.  TMS's actual contentions are this: The claims require performing database-type manipulations directly on the transferred data without being connected to the original source of data (the claim construction issue), and TMS does not infringe because Zap2it.com itself does not have this capability and

---

[6]    The deposition testimony TV Guide cites clearly does not contain the purported claim that "under TMS's construction, it would be virtually impossible for ... any website ... to infringe the '078 patent."  D.I. 205, TV Guide *Markman* Br. at 23.  But this is beside the point.

there is no commercially available database manipulation program that could be used with Zap2it.com in that way (the non-infringement issue).[7]

TV Guide similarly misses the mark with its position that TMS's construction cannot be right because it "would purportedly render the claim meaningless when applied to Zap2it.com" and therefore is "contrived" and "goal-oriented."  D.I. 205, TV Guide *Markman* Br. at 23-24.  This is nothing but empty rhetoric.  If the construction were not relevant to infringement, it would not be at issue.  As noted above, the Federal Circuit has explained that the purpose of claim construction is to resolve disputed meanings "for use in the determination of infringement."  *U.S. Surgical*, 103 F.3d at 1568.  Indeed, the Federal Circuit has specifically instructed that "it is appropriate for a court to consider the accused device when determining what aspect of the claim should be construed."  *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1309 n.10 (Fed. Cir. 2006); *see also MIT*, 462 F.3d at 1351 ("[I]t is highly undesirable to consider [claim construction] issues in the abstract …."").  The fact that TMS's construction is relevant to its infringement defense is precisely why it must be construed, and it is not evidence against TMS's construction.

Further, TV Guide's argument against "litigation inspired" constructions goes both ways: "The public has a right to rely on the assertions made by a patent applicant to secure allowance of its claims.  Post-hoc, litigation-inspired argument cannot be used to reclaim subject matter that the public record in the PTO clearly shows has been abandoned."  *Desper Prods., Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1340 (Fed. Cir. 1998).  That is exactly what TV Guide attempts to do

---

[7]   Even if there were a commercially available program that could be used this way with Zap2it.com (as TV Guide contends), there is no evidence that Zap2it.com was ever used that way, let alone that TMS induced any such use.  *See* D.I. 211, TMS Noninfring. Br. at 25.

here. Specifically, as shown below, TV Guide asks the Court to construe the claims to cover a system where schedule information from a remote database is downloaded through a modem on an as-needed basis, subject matter explicitly disclaimed during prosecution and broader than what Levine represented as his invention to the PTO. The Federal Circuit forbids this litigation tactic. *See Microsoft*, 357 F.3d at 1349 ("We cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO.").

**Third**, after all of this rhetoric, TV Guide finally addresses the real issue for construing the "receive" limitation—whether the prosecution history arguments from the 1992 application apply to the '078 patent—but the single case that TV Guide cites to refute this prosecution history does not apply here. TV Guide's case, *Ventana Medical Systems, Inc. v. Biogenex Laboratories, Inc.*, 473 F.3d 1173 (Fed. Cir. 2006), stands for the proposition that prosecution history regarding different claim terms is irrelevant. This caselaw coexists with the caselaw TMS presented in its opening brief applying arguments from a parent application's prosecution history characterizing "the invention" to the claim construction of the child patent. *See, e.g., Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1384 (Fed. Cir. 1999); *Jonsson v. Stanley Works*, 903 F.2d 812, 817-18 (Fed. Cir. 1990); *Microsoft*, 357 F.3d at 1349. TMS demonstrated in its opening brief why this is not a case like *Ventana*, where the prosecution history argument is relevant only to the specific claim terms in the parent application. Levine distinguished a prior art patent based on this prior art feature: "schedule information might be kept in remote database 44 and downloaded through modem 42 to central processor 10 on an as-needed basis." 11/16/93 Amend., at 7 (A42). Emphatically disclaiming such a system, where

schedule information from a remote database is downloaded through a modem on an as-needed basis, Levine argued:

> ***In contrast, <u>the present invention</u> maintains a database*** including information relating to programming available to the VCR during a future period, including program identification, start time and so forth. This information may be derived from a remote database via telephonic communication, by broadcast, or by subscription provision of disposable memories. ***<u>In all cases</u>***, however, ***an entire block of schedule information for a given period of time is transferred to the personal computer in accordance with <u>the present invention</u>, thereby enabling an operator to perform database-type manipulations directly on this information***, including its use to immediately schedule a particular video program for future recording.

*Id.* at 7-8 (emphases added) (A42-A43). Levine's argument was not limited to the claim language at issue, but rather was made explicitly as to "the present invention" with the broad and unequivocal language that it applies ***in all cases***. Moreover, this argument is consistent with other prosecution history arguments made by Levine directed at the invention, *see id.*, at 1 (A36), as well as the claim language and specification as one of ordinary skill in the art would understand it. *See* D.I. 216, TMS *Markman* Br. at 30-37. All of this intrinsic evidence, detailed in TMS's opening *Markman* brief, compels the construction "having data transferred to a computer such that a user can perform database-type manipulations directly on the transferred data without being connected to the original source of the data."

F.    **The Proper Construction Of "The Controller Being Programmed To Perform" Is That "Computer Application Programs Are Installed On The Controller Prior To Its Use By A User To Perform."**

Independent claim 8 and thus its dependent claim 10 are apparatus claims with the limitation "the controller being programmed to perform the following functions," followed by four required functions. '078 patent at claim 8 (A8). The proper construction of this limitation is that "computer application programs are installed on the controller prior to its use by a user to

19

perform the functions," proposed by TMS, as opposed to being incrementally downloaded during execution, as TV Guide tries to read this 1992 technology on today's Internet technology.

TMS explained in its opening brief that the claim term "controller" does not appear in the '078 specification.[8]  Rather, the disclosure corresponding to the "controller being programmed" limitation is that:

> (1) "The method and apparatus of the present invention further utilizes *a conventional personal computer*...." *Id*. at 3:16-17 (emphasis added) (A6).

> (2) "*The personal computer is conventional but is provided with a special application program to implement the present invention*.  The organization of this application program is well within the skill of a programmer using the functional description of the program provided herein." *Id.* at 3:22-27 (emphasis added) (A6).

> (3) "The application program is loaded into the personal computer via a diskette or the like." *Id.* at 3:40-41 (A6).

*See also id.* at 1:59-63; 2:1-6; 2:20-22, 2:24-27; 3:59-63; 4:57-60 (A5-A6).  The controller, therefore, is part of a "conventional personal computer," limiting it to 1992 technology.  *See Kopykake Enters., Inc. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001)  ("[W]hen a claim term understood to have a narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean at the time of filing."); *MIT*, 462 F.3d at 1353 n.3 (same, quoting *Kopycake*); *PC Connector Solutions LLC v. SmartDisk Corp*., 406 F.3d 1359, 1363 (Fed. Cir. 2005) (same, quoting *Kopycake*); *Plant*

---

[8]    The term "controller" was resurrected from the 1981 application, contained in the '713 patent: "In the preferred embodiment of the invention the controller takes the form of a microprocessor such as Zilog Z-80 or Intel 8080. In alternative embodiments of the invention the controller could be implemented with discrete components.  A readonly [sic] memory 28 is connected to the controller and provides the operating program for the video recorder system 10.  In alternative embodiments of the invention the operating program could be stored in part of the digital memory 24 so that only a single memory chip would be required ...."  '713 patent at 3:50-59 (B39); *see also id*. at Fig. 2 (B37).

*Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1345 (Fed. Cir. 2003) (same, quoting *Kopycake*).

TV Guide misunderstands this claim construction issue in its brief when it refutes arguments that TMS does not make and fails to address the real issue. Contrary to TV Guide's representation, TMS has never contended that this limitation requires installing programs "prior to a user even turning on his computer." D.I. 205, TV Guide *Markman* Br. at 35. Rather, TMS contends the programs must be installed prior to the controller being used **to perform the claimed functions** (how one of ordinary skill in the art would have understood the claim in 1992), as opposed to being incrementally downloaded during execution (how today's Internet technology operates). 10/5/07 Tjaden Decl. at ¶ 5 (A654). The specification discloses that "the personal computer 18 is conventional but is provided with a special application program," and that "the application program is loaded into the personal computer via a diskette or the like," which contemplates that the user would subscribe to a service such as CompuServe and receive a floppy disk containing the program to load into the user's personal computer prior to using the computer to perform the functions. '078 patent at 3:22-23, 3:40-41 (A6). Clearly the user turns on the computer before loading the program into it.

TV Guide also argues that "it was common in the early 1990's, as it is today, for programs to be placed on a computer connected to a network as the computer is being used," citing its expert's invalidity and supplemental reports for support. D.I. 205, TV Guide *Markman* Br. at 35. This argument has several fatal flaws. First, this argument mischaracterizes the expert reports. TV Guide's expert did not state this in either report TV Guide cites, and thus TV Guide's argument is completely unsupported. Second, this argument is incorrect: "It was not common in the early 1990's for programs to be placed, or installed, on a computer connected to a

21

network as the computer was being used." 11/20/07 Tjaden Decl. at ¶ 39 (B90-91). Third, this argument does not address the real issue of whether incrementally downloading programs during execution was known in 1992. *Id.* That issue was addressed in both experts' reports, including one of the reports that TV Guide cited in its brief. Specifically, TMS's expert opined that in 1992:

> personal computer application programs were completely installed on the personal computer before they began executing. The concept of downloading during the execution of the application program incremental functionality for it to perform was not used or commonly known to skilled artisans. Only several years after the introduction of the first widely available Internet browser, a time subsequent to the '078 Patent's priority date, was this concept commonly known and in use.

10/5/07 Tjaden Decl. at ¶ 5 (quoting 2/9/07 Tjaden Rpt.) (A654). In rebuttal, TV Guide's expert opined that in 1992 "examples of systems that downloaded or installed incremental functionality while the application program was being executed were common," citing the same articles TV Guide cites to in its brief, but without any explanation. 2/28/07 Cole Supp. Report at ¶ 37 (B71). At his deposition, TV Guide's expert identified the specific passages in two of the articles that he contends support his opinion, but he was unable to do so for the third article. *See* Cole Dep. at 243:23-248:12 (B56-57). As TMS's expert will testify, these articles "do not show that 'at the time of the '078 patent's priority date, examples of systems that downloaded or installed incremental functionality while the application program was being executed were common.' Rather, if anything they show that such functionality was not at the time commonly known to or understood by a skilled artisan, and certainly not used by consumer personal computers in user's homes." 11/20/07 Tjaden Decl. at ¶ 38 (B90); *see also id.* at ¶¶ 6-37 (B78-90).

Accordingly, the correct construction of this limitation is that computer application programs are installed on the controller prior to its use by a user to perform the claimed functions.

G.    **Undisputed Claim Terms**

TV Guide's opening brief improperly asks the Court to construe six limitations that are not at issue:  (1) "available to a particular one of the viewing locations"; (2) "wide-area network"; (3) "operator input"; (4) "receive information through the operator input"; (5) "schedule of the television programming"; and (6) "controller."  The first five limitations were initially construed by TMS but not TV Guide when the parties exchanged preliminary proposed claim constructions, while the sixth limitation ("controller") was initially disputed by the parties. In the course of refining the issues to be presented to the Court, and in the interest of judicial efficiency, TMS notified TV Guide prior to filing opening *Markman* briefs that it would accept TV Guide's construction of "controller" and agree that the other terms have their plain and ordinary meaning.  *See* 9/21/07 Ltr. from M.Zinanni to C. Harnett (B46-48).  These terms therefore are not in dispute for *Markman* purposes and need not be construed.  For example, in *U.S. Surgical*, where "[t]he jury was instructed that the technical terms had their plain meaning," the Federal Circuit rejected a challenge to jury instructions that did not construe these terms because:

> The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court.  Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy.

103 F.3d at 1562, 1568; *see also Vanderlande Indus. Nederland BV v. I.T.C.*, 366 F.3d 1311, 1323 (Fed. Cir. 2004) (quoting *U.S. Surgical* for the proposition that "[c]laim construction is a matter of resolution of disputed meanings," and affirming where "this claim limitation was not in dispute when the ALJ construed the claims, and thus there was no reason for the ALJ to set out a formal construction").

TV Guide's extensive discussion of TMS's revised constructions, with its insinuation that TMS intended to deceive the Court by agreeing to the plain meaning but then reasserting its original constructions at trial, is inaccurate and inappropriate mudslinging. The Court's Scheduling Order specifically provided that the parties would first exchange preliminary constructions before submitting expert reports and then meet and confer before filing a Joint Claim Construction Chart identifying disputed claim language on the same date as *Markman* briefs. *See* D.I. 27, Scheduling Order at ¶¶ 12-13. The Scheduling Order thus contemplated that the parties would refine their claim constructions in the course of expert discovery up until the time of filing *Markman* briefs in order to accurately identify the disputed issues for the Court. TMS's revised constructions and attempts to narrow the issues for the Court fully comply with the letter and spirit of the Court's Scheduling Order.

## III.    CONCLUSION

In consideration of the foregoing points and authorities and those set forth in its Opening *Markman* Brief, TMS respectfully requests that the Court adopt TMS's proposed claim constructions.

Dated: November 21, 2007          */s/ Richard K. Herrmann*
                                  Richard K. Herrmann (I.D. No. 405)
                                  Mary B. Matterer (I.D. No. 2696)
                                  MORRIS JAMES LLP
                                  500 Delaware Avenue, Suite 1500
                                  Wilmington, Delaware 19801
                                  302.888.6800
                                  rherrmann@morrisjames.com

                                  Mark A. Pals, P.C.
                                  Linda S. DeBruin, P.C.
                                  Michael A. Parks
                                  Meredith Zinanni
                                  KIRKLAND & ELLIS LLP
                                  200 East Randolph Drive
                                  Chicago, Illinois 60601
                                  312.861.2000

                                  *Counsel for Defendant Tribune Media Services, Inc.*