## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| TV GUIDE ONLINE, INC. AND TV GUIDE ONLINE, LLC, | ) ) ) ) | |
| Plaintiffs, Counterclaim-Defendants, | ) ) ) ) | C.A. No. 05-CV-725-*** |
| v. | ) ) ) | **JURY TRIAL DEMANDED** |
| TRIBUNE MEDIA SERVICES, INC. | ) ) ) | |
| Defendants, Counterclaim-Plaintiffs. | ) ) ) ) | **REDACTED PUBLIC VERSION** |

## TV GUIDE'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Christopher J. Harnett
Ching-Lee Fukuda
Stuart W. Yothers
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

Ronald E. Naves, Jr.
Jeffrey A. Fehervari
Gemstar-TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, CA 90028
(323) 817-4600

Dated: November 21, 2007

Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Steven J. Fineman (#4025)
Richards, Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
cottrell@rlf.com
moyer@rlf.com
fineman@rlf.com

*Attorneys for Plaintiffs TV Guide Online, Inc. and TV Guide Online, LLC*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION...................................................................................1

II.   OVERVIEW.......................................................................................1

III.  TMS'S GOAL-ORIENTED CLAIM CONSTRUCTION  ARGUMENTS ARE
      UNSUPPORTED AND INCORRECT......................................................5

      A.   Viewing Location .....................................................................5

           1.   TMS's "Actually Receives" Argument Has No Basis In The
                Intrinsic Record........................................................6

           2.   TMS Cannot Limit The Claims To A Preferred Embodiment........................8

           3.   TMS's "Prosecution History Estoppel" Argument Fails ....................9

      B.   Information ... Regarding/Pertaining To The Geographical Location/Area............10

      C.   Modem..............................................................................14

      D.   Transmit/Transmitting .............................................................17

      E.   Receiving ..........................................................................20

           1.   TMS's Dictionary Argument Is A Contrivance...............................22

           2.   TMS's "Prosecution History Estoppel" Argument Is Demonstrably
                Incorrect.....................................................................23

           3.   TMS's Reliance On The *SciMed* Case Is Unfounded.....................25

      F.   The Controller Being Programmed To Control.........................................27

      G.   TMS's Withdrawn Definitions For Claim Terms.......................................29

IV.   CONCLUSION ....................................................................................30

# TABLE OF AUTHORITIES

## CASES

*ATD Corp. v. Lydall, Inc.,*
   159 F.3d 534 (Fed. Cir. 1998) ............................................................................19

*Desper Prods., Inc. v. QSound Labs, Inc.,*
   157 F.3d 1325 (Fed. Cir. 1998)............................................................................26

*Finch v. Hercules Inc,*
   C.A. No. 92-251 MMS, 1995 WL 785100 (D. Del. Dec. 22, 1995) .......................19

*Gart v. Logitech, Inc.,*
   254 F.3d 1334 (Fed. Cir. 2001) ........................................................................4, 8

*Georgia-Pacific Corp. v. United States Gypsum Co.,*
   C.A. No. 94-489-RRM, 1996 U.S. Dist. LEXIS 22616
   (D. Del. Dec. 27, 1996) *modified* 195 F.3d 1322 (Fed. Cir. 1999)......................19

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.,*
   370 F.3d 1131 (Fed. Cir. 2004) ..........................................................................26

*Jonsson v. Stanley Works,*
   903 F.2d 812 (Fed. Cir. 1990)..............................................................................26

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
   357 F.3d 1340 (Fed. Cir. 2004)......................................................................16, 17

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) .................................................................. *passim*

*Pods, Inc. v. Porta Stor, Inc.,*
   484 F.3d 1359 (Fed. Cir. 2007), *cert. denied*, 2007 WL 266678 (U.S. Nov. 13, 2007).........20

*Praxair, Inc. v. ATMI, Inc.,*
   231 F.R.D. 457 (D. Del. 2005) ............................................................................19

*Rexnord Corp. v. Laitram Corp.,*
   274 F.3d 1336 (Fed. Cir. 2001) ............................................................................8

*SafeTCare Mfg., Inc. v. Tele-Made, Inc.,*
   497 F.3d 1262 (Fed. Cir. 2007) ..........................................................................27

*Saunders Group, Inc. v. Comfortrac, Inc,*
   492 F.3d 1326 (Fed. Cir. 2007)............................................................................23

*SciMed Life Sys., Inc.* v. *Advanced Cardiovascular Sys., Inc.*,
   242 F.3d 1337 (Fed. Cir. 2001)................................................................25, 26, 27

*Sorensen* v. *Int'l Trade Comm'n*,
   427 F.3d 1375 (Fed. Cir. 2005) .................................................................10, 25

*Southwall Techs., Inc.* v. *Cardinal IG Co.*,
   54 F.3d 1570 (Fed. Cir. 1995) .............................................................................8

*TA Instruments, Inc.* v. *Perkin-Elmer Corp.*,
   277 F. Supp. 2d 367 (D. Del. 2003), *aff'd*, 97 Fed. Appx. 319 (Fed. Cir. 2004) .....................7

*Tate Access Floors, Inc.* v. *Maxcess Techs., Inc.*,
   222 F.3d 958 (Fed. Cir. 2000) .............................................................................8

*Ventana Med. Sys., Inc.* v. *Biogenex Labs., Inc.*,
   473 F.3d 1173 (Fed. Cir. 2006)...........................................................................23

*Wang* v. *Am. Online, Inc.*,
   197 F.3d 1377 (Fed. Cir. 1999)...........................................................................26

I.     **INTRODUCTION**

On October 5, 2007, the parties served and filed their respective opening submissions on issues directed to claim construction and on motions for summary judgment. TV Guide respectfully submits this brief in response to TMS's "*Markman* Brief" (D.I. 216). TV Guide also submits concurrently herewith its briefs in response to the four different summary judgment motions filed by TMS.

II.    **OVERVIEW**

What comes through loud and clear from TMS's *Markman* Brief is this: TMS does not like the words and phrases that are *actually present* in the asserted '078 patent claims and is trying desperately to rewrite them to be something different.

As TV Guide explained in its opening claim construction brief (D.I. 205), TMS's proposed construction of the asserted '078 patent claims has been a moving target. The Court's Scheduling Order directed the parties to exchange proposed definitions for the claim terms that would require construction no later than October 16, 2006 -- *more than a year ago*. TV Guide fully complied with the Scheduling Order and identified six terms for which further construction would be helpful to the jury. TV Guide proposed straightforward definitions for those terms that are fully consistent with the intrinsic evidence and has stuck with those definitions ever since. TMS, on the other hand, ignored the schedule set by the Court.

TV Guide has already detailed for the Court TMS's disruptive and prejudicial efforts to repeatedly change its proposed claim definitions after the Court-ordered deadline for identifying them (D.I. 205 at 3-5). TMS's efforts in that regard continued through the close of fact discovery and throughout expert discovery. TMS's "*Markman* Brief" confirms that even now -- more than a year after the date set by the Court to identify proposed definitions -- TMS still feels free to change its position on claim construction.

1

This is evident, for example, from TMS's arguments concerning the words "transmit" and "transmitting" that appear in the '078 patent claims. Throughout the entirety of fact and expert discovery, TMS and its expert argued that those terms did not require any further construction. (TV Guide proposed the common-sense definition "send/sending electronically" as its definition for that term). Now, in its *Markman* Brief, TMS argues for the first time that these "transmit/transmitting" limitations require "making an ***affirmative*** indication." (D.I. 216 at 26-29).

This is yet another attempt by TMS to manufacture a non-infringement defense where none exists. As TV Guide explains in detail below, TMS's untimely suggestion that the extraneous "affirmative indication" language should be part of the claim definition is another litigation-inspired argument. Specifically, TMS has hinted that it will argue that there is some difference between transmitting geographic information, on the one hand, by manually typing a Zip Code on a keyboard and hitting "enter" and, on the other hand, transmitting the Zip Code by way of a stored "cookie" during subsequent visit to the website. TMS is grasping at straws. There is no difference between such modes of "transmitting" within the meaning of the claims in light of the intrinsic evidence.

When all is said and done, TMS's new "transmitting" argument is apiece with its other efforts to manufacture non-infringement arguments by adding extraneous language to various claim terms to limit their scope. This is exemplified by TMS's continuing attempt to rewrite the "receiving" limitation by including extraneous verbiage such as "perform database-type manipulations directly on the transferred data without being connected to the original source of the data." (D.I. 216 at 29). There is absolutely nothing in the intrinsic record that supports such a restrictive definition. Beyond that, as TV Guide previously explained, TMS's own technical expert testified that TMS's construction, with its extraneous limitations, supposedly

2

makes it impossible for Zap2It.com -- or, for that matter, *any other commercial product* -- to infringe the '078 patent.

## REDACTED

(Ex. D at 142:14-19[1]).  While TMS's desire to avoid liability for its infringement is understandable, it does not justify such a far-fetched construction.

TMS also continues with its efforts to add extraneous language to other claim limitations to broaden their scope in the hopes of having the claims read on the prior art.  This is exemplified by TMS's proposed construction of the term "information ... regarding the geographic location of a particular viewing location."  For this term, TMS proposes the construction:

> Any information *irrespective of how the information is encoded, that expressly indicates in geographic language* (e.g. name of continent, country, province, state, city, town, region, street address, zip code, area code, etc) *the approximate portion of the planet* in which a particular "television viewing location," as defined above, is located (emphasis added).

Again, there is no basis in the intrinsic record supporting TMS's proposed inclusion of extraneous language such as "irrespective of how the information is encoded" and "the approximate portion of the planet."  TMS's proposed expansive definition is a transparent attempt to improperly broaden this claim to manufacture an invalidity defense where none exists.[2]

---

[1]     As used herein, "Ex. __" refers to the stated exhibit to the Declaration of Stuart W. Yothers, which is submitted herewith.

[2]     Even though TMS filed a separate motion for summary judgment of invalidity, throughout its *Markman* brief, TMS presents arguments directed to its validity defenses.  TV Guide believes that the appropriate place to address TMS's arguments on the question of validity is in its brief answering TMS's motion for summary judgment of invalidity.  That answering brief is submitted concurrently herewith.  There, TV Guide explains that TMS's assertions on the

3

And, TMS persists with its efforts to limit the claims to a single preferred embodiment. This is illustrated, for example, by TMS's proposed definition of the term "viewing location." According to TMS, that claim term must be defined as "the specific room within a building where a television set is positioned and watched by a user" and, as such, should be limited to a single preferred embodiment disclosed in the specification. TMS's efforts to limit the claims to a preferred embodiment are improper under controlling legal principles. As a matter of law, a patentee's claims are not limited to the scope of a single or preferred embodiment that is included for purposes of illustration in the patent's specification. *See, e.g., Gart v. Logitech, Inc.*, 254 F.3d 1334, 1343 (Fed. Cir. 2001). This controlling precedent is particularly applicable here *because the '078 patent expressly discusses alternative embodiments that are flatly inconsistent with TMS's proposed definition*. For example, the specification expressly describes embodiments in which the "viewing location" covers at least two rooms with the computer receiving schedule information in one room and the television in another room. To limit the claim to a different particular embodiment would be legal error.

In effect, TMS is asking the Court to disregard the intrinsic evidence in order to construe the claims of the '078 patent: (a) in any way possible that would exclude the Zap2It.com website from their scope; or (b) in any way possible to make the '078 claims read on the prior art. TMS's goal-oriented strategy is manifestly apparent from TMS's *Markman* Brief. There, TMS argues that its efforts to add extraneous language are somehow justified in view of: (1) statements made during prosecution of *different* applications directed to *different* claim terms; (2) case law reporting on *different* litigations that addresses claim language appearing in *different* patents (with *different* claims, specifications and prosecution histories) issued to

---

question of validity find no basis in law or in fact. TV Guide confines its arguments in *this* brief to the question at hand -- claim construction.

4

*different* inventors and directed to *different* technology; (3) dictionary definitions of words that do not even appear in the claims at issue; and (4) the unsupported (and frequently-shifting) views of its retained technical expert.

In TV Guide's opening claim construction submission, we thoroughly addressed the intrinsic evidence that supports TV Guide's proposed construction of the disputed '078 patent claim terms. TV Guide also demonstrated why TMS's proposed definitions were flatly inconsistent with the intrinsic record (starting with the language of the claims themselves) and with the controlling legal authorities on questions of the construction. In the pages that follow, TV Guide further addresses TMS's litigation-inspired claim construction arguments.[3]

## III.  TMS'S GOAL-ORIENTED CLAIM CONSTRUCTION ARGUMENTS ARE UNSUPPORTED AND INCORRECT

### A.  Viewing Location

The parties' dispute regarding the term "viewing location" is set forth below:

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| "viewing location" | "residence or building at which a television signal can be received" | "The physical spot where a television set is positioned and watched by a user." | "The specific room within a building where a television set is positioned and watched by a user." |

As such, the point of disagreement is whether, within the meaning of the '078 patent claims, the computer with which geographic information is used to access television listings *must be in the same exact room as the television set*. There is nothing in the claims,

---

[3]     TMS inexplicably litters its *Markman* brief with irrelevant (and incorrect) assertions about, for example, standing to sue in earlier litigations (D.I. 216 at 7) and the number of continuation applications that ultimately led to the '078 patent (D.I. 216 at 6-7). The futility of these assertions is confirmed by the fact that none of them pertain to any defense that TMS actually advanced in this case.

specification or the prosecution history to suggest that the television and the computer must be in the same room.

As TV Guide explained in its opening claim construction submission, claim 1 provides that a computerized unit is provided at the television viewing location. In other words, the viewing location is at least large enough to cover the space occupied by both a computer and a television. The patent specification further discloses that the computer that receives the schedule information may be located in one room and the television "*may be located in another room.*" (Ex. A at col. 4:45-49 (emphasis added).)

The specification discloses another embodiment (an embodiment that is, in fact, directed to use of a VCR) in which a computer is located in one room and the VCR is located "*in another room of the house.*" (Ex. A at col. 6:13-16 (emphasis added).) TV Guide's proposed construction of a "residence or building at which a television signal can be received" is, therefore, supported by the disclosure of the specification that a "viewing location" is large enough to cover two different rooms.

### 1. TMS's "Actually Receives" Argument Has No Basis In The Intrinsic Record.

In an attempt to avoid the clear teachings of the '078 patent, TMS presents an argument that is difficult to understand -- let alone to respond to. TMS now argues that claim 1 *really* requires that the viewing location must be at a spot where the television "actually receive[s] a television signal." (D.I. 216 at 19). According to TMS, TV Guide's proposed construction is not sufficiently restrictive because it "only requires the viewing location be *capable* of receiving a television signal, not that it actually does receive the signal." (D.I. 216 at 18). TMS then goes on to assert that: (1) "the language of the claim [claim 1] ... requires that

6

the location actually receive a television signal" and (2) the specification somehow teaches "that the personal computer [must] be located in the same room as the television." (D.I. 216 at 19).[4]

Neither argument holds water. With respect to the claim language, the '078 patent claims -- including claim 1 -- say nothing at all about a personal computer being in a room where the television "actually" receives the signal. Not surprisingly, then, neither TMS's original nor its revised construction of "viewing location" say anything about "actually" receiving a television signal. TMS is, therefore, once again trying to: (1) rewrite the claims; and (2) modify its earlier proposed construction. Those efforts are inconsistent with controlling case law -- as well as this Court's Scheduling Order governing the proceedings in this case. *See TA Instruments, Inc. v. Perkin-Elmer Corp.*, 277 F. Supp. 2d 367, 375 (D. Del. 2003), *aff'd*, 97 Fed. Appx. 319 (Fed. Cir. 2004). (D.I. 27).

In any event, the precise language from the preamble of claim 1 on which TMS relies -- "a television distribution arrangement wherein a plurality of geographically dispersed television viewing locations receive television programming from a source of such programming" (D.I. 216 at 17) -- does not support TMS's argument. Whether the particular location "actually receives" a signal or is "capable" of receiving a signal (because a signal is provided to that location) is utterly irrelevant to the issue of positioning the television and the computer in the same room. Beyond that, the term "viewing location" also appears in claim 6

---

[4]    The implausibility of TMS's "same room" construction is evident from the deposition testimony of Dr. Tjaden -- TMS's technical expert. Initially, he declined to identify what he and TMS would consider to be a "room" -- be it a studio apartment, a loft space with or without partitions, or, perhaps, a single floor of a large house with an open floor plan (Ex. D at 27:4-29:22, 31:15-38:9). Ultimately, Dr. Tjaden offered the assertion that a "room" somehow could be defined as the distance over which the infrared signal of a remote control could travel (Ex. D at 34:3-37:12). TMS and its expert are simply making things up to do what it takes to avoid infringement.

and claim 8 *which do not include the preamble language of claim 1 at all.* (Ex. A at col. 7:5-19 and col. 7:26-8:16).[5]

TMS's arguments about the teachings of the specification also conflict with reality. The fact that the specification describes embodiments in which the computer and television are, in fact, located in different rooms confirms that the construction of "viewing location" *cannot* be limited to just the room where the television is located. *See Gart*, 254 F.3d at 1343.

### 2.    TMS Cannot Limit The Claims To A Preferred Embodiment

When TMS argues that the '078 patent is "directed to using a personal computer to control a VCR with infrared signals as depicted in Figures 1 and 2" (D.I. 216 at 18), TMS is, again, trying to limit the claims of the '078 patent to a single embodiment. That is impermissible as a matter of law. *See Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 966 (Fed. Cir. 2000) ("'[P]articular embodiments appearing in the specification will not be read into the claims when the claim language is broader than such embodiments.'") (citation omitted). In that regard, TMS's repeated mischaracterization of the claimed invention as being limited to embodiments involving the control of a VCR with infrared signals is just plain wrong. The words "VCR" or "infrared signal" are not used anywhere in asserted claims 1-8 or 10. TMS's expert even admits that the claims are not so limited. (Ex. D at 38:3-9; 45-46 and 48-49.) TMS simply cannot get past the express disclosure of embodiments in which the computer is located in a different room from the television.

---

[5]     As a matter of law, where the same claim term appears in different claims, that claim term has the same meaning for all claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). The preamble of claim 1 sets context for that particular claim -- but it has nothing to do with independent claims 6 or 8. The meaning of "viewing location" of claims 6 and 8, however, must apply equally to claim 1. Therefore, the preamble language cannot affect the meaning of "viewing location."

8

And, in any event, the specification -- in describing an embodiment that *does* involve a VCR -- discloses exactly the opposite of what TMS is suggesting. In at least one embodiment, the computer and recorder can be located in *two different rooms*, and the infrared transmitter can be replaced by a *radio* transmitter:

> The embodiment of the invention illustrated in FIG. 7 is utilized in systems where the cassette recorder 14 is located a large distance from the personal computer 18, such as *in another room of the house.* In this system *the remote I/R transmitter 26 is replaced by a radio transmitter 60.* (Ex. A at col. 6:13-16 (emphasis added)).

### 3.    TMS's "Prosecution History Estoppel" Argument Fails

Unable to come to terms with the plain words of the claims and the teachings of the specification, TMS asserts a flawed "prosecution history estoppel" argument. Specifically, TMS points to a statement made during prosecution of the '078 patent in which the applicant stated that the "claims include the limitation, in one form or another, of transmitting, from a computerized unit situated at a viewing location, information regarding geographical location" (D.I. 216 at 19). TMS argues that this is somehow an admission -- an estoppel -- that "in all claims, . . . the computer [is] situated at the location where the television is positioned and watched by the user, i.e., at the viewing location" (D.I. 216 at 19). TMS, however, does not and cannot explain how the applicant's arguments in which the phrase "viewing location" is used can possibly lead to a requirement that the computer *must* be located in the same room "where the television is positioned and watched by the user." Instead, TMS simply says it is so.

But, even a casual review of the statements made by the applicant during prosecution confirms that the applicant never restricted "viewing location" to the "specific room ... where a television set is positioned." And, the applicant certainly did not exclude the embodiment discussed above where the television is located in a *different room* from the computer. There is nothing in the prosecution history that limits the definition of viewing

9

location to one room.  As such, TMS's "prosecution history estoppel" argument has no factual basis.

That argument is legally unsustainable as well.  Arguments made during prosecution do not result in an estoppel absent "clear and unmistakable" surrender of the subject matter.  *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005).  There is nothing in the prosecution history to suggest that Mr. Levine clearly and unmistakably surrendered coverage of any method or system in which a computer is positioned in a different room than the television.

*          *          *

There should be no mystery about why TMS is proposing the definition of "viewing location" that it is now advancing.  TMS wants to make it as difficult as possible for TV Guide to prove infringement and entitlement to damages at trial.  Specifically, TMS hopes to argue that for *each one of* the millions of users of its infringing Zap2It.com website, TV Guide is required to prove whether or not the computer is in the same room as the television.  The plain words of the claims simply do not require TV Guide to do so.

**B.      Information ... Regarding/Pertaining To The Geographical Location/Area**

This term appears in various phrases in claims 1 and 6-8.  The parties' dispute is set forth below:

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| Claim 1: "Information . . . regarding the geographical location of a particular viewing location." (Ex. A at col. 6:49-53.) | "geographic information regarding the residence or other building at which a television signal can be received." | No construction provided. | "Any information, irrespective of how the information is encoded, that expressly indicates in geographic language (e.g., name of a continent, country, province, state, city, town region, street address, zip code, area code, etc.) the approximate portion of the planet in which a particular 'television viewing location,' as defined above, is located." |
| Claim 6 & 7: "Information . . . regarding the geographical area of the viewing location." (Ex. A at col. 7:13-16 and col. 7:21-24) | (same as above) | | |
| Claim 8: "information . . . pertaining to the geographic location of the television receiver." (Ex. A at col. 8:12-14) | "geographic information pertaining to the residence or other building at which a television receiver is located." | | |

As TV Guide explained in its opening claim construction brief, TV Guide's proposed definition is consistent with the intrinsic evidence and its definition of viewing location. (D.I. 205). The patent specification teaches, for example, that the "computer operator keys in *the postal ZIP code of his location*." (Ex. A at col. 3:52-54 (emphasis added).) This disclosure supports TV Guide's construction because a ZIP code designates a specific geographic location, such as a location of a building or residence. Elsewhere, the patent specification discloses that "geographic information" may be entered, for example, through the computer keyboard, and expressly identifies "zip code" as an example of "geographic information." (Ex. A at col. 6:8-10 and col. 5:41-42.)

Unlike TV Guide's straightforward and well-supported definition, TMS has proposed a definition for this claim limitation that includes lengthy phrases of extraneous

11

verbiage found nowhere in the intrinsic record. Having done so, TMS then makes the remarkable argument that TV Guide's proposed definition is "effectively no construction at all and provides no guidance to a jury regarding the proper meaning of this term." (D.I. 216 at 20-21).

As a preliminary matter, TMS should not be heard to complain that any proposed definition "is effectively no construction at all." TMS has apparently forgotten that, just a few days before the due date for submission of opening claim construction briefs -- and after more than a year of fact and expert discovery on claim construction issues -- TMS asserted that numerous claim terms for which TMS had previously proposed definitions should be construed according to their "plain and ordinary meaning." (Ex. X). As TV Guide explained in its opening brief, TMS's eleventh-hour withdrawal of its proposed construction is difficult to understand because TMS's technical expert had based his opinions on the specific definitions advanced by TMS. TMS's expert did not base his opinions on the so-called "plain and ordinary meaning."[6]

Beyond that, it is TMS's proposed definition -- not TV Guide's proposed definition -- that fails to provide guidance to the jury because that definition is incomprehensible and intentionally inconsistent. For example, TMS's definition refers to "information, irrespective of how the information is encoded" that "expressly indicates in geographic language." That makes no sense. TMS does not explain how information can, at the same time, possibly be "encoded" and "expressly indicate."

---

[6]     TMS is attempting to avoid having the Court pass judgment on TMS's proposed definitions now and instead, later seek to introduce testimony at trial from its expert that TMS's previously-advanced definitions are, in fact, the "plain and ordinary meaning." That is improper. When asked, TMS did not deny that this is its intention (Ex. Y). To avoid such a situation, TV Guide explained in its opening claim construction brief why the definitions proposed by TMS for these claim terms are legally incorrect. (D.I. 205).

12

And, TMS's overly-broad verbiage -- "e.g., the approximate portion of the planet" -- finds no basis in the intrinsic evidence.  Under TMS's definition, the information transmitted to the service provider could be extremely broad, *e.g.*, North America or the Northern Hemisphere, and would not provide any meaningful information which would allow the user to receive information specific to his location.  As the '078 patent specification teaches, the method of the claim involves "transmitting information . . . regarding the geographical location of a particular viewing location" *so as to* "receiv[e] . . . information specific to the type of programming available to the particular viewing location."  The specification describes this tie between the two steps:

> In the preferred embodiment of the invention the schedule information is provided to the personal computer 18 from a remote database 40 . . . .  This information may be customized for the cable service 38 available to the system through an initialization routine in which *the computer operator keys in the postal ZIP code of his location* and, if necessary, an identification of the cable service provider.  *The head end database uses this information to provide the computer 18 with the schedule of programming* for that service.  (Ex. A at col. 3:46-56 (emphasis added).)

Even TMS's own expert admits that a Zap2it.com user can obtain a television program grid "*for* [the] zip code and the program provider that [the user] selected."  (Ex. D at 51:13-15 (emphasis added).)  TMS's proposed definition, therefore, ignores the context of the entire claim.

Once again, there should be no mystery as to TMS's motivation for proposing its expansive "any information irrespective of how it is encoded ... that expressly indicates ... the approximate portion of the planet ..." construction.  In this instance, TMS is seeking to broaden the claim beyond the teachings of the intrinsic record so that it can argue at trial that the claims are invalid because they read on the prior art.  The claims do not read on the prior art, and TMS's efforts to rewrite them should be rejected.

13

C.    Modem

The term "modem" appears in independent claims 1, 6 and 8 of the '078 patent.

The parties' dispute regarding the term "modem" is set forth below:

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| Claim 1: "providing a computerized unit at the particular viewing location, the unit including an operator input and a *modem*" <br><br> Claim 1 & 6: "establishing a connection to a wide-area network through the *modem*" <br><br> Claim 6: "a controller interfaced to a bidirectional *modem*" <br><br> Claim 8: "establish a connection to a service provider through the *modem*" | "A data signal conversion device that connects data terminal equipment to a communication line." | "A device that converts digital signals to analog signals (and vice versa) and allows a computer to exchange data over a standard dial-up telephone line." | "A data signal conversion device that converts digital signals to analog signals (and vice versa) and allows a computer to exchange data over a standard dial-up telephone line." |

As TV Guide explained in its opening submission, TV Guide's construction of

"modem" is consistent with the intrinsic evidence and the understanding of one of ordinary skill

in the art. At the time the application leading to the '078 patent was filed -- during the very early

days of the Internet -- it was understood that the term "modem" encompassed several types of

devices and was not limited to a specific type of modem so long as it was a "data signal

conversion device that connects data terminal equipment to a communication line." (See Cole

Ex. A at ¶ 49 and n.30.[7]) Indeed, the specification discloses communication over "phone lines"

and "via cablecast or broadcast." (Ex. A at col. 3:57 and col. 3:65-66.) Accordingly, there were,

---

[7]    As used herein "Cole Ex. __" refers to the stated exhibit to the Affidavit of J. Tipton Cole, D.I. 206.

for example, dial-up modems, DSL modems, and cable modems. Each serves the function of connecting data terminal equipment -- *e.g.*, a computer -- to a communication line.

An authoritative contemporaneous technical dictionary confirms the definition proposed by TV Guide:

> "**modem (1) (data transmission)**  A contraction of MOdulator-DEModulator, an equipment that connects data terminal equipment to a communication line." *The New IEEE Standard Dictionary of Electrical and Electronics Terms (5th ed.)*, IEEE, 1993 (Cole Ex. A at ¶ 49 and n.30; and Ex. Z at TG194150).

In its brief, TMS criticizes TV Guide for its reference to this IEEE definition of "modem." In doing so, TMS refers to language from the Federal Circuit's decision in the *Phillips* case providing that "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Phillips*, 415 F.3d at 1321. According to TMS, TV Guide's reliance on the IEEE dictionary exemplifies the "problem" identified in *Phillips* where "there may be a disconnect between the patentee's responsibility to describe and claim his invention, and the dictionary editors' objective of aggregating all possible definitions for particular words." *Id.* TMS's argument in this regard is best described as audacious.

As a preliminary matter, the IEEE dictionary is not "divorced from the intrinsic evidence." It is fully consistent with the intrinsic evidence. Indeed, as stated above, the specification expressly teaches that communication need not be over phone lines.

Beyond that, TV Guide's use of the IEEE dictionary -- an authoritative document prepared by the Institute of Electrical and Electronics Engineers (which is the world's leading professional association for the advancement of technology) (Ex. Z) -- is exactly the type of reliance on dictionary definitions that the *Phillips* Court endorsed. The use of such sources is

15

encouraged as confirming the "accepted meanings of terms used in various fields of science and technology" -- particularly where, as here, they are *consistent* with the intrinsic evidence. *Phillips*, 415 F.3d at 1318.

And, TMS's criticism of TV Guide's reference to the IEEE dictionary is curious in light of TMS's own heavy reliance on snippets from a broad array of dictionaries in an effort to justify its proposed claim definitions. In a particularly interesting example of TMS's over-use of dictionary definitions, TMS cites to a dictionary definition of a different word -- "download" to propose a construction for the claim term "receive." TMS cites to no authority (and TV Guide is aware of none) endorsing the use of dictionary definitions of alleged "synonyms" to support a party's proposed construction.[8]

In its next attempt to unnecessarily limit the "modem" claim term to "standard dial up modems," TMS argues that the Federal Circuit has previously "resolv[ed] a similar claim construction dispute in *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1344-45 n.2, 1347 n.3 (Fed. Cir. 2004)" (D.I. 216 at 24). TMS's reliance on that *Microsoft* case is utterly unavailing. *Microsoft* involved a different patent with different claim terms defined in a different specification and a different prosecution history. The Federal Circuit's resolution of the meaning of "modem," as used by different inventors of different technology in different patents, is simply not relevant here.

Beyond that, in the *Microsoft* case, one of the claims at issue actually recited "'a modem connected to a *telephone line*,'" and another recited "'sending the outgoing packets to a remote site over a *telephone line* using a modem.'" 357 F.3d. at 1347 (emphasis added; citations

---

[8]     TMS itself relies on the IEEE dictionary. (D.I. 216 at 23). Unlike TV Guide, which relied on the first (and predominant) definition of "modem" in the IEEE dictionary, TMS made reference to the definition that was set forth as the *fifth* definition. Most importantly, the first definition is consistent with the intrinsic evidence; the fifth is not.

omitted). The *Microsoft* case, therefore, is a far cry from "a similar claim construction dispute" -- as TMS incorrectly describes it.

Once again, the reason why TMS is asserting its unsupported proposed definition for "modem" is readily apparent -- TMS is trying to make TV Guide's proofs at trial with respect to infringement and damages as cumbersome as possible. TMS intends to argue that it is somehow necessary for TV Guide to prove which of the millions of Zap2It.com users access the site with a dial-up modem as opposed to some other type of modem. As TV Guide explained above, there is no basis in the intrinsic evidence to limit the claims to dial-up modems. And, in any event, the Zap2It.com website *in all cases* permits access via a dial-up modem and would infringe even under TMS's far-fetched construction.

### D.    Transmit/Transmitting

TMS's accused Zap2It.com website permits electronic transmission of geographic information in at least two ways. When a user first accesses the website, he or she is instructed to enter his or her Zip Code as an indication of the geographic area for which television listings are sought. On subsequent visits, that Zip Code information may be electronically transmitted by way of a "cookie" on the personal computer that stored the geographic Zip Code information.

On October 16, 2006 -- the date on which the parties were required to identify terms that required construction and to provide definitions -- TV Guide advised TMS that its proposed definition for the "transmit/transmitting" limitation was "send/sending electronically." TMS, on the other hand, did not offer a proposed construction for the "transmit/transmitting" limitation and throughout fact and expert discovery, never expressed any serious disagreement with TV Guide's proposed definition.

As TV Guide explained in its opening claim construction submission, TV Guide's proposed construction is fully consistent with the intrinsic evidence. The claims discuss

17

"transmitting . . . through a wide-area network" (Claim 1 and 6) and "transmit[ting] the information . . . to the service provider" via a "modem" (Claim 8). The preferred embodiment discloses the use of a "personal computer" in which "the computer operator keys in the postal ZIP code of his location" and transmits that information to the "head end database." (Ex. A at col. 3:47-54.) Because the transmission of the "ZIP code" to the database is sent from a computer, it is clear from the '078 specification that the transmission of the ZIP code is accomplished electronically. Even TMS's own expert acknowledges that "[t]he transmission of information back and forth over the wide area network required by the '078 patent is electronic." (Ex. D at 144:21-23.) Thus, throughout fact and expert discovery, it appeared that TMS would not be disputing TV Guide's construction of this term.

In its *Markman* Brief, however -- which was filed a year after the Court-ordered deadline for identifying its proposed claim construction -- TMS presented arguments for the first time that the term "transmit/transmitting" must somehow be defined to require an "affirmative" indication of geographic information. As explained above, TMS concocted this construction to advance an argument that it has hinted at but not expressly disclosed -- namely, that the transmission of geographic information by a stored cookie on the user's computer during subsequent visits to the Zap2It.com website somehow does not constitute an "affirmative" indication.

TV Guide respectfully states that the Court should disregard TMS's argument because: (1) it is untimely and inconsistent with the Court's Scheduling Order; and (2) in any event, it is inconsistent with the intrinsic record.

The Court's March 10, 2006 Scheduling Order set forth procedures for claim construction discovery. Specifically, on October 6, 2006, the parties were required to identify the limitations of the '078 patent claims that required construction and to identify their respective

18

definitions for the claim terms. That procedure was put in place so that the parties could complete fact and expert discovery and proceed with claim construction and dispositive motion practice in an open and orderly fashion. TV Guide fully complied with the Court's Order; TMS did not (*see* D.I. 205 at 3-5). This Court has repeatedly declined to consider arguments belatedly presented by a litigant who does not comply with the term of the Court's Scheduling Order. *See, e.g., Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457 (D. Del. 2005); *Finch v. Hercules Inc.*, C.A. No. 92-251 MMS, 1995 WL 785100, at *9 (D. Del. Dec. 22, 1995); *Georgia-Pacific Corp. v. United States Gypsum Co.*, C.A. No. 94-489-RRM, 1996 U.S. Dist. LEXIS 22616, at *19 - 25 (D. Del. Dec. 27, 1996), *modified* 195 F.3d 1322 (Fed. Cir. 1999); *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 550-51 (Fed. Cir. 1998). TV Guide respectfully submits that the Court should do so here.

Even if the Court were to consider TMS's belated arguments about the "transmit/transmitting" limitation, those arguments should be rejected. There is nothing about TMS's proposed construction that adds clarity rather than uncertainty because TMS (perhaps deliberately) does not even explain what it means by "affirmative." For example, both the act of typing in a Zip Code and the transmission of Zip Code information by way of a stored cookie constitute affirmative transmission. The intrinsic record makes clear, as explained above, that transmission within the meaning of the '078 claims means simply to send electronically.

TMS's newly-advanced prosecution history estoppel argument with respect to the "transmit/transmitting" limitation -- like its other prosecution history estoppel arguments -- does not withstand scrutiny. The distinction being made by Mr. Levine about transmitting an affirmative indication of his viewing location was made to draw a contrast between certain features of the prior art Young patent that disclose downloading of program schedule information by way of a passive pull-down menu. (Ex. AA at TG002283). There were other distinctions as well. Nothing in the '078 prosecution history constitutes a "clear and

19

unmistakable" surrender of any type of electronic transmission such as the transmission of Zip

Code information by way of a stored cookie. *Pods, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1367-

68 (Fed. Cir. 2007), *cert. denied*, 2007 WL 266678 (U.S. Nov. 13, 2007).

> E.    Receiving

The term "receiv[ing], [ed], or [e]" appears in independent claims 1, 6 and 8 and

dependent claim 3. The parties' dispute regarding this term is set forth below.

| Claim Language | TV Guide's Proposed Construction | TMS's Initial Proposed Construction | TMS's Revised Proposed Construction |
|---|---|---|---|
| Claim 1, *e.g.*: "*receiving* . . . information specific to the type of programming available to the particular viewing location" (Ex. A at col. 6: 53-55). *See also* Ex. A at col. 6:41-42. | "receiving electronically" | "Having data transferred to a computer such that a user can manipulate the transferred data." | "Having data transferred to a computer such that a user can perform database-type manipulations directly on the transferred data without being connected to the original source of the data." |
| Claim 6, *e.g.*: "*receiving* . . . television programming information specific to the viewing location" (Ex. A at col. 7:16-18). *See also* Ex. A at col. 7:5-6. | Same as above | | |
| Claim 3: "information *received* from the service provider includes television programming available to a particular viewing location" (Ex. A at col. 6:59-62). | "received electronically" | | |
| Claim 8: "*receive* . . . the information specific to the type of television programming available to the receiver" (Ex. A at col. 8:15-17). *See also* Ex. A at col. 8:8-10. | "receive electronically" | | |

TV Guide's construction is consistent with the plain and ordinary meaning of the

term in the context of the patent. All of the claims refer to "receiving" information over a wide-

area network or another type of electronic device, which requires electronic reception. Indeed,

20

TMS's own expert agrees: "'reception' of data is inherently 'electronic'" (Ex. N at ¶ 82) and "transmission of information back and forth over the wide area network required by the '078 patent is electronic" (Ex. D at 144:21-23). Therefore, the term "receive" in the context of the '078 patent must be construed to mean "receive electronically."

Despite the admissions of its own expert, TMS advances its contrived definition adding unnecessary verbiage that finds no support in the intrinsic record. For example, TMS argues that the claim term somehow includes a requirement that the user must be able to perform database manipulations on a local computer. Beyond that, according to TMS, the users must *also* be able to do so "without being connected to the original source of the data." (D.I. 216 at 29).

As TV Guide explained in its opening brief, TMS's motivation for proposing its claim construction -- which is inconsistent with the intrinsic record and with controlling case law -- is readily apparent from the report and deposition testimony of TMS's expert on the subject of infringement.

## REDACTED

**REDACTED**

In view of Dr. Tjaden's testimony, it is difficult to imagine a more goal-oriented proposed construction.    TMS's construction imposes extraneous limitations on the term "receive" that, if adopted, would purportedly render the claim meaningless when applied to Zap2it.com -- or any other commercial product.    There is nothing in the intrinsic record to suggest that the term "receive" requires any database manipulations be performed, or that the patentee wished to depart from the plain and ordinary meaning and gave a special meaning to that term. (Cole Ex. A at ¶ 66).

        1.     **TMS's Dictionary Argument Is A Contrivance**

As stated above, TMS harshly criticized TV Guide for referring to the IEEE definition of "modem" to demonstrate the full consistency between the intrinsic evidence and that particular authoritative text.  After levying that criticism, TMS turns cartwheels picking and

22

choosing from a variety of disparate dictionary definitions trying to find some support -- any support -- for its definition of "receiving."

Specifically, TMS tries to piece together definitions from three separate dictionaries -- including the definition of "download" -- *which is not even the claim term at issue*. (D.I. 216 at 30-31). *This* is precisely the use of dictionaries that the Federal Circuit has criticized:  the Court does not "condone the adoption of a dictionary definition entirely divorced from the context of the written description." *Phillips*, 415 F.3d at 1321.

### 2.    TMS's "Prosecution History Estoppel" Argument Is Demonstrably Incorrect

The '078 patent issued from an application that is a continuation-in-part of U.S. Application No. 07/848,338 ("the '338 Application").  TMS cites to a portion of the prosecution history of the '338 Application -- *not* the '078 application -- as supposed support for its construction of the term "receiving" (D.I. 216 at 7).  Notably, that cited portion relates to a set of pending claims that are substantially different from the '078 claims at issue in this action -- none of those claims even include the term "receiving."

As a matter of law, statements made during the prosecution of a different application regarding different claim terms cannot be used to limit the claims at issue here. *Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333-34 (Fed. Cir. 2007); *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006).  If anything, the difference in terms indicates that the constructions ought to be different.

The '338 application claims are directed to a system for programming a video recorder.  In that system, a personal computer stores a database of future programming schedules and an application program allows the use of the database information for programming the video recorder.  Each of the '338 claims calls for "*a database of future programming*

*schedules*." For example, the two pending independent claims in the '338 application recite the

following:

> 1. (Amended) A system for programming a video recorder [of the type] having an electromagnetic remote control, for the [future,] unattended recording of programming from a video programming source connected to the <u>video</u> recorder, comprising:
>> a personal computer;
>> <u>means within said personal computer for storing</u> *a database of future programming schedules* <u>including information relating to program identification and start time;</u>
>> an electromagnetic radiation transmitter connected to an I/O port of the personal computer; and
>> an application program for the personal computer operative to cause generation of signals by said electromagnetic transmitter operative to program the video recorder to record a particular video program *in accordance with information contained within said database* <u>being selected by a user of said personal computer</u> [available to the video recorder on said source of said video programming at a particular future time].
>
> 10. (Amended) The method of programming a video recorder having an electromagnetic remote receiver to record programming available to the video recorder at a particular future time comprising:
>> connecting an electromagnetic transmitter to an output port of a personal computer; [and]
>> <u>storing in the personal computer</u> *a database of future programming schedules;* <u>and</u>
>> providing the personal computer with an application program which causes the output port to generate signals to said electromagnetic transmitter causing said video recorder to record [said] <u>a</u> program [at said particular future time] *selected from said database* <u>by a user of said personal computer.</u>

(Ex. B at TG000774 and TG000776 (italics added, underline in original)).

In connection with distinguishing the '338 invention from the cited Launey

reference, the applicant argued:

> Claims 1 and 10 have been amended to include means within the personal computer for storing a **database of future programming schedules.** . . . The Applicant respectfully submits that *this database*, in combination with the electromagnetic radiation transmitter already recited, **distinguish claims 1 and 10 over the prior art, including the Launey patent.**

(Ex. B at TG000780 (emphasis added); *cf.* D.I. 216 at 7).

There is no "database" limitation in the asserted claims of the '078 patent. As a matter of law, therefore, TMS's prosecution history estoppel arguments are inapplicable. Again, arguments made during prosecution lead to estoppel only where there is "clear and unmistakable" surrender of the subject matter. *Sorensen*, 427 F.3d at 1378-79. Even a casual review of the claims confirm that the subject matter of the '338 application is quite different from the subject matter of the '078 claims.

### 3.    TMS's Reliance On The *SciMed* Case Is Unfounded

The *SciMed* case on which TMS relies heavily is inapplicable. In *SciMed*, the statements at issue -- found in the specification -- were directed to *all* embodiments of the patent in suit. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337 (Fed. Cir. 2001). Here, on the other hand, the statements that TMS seeks to rely on -- found in the prosecution history of a parent application -- are directed to some particular, preferred embodiments, but not other embodiments. (D.I. 216 at 34).

TMS's attempted reliance on the prosecution history here finds no justification in *SciMed*. The claims that were pending in the earlier application cited by TMS *did not even include the word "receiving."* Those claims were directed to a different embodiment in which the subject matter was quite different from the subject matter of the '078 claims. These claims were not directed to "common subject matter" as TMS asserts. (D.I. 216 at 35). The claims of the '338 application and the claims that issued as the '078 patent were directed to different embodiments. This is confirmed by a comparison of the '078 patent claims and the '338 application claims on which TMS relies.

Thus, the "in all cases" language that TMS trumpets refers specifically to all of the '338 application claims which are directed to specific embodiments. The "in all cases" language does not refer to all of the embodiments in the '078 patent which were, by TMS's own

25

admission, prosecuted as different sets of claims in different applications. (D.I. 216 at 35). TMS

seizes on the language -- "the present invention" -- used by the patentee and argues that the

statements made in the '338 application apply equally to the claims that issued as the '078

patent. TMS's argument ignores a fundamental tenet of patent law. Each and every claim

defines a distinct invention. *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131,

1148 (Fed. Cir. 2004) (Newman, J., dissenting). The claims pending in the '338 application do

not use the word "receiving" and the claims of the '078 patent do not include the word

"database." A comparison of the claims confirms that there are many other differences as well.

They are directed to different inventions.[9]

Next, a review of the portions of the '078 patent cited by TMS further

demonstrates that TMS's reliance on the *SciMed* case is flawed. Nothing in those passages even

remotely suggests that in every embodiment of the '078 inventions, "data-base type

manipulations" can be performed "directly on the transferred data without being connected to the

original source of the data." For example, TMS cites the following passages from the '078

specification:

> The present invention allows the implementation of the electronic
> schedule memory and cursor-based programming ... (Ex. A at col.
> 1:54-55).
>
> Future programming schedule information may be provided to the
> personal computer from a remote database by telephonic communication,
> by broadcast, or by subscription provision of disposable memories. The
> schedule information may be displayed on the monitor of the personal
> computer under control of a database program allowing chronological,
> alphabetical or topical selection and the operator may move a cursor on

---

[9]    The remaining case law relied upon by TMS as supposed support for its restrictive claim
construction based on earlier arguments by the applicant are also inapplicable. In *Desper Prods.,
Inc. v. QSound Labs, Inc.*, 157 F.3d 1325 (Fed. Cir. 1998), and *Jonsson v. Stanley Works*, 903
F.2d 812 (Fed. Cir. 1990), the exact claim terms at issue were the subject of the applicant's
earlier argument. In *Wang v. Am. Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999), the same
embodiment of the invention was at issue. Neither situation is applicable here.

26

the display screen to point to a particular program to select it for future recording (Ex. A at col. 1:65-2:6).

The application program is loaded into the personal computer via a diskette or the like. The program requires as data the schedule of future programming available to the system 10 from a programming source 38, such as a cable or the like, for a particular period of time such as a week or month (Ex. A at col. 3:40-45).

Through use of a database program employing menus, submenus and the like, the operator may obtain a display of programming for a particular period of time, such as that illustrated at 46 in FIG. 1 (Ex. A at col. 4:1-4).

None of these passages in any way disclaim an embodiment in which data on a remote database can be manipulated. In fact, the second passage cited by TMS above expressly indicates that the database is, in fact, *remote*. The statements in the '078 specification relied upon by TMS are, therefore, a far cry from the types of disclaimers and strict characterizations made by the patentee in *SciMed*.[10]

## F.    The Controller Being Programmed To Control

The claim term "controller being programmed to perform" is self-explanatory and requires no elucidation or amplification. When the words of a claim are clear and readily understood, as a matter of law, there is no need for a Court to use different words to define them. *See Phillips*, 415 F.3d at 1314.

Here, once again, TMS is seeking to add extraneous verbiage -- this time a temporal limitation "computer application programs are installed on the controller prior to the use by a user to perform" -- to limit the scope of the claims in the hopes of manufacturing a

---

[10]    Like *SciMed*, the *SafeTCare* case relied upon by TMS is also directed to express disavowals in the patent specification, much different from the various embodiments of the '078 patent that TMS conflates in advancing its argument here. *See SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1270 (Fed. Cir. 2007) (holding that the description of the patent's "'pushing forces'" to be "'in contrast to conventional bed frames in which lift motors exert a pulling force against the frame'" was a disavowal of pulling forces from the scope of the claimed "pushing force"). No such express disavowals were made by Mr. Levine in the '078 patent specification, and therefore, *SafeTCare* is also inapposite.

27

noninfringement defense. TMS cites to nothing in the words of the claims, the patent specification or the prosecution history to justify this temporal limitation. Instead, TMS says that at trial, the retained expert will testify that it is so. The Federal Circuit has repeatedly held that "expert testimony" of this kind, which is unsupported by the intrinsic record is entitled to no weight: "a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'" *Phillips*, 415 F.3d at 1318 (citation omitted).[11]

As TV Guide explained in its opening claim construction submission, TMS's definition unnecessarily and improperly includes a time restriction on "being programmed to perform" by including the limitation "installed . . . prior to its use by a user to perform." This construction is inconsistent with the intrinsic evidence and inconsistent with how one of ordinary skill in the art would understand the claim language. For example, under TMS's definition, this limitation could be interpreted to mean that prior to a user even turning on his computer, specific computer programs would need to be installed. There is nothing in the patent that limits the claim term in that way. Even TMS's own expert admits that the specification does not explicitly require the time restriction proposed by TMS. (Ex. D at 71:14-72:7.)

The language of the term -- "being programmed" -- expressly allows the programming to take place concurrently with the performance of the steps. Indeed, it was common in the early 1990's, as it is today, for programs to be placed on a computer connected to

---

[11]   In this regard, TMS relies solely on a statement by its technical expert that "[a]t the priority date of the'078 patent (March 1992), personal computer application programs were completely installed on the personal computer before they began executing" (D.I. 216 at 40). This statement has been directly refuted by technical publications cited by TV Guide's technical expert. (Cole Ex. C at ¶ 37.)

a network as the computer is being used. (*See* Cole Ex. B at ¶¶ 121-123; and Cole Ex. C at ¶ 37, Exs. D, E, and F).

G.    **TMS's Withdrawn Definitions For Claim Terms**

As TV Guide has already explained (*see* D.I. 205 at 3-5 and *supra* pp. 1 and 18), just days before the parties were required to submit their opening claim construction submissions, TMS abandoned several proposed definitions that its expert relied on in his reports on validity and infringement issues. TMS stated, without explanation, that these terms should simply be defined in accordance with their "plain and ordinary meaning." TMS did so despite the fact that TMS and its expert -- throughout the course of fact and expert discovery -- never suggested that these claim terms were self-explanatory. Instead, TMS proposed specific, detailed definitions for the claim terms and TMS's expert applied those definitions when opining on validity and infringement.

TMS's last-minute withdrawal of its proposed constructions appears to be an attempt by TMS to avoid having the Court pass judgment on TMS's proposed definitions now and instead, later seek to introduce testimony at trial from its expert that TMS's previously-advanced definitions are, in fact, the "plain and ordinary meaning." That is not sound. In its opening brief, TV Guide explained why the definitions of these terms that had been adopted and applied by TMS' expert were inconsistent with the extrinsic evidence. To avoid unnecessary duplication of information, TV Guide identifies below the claim terms at issue in this regard and respectfully refers the Court to the portions of TV Guide's opening brief where TV Guide demonstrates that the construction applied by TMS's expert is improper.

- "Available to a particular one of the viewing locations" (D.I. 205 at 17-18);

- "Wide area network" (D.I. 205 at 27-29);

- "Operator input" (D.I. 205 at 29-31);

- "Receive information through the operator input" (D.I. 205 at 31); and

- "Schedule of the television programming" (D.I. 205 at 31-33).

TMS was completely silent on these claim terms in its opening brief and, therefore, TV Guide reserves the right to further address these claim limitations, if necessary.

## IV.    CONCLUSION

In view of the foregoing, TV Guide respectfully submits that the Court should adopt TV Guide's proposed construction and reject TMS's proposed construction.

OF COUNSEL:

Christopher J. Harnett
Ching-Lee Fukuda
Stuart W. Yothers
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

Ronald E. Naves, Jr.
Jeffrey A. Fehervari
Gemstar-TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, CA 90028
(323) 817-4600

Dated: November 21, 2007

Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Steven J. Fineman (#4025)
Richards, Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
moyer@rlf.com
fineman@rlf.com

*Attorneys for Plaintiffs TV Guide Online, Inc. and*
*TV Guide Online, LLC*

30

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

      Richard K. Herrmann, Esquire
      Mary B. Matterer, Esquire
      Morris James, LLP
      500 Delaware Avenue
      Suite 1500
      Wilmington, DE 19801-1494

I hereby certify that on November 21, 2007, I have sent by Federal Express and

electronic mail, the foregoing document to the following non-registered participant:

      Mark A. Pals, P.C., Esquire
      Kirkland & Ellis, LLP
      200 East Randolph Drive
      Chicago, IL 60601

                            Steven J. Fineman (#4025)
                            Richards, Layton & Finger, P.A.
                            One Rodney Square
                            P.O. Box 551
                            Wilmington, Delaware 19899
                            (302) 651-7700
                            fineman@rlf.com

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 29, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

      Richard K. Herrmann, Esquire
      Mary B. Matterer, Esquire
      Morris James, LLP
      500 Delaware Avenue
      Suite 1500
      Wilmington, DE 19801-1494

I hereby certify that on November 29, 2007, I have sent by electronic mail, the foregoing

document to the following non-registered participant:

      Mark A. Pals, P.C., Esquire
      Kirkland & Ellis, LLP
      200 East Randolph Drive
      Chicago, IL 60601

                              Steven J. Fineman (#4025)
                              Richards, Layton & Finger, P.A.
                              One Rodney Square
                              P.O. Box 551
                              Wilmington, Delaware 19899
                              (302) 651-7700
                              fineman@rlf.com