**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| TV GUIDE ONLINE, INC. AND TV GUIDE ONLINE, LLC,<br><br>    Plaintiffs,<br>    Counterclaim-Defendants,<br><br>    v.<br><br>TRIBUNE MEDIA SERVICES, INC.<br><br>    Defendants,<br>    Counterclaim-Plaintiffs. | )<br>)<br>)<br>)<br>)<br>)  C.A. No. 05-cv-725-***<br>)<br>)<br>)  **REDACTED**<br>)  **PUBLIC VERSION**<br>)<br>)<br>)<br>) |

**TV GUIDE'S ANSWERING BRIEF IN OPPOSITION TO TMS' MOTION**
**FOR SUMMARY JUDGMENT THAT THE '078 PATENT IS INVALID**

OF COUNSEL:

Christopher J. Harnett
Ching-Lee Fukuda
Stuart W. Yothers
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000

Ronald E. Naves, Jr.
Jeffrey A. Fehervari
Gemstar-TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, California 90028
(323) 817-4600

November 21, 2007

Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Steven J. Fineman (#4025)
Richards, Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
moyer@rlf.com
fineman@rlf.com

*Attorneys for Plaintiffs TV Guide Online,*
*Inc. and TV Guide Online, LLC*

# TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ..............................................................................................1

II.  NATURE AND STAGE OF THE PROCEEDINGS ......................................1

III.  SUMMARY OF ARGUMENT ......................................................................2

IV.  STATEMENT OF FACTS ..............................................................................3

    A.  Historical Events ....................................................................................3

    B.  Technological Facts ................................................................................6

        1.  TV Guide's Patent ......................................................................6

        2.  The Prior Art ..............................................................................7

        3.  The PTO Was Aware Of Both CompuServe And
            The Young Patent Before It Issued TV Guide's Patent ...................15

    C.  Response To TMS's Allegations ..........................................................18

V.  ARGUMENT ..................................................................................................25

    A.  TV Guide's Patent Is Valid ..................................................................25

        1.  The Governing Principles Of Law ............................................25

        2.  The Facts ...................................................................................27

        3.  TV Guide's Invention Was Not Obvious ..................................35

    B.  This Case Is Not Appropriate For Summary Judgment ........................38

        1.  The Governing Principles Of Law ............................................38

        2.  The Facts ...................................................................................39

VI.  CONCLUSION ..............................................................................................40

RLF1-3226730-1

# TABLE OF AUTHORITIES

**PAGE**

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*,
    402 U.S. 313 (1971)..............................................................................................................26

*Cont'l Can Co. USA Inc. v. Monsanto Co.*,
    948 F.2d 1264 (Fed. Cir. 1991) ........................................................................................32

*Crown Operations Int'l, Ltd. v. Solutia, Inc.*,
    289 F.3d 1367 (Fed. Cir. 2002) ........................................................................................30

*Custom Accessories, Inc. v. Jeffrey Allan Indus., Inc.*,
    807 F.2d 955 (Fed. Cir. 1986) ..........................................................................................26

*Dayco Prods., Inc. v. Total Containment, Inc.*,
    329 F.3d 1358 (Fed. Cir. 2003) ........................................................................................39

*Glaxo Group Limited v. Apotex, Inc.*,
    376 F.3d 1339 (Fed. Cir. 2004) ..................................................................................26, 27

*Graham v. John Deere & Co.*,
    383 U.S. 1 (1966)..............................................................................................................25

*KSR Int'l Co. v. Teleflex Inc., et al.*,
    __ U.S. __, 127 S. Ct. 1727 (2007)..........................................................................26, 36, 37

*Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*,
    322 F.3d 1335 (Fed. Cir. 2003) ........................................................................................30

*In re Newell*,
    891 F.2d 899 (Fed. Cir. 1989) ..........................................................................................32

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ........................................................................................39

*Sanofi-Synthelabo v. Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006)........................................................................................27

*Scripps Clinic & Research Found v. Genentech, Inc.*,
    927 F.2d 1565 (Fed. Cir. 1991) ........................................................................................39

*Truswal Sys. Corp. v. Hydro-Air Eng'g Inc.*,
    813 F.2d 1207 (Fed. Cir. 1987)........................................................................................36

*W.L. Gore & Assocs., Inc.* v. *Garlock, Inc*,
  721 F.2d 1540 (Fed. Cir. 1983) ................................................................................26

## STATUTES

35 U.S.C. § 103(a) .....................................................................................16, 25

35 U.S.C. § 282.................................................................................................26

## RULES

Fed.R.Civ.P. 56(c) ..........................................................................................38

RLF1-3226730-1

## I.    INTRODUCTION

TMS's brief is most remarkable for what it ignores.

First, it ignores an entire category of evidence bearing on the obviousness inquiry -- the historical factors surrounding the emergence of the invention, sometimes called the "objective criteria of patentability" -- that the Supreme Court has held is material to this inquiry and the Federal Circuit has held must be considered in any proceeding in which it is present.

Second, it ignores the special role that the statutory presumption of patent validity plays in a case, such as this one, where the prior art relied on by the party attacking the patent is the same prior art that the PTO considered before determining that the subject matter claimed in the patent was not obvious.

And, third, it ignores the testimony of TV Guide's expert, J. Tipton Cole, which refutes TMS's interpretation of the prior art on which TMS relies to argue obviousness.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

This action for patent infringement is now before the Court for determinations of: (1) claim construction issues; (2) TV Guide's motion for summary judgment (infringement); and (3) TMS's four motions for summary judgment (invalidity, noninfringement, no pre-suit damages, and no recovery of specified lost royalties).

This brief answers TMS's motion on invalidity issues. Concurrently with this brief, TV Guide is filing a consolidated brief that answers TMS's pre-suit damages and lost royalties motions, a second brief that answers TMS's noninfringement motion, and a third brief that responds to TMS's opening brief on claim construction issues.

TV Guide respectfully directs the Court's attention to pages 2-3 of TV Guide's Opening Claim Construction Brief (D.I. 205) for a summary of the procedural history of this case.

1

III.    **SUMMARY OF ARGUMENT**

1.    TV Guide's patent bears all of the hallmarks of patent validity:

a.    The claimed invention filled a long-felt need:  At the time of TV Guide's invention, there was a decade-old need for a system that would provide in real time, via computer, television programming information specific to the viewer's particular geographic location.

b.    Others had tried and failed to fill this need:  Their efforts are documented in the nine prior art references cited in TMS's interrogatory responses and expert report. CompuServe, in particular -- which was the preeminent online service provider of the 1980s -- could not fill this need.  In fact, CompuServe made a specific attempt to do so months after the priority date of the patent-in-suit -- and failed.  This fact, standing alone, is enough to defeat TMS's present motion.

c.    TV Guide's invention proceeded in a direction dramatically different from the one taught by the references on which TMS bases its motion.  TMS relies on CompuServe's experimental offering of select information from a select handful of newspapers for a year or so in the early 1980s.  TMS has not even shown that this experimental feature *actually* provided television program listings to users of CompuServe.  Assuming, *arguendo*, that it did, however, it did so by a user making a request to view an electronic page of an on-line newspaper -- not by a user transmitting information regarding the geographical location of the user's viewing location.  These are entirely opposite approaches.

d.    TV Guide's invention has been an enormous commercial success:  It has already garnered many millions of dollars in sales and advertising revenues.  It has displaced the prior art.

2

e.     TV Guide's invention has been recognized throughout the industry: Many of TV Guide's competitors have taken a license. These licenses have yielded many millions of dollars in royalties. Money talks. These royalties speak loudly as to the merits of TV Guide's invention.

f.     TV Guide's invention has been copied. TMS did not introduce its infringing system until after TV Guide had opened the market with its system. Imitation is the sincerest form of flattery. TMS's actions in the marketplace speak more persuasively than the words of its brief in revealing what it really thinks of the invention now before the Court.

g.     The best prior art was before the PTO. The prior art TMS relies on in its motion is the same prior art that the PTO found did *not* make TV Guide's invention obvious. All patents are presumed valid. This presumption can be overcome only by evidence that is clear and convincing. This burden is especially difficult to discharge when the prior art that is before the Court is the very same prior art that was before the PTO.

2.     This case is not one that is appropriate for summary judgment. Apart from the lack of its substantive merit, the motion fails because -- as detailed in the Statement of Facts section of this brief -- there are genuine issues as to facts that are material to the motion. Among many things, TMS's interpretations of the critical teachings of the prior art are contradicted by TV Guide's expert, J. Tipton Cole. TMS ignores these contradictions in its brief. They are sufficient by themselves to defeat the motion.

IV.    **STATEMENT OF FACTS**

A.     **Historical Events**

1.     The patented technology was developed during the early days of the Internet. This technology allowed a television viewer to access television listings for his or her particular viewing location using a computer. Prior to this invention, viewers had available only passive

3

program guides, *e.g.*, magazines, newspapers, and listings on television screens provided by the cable systems, to receive information about scheduled television programming. Because of the large number of television providers, the desired information was not always easily accessible or accurate for each viewer.

2.    The volume and inaccessibility of this information led Michael R. Levine, the inventor of the '078 patent, to come up with his invention in early 1992. Mr. Levine developed his television program guide technology after being increasingly frustrated with the technology available in the late 1980s and early 1990s that required repeated programming of his VCR Plus.

**REDACTED**

This led Mr. Levine to conclude that, by using a geographic identifier, *e.g.*, a ZIP code, one could determine an accurate channel line-up and television program schedule, which would be beneficial in a number of different ways (Ex. BB at 20:4-22:9[1]).

**REDACTED**

3.    Throughout the 1980s, various information providers became available to the public via home computers having dial-up modems, such as CompuServe, Prodigy, and The Source. With the development of the World Wide Web in the 1990s, more people began accessing information "on-line." With the growing popularity and use of the Internet and the

---

[1]    As used herein, "Ex. __" refers to the stated exhibit to the Declaration of Stuart W. Yothers, which is submitted herewith.

4

World Wide Web, traffic at online information sites like TVGuide.com and Zap2it.com grew over time. These websites succeeded where other television listings products had failed.

4.      For example, in 1989, Mark Kaplinsky and his wife founded Lookahead Communications, Inc. and developed its Personal Entertainment Guide ("PEG") product in the early 1990s. PEG allowed its users to register for a particular cable provider's listings in Manhattan by mailing in a registration postcard. At the time, Manhattan had only two cable providers (Ex. EE at 52:21-24). Lookahead then sent the user a diskette which enabled a computer to dial-in and retrieve the preselected listings on a regular basis. The PEG product had a limited number of users (*see* Ex. EE at 63:21-25). However, Lookahead was eventually contacted by CompuServe and asked to provide their service through CompuServe (Ex. EE at 64:11-15). In October 1992, Lookahead launched its PEG product with CompuServe (Ex. EE at 89:2-5). Although Mr. Levine had already applied for his patent, it was not yet issued, and therefore Lookahead was unaware of Mr. Levine's groundbreaking approach to handling the large volume of television listings information available on a national level. Instead, "much to [its] horror," Lookahead found "that there were 10,000 channel lineups, and [they] weren't going to be able to put out 10,000 files every week" (Ex. EE at 66:6-9). Having no idea how to process the large volume of television listings data, CompuServe and Lookahead chose to provide "national listings represented by what you might see on a satellite TV and 13 major demographic areas like Washington, D.C. and Baltimore and Philadelphia, Atlanta, Denver, Los Angeles, San Francisco, the largest 13 cities by demographic areas and then some of the outlying areas" (Ex. EE at 66:9-16).

5.      Eventually, CompuServe, Prodigy, The Source, and PEG fizzled-out. The World Wide Web was here to stay. TV Guide's and TMS's (albeit unlicensed) use of Mr. Levine's

5

patented technology thrust their websites to the top ranks (as measured by unique visitors, pageviews, and advertising dollars) as providers of television listings information based on geographic information.

## REDACTED

B.    **Technological Facts**

1.    **TV Guide's Patent**

1.    The Levine '078 patent discloses and claims a novel and nonobvious method of using a computer to "receiv[e] information *specific* to the type of *[television] programming* available to a *particular . . . viewing location*[]" (Ex. A at col. 6:41-43).

As outlined in claim 1 of the '078 patent, the object of this method is accomplished in four steps:

[a]    providing a computerized unit at the particular viewing location, the unit including an operator input and a modem; (Ex. A at col. 6:44-46)

[b]    establishing a connection to a wide-are network through the modem; (Ex. A at col. 6:47-48)

[c]    *transmitting*, from the computerized unit, *information* to a service provider through the wide-area network *regarding the geographical location of the particular viewing location*;  and (Ex. A at col. 6:49-52)

[d]    receiving, from the service provider, information *specific* to the type of programming available to the *particular* viewing location (Ex. A at 6:53-55).

2.    The '078 patent specification teaches that the invention may be implemented with a conventional personal computer that has been equipped with a special application program (Ex. A at 3:16-26).

6

3.      The '078 patent specification teaches that in the preferred embodiment of the invention "the [television] schedule programming information is provided to the personal computer from a remote database . . . " (Ex. A at col. 3:46-48 (internal reference numerals omitted)).   The patent goes on to say that the remote database "*may* constitute a database provider such as 'COMPUSERVE,' 'PRODIGY,' or the like" (Ex. A at col. 3:48-49 (emphasis added)).   Prior to Mr. Levine's invention, neither COMPUSERVE nor PRODIGY contained a television programming database that was searchable by reference to the geographical location of a particular viewer (*infra* pp. 7-14, ¶¶ 5-18).

4.      The '078 patent specification teaches that, in accordance with Mr. Levine's invention, the postal ZIP code of the geographic location of a particular viewer (together, in some circumstances, with the identity of the viewer's cable service provider) can be used to access television schedule programming information pertinent to a particular viewing location (Ex. A at col. 3:50-58 (internal reference numerals omitted)).   Claims 2 and 6 of the '078 patent require that the geographical location of the viewer be identified by the ZIP code associated with the viewer's location (Ex. A at 6:57-58 and 7:23-25).

## 2.      The Prior Art

### a.      *CompuServe*

5.      TMS treats CompuServe as if it were a specific, unique and unchanging system.   TMS does this by lumping together four different prior art references from four different years (1982, 1985, 1987 and 1990) to create on paper a single system that never existed in fact (Cole Ex. B at ¶ 21[2]).

------

[2]      As used herein "Cole Ex. __" refers to the stated exhibit to the Affidavit of J. Tipton Cole, D.I. 206.

6.    In fact, through the period relevant here, CompuServe was an evolving system.  In some respects, it expanded (Ex. FF at 9 ("Throughout the 1980s, CompuServe continued to expand, offering users more and better online service and communications opportunities.")).  In other respects, it contracted (Cole Ex. B at ¶ 21 and n. 5 ("The CompuServe newspaper options disclosed in the TODAY 1982 reference [relied on by TMS] are discussed in a 1983 book by Efrem Sigel, entitled, 'The Future of Video Text.'  As Sigel explains:  'A two-year experiment in videotext journalism involving the Associated Press (AP), 10 newspapers and CompuServe ended June 30, 1982.  With the experiment's conclusion, only three newspapers are continuing to provide CompuServe with electronic information.'")).

7.    Accordingly, in the sections that follow, we treat separately each of the four prior art references pertaining to CompuServe -- as CompuServe expanded and contracted over time.  The four references are:

- CompuServe Information Service Today, January 1982

- Online Today, January 1985

- Alfred Glossbrenner's Master Guide to CompuServe, 1987

- B. Schepp and D. Schepp, The Complete Guide to CompuServe, Osborne Mc-Graw-Hill, 1990

They will be identified as CompuServe (1982), CompuServe (1985), CompuServe (1987), and CompuServe (1990), respectively.

i.    *CompuServe (1990)*

8.    CompuServe was an on-line information utility and, in 1990, it was recognized as the "definitive" online service and the "most successful personal information service" in North America -- with easily accessible databases and services that were second to none.

8

CompuServe is the definitive online service. No other service comes close. CompuServe has more than a half million users and more interesting and practical databases and forums than any other service in the world. (Ex. FF at xxi).

\*                    \*                    \*

CompuServe is North America's most successful personal information service for computer users. CompuServe has watched competitors come and go from its perch at the top. Competitors try, but none has ever approached the success that CompuServe enjoys . . .

It's no wonder CompuServe is successful; it offers more than 1,400 databases and services, all accessible by the average computer user. If you use a computer for *anything*, you have enough computer savvy to sign on and use CompuServe. (Ex. FF at xxvii).

9.    Notwithstanding these encomiums, CompuServe (1990) was incapable of providing television programming information specific to a viewer's particular viewing location, in response to a transmittal of information identifying the viewer's geographical location.

24.    The CompuServe system does not, . . ., disclose at least the "transmitting" step of ['078 patent] claim 1 . . ., the "receiving" step of claim 1 . . ., the "zip code" limitation of claim 2, the "schedule" limitation of claim 3, the "displaying" step of claim 4, the "memory" limitation of claim 5, the "transmitting" step of claim 6 . . ., the "receiving" step of claim 6 . . ., the "viewing" step of claim 6 . . ., the "zip code" limitation of claim 7, the "receive" element of claim 8 . . ., the "transmit" element of claim 8 . . ., the second "receive" element of claim 8 . . ., or the "memory" element of claim 10.

25.    No CompuServe database or service delivered television programming information or a television schedule to the user based on the transmission of geographical information, as claimed by the '078 patent.

26.    The references on which Dr. Tjaden [TMS's expert] relies in describing the CompuServe system do not disclose the transmission of any geographical information – much less a ZIP code – by a user as part of a system or method for receiving television programming information . . . . (Cole Ex. B at ¶¶ 24-26).

ii.    *CompuServe (1982)*

10.    CompuServe Information Service Today, January 1982 ("Today (January 1982)") provides very little information concerning the CompuServe system as it existed at that time.

9

11.    Today (January 1982) reports that, in 1982, CompuServe had a "stable" of electronic newspapers in its database (Ex. GG at TMS0001078). "*The Columbus Dispatch* was the first newspaper to join CompuServe on July 1, 1980" (Ex. GG at TMS0001078). Today (January 1982) announced the addition of *The (Framingham, Mass.) Middlesex News.*

> In addition to The Middlesex News, the other newspapers and The Associated Press can be found under main menu item 1, Newspapers, and include *The Columbus Dispatch, The New York Times, The Washington Post, The St. Louis Post-Dispatch, The (Norfolk, Va.) Virginian-Pilot and Ledger-Star, The Atlanta Constitution and Journal, The Minneapolis Star and Tribune, The San Francisco Examiner, The San Francisco Chronicle* and *The Los Angeles Times.* (Ex. GG at TMS0001078 and TMS0001080).

CompuServe's "stable" of electronic newspapers was very small -- apparently never holding more than 11 newspapers.

12.    But Today (January 1982) provides no information as to whether the online editions of any of the newspapers in CompuServe's database contained television programming information specific to the many different television viewing venues encompassed by a single newspaper. Such information is conspicuous by its absence. Today (January 1982)'s write-up on *The Middlesex News* -- the newspaper identified in the lead-in paragraph quoted above -- is as follows:

> *The Middlesex VideoNews*, as the electronic edition is called, is covering the Boston–Eastern Massachusetts area with sections on restaurants, theaters and movies, sports, breaking national and state news, personal columns, Classified Advertising and a special section with emphasis on local news mirroring its printed pages. (Ex. GG at TMS0001079).

There is no reference here to television or to television programming information of any kind. There is no reference anywhere in Today (January 1982) to any geographically based television programming information. And, it is noteworthy that even this limited "experiment in videotext journalism involving the Associated Press (AP), 10 newspapers and CompuServe ***ended***

10

*June 30, 1982*" (Cole Ex. B at ¶ 21 and n. 5 (internal quotation marks omitted) (emphasis added)).

13.    *The bottom line* on CompuServe (1982) is that it was incapable of providing television programming information specific to a viewer's particular viewing location, in response to a transmission of geographic information identifying the viewer's location.

14.    This conclusion holds true even if one assumes for the sake of argument (and contrary to the record) that the online editions of the newspapers in CompuServe's database included television programming information. This is so because such information specific to a viewer's location could not be obtained in response to a search request based on the geographical location of the viewer. A keyword search request would only return any newspaper, among other things, that happened to contain the keyword -- nothing more. This information is not television programming information specific to a viewer's particular viewing location.

15.    To be specific:

•    In 1982, CompuServe's interface permitted a user to navigate to a particular section of a newspaper through a hierarchical menu system. CompuServe would display a list of items, each associated with a number (Ex. HH at 22:8-18). Selecting an item would either produce a submenu or the desired page of information. For instance, to navigate to *The New York Times* from the starting screen, a user would type "1" (Newspapers) followed by "2" (*The New York Times*) (Ex. II at TMS0001074). This process did not involve the transmission of geographical information identifying a television viewer's particular location. The geographical area through which *The New York Times* is distributed is virtually nationwide. Even the "local" edition serves three states and encompasses many television programming distribution schemes. Moreover, TMS has not proffered any evidence establishing (or even

11

tending to establish) that the 1982 online version of *The New York Times* available on CompuServe's database contained television programming information.

• In 1982, CompuServe provided an alternative means of locating a newspaper section through its "GO" command. Content in CompuServe was associated with unique page numbers (e.g., "SFC-7") akin to file names (Ex. HH at 25:22-26:2; and Ex. JJ at 173:15-24). Using the GO command in conjunction with a page number acted as a shortcut, resulting in the immediate retrieval of the desired page (Cole Ex. B at ¶ 28). Use of the GO command did not constitute the transmission of geographic information identifying a specific viewing location. A page number was not geographic information, it was a shortcut term useful in selecting an item from menus on lists on the CompuServe database (e.g., a particular section of the *San Francisco Chronicle*). As explained by Mr. Cole:

> 28. ...user entry of such a shortcut term or keyword is not the same as transmission of geographic information from the user to the service provider. The user is not entering geographic information (e.g. San Francisco), but instead the shortcut term for what the user wants (i.e., the page[6] named "SFC-7"). Dr. Tjaden's [TMS's expert's] assertion that "The number '7' is the number of the CompuServe page within the San Francisco area database" is purely supposition. None of the references on which he relies teaches the deconstruction of what Schepp describes as a (single, unified, coherent, undifferentiated) "page number."
>
> > [6]Schepp at 26, "If you select the option Today's News from the Monitor menu you will see the page number OLT-90, shown in Figure 2-3." The CompuServe screen display in Figure 2-3 bears the legend "CIS:OLT-90" at the bottom. *See also* Schepp at 321-323. The "GO" word is a command that the user employs to "move directly to the page or menu" of his choice. *Id.* at 50.
>
> (Cole Ex. B at ¶¶ 27-28 and n.6; *see also* Ex. JJ at 172:13-16 and 173:15-24).

Likewise, the page number was not "encoded" geographic information. CompuServe did not "decode" the page number or map it to a geographic location. Again, as explained by Mr. Cole, "a person of ordinary skill in the art would understand that the CompuServe system treated the entry 'SFC-7' as a pointer to a page, NOT as geographic information" (Cole Ex. B at ¶ 29).

• In 1982, CompuServe had a "FIND" command. But this command did not enable the viewer to obtain television programming specific to the viewer's particular viewing location, in response to a transmission of geographical information identifying the viewer's location. The FIND command acted only as a keyword search, returning services or databases related to an entered search term (e.g., "Find Hampton Road") (Ex. HH at 23:1-4 and 23:20-24). There is no documentation as to the nature of databases that might have been searched via this command or the results that might have been obtained. The only suggestion that a FIND search would yield a television schedule is the speculation of Mr. Berkov that a user would be presented with a listing similar to the CompuServe Information Service subject index. But, there is no evidence that even this was so (Ex. HH at 26:9-14). Moreover, Mr. Berkov never testified to having ever carried out such a search. Most importantly, such a search would not produce television programming information specific to the viewer's location in response to a transmission of geographical information identifying the viewer's location.

### iii.    *CompuServe (1985)*

16.    Online Today (January 1985) reports that by this time CompuServe had added a new searchable database containing various categories of demographic data (Ex. KK at TMS0054629). There is no reference in this 1985 report to television programming information. There is no reference in the report to a means or method of providing television programming information specific to a viewer's particular viewing location, in response to a transmission of information identifying the viewer's geographical location (Cole Ex. B at ¶¶ 15-17 and 24-25).

### iv.    *CompuServe (1987)*

17.    Alfred Glossbrenner's Master Guide to CompuServe (1987) reports that by 1987 CompuServe had added travel services to its database (Ex. LL at TMS0054635). There is no reference in the full report to television programming information. There is no reference in

13

the report to a means or method of providing television programming information specific to a viewer's particular viewing location, in response to a transmission of information identifying the viewer's geographical location (Cole Ex. B at ¶¶ 15-17 and 24-25).

### b.    *The Young Patent*

18.    Young patent 4,706,121 is directed to a means and method for programming a VCR to record specific television programs in a viewer's absence:

> This invention relates to an electronic system and a process for controlling a television set to present programs selected in advance from a schedule by a user. More particularly, it relates to such an electronic system and process which allows the user to make the broadcast program selection using selection criteria that can be combined in different ways. Most especially, the invention relates to such an electronic system and process which receives the schedule information in broadcast form and then processes the schedule information to make the selections. The invention further relates to a system that will enable a user to program a video cassette recorder (VCR) for unattended operation by making a simple selection from a menu. (Ex. MM at col. 1:11-24).

19.    The patent describes in full two methods of transmitting scheduling information. Both involve broadcast and are described by a substantial volume of text in the patent's specification. The first is via FM (Ex. MM at col. 6:18-59). The second is via a normally unused portion of the TV frame (Ex. MM at col. 6:60-7:32). As an alternative to FM or TV broadcast, Young suggests in the last paragraph of the patent specification preceding the claims that schedule information *might* be obtained from an information utility such as CompuServe (Ex. MM at col. 21:65-22:26).

20.    TMS concedes that Young does not expressly disclose the "transmitting ... information regarding the geographic location of the particular viewing location" step of each of TV Guide's asserted claims. Instead, TMS argues that this step is inherent in Young. As TV Guide explains in detail below, TMS is mistaken.

14

21.    **The bottom line**:    Young does not disclose a method or system of obtaining television programming information specific to a viewer's particular viewing location, in response to a transmission of geographical information identifying a viewer's location (Cole Ex. B at ¶ 39).    Likewise, the combination of Young and CompuServe does not either.    As pointed out above, CompuServe, like Young, was incapable of providing such television programming information in response to a transmission of geographical information.    Because of the deficiencies in the CompuServe references, the Young reference, which refers to some indeterminate CompuServe system, cannot invalidate the '078 patent -- either alone or in combination with CompuServe (Cole Ex. B at ¶¶ 41 and 45).

### 3.    The PTO Was Aware Of Both CompuServe And The Young Patent Before It Issued TV Guide's Patent

22.    The application that ultimately issued as the '078 patent was filed October 9, 1997 by Gemstar Development Corporation, now an affiliate of TV Guide.    (For simplicity, we refer to both companies as "TV Guide.")    This application was a "continuation-in-part" of three earlier-filed applications -- one of which has issued as U.S. patent 5,692,214.

23.    After filing, the examination of TV Guide's patent application by the United States Patent and Trademark Office (the "PTO") proceeded in the normal course.

24.    In a Preliminary Amendment filed with the application on October 9, 1997, TV Guide cancelled the sole claim carried over from an earlier-filed application and added new application claims 19-28 (Ex. NN at TG001829-33).    The new claims correspond exactly to claims 1-10 of the now issued '078 patent.

25.    In an Office Action mailed July 29, 1998, the PTO rejected application claims 19-28 on the ground that the subject matter they seek to protect was obvious in light of

15

prior art cited by the Examiner and is therefore unpatentable under 35 U.S.C. § 103(a) (Ex. OO at TG001834-35).

26.    In an Amendment filed December 7, 1998, TV Guide distinguished the prior art cited by the Examiner and argued that the subject matter covered by the pending claim was not obvious (Ex. PP at TG002252-56).

27.    In an Office Action issued February 19, 1999, the PTO responded with a new rejection of the pending claims. Claims 19-28 were rejected under 35 U.S.C. § 103(a) for obviousness in light of Young U.S. patent 4,706,121 (Ex. QQ at TG002257-59).

28.    The Young patent cited by the PTO against TV Guide's patent application claims is the same Young patent that TMS relies on now to contend the subject matter of the '078 patent claims was obvious. This Young patent identifies in its specification the same CompuServe system that TMS also relies on now, together with Young, to contend that the subject matter of the '078 patent was obvious (Cole Ex. B at ¶¶ 41 and 45).

29.    In rejecting TV Guide's patent application claims as unpatentable over the prior art, the PTO cited both to Young and to the CompuServe system cited in Young. The PTO also took notice of the citation to this CompuServe system in TV Guide's own application:

Claims 19-28 are rejected under 35 U.S.C. § 103(a) as being unpatentable over *Young*, U.S. Patent Number 4,706,121.

As to claim 19, *Young* teaches in a television distribution arrangement, a method of receiving information specific to the type of programming available to a particular viewing location, the method comprising the steps of:

providing a computerized unit (personal computer – col. 22, lines 1-9; system control unit 106 with CPU 110–Fig. 3) at the particular viewing location, the unit including an operator input (inherent to personal computer, e.g. keyboard; remote control 116– Fig. 3);

transmitting, from the computerized unit, information to a service provider *(Compuserve or The Source–col. 22 lines 1-9)*

16

regarding the geographic location *(locality–col. 22 lines 1-9)* of the particular viewing location; and

receiving from the service provider, information *(schedule information–col. 22 lines 1-9)* specific to the type of programming available to the particular viewing area.

While *Young* does not explicit [sic] teach establishing a connection to a wide-area network through a modem, such a step is inherent to accessing a service provider *(Compuserve–col. 22 lines 1-9)*. Moreover, the applicant's specification teaches establishing a connection to a wide-area network in a similar indirect manner *(Compuserve -- page 8)*. Therefore *Young* teaches the invention as claimed in claim 19.

[The rejection continues, addressing the remaining claims, claims 20-28.] (Ex. QQ at TG002259-60).

30.    In a Response to Office Action, TV Guide set forth reasons why the PTO Examiner was mistaken to reject the claims based on the Young patent. It set forth reasons why the subject matter of the application claims (the claims that are now in the issued '078 patent) was not obvious and why the claims are patentable over the prior art. TV Guide points out the patentable distinctions between (a) its invention and (b) Young, CompuServe, and the combination of Young and CompuServe.

Claims 19-28 stand rejected under 35 U.S.C.§ 103(a) as being unpatentable over Young ('121 of record). Applicant respectfully disagrees with the Examiner's interpretation of the Young patent, and submits that obviousness is precluded in this case.

*All of Applicant's independent claims include the limitation, in one form or another, of transmitting, from a computerized unit situated at a viewing location, information regarding geographical location.* The Young patent does not disclose or suggest such a limitation. *The Examiner argues that the Young patent teaches "transmitt[al of], from the computerized unit, information to a service provider (CompuServe or The Source-- col. 22 lines 1-9) regarding the geographic location (locality-- col. 22 lines 1-9) of the particular viewing location." However, retrieval of information from a database does not, by definition, include or even suggest transmittal of a viewer's geographic location. The '121 patent describes the process of "download[ing] the program schedule information for his or her locality" (Young patent-- col. 22, ln. 5-7). This description does not imply transmitting particular geographical location information.* Most database applications allow a user to passively select

17

information from a list/menu, or to search a database without transmitting location-specific information. Such applications provide choices from which a user may select without transmitting a request.

In contrast, Applicant's claim 19 clearly sets forth the active ***transmittal*** of "geographical location of the particular viewing location." This language explicitly requires data transmission from the user "to a wide-are-network through [a] modem" before retrieval of the desired information can occur. The user of Applicant's device must transmit an affirmative indication of his viewing location before receiving programming data. Although the Young patent specification considers user inputs to a "utility's mainframe for running a selection program on the mainframe" (col. 22, ln. 3-4), and this may occur via a modem, it does not require a user's geographical input.

Since it is Applicant's position that all of the independent claims distinguish over the Young patent, Applicant need not argue the dependent claims separately. . . . (Ex. AA at TG002282-83 (underscoring in original, bold italics added)).

31. The PTO agreed. On June 21, 1999, the PTO issued a Notice of Allowability (Ex. RR). This Notice includes an "Examiner's Amendment" -- in which the PTO Examiner, on his own initiative, changed the title of TV Guide's patent application (and subsequent patent) in order to spotlight the importance to the invention of the transmission of the geographical location of the viewer.

Pursuant to MPEP 606.01, the title has been changed to read:

– METHOD AND APPARATUS FOR RECEIVING CUSTOMIZED TELEVISION PROGRAMMING INFORMATION BY *TRANSMITTING GEOGRAPHIC LOCATION* TO A SERVICE PROVIDER THROUGH A WIDE-AREA NETWORK – (Ex. RR at TG00287 (emphasis added)).

32. ***The bottom line: The '078 patent did not issue until the PTO had considered and dismissed the prior art and the arguments that TMS relies on here.***

## C.    Response To TMS's Allegations

The numbered paragraphs that follow correspond to the numbered paragraphs in the Statement of [Allegedly] Undisputed Facts section of TMS's brief (D.I. 215 at 3-9).

3.    Disputed. The '078 patent claims speak for themselves. They call for a method and system for providing television programming information specific to a viewer's particular viewing location, in response to a transmission of geographical information identifying the viewer's location (Ex. A at col. 6:37-8:27).

5.    Disputed. The patent specification discloses that the schedule information is provided from a remote database. There is no further limitation. The information *may* be provided by a database provider. This database provider *may* be a commercial service, such as CompuServe. The only requisite is a remote database containing the schedule information (Ex. A at col. 3:46-49).

6.    Disputed in three respects:

a.    Though television programming information existed on CompuServe in 1982, there is no evidence that it continued past June of that year. Mr. Cole pointed to a 1983 text which revealed that the "experiment in videotext journalism involving the Associated Press (AP), 10 newspapers and CompuServe ended June 30, 1982." Though three newspapers continued to provide electronic information to CompuServe, there is no evidence that these newspapers provided television programming information (Cole Ex. B at ¶ 21 and n. 5).

b.    Dr. Tjaden admitted never having used the newspaper access feature of CompuServe and having no knowledge as to how television programming information would be displayed to a user (Ex. D at 213:19-214:2 and 215:15-24).

c.    Mr. Berkov spoke of two speculative ways of accessing television programming information (Ex. HH at 23:22-24 and 26:23-25). Neither involved a transmission of information identifying the geographical location of the viewer:

19

i)    Using the FIND command. Upon entering a keyword, "[t]he user would get back a list of those services or databases on CompuServe that were somehow related to the particular search term."

ii)    Using the "database identifier." A user "might have, if they knew it, done a GO command of VPL-7, which would have taken them directly to this listing."

This is not geographical information (*see infra* p. 24, ¶ 20).

7.    Disputed in two respects:

a.    Mr. Cole did not "admit[] in his expert report that CompuServe implements the '078 patent claim." In his report, Mr. Cole states: "I understand that TMS has asserted that 'zap2it.com neither operates nor is practiced in a television distribution arrangement.' The Claim, however, is referring to the distribution of television programming to dispersed geographic locations. I note that the patent describes the claimed method as being implemented, for example, by a service provider such as CompuServe which was not itself a distributor of television programming" (Cole Ex. A at n. 23; and Ex. A at col. 3:46-49). As Mr. Cole explains, this statement is in response to a TMS assertion that zap2it.com is incapable of implementing the invention. TMS argues that this is because zap2it.com does not operate or practice a television distribution arrangement. In response, Mr. Cole explains that the distribution of television programming is not required of a service provider. To be capable of implementing the patent, a service provider need only offer a remote database containing schedule information (*see supra* p. 19, ¶ 5). Mr. Cole never states that CompuServe possessed such a database in 1992 or earlier. Mr. Cole only recognizes that it *could* possess such a database and may in fact have such today (*see infra* p. 21, ¶ 7b).

b.    Mr. Levine did not admit or imply that CompuServe implemented the '078 invention in 1992.

**REDACTED**

20

**REDACTED**

Mr. Levine's point is that he did not know whether CompuServe had a database of television programming information. It is illogical to suggest Mr. Levine implicitly admitted that CompuServe implemented the invention, immediately after explicitly stating that he had no knowledge of any CompuServe database with television programming information.

**REDACTED**

In this context, the fragment TMS excerpts from the deposition had been removed from its context. Mr. Levine is not asserting that CompuServe had television programming information. Mr. Levine is describing the initialization routing *if* CompuServe had television programming information. Mr. Levine's deposition continues with the testimony below.

21

**REDACTED**

10.    Disputed.   In the citation referenced by TMS, Mr. Cole states that the patent assumes one practicing the patent has access to a database of television programming information. He does not state that CompuServe provided such a database.

11.    Disputed in two respects:

a.    The patent specification discloses that the schedule information is provided from a remote database.   There is no further limitation.   The information *may* be provided by a database provider.   This database provider *may* be a commercially available system, such as CompuServe.   The only requisite is a remote database containing the schedule information (Ex. A at col. 3:46-49; *see also supra* p. 19, ¶ 5).

b.    The '078 patent discloses searching by geographical locations, specifically by ZIP code (Ex. A at col. 3:52-53).

22

12.    Disputed. The '078 patent states that in order to implement the invention a personal computer needs to be "provided with a special application program . . . [which] is well within the skill of a programmer" (Ex. A at col. 3:22-25).

13.    Disputed. *See supra* p. 22, ¶11.

14.    Disputed. The specification of the Young patent discloses accessing schedule information through an information utility. One cited example of an information utility is CompuServe. The patent does not claim that CompuServe ever actually provided such information, much less by geographic location:

> "For example, the schedule information could be accessible with a personal computer through an information utility, such as Compuserve or The Source, and the user could either make the selection inputs to the utility's mainframe for running a selection program on the mainframe and then download the selected program information, or download the program schedule information for his or her locality, then run the selection program with the downloaded program schedule information on the personal computer." (Ex. A at col. 21:67-22:9).

Young does not furnish a system by which television programming information specific to a viewer's particular viewing location is provided in response to a transmittal of geographic information identifying the viewer location (Cole Ex. B at ¶ 39).

16.    Disputed. *See supra* p. 23, ¶ 14.

19.    Disputed. Nowhere in the Office Action response does TV Guide distinguish the invention from Young based simply on "affirmative indications." TV Guide states correctly that the user of the invention "must transmit an affirmative indication *of his viewing location*." TV Guide similarly states that the invention discloses "the active *transmittal* of 'geographic location of the particular viewing location.'" The distinguishing characteristic is not transmission of an affirmative indication, it is transmission of an affirmative indication *of a viewing location*. (Ex. AA at TG002283).

23

20.    Disputed.   The method of selection described in Dr. Tjaden's Validity Report (e.g., "GO SFC-7") does not constitute transmission of an affirmative indication *of geographic information*.   As Mr. Cole explains in his Validity Report and in his deposition, CompuServe permitted the entry of a page number in the system as a shortcut to retrieving information.   This page number is distinct from the geographic information required by the patent (Cole Ex. B at ¶ 28 ("The user is not entering geographic information (e.g., San Francisco), but instead the shortcut term for what the user wants (i.e., the page named 'SFC-7').'"); and Ex. JJ at 172:13-16, 173:7-24 ("As I explained in the report here the SFC-7 is what is called in the CompuServe system a page number or page name.   It designates a page in the system.   You might think of it as a separate file that is sitting out there.   It would be the name of the file.   Within the system that you're talking about in the CompuServe system it's not geographical information, it is the name of the page.")).

22.    Disputed.   TMS misrepresents Mr. Cole's answer.   Mr. Cole stated that one of the key aspects of the '078 invention is "having a user provide some geographic information that the service provider then employs to limit the universe of possible programming."  Mr. Cole does not state that the filtering function is the nub of the invention.   It is the *transmission of geographic information by the user* in combination with the actions of the service provider that Mr. Cole cites as one of the keys to the invention.   This is the same feature (transmission of geographic information) that TV Guide relied on during the USPTO prosecution of the application for the '078 patent in order to distinguish Mr. Levine's invention from the prior art Young patent (Ex. JJ at 126:1-18; and Ex. AA at TG002283).

28.    Disputed.   Mr. Cole did not admit that one skilled in the art would know television programming information could be retrieved from databases.   He agreed with the

24

unremarkable proposition that, *given the existence and knowledge* of such a database, one skilled in the art would know information could be retrieved from it. The question posed to Mr. Cole was "One of ordinary skill in the art who knew about database retrieval in the 1991 to 1992 time frame would in fact know that television listings could be retrieved from a database *if there were a database that existed of television listings*, correct?" (Ex. JJ at 180:8-14 (emphasis added)). Mr. Cole was asked to assume that a database of television listings existed. Given this assumption, the question is essentially a tautology.

## V.    ARGUMENT

### A.    TV Guide's Patent Is Valid

#### 1.    The Governing Principles Of Law

Obviousness (35 U.S.C. § 103(a)) is a factually intensive defense. Although the ultimate issue is one of law, the "[35 U.S.C. § 103(a)] condition ... lends itself to [four] basic factual inquires." *Graham v. John Deere & Co.*, 383 U.S. 1, 17-18 (1966). They are:  (1) the scope and context of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) the historical circumstances surrounding the emergence of the invention.

> In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966), the Court set out a framework for applying the statutory language of § 103, language itself based on the logic of the earlier decision in *Hotchkiss v. Greenwood*, 11 How. 248, 13 L. Ed. 683 (1851) and its progeny. See 383 U.S., at 15-17, 86 S. Ct. 684.. The analysis is objective:

> "Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are be ascertained;  and the level of ordinary skill in the pertinent art resolved.  Against this background the obviousness or nonobviousness of the subject matter is determined.  Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Id.*, at 17-18, 86 S. Ct. 684.

> *While the sequences of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls.*

*KSR Int'l Co. v. Teleflex Inc.*, __ U.S. __, 127 S. Ct. 1727, 1734 (2007) (emphasis added).

The Federal Circuit has pointed out that, of the four factors, the last may be the most probative. It must be considered in all cases where it is present. It provides objective evidence of the stature of the invention. It is a safeguard against the kind of "hindsight" reasoning whereby every invention becomes obvious as soon as it has been made:

B.    *Ignoring Objective Evidence Of Nonobviousness*

> [T]he district court seemed to ignore the concrete evidence of copying and commercial success. Failure to consider such evidence is clearly error.
>
> Under *Graham*, objective evidence of nonobviousness includes commercial success, longfelt but unresolved need, failure of others, and copying. When present, *such objective evidence **must** be considered. It* can be the most probative evidence of nonobviousness in the record, and *enables the district court to avert the trap of hindsight.*

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986) (footnotes omitted) (vacating and remanding judgment of invalidity); *see also KSR Int'l Co.*, __ U.S. __, 127 S. Ct. at 1739. *See generally W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983) ("To imbue one of ordinary skill in the art with knowledge of the invention in suit, when no prior art . . . convey[s] or suggest[s] that knowledge, is to fall victim to the insidious effect of a *hindsight* syndrome wherein that which only the inventor taught is used against its teacher.") (emphasis added).

A patent is presumed valid. 35 U.S.C. § 282 (2001). By virtue of this presumption, patentees are "heavily favored as a class of litigants." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 335 (1971). This presumption may be overcome only by evidence that is both clear and convincing. *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1348 (Fed. Cir. 2004). "This burden [the burden of establishing invalidity by clear and

26

convincing evidence] is 'especially difficult' when, as in the present case, the infringer attempts to rely on prior art that was before the [PTO] patent examiner during prosecution." *Id.*; *see also Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1375 (Fed. Cir. 2006).

## 2.    The Facts

### a.    *The Scope And Content Of The Prior Art*

There are genuine, material disputes between the parties concerning the prior art and its teachings.

#### i.    *CompuServe*

The parties are in sharp disagreement over the nature of the CompuServe system that TMS treats as prior art and even as to whether the system described in TMS's brief ever, in fact, existed.

The CompuServe system described by TMS did not exist in fact. CompuServe was an evolving system. Over time, it expanded in some respects and contracted in others as it constantly added and discarded features and capabilities. The CompuServe system described in TMS's brief is a synthetic one, not a real one. It is confected from four separate publications written at four different times. As TV Guide's expert points out:

> 21.    Without further information, I cannot verify that these four documents do, in fact, describe the same system. *I would be surprised, however, if the CompuServe system did not change over the nine year period encompassed by these documents.* For example, the newspaper options to which Dr. Tjaden refers in connection with the TODAY 1982 reference (e.g., 'GO SFC-7') were an experiment that was terminated by the fall of 1982.[5] The Schepp reference, on the other hand, apparently discusses a later version of CompuServe. For example, the figures showing the navigation in the Schepp reference consistently depict the CompuServe Information Manager (CIM), a menu interface to CompuServe that was "released only at the end of 1989." *Id.* Indeed, the minimal computer operating system necessary for using the CIM menu interface was MS-DOS 2.0, Schepp at 38-39, which was not even available until early 1983. It appears, therefore, that the CompuServe system described by the TODAY 1982 reference differs in significant ways from the system described by Schepp. Dr. Tjaden then combines these disparate materials. Accordingly, they cannot be anticipating.

27

[5]The CompuServe newspaper options disclosed in the TODAY 1982 reference are discussed in a 1983 book by Efrem Sigel, entitled, "The Future of VideoText." As Sigel explains: "A two-year experiment in videotext journalism involving the Associated Press (AP), 10 newspapers and CompuServe ended June 30, 1982. With the experiment's conclusion, only three newspapers are continuing to provide CompuServe with electronic information." *Id.*, at 61.

(Cole Ex. B at ¶ 21 and n. 5 (emphasis added)).

The parties are also in disagreement with respect to the nature of the CompuServe system confected by TMS and its expert. As explained by TV Guide's expert:

22. In my opinion, even if the four references relied upon by Dr. Tjaden [TMS's expert] do describe the same CompuServe system, the CompuServe system does not anticipate the asserted claims of the '078 patent.

23. As described in the four documents upon which Dr. Tjaden relies, CompuServe was a personal information service for computer users that, as of 1990, offered more than 1400 databases and services to the average computer user. Schepp, at xxvii. For example, the CompuServe system provided access to news, sports, and weather along with travel, health, finance and games. CompuServe also provided "forums" in which users could post comments for debate or support on a variety of personal, professional or technical topics.

24. *The CompuServe system does not, however, disclose* at least the "transmitting" step of claim 1 (1.3), the "receiving" step of claim 1 (1.4), the "zip code" limitation of claim 2, the "schedule" limitation of claim 3, the "displaying" step of claim 4, the "memory" limitation of claim 5, the "transmitting" step of claim 6 (6.3), the "receiving" step of claim 6 (6.4), the "viewing" step of claim 6 (6.5), the "zip code" limitation of claim 7, the "receive" element of claim 8 (8.1b), the "transmit" element of claim 8 (8.1c), the second "receive" element of claim 8 (8.1d), or the "memory" element of claim 10.

25. *No CompuServe database or service delivered television programming information or a television schedule to the user based on the transmission of geographical information, as claimed by the '078 patent.*

26. *The references on which Dr. Tjaden relies* in describing the CompuServe system *do not disclose* the transmission of any geographical information – much less a ZIP code – by a user as part of a system or method for receiving television programming information. In connection with the retrieval of information not related to television programming (such as weather reports), the references on which Dr. Tjaden relies specifically teach the use of geographical information. There is, however, absolutely no suggestion in those references that geographic

28

information is used in connection with television programming information – much less schedules of available programming. As such, it is not reasonable for Dr. Tjaden to conclude – based on these references – that the CompuServe system was capable of using transmitted geographic information to obtain television programming information.

27.     Dr. Tjaden argues that user entry and transmission of, for example, "SFC-7" – a "GO" term that presumably enabled a user to view television information printed in the San Francisco Chronicle (although I note that there is no disclosure of what was actually transmitted to the user) – constitutes the transmission of geographic information. Tjaden Report, Exh. 3 at 3.

28.     *I disagree* with this assertion. "GO" terms, such as "SFC-7," were simply shortcuts for selecting items from menus or lists of CompuServe databases (e.g., a particular section of the San Francisco Chronicle online edition). The concept of using menus or lists to select information was one aspect of the prior art that was distinguished from the '078 patent's claimed inventions during the prosecution of the '078 patent. See '078 patent prosecution history at TG002283. Moreover, user entry of such a shortcut term or keyword is not the same as transmission of geographic information from the user to the service provider. The user is not entering geographic information (e.g., San Francisco), but instead the shortcut term for what the user wants (i.e., the page[6] named "SFC-7"). Dr. Tjaden's assertion that "The number '7' is the number of the CompuServe page within the San Francisco area database" is purely supposition. None of the references on which he relies teaches the deconstruction of what Schepp describes as a (single, unified, coherent, undifferentiated) "page number."

29.     Dr. Tjaden asserts that the "SF" portion of the entry "SFC-7" acts as encoded geographic information. Again, *I disagree* with this assertion. The CompuServe system does not "decode" the "SFC" part of the page name or in any way map "SF" or "SFC" to a geographic location. Instead, based on the references on which Dr. Tjaden relies, a person of ordinary skill in the art would understand that the CompuServe system treated the entry "SFC-7" as a pointer to a page, NOT as geographic information. (Cole Ex. B at ¶¶ 22-29 (emphasis added, footnote deleted)).

        In addition to the preceding, there are two separate and independent evidentiary holes in TMS's case. The documents on which TMS relies to establish the nature of CompuServe and its capabilities (at various times) are secondhand accounts. They are hearsay within hearsay. They would not be admissible at trial to establish the truth of their contents. The deposition testimony of Barry Berkov of CompuServe, which TMS relies on to attempt to fill

29

substantive gaps in its "CompuServe" documents, is also insufficient as a matter of law. *Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1350 (Fed. Cir. 2003).

ii.    *The Young Patent*

TMS concedes that the Young patent does not disclose what TMS would need it to disclose -- "transmitting . . . information regarding the geographical location of the particular viewing location" -- in order for TMS to have a shot at invalidating TV Guide's patent. (Ex. SS at Ex. 5 p. 5; and Cole Ex. B at ¶¶ 10-11, 12 (e), and 13) (D.I. 215 at 18, 19, and 22). TMS argues that this hole in the Young patent is not fatal to TMS, because Young "inherently" discloses that which is expressly missing. (D.I. 215 at 18 ("Young *inherently* teaches transmitting geographical information" (emphasis added)), 19 ("thus Young *inherently* teaches this limitation" (emphasis added)), and 22 ("With respect to the transmitting limitation, . . . Young *inherently* teaches this limitation" (emphasis added))).

TMS is wrong. To establish inherency, TMS must establish that the "'missing characteristic is necessarily present.'" *Glaxo Group Ltd.*, 376 F.3d at 1348 (citation omitted). TMS must establish that the "transmitting" requirement of each of TV Guide's patent claims is "necessarily present" in the Young patent. "Inherency 'may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.'" *Crown Operations Int'l, Ltd. v. Solutia, Inc.*, 289 F.3d 1367, 1377 (Fed. Cir. 2002). The burden of establishing inherency lies with the party asserting it -- here, TMS. *Id.* at 1377 ("In arguing inherent disclosure of the two percent limitation [not expressly disclosed] in the [prior art] Gillery patent, Crown [the party attacking the patent in suit] bears an evidentiary burden to establish that the limitation was necessarily present.").

In an attempt to discharge its burden, TMS relies on argument: (D.I. 215 at 19 ("a system would not know how to provide located information without being told of the locality to

30

which the information relates"), and 22 ("in order to locate program schedule information for a particular locality from a service provider, that service provider would need to know the locality for which program schedule information is sought").

TMS is mistaken. Its argument conflicts with the evidentiary record. It is indeed possible for a television viewer to receive television specific to the viewer's particular location without transmitting his or her viewing location. It happens every day:

Q.    How is it in your opinion that in the Young patent a user receives program schedule information for his or her viewing location without transmitting the location of the viewing location?

A.    Well there are a couple of different ways in which that could be true. One of which is that he gets information for his locality that is generic information and not based on the geographic location. Or geographic information, he asks for a national schedule for ABC television and gets it. It is programming information for his locality, but it is not derived for his locality. The other is he identifies, for instance, a cable supplier and says give me the information for this cable supplier, the head end. And he gets the information that way. And again he has received the information without providing geographical location about his viewing location. (Ex. JJ at 187:21-188:17).

*        *        *

A.    Are there other ways – there are other ways of doing this. For instance, if you use the CompuServe method of identifying the page in a database as opposed to identifying the supplier of the programming, that would work. What else? Identify a page of information you get based on, that identify the head end, get generic information without – that is applicable to you. That's a pretty good list. I think that is about it. That is all I can really think of right now. (Ex. JJ at 189:4-14; *see also* Ex. EE 105:7-107:5; *see generally* Cole Ex. B at ¶¶ 54-64 and 27-29).

TMS's fallback argument (D.I. 215 at 19: "Using this 'Find' feature, users could transmit geographical information to CompuServe for the purpose of receiving television programming information") fails too -- because (1) it does not establish inherency in Young of transmitting geographical location; that is to say, it does not establish that it was invariably necessary to transmit geographical information in order to receive geographical information; and

31

(2) it is contradicted by the record: the CompuServe "find" command acted only as a key word search; that is to say, it did not enable a viewer to obtain television programming specific to the viewer's particular viewing location in response to a transmission of geographic information identifying the viewer's location (Ex. HH at 23:20-24 and 26:9-14; *supra* p. 13, ¶15 ).

The Federal Circuit has pointed out that inherency is an especially poor predicate for the ultimate argument -- the argument of obviousness -- that TMS is making here. "That which may be inherent is not necessarily known. ***Obviousness cannot be predicated on what is unknown.***" *In re Newell*, 891 F.2d 899, 901 (Fed. Cir. 1989) (emphasis added). "[Inherency] is not ... a substitute for determination of patentability in terms of [35 U.S.C.] § 103." *Cont'l Can Co. USA Inc. v. Monsanto Co.*, 948 F.2d 1264, 1269 (Fed. Cir. 1991).

### b.    *The Differences Between The Prior Art And TV Guide's Claimed Invention*

The details of TV Guide's understanding of "CompuServe" are set forth in paragraphs 5-18 of Technological Facts section of this brief. The details of TV Guide's specific disagreements with TMS are found at paragraphs 5-7, 10-11, 14, 16 and 20 of the Response To TMS's Allegations section.

The details of TV Guide's understanding of the Young patent are set forth in paragraphs 19-20 of the Technological Facts. The details of TV Guide's specific disagreements with TMS concerning the Young patent are found in paragraphs 14, 16, 19, 20, 22 of the Response To TMS's Allegations -- and in the preceding section of the brief concerning Young, which addresses inherency, ***a disputed issue of material fact*** not mentioned in TMS's Statement of Facts.

Neither CompuServe nor the Young patent disclose expressly or inherently the "transmitting" step that is a requirement of each of the claims of TV Guide's patent (Cole Ex. B

32

at ¶ 22 and ¶ 39).    Moreover, CompuServe fails to disclose the "receiving" step that is a requirement of each of the asserted claims.

###     c.    *The Level Of Ordinary Skill In The Art*

Given TMS's stipulation, this point is not in dispute.

###     d.    *The Objective Evidence Of Patentability*

The objective evidence of patentability is overwhelmingly in favor of TV Guide. For example, TV Guide's patented technology has enjoyed vast ***commercial success***.

### REDACTED

The value and commercial success of TV Guide's patented technology has been recognized by TMS's own senior management.  Michael Silver, Vice President of Development at Tribune Company (TMS's parent company), testified with respect to TMS's infringing website, Zap2it.com:

### REDACTED

Barbara Needleman, TMS's former Vice President of Entertainment Products (including Zap2it.com), testified:

33

**REDACTED**

Many of the competitors, mentioned above and now licensees of TV Guide's patent, were *copying* -- another objective indicator -- TV Guide's patented technology before they were licensees to the patent-in-suit. See the evidence of copying in the sample screenshots of, for example, www.tvguide.com, tv.yahoo.com/listings, tv.msn.com/tv/guide#, www.titantv.com/index.aspx and www.zap2it.com -- the accused product (Exs. TT - XX).

Not only has the '078 patent enjoyed significant commercial success, and been copied numerous times by TV Guide's competitors, it also fulfilled a *long felt but unresolved need* -- a third objective factor to consider when evaluating an allegation of obviousness. As Mr. Levine testified, he was driven to invent the '078 patent technology out of frustration with the massive amount of television listings information which was not readily accessible to users nor organized in a usable fashion.

Perhaps most significantly, the patent-in-suit succeeded where *others failed*. CompuServe, the then-preeminent online service provider, even began collaborating with

34

another developer of electronic program guides -- Lookahead Communications, Inc. -- a number of months *after* Mr. Levine filed his patent application. Unfortunately for CompuServe, experts in the relevant field of art, they and Lookahead realized that "much to [their] horror, . . . there were 10,000 channel lineups, and [they] weren't going to be able to put out 10,000 files every week" (Ex. EE at 66:6-9). CompuServe and Lookahead had not yet even contemplated Mr. Levine's elegant invention of transmitting information regarding the geographic location of the user's particular viewing location in order to receive information specific to the type of programming available to the particular viewing location. Once TVGuide.com, and others, began implementing such technology in the late 1990s, the prior art attempts were displaced and literally left in the dust (Ex. EE at 124:10-21 ("the CompuServe [PEG] system was only a few hundred customers and ... it was, as I said, *not commercially viable* .... The CompuServe system dried up and we refunded everybody's money ... and we said we were stopping the product" (emphasis added)). Now, substantially all of the Internet page views of localized television program listings are provided by TV Guide's patented technology.

TMS was incorrect to ignore these objective factors. Had it properly considered them, TMS would have realized that it had fallen victim to the very hindsight trap that the objective indicia of nonobviousness were designed to prevent.

### 3.    TV Guide's Invention Was Not Obvious

TMS's thesis -- that in this case obviousness may be decided by the Court without a jury discharging its role as finder of fact -- does not get off the ground. There are genuine, material and acute differences between the parties regarding the factual underpinnings for the obviousness determination. There are genuine, material and acute differences between the parties regarding the teachings of the prior art. Most conspicuously, the parties disagree on whether the CompuServe system described in TMS's brief ever existed in fact; the parties

disagree on whether that which TMS says was inherent in the Young patent was so in fact (assuming for the sake of argument that an obviousness defense can be predicated on "inherency"); and the parties disagree on whether any prior art does in fact teach the "transmitting" and "receiving" steps that are requirements of each TV Guide patent claim. A jury must resolve those disputes.

And there is a complete failure of proof on TMS's part with respect to the objective indicia of patentability -- sometimes called the "secondary considerations" -- that both the Supreme Court and the Federal Circuit have held are a necessary part of every case where they are present. The secondary considerations are "'secondary' in time ... not secondary in importance." *Truswal Sys. Corp. v. Hydro-Air Eng'g Inc.*, 813 F.2d 1207, 1212 (Fed. Cir. 1987). They are often the most probative of all evidence bearing on the obviousness/nonobviousness analysis. They are the ultimate safeguard against the trap of hindsight analysis.

Because of TMS's failure to establish that there is no genuine issue of fact with respect to three out of the four *Graham* factors, its obviousness argument is largely academic -- given that the factual predicate which TMS needs for its obviousness argument is missing.

TMS's reliance on *KSR Int'l Co. v. Teleflex Inc.*, ___ U.S. ___, 127 S. Ct. 1727 (2007), is to no avail. This case is not *KSR*. In that case, there was no dispute concerning the content of the prior art. *Id.* at 1745-46. Here there is a vigorous dispute concerning the content of the prior art, as well as the differences between the prior art and the claimed invention. In *KSR* all of the elements of the claimed invention were found in the prior art. *Id.* at 1736-38. Here, neither CompuServe nor the Young patent, considered separately or together, discloses all of the elements of the claimed invention, namely:

36

*transmitting*, from the computerized unit, information to a service provider through the wide-area network regarding *the geographical location of the particular viewing location*

*receiving*, from the service provider, *information specific* to the type of programming available *to the particular viewing location*

Following its citation of *KSR*, TMS proceeds with an obviousness analysis predicated on a comparison of "Young/CompuServe" against the requirements of the TV Guide patent claims. (D.I. 215 at 15-23). This analysis is bankrupt on two levels.

First, neither the Young patent nor CompuServe teaches what TMS wishes it did. Second, as *KSR* points out, the test is *not* whether all the elements of a claimed invention can be found in the prior art, considered collectively. *KSR*, _____ U.S. ____, 127 S. Ct. at 1741 ("a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art"). The test is whether there was a reason that would have occurred to someone having ordinary skill in the relevant art to combine the disparate and separated elements of the prior art in the manner that the patentee did. *Id*. at ____, 127 S. Ct. at 1741 ("it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does"). Also, *KSR* confirmed the critical importance of secondary considerations of nonobviousness -- critical factors that TMS completely ignored.

History tells us that Mr. Levine's invention was not obvious to those skilled in the art. In TMS's words, "[a]s far back as 1981" (D.I. 215 at 14) CompuServe was fully equipped to make the invention had it been obvious. Also, in TMS's words, the "prior art Young patent issued in 1987 – five years before TV Guide's alleged invention date" (D.I. 215 at 15). Eleven years of failure and five years of failure, respectively, by those having the most intimate

37

knowledge of what TMS says is the closest prior art is proof positive that the invention was not obvious.

CompuServe and Young were not alone. Others familiar with the prior art and the problem to be solved failed too -- most notably, Mark Kaplinsky and his company, Lookahead Communications. Mr. Kaplinsky, the proprietor of the Personal Entertainment Guide, had access to "all the pieces of the puzzle" and had a strong commercial incentive to put them together. But he did not have the wit or the insight to do it. As a consequence, the Personal Entertainment Guide is no more. Failure does not equate with obviousness.

### B.    This Case Is Not Appropriate For Summary Judgment

#### 1.    The Governing Principles Of Law

It is hornbook law, and it is the rule, that a motion for summary judgment cannot be granted unless the moving party first establishes that there is no genuine issue as to any fact which is material to the claim or defense raised in the motion. Fed. R. Civ. P. 56(c). Here, on the issue of validity, the proof must be clear and convincing.

Summary judgment is not a substitute for trial. A fact in dispute that is material to the claim or defense raised by the motion can be resolved only at trial. A fact in dispute is a material one, if a jury could base a verdict for the opponent to the motion at least in part on its resolution of the dispute. In all cases, the evidence presented in support and in opposition to a motion for summary judgment must be viewed in a light most favorable to the party opposing the motion. Likewise, all inferences drawn from facts not in dispute must be drawn in favor of the opposing party. For all of these reasons, issues that turn on witness credibility cannot be resolved on a motion for summary judgment.

38

The Federal Circuit decisions establishing and applying these principles are numerous. *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565 (Fed. Cir. 1991), is representative:

> Summary judgment is a useful procedural tool whereby an unnecessary trial is avoided when there are no material facts in dispute. ***However, summary proceedings are not intended to substitute for trial when it is indeed necessary to find material facts.*** *Meyers v. Brooks Shoe, Inc.*, 912 F.2d 1459, 1461, 16 USPQ2d 1055, 1056 (Fed. Cir. 1990) ("The factual dispute should be reserved for trial"). ***A factual question is material if a reasonable jury could return a verdict for the non-moving party based at least in part on its determination of the factual question.*** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). In determining whether there is a genuine issue of material fact, ***the evidence must be viewed in light most favorable to the opponent of the motion.*** *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), and doubts resolved in favor of the opponent. *Cantor, dba Selden Drugs Co. v. Detroit Edison Co.*, 428 U.S. 579, 582, 96 S.Ct. 3110, 3113, 49 L.Ed.2d 1141 (1976).
>
> A motion for summary judgment must be supported with a sufficient showing to establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). ***The burden of establishing entitlement to summary disposition is with the movant, with due consideration to the burden of proof.*** *Id.*

*Id.* at 1570-71 (emphasis added); *see also, Accord Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1366-71 (Fed. Cir. 2003) (vacating summary judgments of invalidity over the prior art and unenforceability for inequitable conduct); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1329, 1335-36 (Fed. Cir. 2003) (vacating summary judgments of invalidity and noninfringement).

## 2.    The Facts

TMS's motion trips over these basic principles.

The issues of fact concerning the scope and content of the prior art and the differences between the prior art and the claimed invention, the failure of TMS to address one of the four *Graham* factors, the circumstances that the prior art which TMS relies on was

39

considered by the PTO before it issued TV Guide's patent, that others tried and failed to solve the same problem that the patent solves, the statutory presumption of patent validity -- all come together to make this case a singularly *inappropriate* one for summary judgment.

## VI.    CONCLUSION

For the reasons stated, TMS's motion should be denied.

OF COUNSEL:

Christopher J. Harnett
Ching-Lee Fukuda
Stuart W. Yothers
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY  10036
(212) 596-9000

Ronald E. Naves, Jr.
Jeffrey A. Fehervari
Gemstar-TV Guide International, Inc.
6922 Hollywood Blvd.
Hollywood, California  90028
(323) 817-4600

November 21, 2007

Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Steven J. Fineman (#4025)
Richards, Layton & Finger PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
moyer@rlf.com
fineman@rlf.com

*Attorneys for Plaintiffs TV Guide Online,
Inc. and TV Guide Online, LLC*

40

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

> Richard K. Herrmann, Esquire
> Mary B. Matterer, Esquire
> Morris James, LLP
> 500 Delaware Avenue
> Suite 1500
> Wilmington, DE 19801-1494

I hereby certify that on November 21, 2007, I have sent by Federal Express and

electronic mail, the foregoing document to the following non-registered participant:

> Mark A. Pals, P.C., Esquire
> Kirkland & Ellis, LLP
> 200 East Randolph Drive
> Chicago, IL 60601

> Steven J. Fineman (#4025)
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700
> fineman@rlf.com

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

> Richard K. Herrmann, Esquire
> Mary B. Matterer, Esquire
> Morris James, LLP
> 500 Delaware Avenue
> Suite 1500
> Wilmington, DE 19801-1494

I hereby certify that on November 29, 2007, I have sent by electronic mail, the foregoing

document to the following non-registered participant:

> Mark A. Pals, P.C., Esquire
> Kirkland & Ellis, LLP
> 200 East Randolph Drive
> Chicago, IL 60601

> Steven J. Fineman (#4025)
> Richards, Layton & Finger, P.A.
> One Rodney Square
> P.O. Box 551
> Wilmington, Delaware 19899
> (302) 651-7700
> fineman@rlf.com