# EXHIBIT FF

DVORAK Osborne McGraw·Hill



Includes TAPCIS™ on One 5¼" Disk
to Automate Your CompuServe Connection
A Complete Guide to Using the
CompuServe Information Manager

# THE COMPLETE GUIDE to
# COMPUSERVE®

INCLUDES DISK

## Brad Schepp and Debra Schepp
## Foreword by John C. Dvorak

TMS 0058354

Osborne **McGraw-Hill**
2600 Tenth Street
Berkeley, California 94710
U.S.A.

Osborne **McGraw-Hill** offers software for sale. For information on transla-
tions, software, or book distributors outside of the U.S.A., please write to
Osborne **McGraw-Hill** at the above address.

This book is printed on recycled paper.

**The Complete Guide to CompuServe®**

Copyright © 1990 by Brad Schepp and Debra Schepp. All rights reserved.
Printed in the United States of America. Except as permitted under the
Copyright Act of 1976, no part of this publication may be reproduced or
distributed in any form or by any means, or stored in a database or
retrieval system, without the prior written permission of the publisher,
with the exception that the program listings may be entered, stored, and
executed in a computer system, but they may not be reproduced for
publication.

1234567890 DOC 99876543210

ISBN 0-07-881632-7

Information has been obtained by Osborne McGraw-Hill from sources believed to be reliable. However, because of the
possibility of human or mechanical error by our sources, Osborne McGraw-Hill, or others, Osborne McGraw-Hill does not
guarantee the accuracy, adequacy, or completeness of any information and is not responsible for any errors or omissions or
the results obtained from use of such information.

## FOREWORD

CompuServe is the definitive online service. No other service comes close. CompuServe has more than a half million users and more interesting and practical databases and forums than any other service in the world. I'd guess that there isn't one professional out there, from journalist to attorney, who would not benefit from a CompuServe account.

I am a big user of CompuServe. I rely on a couple of major subsystems you'll find on CompuServe. One is PC MagNet, *PC Magazine*'s online information service. It exists to provide *PC Magazine* readers direct access to the magazine's programs, articles, databases, and editorial staff.

PC MagNet is actually a microcosm of CompuServe. PC MagNet users get many of the same things CompuServe's general users receive: information, communications, software, expert advice, opinions, and friendship. Take the concept of PC MagNet and explode it to include every topic you can name, every concern you may have, and every information need that comes your way, and you will begin to understand CompuServe.

I'm stunned by the amount of data that can be accessed on CompuServe, but I'm like most CompuServe users—barely scratching the surface. CompuServe is actually very easy to use in terms of a user being able to jump from place to place effortlessly. Once you understand how CompuServe's database is structured and how the page jumping works, it's astonishingly efficient. The problem isn't maneuvering, but knowing where to maneuver. I'm always amazed when someone tells me about some useful service on CompuServe and tells me that it's been there for years. There's always something new creeping into the system, so it's critical to read the "What's New" memo that CompuServe offers.

The biggest help, though, will be this book. If you're an old-timer on CompuServe, you'll learn new tricks. If you're a beginner, this book is crucial to your success. Best of all it saves you money. When it comes to

xxi

## INTRODUCTION

CompuServe is North America's most successful personal information service for computer users. CompuServe has watched competitors come and go from its perch at the top. Competitors try, but none has ever approached the success that CompuServe enjoys. CompuServe boasts more than 600,000 subscribers, and for years has added between 6,000 and 7,000 subscribers per month.

It's no wonder CompuServe is successful; it offers more than 1,400 databases and services, all accessible by the average computer user. If you use a computer for *anything*, you have enough computer savvy to sign on and use CompuServe. Of course, you will need some help and guidance to find your way through the twists and turns of this information giant. You have come to the right place.

## ABOUT THIS BOOK

Perhaps it is best to begin describing this book by explaining what it is not. First off, it is not a tutorial. We will give you the tools you will need to get started and then set you free (returning again when you are ready for power user material). We believe you will want to explore Compu-Serve in your own way at your own pace, determining for yourself what you want to focus on. A tutorial approach is contrary both to the free-wheeling diversity of CompuServe and the way most people will want to approach it.

Of course, you will need help in getting started, and you will need to know some basic commands to navigate the system. You will find both in this book, but you will also find that this book is not meant to replace the *CompuServe Users Guide*. CompuServe's guides are more than adequate—especially the guide for the CompuServe Information Manager, the front-end software program for using the system. Although we will include

Serve maintained its own board of directors, but H&R Block supplied the "deep pockets" needed to expand the network and enhance the Information Service.

In 1980 CompuServe also joined forces with the Associated Press (AP) to conduct a fascinating experiment. The traditional news media were more than a little curious about the impact electronic information delivery would have on newspapers. The AP began a two-year study with Compu-Serve to determine what users wanted from electronic news delivery. They concluded that videotex services would not put newspapers out of business. Most people did not want to read the evening news from a computer screen. What they did want, however, was an electronic clipping and delivery service that could screen and clip selected news stories on demand. The CompuServe Electronic News Service was born of this experiment, and it is still popular today.

CompuServe also learned that, more than anything, users wanted communications-related services. They wanted to do the most basic of things—connect with their fellow human beings. Their PCs (and Compu-Serve) gave them some unique and powerful ways to do that.

CompuServe gained some valuable information and marketing assets from that experiment. The publicity CompuServe received from the work surpassed anything a marketing or public relations firm could have generated. The experiment received national attention, including coverage on NBC's "The Today Show."

Throughout the 1980s, CompuServe continued to expand, offering users more and better online services and communications opportunities. Early in 1989, CompuServe signed its 500,000th subscriber. Several months later, CompuServe bought its long-time competitor, The Source. By adding the 50,000 Source subscribers, CompuServe topped the 550,000 subscriber mark, and reached 600,000 subscribers soon after that.

## CompuServe's Knack

Today, CompuServe has more subscribers than all of its competitors combined. It offers users the online industry's most comprehensive service. Early in its history, CompuServe adopted a strategy—identify the advantages electronic information delivery offers and stick with them. This strategy has been a sound one. CompuServe has applied that strategy along with a commitment to support the widest array of equipment possible within an environment that is easy to access.

# EXHIBIT GG

GG



CompuServe
Information Service

# TODAY

JANUARY 1982                PRICE $2.50

Space War!

U-Star
on CompuServe

How Much Are
You Worth?

Industry
Watch

And More...

TMS 0001076



**LATEST NEWS**

5  **Middlesex Completes Newspapers on CompuServe**
   **CompuServe Announces Major Network Service**
   **New Offering Can Save You a Bundle**
   **World Book Encyclopedia, CompuServe Sign Pact**

**PRODUCTS**

6  **Space War!**
   *Enemy space ships and crystallized clouds. Conquering the universe
   has never been so much fun.*

9  **Blackjack: It's a Gamble!**
   *Can't make it to Las Vegas this weekend? Play against the dealer in
   CompuServe's blackjack game.*
   **Concentration Can Be Consternating**
   *Your screen turns into a stage with numbered "doors" hiding "prizes,"
   like the TV game show.*

10 **Talk Shop with Comp-U-Star**
   *Call up crystal. tune in TVs–all on your personal computer. Electronic
   shopping has arrived.*

13 **FINTOL Answers Your Financial Questions**
   *From mortgage loan calculations to salary schedules. FINTOL can
   answer your personal financial questions.*
   **How Much Are You Worth?**
   *Determine your assets and liabilities the easy way with our program
   which prompts you with all the questions.*

**CABLE NEWS**

14 **CompuServe Encourages Data Services for Cable**
   *CompuServe is working to establish data services as an important
   part of the cable TV industry.*

**CUSTOMER SERVICE**

15 **Q&A**
   *Answers to the most frequently asked questions about CompuServe.*

30 **Magazine, Manuals Available to Customers**
   *Customers receive TODAY magazine and our Update newsletter as
   part of their CompuServe subscription, but other printed material is
   available upon order.*

**SUBJECT INDEX**

16 *A printed copy for you to tear out and keep.*

**LIFE, LOVE & TRIVIA**

18 **Ask Aunt Nettie**
   *Our on-line authority on everything discusses guidelines for using CB
   and bulletin boards.*

**TECHNOLOGY**

20 **CIS Customers Will Benefit from Network Expansion**
   *More and more customers can access CompuServe directly as the
   result of a massive network expansion program.*

**CUSTOMER PROFILE**

22 **Al Smith: Computing is a Family Affair**
   *Al Smith uses his microcomputer at work, but when he takes it home,
   microcomputing becomes a family activity.*

**INDUSTRY WATCH**

24 **Is There a Microcomputer in Your Future?**
   *Read why microcomputing is becoming an increasingly popular
   activity. Also read brief news announcements within the
   microcomputing industry.*

**FUTURE**

26 **Dear Mom and Dad:**
   *Ricky writes home from summer camp, only this is no ordinary letter
   and no ordinary camp.*

   The Cover:
   An artist's conception of CompuServe's Colossal Cave.

TMS 0001077

# NEW OFFERING CAN SAVE YOU A BUNDLE

Refundle Bundle, a clearinghouse for consumer information about making and saving money through manufacturers' refund offers, is now an information provider on the CompuServe Information Service.

For the veteran refunder and novice alike, Refundle Bundle offers valuable hints and tips on such topics as what to save from packages and how to save it, definitions of terms involved in refunding and descriptions of the various kinds of refund offers, such as the "form required" versus "no form required." An interactive section is also available through which readers can receive answers to specific questions.

CompuServe subscribers can access this information for the standard rate of $5 per hour weekday evenings, all day Saturday, Sunday and holidays. Weekday daytime access is also available. To access the service, a subscriber needs a personal computer or terminal, a telephone and a modem. The Refundle Bundle is accessible through main menu item 7, Home Information, or Go TRB-1.

# WORLD BOOK ENCYCLOPEDIA, COMPUSERVE SIGN PACT

The CompuServe Information Service has signed an agreement with World Book Encyclopedia to cooperate in developing the online electronic version of the en-

cyclopedia.

Robert King, chairman of the board of directors at World Book, a subsidiary of Scott & Fetzer Company, said, "We welcome the opportunity to work with the CompuServe Information Service to make the World Book Encyclopedia available in the new, exciting videotex format. We expect to develop significant new services utilizing our existing database, both for the home and business markets. This service will add a new dimension to the printed edition of World Book."

When development is completed, CompuServe subscribers will be able to access the World Book service for the standard service charge weekday evenings, all day weekends and holidays. Weekday daytime access will also be available. Currently there are over 19,000 personal computer and terminal owners who use the CompuServe Information Service in their homes and offices across the country.

CompuServe is available through a local telephone call in more than 260 U.S. cities and in Canada.

# COMPUSERVE ANNOUNCES MAJOR NETWORK SERVICE

CompuServe Incorporated has announced the formation of ComLink, a major new network service for the value-added network (VAN) market (see related story under the heading "Technology").

ComLink customers will be able to access their own host computers via the CompuServe data communications network, ob-

taining many of the advanced features that CompuServe customers have come to expect.

"We have initiated an ambitious network expansion program designed to bring the full advantage of ComLink communications to over 300 domestic locations by the end of 1983. The combined needs of CompuServe's remote computing customers, the CompuServe Information Service and ComLink customers will make this growth possible," said Alexander B. Trevor, executive vice president, CompuServe network services.

Current market research indicates a high level of prospective customer interest in the company's new VAN offering. This is due to the CompuServe network's reputation for high reliability and responsiveness throughout the industry.

CompuServe has 26 commercial marketing offices across the country marketing computer services to more than 700 major corporations, financial institutions and government agencies.

# MIDDLESEX COMPLETES NEWSPAPERS ON COMPUSERVE

The addition of The (Framingham, Mass.) Middlesex News to CompuServe's stable of electronic newspapers completes the original list of newspapers who had agreed to offer an electronic edition of their news.

The Columbus Dispatch was the first newpaper to join CompuServe on July 1, 1980. Since then, the newspapers joined the CompuServe Information Service (continued on page 13)

TMS 0001078



# A Window on the World

The Middlesex News (Framingham, Mass.), has joined ten other newspapers across the country in helping to pioneer a computer information network for use in homes and businesses all across the nation.

The Middlesex VideoNews, as the electronic edition is called, is covering the Boston—Eastern Massachusetts area with sections on restaurants, theaters and movies, sports, breaking national and state news, personal columns, Classified Advertising and a special section with emphasis on local news mirroring its printed pages.

Subscribers also have access to the CompuServe Information Service, a nationwide network of computerized information and entertainment.

*The Future Is Now
And The Middlesex News
Is A Part Of It All!*

The MIDDLESEX VIDEO NEWS

(617) 872-4321

A Division of Harte-Hanks Communications

TMS 0001079

**Products**

# FINTOL ANSWERS YOUR FINANCIAL QUESTIONS

Think of FINTOL as a set of computerized financial tools. Just give the command, and the FINTOL tools will go to work for you, figuring solutions to common financial problems.

If you're considering buying a home, for instance, FINTOL can tell you the amount of your monthly mortgage loan payment. Money in the bank? FINTOL will provide compound interest calculations, plus the sum of a periodic investment, sinking fund deposit, and present value. Other FINTOL features include depreciation analysis and compound growth rate calculations.

Let's return to that mortgage question, and command FINTOL to display its loan amortization program. FINTOL tells us, 'This program computes mortgage loan values and will print an amortization schedule given any three of the four loan values:

1) interest rate
2) monthly payment
3) life of the loan
4) amount of the loan

Enter values for three of the four following inputs and a zero for the one you wish computed. . .' FINTOL tells you. If you're buying a home for $50,000 and you're making a $20,000 down payment, you know that the amount of the loan is $30,000. You also know that the current interest rate is 17.5% and the life of the loan is 30 years. FINTOL then tells you that the monthly payment is $493.90 and the total interest you pay on the loan is $128,363.00. If you wish, FINTOL will then provide an amortization schedule.

Other FINTOL programs guide the user with the same types of brief explanations and descriptive prompts. Use FINTOL by selecting MicroNET Personal Computing, main menu item 9 and typing R FINTOL.

## HOW MUCH ARE YOU WORTH?

Determining what your assets and liabilities are is no easy task to undertake on your own. To be sure, certain procedures are rather elementary — adding up the worth of your house, money you have in savings accounts, for instance. In fact, you may think you have a fairly good estimate of your assets and liabilities.

But wait a minute. Didn't you forget to include the cash in your individual retirement account? And how about the diamond pendant you inherited from Aunt Bessie? Did you enter that $750 loan you owe to your brother-in-law under liabilities? Perhaps not. However, such information must be included for any true accounting of your net worth. Hmmmm. . . maybe this procedure isn't so simple, at that.

The CompuServe Information Service has the answer, with a Personal Assets/Liabilities Program. By asking you the proper questions and recording your monetary answers, the program offers a precise system for determining your total assets and liabilities.

The program, of course, operates accurately only with your help. You, not the computer, must have the financial facts at hand. You must know the cash value of your life insurance policy, for instance, and the approximate worth of that diamond pendant.

The program acts as a kind of "prompter," by listing categories you may not have considered. The program then totals your net worth by adding up your responses in various categories and subtracting the amount of your liabilities.

Of course, the personal financial information that you enter on the CompuServe Information Service is totally confidential.

You can find the Assets/Liabilities program by choosing MicroNET Personal Computing, main menu item 9, and typing R WORTH.

*by Patricia H. Carro*

(continued from page 5)

one at a time to help pioneer the world of electronic newpapers.

Each newspaper offers an electronic edition of their daily news over CompuServe. In many cases the news appears on CompuServe before it appears in the printed edition of the newpaper.

In addition to the newspapers, The live Associated Press news wire is available continuously. The news is unedited and is updated as AP reporters around the world file their stories for transmission over the AP wire.

In addition to *The Middlesex News*, the other newspapers and The Associated Press can be found under main menu item 1, Newspapers, and include *The Columbus Dispatch, The New York Times, The Washington Post, The St. Louis Post-Dispatch, The (Norfolk, Va.) Virginian-Pilot and Ledger-Star, The Atlanta Constitution and Journal, The Minneapolis Star and Tribune, The San Francisco Examiner, The San Francisco Chronicle* and *The Los Angeles Times.*

# Cable News

# COMPUSERVE ENCOURAGES DATA SERVICES FOR CABLE

Which came first, the chicken or the egg?

That question has been deliberated for years, but now, in terms of data communications, the query has taken on new meaning. And CompuServe is looking for some answers.

In this case, the dilemma isn't with chickens and eggs, but with multiple systems operators (MSOs) and cable equipment manufacturers. However, the same chicken-and-egg quandary applies.

According to George Minot, senior vice president at CompuServe, time sharing networks are looking for a viable alternative to increasing local telephone charges, especially now, with the knowledge that time and distance tolls for local calls are already in effect in the greater Boston area.

It is Minot's opinion that within three years, cost effective data transmission will take place over wide-band coaxial cables, the same kind of cable used to transmit clearer television images on home TV sets.

However, says Minot, it's been a tough struggle to convince cable company operators and potential cable equipment suppliers that two-way data transmission is one wave of the future that stands to benefit all sides. But who will be first to commit to development? Back to



George M. Minot

the chicken-and-egg dilemma.

Minot explains that cable operators have directed their attention more toward acquiring urban franchises than they have in developing enhanced services, among them, data transmission. He also feels that it is only a matter of time, within just a few years, before receiving thirty channels in a home won't produce enough revenue to support a particular cable franchise in urban areas. And that is where CompuServe steps in. Cable operators and their equipment manufacturers are slowly realizing the benefits of enhanced services. How is the evolution taking place? "You try to explain from the ground up what data communications is, what the size of the industry is, what the problems are, and what we see as the opportunities for somebody to step in and take the dollars that we're all spending for local telephone service, and tell them you can have a big chunk of that business,' " says Minot.

He also explains that cable companies are making promises

in order to gain urban franchises that may not be kept easily because of a lack of awareness of the technology it takes to fulfill the promises.

Furthermore, cable equipment manufacturers are not encouraged to spend additional dollars to develop the technology because cable operators currently don't show an overwhelming interest in it. Who will give in first? Chickens or eggs again.

Minot, however remains undaunted.

"We're in the middle trying to make it happen because we think it is important in the long term," he explains. "For example, we called a meeting of the 12 major manufacturers, the vendors, back in May. We hired a consultant to find out who the right people were, who were the leaders in the industry. Since we were outsiders, we actually had the consultant set it up. We held a meeting in Chicago and presented what we thought the industry needed technically in order to make it a business for us and for the MSOs.

"It was a beginning. Then we had our vice president of research and development go to a cable television engineering conference to make a speech."

The evolution of the technology and the increased awareness take time to happen. Minot feels that the light at the end of the tunnel is beginning to glow a little brighter, and that it's merely a matter of time until two-way data transmission through coaxial cables becomes state-of-the-art.

*by Glady J. Fazio*

TMS 0001081

The CompuServe Information Service subject index is updated...

Item 5: For the latest list of subject...

For your convenience you may read out and use this printed subject index.

TMS 0001082

TMS 0001083

# EXHIBIT HH

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - -

TV GUIDE ONLINE, INC ., and TV )

GUIDE MEDIA SERVICES, LLC          )

             Plaintiffs,          )   NO.   05-CV-725-KAJ

      v.                           )

TRIBUNE MEDIA SERVICES, INC.   )

           Defendant.          )

- - - - - - - - - - - - - - -

DEPOSITION OF BARRY BERKOV

TAKEN ON:  WED., OCTOBER 11, 2006

TAKEN AT:  1380 Harbor Island Drive

           San Diego, California

REPORTED BY:  Florinda St. Cyr

           CSR No. 10180, RPR

Page 2

1   APPEARANCES:
2
3   FOR PLAINTIFFS:
4       ROPES & GRAY
5       1251 Avenue of the Americas
6       New York, New York 10020
7           BY: STUART W. YOTHERS, ESQ.
8
9   FOR DEFENDANT:
10      KIRKLAND & ELLIS, LLP
11      200 East Randolph Drive
12      Chicago, Illinois 60601
13          BY: MEREDITH ZINANNI, ESQ.
14
15  ALSO PRESENT: Jennifer Eastman, Videographer
16
17
18
19
20
21
22
23
24
25

Page 3

1           I N D E X
2   WITNESS      EXAMINED BY        PAGE
3   BARRY BERKOV    By Ms Zinanni       5
4               By Mr. Yothers      52
5
6
7           E X H I B I T S
    NUMBER      DESCRIPTION       PAGE
    36      Deposition Subpoena (retained)    7
8   37      Applications Software     11
    38      CompuServe Information Service    24
9           Today July 1981
    39      CompuServe Information Service    29
10          Today October 1981
    40      CompuServe Information Service    30
11          Today January 1982
    41      CompuServe Information Service    33
12          Today April 1982
    42      CompuServe Information Service    34
13          Today September/October 1982
    43      CompuServe Magazine October 1992   35
14  44      Online Today      40
    45      Online Today January 1985    44
15  46      How to Get the Most out of CompuServe 45
    47      Master Guide to CompuServe    47
16  48      CompuServe Almanac     48
    49      CompuServe Information Service    51
17
18
19
20
21
22
23
24
25

Page 4

1   SAN DIEGO, CALIFORNIA, WEDNESDAY, OCTOBER 11, 2006;
2           1:00 P.M.
3
4       VIDEOGRAPHER: Here begins Volume I, Tape 1 in the
5   deposition of Barry Berkov, in the matter of TV Guide
6   Online, Inc., et al., versus Tribune Media, in the U.S.
7   District Court, for the District of Colombia, Case No.
8   05-CV725 KAJ. Today's date is October 10th -- excuse
9   me. Today's date is October 11, 2006. The time on the
10  video monitor is 12:59. The video operator is Jen
11  Eastman, contracted by LegaLink San Diego, in San
12  Diego, California. This deposition is taking place at
13  Sheraton Harbor Island Drive, at 1380 Harbor Island
14  Drive, San Diego and was noticed by Cassandra Lukes of
15  Kirkland & Ellis.
16      For the counsel, if you will please identify
17  yourselves and whom you represent.
18      MS. ZINANNI: Meredith Zinanni, Kirkland & Ellis
19  representing Tribune Media Services.
20      MR. YOTHERS: Stuart Yothers representing the TV
21  Guide Online plaintiffs.
22      VIDEOGRAPHER: Our court reporter today is Florinda
23  St. Cyr of LegaLink San Diego. If you will please,
24  swear in the witness.
25  ///

Page 5

1           BARRY BERKOV,
2   BEING FIRST DULY SWORN, TESTIFIED AS FOLLOWS:
3
4           EXAMINATION
5   BY MS. ZINANNI:
6       Q. Good afternoon, Mr. Berkov. Would you please
7   state your full name and address for the record?
8       A. Certainly. Barry F. Berkov, 5722 Brittany
9   Forrest Lane, spelled F-o-r-r-e-s-t, San Diego, zip,
10  92130.
11      Q. Thank you. Mr. Berkov, have you been deposed
12  before?
13      A. Yes.
14      Q. How many times have you been deposed?
15      A. Approximately three or four.
16      Q. When was the last time you were deposed?
17      A. Don't remember exactly. It's probably been
18  several years.
19      Q. You understand that your answers here are
20  being recorded by the court reporter, so you need to
21  respond orally to any questions?
22      A. I do.
23      Q. And you understand that you're under oath as
24  if you were at trial?
25      A. Yes.

Page 6

1    Q.  Will you let me know if you don't hear the
2  question that I ask?
3    A.  Yes.
4    Q.  And will you let me know if you don't
5  understand the question that I ask?
6    A.  Yes.
7    Q.  If I do not say otherwise, I will assume
8  you've heard and understood my questions. If you need
9  a break at any time, please let me know. We will
10  finish your answer if we're in the middle of it, and
11  then we'll see what we can do about the break. Is that
12  okay?
13    A.  That's fine.
14    Q.  When you're answering, you may think of some
15  documents that may help you remember the answer or help
16  give you a more accurate answer. Will you let me know
17  if there are any such documents?
18    A.  Yes, I will.
19    Q.  Sometimes you may give an answer as completely
20  as you can, but later may remember additional
21  information or some clarification that should be made.
22  If that happens, please let me know, and we can make
23  that change. Is that okay?
24    A.  It is.
25    Q.  Is there any reason why you cannot give

Page 7

1  truthful, complete testimony today?
2    A.  There is no reason.
3    Q.  I am handing you what has been marked as
4  Defendant's Exhibit 36.
5      (The document was marked as Defendant's
6    Exhibit 36 and is retained by counsel.)
7  BY MS. ZINANNI:
8    Q.  Mr. Berkov, have you seen that document
9  before?
10    A.  I don't think I have. Is this what you sent
11  me for the subpoena? If it is, I've seen it. If not,
12  I haven't seen it.
13    Q.  I think if you turn to Page 3, is that the
14  document that you received?
15    A.  Yes.
16    Q.  So you understand you're here pursuant to this
17  subpoena from Tribune Media Services to give testimony
18  in a case TV Guide Online --
19    A.  I do.
20    Q.  -- Media Services?
21    A.  Uh-huh, yes.
22    Q.  Thank you. Mr. Berkov, are you currently
23  employed?
24    A.  I'm self-employed.
25    Q.  What do you do?

Page 8

1    A.  I am a consultant in the area of management,
2  Internet services and other general executive
3  consulting.
4    Q.  How long have you been working as an
5  independent consultant?
6    A.  Approximately 11 years with a couple of
7  interruptions.
8    Q.  What was the first of those interruptions?
9    A.  The first of those interruptions was a tour of
10  duty as the president and chief operating officer of
11  Box Lock, Inc., an Internet company.
12    Q.  And when did you work with Box Lock, Inc.?
13    A.  From approximately March of 1999 to sometime
14  in 2000.
15    Q.  And what was the second interruption?
16    A.  I spent eight months as the interim general
17  manager of Sign On San Diego, which is the website of
18  the Union Tribune here in San Diego.
19    Q.  And when did you work for them?
20    A.  I don't remember the exact dates, but I
21  believe it was from the spring of 2000 to the fall of
22  2000.
23    Q.  And --
24    A.  Might have been 2001.
25    Q.  Prior to your becoming an independent

Page 9

1  consultant, whom did you work for?
2    A.  CompuServe, Inc.
3    Q.  When did you start working for CompuServe?
4    A.  I initially worked for CompuServe beginning in
5  March of 1977.
6    Q.  What was your position in 1977 with
7  CompuServe?
8    A.  Director of marketing services.
9    Q.  What were your responsibilities as director of
10  marketing services?
11    A.  It was my responsibility to build a value
12  added product line, CompuServe, which at the time was a
13  time-sharing company. Okay.
14    Q.  Can you explain what a time-sharing company is
15  in the context of CompuServe?
16    A.  In those days, a time-sharing company was a
17  company that had a mainframe computer or a large-scale
18  computer and rented time on that computer to other
19  organizations.
20    Q.  How long did CompuServe function as a
21  time-sharing company?
22    A.  CompuServe probably functioned as a
23  time-sharing company from its inception, which was --
24  I'm not exactly sure when it was. Probably in the late
25  '60s up until the time that it was acquired by AOL,

**Page 10**

1  which probably ceased to offer commercial services of
2  the same nature.
3      Q.  Did CompuServe add functionality other than
4  time sharing to its product offerings?
5      MR. YOTHERS: Objection to form.
6  BY MS. ZINANNI:
7      Q.  You can answer.
8      A.  I think it would be easier to answer the
9  question as follows: CompuServe began life as a
10  time-sharing company, was actually the data processing
11  department of an Ohio stock insurance company. It
12  began to sell time as a way of paying for a larger
13  computer. That got it into the time-sharing business.
14  When CompuServe was acquired by H&R Block, it also got
15  in the value added network business. Along the way,
16  CompuServe also got into what you would think of today
17  as CompuServe, which was an information services
18  company oriented towards individual users of computers.
19      Q.  When did it start offering that information
20  service?
21      A.  The initial experimental offerings were I
22  believe in 1979.
23      Q.  In your job as -- was it vice-president of
24  marketing?
25      A.  Originally I was director of marketing

**Page 11**

1  services. Six months after I started, I became
2  vice-president of marketing services.
3      Q.  While you were director of marketing services,
4  did you have any responsibility for the information
5  service product?
6      A.  Not while I was director of marketing
7  services.
8      Q.  While you were vice-president of marketing,
9  did you have any oversight over the --
10      A.  Yes, I did.
11      Q.  Okay. Can you describe your responsibilities
12  as related to the information service as of 1980?
13      A.  Okay. In 1980, my involvement with the
14  information service was primarily limited to taking
15  content that was developed for the commercial side of
16  the business and making it available to the individual
17  computer services or information services side of the
18  business. That meant taking products and services and
19  re -- I guess the term would be modifying them for use
20  by individuals.
21      Q.  Mr. Berkov, I'm handing you what's been marked
22  as Defendant's Exhibit No. 37.
23      (The document was marked as Defendant's
24      Exhibit 37 and is made a part of this
25      deposition.)

**Page 12**

1  BY MS. ZINANNI:
2      Q.  Do you recognize Defendant's Exhibit 37?
3      A.  I do.
4      Q.  What is it?
5      A.  Exhibit 30 -- Exhibit 37 is kind of a catalog
6  of value added software that was added to the
7  CompuServe time-sharing service to enhance its appeal
8  to its commercial customers. I was responsible for the
9  development and/or acquisition of a lot of this
10  software.
11      Q.  And during what period did you acquire --
12  develop this software as listed in Defendant's
13  Exhibit 37?
14      MR. YOTHERS: Objection to form.
15      THE WITNESS: Essentially from 1977, when I joined
16  CompuServe, through approximately 1982.
17  BY MS. ZINANNI:
18      Q.  Why did your involvement with these products
19  end in 1982?
20      A.  Well, in 1982, I left CompuServe to accept
21  employment in another organization.
22      Q.  How long were you with that other
23  organization?
24      A.  Six months or less.
25      Q.  What did you do after you left that other

**Page 13**

1  organization?
2      A.  I was an independent consultant.
3      Q.  Mr. Berkov, did you help prepare Defendant's
4  Exhibit 37?
5      A.  Prepare it?
6      Q.  Did you write any portion of it?
7      A.  I didn't personally write this. I edited the
8  content.
9      Q.  And was this created in the ordinary course of
10  business at CompuServe?
11      A.  It was, yes.
12      Q.  Who was the audience for Defendant's
13  Exhibit 37?
14      A.  The audience for this was businesses who were
15  buying either time sharing, raw time sharing or value
16  added products and services, which included software
17  and databases, which were available to commercial
18  clients of CompuServe.
19      Q.  After you left the other position that you
20  started in 1982, where did you go next?
21      A.  I was an independent consultant. My primary
22  client was CompuServe.
23      Q.  Did you ever return to work full-time for
24  CompuServe?
25      A.  I did.

Page 14

1    Q.  When was that?
2    A.  In the fall of 1983, I believe.
3    Q.  And what was your position when you rejoined
4  CompuServe?
5    A.  Something like vice-president of business
6  development.
7    Q.  And would you describe your responsibilities
8  as vice-president of business development?
9    A.  Well, it's difficult to describe what they
10  were. It was a general position, ostensibly
11  responsible for putting together business deals of a
12  variety of -- in a variety of natures. In actuality,
13  however, my responsibilities turned out to be to return
14  to the product planning, product management, and I also
15  wound up running the customer support organization for
16  CompuServe.
17    Q.  For how long were you vice-president of
18  business development?
19    A.  Probably six months.
20    Q.  And what was your next position after that?
21    A.  I'm not sure of the exact title, but it was
22  effectively something like vice-president of product
23  management and business support.
24    Q.  And was that a change in your
25  responsibilities?

Page 15

1    A.  Not really. It was mostly a change in title.
2    Q.  For how long were you vice-president of
3  project management and business support?
4    A.  Product management as opposed to project.
5  It's product.
6    Q.  That's what I have written down.
7    A.  Product marketing, management, one of the two.
8  Again, I don't remember exactly, because there are a
9  variety of titles, but we could probably say until 1990
10  in one form or another.
11    Q.  And in 1990, were you still working for
12  CompuServe?
13    A.  I was.
14    Q.  What did your title change to in 1990?
15    A.  Executive vice-president CompuServe
16  information services.
17    Q.  And did your responsibilities change when you
18  became executive vice-president of CompuServe
19  information services?
20    A.  They did.
21    Q.  What were your responsibilities as executive
22  vice-president?
23    A.  I had responsibilities for the entire business
24  unit devoted to the CompuServe information service or
25  services, so I had responsibility for all of the

Page 16

1  business functions other than computer operations,
2  finance, human resources and the low-level operating
3  system software.
4    Q.  Were you responsible for the content in the
5  CompuServe information system?
6    A.  Yes.
7    Q.  Did you work with -- strike that.
8      Were you responsible for negotiating with other
9  companies to add content to CompuServe?
10    A.  That was a key component of my responsibility.
11    Q.  During your time with CompuServe, did you have
12  reason to understand how a user accessed CompuServe?
13    MR. YOTHERS:  Objection to form.
14    THE WITNESS:  Understanding the user interface,
15  building, developing and refining the user interface as
16  to CompuServe was a primary portion of my
17  responsibility from the time that I joined CompuServe
18  until the time that I left.
19  BY MS. ZINANNI:
20    Q.  And when did you leave CompuServe?
21    A.  November of 1995.
22    Q.  And why did you leave CompuServe?
23    A.  Had a difference of opinion with the new
24  management of CompuServe at the time with respect to
25  their pursuit of a very highly consumer-oriented

Page 17

1  information service, which they had called WOW.
2    Q.  When did CompuServe information service
3  launch?
4    A.  CompuServe information service started out in
5  approximately 1979 as a service that had the name for a
6  brief period of time of Micronet. Turned out Micronet
7  was not a protectable name, and very soon thereafter,
8  it was referred to as the CompuServe information
9  service or CIS. I would say the true launch of the
10  CompuServe information service beyond that initial
11  group of semiexperimental enthusiasts was probably in
12  1980.
13    Q.  How did a business user of the CompuServe
14  time-sharing service access the CompuServe computer?
15    A.  For the most part, that person would have a
16  terminal, a modem and a phone line, would dial a number
17  to a CompuServe access point and make a telephonic
18  connection via modem to CompuServe.
19    Q.  How would a user of the CompuServe information
20  service access it?
21    MR. YOTHERS:  Objection to form.
22    THE WITNESS:  In exactly the same way. Users of
23  the CompuServe information service would connect by
24  using a telephone, dialing a phone number, connecting
25  to an access point and logging into the CompuServe

Page 18

1 information service.
2 BY MS. ZINANNI:
3   Q.  Could a user follow those steps from -- I
4 understand they're called a dumb terminal.
5   A.  Yes.
6   Q.  Could a user follow those steps using a modem
7 to connect to CompuServe from a micro computer?
8   A.  Yes.
9   Q.  Where were -- where were the computers that
10 those users were accessing located?
11   MR. YOTHERS:  Objection to form.
12   THE WITNESS:  Well, I presume you're referring to
13 the host computers, not the individual user's personal
14 computer that they were using to access.
15 BY MS. ZINANNI:
16   Q.  Correct.
17   A.  So the computers they were accessing were, for
18 the most part, located in Columbus, Ohio and Dublin,
19 Ohio.
20   Q.  Was the user ever connected through the
21 CompuServe information service to another host
22 computer, as you used that term?
23   A.  Yes.
24   Q.  Can you give me an example of such a
25 situation?

Page 19

1   A.  Certainly.  The official airline guide, the
2 PARS TWA airline reservation system, the EZ Saver
3 airline reservation system, a system called IQuest.
4 Those are some of the examples.
5   Q.  Can you explain to us how a user would connect
6 to the official airline guide?
7   A.  The CompuServe user would make an initial
8 connection to CompuServe, would go through an
9 authentication process, whereby the user supplies a
10 user I.D. and a password, and is then, quote, unquote,
11 logged into CompuServe.  Once on CompuServe, the user
12 would select a service through a menu choice typically,
13 which would result in their being connected and logged
14 in to the official airline guide's computers without
15 being logged off of CompuServe computers.
16   Q.  You said there's an -- a user would undergo an
17 authentication process with the CompuServe server?
18   A.  Right.
19   Q.  With a user I.D. and a password?
20   A.  That is correct.
21   Q.  What was the content of the user I.D.?
22   A.  The user I.D. was a series of numbers,
23 typically five or six numbers and a comma or a period,
24 and then from one to four additional numbers.
25   Q.  Did the numbers of the user's I.D. stand for

Page 20

1 anything in particular?
2   A.  No.
3   Q.  Did the user choose their own user I.D.?
4   A.  No.
5   Q.  Was their user I.D. assigned by CompuServe?
6   A.  Yes.
7   Q.  Did the user select their own password?
8   A.  Not initially.
9   Q.  CompuServe assigned it initially?
10   A.  CompuServe assigned the password initially.
11 The user then was then able to change his or her
12 password.
13   Q.  When a user accessed CompuServe using a micro
14 computer and a modem, was the user able to download any
15 of the information to their micro computer?
16   A.  Yes.
17   Q.  Were they able to do that for all content on
18 CompuServe?
19   MR. YOTHERS:  Objection to form.
20   THE WITNESS:  The answer is a qualified yes, in
21 that any computer connected to another computer can
22 potentially capture and save the information that's
23 delivered to it.
24 BY MS. ZINANNI:
25   Q.  Would the user be able -- would a CompuServe

Page 21

1 user connecting to the CompuServe servers using a micro
2 computer be able to save the information to their
3 computer in a form that they then would be able to
4 manipulate or search?
5   A.  Again, my answer is a qualified yes to that.
6   Q.  What is the qualification?
7   A.  Well, again, any information that is
8 downloaded to a personal computer can potentially be
9 searched or reviewed, so it would be up to the user to
10 determine what form it took on his or her computer and
11 what, if any, transformations were made to it or
12 indexing occurred in order to make it searchable.
13   Q.  How is the information stored on CompuServe's
14 servers?
15   MR. YOTHERS:  Objection to form.
16   THE WITNESS:  You're going to need to clarify that
17 question.  It's stored on disc drives that are attached
18 to the computer.
19 BY MS. ZINANNI:
20   Q.  How is the data on the CompuServe host system
21 organized so that a user could access it?
22   A.  It's in a variety of files that have differing
23 structures depending on the particular application or
24 function that's being used.
25   Q.  How did a user identify the database that they

Page 22

1  wanted to access?
2      A.  The answer to that question has to be set in
3  the context of the time which the user was accessing it
4  and the methodology that the user was accessing.
5      Q.  Okay.
6      A.  So --
7      Q.  In 1981.
8      A.  In 1981, the user would typically be presented
9  with a menu structure, menu being a list of items, each
10 of which had an identifier, typically a number.  The
11 user would select an item on that menu by typing the
12 number, pressing the caricature or enter key on the
13 keyboard, which would, in turn, either take the user to
14 a particular service or area or alternatively, would
15 produce another menu.  The process would be repeated in
16 terms of having a list of topics or alternatives.
17 Selection of one of those would lead, again, either to
18 a submenu or to the particular service.
19     Q.  In 1991, was there any way a user could search
20 for information other than through that --
21     A.  No.  You said 1991, or did you say -- what did
22 you mean?
23     Q.  I said 1981, I thought.
24     A.  You said '91.
25     Q.  Excuse me.  1981.

Page 23

1      A.  In 1981, I believe the user had the ability to
2  execute what was called the Find command, which would
3  allow typing in a key word, the result of which would
4  be a list of items to choose from.
5      Q.  Did the user type in the key word with the
6  command all at the same -- all before hitting the enter
7  button?
8      A.  The user had the option of typing Find and
9  being prompted with an input box or a request for
10 input, depending on what the interface was, and then
11 supplying the key word, or alternatively, the user
12 could put the key word after the Find command.
13     Q.  Were there any restrictions on what a user
14 could enter for a key word?
15     A.  No, no practical restrictions.
16     Q.  Could a user enter a city?
17     A.  Yes.
18     Q.  Could a user enter a state?
19     A.  Yes.
20     Q.  If a user entered Find and a city name, what
21 information would be returned to the user?
22     A.  The user would get back a list of those
23 services or databases on CompuServe that were somehow
24 related to the particular search term.  So, for
25 example, if I put Find Columbus, I would get a menu or

Page 24

1  a list of things that were related to Columbus.
2      Q.  Mr. Berkov, in 1981, were TV listings
3  available on CompuServe?
4      MR. YOTHERS:  Objection to form.
5      THE WITNESS:  To the best of my recollection, TV
6  listings were part of the offerings of several of the
7  newspaper organizations who were on-line on CompuServe.
8  BY MS. ZINANNI:
9      Q.  Mr. Berkov, I'm handing you what's been marked
10 as Defendant's Exhibit 38.
11         (The document was marked as Defendant's
12         Exhibit 38 and is made a part of this
13         deposition.)
14 BY MS. ZINANNI:
15     Q.  Do you recognize this document?
16     A.  Yes, I do.
17     Q.  What is it?
18     A.  This is the premier issue of a magazine
19 published by the CompuServe information service for its
20 members.
21     Q.  Was this created in the ordinary course of
22 CompuServe's business?
23     A.  It was.
24     Q.  Did you write Defendant's Exhibit 38?
25     A.  I did not write it.

Page 25

1      Q.  Did you supervise the creation of Defendant's
2  Exhibit 38?
3      A.  I did not directly supervise the creation of
4  this exhibit.
5      Q.  Did you indirectly supervise the creation of
6  this exhibit?
7      A.  I was aware of the content of this exhibit,
8  and my recollection is fuzzy, but I probably reviewed
9  the copy or selected portions of it.
10     Q.  Did you participate in the decision to create
11 a publication for CompuServe's subscribers?
12     A.  I did not.
13     Q.  Mr. Berkov, may I ask you to turn to the page
14 with the Bates number TMS 1093?
15     A.  Yes, ma'am.
16     Q.  In the center column, about halfway down, do
17 you see where it says Hampton Road, Virginia area?
18     A.  I do.
19     Q.  And below that, there's a line that says
20 Television Schedule; correct?
21     A.  Yes.
22     Q.  What does the "Go VPL-7" across from
23 Television Schedule, the middle column of TMS 1093,
24 stand for?
25     A.  That is a page number within the CompuServe

Page 26

1  system, which would be expected to produce the
2  television schedule.
3      Q.  Was that television schedule specific for a
4  geographic location?
5      MR. YOTHERS:  Objection to form.
6      THE WITNESS:  It would have been for the Hampton
7  Road, Virginia area.
8  BY MS. ZINANNI:
9      Q.  How could a user access the television
10  schedule for the Hampton Road, Virginia area on the
11  CompuServe information service?
12      A.  They would have a variety of options to do
13  that. They might do Find Hampton Road and be presented
14  with a listing very much as you saw here. They might
15  do a Find command on television listings, in which case
16  I would expect that this entry would also have
17  appeared. They might have known what the base level
18  database identifier for Hampton Road was, which is
19  apparently VPL, so they might have done a Go VPL, which
20  would have taken them to what's called the top level of
21  the database, which would have been a menu of entries
22  or services available or content available in that
23  database. Or they might have, if they knew it, done a
24  Go command of VPL-7, which would have taken them
25  directly to this listing.

Page 27

1      Q.  To your knowledge, was the television schedule
2  available for any locations other than Hampton Road,
3  Virginia at the time of Defendant's Exhibit 38?
4      A.  There were several newspapers that
5  participated in the AP agreement with CompuServe that
6  had television listings.
7      Q.  Do you recall any of those newspapers?
8      A.  I don't remember exactly which ones did and
9  didn't. I believe Columbus and New York did. Again,
10  my memory would be fuzzy.
11      Q.  If you turn to TMS 1094 in Defendant's 38, in
12  the left-hand column, do you see where it says
13  "Columbus area"?
14      A.  Yes.
15      Q.  Is that referring to the newspaper, as you
16  just mentioned, for Columbus?
17      MR. YOTHERS:  Objection to form.
18      THE WITNESS:  Based on these listings here, I would
19  expect that all of the items there, since they have a
20  CDP designator, were part of the dispatch, Columbus
21  dispatch offerings.
22  BY MS. ZINANNI:
23      Q.  And one of those offerings is television
24  listings; correct?
25      A.  It is.

Page 28

1      Q.  Mr. Berkov, do you know why CompuServe --
2  strike that.
3      Defendant's Exhibit 38 in the front says it is the
4  premier issue; correct?
5      A.  That is correct.
6      Q.  Do you know why CompuServe developed this
7  publication?
8      A.  Yes, I do.
9      Q.  Why was that?
10      A.  CompuServe felt it was appropriate and
11  necessary to have a communications vehicle to provide
12  its members or subscribers, however you want to call
13  them, with information about the service and how to
14  optimize the use of the service. It was also a method
15  of identifying new products and services that the
16  members or subscribers might not otherwise have heard
17  about.
18      Q.  For how long was CompuServe Information
19  Service Today in publication?
20      A.  I don't know exactly, but we know that it was
21  obviously produced up through the time that I left,
22  which was in 1995, so it began in 1981 and ran through
23  until 1995.
24      Q.  Was it in continuous publication from 1981
25  through 1995?

Page 29

1      A.  I believe so.
2      Q.  How often was CompuServe Information Service
3  Today issued?
4      A.  Monthly.
5      Q.  I'm handing you what's been marked as
6  Defendant's Exhibit 39.
7          (The document was marked as Defendant's
8          Exhibit 39 and is made a part of this
9          deposition.)
10      MS. ZINANNI:  It's a document bearing the Bates
11  range TMS 1084 through TMS 1090.
12      THE WITNESS:  Okay.
13  BY MS. ZINANNI:
14      Q.  Do you recognize Defendant's Exhibit 39?
15      A.  I do.
16      Q.  And what is it?
17      A.  It's another issue of CompuServe magazine. At
18  this time it was called CompuServe Today.
19      Q.  And what is the date of Defendant's
20  Exhibit 39?
21      A.  1981.
22      Q.  And was this document created in the ordinary
23  course of business of CompuServe?
24      A.  It was.
25      Q.  Did you supervise the copy of Defendant's

Page 30

1  Exhibit 39?
2     A.  I did not.
3     Q.  Did you review the copy of Defendant's Exhibit
4  39?
5     A.  I don't remember whether I did or did not.
6  It's possible that I did.
7     Q.  Do you know who created Defendant's Exhibit
8  39?
9     A.  I do.
10    Q.  Who was that?
11    A.  The staff of CompuServe today, which was a
12  part of the marketing organization of CompuServe.
13    Q.  And at that time, were you vice-president of
14  the marketing division?
15    A.  At the time, in October of 1981, I did not
16  have responsibility for CompuServe marketing.
17    Q.  Mr. Berkov, I'm handing you what's been marked
18  as Defendant's Exhibit 40.
19       (The document was marked as Defendant's
20    Exhibit 40 and is made a part of this
21    deposition.)
22    THE WITNESS:  Okay.  I have it.
23  BY MS. ZINANNI:
24    Q.  It's the document bearing the Bates range TMS
25  1076 through 1083.

Page 31

1     A.  Yes.
2     Q.  Do you recognize Defendant's Exhibit 40?
3     A.  I do.
4     Q.  And what is it?
5     A.  It's another issue of CompuServe today.
6     Q.  As of January 1982, the date of Defendant's
7  Exhibit 40, were you responsible for the marketing?
8     A.  I was not.  Incidentally I want to potentially
9  put a footnote to a prior answer I gave, which is that
10  I am not -- hello?  I am not 100 percent sure that at
11  this time period this was a monthly publication.  It
12  might have been a quarterly publication.  Ultimately it
13  was a monthly publication, but I just don't remember
14  for sure whether this was a monthly at this time.
15    Q.  I'd like to turn your attention to TMS 1083 of
16  Defendant's Exhibit 40.  In the fifth column, do you
17  see where it says "San Francisco area"?
18    A.  Yes, I guess I do.
19    Q.  Do you see where it says "Television"
20  underneath "San Francisco area"?
21    A.  Yes.
22    Q.  What does that "Television" under "San
23  Francisco area" refer to?
24    A.  I believe it is television listings as
25  provided by the San Francisco paper.

Page 32

1     Q.  Next to Television, I see there are two Go
2  indicators; is that correct?
3     A.  Yes.
4     Q.  Does SFC-7 stand for the San Francisco
5  Chronicle?
6     A.  That would be a good guess.
7     Q.  And SFE would be the San Francisco Examiner?
8     A.  Another good guess.
9     Q.  In the sixth column on Page TMS 1083 of
10  Defendant's Exhibit 40, do you see where it says
11  "Washington, D.C. area"?
12    A.  Yes.
13    Q.  And below that it says "Television"; correct?
14    A.  That is correct.
15    Q.  Do you know if Television under "Washington,
16  D.C. area" also stood for television listings?
17    MR. YOTHERS:  Objection to form.
18    THE WITNESS:  Yes.
19  BY MS. ZINANNI:
20    Q.  Yes, it does stand for television listings?
21    MR. YOTHERS:  Objection to form.
22    THE WITNESS:  To the best of my knowledge,
23  Television under "Washington, D.C." is television
24  listings as provided by the newspaper in Washington.
25  BY MS. ZINANNI:

Page 33

1     Q.  I'm handing you what's been marked as
2  Defendant's Exhibit 41, which is a document bearing the
3  Bates range TMS 1070 through 1075.
4        (The document was marked as Defendant's
5     Exhibit 41 and is made a part of this
6     deposition.)
7  BY MS. ZINANNI:
8     Q.  Do you recognize Defendant's Exhibit 41?
9     A.  I do.
10    Q.  And what is it?
11    A.  It's another issue of CompuServe today.
12    Q.  And what is the date of Defendant's
13  Exhibit 41?
14    A.  April of 19- -- looks like '82.
15    Q.  And was this document created in the ordinary
16  course of CompuServe's business?
17    A.  It was.
18    Q.  Did the purpose of the CompuServe Information
19  Service Today magazine change over time?
20    A.  I do not believe it changed.  Its primary
21  mission was to inform and communicate with members and
22  subscribers.  That remained in place.
23    Q.  Mr. Berkov, I'm handing you an exhibit that's
24  been marked as Defendant's Exhibit 42, which bears the
25  Bates Nos. TMS 1099 through TMS 1104.  Do you recognize

Page 34

1  Defendant's Exhibit 42?
2     A.  Yes.
3     Q.  And what is it?
4     A.  It's an issue of CompuServe today.
5        (The document was marked as Defendant's
6     Exhibit 42 and is made a part of this
7     deposition.)
8  BY MS. ZINANNI:
9     Q.  And what is the date of Defendant's
10 Exhibit 42?
11    A.  Well, it looks like it says September and
12 October of 1982.
13    Q.  And was this document created in the ordinary
14 course of CompuServe's business?
15    A.  It was.
16    Q.  Mr. Berkov, have you heard of the Personal
17 Entertainment Guide?
18    A.  Yes.
19    Q.  What is the Personal Entertainment Guide?
20    A.  It was an area on CompuServe that had various
21 things with respect to entertainment.  I believe it was
22 in what we would have called a forum or a bulletin
23 board area.
24    Q.  What was the bulletin board area?
25    A.  Well, a bulletin board is an area where people

Page 35

1  post messages or files that represent content that's
2  available for other members to either comment on or
3  download to their computers.
4     Q.  In the personal entertainment guide was part
5  of one of these bulletin boards?
6     A.  I believe so.
7     Q.  Mr. Berkov, I'm handing you what's been marked
8  as Defendant's Exhibit 43, which is a document bearing
9  the Bates numbers TMS 8885 through 8887.
10       (The document was marked as Defendant's
11    Exhibit 43 and is made a part of this
12    deposition.)
13 BY MS. ZINANNI:
14    Q.  Do you recognize Defendant's Exhibit 43?
15    A.  I do.
16    Q.  What is it?
17    A.  It's an issue of CompuServe magazine from
18 October 1992, CompuServe Magazine renamed Publication
19 of CompuServe Today.
20    Q.  And was Defendant's Exhibit 43 created in the
21 ordinary course of CompuServe's business?
22    A.  It was.
23    Q.  As of October 1992, did you oversee the
24 production of CompuServe magazine?
25    A.  I did.

Page 36

1     Q.  Mr. Berkov, if you turn to TMS 8887, do you
2  see on the left-hand column the article entitled "On
3  TV? On TV," exclamation mark?
4     A.  Yes, I do.
5     Q.  Is the personal entertainment guide referred
6  to in this article the same personal entertainment
7  guide you were describing earlier?
8     A.  Yes.
9     Q.  And you said that the personal entertainment
10 guide provided entertainment information; correct?
11    A.  That is correct.
12    Q.  Did that entertainment information include TV
13 listings?
14    MR. YOTHERS:  Objection to form.
15    THE WITNESS:  Yes.
16 BY MS. ZINANNI:
17    Q.  Mr. Berkov, we talked about how CompuServe
18 operated as of 1981 through the menu structure, and you
19 indicated that the users' interaction with CompuServe
20 changed over time.
21    A.  It did.
22    Q.  What was -- when was the first change away
23 from a menu-based structure made?
24    A.  Well, I'm fuzzy on the exact dates, but it was
25 in the late '80s when the first CompuServe information

Page 37

1  manager appeared.
2     Q.  What was the CompuServe information manager?
3     A.  It's a piece of software that ran on the
4  user's personal computer that interfaced with the
5  CompuServe information service and provided a more
6  computer-like interface than the prior dumb terminal
7  interface.
8     Q.  Were users able to search the CompuServe
9  information service using the CompuServe information
10 manager?
11    A.  Yes.
12    Q.  Can you describe how that search function
13 worked?
14    A.  Search function worked very similar to the way
15 it worked previously in that the user would invoke a
16 search or Find command, present a dialogue box with an
17 input blank.  The user would type in the desired search
18 term.  In this case they would click okay or search,
19 depending on how the dialogue was constructed.  It
20 would turn on the screen, a list, a computer screen
21 list or menu of the items that met the search criteria.
22    Q.  Using the CompuServe information manager, did
23 a user always select from a menu of options available
24 to the user?
25    A.  Well, at some point they might get to that.  I

Page 38

1  mean, they could have issued a Go command, which would
2  take them directly to a service or offering.
3      Q.  When the user initially -- strike that.
4      Would a user open CompuServe information manager on
5  their computer?
6      A.  Yes.
7      Q.  When they initially opened the CompuServe
8  information manager, were they presented with a list of
9  menu options at that time?
10     A.  Well, I think we need to step back and say
11 that when you have a CompuServe client software, you
12 would load that software.  You would be presented with
13 a screen that might have icons on it, so it's a menu or
14 a list of options, but they're in the form of icons.
15 Upon selecting one of those, the user would be logged
16 on to CompuServe.  Now, in some cases the user might be
17 prompted for the user I.D. and password.  In other
18 cases it might have been prestored on their personal
19 computer in conjunction with the software.
20     Q.  Was the user I.D. and password used with the
21 CompuServe information manager set by CompuServe?
22     A.  Yes.
23     Q.  Using the CompuServe information manager, did
24 a user always -- after the initial screen that you
25 described, did a user always select an icon?

Page 39

1      A.  Might have selected an icon.  They might have
2  selected a menu choice.
3      Q.  At any time, would a user of the CompuServe
4  information manager type in information?
5      A.  Yes.
6      Q.  Would the user ever type in geographical
7  information?
8      MR. YOTHERS:  Objection to form.
9      THE WITNESS:  There were several places where
10 geographical information might have been entered into
11 the system for the purposes of doing a retrieval of
12 some type.
13 BY MS. ZINANNI:
14     Q.  Can you give me some examples where
15 geographical information might be entered?
16     A.  Yes.  The first one that comes to mind is
17 weather.  There's a weather feature.  Typed in the city
18 name.  You got the weather back for that particular
19 location.
20     Q.  Do you know when that weather function first
21 appeared on CompuServe?
22     A.  The weather function was there very early on.
23 I don't remember the exact date, but it was very early
24 and prior to the existence of the CompuServe
25 information manager.  There are people who would know

Page 40

1  the dates associated with that.
2      Q.  And other than the weather, were there
3  other --
4      A.  Yes.
5      Q.  -- options?
6      A.  All of your airline reservation systems
7  require typing in a destination and a departure
8  location.  Those are both geographical.  There was a
9  database called Site, which was demographical
10 information where you could type in a zip code and
11 receive demographic information for the particular zip
12 code that you typed in.  The subscriber directory, one
13 of the components of finding someone's e-mail address
14 in addition to the user's name would have been their
15 geographical location, city and state.
16     Q.  Can you think of any others at this time?
17     A.  No, but there probably were others.
18 Geographical location is a typical method of retrieving
19 information from an information service, so it would
20 have been used throughout the service.
21     Q.  Mr. Berkov, I'm handing you what's been marked
22 as Defendant's Exhibit 44, which is a document bearing
23 the Bates range TMS 54623 through 54627.
24     (The document was marked as Defendant's
25     Exhibit 44 and is made a part of this

Page 41

1      deposition.)
2      THE WITNESS:  Uh-huh.
3  BY MS. ZINANNI:
4      Q.  Do you recognize this document?
5      A.  Well, I'm trying to see what the date on this
6  is.  1988?  Yes, I've seen this document.
7      Q.  And what is it?
8      A.  Well, it appears to be an issue of Online
9  Today, which -- which was the predecessor of the
10 CompuServe magazine, so we've gone back in time.
11     Q.  And was Defendant's Exhibit 44 created in the
12 ordinary course of CompuServe's business?
13     A.  It was.
14     Q.  In March 1988, did you oversee the staff of
15 Online Today?
16     A.  I did not.
17     Q.  Mr. Berkov, I'll ask you to turn to TMS 54626
18     A.  Okay.
19     Q.  I believe the first sentence starts on the
20 page before.  On the upper left-hand column, it lists
21 various online reservation systems.  Do you see that?
22     A.  Well, which -- where are you looking exactly?
23     Q.  On Page TMS 54626 on the top left column.
24     A.  Yes, right.  Okay.  I see that.
25     Q.  You mentioned that airline reservation systems

Page 42

1  were one place a user may enter geographical
2  information?
3      A.  Yes, I did.
4      Q.  For each of the online reservation systems
5  listed on Page TMS 54626, did a user type in their
6  departure city?
7      A.  Yes.
8      Q.  And for each of the airline reservation
9  systems on TMS 54626, did a user type in their arrival
10  city?
11      A.  Yes.
12      Q.  I'm handing you what's previously been marked
13  as Krass Exhibit 9, which is a document bearing the
14  Bates range TMS 1210 through TMS 1233.
15      A.  Yes.
16      Q.  Do you recognize Krass Exhibit 9?
17      A.  I am aware of this publication.  I have not
18  read this publication.
19      Q.  How did you become aware of Krass Exhibit 9?
20      A.  As part of my management and executive
21  responsibilities, I was aware of all of the major
22  publications, books and even articles that were written
23  with respect to CompuServe.
24      Q.  Did the authors of this book contact
25  CompuServe before the publication of Krass Exhibit 9?

Page 43

1      A.  I don't know.
2      Q.  I'll ask you to turn to Page TMS 1217.
3      A.  Okay.
4      Q.  You stated earlier that a CompuServe user, in
5  order to access weather information, could type in
6  their city; is that correct?
7      A.  That's correct.
8      Q.  Figure 4-11 on Page TMS 1217, is that the box
9  you described?
10      A.  It is.
11      Q.  And where would a user type in their city
12  information in Figure 4-11?
13      A.  In the space right after City.
14      Q.  How would a user select the city option in the
15  dialogue box in Figure 4-11?
16      A.  They would probably type a down arrow to get
17  to the city.  They might -- I'm not sure, but I believe
18  they would probably type a down arrow.  The asterisk or
19  check mark would move from local to city, at which
20  point they would be able to type in the name of a city.
21      Q.  After a user typed in the name of a city and
22  selected okay, what information did the user receive?
23      A.  A weather report.
24      Q.  Was the weather report specific to any
25  location?

Page 44

1      A.  The city that they typed in.
2      Q.  Mr. Berkov, I'm handing you what's been marked
3  as Defendant's Exhibit 45.
4          (The document was marked as Defendant's
5          Exhibit 45 and is made a part of this
6          deposition.)
7  BY MS. ZINANNI:
8      Q.  It's a document bearing the Bates range of TMS
9  54628 through TMS 54629.
10      A.  Yes.
11      Q.  Do you recognize this document, Mr. Berkov?
12      A.  I do.
13      Q.  What is Defendant's Exhibit 45?
14      A.  It is another issue of a CompuServe
15  publication, Online Today, appears to be from January
16  of 1985.
17      Q.  And was Defendant's Exhibit 45 created in the
18  ordinary course of CompuServe's business?
19      A.  It was.
20      Q.  I'll ask you to turn to Page TMS 54629.
21      A.  Yes.
22      Q.  You said there was a database called Site with
23  demographic information --
24      A.  Yes.
25      Q.  -- on CompuServe.  Does this article describe

Page 45

1  the database you referenced?
2      A.  It does.
3      Q.  And a user entered a zip code on this site to
4  get demographic information?
5      A.  Zip code was one of the access methods, yes.
6      Q.  What were the other access methods?
7      A.  Probably the name of a state or region.  Might
8  have been -- what do they call it?  SMSA, metropolitan
9  statistical area or whatever.
10      Q.  Mr. Berkov, I'm handing you what's been marked
11  as Defendant's Exhibit 46.
12          (The document was marked as Defendant's
13          Exhibit 46 and is made a part of this
14          deposition.)
15      THE WITNESS:  Okay.
16  BY MS. ZINANNI:
17      Q.  Do you recognize Defendant's Exhibit 46?
18      A.  Yes, I do.
19      Q.  What is Defendant's Exhibit 46?
20      A.  It is a book on CompuServe called How To Get
21  the Most Out of CompuServe.
22      Q.  I should clarify for the record, Defendant's
23  Exhibit 46 is a document bearing the Bates range TMS
24  54646 through TMS 54651.  Was Defendant's Exhibit 46
25  created by CompuServe?

Page 46

1    A.  No.
2    Q.  Who was it created by?
3    A.  It was created by the authors, Payton and
4  Bowen.
5    Q.  Did Mr. Payton and Mr. Bowen contact
6  CompuServe before publication of Defendant's
7  Exhibit 46?
8    A.  Yes.
9    Q.  Did CompuServe review the content of
10  Defendant's Exhibit 46 before it was published?
11    A.  Yes.
12    Q.  Did you review the content of Defendant's
13  Exhibit 46 before it was published?
14    A.  I do not remember whether I did or I didn't.
15    Q.  Do you know the purpose of publication of
16  Defendant's Exhibit 46?
17    A.  Well, the smart answer is to make money, but
18  the real answer is that the purpose of it was to write
19  a book that was essentially a user's manual for
20  CompuServe in more layman terms perhaps or more popular
21  form than the publication provided by CompuServe
22  itself.
23    Q.  Did CompuServe make any changes to its system
24  as a result of talking to Mr. Payton and Mr. Bowen?
25    A.  I don't know that we did.  CompuServe had its

Page 47

1  objective to listen to user input.  These were
2  influential users, so it's conceivable that some change
3  or some tweak to the system occurred as a result of the
4  interaction with these.
5    Q.  I'd ask you to turn to Page TMS 54649 of
6  Defendant's Exhibit 46.
7    A.  Yes.
8    Q.  You testified earlier that there was a
9  subscriber directory in which city and state would be
10  part of the search term; is that correct?
11    MR. YOTHERS:  Objection to form.
12    THE WITNESS:  My answer is that there was a
13  subscriber directory.  Its purpose was to locate other
14  users of CompuServe, other members.  There were a
15  variety of inputs that went into that search.  Included
16  in those inputs was city and state.
17  BY MS. ZINANNI:
18    Q.  Mr. Berkov, I'm handing you what's been marked
19  as Defendant's Exhibit 47.  I apologize, it's not the
20  clearest copy.
21    (The document was marked as Defendant's
22    Exhibit 47 and is made a part of this
23    deposition.)
24  BY MS. ZINANNI:
25    Q.  It's a document bearing the Bates Nos. TMS

Page 48

1  54630 through TMS 54645.  Do you recognize Defendant's
2  Exhibit 47?
3    A.  I do.
4    Q.  And what is Defendant's Exhibit 47?
5    A.  It's another book on CompuServe similar to the
6  one we just looked at.
7    Q.  Did CompuServe review the copy of Defendant's
8  Exhibit 47 before it was published?
9    A.  I cannot state with certainty that they did.
10  It would be my expectation that they did.
11    Q.  Did CompuServe maintain copies of guides such
12  as Defendant's Exhibit 47 created by CompuServe users?
13    A.  Yes.
14    Q.  Did you oversee the maintenance of users'
15  guides such as Defendant's Exhibit 47?
16    A.  Well, certainly from 1990 to 1995, that was
17  part of my responsibility.  It may have been part of my
18  responsibilities prior to 1990, but I cannot state with
19  certainty that it was.
20    Q.  I'm handing you, Mr. Berkov, a document that's
21  been marked as Defendant's Exhibit 48.
22    (The document was marked as Defendant's
23    Exhibit 48 and is made a part of this
24    deposition.)
25  BY MS. ZINANNI:

Page 49

1    Q.  It bears the Bates Nos. TMS 54794 through TMS
2  54802.  Do you recognize Defendant's Exhibit 48?
3    A.  I do.
4    Q.  And what is Defendant's Exhibit 48?
5    A.  It is an almanac which is basically a
6  directory of services and offerings on CompuServe.
7    Q.  Do you know the date of Defendant's
8  Exhibit 48?
9    A.  No, but it appears to be from the 1990 time
10  frame based on the publication number.
11    Q.  Was Defendant's Exhibit 48 published by
12  CompuServe?
13    A.  It was.
14    Q.  Do you know who created Defendant's Exhibit
15  48?
16    A.  CompuServe staff members created it.
17    Q.  Did you oversee the creation of Defendant's
18  Exhibit 48?
19    A.  Yes.
20    Q.  Was this -- was Defendant's Exhibit 48 created
21  in the ordinary course of CompuServe's business?
22    A.  Yes.
23    Q.  And what was the purpose of Defendant's
24  Exhibit 48?
25    A.  The purpose was to assist users in finding

Page 50

1 products and services of interest to them.
2  Q. Make sure I'm clear. Defendant's Exhibit 48
3 was created for users of CompuServe?
4  A. Yes.
5  Q. Mr. Berkov, if you turn to Page TMS 54799.
6  A. Okay.
7  Q. I believe we discussed the Super Site database
8 already; correct?
9  A. That is correct.
10  Q. There are two other databases listed on Page
11 TMS 54799. To your knowledge, were these two
12 databases, the neighborhood report and the
13 U.S.-State-County reports, searchable?
14  A. Yes. These were part of Super Site.
15  Q. What do you mean when you say they were part
16 of Super Site?
17  A. Super Site was the name of the overall
18 offering, consisted of a variety of offerings under
19 that umbrella name. These are two of those offerings.
20  Q. And were these two offerings searchable using
21 geographic information?
22  A. Yes.
23  MR. YOTHERS: Objection to form.
24  THE WITNESS: The answer is yes. They were
25 searchable by zip code or by other geographical

Page 51

1 criteria.
2 BY MS. ZINANNI:
3  Q. Mr. Berkov, I'm handing you what's been marked
4 as Defendant's Exhibit 49.
5  (The document was marked as Defendant's
6  Exhibit 49 and is made a part of this
7  deposition.)
8 BY MS. ZINANNI:
9  Q. Which bears the Bates Nos. TMS 54719 through
10 54756. Mr. Berkov, do you recognize Defendant's
11 Exhibit 49?
12  A. I do.
13  Q. And what is Defendant's Exhibit 49?
14  A. It's a manual or user's guide for the
15 CompuServe information service.
16  Q. And was Defendant's Exhibit 49 created by
17 CompuServe?
18  A. Yes.
19  Q. Was it created in the ordinary course of
20 CompuServe's business?
21  A. Yes.
22  Q. Did you supervise the creation of Defendant's
23 Exhibit 49?
24  A. Effectively I did because I was responsible
25 for the content of it.

Page 52

1  Q. And what was the purpose of Defendant's
2 Exhibit 49?
3  A. To enable and assist members of CompuServe or
4 users of CompuServe in operating the service and
5 finding the information that they sought or services
6 that they were looking for.
7  MS. ZINANNI: I have no further questions.
8  MR. YOTHERS: I have a few questions, but I'd like
9 to take a break if we could.
10  THE WITNESS: Okay.
11  VIDEOGRAPHER: We're going off the record. The
12 approximate time is 2:14.
13  (Recess taken.)
14  VIDEOGRAPHER: We're going back on the record. The
15 time is approximately 2:28
16
17  EXAMINATION
18 BY MR. YOTHERS:
19  Q. Mr. Berkov, I just have a few follow-up
20 questions for you. One was, it sounds like in about
21 1982, you had left CompuServe for a six-month period
22 somewhere else?
23  A. That's correct.
24  Q. What was that employment?
25  A. I was vice-president of marketing for a

Page 53

1 financial database software firm called Capital Market
2 Systems, subsequently known as Gregg Corporation.
3  Q. Sorry, as what corporation?
4  A. Greg, G-r-e-g-g.
5  Q. Okay. All right. And you said you were
6 self-employed; correct?
7  A. That is correct.
8  Q. Okay. What type of work do you do?
9  A. I am an executive management consultant. I'm
10 also a specialist in Internet and online services.
11  Q. Are you being compensated for your time here
12 today?
13  A. I am being compensated for the time that I am
14 missing as a consultant. I'm not being paid for my
15 testimony.
16  Q. Okay. What amount is that being compensated
17 at?
18  A. $300 an hour.
19  Q. Is that being paid by Tribune Media Services?
20  A. I presume so.
21  Q. What's your normal consulting rate?
22  A. It varies from slightly more than flipping
23 burgers to 300 or more dollars an hour.
24  Q. Okay. And let's see. And did you meet with
25 Tribune Media Service or Kirkland & Ellis before today?

Page 54

1   A.  I did.
2   Q.  When was that?
3   A.  This morning.
4   Q.  Okay.  How long did you spend doing that?
5   A.  Hour and a half perhaps.
6   Q.  And whom did you talk with?
7   A.  Meredith.
8   Q.  Anyone else?
9   A.  No.
10  Q.  Okay.  Did you discuss your testimony today?
11  A.  We did not discuss my testimony.  We reviewed
12  the materials.
13  Q.  So you did not discuss the questions that will
14  be asked of you today?
15  A.  No.
16  Q.  Okay.  And were you given any information on
17  the issues present in this case?
18  A.  Well, could you clarify what that is?  I mean,
19  I'm aware that there's a dispute between the parties
20  with respect to a particular patent, but other than
21  that, I don't have any information.
22  Q.  So did you review the patent, then?
23  A.  No.
24  Q.  Okay.
25  MR. YOTHERS:  I believe that's all for me today.

Page 55

1   THE WITNESS:  That was easy.
2   VIDEOGRAPHER:  This marks the end of Tape 1, Volume
3   I in the deposition of Barry Berkov.  The original
4   videotapes will be retained by LegaLink.  We're going
5   off the record.  The time is approximately 2:31.
6   (Whereupon, at 2:31 P.M. the deposition
7   concluded.)
8
9           * * * * *
10
11  I hereby declare under penalty of perjury
12  that the foregoing deposition is my deposition under
13  oath; that these are the questions asked of me and my
14  answers thereto; that I have read my deposition and
15  have made the necessary corrections, additions or
16  changes to my answers that I deem necessary.
17
18  IN WITNESS THEREOF, I hereby subscribe my
19  name, this _____ day of _____ 2006.
20
21
22  _____
23  BARRY BERKOV
24
25

Page 56

1   STATE OF CALIFORNIA    )
2                          ) SS.
3   COUNTY OF SAN DIEGO    )
4
5   I, FLORINDA ST. CYR, CSR No. 10180, RPR, hereby
6   certify that I reported in shorthand the above
7   proceedings on WEDNESDAY, OCTOBER 11, 2006, at
8   1380 Harbor Island Drive, in the City of San Diego,
9   County of San Diego, State of California; and I do
10  further certify that the above and foregoing pages,
11  numbered from 4 to 56 inclusive, contain a true and
12  correct transcript of all of said proceedings.
13  It was stipulated that the original deposition
14  be delivered to Meredith Zinanni, Esq. for the purpose
15  of having the witness read, correct and sign the
16  deposition under penalty of perjury; said original
17  thereafter to be forwarded to and maintained by
18  Meredith Zinanni, Esq. until the time of trial.
19
20  DATED: October ____, 2006.
21
22
23  _____
                FLORINDA ST. CYR
24              CSR NO. 8573, RPR
25


**LEGALINK**
A MERRILL COMPANY

CASE: TV Guide vs. Tribune Media Services

Barry Berkov  October 11, 2006

| PAGE | LINE | ERRATA SHEET | |
|---|---|---|---|
| 8 | 11 | CHANGE: | box LOT |
| | | REASON: | spelling / name |
| 8 | 12 | CHANGE: | box Lot |
| | | REASON: | spelling / name |
| 27 | 20 | CHANGE: | Dispatch |
| | | REASON: | capital D / proper case |
| 27 | 21 | CHANGE: | Dispatch |
| | | REASON: | capital D / proper case |
| | | CHANGE: | |
| | | REASON: | |
| | | CHANGE: | |
| | | REASON: | |
| | | CHANGE: | |
| | | REASON: | |
| | | CHANGE: | |
| | | REASON: | |
| | | CHANGE: | |
| | | REASON: | |
| | | CHANGE: | |
| | | REASON: | |

(signed)  _____  DATE 11/22/06
Witness Signature

Reporter:  Florinda St. Cyr

GLOBAL COURT REPORTING  ·  LEGAL VIDEOGRAPHY  ·  TRIAL SERVICES



## CERTIFICATION OF WITNESS

I, Barry Berkov, being first duly sworn, on oath say that I

am the deponent in the aforesaid deposition taken on

October 11, 2006; that I have read the foregoing transcript

of my deposition, consisting of pages 1 through 56

inclusive, and affix my signature to same.

_____
                    WITNESS                          11/22/06


Subscribed and sworn to before me this _____ day of

_____, ____.


_____
        Notary Public


Reporter:  Florinda St. Cyr

TV Guide vs. Tribune Media Services

# EXHIBIT II



CompuServe
Information Service

# TODAY

PRICE $2.50

Groups and Clubs
Go National

Electronic
Mail

The Multiple
Choice

The Children's
Computer School

Popular
Science

CompuServe Information Service

## Groups and Clubs

Heath Users Group         Go PCS-50
     Meeting NOW!

Apple Users Group         Go PCS-50
     Meeting NOW!

Aviation Interest Group   Go HOM-50
     Meeting NOW!

Photography Club          Go HOM-50
     Meeting NOW!

Ham Radio Operators       Go HOM-50
     Meeting NOW!

CB Simulator              Go HOM-50
Users Group
     Meeting NOW!

NETWITS                   Meeting NOW!

Radio Shack TRS-80
Users Group
     Meeting NOW!

TMS 0001070



**LATEST NEWS**       5   **CompuServe at 25,000 Mark, Still Growing**
                          **Future View, Legislation Featured in New Offerings**
                          **Business News from Canadian Wire Service**

**PRODUCTS**          8   **All New Electronic Mail**
                          *EMAIL is a user-friendly electronic mail system that provides an*
                          *inexpensive and efficient method for communicating.*

                     10   **The Multiple Choice**
                          *Trivia? Analogies? Personality Profile? The Multiple Choice will put you*
                          *to the test.*

                     12   **Groups and Clubs Go National**
                          *Now you can belong to clubs that have nationwide memberships and*
                          *that meet 24 hours a day.*

                     25   **10 Can Play Interactive Decwars Game**
                          *Federation forces battle the dreaded Klingons for control of the galaxy.*

**INDUSTRY WATCH**    9   *Read brief news announcements within the*
                          *microcomputing industry.*

                     28   **School Offers Instruction in Computer Literacy**
                          *The Children's Computer School opens its doors to teach children and*
                          *adults how to use personal computers.*

**CUSTOMER SERVICE** 15   **Q&A**
                          *Answers to the most frequently asked questions about CompuServe.*

**SUBJECT INDEX**    16   *A printed copy for you to tear out and keep.*

**LIFE, LOVE & TRIVIA** 18 **Ask Aunt Nettie**
                          *A sample of Aunt Nettie's weekly on-line column.*

**FUTURE**           20   **The Perfect Rose**
                          *The story of how an electronic club helped one person grow the*
                          *perfect rose.*

**TECHNOLOGY**       22   **Menu Structure Takes on New Look**
                          *CompuServe's new menu structure promotes ease of use.*

**I.P. SPOTLIGHT**   26   **Videotex Lets Top Magazine Interact with Readers**
                          *Popular Science uses videotex to involve its readers.*

The Cover:
A list of meeting times of CompuServe's groups and clubs.
Greg Miller, Photographer

TMS 0001071



TMS 0001072

TMS 0001073

# Technology

## MENU STRUCTURE TAKES ON NEW LOOK, PROMOTES EASE OF USE



As part of CompuServe's continuing effort to make its information service responsive to customers' needs, a new menu structure has been put into effect.

All of the information contained on CompuServe has been organized under 6 primary interest sections: 1. Newspapers, 2. Home Services 3. Business and Financial Services 4. Personal Computing Services 5. User Information 6. Index.

**Newspapers.** Our electronic newspapers are now directly accessible from the new main menu as selection 1. All eleven newspapers can also be reached from the Home Services menu.

**User Information.** The User Information section contains material pertinent to your general use of the information service including Feedback, documentation and product ordering, What's New, a general command summary as well as instructions for verifying and/or altering your terminal defaults, password and credit card information. Detailed billing information, current access rates and telephone numbers are located here.

**Index.** The Index section contains the most up-to-date version of our Subject Index.

**Home Services.** The Home Services sections contains general and family-related information

and services. Currently, these include:

1. Newspapers.

2. Weather: This includes both aviation and public/marine weather.

3. Reference Library: Under this menu you can find general interest newsletters from such information providers as the Aviation Safety Institute, magazines such as Better Homes & Gardens, and the Refundle Bundle.

4. Communications: A com-

TMS 0001074

# Technology



munications area has been placed in each of the three main service sections to enable you to have access to these often-used offerings as easily as possible. This communications area includes Electronic Mail, CB, the National Bulletin Board and the on-line User Directory.

5. Shop/Bank at Home: Electronic banking and shopping offerings can be found under this choice including, among others, Comp-U-Star and Bank-at-Home.

6. Groups and Clubs: The groups and clubs available under Home Services are general interest groups that share an interest in non-technical subjects.

7. Games and Entertainment:

The games menu contains your old favorites, like Adventure and football, in addition to games that were previously available on other areas of the service. Interactive games, such as Decwars and Space War, can be reached through this menu.

8. Education: The education section contains the College Board that is a must for any prospective college student and the Multiple Choice where you can test your trivia skills and be challenged by many types of self development tests.

9. Home Management: In this section are grouped several very handy home-management programs for doing such otherwise

tedious jobs as balancing your checkbook or figuring out your schedule.

Business and Financial Services: The Business and Financial Services section includes business and financial reports, updated stock quotes, business reference data including, among others, Dow Quote and Standard and Poor.

Personal Computing Services: The Personal Computing services section includes new programming languages, a word processor, a Software Exchange program for purchasing software, computer related groups and clubs and an area for programming activities.

TMS 0001075