IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TV GUIDE ONLINE, INC. and<br>TV GUIDE ONLINE, LLC,<br><br>Plaintiffs and Counterclaim Defendants,<br>v.<br><br>TRIBUNE MEDIA SERVICES, INC.,<br><br>Defendant and Counterclaim Plaintiff. | )<br>)<br>)<br>)<br>)  C.A. No.: 05-725-***<br>)<br>)<br>)  **PUBLIC VERSION**<br>)<br>) |

**CONSOLIDATED APPENDIX OF EXHIBITS FOR DEFENDANT
TRIBUNE MEDIA SERVICES, INC.'S REPLY BRIEFS**

*Of Counsel*

Mark A. Pals, P.C.
Linda S. DeBruin, P.C.
Michael A. Parks
Meredith Zinanni
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
312.861.2000

Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I.D. No. 2696)
MORRIS JAMES LLP
500 Delaware Avenue, 15th Floor
Wilmington, Delaware 19801
302.888.6800

*Counsel for Defendant Tribune
Media Services, Inc.*

Originally filed: December 21, 2007

Public version filed: January 3, 2008

## Appendix C Index for *TV Guide v. TMS* Reply Briefs

| Document Name | Appendix C page # |
|---|---|
| 10/16/2006 Claim Construction Issue Identification | C 1 - C 4 |
| 9/27/2007 Letter from Meredith Zinanni to Christopher Harnett | C5 - C 6 |
| 9/25/2007 Letter from Christopher Harnett to Meredith Zinanni | C 7 - C 8 |
| License Agreement TG 013380 - TG 013381 | C 10 - C 11 |
| 6/10/2003 Order from In re Gemstar Development Litigation (MDL - 1274) | C 11 - C 17 |
| 4/22/2005 Email from M. Ford-Livene to B. Needleman | C 18 - C 20 |
| Press Release | C 21 - C22 |
| Samir Armaly business card | C 23 |
| Handwritten Notes | C 24 - C 25 |
| Excerpts from S. Armaly 10/18/2006 Deposition Transcript | C 26 - C 28 |
| Excerpts from  B. Needleman 9/29/2006Deposition Transcript | C 29 - C 30 |
| Excerpts from M. Kaplinsky 10/5/2006 Deposition Transcript | C 31 - C 34 |
| Excerpts from G. Tjaden 6/15/2007 Deposition Transcript | C 35 - C 38 |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TV GUIDE ONLINE, INC. AND TV GUIDE ONLINE, LLC, )<br>Plaintiffs, )<br>v. )<br>TRIBUNE MEDIA SERVICES, INC., )<br>Defendant. ) | C.A. No. 05-725-KAJ |

## CLAIM CONSTRUCTION ISSUE IDENTIFICATION

Pursuant to paragraph 12 of the Court's March 10, 2006 Scheduling Order, Plaintiffs TV Guide Online, Inc. and TV Guide Online, LLC (collectively "TV Guide" or "Plaintiffs") submit the following list of claim term(s)/phrases and proposed constructions. TV Guide reserves the right to supplement or amend this identification and the proposed constructions as appropriate or in light of TMS's proposed constructions. For those terms or phrases not defined herein, TV Guide presently asserts that those terms and phrases need no further explanation or definition for ultimate inclusion in a jury instruction. If Tribune Media Services ("TMS") offers proposed definitions for such terms or phrases, TV Guide will consider TMS's proposed constructions and reserves the right to offer different definitions in accordance with the procedure set forth in the Scheduling Order.

**Proposed Terms and Constructions**

U.S. Patent No. 5,988,078

| Term or Phrase | Patent Claims | TV Guide's Proposed Construction |
|---|---|---|
| "viewing location" | 1-7 | "residence or other building at which a television signal can be received" |
| "transmitting" | 1-7 | "sending electronically" |
| "transmit" | 8, 10 | "send electronically" |
| "receiving" | 1-7 | "receiving electronically" |
| "receive" | 8, 10 | "receive electronically" |
| "modem" | 1-8, 10 | "data signal conversion device that connects data terminal equipment to a communication line" |
| "controller" | 8, 10 | "a programmable electronic device" |
| "information . . . regarding the geographical location of the particular viewing location" | 1-5 | "geographical information regarding the residence or other building at which a television signal can be received" |
| "information . . . regarding the geographical area of the viewing location" | 6-7 | (same as above) |
| "information . . . pertaining to the geographic location of the television receiver" | 8, 10 | "geographical information pertaining to the residence or other building at which a television receiver is located" |

2

OF COUNSEL:

Robert C. Morgan
Christopher J. Harnett
Ching-Lee Fukuda
Stuart W. Yothers
Danielle C. Schillinger
FISH & NEAVE IP GROUP
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 596-9000

Ronald E. Naves, Jr.
Sr. Vice President
Legal Affairs and Litigation
Gemstar-TV Guide International, Inc.
6922 Hollywood Boulevard
Hollywood, California 90028
(323) 817-4600

Dated: October 16, 2006

Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Steven J. Fineman (#4025)
RICHARDS, LAYTON & FINGER PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700
cottrell@rlf.com
moyer@rlf.com
fineman@rlf.com

Attorneys for Plaintiffs TV Guide Online, Inc. and
TV Guide Online, LLC

3

C-3

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2006 the foregoing document was Hand Delivered to

the following:

Richard K. Herrmann, Esquire
Mary B. Matterer, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
Wilmington, DE   19899-0951

I hereby certify that on October 16, 2006, I have sent by Electronic Mial, the foregoing

document to the following non-registered participant:

Mark A. Pals, P.C., Esquire
Kirkland & Ellis, LLP
200 East Randolph Drive
Chicago, IL  60601

Steven J. Fineman (#4025)

RLF1-2983269-1

C-4

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Meredith Zinanni
To Call Writer Directly:
(312) 861-2010
mzinanni@kirkland.com

312 861-2000

www.kirkland.com

Facsimile:
312 861-2200
Dir. Fax (312) 660-8036

September 27, 2007

**Via E-Mail**

Christopher J. Harnett
Fish & Neave IP Group of Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036

*Re:    TV Guide Online v. Tribune Media Services*

Dear Chris:

I write in response to your letter from earlier today.

TMS cannot provide "unequivocal written assurance" that the plain and ordinary meaning of the terms for which constructions were previously proposed do not "include any of the definitions that TMS previously proposed," as you request, because TMS does not fully understand your request. For the majority of these terms, TMS is of the view that its previously proposed constructions were consistent with the plain and ordinary meaning of the term. TV Guide appeared to be of the same view, as TV Guide's expert did not identify any substantive dispute between the parties regarding the constructions of "available to a particular one of the viewing locations," "operator input," "memory for storing the information," "receive information through the operator input," or "electronic terminal unit."

It appears from your objections, however, that TV Guide has a different view regarding the plain and ordinary meaning of these terms. TMS will not agree to limit its ability to put forth arguments or testimony regarding the proper construction of these terms without further clarification from TV Guide regarding its objection.

Again, to ensure that the parties are on the same page, here are the terms in the disputed claims for which TMS previously proposed a construction and is now proposing have their plain and ordinary meaning:

- "available to a particular one of the viewing locations"
- "operator input"
- "schedule of the television programming"

Hong Kong      London      Los Angeles      Munich      New York      San Francisco      Washington, D.C.

C-5

Christopher J. Harnett
September 27, 2007
Page 2

- "memory for storing the information"
- "download"
- "receive information through the operator input"
- "wide area network"
- "electronic terminal unit"

Additionally, we have agreed to TV Guide's proposed construction of "controller" to be a "programmable electronic device."

If TV Guide can provide a more focused request clarifying where it believes TMS's previous proposed constructions conflict with the plain and ordinary meaning of these terms, TMS will gladly consider it in order to resolve this issue. However, TMS cannot agree to make a blanket assurance that there is no overlap between the plain and ordinary meaning of these claim terms and the constructions previously proposed by TMS.

Sincerely,

Meredith Zinanni

cc:    Frederick Cottrell III
       Richard Herrmann

C-6



## FISH & NEAVE IP GROUP

ROPES & GRAY LLP
1211 AVENUE OF THE AMERICAS    NEW YORK, NY 10036-8704    212-596-9000    F 212-596-9090
BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

Christopher J. Harnett
212-596-9125
212-596-9000 fax
Christopher.Harnett@ropesgray.com

September 25, 2007

<u>VIA FAX</u>

Meredith Zinanni, Esq.
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601

*TV Guide Online v. Tribune Media Services*
C. A. No. 05-CV-725-KAJ

Dear Meredith:

I write in response to your letter concerning claim construction proceedings that we received after the close of business on Friday, September 21, 2007.

In response to your inquiry, TV Guide does not intend to withdraw any of the claims of the '078 patent that it is asserting against TMS.

Next, we do not understand TMS's latest attempt to change its position on the construction of the words and phrases included in the asserted patent claims. The deadline for the parties to identify proposed constructions was nearly one year ago. Since that time, TMS has changed its proposed constructions on several occasions. Now -- less than one week before the due date for submission of claim construction briefs (a date that was extended on several occasions at TMS's request) -- TMS asserts for the first time that several claim terms for which TMS had previously proposed definitions, should be construed according to their "plain and ordinary meaning."

C-7

09-25-07    05:30pm    From-ROPES & GRAY LLP    T-044  P.003/003  F-734

ROPES & GRAY LLP

Meredith Zinanni, Esq.                          - 2 -                          September 25, 2007

That makes no sense. TMS's expert has based his opinions on various definitions previously proposed by TMS. TMS's expert did not base his opinions on the so-called "plain and ordinary meaning" of limitations that TMS now proposes. Accordingly, TV Guide believes that the parties and Court should address the proposed constructions that TMS's expert actually used.

Very truly yours,

Christopher J. Harnett

CJH:epb

cc:    Frederick L. Cottrell, III, Esq.

C-8

REDACTED

**C-9**

# REDACTED

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JUN 1 0 2003

LUTHER THOMAS, Clerk
BY: _____ Deputy Clerk

IN RE GEMSTAR DEVELOPMENT
CORPORATION PATENT LITIGATION

MDL-1274-WBH
No. 1:98-CV-3477

RELATED TO
CIVIL ACTION FILE

No. 1:01-CV-2426-WBH (MDL)

## ORDER

Before the Court are EchoStar's motion for summary judgment that Gemstar lacks

standing to enforce patent number '713 [191], Gemstar's motion to amend its answer and

counterclaim [199], and EchoStar's motion to file additional evidence [225].[1]

EchoStar[2] moves for summary judgment dismissing all claims under U.S. Patent No.

4,908,713 ("the '713 patent") on the ground that Gemstar[3] lacks standing to bring an

infringement action based on the '713 patent. EchoStar asserts that Gemstar Development

Corporation ("GDC") is, at most, the holder of rights to only eighteen of the '713 patent's

thirty claims, and that the law provides that a holder of less than all substantial rights under

---

[1] These motions have also been filed in the MDL master file, case no. 1:98-CV-3477, and have been assigned docket numbers [454], [504]and [589] in the master file.

[2] EchoStar, as defined in the Amended Complaint, refers to the following entities: EchoStar Communications Corporation, EchoStar Technologies Corporation, and EchoStar Satellite Corporation.

[3] The Gemstar counter-claimants are Gemstar-TV Guide International, Inc., Gemstar Development Corp., TV Guide, Inc., and StarSight Telecast, Inc.. Of these four entities, the only party with any arguable right to enforce the '713 patent is Gemstar Development Corp.. Summary judgment as to claims raised by Gemstar-TV Guide International, Inc., TV Guide, Inc., and StarSight Telecast, Inc. is GRANTED AS UNOPPOSED.

AO 72A
(Rev.8/82)

C-11

a patent is a mere licensee without the power to sue on the patent. Gemstar opposes the motion, and has filed a motion to amend its answer and counterclaim to add its wholly-owned subsidiary, Index Systems, Inc., as a counter-claimant. As this case is before the Court on EchoStar's motion for summary judgment, the Court must view the facts in the light most favorable to GDC, the non-movant. See Hairston v. Gainesville Sun Publishing Co., 9 F.3d 913, 918 (11th Cir. 1993). Viewed in this light, the following facts emerge:

## I. BACKGROUND

The '713 patent, which contains thirty claims, issued on March 13, 1990 to Michael R. Levine. Three years later, on July 30, 1993, Levine and his company, Smart VCR Limited Partnership ("Smart VCR"), entered into a License Agreement ("the License Agreement") with GDC. Under the License Agreement, Smart VCR granted GDC the exclusive right and license to the "Levine Patents," which were defined as including only claims 1-18 of the '713 patent.

During the term of this exclusive license agreement, a dispute arose between GDC and Smart VCR regarding the amount of royalties GDC owed under the License Agreement. To settle this dispute Levine, Smart VCR and GDC executed an Assignment Agreement on October 20, 1997 ("the 1997 Agreement") in which Levine and Smart VCR assigned to GDC the rights to the claims that were subject to the License Agreement. With respect to the '713 patent, the 1997 Agreement specifically noted that it was assigning "only claims 1-18" of the '713 patent. Neither Levine nor Smart VCR is a party to the counterclaim.

On January 6, 1998, Levine and Smart VCR entered into an agreement ("the 1998 Assignment") which assigned to Index Systems rights in several patents, including claims 1-

2

18 of the '713 patent.[4]  Although Levine and Smart VCR previously had conveyed, by the 1997 Agreement, rights to claims 1-18 of the '713 patent to GDC, the 1998 Assignment purports to convey those same rights to Index Systems. Index Systems is not currently a party to the counterclaims asserted against EchoStar in this action, but GDC has filed a motion to amend its counterclaims to add Index Systems as a party.

In September 2001, EchoStar filed the present action, alleging violations of federal and state antitrust and unfair competition laws. In March 2002, Gemstar filed an answer and counterclaim, alleging that EchoStar infringed on the '713 patent. In the present motion for summary judgment, EchoStar argues that GDC does not have rights to claims 19-30 of the '713 patent, and, therefore, GDC does not have standing to bring the counterclaims against EchoStar for infringement of that patent.

## II. ANALYSIS

### *Summary judgment standard*

"Summary judgment is appropriate in a patent case, as in other cases, when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Nike, Inc. v. Wolverine World Wide, Inc., 43 F.3d 644, 646 (Fed. Cir. 1994); Fed. R. Civ. P. 56(c). The movant carries the initial burden and must show that there is "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "Only when that burden has been met does the burden shift to the non-

---

[4]In a column identifying the patents to be assigned by the 1998 Assignment, the '713 patent is listed with the words "only claims 1-18" right next to the patent number. Despite this clear language, Gemstar contends that this agreement conferred all rights to the '713 patent to Index Systems. As set forth later in this Order, the Court need not decide (1) whether the 1997 Agreement or the 1998 Assignment controls; or (2) whether the 1998 Assignment transfers all of the rights in the '713 patent to Index Systems.

3

moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Id.

### Standing to enforce a patent

In the realm of patents, only the "patentee" has standing under federal law to bring suit for infringement of a patent. See Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1483 (Fed. Cir. 1998); Ortho Pharmaceutical, 52 F.3d 1026, 1030 (Fed. Cir. 1995). The United States Code defines "patentee" to include the person to whom the patent was issued and also "successors in title to the patentee." 35 U.S.C. § 100 (2000). Thus, a party that has acquired rights to a patent may have standing to sue independent of the patent owner only if that party has obtained a sufficient interest. See Intellectual Prop. Devel., Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1345 (Fed. Cir. 2001). Assignment of less than all claims to a patent is not an assignment at all, but, rather, is a mere license which does not afford the licensee standing to sue for infringement. See Pope Manuf. Co. v. Gormully & Jeffery Manuf. Co., 144 U.S. 248 (1892). If the agreement cannot be considered an assignment, or transfers less than the whole of the patentee's rights, then the other party to the agreement is merely a

4

licensee who must seek enforcement of the patent only with the patentee or in the name of the patentee. See Ortho Pharmaceutical, 52 F.3d at 1030.

### *EchoStar's motion for summary judgment*

EchoStar argues that the 1997 Agreement controls and that Levine and Smart VCR's attempt to transfer rights to claims 1-18 to Index Systems under the 1998 Assignment is ineffective because a party cannot transfer that which he does not have. EchoStar relies upon the Supreme Court decision in Pope to argue that because GDC was assigned rights only to claims 1-18 of the '713 patent, GDC is a mere licensee who cannot sue for infringement without joining the patent owner.[5] The Court agrees.

The Court finds that the unambiguous documentation establishes that the 1997 Agreement assigned to GDC only claims 1-18 of the '713 patent. While it is not clear to the Court who owns claims 19-30 of the '713 patent, it is clear that the 1997 Agreement does not convey rights to claims 19-30 to GDC or any other counter-claimant. Thus, because GDC was assigned less than all the claims, and the patent owner was not joined in the suit, GDC is a mere licensee without standing to sue for infringement. See Pope, 144 U.S. 248. This conclusion is supported not only by the explicit limitation to claims 1-18 contained in the 1997 Agreement, but also by other terms of the 1997 Agreement, the 1993 License Agreement which is referenced in the 1997 Agreement, and statements of Gemstar's counsel.[6] Thus,

---

[5] Gemstar's only response to this motion is that the 1998 Assignment – rather than the 1997 Agreement – controls. This argument is addressed in the next section of this Order.

[6] In a letter dated September 20, 2002, Gemstar counsel acknowledged that "Gemstar does not own any rights to . . . claims 19-30 of the '713 patent."

5

EchoStar's motion for summary judgment that Gemstar lacks standing to enforce the '713 patent is GRANTED as to Defendant GDC.

### *Gemstar's motion to amend*

Gemstar, on the other hand, contends that the 1997 Agreement was canceled by consent of the parties, and the 1998 Assignment to Index Systems controls. Gemstar then argues that the 1998 Assignment transferred all of the rights to the '713 patent to Index Systems, who in turn, granted GDC an exclusive license to claims 1-18. Thus, Gemstar now contends that it, through its wholly-owned subsidiary Index Systems, is the owner of the entire '713 patent.[7] Gemstar seeks leave of Court to amend its answer and counterclaim to join Index Systems as a counter-claimant.

EchoStar opposes the motion to amend, arguing that amendment would be futile. According to EchoStar, even if Index Systems is the owner of the entire '713 patent (which EchoStar disputes) there is no evidence that Index Systems ever granted GDC an exclusive license. If GDC was not a licensee, then none of the four listed counter-claimants had standing at the time the counterclaim was filed, and therefore there was no constitutional standing at the outset of the case. When a party cannot demonstrate constitutional standing at the outset of the case, that party cannot amend to cure the standing defect, and the case must

---

[7] In its response to the summary judgment motion, Gemstar takes several positions inconsistent with those it has taken throughout this litigation. First, Gemstar represented numerous times in court pleadings, discovery papers, and correspondence that its right to assert the '713 patent was based on the 1997 Agreement. Now, Gemstar asserts that the 1997 Agreement does not control and was rescinded by the parties. Second, Gemstar previously claimed that GDC's rights in the patent came from an assignment from Smart VCR and Levine. Now it claims that GDC's rights came from an exclusive license from Index System. Finally, although Gemstar counsel acknowledged that Gemstar had "no rights" in claims 19-30, Gemstar now claims that it owns the rights to all the claims of the '713 patent.

6

AO 72A
(Rev.8/82)

be dismissed. See Paradise Creations, Inc. v. U V Sales, Inc., 315 F.3d 1304, 1309 (Fed. Cir. 2003).

The Court finds that there is no competent evidence that Index Systems ever granted any rights to GDC. Gemstar's documentary evidence on this point consists of an unauthenticated, unsigned draft agreement between Index Systems and GDC, and there is no evidence that the agreement was ever executed. Thus, accepting Gemstar's new theory that Index, not GDC, is the assignee of the patents, there does not appear to be any license to any of the counter-claimants as of the date the counterclaims were filed. Accordingly, there was no constitutional standing at the outset of the case, and under Paradise Creations, Gemstar cannot cure this procedural defect through amendment of the pleadings. Accordingly, Gemstar's motion to amend is DENIED.

### III. CONCLUSION

For the reasons set forth above, EchoStar's motion for summary judgment that Gemstar lacks standing to enforce patent number '713 [191] as to claims raised by Gemstar-TV Guide International, Inc., TV Guide, Inc., and StarSight Telecast, Inc. is GRANTED AS UNOPPOSED. EchoStar's motion for summary judgment that counter-claimant Gemstar Development Corp. lacks standing to enforce patent number '713 [191] is GRANTED. Gemstar's motion to amend its answer and counterclaim [199] is DENIED. EchoStar's motion to file additional evidence [225] is GRANTED.

It is so ORDERED this _10_ day of June, 2003.

Willis B. Hunt, Jr.
Judge, United States District Court

7

# REDACTED

# REDACTED

# REDACTED



Wednesday December 10, 6:58 am Eastern Time

**Company Press Release**

*SOURCE: clickTV*

## clickTV Website Adds 11,000 Cable System, Broadcast and DBS Lineups to Its TV Listings

### ZIP Code Selection of Local TV Information Now Available

QUEENSBURY, N.Y., Dec. 10 /PRNewswire/ -- clickTV's TV listings now feature more than 11,000 cable, broadcast and DBS lineups, which users select by typing in their ZIP code. The clickTV Website, which features two weeks of searchable TV listings updated daily, is located at http://www.clicktv.com and is a service of TVData, the TV information provider.

"Users can now select actual channel lineups for their area, with dial positions," says Kenneth Carter, senior vice president of business development for TVData. "The addition of this extensive collection of local lineups, along with powerful personalization tools and daily updates, makes clickTV the ideal destination for television fans looking for current, local TV information."

New convenient administrative features on clickTV allow users to edit their logon information, and to allow clickTV to remember it, so they won't have to. Several personalization features have also been added, including display options for how much descriptive text appears in a TV grid or search result. Search results can now be displayed chronologically, alphabetically or categorically.

clickTV users can already create personalized program listings by choosing the number and display order of channels, excluding channels they don't use and sorting channels in a TV grid by dial position, call letters or type of channel. clickTV's listings grids can also be customized by hour, type size, width and depth.

Other key features on clickTV include a comprehensive search engine, the ability to save favorite searches, a reminder file for keeping track of air times for favorite programs, links to pertinent details on programs and links to performers and directors that provide a list of all shows he or she is appearing in for the current and following week. Listings information is updated on clickTV's server early each morning, ensuring the inclusion of late-breaking programming changes such as sports playoff updates.

clickTV is also available as co-branded local content for newspapers, cable systems, Internet service providers and other commercial Websites.

The data source for clickTV's listings is TVData's comprehensive television information database, which is the largest in the world. It contains 1.4 million programs, 4,800 station and network schedules, and 11,000 cable system channel lineups. The data is maintained and updated 24 hours a day, seven days a week, by a staff of 120 editors.

TVData is the leading provider of television listings, information services and entertainment features to the

TMS 0015689

online, electronic, newspaper, cable and entertainment industries. Every day more than 100 million viewers refer to TVData's listings. More information on TVData is available at the company's Website, located at http://www.tvdata.com.

*SOURCE: clickTV*

**Related News Categories:** entertainment, internet

Help

Copyright © 1997 PRNewswire. All rights reserved. Republication or redistribution of PRNewswire content is expressly prohibited without the prior written consent of PRNewswire. PRNewswire shall not be liable for any errors or delays in the content, or for any actions taken in reliance thereon.
Important Disclaimers and Legal Information
Questions or Comments?

YAHOO!

TMS 0015690

**REDACTED**

# REDACTED

# **REDACTED**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


TV GUIDE ONLINE, INC., AND        )

TV GUIDE ONLINE, LLC,             )

        Plaintiffs,        )   Case No.

       vs.                     )   05-725-KAJ

TRIBUNE MEDIA SERVICES, INC.,     )   Pages 1 to 204

       Defendant.          )


TRANSCRIPT DESIGNATED CONFIDENTIAL


VIDEO DEPOSITION OF TV GUIDE ONLINE, INC.,

THROUGH ITS PERSON MOST KNOWLEDGEABLE,

SAMIR ARMALY

TAKEN ON

WEDNESDAY, OCTOBER 18, 2006


Reported by:  BRENDA R. COUNTZ, RPR-CRR

CSR NO. 12563

# REDACTED

# REDACTED

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


TV GUIDE ONLINE, INC.      )
AND TV GUIDE ONLINE, LLC,)
                          )
        Plaintiffs,       )
                          )
        -vs-              ) C.A. No:  05-CV-725-KAJ
                          )
TRIBUNE MEDIA SERVICES,   )
INC.,                     )
                          )
        Defendant.        )


        The Videotaped Deposition of BARBARA

NEEDLEMAN, taken in the above-entitled case before

KATHLEEN J. PACULT, a Certified Shorthand Reporter

within and for the County of Cook, State of

Illinois, taken pursuant to the provisions of the

Federal Code of Civil Procedure and the Rules of the

Supreme Court thereof pertaining to the taking of

depositions for the purpose of discovery, taken on

the 29th day of September 2006, at the hour of 9:08

a.m., at 200 East Randolph, Chicago, Illinois.


VERITEXT CORPORATE SERVICES  (800)  567-8658

C-29

5fcc2483-825c-4193-8809-2b76c271bbcd

# REDACTED

Mark Kaplinsky   October 05, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


TV GUIDE ONLINE, INC, and TV        )
GUIDE MEDIA SERVICES, LLC,          )
                                    )
        Plaintiffs,                 )
                                    )
    vs.                             )C.A. No. 05-
                                    )CV-725-KAJ
TRIBUNE MEDIA SERVICES, INC.,       )
                                    )
        Defendant.                  )
_____ )


VIDEOTAPED DEPOSITION OF MARK KAPLINSKY

Taken on Thursday, October 5, 2006

At 1:36 p.m.

At Courtyard Marriott
3275 Paradise Road

Las Vegas, Nevada


Reported by:  Maria C. Wooley, CCR NO. 488

LegaLink, a Merrill Communications Company
Tel: 312-263-3524 Fax: 312-263-3544

b7be60d0-d0fc-4410-a882-a593979157fd

Mark Kaplinsky   October 05, 2006

Page 62

1    the technology and it introduced us to all the
2    players in the industry, including TV Data, TMS,
3    TV Listings, Gemstar, AT&T, numerous other
4    companies that are smaller, and ultimately
5    fostered an agreement between us and Tribune
6    Media Services, the company you represent, and
7    which we contracted with later on for five
8    years. And that was very successful, both for
9    us also for TMS.
10         So in the sense that it got us to
11   the next step, very successful. In the sense
12   that it in and of itself was a successful
13   product, not in the economic sense.
14         Q. You mentioned the system we were
15   talking about that Exhibit 26 is the user's
16   guide for, that was the DOS system; is that
17   correct?
18         A. Yes, right, only the DOS system.
19         Q. Now, you mentioned some work that
20   you did with CompuServe and I'd like to talk
21   about that now.
22         A. Right.
23         (Defendant's 30 was marked
24           for identification.)
25   ///

Page 63

1    BY MS. DeBRUIN:
2         Q. I'm handing you an exhibit that I
3    have marked as Exhibit No. 30. For the record,
4    it bears production numbers TMS 8754 through TMS
5    8756.
6         Do you recognize Exhibit 30?
7         A. Yes.
8         This is the press release that we
9    designed for CompuServe, and it's a -- the
10   overall form of it is it's a fax of the sales
11   brochure or sales flier or press release that we
12   made for our introduction to CompuServe, being
13   sent to Dick Guay of TV Data.
14         And as I said, we always --
15   everything we did publically, we kept them
16   informed. We always faxed them everything that
17   went out to anybody, lawyers, CompuServe,
18   whoever.
19         Q. Do you have any -- how did you first
20   start working with CompuServe?
21         A. When we first put out the package in
22   Manhattan, we ended up with a lot of very
23   influential, a limited number I say -- the
24   number wasn't great, but the quality of the
25   customer was extraordinary.

Page 64

1         We had a lot of reporters for major
2    newspapers and cable companies and directors and
3    people who were in the industry. And one of the
4    people we had was the author of -- was either
5    the publisher or -- it was the editor of Video
6    Review Magazine, a national magazine. And Video
7    Review did a review of our product based on our
8    New York release and wrote a national article,
9    and at that point we started getting calls from
10   all over the country based on that article.
11         And one of those calls was from Dawn
12   Gordon, Dawn, D-a-w-n, Dawn Gordon of
13   CompuServe, and she said she'd like to use our
14   package in her consumer electronics form on
15   CompuServe.
16         (Defendant's 31 was marked
17           for identification.)
18   BY MS. DeBRUIN:
19         Q. I'm handing you a document I've
20   marked as Exhibit 31.
21         Is Exhibit 31 a copy of the Video
22   Review article that you were referring to?
23         A. Yes, it is.
24         Q. Did Miss Gordon contact you?
25         A. Yes, she did.

Page 65

1         Q. Did you ultimately end up working
2    with CompuServe?
3         A. Yes, we did.
4         Q. And how did the CompuServe system
5    differ from the DOS system that you've described
6    for us earlier?
7         A. It was -- well, there were many
8    differences. There were differences forced upon
9    us by the nature of CompuServe as a distribution
10   mechanism.
11         And then there were practical
12   considerations based on the fact that we were
13   going from just the New York area to the
14   national listings.
15         And then there was a wish list based
16   on the technical sophistication of the
17   CompuServe user base, and each one of those had
18   put upon us specific requirements. So let me
19   take them in order, if I may.
20         Our bulletin board was proprietary
21   and used proprietary mechanisms between the user
22   and the bulletin board itself. None of that
23   could be used with CompuServe.
24         In fact, the DOS program itself was
25   keyed specifically to our bulletin board and was

17  (Pages 62 to 65)

LegaLink, a Merrill Communications Company
Tel: 312-263-3524 Fax: 312-263-3544

b7be60d0-d0fc-4410-a882-a593979157fd

C-32

Mark Kaplinsky    October 05, 2006

Page 66

1  incompatible with CompuServe. So we immediately
2  had to strip out the whole bulletin board
3  protocol, then we had to make the files in a
4  format such that people could download the
5  proper channels from CompuServe.
6      Well, we found much to our horror
7  that there were 10,000 channel lineups, and we
8  weren't going to be able to put out 10,000 files
9  every week. So what we did is we put -- linked
10  them together and we served the national
11  listings represented by what you might see on a
12  satellite TV and 13 major demographic areas like
13  Washington, D.C. and Baltimore and Philadelphia,
14  Atlanta, Denver, Los Angeles, San Francisco, the
15  largest 13 cities by demographic areas and then
16  some of the outlying areas.
17      And then because of the technical
18  sophistication of the CompuServe users, they
19  demanded that the system be done in Windows, and
20  Windows was just becoming -- just coming into
21  its own at the time, Windows 3.1.
22      And prior to that, it wasn't
23  really -- well, I mean this will be my own
24  opinion, but it had many, many bugs in it prior
25  to 3.1. 3.0 was considered to be the first

Page 67

1  useful version.
2      And so we recoded our system and we
3  did it in Windows, and we did an extensive
4  rewrite and we took all of these different
5  considerations in mind. And so the mechanism
6  for requesting the files changed, the protocols
7  changed, and basically we abandoned or DOS
8  program and we just pretty much kept it in
9  Windows. Although we did provide the DOS
10  program, very few people used it.
11      And then we had one other version
12  which we call PEG Speak, and that was
13  specifically designed for blind people, and that
14  was designed for talking machines. That's a
15  whole different thing like that.
16  Q. On the CompuServe system, did you
17  have anything that was comparable to the key
18  that you had in the DOS system?
19  A. Right.
20      Instead of us having to -- we had no
21  way of providing the disk to each customer, that
22  is, uploading an entire program and program
23  files and disk files was unwieldy.
24      So what we did is we compressed all
25  of the information that was necessary to support

Page 68

1  that customer into a very short key file, which
2  also included an encryption or D encryption key
3  or a key and we called it the key file. And
4  within that key file is the same sort of code
5  that I showed you on the envelope here, 718 QO,
6  or like in New York it would be 212 MO, M
7  standing for Manhattan Cable TV, 212 being the
8  Area Code of Manhattan and 0 being the basic
9  lineup.
10      And that particular code was put in
11  this little short key file of maybe only a
12  thousand bytes, 1,000 characters long, and to
13  each and every customer we would send the key
14  file.
15      So people would say or e-mail to us:
16  Please send me the key to Denver, and we'd give
17  them the Denver key. Now, the Denver key
18  included many, many, let's say, 100 channels,
19  and at that point our system was not keyed by
20  cable system. Our system was keyed by
21  demographic area. And we left it up to the end
22  user to arrange the channels in the order of
23  their particular lineup.
24      Again, so we couldn't put out the
25  10,000 different lineups that existed in the

Page 69

1  country, so we'd only issue I think 13
2  demographic areas or perhaps four national. For
3  example, I think it's four national satellite
4  listings, like Dish TV, Direct TV, or whatever
5  their predecessors were. I forget the exact
6  ones -- oh, C band TV, things like that. So
7  there was about 15, 16 lineups in general, and
8  then people would mix and match those files.
9      Now, the way they requested those
10  files were they would type -- we had to use the
11  standard mechanism that CompuServe provided. We
12  didn't have any other way of doing it.
13      What I would have loved to have done
14  would have been, you know, if you're in Detroit,
15  press 13. But what would happen is if you're in
16  Detroit, you had to ask for the file by name and
17  that would have been PEG DT for Detroit, and
18  then three numbers which corresponded to the
19  week, dot zip.
20      And it was wieldy, but it was
21  something that CompuServe customers were very
22  used to, as they downloaded a lot in that
23  format. So that's how the customers downloaded
24  the proper file.
25  ///

18 (Pages 66 to 69)

LegaLink, a Merrill Communications Company
Tel: 312-263-3524 Fax: 312-263-3544

b7be60d0-d0fc-4410-a882-a593979157fd

C-33

Mark Kaplinsky    October 05, 2006

Page 62

1  the technology and it introduced us to all the
2  players in the industry, including TV Data, TMS,
3  TV Listings, Gemstar, AT&T, numerous other
4  companies that are smaller, and ultimately
5  fostered an agreement between us and Tribune
6  Media Services, the company you represent, and
7  which we contracted with later on for five
8  years. And that was very successful, both for
9  us and also for TMS.
10      So in the sense that it got us to
11  the next step, very successful. In the sense
12  that it in and of itself was a successful
13  product, not in the economic sense.
14      Q.  You mentioned the system we were
15  talking about that Exhibit 26 is the user's
16  guide for, that was the DOS system; is that
17  correct?
18      A.  Yes, right, only the DOS system.
19      Q.  Now, you mentioned some work that
20  you did with CompuServe and I'd like to talk
21  about that now.
22      A.  Right.
23          (Defendant's 30 was marked
24           for identification.)
25  ///

Page 63

1  BY MS. DeBRUIN:
2      Q.  I'm handing you an exhibit that I
3  have marked as Exhibit No. 30. For the record,
4  it bears production numbers TMS 8754 through TMS
5  8756.
6          Do you recognize Exhibit 30?
7      A.  Yes.
8          This is the press release that we
9  designed for CompuServe, and it's a --
10  overall form of it is it's a fax of the sales
11  brochure or sales flier or press release that we
12  made for our introduction to CompuServe, being
13  sent to Dick Guay of TV Data.
14          And as I said, we always --
15  everything we did publicly, we kept them
16  informed. We always faxed them everything that
17  went out to anybody, lawyers, CompuServe,
18  whoever.
19      Q.  Do you have any -- how did you first
20  start working with CompuServe?
21      A.  When we first put out the package in
22  Manhattan, we ended up with a lot of very
23  influential, a limited number I say -- the
24  number wasn't great, but the quality of the
25  customer was extraordinary.

Page 64

1          We had a lot of reporters for major
2  newspapers and cable companies and directors and
3  people who were in the industry. And one of the
4  people we had was the author of -- was either
5  the publisher or -- it was the editor of Video
6  Review Magazine, a national magazine. And Video
7  Review did a review of our product based on our
8  New York release and wrote a national article,
9  and at that point we started getting calls from
10  all over the country based on that article.
11          And one of those calls was from Dawn
12  Gordon, Dawn, D-a-w-n, Dawn Gordon of
13  CompuServe, and she said she'd like to use our
14  package in her consumer electronics form on
15  CompuServe.
16          (Defendant's 31 was marked
17           for identification.)
18  BY MS. DeBRUIN:
19      Q.  I'm handing you a document I've
20  marked as Exhibit 31.
21          Is Exhibit 31 a copy of the Video
22  Review article that you were referring to?
23      A.  Yes, it is.
24      Q.  Did Miss Gordon contact you?
25      A.  Yes, she did.

Page 65

1      Q.  Did you ultimately end up working
2  with CompuServe?
3      A.  Yes, we did.
4      Q.  And how did the CompuServe system
5  differ from the DOS system that you've described
6  for us earlier?
7      A.  It was -- well, there were many
8  differences. There were differences forced upon
9  us by the nature of CompuServe as a distribution
10  mechanism.
11          And then there were practical
12  considerations based on the fact that we were
13  going from just the New York area to the
14  national listings.
15          And then there was a wish list based
16  on the technical sophistication of the
17  CompuServe user base, and each one of those had
18  put upon us specific requirements. So let me
19  take them in order, if I may.
20          Our bulletin board was proprietary
21  and used proprietary mechanisms between the user
22  and the bulletin board itself. None of that
23  could be used with CompuServe.
24          In fact, the DOS program itself was
25  keyed specifically to our bulletin board and was

17 (Pages 62 to 65)

LegaLink, a Merrill Communications Company
Tel: 312-263-3524  Fax: 312-263-3544

b7be60d0-d0fc-4410-a882-a593979157fd

C-34

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TV GUIDE ONLINE, INC.        )
AND TV GUIDE ONLINE, LLC,)
                             )
        Plaintiffs,          )
                             )
        -vs-                 )  C.A. No:  05-CV-725-KAJ
                             )
TRIBUNE MEDIA SERVICES,      )
INC.,                        )
                             )
        Defendant.           )


        The Videotaped Deposition of GARY

TJADEN, taken in the above-entitled case before

KATHLEEN J. PACULT, a Certified Shorthand Reporter

within and for the County of Cook, State of

Illinois, taken pursuant to the provisions of the

Federal Code of Civil Procedure and the Rules of the

Supreme Court thereof pertaining to the taking of

depositions for the purpose of discovery, taken on

the 15th day of June 2007, at the hour of

8:04 a.m., at 200 East Randolph, Chicago, Illinois.

**Page 50**

1  A.  I have it.
2  Q.  There is a sentence that I'm going to
3  read into the record. "For example, a 'search' of
4  the information cannot be performed by a
5  commercially available database manipulation program
6  running on the user's personal computer to identify
7  or select a particular television program based on
8  some property of the program, such as time, title,
9  subject or provider."
10      You stand by that sentence?
11  A.  Yes.
12  Q.  Okay. You are familiar with the
13  operation of zap2it.com, correct?
14  A.  Yes.
15  Q.  Now, I want you to assume that we are
16  in my house in New Jersey where I have a computer in
17  my living room, near the TV. And it is a Sunday
18  afternoon in October, 3 o'clock Eastern Time, and I
19  enter my zip code into zap2it and get information
20  about what is on television in Montclair, New
21  Jersey.
22      Do you follow me so far?
23  A.  I understand.
24  Q.  Okay. Now, what will appear on my

**Page 51**

1  screen if I do that?
2  A.  Displayed on your screen, if it is the
3  same as what is displayed on my screen, is a grid of
4  television programs. Actually, what is displayed on
5  your screen, as I recall, is another screen that
6  asks you to select your provider of television
7  programming. I believe that's the next screen.
8  Q.  And I do that and get the list of
9  television shows that you are talking about.
10  A.  For --
11  Q.  Montclair, New Jersey, Sunday
12  afternoon in October.
13  A.  For your zip code and the program
14  provider that you selected. You get a grid showing
15  television programs.
16  Q.  Are you a football fan?
17  A.  Not really.
18  Q.  Do you ever watch football games on
19  Sunday afternoon?
20  A.  No, not anymore. I used to.
21  Q.  You know that in October on Sunday at
22  3 o'clock Eastern Time, there is a couple football
23  games on.
24  A.  Usually. I wouldn't be surprised.

**Page 52**

1  Q.  Okay. So I have gotten this grid,
2  that you call it, up on the screen. And I unplug, I
3  disconnect any access of my computer to the
4  internet. You follow me?
5      The grid will stay on the screen,
6  correct?
7  A.  As long as you don't close your
8  browser or turn off your computer.
9  Q.  And I want you to assume that I have a
10  browser provided by the Microsoft Corporation. Is
11  that familiar to you?
12  A.  Internet Explorer, for example.
13  Q.  Yes.
14      Are you familiar with the find
15  feature of Internet Explorer?
16  A.  Not really, no.
17  Q.  If you hit control left, do you know
18  what happens with Internet Explorer?
19  A.  No, I don't.
20  Q.  Would it surprise you if using
21  Internet Explorer, the find feature, I could search
22  the word "football" and find football games from
23  that grid. Would that surprise you?
24  A.  Yes.

**Page 53**

1  Q.  That would surprise you?
2  A.  Yes.
3  Q.  Okay. If that turned out to be the
4  case, would you agree that I was finding -- I was
5  searching the grid to find football games?
6  A.  What do you mean by searching?
7  Q.  You used the word "search" in here.
8  A.  Searching --
9  Q.  Looking for.
10  A.  -- in the sense of querying a database
11  stored in permanent memory on a personal computer,
12  for example? Is that what you mean?
13  Q.  How did you use the word "searching"
14  here? In Paragraph 88 and 89, how did you define
15  the word "search"?
16  A.  A commercially available database
17  manipulation program running on the user's personal
18  computer to identify or select.
19  Q.  Is that how you use the word "search"
20  in ordinary conversation?
21  A.  Are you asking me about this question
22  or in ordinary conversation?
23  Q.  What does the word "search" mean in
24  ordinary conversation to you?

14 (Pages 50 to 53)

VERITEXT CORPORATE SERVICES (800) 567-8658

C-36

2ce753b6-39a5-4cfb-9b5a-df170105a7c2

**Page 54**

1  A.  The plain and ordinary meaning of the
2  word "search" would be something like look for.
3  Q.  Right.  Now, would you agree that I
4  could use Internet Explorer to look for the words
5  "football" in a zap2it grid?
6  A.  I was going to say, I don't know, I
7  have never done that.
8  Q.  You have no understanding one way or
9  the other?
10  A.  That's correct.  However, as I recall
11  your question was, is that searching in the sense of
12  this sentence.  And I certainly wouldn't consider
13  Internet Explorer to be a commercially available
14  database manipulation program.  So in the sense of
15  this sentence, you would not be doing searching.
16  Q.  Why would you not consider Internet
17  Explorer to be a commercially available database
18  manipulation program?
19  A.  Well, it is an internet browser.  It
20  only knows what is in an HTML file that is sent to
21  it.  When one closes the internet browser, unless
22  one takes special measures, that file is no longer
23  available.  It -- Internet Explorer is not something
24  that anyone skilled in the art, that I can imagine,

**Page 55**

1  would consider to be a commercially available
2  database manipulation program.  It is an internet
3  browser.
4  Q.  Okay.  When you are explaining -- in
5  Paragraph 88 you are applying your definition of the
6  receive/receiving limitations about performing
7  database-type manipulations, blah, blah, blah,
8  right?
9  A.  That's correct.
10  Q.  Okay.  And one of the manipulations
11  you are identifying in Paragraph 88 and again in
12  Paragraph 89 is searching, correct?
13  A.  The word "search" appears in
14  Paragraph 88 and "searching" appears in
15  Paragraph 89.
16  Q.  And that's -- searching is a type of
17  manipulation in those photographs, correct?
18  A.  Searching here is regarding what is
19  called database, referring to database
20  manipulations.
21  Q.  Okay.
22  A.  Of a -- using a database program.
23  Q.  So in your construction, performing
24  database-type manipulations, that would subsume

**Page 56**

1  searching, correct?
2  A.  That refines or constrains what
3  searching means to be a query against a database
4  using a database manipulation program.
5  Q.  Okay.  So is your construction
6  manipulations using a database manipulation programs
7  or is it just manipulations?
8  A.  My construction is intended to be what
9  the prosecution history used, which says, "Thereby,
10  enabling an operator to perform database-type
11  manipulations directly on this information."
12  Q.  Okay.  Does the prosecution history
13  say anything about commercially available database
14  manipulation tools that are something more than
15  Internet Explorer?
16  A.  Internet Explorer did not exist at the
17  time the patent was filed.
18  Q.  Okay.
19  A.  The patent is not going to refer to
20  Internet Explorer.
21  Q.  Okay.  What is it about Internet
22  Explorer that doesn't do enough stuff, in your mind,
23  to be a database manipulation tool?
24  A.  It doesn't accept SQL queries.

**Page 57**

1  Q.  Anything else?
2  A.  It doesn't accept queries for
3  information contained in multiple data files such
4  that part of the information is in one -- to be
5  returned is in one file and part of it is to be in
6  another.
7  Q.  Anything else?
8  A.  Not that I can think of off the top of
9  my head.
10  Q.  Okay.  Does the prosecution history
11  snippet that you referred to say anything about
12  accepting SQL queries?
13  A.  It says what it says.
14  Q.  I mean does it say anything about
15  accepting SQL queries?
16  A.  It doesn't use the phrase "SQL."
17  Q.  Does anything about the prosecution
18  history snippet that you referred to talk about
19  accepting queries from information contained in
20  multiple data files such that part of the
21  information to be retrieved is in one file and part
22  of it is in another?
23  A.  The prosecution history uses the
24  phrase "perform database-type manipulations."  The

15  (Pages 54 to 57)

Page 58

1  issue is, what would that mean to a skilled artisan
2  in this time frame? In this time frame that would
3  mean, to a skilled artisan, for example, the items I
4  mentioned about what database programs do to
5  manipulate data.
6     Q.  Well, if the judge is going to
7  instruction the jury on how to apply the claim
8  construction that you proposed, the phrase "perform
9  database-type manipulations directly on the
10  transferred data without being connected to the
11  original source of the data," the jury would have to
12  then understand, in your opinion, that the
13  database-type manipulations have to be such that
14  they accept SQL queries and accept queries of the
15  information contained in multiple data files, such
16  that part of the information to be retrieved is in
17  one file and part is in another, is that right?
18     MR. PARKS:  Objection to the form of
19  the question.
20  BY THE WITNESS:
21     A.  I am not in a position to say what the
22  jury needs to understand to make their decision.
23  BY MR. HARNETT:
24     Q.  But you are not satisfied with just

Page 59

1  the words "database manipulations." Database
2  manipulations, in your mind, has to be expanded to
3  explain those concepts about SQL commands and
4  multiple data files?
5     A.  Not in my mind.
6     Q.  That's the way you understand it.
7     A.  A skilled artisan reading this would
8  understand it to be what I just explained to you it
9  is.
10     Q.  Okay. And they would understand that
11  search, in your mind, doesn't just mean take a
12  parameter and look for it?
13     A.  They would understand that
14  database-type manipulations doesn't just mean that.
15     Q.  A skilled worker doesn't understand
16  you can search a database by a key word?
17     A.  A skilled artisan would understand
18  that, yes.
19     Q.  Okay. So if you take a block of text
20  and search a key word, is that a database-type
21  manipulation?
22     A.  Not necessarily. It would depend on
23  how that's done.
24     Q.  So it is a database-type manipulation

Page 60

1  of a certain type you are talking about?
2     A.  Of a database type. I don't know how
3  else to explain it. We could go to some textbooks
4  and study up on it, but...
5     Q.  Okay. Did you refer to any textbooks
6  in here about database-type manipulations?
7     A.  Yes. In one or more of the reports, I
8  referred to textbook by Professor Knuth who, in the
9  1970s, taught university courses in databases and
10  talked about what a query is and what a database
11  system is and how they were used and so forth.
12     Q.  And that was in the '70s?
13     A.  That was in the '70s when that version
14  of his textbook was published.
15     Q.  But this is the '90s we are talking
16  about here, right? The patent, the date where the
17  ordinary skilled worker --
18     A.  The priority date of this patent is in
19  1992.
20     Q.  So you are talking about two decades
21  earlier, right?
22     A.  I'm talking about what a skilled
23  artisan would know long before this patent was
24  filed.

Page 61

1     Q.  Okay. I understand.
2         All right. Now, you talk about,
3  in Paragraph 88, "A search of the information cannot
4  be performed by a commercially available database
5  manipulation program running on the user's personal
6  computer to identify or select a particular
7  television program based on some property of the
8  program, such as title, subject or provider."
9         That's what you wrote, correct?
10     A.  That's what that statement says,
11  correct.
12     Q.  Would you agree that football is the
13  subject of a football game on television?
14     A.  Football is a subject or topic, yes.
15     Q.  Okay. And if I were to search title,
16  and if title was to appear -- title of a television
17  program, if I were to search the Sopranos and find
18  the Sopranos from a grid provided by zap2it, the
19  title Sopranos would be a title within the meaning
20  of what you wrote in Paragraph 88, correct?
21     A.  Yes.
22     Q.  Okay. Let's look at the next two
23  definitions, controller and controller being program
24  to perform.

16  (Pages 58 to 61)

VERITEXT CORPORATE SERVICES  (800)  567-8658

2ce753b6-39a5-4cfb-9b5a-df170105a7c2